1  [Submitting Counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION | Case no. 24-MD-3101-JSC |
| This Document relates to: | MDL 3101 |
| *Watkins, et. al v. Nurture, LLC, et al.* Case No. 3:24-cv-02832-JSC | Hon. Jacqueline Scott Corley |
| | **THIRD AMENDED PETITION** |

## INTRODUCTION

1.     This case involves two manufacturers, Hain Celestial Group, Inc. and Nurture, LLC (collectively "Defendant Baby Food Manufacturers," or "Manufacturer Defendants") and two retailers that *knowingly* sold baby food products ("Baby Foods") which contain dangerous levels of toxic heavy metals—mercury, [1] lead, arsenic, and cadmium (collectively "Toxic Heavy Metals"), which are all known to be severe neurotoxins—and how such toxic exposures caused or substantially contributed to Plaintiff developing lifelong brain damage and neurodevelopmental disorders. The products of these Baby Food Manufacturers were retailed by Amazon.com Services, LLC and Whole Food Market Services, Inc. (collectively "Retailer Defendants"). The four

---

[1] To be clear, the type of organic mercury at issue here is methylmercury found in food, not ethylmercury contained in the thimerosal vaccine. Ethylmercury is rapidly excreted from the body and is not considered as toxic as methylmercury. Ethylmercury and vaccines are irrelevant to this litigation.

Defendants are collectively referred to as "Defendants." Plaintiff JMW ("Plaintiff"), represented in this lawsuit by his parents and guardians *ad litem*, is a five-year-old boy who lives with several neurological and cognitive injuries, including lowered IQ and debilitating Autism Spectrum Disorder ("ASD") because he consumed poisonous Baby Foods manufactured, marketed, and sold by these Defendants. This case seeks to hold the Defendants accountable for their reprehensible conduct and ensure they are punished for permanently affecting Plaintiff's ability to live a fulfilling life.

2.    That Defendants' Baby Foods are contaminated with staggering amounts of Toxic Heavy Metals recently made headlines following research and a Congressional investigation. In February 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, released a report containing shocking details of Defendants' tainted Baby Foods based on the submission of internal test results and company documents. Specifically, the Subcommittee found that Defendants sold Baby Foods containing as much as 180 parts per billion ("ppb")[2] inorganic arsenic, 641 ppb lead, and 10 ppb mercury, and manufacture their Baby Foods using ingredients containing as much as 913.4 ppb arsenic and 886.9 ppb lead, far eclipsing domestic and international regulatory standards. By way of comparison, the U.S. Food and Drug Administration ("FDA") has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the U.S. Environmental Protection Agency ("EPA") has capped the allowable level of mercury in drinking water at 2 ppb. With a chilling note the Subcommittee concluded that "[m]anufacturers *knowingly* sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[3]

3.    The high levels of Toxic Heavy Metals found in Defendants' Baby Foods are, in

---

[2] Ppb (or ppb) is used to measure the concentration of a contaminant in soils, sediments, and water. 1 ppb equals 1 μg (microgram) of substance per kg of solid (μg/kg). For the average baby weighing approximately 3kg, the quantities of Toxic Heavy Metals found in Defendants' Baby Foods, as explained below, pose significant health risks.
[3] Staff Report, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021) ("Subcommittee Report") at 59 (emphasis added).

part, a function of the ingredients used by Defendants to manufacture their Baby Foods, the setting of dangerously inflated internal limits which Defendants willingly flouted, disregard of regulatory standards, and corporate policies which failed to test finished products before market distribution, purchase by unknowing parents, and consumption by vulnerable infants.

4.     Defendants' malicious recklessness and callous disregard for human life has wreaked havoc on the health of countless vulnerable children, all so that Defendants could maximize profits while deliberately misleading parents regarding the safety of the Baby Foods they manufactured and sold. Accordingly, this lawsuit will not only ensure that Plaintiff is duly compensated for his tragic injuries and Defendants punished, but that future generations are protected from the poisonous products that Defendants pander as "food."

## **Parties**

### A. Plaintiff

5.     Plaintiff is a citizen of Louisiana and no other state and currently resides in New Orleans, Louisiana. Defendants' Baby Foods consumed by Plaintiff were purchased in New Orleans, Louisiana and consumed by Plaintiff in New Orleans, Louisiana.

### B. Defendants

6.     Defendant Hain Celestial Group, Inc. ("Hain") is a citizen of Delaware and Colorado with its principal place of business in Boulder, Colorado. Hain sells Baby Foods under the brand name Earth's Best Organics. Hain offers infant and baby formula and foods as well as toddler foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on the go." At all relevant times, Hain has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Louisiana and Orleans Parish.

7.     Defendant Nurture, LLC ("Nurture") is a Delaware limited liability company. Nurture owns Happy Family Brands (including Happy Family Organics) and sells Baby Foods under the brand name HappyBaby. Nurture classifies its Happy Baby range of products according to three categories: "baby," "tot," and "mama." The "baby" category is comprised of foods, including "starting solids," intended for age groups 0-7+ months, the "tot" category covers 12+

months, and "mama" includes infant formulas for newborn babies. At all relevant times, Nurture has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of HappyBaby within the State of Louisiana and Orleans Parish.

8.    Defendant Whole Food Market Services, Inc. ("Whole Foods") is a Texas corporation with its principal place of business in Austin, Texas. At all relevant times, Whole Foods retailed the Manufacturer Defendants' Baby Foods online and at its stores throughout Louisiana. At all relevant times, Whole Foods has conducted business and derived substantial revenue from its retailing of Baby Foods within the State of Louisiana and Orleans Parish. Whole Foods is a wholly owned subsidiary of Amazon.

9.    Defendant Amazon.com Services LLC ("Amazon") is a limited liability company organized under the laws of Delaware and having its principal place of business in the State of Washington. The sole member of Amazon.com Services LLC is Amazon.com Sales, Inc., which is a Delaware corporation having its principal place of business in the State of Washington. Amazon is authorized to and doing business in Orleans Parish and the State of Louisiana. At all relevant times, Amazon has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Louisiana and Orleans Parish.

10.    The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendants DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiff at this time, who therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiff for the acts and omissions alleged herein below, and the resulting injuries to Plaintiff, and damages sustained by Plaintiff. Plaintiff will amend this Complaint to allege the true names and capacities of said DOE Defendants when that same is ascertained. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of Louisiana and including Orleans Parish, and

THRID AMENDED PETITION

said Defendants derived and derive substantial revenue therefrom.

## JURISDICTION AND VENUE

11.    Plaintiff originally filed this case in the Orleans Civil District Court in Orleans Parish, Louisiana. Venue is proper in that court under La. C.C.P. art. 74 because a substantial part of the events or omissions giving rise to this claim occurred in Orleans Parish, Louisiana, and because the damages sustained as a result of tortious and wrongful conduct complained of herein were sustained in Orleans Parish, Louisiana.

12.    A Louisiana Court's exercise of personal jurisdiction over these Defendants is proper under La. R.S. § 13:3201 because Defendants have sufficient minimum contacts with the State of Louisiana and intentionally availed themselves of the market within Louisiana through the promotion, sale, marketing, and distribution of their products. Additionally, Defendants caused tortious injury by acts and omissions in this judicial jurisdiction and caused tortious injury in this jurisdiction by acts and omissions outside this jurisdiction while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or co-owned and services rendered in this jurisdiction.

13.    On March 4, 2022, Defendants removed this case to the United States District Court for the Eastern District of Louisiana, alleging diversity jurisdiction. Plaintiff thereafter moved to remand. The District Court denied that motion on March 22, 2024, without issuing reasons for the denial. Plaintiff files this Second Amended Petition without waiving any future right to seek remand to the Orleans Civil District Court in Orleans Parish, Louisiana.

## FACTUAL ALLEGATIONS

### I.    Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods.

14.    In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing

THRID AMENDED PETITION

"outcomes- based programs to measurably reduce babies' exposures to toxic chemicals," [4] published a report investigating the presence of Toxic Heavy Metals in baby foods.[5] The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury. All but nine of 168 baby foods contained at least one metal; most contained more than one."[6] Specifically, the HBBF report identified "puffs and other snacks made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple, pear, grape and other fruit juices," and "carrots and sweet potatoes" manufactured by the Defendant Baby Food Companies as particularly high in Toxic Heavy Metals.[7]

15.      The results of the HBBF report were consistent with that of the FDA which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.[8] However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."[9] The HBBF's findings were by no means an outlier. Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead and cadmium concentrations in a large convenience sample of US baby foods."[10] The study detected lead in 37% of samples, and cadmium in 57%.[11] This was consistent with findings by researchers examining baby food products in other parts of the world.

---

[4] https://www hbbf.org/solutions.
[5] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www.healthybabyfood.org/sites/healthybabyfoods/files/2019- 10/BabyFoodReport FULLREPORT ENGLISH R5b.pdf).
[6] *Id.* at 6.
[7] *Id.* at 10-11.
[8] *Id.* at 6.
[9] *Id.* at 6.
[10] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, 651 SCI.TOTAL ENVIRON. 1, 822-827 (2019), available at:
https://www.sciencedirect.com/science/artic1e/abs/pii/S0048969718334442?via%3Dihub.
[11] *Id.*

THRID AMENDED PETITION

## II. Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods, Sparking National Outrage.

16.     On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including arsenic, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.[12]

17.     The Subcommittee reported that the data submitted by the companies unequivocally revealed that a substantial number of Defendants' finished products and/or ingredients used to manufacture the Baby Foods are tainted with significant levels of Toxic Heavy Metals, namely inorganic arsenic, lead, and mercury.[13]

18.     Specifically, the Congressional committee concluded that arsenic was present in baby foods. Nurture (Happy BABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over l00 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic. Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

19.     Lead was present in baby foods made by all responding companies. Nurture (Happy BABY) knowingly sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead. Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

20.     Moreover, Nurture (Happy BABY) sold finished baby food products containing as

---

[12] *See generally* Subcommittee Rpt.
[13] *Id.* at 2-3.

THRID AMENDED PETITION

much as 10 ppb mercury. Hain (Earth's Best Organic) does not test for mercury in baby food.[14] However, independent testing by HBBF of Hain's Baby Foods confirm that Hain's products contain as much as 2.4 ppb of mercury.[15]

21.    These levels greatly surpass the limits allowed by U.S. regulatory agencies. Upon information and belief, there were no FDA regulations governing the presence of Toxic Heavy Metals in Baby Foods specifically (with the exception of infant rice cereal) during the time that JMW was consuming Baby Foods; to the extent such regulations existed, the quantities of Toxic Heavy Metals in Defendants' Baby Foods far exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to adult exposure, not infants. Compared to these thresholds, the test results of the Defendants' Baby Foods and their ingredients are 91 times greater than permitted arsenic levels, 177 times greater than permitted lead levels, and 5 times greater than permitted mercury levels.

22.    Moreover, compounding these troubling findings, the Manufacturer Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below. For example, the Subcommittee found that Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic and lead in some of its ingredients. But Hain routinely exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic. Hain justified these deviations based on "theoretical calculations," even after Hain admitted to FDA that its testing underestimated final product toxic heavy metal levels.[16]

23.    As found by the Subcommittee, the Defendants have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products. In August 2019, Hain held a closed-door meeting

---

[14] *Id*. at 2-4.
[15] *See* HBBF Rpt. at 19.
[16] *Id*. at 4-5.

THRID AMENDED PETITION

with the FDA during which Hain delivered a presentation to the agency acknowledging the Toxic Heavy Metal problem in its Baby Food.[17] In the PowerPoint slides presented during the meeting—only made public by the Subcommittee—Hain confirmed that some of the ingredients in its Baby Food contain as much as between 108 to 129 ppb of arsenic, specifically noting "[p]reliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor."[18]

24.    Discovery will flesh out in greater detail the extent of Toxic Heavy Metals in the Baby Food sold by Defendants.

25.    At all times relevant to this litigation, the quantity of Toxic Heavy Metals in Defendants' Baby Foods was sufficient to cause neurological injury and/or exacerbate underlying neurological conditions injuries and/or act together with other factors to cause or exacerbate underlying neurological conditions or injuries to result in injuries that include cognitive impairment, lowered IQ, and a diagnosis of autism spectrum disorder.

## III.    Dangers of Toxic Heavy Metals to Babies and Children.

26.    According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically arsenic, lead, and mercury, pose a "major public health concern" for children.[19] The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."[20] Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number one among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), and mercury (third).[21]

27.    The threat presented by Toxic Heavy Metals to children's health is widely shared

---

[17] Hain, *PowerPoint Presentation to Food and Drug Administration: FDA Testing Result Investigation* (Aug. 1, 2019) ("2019 Hain & FDA Meeting"), available at:
https://oversight house.gov/sites/democrats.oversight.house.gov/files/2.pdf).
[18] *Id.* at *9.
[19] World Health Organization, *Children's Health and the Environment WHO training Package for the Health Sector* (October 2011), available at: https://www.who.int/ceh/capacity/heavy metals.txlf.
[20] OSHA, *Toxic Metals*, available at: https://www.osha.gov/toxic-metals.
[21] ATSDR, *ATSDR 's Substance Priority List* (2019), available at: www.atsdr.cdc.gov/spl/index.html#20l9spl.

9

by the global scientific community. As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases. Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."[22] Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.[23] And, the mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.[24] For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs.[25] According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[26] Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth."[27] In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

28.     Toxic Heavy Metals can have these devastating health outcomes for babies and children regardless of the method or route of exposure. Nothing about the baby food products

---

[22] Osman, et al., *Exposure routes and health effects of heavy metals on children*, 32 BIOMET ALS 563-573 (2019), available at: https://link.springer.com/article/10.1007%2Fsl 0534-019-00193-S#citeas.

[23] Stein, et al., *In harm's way: toxic threats to child development,* 23 J DEVBEHAV PEDIATR. 1 Sl3-S22 (2002).

[24] Gorini, et al., *The Role of Heavy Metal Pollution in Neurobehavioral Disorders: A Focus on Autism*, 1 REV. J. AUTISM DEV. DISORD. 1, 354-372 (2014), available at: https://link.springer.com/article/10.1007/s40489-014-0028-3.

[25] Del Rio, et al., *A comparison of arsenic exposure in young children and home water arsenic in two rural West Texas communities*, 17 BMC PUBLIC HEALTH 850 1-13 (2017), available at: https://bmcpublichealth.biomedcentral.com/articles/1O. 11 86/s12889-017-4808-4.

[26] Roni Caryn Rabin, *Some Baby Food May Contain Toxic Metals, US. Reports* (NY TIMES, Feb 4. 2021), available at: https://www nytimes.com/2021/02/04/health/baby-food-metals-arsenic html

[27] Gorini, et al. *supra*.

THRID AMENDED PETITION

manufactured and sold by Defendants or the nutrients or ingredients that may be contained therein are sufficient to blunt, ameliorate, inhibit, or prevent the ill effects that exposure to Toxic Heavy Metals can have on babies and children.

### A. Exposure to Toxic Heavy Metals Has Been Consistently Associated with Autism in Pediatric Populations

29.     A chorus of regulators, research agencies and independent scientists are in broad agreement that exposure to heavy metals in early life is causally associated with ASD. The Centers for Disease Control ("CDC") in its toxicological profile of lead specifically observes that "neurodevelopmental effects in children have been associated with [lead]" at different quantities of exposure.[28] At doses of <10 μg/dL29,[29] the agency observed "[a]ltered mood and behaviors that may contribute to learning deficits, including attention deficits, hyperactivity, *autistic behaviors*, conduct disorders, and delinquency."[30] The U.S. National Institute of Health ("NIH") concurs, noting that "[p]renatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."[31] And, in July 2016, a large consortium consisting of the world's leading epidemiologists, autism experts, and medical organizations published a consensus statement which identified heavy metals such as lead and mercury as "*prime examples* of toxic chemicals that can contribute to…autism spectrum disorder[.]"[32]

30.     Such conclusions are based upon a substantial body of independent, peer-reviewed research conducted throughout various parts of the world over the last decade which has consistently observed a positive association between exposure to Toxic Heavy Metals and the development of ASD in children and infant populations. The literature is comprised of prospective

---

[28] ATSDR Toxicological Profile for Lead at 133, available at: https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf.
[29] This means effects observed at less than ten micrograms of lead per blood liter.
[30] *Id*. (emphasis added).
[31] NIH, *Autism Spectrum Disorder and the Environment* (April 2019), available at: https://www.niehs.nih.gov/health/materials/autism_spectrum_disorder_and_the_environment_508.pdf
[32] Bennett, et al., *Project TENDR: Targeting Environmental Neuro-Developmental Risks The TENDR Consensus Statement* 124 ENVIRON. HEALTH. PERSPECT. 7 A118-A122 (2016), available at: HTTPS://WWW.NCBI.NLM.NIH.GOV/PMC/ARTICLES/PMC4937840/. (emphasis added).

cohort studies where children's metal exposure is measured in early life and their risk of subsequently developing ASD evaluated; pre-natal studies where pregnant mothers' metal exposure is measured prior to assessing the risk of ASD in later born children; case-control and cross-sectional studies where children's metal exposure is measured contemporaneous with ASD diagnoses; as well as meta-analyses where individual studies are grouped together to derive an overall picture of the data.

31.     Repeatedly, the different study types evince a strong association between metal exposure and ASD risk. For example, a 2017 NIH-funded study of twins concluded that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD…[and] increases ASD risk and severity"[33] Similarly, a 2019 study and a 2021 study of metal exposure in pregnant mothers and the risk of subsequent ASD diagnosis in children respectively observed that "[arsenic] and [lead] levels in [amniotic fluids] tend to be positively associated with ASD risk, suggesting the possible role of prenatal exposure to toxic metals in the ASD development"[34] and "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD…in children. The most notable ones involved arsenic…mercury… and lead."[35]

32.     Such results have been replicated in prospective cohort studies of early life metal exposure, with a 2016 Korean study noting that "[e]ven low blood lead concentrations at 7–8 years of age are associated with more autistic behaviors at 11–12 years of age[.]"[36] Similarly, another prospective Korean study from 2017 "observed that higher blood mercury levels at late pregnancy, in cord blood, and at 2 and 3 years of age were positively associated with autistic behaviors among

---

[33] Arora. et al., *Fetal and postnatal metal dysregulation in autism*, 8 NATURE COMM. 1-10, 1, 5 (2017), available at: https://www.nature.com/articles/ncomms15493.

[34] Long, et al., *Autism spectrum disorders, endocrine disrupting compounds, and heavy metals in amniotic fluid: a case-control study* 10 MOL. AUTISM 1-19, 15 (2019), available at: https://pubmed ncbi nlm.gov/30647876/.

[35] Skogheim, et al. *Metal and essential element concentrations during pregnancy and associations with autism spectrum disorder and attention-deficit/ hyperactivity disorder in children*, 152 ENVIRON. INTL. 1-14, 1 (2021), available at: https://pubmed ncbi.nlm.nih.gov/33765546/.

[36] Kyoung-Nam Kim et al., *Low-level lead exposure and autistic behaviors in school-age children* 53 EURO TOXICOLOGY 193-200, 193 (2016), available at: https://pubmed.ncbi nlm nih.gov/26877220/.

preschool-age children."[37]

33.    Furthermore, smaller human studies from around the world have observed similar results, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy metal exposure, particularly mercury, in the etiology of ASD.[38] Indeed, a 2014 Egyptian study noted that "[l]ead and mercury are considered as one of the main causes of autism."[39]

34.    On the basis of this robust body of data, several meta-analyses published in recent years report consistent associations between exposure to Toxic Heavy Metals and ASD in children; with the authors of a 2017 meta-analysis specifically concluding: "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."[40]

---

[37] Jia Ryu et al., *Associations of prenatal and early childhood mercury exposure with autistic behaviors at 5 years of age: the Mothers and Children's Environmental Health (MOCEH) Study*, 605-606 SCI. OF THE TOTAL ENVT. 251-257, 251 (2017), available at: https://pubmed.ncbi nlm nih.gov/28667852/.

[38] Li, et al., *Blood Mercury, Arsenic, Cadmium, and Lead in Children with Autism Spectrum Disorder*, 181 BIOL TRACE ELEM RES 31-37, 31 (2018), available at: https://pubmed.ncbi nlm nih.gov/28480499/; *see also* Dickerson, et al., *Autism spectrum disorder prevalence and associations with air concentrations of lead, mercury, and arsenic*, 188 ENVIRON MONIT. ASSESS. 407 (2016); Mohamed, et al., *Assessment of Hair Aluminum, Lead, and Mercury in a Sample of Autistic Egyptian Children: Environmental Risk Factors of Heavy Metals in Autism*, BEHAV. NEUROL. (2015), available at: https://pubmed.ncbi nlm.nih.gov/26508811/; Adams, et al., *Toxicological Status of Children with Autism vs. Neurotypical Children and the Association with Autism Severity*, 151 BIOL. TRACE ELEM. RES 171-180 (2013), available at: https://pubmed ncbi.nlm.nih.gov/23192845/.

[39] Yassa, H., *Autism: A form of lead and mercury toxicity*, 38 Environ. Tox. & Pharm. 1016-1024 (2014), available at: https://pubmed.ncbi nlm nih.gov/25461563/ (emphasis added); *see also* Filon, et al., *Analysis of lead, arsenic and calcium content in the hair of children with autism spectrum disorder*, 20 BMC PUBLIC HEALTH 1-8 (2020), available at: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-020-08496-w; Fiore, et al., *Metal and essential element levels in hair and association with autism severity*, 57 JOURNAL OF TRACE ELEMENTS IN MEDICINE AND BIOLOGY 99-103 (2020), available at: https://pubmed.ncbi nlm.nih.gov/31630927/.

[40] Jafari, et al., T*he association between mercury levels and autism spectrum disorders: A systematic review and meta-analysis*, 44 J. Trace Elem. Med. Biol. 289-297, 289 (2017), available at: https://pubmed ncbi.nlm.nih.gov/28965590/; Saghzadeh & Rezai, S*ystematic review and meta- analysis links autism and toxic metals and highlights the impact of country development status: Higher blood and erythrocyte levels for mercury and lead, and higher hair antimony, cadmium, lead,  and mercury*, 79 PROG. NEURO-PSYCHOPHARMACOL. BIOL. PSYCHIATRY 340-368 (2017), available at: https://pubmed ncbi.nlm.nih.gov/28716727/; Wang, et al., *Exposure to Inorganic Arsenic and Lead and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 21 CHEM RES. TOXICOL. 32, 1904-1919 (2019), available at: https://pubmed ncbi nlm nih.gov/31549506/; Sulaiman, et al., *Exposure to Aluminum, Cadmium, and Mercury and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 33 Chem. Res. Toxicol. 11, 2699-2718 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/32990432/; Yoshimasu, et al., *A meta-analysis of the evidence on the impact of prenatal and early infancy exposures to mercury on autism and*

13

35.    The fact that such results have been observed in multiple studies, conducted by different researchers, at different times, in different parts of the world, in children of varying ages, and measuring a variety of end-points (including hair, blood, and urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of ASD in children.

## IV. Defendants Knowingly Sold Baby Foods Containing Dangerous Levels of Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children.

36.    During the time that Defendants manufactured and sold Baby Foods in the United States, the weight of evidence showed that Defendants' Baby Foods exposed babies and children to unsafe levels of Toxic Heavy Metals capable of causing or exacerbating neurological injury and resulting ASD diagnoses, cognitive impairments, IQ loss, and other neurodevelopmental disorders and conditions.  Defendants failed to disclose this risk to consumers through any means.

37.    As discussed above, both independent testing, the Manufacturer Defendants' internal evaluations of their Baby Foods, and the Manufacturer Defendants' representations and disclosures to the Subcommittee and FDA reveal the presence of substantial amounts of Toxic Heavy Metals in Defendants' products at levels capable of causing the injuries complained of herein. As such, Defendants knew or should have known that their Baby Foods contain dangerous of Toxic Heavy Metals.

38.    Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market,[41] and the HBBF Report further confirmed such contamination of Defendants' Baby Foods.[42] And, as the Subcommittee found, the Manufacturer Defendants continued to sell their Baby Foods even after testing of both ingredients and finished products revealed the presence of substantial amounts of

---

*attention deficit/hyperactivity disorder in the childhood*, 44 NEURO TOXICOL. 121-131 (2014), available at: https://pubmed ncbi.nlm.nih.gov/24952233/.
[41] *See* Gardener, et al., *supra*.
[42] *See* HBBF Rpt, *supra*.

14

Toxic Heavy Metals.[43]

39.    Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers, marketers, and retailers of Baby Foods, are held to the standard of experts responsible for keeping abreast of the latest scientific developments related to the dangers of contaminants in their products. Defendants failed to take action in protecting vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of neurological damage and developing neurodevelopmental disorders such as ASD and cognitive impairments such as loss of IQ.

40.    To be clear, the Manufacturer Defendants are able to manufacture Baby Foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals, or sampling their ingredients from other sources, as specifically acknowledged by Hain in its August 2019 presentation to the FDA: "Explore alternatives for Brown Rice ingredient to reduce risk." [44] At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of and/or risks associated with the levels of Toxic Heavy Metals in their Baby Foods. However, Defendants took no action, continued to manufacture, market, and sell their products with full knowledge of the risks posed by their Baby Foods, and misled consumers regarding the safety of their products, all to the harm of children.

## V.  Exemplary/ Punitive Damages Allegations (Against Manufacturer Defendants)

41.    Defendants' conduct as alleged herein was intentional, willful, wanton, oppressive, and done with reckless disregard for human life. Defendants' conduct is particularly reprehensible given that their toxic foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

---

[43] *See, e.g.*, Subcommittee Rpt. at 13-14.
[44] 2019 Hain & FDA Meeting at *10.

THRID AMENDED PETITION

42.     Defendants were fully aware of the safety risks of Baby Foods, particularly the dangerous potential of their Baby Foods given the high content of Toxic Heavy Metals that have all been associated with neurodevelopmental injury and disorders in children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their Baby Foods as safe for consumption and go so far as claiming that they adhere to "the strictest standards in the world" and provide "baby's food full of nutrition while meeting standards strict enough for tiny tummies" as well as other statements and representations that hold out their Baby Foods as safe for consumption by infants and young children. In fact, as discussed above, Defendants routinely sold Baby Foods containing astronomical amounts of Toxic Heavy Metals, regularly flouted their own internal limits of Toxic Heavy Metals in Baby Foods, and failed to disclose to consumers that their products contained such dangerous contaminants.

43.     This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their Baby Foods were harmless to humans, and that full disclosure of the true risks of the Toxic Heavy Metals present in the Baby Foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, failure to test, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Parents were denied the right to make an informed decision about whether to purchase and Defendants' Baby Food for their children, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

44.     Pursuant to La. C.C.P. art. 3546, the injurious conduct at issue in this case occurred at each Defendants' principal place of business, where decisions regarding the marketing, design, manufacturing processes, and warnings on the products consumed by JMW were made.

45.     Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Plaintiff.

THRID AMENDED PETITION

## PLAINTIFF SPECIFIC ALLEGATIONS

46.     Plaintiff was born on April 5, 2018, and diagnosed with ASD in early 2021, at approximately 2 years and 9 months of age.

47.     Plaintiff started consuming Baby Food products manufactured by Defendants Nurture and Hain prior to his ASD diagnosis. Plaintiff consumed substantial quantities of the Baby Food products manufactured by Defendants prior to his ASD diagnosis.

48.     Plaintiff's parents purchased these Baby Food products through Defendants Whole Foods and Amazon.

49.     Defendants' Baby Foods consumed by Plaintiff were purchased in New Orleans, Louisiana and consumed in New Orleans, Louisiana.

50.     Upon information and belief, the Baby Food products manufactured by Nurture and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead—exceeding that of any regulatory limits.

51.     Upon information and belief, as a direct and proximate result of consuming Nurture's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

52.     Upon information and belief, nothing about Nurture's Baby Foods, or the nutrients or ingredients contained therein, was sufficient to blunt, ameliorate, inhibit, or prevent the ill effects caused by exposure to the Toxic Heavy Metals contained in Nurture's Baby Foods.

53.     As a direct and proximate result of consuming Nurture's Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered neurological injury and was diagnosed with ASD.

54.     Upon information and belief, the Baby Food products manufactured by Hain and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead—exceeding that of any regulatory limits.

55.     Upon information and belief, as a direct and proximate result of consuming Hain's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

THRID AMENDED PETITION

56.    Upon information and belief, nothing about Hain's Baby Foods, or the nutrients or ingredients contained therein, was sufficient to blunt, ameliorate, inhibit, or prevent the ill effects caused by exposure to the Toxic Heavy Metals contained in Hain's Baby Foods.

57.    As a direct and proximate result of consuming Hain's Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered neurological injury and was diagnosed with ASD.

58.    Based on prevailing scientific evidence, exposure to Toxic Heavy Metals at the levels contained in Defendants' Baby Foods can cause cognitive impairment, loss of IQ, and neurological injury resulting in ASD in humans.

59.    Based on prevailing scientific evidence, nothing about the ingredients or total composition of Defendants' Baby Foods is sufficient to mitigate, ameliorate, inhibit, or otherwise diminish the toxic effects of the Toxic Heavy Metals contained therein.

60.    Had any Defendant warned Plaintiff's parents that Defendants' Baby Foods could lead to exposure to Toxic Heavy Metals or, in turn, neurological damage, cognitive impairment, loss of IQ, or ASD, Plaintiff would not have consumed the Baby Foods.

61.    Plaintiff alleges that as a direct and proximate result of Plaintiff's consumption of Baby Foods supplied and distributed by Defendants, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, cognitive impairment, loss of IQ, neurological damage, ASD, and other *sequelae*.

## CAUSES OF ACTION

### COUNT I: PRODUCTS LIABILITY—FAILURE TO WARN
### (Against Manufacturer Defendants)

62.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

63.    At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and

18

promoting Baby Foods, which are defective and unreasonably dangerous to consumers, including Plaintiff and his parents, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Baby Foods and Toxic Heavy Metals. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Baby Foods and aimed at a consumer market.

64.    Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff and his parents, and therefore had a duty to warn of the risks associated with the consumption of Baby Foods contaminated with Toxic Heavy Metals.

65.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff and his parents of dangers associated with Baby Foods. Defendants, as manufacturers, sellers, or distributors of food, are held to the knowledge of an expert in the field.

66.    At the time of the manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

67.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers of their products to users and consumers and to those who would foreseeably use or be harmed by Defendants' Baby Foods.

68.    Even though Defendants knew or should have known that Baby Foods posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use of and exposure to the products. The dangerous propensities of their products and the neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Baby Foods, as

described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the product, and were not known to end users and consumers, such as Plaintiff. The product warnings for Baby Foods in effect during the time period Plaintiff consumed Baby Foods were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Baby Foods consumption.

69.     Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, of the risks of exposure to their products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of Toxic Heavy Metals in their Baby Foods and the potential for consumed Baby Foods to expose children to Toxic Heavy Metals, and further, have made false and/or misleading statements concerning the safety of Baby Foods.

70.     At all relevant times, Defendants' Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

71.     Plaintiff was exposed to Defendants' Baby Foods without knowledge of their dangerous characteristics.

72.     At all relevant times, Plaintiff was exposed to Defendants' Baby Foods while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

73.     Plaintiff could not have reasonably discovered the defects and risks associated with Baby Foods prior to or at the time of Plaintiff consuming Baby Foods. Plaintiff relied upon the skill, superior knowledge, and judgment of the Defendants to know about and disclose serious health risks associated with using Defendants' products.

74.     Defendants knew or should have known that the information disseminated with their Baby Foods was inadequate, failed to communicate adequate information on the dangers of consumption, and failed to communicate warnings and instructions that were appropriate and

adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

75.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff and his parents to avoid purchasing and consuming the products. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of consuming Baby Foods.

76.    This alleged failure to warn is not limited to the information contained on Baby Foods labeling. The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium. The ability to provide such warnings is not prohibited by any federal law.

77.    Furthermore, Defendants possess a First Amendment right to make truthful statements about the products they sell, and no law could lawfully constrain that constitutional right.

78.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products. However, as a result of Defendants' concealment of the dangers posed by their Baby Foods, Plaintiff could not have averted his injuries.

79.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of babies and children, including Plaintiff, with knowledge of the safety problems associated with Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct

THRID AMENDED PETITION

warrants an award of punitive damages.

80.    The Defendants' lack of adequate warnings and instructions accompanying their Baby Foods were a substantial factor in causing Plaintiff's injuries.

81.    The Defendants' lack of adequate warnings and instructions accompanying their Baby Foods caused or contributed to Plaintiff's injuries.

82.    As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, past and future medical expenses, lost income, and other damages.

83.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT II: PRODUCTS LIABILITY—DESIGN DEFECT
### (Against Manufacturer Defendants)

84.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

85.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff. These actions were under the ultimate control and supervision of Defendants.

86.    At all relevant times, Defendants' Baby Food products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or expose to infants and babies, including Plaintiff.

87.    Defendants' Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they were placed into the stream of commerce, they were Defendants' Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants and were

THRID AMENDED PETITION

defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

88.     At all relevant times, the Baby Food products consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

89.     At all relevant times, Defendants knew or had reason to know that their Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

90.     Therefore, at all relevant times, Defendants' Baby Food products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

    a.  When placed in the stream of commerce, Defendants' Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.  When placed in the stream of commerce, Defendants' Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    c.  Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products;

    d.  Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the ability for Baby Foods to expose babies to high amounts of Toxic Heavy Metals;

    e.  Exposure to Defendants' Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

    f.  Defendants knew or should have known at the time of marketing Baby Foods that exposure to Toxic Heavy Metals contained in the Baby Foods could result in neurological injuries, cognitive impairments, and neurodevelopmental disorders—

23

specifically ASD—and other severe illnesses and injuries; and

g.  Defendants did not conduct adequate post-marketing surveillance of their Baby Foods.

91.  Defendants could have employed safer alternative designs and formulations. For example, the Defendants could have avoided use of certain ingredients high in Toxic Heavy Metals, avoided using pre-mix vitamins high in Toxic Heavy Metals, and/or sampled their ingredients from other sources.

92.  The likelihood that the design and formulation of the Baby Foods as sold by Defendants would cause JMW's neurological injury resulting in ASD and cognitive impairments and the severity of that injury outweigh any minimal burden on Defendants in using a safer alternative design as described herein.

93.  Plaintiff consumed Defendants' Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

94.  Defendants' Baby Food products were and are more dangerous than alternative products, and Defendants could have designed their Baby Food products to avoid harm to children. Indeed, at the time Defendants designed the Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

95.  At the time the Baby Food products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Baby Foods, as, for example, demonstrated by Hain's presentation to the FDA wherein Hain acknowledges the risk posed by specific ingredients in its Baby Foods.

96.  Defendants have intentionally and recklessly defectively designed the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

97.  The design defects in Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

98.  The design defects in Defendants' Baby Foods caused or contributed to Plaintiff's injuries.

THRID AMENDED PETITION

99.    As a direct and proximate result of the Defendants' defective design of the Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

100.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT III: PRODUCTS LIABILITY—MANUFACTURING DEFECT
### (Against Manufacturer Defendants)

101.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

102.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff.

103.    At all relevant times, the Baby Foods consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

104.    At all relevant times, the Baby Foods consumed by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

105.    The Baby Foods consumed by Plaintiff were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that Defendants deviated materially from their manufacturing specifications and/or performance standards and/or such design and manufacture posed an unreasonable risk of harm to Plaintiff.

106.    The Defendants' Baby Foods are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of parents or children.

107.    The Defendants' Baby Foods create risks to the health and safety of babies that are far more significant and devastating than the risks posed by other baby food products, and which

THRID AMENDED PETITION

far outweigh the utility of the Baby Foods products because of Defendants' manufacturing defects, which included but were not limited to: Failure to adequately inspect/test the Baby Foods during the manufacturing process; Failure to implement procedures that would reduce or eliminate the levels of Toxic Heavy Metals in Baby Foods; Failure to use ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture Baby Foods.

108.    Defendants have intentionally and recklessly manufactured the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

109.    The manufacturing defects in Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

110.    The manufacturing defects in Defendants' Baby Foods caused or contributed to Plaintiff's injuries.

111.    As a direct and proximate result of the Defendants' defective manufacture of the Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

112.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT IV: PRODUCTS LIABILITY—BREACH OF EXPRESS WARRANTY
### (Against Manufacturing Defendants)

113.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

114.    Defendant Baby Food Manufacturers' Baby Food products are unreasonably dangerous because they do not, and did not, conform to the express warranty made at all relevant times by the Defendant Baby Food Manufacturers that their product was "baby food."

115.    The express warranty that the Defendant Baby Food Manufacturers' product was

THRID AMENDED PETITION

"baby food" induced the parents of JMW to purchase and use the Baby Food as "baby food."

116.    At all times the Baby Foods were used in a reasonably anticipated or intended manner.

117.    Plaintiff's injuries were directly and proximately caused or contributed to because the express warranty that the Baby Food was in fact appropriate to feed to babies was untrue.

118.    In fact, the "food" Defendants sold was more appropriately warranted as rat food and was not healthy or something that a baby should ever ingest as food.

119.    **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V: REDHIBITION
### (Against Retailer Defendants)

120.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

121.    Whole Foods and Amazon represent and advertise that they take great care to ensure that the products they sell are safe for consumption. Whole Foods and Amazon represent and advertise that, in order to do so, they receive data on the products they sell, including manufacturer testing.

122.    Upon information and belief, Whole Foods and Amazon, the owner of Whole Foods, knew or should have known about the heavy metal levels in the Baby Foods sold to Plaintiff's parents and consumed by Plaintiff.

123.    Despite this actual or constructive knowledge, Whole Foods and Amazon sold Baby Foods to Plaintiff, which were contaminated with sufficient quantities of heavy metals to cause neurological injury resulting in ASD, IQ loss, and other neurodevelopmental disorders. As such, the Retailer Defendants are bad faith sellers under redhibition law.

124.    The Retailer Defendants, as bad faith sellers of Baby Foods, knew that the Baby Foods had a defect, namely that they were tainted by levels of heavy metals sufficient to cause

THRID AMENDED PETITION

neurological injury capable of resulting in ASD or IQ loss, but omitted to declare it.

125.    Despite their knowledge of the levels of heavy metal contamination, the Retailer Defendants also declared that the Baby Foods they sold had a quality that they knew the products did not have, namely that they were healthy baby food and appropriate to feed to babies and young children.

126.    The Retailer Defendants had direct knowledge of the amount of tainted food Plaintiff consumed because they had records of how much of the Manufacturer Defendants' Baby Food products his parents purchased. Despite this knowledge, the Retailer Defendants continued to induce Plaintiff's parents to purchase Nurture and Hain's food by specifically promoting and suggesting Nurture's and Hain's baby food products to Plaintiff's parents for purchase.

127.    The Retailer Defendants even offered subscription discounts to encourage Plaintiff's parents to purchase additional and larger quantities of the tainted foods the Retailer Defendants knew Plaintiff was consuming.

128.    As a direct and proximate result of the Defendants' failure to declare the presence or levels of Toxic Heavy Metals in the Baby Foods, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

129.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI: NEGLIGENCE

### (Against Retailer Defendants)

130.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

131.    At all relevant times, the Retailer Defendants operated stores and/or online marketplaces as sellers of third-party products. The Retailer Defendants had physical custody of

THRID AMENDED PETITION

the products at issue either in their distribution warehouses or in their physical stores. The Retailer Defendants also controlled the process of the transactions and delivery of the products at issue through their product fulfillment programs. In a recent unanimous decision, the U.S. Consumer Product Safety Commission determined that Amazon operates as a distributor, and as such was responsible under federal law for notifying consumers of certain hazardous products and remediating those hazards, given the control that Amazon exercises over products sold through "Fulfilled by Amazon."[45]

132.    At all relevant times, the Retailer Defendants were service providers engaged in the business of curating, selecting, testing, and monitoring of goods.

133.    At all relevant times, the Retailer Defendants held themselves out to the public as selecting, curating, and actively monitoring their products for safety through independent testing and evaluation of the products they sell.

A.    **Whole Foods**[46]

134.    Whole Foods maintains a quality standards team that develops and maintains the standards for ingredients, products, and the sourcing of products prior to products being placed on Whole Foods' shelves.

135.    Whole Foods also maintains a list of acceptable and unacceptable ingredients.[47]

136.    Whole Foods employs a "Category Merchant" who is responsible for Baby Food

---

[45] Decision & Order, *In the Matter of Amazon.com, Inc.*, CPSC Dkt. No. 21-2, at 11, 27 (July 29, 2024), available at https://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/142%20-%20In%20the%20Matter%20of%20Amazon.com%20Inc.%20Decision%20and%20Order.pdf.

[46] Allegations regarding Whole Foods' negligence are included in this Third Amended Petition for preservation purposes. Plaintiffs understand the Court's order to allow amendment with respect to allegations regarding Amazon's Negligent Undertaking. Plaintiffs Second Amended Complaint, while alleging Negligent Undertaking against both Amazon and Whole Foods, alleged Negligence separate from Negligent Undertaking against those retailers as well. It is unclear to Plaintiffs whether the Court has dismissed the "pure" Negligence claims against Whole Foods or only the Negligent Undertaking claim. Nevertheless, in an abundance of caution and in keeping with the Court's Order with respect to this amendment, Plaintiffs have not substantively altered any allegations with respect to Whole Foods.

[47] Ex. A 11/4/2022 P. Brady Deposition exhibit 5, Whole Foods Food Ingredient Quality Standards

THRID AMENDED PETITION

products. The Category Merchant's duties include communicating the acceptable and unacceptable ingredient list to baby food suppliers.

137.    Whole Foods tells its product suppliers like Nurture and Hain to establish a process to identify environmental, health, safety, and ethical risks associated with their operational practices.

138.    In order to sell products at Whole Foods, companies like Nurture and Hain must comply with Whole Foods' list of acceptable/unacceptable ingredients.

139.    Whole Foods and Amazon both manufacture their own private label baby food products. As such, Whole Foods and Amazon are experts in the field. As experts in the field, Whole Foods and Amazon were aware or should have been aware of the issues regarding toxic heavy metals in Baby Food.

140.    As manufacturers of their own baby food products and experts in the field, Whole Foods and Amazon were aware or should have been aware of the Congressional Report regarding toxic heavy metals in Nurture's and Hain's baby food.

141.    Indeed, under 21 C.F.R. § 109.7(b), manufacturers of food must at all times utilize quality control procedures which will reduce contamination to the lowest level currently feasible. This requirement applies regardless of any tolerance or action levels that may be set by the FDA or other regulatory bodies. Thus, given Amazon and Whole Foods expertise, safety monitoring, and ingredient control procedures and requirements, Amazon and Whole Foods knew or should have known that the heavy metals in Nurture's and Hain's Baby Food products were not reduced to the lowest levels feasible at the time as required under 21 C.F.R. § 109.7(b).

142.    Instead, Whole Foods and Amazon mislead consumers into believing that the Manufacturer Defendants' Baby Food products sold by Whole Foods and Amazon are safe and actively monitored for safety concerns.

143.    Despite Whole Foods' and Amazon's representations to consumers, Whole Foods and Amazon never chose to add toxic heavy metals to their acceptable/unacceptable ingredients list, place warnings on those product's pages on their websites, or remove those products from their shelves.

144.    Additionally, Whole Foods represents to consumers that it has "unparalleled quality

30

standards" to ensure that the food they sell "meet[s] a higher standard."48 Yet, Whole Foods failed to address heavy metals in baby food in any way. Meanwhile, as early as 2012, Walmart, one of Whole Foods' competitors, set an internal limit for arsenic in finished baby food products at 23 parts per billion. Still, Whole Foods failed to take any action to limit heavy metals in baby food products sold in their stores.

### B.    Amazon's Product Safety Team Investigates and Commits to Warning about Safety Concerns.

145.    Amazon maintains a product safety team that monitors customer reviews for potential safety issues.

146.    Amazon tells consumers that its product safety team monitors the products sold on its site and that it may post warnings on the product page "in concerning situations." For example, Amazon tells consumers that in concerning situations, it can "remove the product from the website," "contact sellers and manufacturers for more information," and/or "put warnings on the product detail page."49

147.    Amazon's product safety team monitored or should have monitored the customer reviews for Nurture's and Hain's baby food products. Monitoring these reviews revealed or would have revealed questions and concerns about heavy metals in Nurture's baby foods—and, upon information and belief, in Hain's baby foods—as early as 2017, years before Plaintiff was born.50

148.    One of these reviews concerned Nurture's Superfood Puffs Variety Pack. This variety pack contained multiple products, including Nurture's "Superfood Puffs Organic Grain Snack – Sweet Potato and Carrot."

149.    In responding to the customer question, Nurture wrote on August 21, 2018 that it had "strict, self-imposed quality standards and proactive testing at[sic] that is done by accredited

---

48 Ex. B 11/4/2022 P. Brady Deposition exhibit 2, 8/22/2019 Whole Foods' Code of Business Conduct
49 https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X
50 Ex. C Amazon Customer Q&A regarding Happy Baby Superfood Puffs; Ex. D, Amazon Customer Reviews regarding Happy Baby Organics Superfood Puffs

---

expert laboratories." Nurture also claimed that it had "a proactive contaminant monitoring program to ensure that all of our products are safe for consumption."

150.    Then, as explained further below, in October 2019, Happy Baby Bright Futures revealed that this product, the Superfood Puffs Organic Grain Snack – Sweet Potato and Carrot, and sold by Amazon, contained as much as 295 ppb arsenic –a level almost three times the limit proposed by the FDA in 2016.

151.    Thus, by October 2019, Amazon's product safety team knew or should have known that Nurture's representations regarding its "quality standards" and "proactive testing" were false or misleading.

152.    Despite this report directly identifying Amazon as a seller of a product with nearly three times the FDA's proposed limit at the time, Amazon failed to remove or correct Nurture's representations regarding Nurture's foods. Amazon also failed to provide a separate warning to parents regarding this product.

153.    Then in November of 2020, JMW's parents purchased that product and JMW consumed it, unbeknownst of its arsenic content due to Nurture and Amazon's failures to warn of the defect.

### C.    Reputable Watchdog Organizations Implicate Amazon in the Sale of Contaminated Baby Food.

154.    But Amazon does not limit its monitoring only to customer reviews. Amazon also tells customers that its Product Safety Team affirmatively "investigates and acts on reported safety complaints" to "protect customers from risks of injury related to products sold on Amazon.com."[51] Amazon also tells consumers that it "proactively investigates and addresses reported safety complaints[.]"[52]

---

[51] https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X
[52] https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X&ref_=bsx_ro_dt_pa_link

THRID AMENDED PETITION

155.    In its public commitments to consumers like JMW and his parents, Amazon does not limit the sources of information it consults to identify, investigate, or evaluate safety complaints or concerns.

156.    Consider that Amazon is one of the largest corporations in the world. Corporations like Amazon regularly monitor news and other publications for coverage that could be adverse to the corporation's business or reputation.

157.    Thus, consumers like JMW and his parents reasonably believe Amazon does more than merely pass on reports it receives from government entities. Rather, consumers like JMW and his parents rely upon Amazon's representations that Amazon will ***proactively investigate*** safety complaints available from reputable sources.

158.    Numerous safety complaints were made regarding Nurture's and Hain's baby food products as early as 2017, a year before JMW was born.

159.    For example, in December 2017 Healthy Baby Bright Futures ("HBBF") published a report entitled "Arsenic in 9 Brands of Infant Cereal." The report described rice cereal as "Infants' top source of arsenic" and described multiple studies showing arsenic's link to "IQ loss and other neurodevelopmental impacts for children exposed . . . during the first few years of life."[53]

160.    The report included testing that revealed that Hain's and Nurture's products contained as much as 92 ppb and 123 ppb arsenic, respectively.

161.    The report also noted that the FDA's 2016 draft guidelines included an action level of 100 ppb for arsenic in infant rice cereal, putting Nurture's products over the limit and Hain's products dangerously close to it.

162.    This 2017 HBBF report also identified Amazon as the seller of multiple products made by other manufacturers that tested well above 100 ppb arsenic, including a product with 235 ppb arsenic.

163.    In another example, in 2018 Consumer Reports published the article "Heavy Metals in Baby Food: What you Need to Know."[54] This report showed that "about two-thirds" of tested

---

[53] https://hbbf.org/sites/default/files/2022-12/HBBF_ArsenicInInfantCerealReport_0.pdf
[54] https://www.consumerreports.org/health/food-safety/heavy-metals-in-baby-food-a6772370847/

THRID AMENDED PETITION

Baby Food products had "worrisome levels of at least one heavy metals" and that "fifteen of the foods would pose potential health risks to a child regularly eating just one serving or less per day." The report went on to say that "snacks and products containing rice and/or sweet potatoes were particularly likely to have high levels of heavy metals."

164.    In the 2018 Consumer Reports findings, Hain's and Nurture's products were both described as containing levels of heavy metals that would pose potential health risks from less than one manufacturer's recommended serving.

165.    Then in 2019, one year after JMW was born and while he continued to consume foods sold by Amazon, HBBF published their "What's in my baby's food" report.[55] The report tested 168 different baby food products. But the report was not limited to only the direct manufacturers of each product. Instead, the report specifically identified the retailers selling each product contaminated with heavy metals.

166.    Amazon featured prominently in the HBBF 2019 report. For example, the report includes a map of the retailers where the contaminated products were purchased and lists Amazon as an "online retailer."



---

[55] https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf

THRID AMENDED PETITION

167.    In another example, HBBF identifies Amazon.com as the seller of a Nurture/Happy Baby product containing 295 parts per billion Arsenic.

| HappyBABY | Superfood Puffs Organic Grain Snack - Sweet Potato & Carrot | Snack - rice puffs | 295 | 91 | 3.7 | 12.2 | 1.94 | Washington, DC | amazon.com |
|---|---|---|---|---|---|---|---|---|---|

168.    This product, the "Superfood Puffs Organic Grain Snack – Sweet Potato and Carrot," is a product that JMW's parents purchased as late as December 2020 from Amazon.com and that JMW consumed.

169.    Amazon's product safety team knew or should have known of the HBBF report given the fact that HBBF specifically identified Amazon as a retailer selling contaminated baby foods.

**D.    Amazon Could No Longer Rely on Assumptions or Representations from the Manufacturing Defendants.**

170.    Because Amazon should have known about the 2019 HBBF report, Amazon should not have continued to rely on any representations Nurture and Hain made regarding the safety of their foods that were sold on Amazon.com.

171.    While Nurture responded to customer reviews on Amazon.com saying that its foods were safe, Amazon now had information that directly contradicted Nurture's representations.

172.    The same is true for Hain with respect to any representations Hain made to Amazon directly or any assumptions Amazon made about Hain's products.

173.    Whatever representations either Hain or Nurture may have made to Amazon in order to sell their products on Amazon.com, those representations should have been evaluated in the light of a credible report showing that Nurture and Hain's foods contained levels of arsenic above 100 ppb, and in some cases as high as 455 ppb.

174.    Beyond customer reviews, in light of the credible public reports from organizations like HBBF, Consumer Reports, and Nutrition Facts, Amazon could no longer reasonably rely on the assumption that sealed containers of Nurture's and Hain's products were not contaminated.

175.    In light of these facts, Amazon's Product Safety Team, then, investigated or should have conducted an "investigation" as Amazon tells customers it will.

THRID AMENDED PETITION

176.     In addition to monitoring and investigating product issues, Amazon provides customers like JMW and his parents with an "A-to-z Guarantee" that Amazon states "ensures that customers are covered an eligible for a full refund for any item they purchase . . . including helping to resolve, in the unlikely event, valid personal injury or property damage claims."[56]

177.     Accordingly, Amazon's product safety team knew or should have known of these concerns and removed the products from its website, contacted Nurture and Hain for additional information, and/or put warnings on the product detail page for Nurture's and Hain's baby food products.

**E.     Amazon Had Actual and Imputed Knowledge of the Risks of the Manufacturing Defendants Products.**

178.     In addition to what Amazon knew or should have known as a seller of baby food products. Amazon had actual knowledge of the industry-wide problem of heavy metals in baby food products.

179.     Amazon manufactured their own private label baby food products.

180.     Amazon began manufacturing their own private label baby food products many years before Plaintiff was born.

181.     Indeed, Amazon knew well before 2021 that there was an issue of heavy metals in baby food products. In response to question about whether Amazon's "Mama Bear" baby food products had been tested for heavy metals, Amazon told consumers that their baby foods have been and are tested for heavy metals.[57]

182.     As a manufacturer of baby food products Amazon was an expert in the field of baby food manufacturing.

183.     Thus, Amazon cannot reasonably state that it was knowledgeable of the issue of heavy metals in its own products, but simultaneously lacked any awareness of the issue with

---

[56] https://trustworthyshopping.aboutamazon.com/focus/product-safety
[57] https://www.amazon.com/ask/questions/Tx298ACHVYB48HI/ref=ask_ql_ql_al_hza

THRID AMENDED PETITION

respect to other suppliers' products that Amazon sold.

184.    That said, beyond drawing an inference that Amazon knew of the reports regarding heavy metals in baby food industry-wide due to public reports, Louisiana law presumes such knowledge for Defendants like Amazon.

185.    Under Louisiana law, "a manufacturer is held to the knowledge and skill of an expert. It **must keep abreast** of scientific knowledge, discoveries, and advances **and is presumed to know what is imparted thereby**." *Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 968-969 (La. 2003) (emphasis added) citing *Simeon v. Doe*, 618 So. 2d 848, 852 (La. 1993).

186.    Thus, Amazon, as an expert in baby food manufacturing, knew of the following non-exhaustive list of scientific knowledge, discoveries, and advances:

a.    2017 HBBF Report, "Arsenic in 9 Brands of Infant Cereal;"

b.    2017, NutritionFacts.org, "Arsenic in Infant Rice Cereal;"[58]

c.    2017, Environmental Defense Fund, "Lead in Food: A Hidden Health Threat;"[59]

d.    2018, FDA, "What FDA is Doing to Protect Consumers from Toxic Metals in Foods"[60]

e.    2018 Consumer Reports, "Heavy Metals in Baby Food: What You Need to Know;"

f.    2019 HBBF Report, "What's in My Baby's Food;"

g.    2020 Clean Label Project, "Baby Food: A Puree of Plasticizers and Heavy Metals"[61]; and

h.    All scientific research linking heavy metal exposure to neurodevelopmental disorders and detrimental effects.

187.    As experts in baby food manufacturing, Amazon knew or was presumed to have known of the defects featured in the Baby Food products at issue and their dangerous heavy metal content.

---

[58] https://nutritionfacts.org/video/arsenic-in-infant-rice-cereal/
[59] https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf
[60] https://www.fda.gov/food/conversations-experts-food-topics/what-fda-doing-protect-consumers-toxic-metals-foods
[61] https://cleanlabelproject.org/baby-food-white-paper/

188.    Manufacturers of baby food products, like Amazon, were well aware of the industry-wide problem regarding heavy metals in baby food long before the Congressional report brought the issue to the public.

189.    Amazon knew of the hidden defect which could injure a child and which could have easily been electronically communicated to Plaintiff's parents by placing a warning on the product pages.

**F.**



THRID AMENDED PETITION



THRID AMENDED PETITION



**G.    Amazon Failed to Warn Plaintiff of the Defect in the Manufacturing Defendants' Food and Caused Plaintiff Harm.**

207.    Plaintiff is a child completely reliant on the sellers of baby food to act as ordinary

[68] Ex. 65 at Hain-MDL-001-049576.
[69] *Id.*
[70] *Id.* at Hain-MDL-001-049575

ethical sellers would in the face of reports that the products they sold, and are selling, for consumption by infants were and are contaminated with heavy metals.

208.    Given Amazon's actual and imputed knowledge of the defects contained in Nurture's and Hain's foods and Amazon's representations about providing warnings in concerning situations, Amazon had a duty to disclose or warn JMW and his parents about these defects. Additionally, Amazon had a duty to disclose the presence of heavy metals in the Baby Food products they sold to Plaintiff's parents for the benefit of Plaintiff because they met all of the *Bunge* factors. *See e.g. First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 401-402 (E.D. La, April 12, 2016) (Engelhardt, K. presiding) citing *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1384 (La. 1990).

209.    Yet despite knowledge of the defective condition of the Nurture's and Hain's Baby Food, Amazon continued to sell them and failed to declare the defect or warn Plaintiff about the defect.

210.    At all times, the Baby Foods were used in a reasonably anticipated or intended manner.

211.    As a direct and proximate result of Amazon's conduct, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

212.    At all relevant times, the Retailer Defendants induced the public, including Plaintiff, to use their service by promoting themselves as service providers that selected, curated, and actively monitored products for sale at their physical locations and/or online platforms for safety through independent testing and evaluation of those products.

213.    The primary incentive to purchase Baby Foods from the Retailer Defendants was the services they provide—namely, the selection, curation, and active monitoring for the wholesomeness and safety of the products they sell, such that the ability to purchase a product from the Retailer Defendants amounts to an independent endorsement of its safety.

214.    As service providers engaged in the curation, selection, testing and monitoring of goods, including Baby Foods, the Retailer Defendants owed a duty to Plaintiff to conduct those

THRID AMENDED PETITION

activities in a way that would not pose an unreasonable risk of injury to Plaintiff.

215.    The Retailer Defendants breached their duty to comport themselves as an ordinarily prudent service provider when they failed to properly inspect, monitor, test, investigate, and take other such steps as necessary to ensure their curation, selection, and sale of Baby Foods did not unreasonably pose a danger to their patrons who used their services to purchase Baby Foods.

216.    In a recent case involving Amazon, the Louisiana Supreme Court affirmed that in some circumstances retailers may also be liable for a negligent undertaking when injuries result from products they sell. *See Pickard v. Amazon.com, Inc.*, 2023-01596 (La. 6/28/24), 2024 WL 3218633, at **6–9. Those circumstances are present here.

217.    First, the Retailer Defendants assumed a duty by undertaking the rendition of services to another, in this case by selling the Manufacturer Defendants' Baby Food products, which the Retailer Defendants should have recognized as necessary for the protection of a third person, in this case Plaintiff. The scope of the Retailer Defendants' involvement and the extent of their authority in this relationship—including their purported efforts to ensure product safety by, e.g., monitoring customer reviews, mandating quality standards, investigating products of concern, removing unsafe products, and notifying consumers of safety concerns—confirm that this was an affirmative undertaking.

218.    Second, the Retailer Defendants' failure to exercise reasonable care in performing their assumed duty makes them liable for Plaintiff's injuries. This failure increased the risk of harm to Plaintiff. By offering the Manufacturer Defendants' Baby Food products for sale and purporting, yet failing, to independently assure their safety, the Retailer Defendants exacerbated the risk that unsafe products would be eaten by consumers like Plaintiff. And Plaintiff suffered harm because he and his parents relied upon the Retailer Defendants' representations regarding the safety of the products they sold and the active monitoring and curating the Retailer Defendants represented that they conducted on the products they sold.

219.    Amazon also failed to exercise reasonable care in performing its assumed duty by failing to disclose or warn about the existence of heavy metals in Nurture's and Hain's foods. Amazon told consumers that it "proactively investigates and addresses reported safety complaints." Yet Amazon failed to appropriately investigate or address safety concerns Amazon

THRID AMENDED PETITION

raised to both Nurture and Hain. ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

220.    JMW then consumed products containing the defect that Amazon was aware of but failed to disclose. JMW was subsequently diagnosed with ASD following the consumption of these products.

221.    The negligence of the Retailer Defendants was a substantial factor in causing Plaintiff's injuries.

222.    The negligence of the Retailer Defendants caused or contributed to Plaintiff's injuries.

223.    As a direct and proximate result of the Retailer Defendants' negligence, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, past and future medical expenses, lost income, and other damages.

224.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VII: LOUISIANA PRODUCTS LIABILITY ACT

### (Against Retailer Defendants)

225.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

226.    Plaintiff further incorporates by reference each allegation set forth regarding the Manufacturer Defendants as if fully stated herein.

227.    Under the Louisiana Products Liability Act, Amazon and Whole Foods are sellers

43

who are in the business of conveying title to or possession of the Baby Foods to consumers in exchange for money.

228.    As sellers, Amazon and Whole Foods are also "Manufacturers" under the Louisiana Products Liability Act because they exercised control over or influenced characteristics of the design, construction, or quality of the Baby Food products.

229.    Whole Foods exercised control over and influenced every ingredient of every product it allowed in its stores or sold on-line, including the Baby Food products at issue.

230.    Amazon, as the parent of Whole Foods (a wholly owned subsidiary), likewise exercised control and influence over every ingredient of every product allowed in Whole Foods' stores or sold online via Whole Foods.

231.    Indeed, following Amazon's purchase of Whole Foods, the number of ingredients on Whole Foods' unacceptable ingredients list increased.

232.    Amazon and Whole Foods operated both online and physical marketplaces of third-party products where they (i) had physical custody of the Baby Food products in their distribution warehouses and stores; and (ii) controlled the process of the transaction and delivery of those products to Plaintiff through their product fulfillment programs.

233.    The Baby Food products that Amazon and Whole Foods sold were unreasonably dangerous because of (i) their construction or composition, (ii) their design, (iii) their lack of adequate warnings, and (iv) their nonconformity to the Nurture's and Hain's express warranties.

234.    These defects existed in the Baby Food products at the time the products left the Nurture's and Hain's possession. And, as explained above, Amazon and Whole Foods knew or should have known the Baby Food products were defective when Amazon and Whole Foods gained possession of the products.

235.    Moreover, Amazon and Whole Foods manufactured their own private label baby food products and thus were experts in the field of baby food manufacturing.

236.    Amazon and Whole Foods began manufacturing their own private label baby food products many years before Plaintiff was born.

237.    As experts in baby food manufacturing, Amazon and Whole Foods knew or are presumed to have known of the defects featured in the Baby Food products at issue and their

dangerous heavy metal content. Experts in this field were well aware of the industry-wide problem regarding heavy metals in baby food long before the Congressional report brought the issue to the public.

238.    Despite knowledge of the defective condition of the Baby Food products, Amazon and Whole Foods failed to declare the defect to Plaintiff.

239.    At all times, the Baby Foods were used in a reasonably anticipated or intended manner.

240.    As a direct and proximate result of the Retailer Defendants' conduct, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

## JURY TRIAL DEMAND

241.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

242.    WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law, including but not limited to:

        i.    past, present, and future physical pain and suffering;

        ii.    past, present, and future mental anguish and emotional distress;

        iii.    past, present, and future medical expenses;

        iv.    damages occasioned by temporary and/or permanent disability;

        v.    loss of wages and loss of earning capacity;

        vi.    economic loss;

        vii.    loss of enjoyment of life, past and future.

viii.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

ix.    pre-judgment and post-judgment interest;

x.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

xi.    any other general and equitable relief the Court may deem just and proper.

Dated: January 6, 2025

Respectfully submitted,

*/s/ Alexandra M. Walsh*
Alexandra M. Walsh (*pro hac vice*)
Anapol Weiss
14 Ridge Square NW, Suite 342
Washington, DC 20016
Tel: (202) 780-3014
Fax: (215) 875-7707
Email: awalsh@anapolweiss.com

Aimee H. Wagstaff *(SBN 278480)*
Madeleine Brumley Clavier (#37432)
Wagstaff Law Firm
940 N Lincoln St.
Denver, CO 80203
Tel: (720) 208-9402
Email:
awagstaff@wagstafflawfirm.com
mclavier@wagstafflawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Alexandra M. Walsh*
Alexandra M. Walsh

THRID AMENDED PETITION

# EXHIBIT A

List

Browse Products

Order Online

Recipes

Weekly Sales

Find a Store

List Login

**Foggy Bottom**    | **Open:** 7 am – 10 pm today

Home / Quality Standards / Food Ingredient Quality Standards

## Food Ingredient Quality Standards

We ban 230+ ingredients from all food that we sell, including hydrogenated fats, high-fructose corn syrup and sweeteners such as aspartame, sucralose and saccharin.



We believe that the best ingredients belong on your plate. That's why we've banned hydrogenated fats, high-fructose corn syrup, sweeteners like aspartame, sucralose and saccharin — along with more than 230 colors, preservatives,

flavors and other ingredients from *all* of the food we sell in our stores. Seriously — from **Berry Chantilly Cake** in our bakery to the foods in our **bulk bins**, we want you to feel confident about what goes in your cart. If it doesn't meet our standards, we won't sell it.

## Higher Food Ingredient Standards

From the first day we swung open our doors in September 1980, steadfast and selective have underpinned the attitude behind the standards of the products we sell — and love. When we review ingredients, we consider the interconnected effects of the way that food is processed and regulated by authorities in the U.S., EU, Canada and beyond. All of this happens before hitting our shelves and ultimately your plate.

The food industry evolves and changes rapidly, and we strive to respond by following emerging research and our customers' expectations. Over the years, we've achieved some major milestones in what we restrict, including banning added MSG in 1992, hydrogenated oils in 2003 and high-fructose corn syrup in 2011.

*Below are a few commonly used additives you won't find in our stores.*

## Partially-Hydrogenated oils

Until recently, ingredients like margarine and shortening-baked goods (like pastries, pies, cookies and snack foods) often contained partially hydrogenated oils. These oils are chemically altered additives designed to improve texture and prolong shelf life — primarily in conventional processed foods. Studies have shown that the trans fats in partially hydrogenated oils raise LDL (bad) cholesterol levels, decrease HDL (good) cholesterol and increase the risk of heart disease. In 2015 the FDA released its final determination that partially hydrogenated oils are not "generally recognized as safe". As of January 1, 2020, manufacturers cannot add PHOs to foods. That's been our stance for more than 15 years.

## FD&C Colors

The Food and Drug Administration breaks color additives into two distinct categories. Exempt colors — most of which we permit — include pigments from sources such as vegetables, minerals and animals. Think dehydrated beets and grape skin extract.

The other category, certified color additives, are synthetic colors like FD&C Yellow No. 6 — which we do not permit — are the additives widely used for intense, uniform color and flexibility in making a variety of hues. These synthetics must undergo batch certification, whereby FDA chemists test composition to ensure they do not contain impurities at levels that post a health concern. Color additives subject to certification are typically made from raw materials obtained from petroleum.

## Preservatives

Shelf life — that's the primary reason preservatives are added to foods. Canning, heating, pasteurizing, drying and pickling are all ways to preserve food. We also allow certain added preservatives like citric acid and cultured dextrose. Preservatives undergo consideration on a case-by-case basis, weighing the benefits and drawbacks.

For example, we allow sulfites in wines, where they may be present naturally in the grapes, or are added to ensure longevity in the bottle. We do not allow sulfites on dried fruits, where they're often used to prevent browning.

## Sweeteners

We have a long history of working to ban sweeteners from food we sell in our stores. Aspartame, for one. When aspartame was approved by the FDA for food, we looked at technical information and considered our customers' expectations. Based on that research, we added aspartame to our list of unacceptable ingredients for food, and have banned these other sweeteners as well:

- Acesulfame-K

- Advantame

- Aspartame

- Aspartame-acesulfame salt

- Cyclamates *(not available at other grocery retailers in the U.S. since it is prohibited in U.S. by FDA)*

- Neohesperidine dihydrochalcone

- Saccharin

- Sucralose

## Flour

A staple baking item that shouldn't be overlooked, many all-purpose white flours are bleached with benzoyl peroxide or bromated with the addition of potassium bromate. These agents chemically age and strengthen gluten, and increase the rise and elasticity of dough. We don't think it's necessary, just a shortcut. Humans have been baking great things with unbromated flour for millennia. While a definitive finding on health risks is yet to be reached, bromate is currently banned in the EU and Canada, among other places.

## Ingredients We Don't Allow in Our Food

The list of no-gos. It can be a difficult process, and the answers are not always easy, but we know our food ingredient standards are part of how we've changed the way food is grown, raised, processed and experienced around the world.

Banned Ingredients

| | | |
|---|---|---|
| 2,4,5-trihydroxybutyrophenone (THBP) | 5-HTP | acesulfame-K |
| acetoin (synthetic) | acetone peroxides | acetylated esters of mono- and diglycerides |
| activated charcoal | alkanna tinctoria | advantame |
| aluminum ammonium sulfate | aluminum potassium sulfate | aluminum starch octenylsuccinate |
| aluminum sulfate | ammonium alum | ammonium chloride |
| ammonium saccharin | ammonium sulfate | apricot kernel/extract |
| aspartame | azo dyes | azodicarbonamide |
| Bacillus coagulans Unique IS-2 | Bacillus coagulans ProDURA UABc-20 | bacopa |
| bentonite | benzoates | benzoic acid |
| benzophenone | benzoyl peroxide | benzyl alcohol |
| Benzyl benzoate | beta-cyclodextrin | BHA (butylated hydroxyanisole) |
| BHT (butylated hydroxytoluene) | black soldier fly | bleached flour |
| bromated flour | brominated vegetable oil | burnt alum |
| butylparaben | caffeine (extended release) | calcium benzoate |

Banned Ingredients

| | | |
|---|---|---|
| calcium bromate | calcium disodium EDTA | calcium peroxide |
| calcium propionate | calcium saccharin | calcium sorbate |
| calcium stearoyl-2-lactylate | canthaxanthin | caprocaprylobehenin |
| carmine | CBD/cannabidiol | certified colors |
| charcoal powder | Citrus Red No. 2 | cochineal |
| DATEM | diacetyl (synthetic) | dimethyl silicone |
| dimethylpolysiloxane | dioctyl sodium sulfosuccinate (DSS) | disodium 5'-ribonucleotides |
| disodium calcium EDTA | disodium dihydrogen EDTA | disodium EDTA |
| disodium guanylate | disodium inosinate | dodecyl gallate |
| EDTA | erythrosine | ethoxyquin |
| ethyl acrylate (synthetic) | ethyl vanillin (synthetic) | ethylene glycol |
| eugenyl methyl ether (synthetic) | FD&C Blue No. 1 | FD&C Blue No. 2 |
| FD&C Colors | FD&C Green No. 3 | FD&C Red No. 3 |
| FD&C Red No. 40 | FD&C Yellow No. 5 | FD&C Yellow No. 6 |
| foie gras | gamma aminobutyric acid | gardenia blue |

Banned Ingredients

| | | |
|---|---|---|
| Garcinia cambogia | Ginkgo biloba | GMP |
| gold/gold leaf | Grapefruit seed extract | Hawaiian black salt |
| He shou wu | heptylparaben | hexa-, hepta- and octa-esters of sucrose |
| high-fructose corn syrup/HFCS | hjijiki | hydrogenated oils |
| inosine monophosphate | insect Flour | iron oxide |
| kava/kava kava | lactic acid esters of monoglycerides | lactylated esters of mono- and diglycerides |
| ma huang | mechanically separated meat | melatonin |
| methyl silicon | methylparaben | microparticularized whey protein derived fat substitute |
| monoammonium glutamate | monopotassium glutamate | monosodium glutamate |
| mucuna pruriens | myrcene (synthetic) | Nature identical flavors |
| natamycin (okay in cheese-rind wax) | neotame | nitrates (synthetic) |
| nitrites (synthetic) | octyl gallate | olestra |
| Orange B | partially hydrogenated oils | plant sterols |

Banned Ingredients

| | | |
|---|---|---|
| polydextrose | potassium alum | potassium benzoate |
| potassium bisulfite (okay in wine, mead, cider) | potassium bromate | potassium metabisulfite (okay in wine, mead, cider) |
| potassium nitrate | potassium nitrite | potassium propionate |
| potassium sorbate | propane-1,2-Diol esters of fatty acids | propionates |
| propionic acid | propyl gallate | propylene glycol esters of fatty acids |
| propylene glycol mono- and di-esters of fats and fatty acids | propylene oxide | propylparaben |
| pulegone (synthetic) | pyridine (synthetic) | saccharin |
| saccharin sodium salt | salatrim (short and long chain acyl triglyceride molecule) | shark cartilage |
| smoke flavor (synthetic) | sodium acid sulfate | sodium alum |
| sodium aluminum phosphate | sodium aluminum sulfate | sodium benzoate |
| sodium bisulfite (okay in wine, mead, cider) | sodium cyclamate | sodium diacetate |
| sodium lauryl sulfate | sodium metabisulfite (okay in wine, mead, cider) | sodium nitrate/nitrite (synthetic) |
| sodium propionate | sodium saccharin | sodium sorbate |

Banned Ingredients

| | | |
|---|---|---|
| sodium stearoyl lactylate | sodium stearoyl-2-lactylate | sodium sulfite (okay in wine, mead, cider) |
| sorbic acid | soy leghemoglobin | stannous chloride |
| succistearin | sucralose | sucroglycerides |
| sucrose acetate isobutyrate | sucrose ester | sucrose polyester |
| sulfites (okay in wine, mead, cider) | sulfur dioxide (okay in wine, mead, cider) | TBHQ (tertiary butylhydroquinone) |
| tetrasodium EDTA | thiodipropionic acid | toluene |
| tonka bean/extract | vanillin (synthetic) | whale oil |

**Note to product suppliers**: This list is intended for our shoppers. It's not for use in formulating products as it doesn't include all Whole Foods Market requirements and ingredient restrictions. Creating a product with no unacceptable ingredients does not guarantee that we will sell it.

## Explore More



**A Guide to Reading Organic Labels**



**What Makes Our Lamb Different**



**Seafood Standards Like Nowhere Else**



**Our Standards: Household Cleaning Products**

# EXHIBIT B



# CODE
## *of Business Conduct*

### August 22, 2019



This Code of Business Conduct (the "Code") applies to all Team Members, Board Members, consultants, contractors and agents of Whole Foods Market, Inc. and its subsidiaries ("WFM" or the "Company").

The Code does not cover all relevant laws or WFM policies. Other Company policies and procedures, such as those found in the central or regional General Information Guides, the Amazon.com Insider Trading Guidelines applicable to Whole Foods Market and the Company Anti-Bribery Policy, supplement the policies in this Code.

The information contained in the Code is not a contract or an offer of a contract. **Violation of this Code may result in corrective action up to and including discharge.** The terms of the Code concerning the employment relationship are implemented at the sole discretion of WFM and may be withdrawn or changed at any time with or without notice.

WFM expects all of its Team Members and Board Members to act in accordance with the highest standards of personal and professional integrity at all times, and to comply with WFM's policies and procedures and all laws, rules and regulations of any applicable international, federal, provincial, state or local government.

Team Members who have questions about the Code should contact their Team Leader or email the Ethics Committee at ethics@wholefoods.com unless a particular provision of the Code says otherwise.

To report concerns about potential violations of the Code and any other ethics or integrity issues, including questions or concerns involving the Company's accounting, auditing, financial reporting or internal controls, Team Members should contact their Team Leader, email the Ethics Committee at ethics@wholefoods.com, or call the Team Member Tipline.

Calls to the Team Member Tipline may be made confidentially and anonymously.

Executive officers and Board Members should contact the General Counsel to raise questions or report a potential Code violation or ethical issue.

Company policy prohibits retaliation against individuals who report violations of this Code.

**Any WFM Team Member in the U.S. or Canada may confidentially and anonymously report ethics matters by calling the Team Member Tipline at 1-844-470-6772.**

**U.K. Team Members can do the same by calling 0808-234-3523.**

i

# TABLE OF CONTENTS

Message from Whole Foods Market's CEO ...................................................................................1

ABOUT THE CODE OF BUSINESS CONDUCT ...........................................................................2
    Purpose
    Your Responsibilities
    Obtaining Additional Information
    Reporting Code Violations
    No Retaliation
    Waivers
    Ethics Committee

CONFLICTS OF INTEREST.........................................................................................................4
    General
    Gifts & Entertainment
    Doing Business with Spouses, Relatives, Friends or Your Own Business
    Outside Employment or Service as Director or Officer
    Financial Interest in a Competitor
    Donations and Other Payments
    Opportunities Related to the Company's Business
    Extensions of Credit
    Leasing Property and Equipment Consulting
    and Other Professional Services

LEGAL COMPLIANCE.................................................................................................................8
    Bribes and Improper Payments
    Antitrust Laws
    Fair Dealing
    Complaints to Government Agencies
    Workplace-Related Laws and Policies

COMPANY INFORMATION AND ASSETS ..................................................................................10
    Confidentiality
    Insider Trading
    Media Inquiries
    Online Forums
    Financial Integrity; Maintaining Books and Records
    No Improper Influence on Audits
    Company Property

WHOLE FOODS MARKET CONTACT INFORMATION ........................................................ 13

APPENDIX ................................................................................................................................14
    Our Core Values
    Our Quality Standards
    Code of Business Conduct Amendments

# Message from
# Whole Foods Market's CEO



Whole Foods Market strives to maintain the highest standards in all of our interactions with Company customers, Team Members and vendors. Our statement of Core Values (see Appendix) also reflects our commitment to all our stakeholders: our customers, our Team Members, our stockholder, and our community and environment.

As Whole Foods Market continues to grow, each of us is personally responsible to support our mission and Core Values. We have issued this Code of Business Conduct to restate our longstanding commitment to follow the law and to act ethically in all situations. The Code is intended to provide guidance to all Whole Foods Market Team Members and members of the Board of Directors, as well as consultants and agents doing business for WFM. Please review this Code carefully and be sure that you understand it. If you have questions, please ask your Team Leader or contact the Ethics Committee directly by email at ethics@wholefoods.com.

Thank you in advance for your help in making sure that we continue to live up to our high ethical standards.

Best regards,

*John Mackey*

John Mackey

# ABOUT THE CODE OF BUSINESS CONDUCT

## Purpose

The Code of Business Conduct ("the Code") is designed to promote a responsible and ethical work environment for all Whole Foods Market ("WFM" or the "Company") Team Members and members of the WFM Board of Directors ("Board Members"). The Code contains guidelines on proper behavior in the workplace and contact information to be used in the event you have questions or concerns (see "Whole Foods Market Contact Information" at the end of the Code). The Code applies to all WFM Team Members and Board Members.  The Code also applies to third parties doing business on behalf of WFM, such as consultants, contractors and agents.  If you hire a third party, you should take reasonable steps to ensure the third party is aware of the Code, has a reputation for ethical behavior, and acts in a manner consistent with the Code.

## Your Responsibilities

In performing your duties for WFM, you are responsible for abiding by WFM policies and all local and national laws in all countries in which the Company does business. You are also obligated to comply with all other applicable laws, rules and regulations of any regulatory organization, licensing agency, or professional association governing your professional  activities. You are responsible for knowing and following the laws and policies that relate to your duties, including the policies in the Code and all other Company policies, such as those found in the General Information Guide ("GIG"). If you have questions about specific laws that may apply to your activities or about whether particular circumstances may involve illegal conduct, contact the WFM General Counsel. You should also contact the General Counsel if you think a provision of this Code may conflict with an applicable legal requirement or a provision in the GIG or another Company policy.

Violating the Code or other Company policies may result in corrective action up to and including discharge, and WFM may seek to recover damages or file criminal charges. However, most problems can be easily avoided by simply using good judgment and seeking guidance when questions arise. It is your responsibility to raise questions, make appropriate disclosures and bring potential problems to the Company's attention.

## Obtaining Additional Information

If you have questions about the policies outlined in the Code or would like additional information, talk with your Team  Leader, or contact the Ethics Committee directly by email at ethics@wholefoods.com unless a particular provision of the Code says otherwise. Executive officers and Board Members should contact the General Counsel.

## Reporting Code Violations

As part of our shared fate philosophy, we believe that we all share responsibility for ensuring that WFM as a whole conducts itself according to the highest ethical standards and strives to avoid even the appearance of impropriety. If you know of or suspect a violation of the Code, you must report it through one of the means provided in the Code. You may report suspected violations of the Code, and any other ethics or integrity issues, to your Team Leader, by email to the Ethics Committee or by calling the Team Member Tipline. The Team Member Tipline can also be used to report questions or concerns involving the Company's accounting, auditing, financial reporting or internal controls. Reports to the Tipline may be made confidentially and anonymously, although you are encouraged to provide your name to facilitate investigation and follow-up. Neither your Team Leader nor the Company will take any action against you for reporting suspected misconduct in good faith. Information about how to contact the Ethics Committee and the Team Member Tipline appears under "Whole Foods Market Contact Information" at the end of the Code along with other important contact information.

If you are an executive officer or Board Member, you should contact the General Counsel.

Reports of potential misconduct will be taken seriously and investigated promptly and thoroughly. Except where disclosure is required to investigate a report or by applicable law or legal process, all reports will be kept confidential to the extent reasonably possible.

## Open Door Communications Policy

As described in the GIG, it is WFM's policy that you have the right to speak with anyone in the Company about your concerns. If you have questions about the Code, we encourage you to discuss with your Team Leader or raise it through one of the other means described in the Code. Team Leaders must maintain this "open door" policy for any Team Member who has a question or wishes to raise a concern.

## No Retaliation

It is against Company policy, and in some cases against the law, for the Company to take any action against a Team Member or a Board Member, vendor or agent of the Company for reporting or threatening to report a violation of this Code or cooperating in investigations relating to Code violations, provided that the person has acted in good faith and with a reasonable belief that the information provided is true.

## Waivers

Waivers of this Code will be granted only in exceptional circumstances. The provisions of this Code may only be waived by the Ethics Committee or, in the case of executive officers and Board Members, by our Board of Directors or an appropriate Board committee. Any waiver of this Code for an executive officer or Board Member will be promptly disclosed in accordance with applicable legal requirements. Waiver requests must include the relevant details and facts supporting the request.

## Ethics Committee

The Ethics Committee is responsible for setting policy, reviewing questions and issues submitted by Team Members or others, and promoting awareness of and compliance with the Code of Business Conduct throughout the Company. Although membership may vary over time, the Committee is generally comprised of Global Support leaders in various areas of operations. Team Members may contact the Ethics Committee directly by email. See page 14 of this Code for contact information.

# CONFLICTS OF INTEREST

## General

All business decisions should be made solely in the best interests of the Company, not for personal benefit. Therefore, you should avoid any actions that create, or appear to create, conflicts of interest with the Company. A "conflict of interest" may occur when an individual's own interests (including the interests of a family member or an organization with an individual has a significant relationship) interfere or appear to interfere with the interests of the Company.

Many conflicts of interest or potential conflicts of interest may be resolved or avoided if they are appropriately disclosed and approved. In some instances, disclosure may not be sufficient and the Company may require that the conduct in question be stopped or that actions taken be reversed where possible.

Questions about potential conflicts of interest and disclosure of these situations as they arise should be directed to the Ethics Committee or your Team Leader or Team Member Services representative. Executive officers and Board Members should contact the WFM General Counsel.

While it is not possible to list all potential conflicts of interest, several examples of different situations are presented in the sections below. Regional policies may also apply to the situations described below, and Team Members should consult their GIG for information about any such policies.

## Gifts & Entertainment

Team Members and Board Members should not give anything of value to anyone, or accept anything of value from anyone, when doing so might compromise or appear to compromise the objectivity of business decisions. Except as specifically noted below, this includes giving to, or accepting from, a current or prospective supplier, vendor, vendor representative (including but not limited to organizations representing multiple vendors or producers, such as a regional food group), landlord or competitor of the Company any gifts, entertainment, travel, or any form of compensation. Team Members are prohibited from receiving any samples or gifts at home – all samples and gifts must be sent to their primary work location. Team Members and Board Members are prohibited from accepting any loans or services from any WFM vendor who is not otherwise in the business of providing such loans or services, and any such loans or services provided must be provided on fair market value terms. Team Members and Board Members are prohibited from buying products directly from any WFM vendor at a discounted rate not available to all Team Members.

Some gifts, entertainment and other forms of compensation are allowed as follows:

(1)     Gifts with an established value of $25 or less are generally allowed.

(2)     Business-related meals of nominal value are allowed if they are reasonable and customary and occur infrequently.

(3)     Gift baskets or flowers may be accepted within reason, but they must be made available for sharing with everyone at the Team Member's store or location.

(4)     Promotional items, such as those bearing a vendor's logo, may be accepted up to total estimated value of $25.

---

### EXAMPLES

**Question:** A Vendor offered me a ticket to a sporting event that the vendor is also planning to attend. Can I accept it? It is part of a season ticket package that the vendor purchased for client entertainment.

**Answer:** Accepting a gift valued at U.S. $25 or more from a vendor is a violation of Company policy. You may not accept the ticket if the face value of the ticket is $25 or more. You should either decline the ticket or give the vendor a personal check for the full face value of the ticket. In any event, you should advise the vendor about our policies regarding conflicts of interest.

**Question:** A vendor typically sends me a holiday gift basket which, while not extravagant, likely costs more than $25.
What should I do with it?

**Answer:** You may accept the gift basket as long as it would be considered of nominal value, but you should share the contents with everyone at your location. A gift basket with extravagant items should be returned to the sender, with an explanation of our policies regarding conflicts of interest.

**Question:** A vendor has offered to provide logo items (shirts, golf balls, etc.) to be given as prizes for our region's annual golf outing. The total value of the prizes will not exceed $25/person when considering the number of Team Members that will attend the outing. Is this permissible?

**Answer:** Yes. The value of these items taken together will not exceed $25/person and therefore may be accepted. No vendor should ever be solicited to provide gifts of this type.

(5)    Existing Team Members may accept samples of new or reformulated products, and new Team Members may accept samples of existing products (one time only). It is not acceptable for Team Members to receive for their personal use multiple samples of the same product from a vendor.

(6)    Travel and other expenses paid for by a consortium of vendors or a trade association/organization is allowed if approved by a Global Vice President or Regional President or above and advance notice is sent to ethics@wholefoods.com to allow for the Ethics Committee to confirm that the exception applies.

(7)    Travel and other expenses paid for by a government agency or organization is allowed if approved by a Global Vice President or Regional President or above and the General Counsel and advance notice is sent to ethics@wholefoods.com to allow for the Ethics Committee to confirm that the exception applies.

For purposes of examples #5 and #6, allowable expenses would be expected to include, as applicable, transportation, lodging, food, conference admission and/or continuing education/classes, and/or reasonable incidentals.


If someone tries to give you a prohibited gift, you should also tell your Team Leader. Then, either return the gift or personally reimburse the giver of the gift for its full value.

## EXAMPLES

**Question:** A Team Member on the Front End team creates greeting cards which he sells to the Whole Body team. Is this permitted under the code?

**Answer:** Yes. Since the Team Member is on a different team than the one purchasing the products this is a permitted situation, and it should be monitored by the STL and regional Whole Body Coordinator.

**Question:** An STL has a side business and has created a line of gourmet mustards that several stores in his region are interested in carrying. Is this permitted under the Code?

**Answer:** Yes. The STL's scope of making purchasing decisions is assumed to extend only to his own store, so he may sell to stores other than his own without conflict. To sell to his own store, he must first obtain the approval of the Ethics Committee.

**Question:** The regional Construction Coordinator's brother is a carpenter and has bid on some millwork being installed in several stores during their remodels. If his is the winning bid, would he be permitted to do the work under the Code?

**Answer:** No. Assuming the Construction Coordinator has oversight of the remodels including making purchasing decisions, this would be considered a conflict that would not be permitted under the Code.

## Doing Business with Spouses, Relatives, Friends or Your Own Business

Team Members and Board Members should not use their positions at WFM for personal gain. Generally, it is not permissible to conduct business with a Team Member or Team Member's spouse, relatives or friends if the Team Member's role allows him or her or a Team Member that he or she directly supervises to make purchasing decisions for the team, store, facility or region where he or she works. Team Members with any concerns about improper influence are encouraged to contact the Ethics Committee, or, if the situation involves a member of the Whole Foods Leadership Network (WFLN) or a Board Member, the WFM General Counsel. Other Team Member/vendor  relationships should be evaluated as follows to determine whether they are permitted:

    a)     ***Investment in a company that is a vendor*** – This is allowed as long as the Team Member or someone the Team Member directly supervises does not make the purchasing decisions surrounding these products.

    b)     ***Team Member has a business and sells products or services to WFM***– This isallowed as long as the Team Member or someone the Team Member directly supervises does not make the purchasing decisions surrounding these products or services. For example, it would be allowed for a frontend Team Member to sell products to the grocery team as long as the Team Member does not impact grocery purchases.

Team Members with any concerns about improper influence are encouraged to contact the Ethics Committee, or, if the situation involves a member of WFLN or a Board Member, the WFM General Counsel.

For permitted situations, it may be necessary to inform the Store or Facility Team Leader and appropriate regional coordinator so that they may monitor and evaluate any relevant changes in circumstances. Board Members and Team Members are prohibited from being involved in any formal or informal negotiations or related discussions between WFM and a vendor when the Board Member or  Team Member has any employment relationship, board membership or direct  or indirect ownership interest in the vendor.

Additionally, it is considered a conflict of interest for any Board Member or WFLN member, or his or her spouse or child, to hold a 5% or greater investment interest in any vendor, lender, or major customer of WFM unless approved by the WFM General Counsel with advice from the Ethics Committee.  It is also considered a conflict of interest for any Board Member or WFLN member, or his or her spouse or child, to actively engage with WFM on behalf of a vendor (they actively own or merely work for) unless approved by the WFM General Counsel with advice from the Ethics Committee.

Team Members (other than executive officers) may apply to the Ethics Committee for approval of particular transactions or situations, and executive officers and Board Members may apply to the WFM General Counsel.

## Certain Outside Employment or Service as Director or Officer

Except in situations permitted under the section above entitled "Doing Business with Spouses, Relatives, Friends or Your Own Business" or under the Moonlighting Policy or other WFM policies approved by the  WFM executive team, the Ethics Committee must approve any circumstance in which a Team Member (other than an executive officer) serves as an employee, director, officer, partner, agent or consultant to any WFM vendor, lender or competitor (as defined below). The WFM General Counsel must approve of any circumstance in which an executive officer serves as an employee, director, officer, partner, agent or consultant to any WFM vendor, lender or competitor.

Team Members may serve on the board of a not-for-profit organization without prior approval, as long as the organization does not have a relationship with WFM that creates a conflict of interest. A Team Member serving on such a board should be aware of Company policies regarding donations and other payments, which are discussed below.  Notwithstanding the foregoing, Team Members do not need prior approval to serve on the boards of WFM's foundations.

Any member of the Board of Directors wishing to serve as an employee, director, officer, partner, agent or consultant to any WFM vendor, lender or competitor must obtain approval from the WFM General Counsel.

## Financial Interest in a Competitor

A conflict may exist if a Team Member or Board Member (or any of their immediate family) holds a financial interest in a competitor, other than a financial interest which constitutes not more than 5% of the outstanding voting securities of a competitor. Team Members should contact the Ethics Committee for guidance on whether a particular financial interest represents a conflict of interest. Executive officers and Board Members should contact the WFM General Counsel. For purposes of this Code, except for Amazon.com and its direct and indirect subsidiaries, a business shall be a 'competitor' if it is engaged in the ownership or operation of any retail supermarket, retail food store, retail natural food enterprise, grocery delivery, or other retail/grocery delivery outlet associated with natural foods; it being understood that a business which is predominately manufacturing or wholesaling in foods with less than 10% of their revenue derived from retail sales, or which is a restaurant business, shall not be deemed competitive.

## Donations and Other Payments

Team Members and Board Members are prohibited from authorizing donations or other payments from WFM to outside organizations such as not-for-profits with which they or a member of their immediate family serve as an officer or employee. Additionally, any WFM donation in excess of $50,000 per year shall be approved by two or more of the Company's executive officers. No contributions, gifts or payment may be made from WFM to any political party or candidate without the prior approval of the CEO. No payments may be made from WFM to any lobbying firms for the purpose of lobbying on WFM's behalf without the prior approval of the CEO.

## Opportunities Related to the Company's Business

Team Members and Board Members may not take for themselves opportunities related to the business of WFM or opportunities that they discover through their positions with WFM or through the use of WFM property or information.

## Extensions of Credit

Team Members and Board Members are prohibited from extending any form of credit from WFM to any organization with which they or a member of their immediate family have a personal affiliation. Further, no extension of credit from WFM may be made to any organization without the specific prior approval of the CEO. The only exceptions to this rule are accounts receivable from customers arising in the ordinary course of business and loan programs previously approved by the CEO.

## Leasing Property and Equipment

Any property or equipment lease between WFM and a Team Member (other than a member of the executive team, which is dealt with in the following paragraph) or the Team Member's immediate family or any organization with which they are affiliated other than Amazon.com must be approved by the Ethics Committee.

Any property or equipment lease between WFM and a Board Member, a member of the executive team, the executive's or Board Member's immediate family, or any organization with which they are affiliated other than Amazon.com must be approved by the WFM General Counsel.

## Consulting and Other Professional Services

Team Members and Board Members are prohibited from providing consulting or other professional services to WFM for payment outside of their normal compensation.

Any situation in which WFM would retain the services of a professional services firm with which a Team Member (other than a member of the executive team, which is dealt with in the following paragraph) or a Team Member's immediate family is affiliated must be approved by the Ethics Committee.

Any situation in which WFM would retain the services of a professional services firm with which a Board Member, a member of the executive team, or a Board Member's or executive's immediate family is affiliated must be approved by the WFM General Counsel.

Examples of professional services include (but are not limited to) accounting, auditing, architectural or design, engineering, investment or commercial banking, legal services, project management and computer programming.

WFM Code of Business Conduct 20190822

# LEGAL COMPLIANCE

## Bribes and Improper Payments

WFM has enacted an Anti-Bribery Policy which applies to all Team Members, Board Members and agents and representatives of WFM. No Team Member or third party acting on WFM's behalf may offer, give or receive a bribe under any circumstances. This applies to every Team Member at every level at every location. A bribe is not limited to a cash payment. Bribes can also include anything of value, such as discounts, services, gifts, charitable or political contributions, travel, and excessive meals and entertainment. Bribery is not only prohibited under WFM's policy, but it is also against U.S. law and against the law in some countries where WFM does business.

If a vendor or government official implies that a bribe is just the way business gets done in his or her country, the answer is simple: WFM does not do it. WFM has the same standards for international business that we do for business we conduct in the U.S.

WFM could be responsible for the actions of third parties acting on its behalf. Accordingly, all contracts or arrangements with third parties acting on behalf of WFM must be conducted with due diligence to ensure that the third party is capable of complying with WFM's Anti-Bribery Policy.

Team Members, Board Members and agents and representatives of WFM should consult and comply with the WFM Anti-Bribery Policy. Any Team Member, Board Member or agent or representative of WFM who knows of or suspects any non-compliance with the Anti-Bribery Policy or any applicable anti-bribery law should report the incident or suspicion to the General Counsel or anonymously via email to ethics@wholefoods.com.

> **EXAMPLE**
>
> **Question:** Can I tip a local government office worker for agreeing to process our application for a permit needed to open a new store more quickly?
>
> **Answer:** No. You may not tip any government worker in any country.

## Antitrust Laws

Team Members are required to comply with the antitrust and competition laws of the countries where we do business. In general, WFM Team Members must avoid agreements, understandings or plans with competitors that limit or restrict competition, including price fixing and allocation of markets.

## Fair Dealing

Team Members and Board Members should always deal fairly with WFM's customers, suppliers, vendors, competitors and employees. They should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other practice involving intentional unfair dealing. This provision does not alter existing legal relationships between the Company and its Team Members, including any at-will employment arrangements.

## Complaints to Government Agencies

Occasionally, a job applicant, customer, or current or former Team Member may file or threaten to file a complaint against WFM with the government. If a Team Member or Board Member is notified about such a complaint, they should immediately contact the General Counsel.

## Workplace-Related Laws and Policies

Team Members should consult the GIG for information regarding the Company's equal employment opportunity policy and compliance with other employment-related laws and policies such as the Immigration Reform and Control Act of 1986, as well as Company policy on drugs and alcohol, workplace violence, weapons, harassment, open door communications, solicitation and distribution, and nepotism and favoritism.

# COMPANY INFORMATION AND ASSETS

## Confidentiality

Team Members and Board Members are expected to protect confidential or proprietary information about WFM, Amazon.com or its subsidiaries, to use this information only for business purposes, and to limit dissemination of the information (both inside and outside WFM, Amazon.com, and its subsidiaries) to those who have a need to know the information for business purposes.

Team Members and Board Members are also expected to protect any confidential or proprietary information that comes to them, from whatever source, in the course of performing their responsibilities for WFM. This includes information received from or relating to third parties (such as vendors) with which WFM has or is contemplating a relationship.

Confidential or proprietary information includes all non-public information relating to WFM, Amazon.com and its subsidiaries or a third party. Examples include material non-public information about store operating results, new store development plans, and most Team Member information. If you are unsure whether information is confidential, contact your Team Member Services representative or email the Ethics Committee. Team Members should consult the GIG for information about additional policies on confidentiality.

## Insider Trading Policy

Federal and state laws prohibit trading in securities by persons who have material information that is not generally known or available to the public.

Team Members may not a) trade in stock or other securities while in possession of material nonpublic information or b) pass on material nonpublic information to others without express authorization by Amazon.com or recommend to others that they trade in stock or other securities based on material nonpublic information.

Amazon.com has adopted guidelines designed to implement this policy. All Team Members are expected to review and follow the Amazon.com Insider Trading Guidelines applicable to Whole Foods Market. Certain Team Members must comply with trading windows and/or preclearance requirements when they trade Amazon.com securities.

## Media Inquiries

Team Members may not speak to reporters or members of the media on behalf of the Company without going through the proper channels, as doing so may risk providing incorrect information or revealing proprietary strategies. Inquiries made to Team Members from members of the media should be directed to your Regional Marketing Coordinator, Regional PR contact, or to the Global Communications Team.

Board Members should consult the Director Media Policy prior to speaking with any reporter or member of the media about the Company.

## Online Forums

The Company realizes the importance of communicating proactively and responsively on the Internet and at the same time the importance of communicating responsibly—i.e., avoiding misrepresentations of facts as well as the intentional or inadvertent violation of laws, regulations or company policies. Accordingly, we have a strict policy regarding postings by Company Leadership to non-Company-sponsored Internet chat rooms, message boards, web logs (blogs), or similar forums, concerning any matter involving the Company, its competitors or vendors, as follows:

- Postings by a member of Company Leadership must be approved by Chief Financial Officer or General Counsel. A posting by any of these three individuals must be approved by one of the other two.
- Any postings which refer to a governmental agency or any legal matter must be approved by the General Counsel.
- Postings made anonymously, under a screen name or through another person are prohibited.

Violation of this policy will be grounds for dismissal. For purposes of this policy, "Company Leadership" includes each Company Board Member, executive team member, Global Vice President and Regional President. For other Team Members, other policies may apply and they should consult their GIG.

## Financial Integrity; Maintaining Books and Records

Accurate records are essential to the successful operation of WFM. Team Members are responsible for preparing accurate and complete Company records, information and accounts. For example, claims on an expense report or time record, payments and other transactions must be correctly recorded and accounted for, and properly authorized in accordance with Company policies.

All business records should be clear, truthful and accurate. Keep in mind that business records and communications may become subject to public disclosure through government investigations, litigation or the media. Business records are Company assets and must be retained or destroyed in accordance with applicable policy.

Team Members must act to promote full, fair, accurate, timely and understandable disclosure and reporting of Company information, including the Company's financial results and financial condition, in reports and documents that the Company or Amazon.com files with or submits to the Securities and Exchange Commission and other government agencies, and in the Company's and Amazon.com's other public communications. All Team Members must comply with Company policies, procedures and controls designed to promote accurate and complete recordkeeping. Accounting for, and financial reporting of, actual transactions and forecasts must follow the Company's accounting policies as well as all applicable generally accepted accounting principles and laws.

If you have questions or concerns about the Company's accounting, auditing, financial reporting or internal controls, you may contact your Team Leader, email the Ethics Committee or call the Team Member Tipline.

## No Improper Influence on Audits

All Team Members and Board Members are expected to cooperate fully with WFM's internal and external auditors. You must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence any public accountant engaged in the performance of an audit or review of WFM's financial statements. Further, any Team Member involved in the preparation of financial statements or WFM's independent audit should avoid a personal relationship with any member of the audit engagement team, other than a casual friendly relationship.

## Company Property

WFM property (for example, inventory, supplies and equipment) should be used for business purposes. WFM property should be cared for and used responsibly, and it should be protected from misuse, improper disclosure, theft and destruction. Taking or using Company property of any value for personal purposes without appropriate permission from the Company is stealing. However, using WFM property (such as telephones, computers and fax machines) for incidental personal activities is permitted. Regional policies also apply to the use of various kinds of Company property, and Team Members should consult the GIG for information about these policies.

# WHOLE FOODS MARKET CONTACT INFORMATION

| Team Member Tipline for Team Members in the U.S. or Canada | 1-844-470-6772 |
|---|---|
| Team Member Tipline for Team Members in the U.K. | 0808-234-3523 |
| WFM Ethics Committee | ethics@wholefoods.com |
| CEO John Mackey | 1-512-542-0215<br>john.mackey@wholefoods.com |
| WFM General Counsel | 1-512-477-4455<br>legal@wholefoods.com |
| Corporate Communications Team | 1-512-487-9333<br>media@wholefoods.com |

# APPENDIX

## Our Core Values

Our Core Values reflect what is truly important to us as an organization. They represent our deeply held beliefs, and we use them to guide us fulfilling our mission and higher purpose as a company. Our six stated Core Values are as follows:

- We sell the highest quality natural and organic foods
- We satisfy and delight our customers
- We promote Team Member growth and happiness
- We practice win-win partnerships with our suppliers
- We create profits and prosperity
- We care about our communities and the environment

## Our Quality Standards

Our unparalleled Quality Standards ensure that the food, supplements, body care and cleaning products we sell meet a higher standard. All Team Members are responsible for upholding our Quality Standards in their business practices and job duties. For an overview of our Quality Standards please see https://www.wholefoodsmarket.com/quality-standards.

## Most Recent Code of Business Conduct Amendments

On August 22, 2019, Whole Foods Market amended the Code of Business Conduct to (1) update the conflict of interest provisions regarding Board members and WFLN members and their spouses and children (x) having an interest in WFM vendors, lenders and competitors and (y) doing business with WFM; (2) revise the section regarding outside employment or service with vendors so that it refers to the Moonlighting Policy and other policies; (3) update the policy regarding vendor-paid trips; (4) update the definition of a "competitor" of WFM; (5) clarify the policy regarding payments to lobbying organizations; and (6) make other minor changes.

# EXHIBIT C



Deliver to Margaret
New Orleans 70118    All ▾

EN ▾    Hello, Margaret
Account & Lists ▾    Returns
& Orders    12

amazon ▾

2 items
$44.65




All    Early Black Fr day Deals    Hol day G ft Gu de    Cl n c    Whole Foods    Pr me V deo

prime THURSDAY NIGHT FOOTBALL    29 : 21 : 27

Happy Baby Organ cs Superfood Puffs, Var ety Pack, 2.1... › **Quest ons & Answers**



## Happy Baby Organics Superfood Puffs, Variety Pack, 2.1 Ounce, Pack of 6 (Flavors may Vary)
by Happy Baby

---

# Customer Questions & Answers

Find answers in product info, Q&As, reviews

    arsen c

All    Product Informat on    **Customer Q&A's**    Customer Rev ews

**Q: The main ingredient is rice. Have you tested for arsenic?**
A: H , Thank you for post ng your quest on. We do evaluate the batches of r ce that we are us ng n our rec pes. We know and are sens t ve to the fact that all r ce conta ns vary ng levels of arsen c. That s why t rema ns our pr or ty to m ndfully source all of our ngred ents and ensure they are acceptable for our l ttle ones. If you have any other quest ons, please reach out to us at parents@happyfam lyorgan cs.com. Best, Laura see less
By **Happy Fam ly Brands** Laura, C... on March 11, 2020

**Q: Anyone worried about the "concerning levels of arsenic, cadmium, and lead?"**
A: H  Amazon Customer,
As a company run by parents who are proud to feed our ch ldren the products that we make every day, we take th s top c very personally and ser ously, and can say w th the utmost confidence that all of our products are safe for bab es and toddlers.

We want to personally assure you that we would never put a product n the market, nor would we feed them to our own ch ldren f they were unsafe. We have a proact ve contam nant mon tor ng program to ensure that all of our products are safe for consumpt on. We have str ct, self mposed qual ty standards and proact ve test ng at that s done by accred ted expert laborator es. Prov d ng ch ldren w th safe, nutr t ous products that are mon tored for these harmful tox ns and contam nants s the reason our company ex sts! If you have any other quest ons, please feel free to reach out to us d rectly at parents@happyfam lybrands.com.

Best, Laura see less
By **Happy Fam ly Brands** Laura, C... on August 21, 2018
See other answers

**Q: What testing methods do you have in place to ensure FDA approved level of metal and arsenic?**
A: H  Andy S., F rst and Foremost, we can say w th the utmost confidence that all Happy Fam ly Organ cs products are safe for bab es and toddlers, and meet l m ts for m nerals and metals set by the FDA. To help prov de further clar ty around our standards, we are cont nuously updat ng our Qual ty & Food Safety webpage, found through our l nk: https://www.happyfam lyorgan cs.com/qual ty and safety of our/products/. We hope th s helps to answer your quest ons. If you have other quest ons, please reach out to us d rectly! Best, Laura see less
By **Happy Fam ly Brands** Laura, C... on Apr l 14, 2021

**Q: Does this contain arsenic and lead as per recent costumer data for baby food?**
A: dont know
By **PN** on November 8, 2019

**Q: Does this contain arsenic and lead as per recent costumer data for baby food?**
A: I hope not! I fin shed them months ago. see less
By **Magda Dream** on October 18, 2019

**Q: Do you test for heavy metals since you are using brown rice?**
A: H , Thank you for reach ng out w th your quest on. As a company run by parents who are proud to feed our ch ldren the products that we make every day, we take th s top c very personally and ser ously and can say w th the utmost confidence that all of our products are safe for bab es and toddlers. We pr de ourselves on be ng at the forefront of mplement ng str ct qual ty standards n prov d ng clean, enl ghtened and nutr t ous offer ngs to bab es. The safety, health and wellness of our l ttle ones s, and has always been, an ntr ns c part of our DNA. Manag ng contam nant exposure s at the heart of our

bus ness and s embedded nto everyth ng that we do.

Our propr etary Qual ty and Food Safety program s des gned to ensure that all our products are safe for every baby and toddler. We have str ct, self mposed qual ty standards and conduct proact ve 3rd party test ng of our products, wh ch have always proven them to be safe for consumpt on. It s mportant to note that trace amounts of contam nants such as heavy metals l ke arsen c and lead, can often be found naturally n the env ronment, nclud ng n water and so l; so t s poss ble that small amounts can be present n some fru ts and vegetables. Manag ng exposure to these naturally occurr ng substances s ncred bly mportant to us. To l m t the presence of these trace amounts n the products we manufacture, we source h gh qual ty, organ c produce from trusted suppl ers and farmers. We are comm tted to mak ng certa n that our products, nclud ng our Superfood Puffs are safe for consumpt on. If you have any other quest ons, please reach out to us d rectly at parents@happyfam lyorgan cs.com. Best, Laura **see less**

By **Happy Fam ly Brands**    **Laura, C…** on December 13, 2019

---

**Don't see the answer you're looking for?**     [ Post your question ]

---

Customers also asked

When s the exp rat on date f I buy t now?          When s exp ry date?

Is th s the same as the ones bought n our local stores, Target/Publ x? I not ce the packag ng s d fferent and the one n stores have greener puffs.

Can I feed puffs to my dogs          Are these da ry free?

---

## Customers who viewed items in your browsing history also viewed

Page 1 of 7



NHUHEQ K ds Baseball Jackets Boys G rls F t Vars ty Jacket Casual L ghtwe ght Pla n Card gan School Coat
24
$19.99-$26.00



A2Z 4 K ds G rls Boys Baseball Contrast Jacket Vars ty Style Coat B.B Long Sleeves Jacket Sports Act vewear Age 2 13 Years
1,180
$24.99



AWD s Hoods Boys' Vars ty Letterman Jacket
913
$19.69-$37.98



DGSYSHML K ds Baseball Jackets Boys G rls Team Un form Vars ty Jacket Everyday Casual School Cotton Class c Cloth ng
22
$25.99



L ttleSpr ng Boys G rl Bomber Jacket Fall L ghtwe ght Vars ty Jacket Z p Up Th n
388
$22.99-$25.99

## Best Sellers in Baby & Toddler Feeding Supplies

amazon
2 items
$44.65



# EXHIBIT D



Deliver to Margaret
New Orleans 70118

Grocery & Gourmet Food ▾

EN ▾    Hello, Margaret
Account & Lists ▾

Returns
& Orders

2 items
$54.89



All    Early Black Fr day Deals    Hol day G ft Gu de    Cl n c    Whole Foods    Pr me V deo    Amazon Bas cs    Early Black Friday deals are here

Grocery    Deals    Snacks ▾    Breakfast ▾    Warm Beverages    Cold Beverages    Cooking Staples ▾    Baby Food ▾    Candy & Chocolate ▾    Subscribe & Save

Baby Products › Feeding › Baby Foods › Snack Foods

Sponsored

**Purchased 15 times.**
Last purchased Dec 21, 2020
Flavor: Flavor Puffs Variety Packs    V ew order

Add to essent als    |    Set rem nder

## Happy Baby Organics Superfood Puffs, Variety Pack, 2.1 Ounce, Pack of 6 (Flavors may Vary)

V s t the Happy Baby Store
6,933 rat ngs
| 86 answered quest ons

Amazon's Choice 🏷 for "happy baby puffs"

🌿 Cl mate Pledge Fr endly

Pr ce: **$24.07** ($1.91 / Ounce)

**Get 5% back ($1.20 in rewards)** on the amount charged to your Amazon Pr me Rewards V sa S gnature Card.

To use SNAP EBT, select **one-time purchase**

Flavor: **Flavor Puffs Variety Packs**

| Apple & Broccol |
| $15.31 |
| ($1.22 / Ounce) |

| Banana & Pumpk n |

| **Flavor Puffs Variety Packs** |
| **$25.34** |
| **($2.01 / Ounce)** |

| Kale & Sp nach |
| 1 option from $32.22 |

| Purple Carrot & Blueberry |
| 3 options from $32.65 |

| Strawberry & Beet |
| $41.43 |
| ($2.59 / Count) |

| Sweet Potato & Carrot |

### Subscribe & Save: 5%
**$24.07** ($1.91 / Ounce)
You've unlocked extra sav ngs on your next del very. Learn more

F rst del very on Dec 5
change

**In Stock.**

Q y: 1

Del ver every:

2 months (Most common) ▾

**Set Up Now**

Ships from and sold by Amazon.com

One-time purchase:
$25.34 ($2.01 / Ounce)

**FREE del very: Monday, Nov 21**
Ships from: Amazon.com
Sold by: Amazon.com

Add to essentials

Learn more about Your Essent als

Add to List

Add to Baby Registry

Add to Registry & Gifting

Have one to sell?

Sell on Amazon

Superfood Puffs! Parents, meet your baby's unsung hero Happy Baby Puffs are a melt n your mouth Organ c Snack fort fied w th Chol ne for eye & bra n health Irres st ble n taste & texture, they re perfect for teach ng bab es tact l ty & self feed ng!

- Organ c Snacks For Baby: Happy Baby goes beyond baby food w th del c ous, Superfood Puffs and freeze dr ed yogurt snacks Bab es may be ready for our del c ous snacks when they can crawl on the r hands and knees, w thout the r tummy touch ng the ground
- Happy Baby: We prov de organ c, del c ous opt ons for your baby's nutr t onal journey; Happy Baby offers baby food pouches, organ c cereals, teeth ng wafers, baby snacks and more made for your l ttle one
- Happy Fam ly Organ cs: We are on a m ss on to change the trajectory of ch ldren's health through nutr t on; We prov de age and stage appropr ate prem um organ c food products for baby, tot, k d, and mama
- Our Happy Prom se: All products are cert fied USDA organ c, made w th non GMO ngred ents grown w thout the use of tox c pers stent pest c des and n packag ng made w thout BPA, BPS, or phthalates

Report ncorrect product nformat on.

## Similar item to consider

Amazon's Choice

 Amazon Brand  Mama Bear Organ c Baby Food, Fru t Var ety Pack, 4 Ounce Tub, Pack of 12
4 Ounce (Pack of 12)
(2559)
$15.36 ($0.32/Ounce)
Cl mate Pledge Fr endly

9,902

Sponsored

 

54

Sponsored


2 items
$54.89



   

      

Roll over mage to zoom n

## Frequently bought together

 + 

Total pr ce: $44.64

Add bo h o Car

☑ **This item:** Happy Baby Organ cs Superfood Puffs, Var ety Pack, 2.1 Ounce, Pack of 6 (Flavors may Vary) $25.34 ($2.01/Ounce)
☑ Happy Baby Organ cs Teether, 3 Flavor Var ety Pack, 12 Count (Pack of 3) $19.30

## Products related to this item

Page 1 of 41

Sponsored










amazon

2 items
$54.89

| Seren ty K ds 6+ Months Gra n Free Puffs Toddler & Baby Snack \| No Added Sugar, Glu... | Happy Baby Organ cs Snackers Baked Gra n Snack, 2 Flavor Vegg e Var ety Pack, 1.5 O... | Happy Baby Organ cs Organ c Teether Crackers Gluten Free Strawberry & Beet w th Ama... | Happy Baby Organ cs Organ c Snackers, Gluten Free Baked Gra n Snack, Vegan Cheddar ... | Awsum Snacks Qu noa Baby Puffs Healthy K d Snack  Essent als Baby Food  USDA Org... |
|---|---|---|---|---|
| 2,191 | 386 | 184 | 6 | 33 |
| $32.95 ($3.66/Ounce) | $25.52 ($4.25/Count) | $25.56 ($2.51/Ounce) | $23.94 ($3.99/Count) | $33.99 ($1.89/Ounce) |
| 🌱 Climate Pledge Friendly | 🌱 Climate Pledge Friendly | 🌱 Climate Pledge Friendly | 🌱 Climate Pledge Friendly | 🌱 Climate Pledge Friend |



## Climate Pledge Friendly

Cl mate Pledge Fr endly uses susta nab l ty cert f cat ons to h ghl ght products that support our comm tment to help preserve the natural world. T me s fleet ng. Learn more

**Product Certification (1)**



USDA Organ c products are grown and processed accord ng to standards address ng so l and water qual ty, among other factors.

**From the manufacturer**









For crawling baby

25mg of choline, an essential nutrient for baby's development

15% DV Vitamin E

Melts in baby's mouth








amazon

2 items
$54.89









**Product Description**

Parents, meet your pantry's unsung hero. Happy Baby Puffs are a melt in your mouth organic snack fortified with Choline for eye and brain health. Irresistible in taste and texture, they're perfect for teaching babies tactility and self feeding. Try this convenient variety pack with one container of each of our flavors.

## Product details

**Is Discontinued By Manufacturer :** No

**Product Dimensions :** 11.5 x 7.5 x 9 inches; 14.08 Ounces

**Manufacturer recommended age :** 0  10 months

**Item model number :** VARHP 6

**Manufacturer :** Nurture, Inc.

**ASIN :** B017DC7M8U

**Country of Origin :** USA

**Domestic Shipping:** Currently, item can be shipped only within the U.S. and to APO/FPO addresses. For APO/FPO shipments, please check with the manufacturer regarding warranty and support issues.

**International Shipping:** This item can be shipped to select countries outside of the U.S. Learn More

**Best Sellers Rank:** #681 in Baby (See Top 100 in Baby)

#3 n Baby Snack Fo...

**Customer Reviews:**

6,933 rat ngs

# Videos

### Videos for this product



| | |
|---|---|
| 1:10 | 1:03 |
| Favorite Baby Snacks From a Nutritionist - Why I Love Them | Happy Baby Organic Puffs review! |
| Healthy Fit Fab | Charles Bost |

Upload your video

---

## Important information

**Safety Information**

Th s product s labelled to Un ted States standards and may d ffer from s m lar products sold elsewhere n ts ngred ents, label ng and allergen warn ngs.

**Ingredients**

see packag ng

**Legal Disclaimer**

Happy Baby Products

Statements regard ng d etary supplements have not been evaluated by the FDA and are not ntended to d agnose, treat, cure, or prevent any d sease or health cond t on.

---

## Products related to this item

Sponsored ⓘ

Page 1 of 24

    

| Happy Baby Organ cs Snackers Baked Gra n Snack, 2 Flavor Vegg e Var ety Pack, 1.5 O... | Happy Baby Organ cs Organ c Teether Crackers Gluten Free Strawberry & Beet w th Ama... | Happy Baby Organ cs Clearly Crafted Stage 2 Baby Food Var ety Pack, Pear Squash & B... | Cerebelly Toddler Snack Bars   Apple Kale (20 ct, Pack of 1), Healthy Snack Bars fo... | Happy Baby Organ cs Organ c Snackers, Glu... Free Baked Gra n Snac... Vegan Cheddar ... |
|---|---|---|---|---|
| 386 | 184 | 2,289 | 1,751 | 6 |
| $25.52 ($4.25/Count) | $25.56 ($2.51/Ounce) | $31.93 ($0.50/Ounce) | $23.96 ($1.20/Count) | $23.94 ($3.99/Count |
| ✹ Climate Pledge Friendly | ✹ Climate Pledge Friendly | ✹ Climate Pledge Friendly | ✹ Climate Pledge Friendly | ✹ Climate Pledge Friend |

amazon ▾



2 items
$54.89





**Help Their Taste Buds Blossom!**



Plum Organics Baby Food Pouch | Mighty 4 | Banana, Kiwi, Spinach, Greek Yogurt and Barley | 4 Ounce | 12...

167

$15$^{85}$ ~~$16.68~~ ✓prime

Save 5%   **Subscribe & Save**

★★★★½

amazon ▾

2 items
$54.89





Sponsored

## Customer questions & answers

**3 votes**

**Question:**  What s the youngest recommended age these should be g ven to a baby?

**Answer:**  9 months. Be sure baby can s t well and always feed when the baby s seated at the table/h gh cha r. They are a good for baby to pract ce p ck ng up and putt ng nto the r mouth. That s usually closer to 9 months.
By Lynn on November 5, 2021

My baby s 8 months and loves puffs
By Tessley on Apr l 11, 2022

My daughter s 7 mouth now, she love t
By T na on March 30, 2015

See more answers (2)

Collapse all answers

**1 vote**

**Question:**  how much ounces for each pack?

**Answer:**  2.1 oz n each conta ner, and that s a lot. Measures out to 4 1/2 cups n each conta ner.
By Bethay on March 14, 2018

Each bottle s 1.5 oz. A large bottle for beg nn ng eaters.
By Megan on December 3, 2015

Collapse all answers

**1 vote**

**Question:**  Anyone worr ed about the "concern ng levels of arsen c, cadm um, and lead?

**Answer:**  H Amazon Customer,
As a company run by parents who are proud to feed our ch ldren the products that we make every day, we take th s top c very personally and ser ously, and can say w th the utmost confidence that all of our products are safe for bab es and toddlers.

We want to personally assure you that we would never put a product n the market, nor would we feed them to our own ch ldren f they were unsafe. We have a proact ve contam nant mon tor ng program to ensure that all of our products are safe for consumpt on. We have str ct, self mposed qual ty standards and proact ve test ng at that s done by accred ted expert laborator es. Prov d ng ch ldren w th safe, nutr t ous products that are mon tored for these harmful tox ns and contam nants s the reason our company ex sts! If you have any other quest ons, please feel free to reach out to us d rectly at parents@happyfam lybrands.com.

Best, Laura see less
By Happy Fam ly Brands   Laura, C... **MANUFACTURER**   on August 21, 2018

Yes. I came across the art cle after purchas ng. Apparently, t s for the green (apple/broccol ) and purple one. I threw them both away.
By Sarah N cole on August 19, 2018

Collapse all answers

**Question:**  Do they conta n soy n any form?

**Answer:**

0 votes




amazon
2 items
$54.89

Thank you so much for comment ng w th your quest on! Our Happy Baby Superfood Puffs are soy free.

If you have any other quest ons, please feel free to ema l parents@happyfam lybrands.com. I'd be happy to help! :)

All the best,

Laura see less

By Amazon Customer **MANUFACTURER** on December 29, 2016

See more answered questions (82)

## Looking for specific info?

arsen c

All    Product Informat on    Customer Q&A's    **Customer Reviews**

**High level of Arsenic**
By The Funks on October 17, 2021
Congress onal report found th s had the h ghest amount of arsen c. Stay away.

**Contains lead and arsenic!**
By H. Sahn on February 7, 2021
A recent congress onal nvest gat on showed these to have h gh levels of lead and arsen c. They should be pulled off the market.

**Be careful with rice products (arsenic).**
By S mple on March 15, 2020
The one th ng I d l ke to know about products that use r ce flour s what are compan es do ng to prevent arsen c from be ng found n the r products.
We ordered th s only to find out the r sweet potatoes and carrot puffs was one of the top products w th the h ghest levels of arsen c (Please do a search on google). I m not tell ng anyone to boycott th s product but just rem nd parents to do the r research because arsen c s very dangerous for nfants.
The reason why there s an extra star s because I don t want to d ng th s product as a whole s nce only a few of them were l sted w th h gh levels of arsen c. Aga n, I hope consumers can ga n that confidence back by prov d ng nformat on on the r products and what they are do ng to prevent other dangerous metals from gett ng n nfant snacks.
Enjoy. see less

**Includes high levels of Arsenic**
By YSK on August 3, 2017
Per a v deo posted on Nutr t onFacts, the FDA analyzed the arsen c content of ch ldren's food and found h gh levels of arsen c n what they c ted as "Toddler Puffs Organ c Green Puffs Sweetened w th 100% Fru t Ju ce Made w th Organ c Whole Gra ns". Laura Jones, Customer Relat ons Coord nator at Happy Baby, wrote to Dr. M chael Greger:
"We are aware of the FDA r sk assessment on norgan c arsen c n r ce based products. We are not n a pos t on to determ ne wh ch company's products may be ncluded n the results l sted by the FDA and therefore we are not able to prov de any comments on the r results."
In l ght of that offic al statement, I threw out what rema ned and cancelled my subscr be and save orders. see less

**Not good for your baby !**
By Scott and Jess ca Gearhart on May 26, 2022
Looks these up on your own w th a Google search. H gh level of arsen c n these regardless of what the brand says. see less

**Great product**
By All son on Apr l 7, 2022
Those concerned about the arsen c n the r ce products should really just start mak ng the r own baby snacks. It s expected that there w ll be arsen c n r ce products that you buy and don t grow on your own. These are great. Baby loves them. They taste l ke regular Cheer os w thout the honey. see less

**Poison, see Clean Labels Project**
By M tra E. St cklen on December 29, 2017
POISON! We learned th s after purchas ng. Heavy metals! See Clean Label Project report. Arsen c and lead! see less

**Consumer Reports harmful ingredients**
By Mama Bear on August 19, 2018
Consumer Report org. Found to conta n norgan c arsen c, lead and cadm um above levels assoc ated w th potent al health r sks. see less

**Just Rice**
By M88Dw on October 16, 2021

They are marketed as "wholesome" snacks but they are all so heavily loaded with sugars that is also a concern for babies. My ped atr c an adv sed we avo d r ce cereal for our nfant due to the norgan c arsen c n r ce. I w sh I had read more carefully that these are r ce puffs before order ng.

Otherw se, no compla nts. We just l m t how many he has a day and found organ c sorghum puffs too. see less

**Consumer reports study found these to be high in heavy metals**
By Sarah R. on March 28, 2019
I w sh the company had d sclosed the dangerous levels of lead, cadm um and norgan c arsen c these conta n. I wouldn't have fed them to my nfant n h s first year of l fe, The compan es are aware of the tests. If you want to read the art cle by Consumer Reports you'll have to search t, amazon doesn't allow l nks. Here s a quote: "Most of the products came from the two b ggest U.S. baby food manufacturers, Beech Nut and Gerber. Other brands were Baby Mum Mum, Earth s Best, Ella s K tchen, Happy Baby, Parent s Cho ce (Walmart), Plum Organ cs, and Sprout. About two th rds of the products (34) we tested conta ned concern ng levels of cadm um, lead, and/or norgan c arsen c; 15 of them would pose a r sk to a ch ld who ate one serv ng or less per day." I would check the art cle out before you buy them but t s n pouches too. see less

Customers also asked

| When s exp ry date? | Do these conta n da ry, soy, or oat? |

| Are these da ry and soy free? Also, are they processed on the same equ pment as da ry or soy products? |

| When s the exp rat on date f I buy t now? | Are these da ry free? |

---

## Customer reviews

4.7 out of 5

6,933 global rat ngs

| | | |
|---|---|---|
| 5 star | | 83% |
| 4 star | | 8% |
| 3 star | | 5% |
| 2 star | | 2% |
| 1 star | | 2% |

How customer rev ews and rat ngs work

## By feature

| | |
|---|---|
| Value for money | 4.3 |
| Comfort | 4.3 |
| Flavor | 4.2 |

See more

## Review this product

Share your thoughts w th other customers

| Write a customer review |

### Reviews with images



See all customer mages

### Read reviews that mention

| gluten free | year old | baby loves | son loves | happy baby |

| motor skills | heavy metals | daughter loves | dissolve quickly |

| diaper bag | finger foods | less sugar | subscribe and save | high chair |

| Top reviews |

### Top reviews from the United States

 Sunshine  VINE VOICE

**Perfect gift**
Rev ewed n the Un ted States us on October 26, 2022
Flavor: Flavor Puffs Var ety Packs  Verified Purchase

I was nv ted to a 1 year old b rthday party and th s was one of the tems l sted on the r reg stry. The k ddo loves these snacks and I m glad the pr ce was very reasonable.

| Helpful |  Report abuse

 an Goldfarb

**my baby is crazy for these**
Rev ewed n the Un ted States us on October 21, 2022
Flavor: Purple Carrot & Blueberry  Verified Purchase

My baby loves these l ttle puffs. She grabs them w th her fingers. They d ssolve n her mouth so I don't have to worry too much about her chok ng on them. Great for car r des.

amazon

2 items
$54.89


amazon ▼

2 items
$54.89

Helpful    Report abuse

Sponsored

Happy Grandma

**Substitute for Sweet Cheerios.**

Rev ewed  n the Un ted States us on October 14, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

To an adult these seem dry & crumbly, but Our toddler l kes them & doesn t throw them as much as other snacks. Messy when stepped on but that s nev table dur ng th s stage of a parent s exper ences.

Helpful    Report abuse

Frequent Buyer

**Happy with my purchase**

Rev ewed  n the Un ted States us on October 5, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

My baby who  s now 12 months old loves these and I love them because they are healthy! Arr ved  n excellent cond t on and as you can tell from the p cs the Exp rat on Date was not an  ssue. Would recommend.

Helpful    Report abuse

Sum1

**Baby loves them!**

Rev ewed  n the Un ted States us on September 1, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

Not gonna l e, I have tasted a couple p eces from each of these just to see what my now 12 month olds (at the t me she started eat ng these 6mo) "hype  was all about. She loves these. She *GASPS* and *po nts* to them out of exc tement when they appear. 😄

O s alone taste almost l ke cardboard or some cheer y O l ke product. But the color dust on these l ttle O s do actually have flavor. Some are more pronounced than others.

Baby loves them. I l ke that they are m n mal  ngred ents and buy a few m nutes of d stract on and qu et when needed. W ll buy aga n. 💜

Helpful    Report abuse

S. E. McBroom

**Allergen warning**

Rev ewed  n the Un ted States us on September 26, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

Apple  s the second  ngred ent  n every flavor, not just ones w th apple  n the name. I w sh I had read the  ngred ents more carefully before order ng. The first two  ngred ents are r ce and apple  bas cally fillers.

Helpful    Report abuse

Jenny P.

**Bigger than expected**

Rev ewed  n the Un ted States us on September 23, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

I love hav ng these on hand and the b g conta ners w ll last a wh le. Also b g enough for her to reach  n and grab the snacks out on her own

Helpful    Report abuse

Brittney

**Delicious**
Rev ewed n the Un ted States us on October 11, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

**My baby loved them**

Helpful    Report abuse

See all reviews ›

## Top reviews from other countries

karishma gokul

**Do not buy!!**
Rev ewed n S ngapore sg on September 15, 2022
Flavor: Flavor Puffs Var ety Packs    Verified Purchase

Do not buy, t has lead.

Report abuse

See all reviews ›

## Related products from Happy Baby

Sponsored



Happy Baby Organ cs
Organ c Teether Crackers
Gluten Free Strawberry
& Beet w th Ama...
184
**$25.56** ($2.51/Ounce)

🌿 Climate Pledge Friendly

Happy Baby Organ cs
Snackers Baked Gra n
Snack, 2 Flavor Vegg e
Var ety Pack, 1.5 O...
386
**$25.52** ($4.25/Count)

🌿 Climate Pledge Friendly



Happy Baby Organ cs
Organ c Snackers, Gluten
Free Baked Gra n Snack,
Vegan Cheddar ...
6
**$23.94** ($3.99/Count)

🌿 Climate Pledge Friendly



Happy Baby Banana
Puffs, F nger Food,
Organ c, 2.1 oz
504

🌿 Climate Pledge Friendly



Happy Baby Organ cs
Cream es Freeze Dr ed,
Gluten Free Vegg e &
Fru t Snacks w th C...
4,177

🌿 Climate Pledge Friendly

8,188

Shop now

Sponsored

Disclaimer: Wh le we work to ensure that product nformat on s correct, on occas on manufacturers may alter the r ngred ent l sts. Actual product packag ng and mater als may conta n more and/or d fferent nformat on than that shown on our Web s te. We recommend that you do not solely rely on the nformat on presented and that you always read labels, warn ngs, and d rect ons before us ng or consum ng a product. For add t onal nformat on about a product, please contact the manufacturer. Content on th s s te s for reference purposes and s not ntended to subst tute for adv ce g ven by a phys c an, pharmac st, or other l censed health care profess onal. You should not use th s nformat on as self d agnos s or for treat ng a health problem or d sease. Contact your health care prov der mmed ately f you suspect that you have a med cal problem. Informat on and statements regard ng d etary supplements have not been evaluated by the Food and Drug Adm n strat on and are not ntended to d agnose, treat, cure, or prevent any d sease or health cond t on. Amazon.com assumes no l ab l ty for naccurac es or m sstatements about products.

Back to top





2 items
$54.89

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell products on Amazon | Amazon Rewards V sa S gnature Cards | Amazon and COVID 19 |
| Amazon Newsletter | Sell apps on Amazon | Amazon Store Card | Your Account |
| About Amazon | Supply to Amazon | Amazon Secured Card | Your Orders |
| Susta nab l ty | Protect & Bu ld Your Brand | Amazon Bus ness Card | Sh pp ng Rates & Pol c es |
| Press Center | Become an Affil ate | Shop w th Po nts | Amazon Pr me |
| Investor Relat ons | Become a Del very Dr ver | Cred t Card Marketplace | Returns & Replacements |
| Amazon Dev ces | Start a package del very bus ness | Reload Your Balance | Manage Your Content and Dev ces |
| Amazon Sc ence | Advert se Your Products | Amazon Currency Converter | Your Recalls and Product Safety Alerts |
| | Self Publ sh w th Us | Promot onal F nanc ng | Amazon Ass stant |
| | Host an Amazon Hub | | Help |
| | › See More Ways to Make Money | | |

English        United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music S ream m llions of songs | Amazon Adver ising Find, a rac , and engage cus omers | Amazon Drive Cloud s orage from Amazon | 6pm Score deals on fashion brands | AbeBooks Books, ar & collec ibles | ACX Audiobook Publishing Made Easy | Sell on Amazon S ar a Selling Accoun |
| Amazon Business Every hing For Your Business | Amazon Fresh Groceries & More Righ To Your Door | AmazonGlobal Ship Orders n erna ionally | Home Services Experienced Pros Happiness Guaran ee | Amazon gni e Sell your original Digi al Educa ional Resources | Amazon Web Services Scalable Cloud Compu ing Services | Audible Lis en o Books & Original Audio Performances |
| Book Deposi ory Books Wi h Free Delivery Worldwide | Box Office Mojo Find Movie Box Office Da a | ComiXology Thousands of Digi al Comics | DPReview Digi al Pho ography | Fabric Sewing, Quil ing & Kni ing | Goodreads Book reviews & recommenda ions | MDb Movies, TV & Celebri ies |
| MDbPro Ge nfo En er ainmen Professionals Need | Kindle Direc Publishing ndie Digi al & Prin Publishing Made Easy | Amazon Pho os Unlimi ed Pho o S orage Free Wi h Prime | Prime Video Direc Video Dis ribu ion Made Easy | Shopbop Designer Fashion Brands | Amazon Warehouse Grea Deals on Quali y Used Produc s | Whole Foods Marke America's Heal hies Grocery S ore |
| Woo ! Deals and Shenanigans | Zappos Shoes & Clo hing | Ring Smar Home Securi y Sys ems | eero WiFi S ream 4K Video in Every Room | Blink Smar Securi y for Every Home | Neighbors App Real-Time Crime & Safe y Aler s | Amazon Subscrip ion Boxes Top subscrip ion boxes – righ o your door |
| | PillPack Pharmacy Simplified | Amazon Renewed Like-new produc s you can rus | | | | |

Conditions of Use    Privacy Notice    nterest Based Ads
© 1996 2022, Amazon.com, nc. or its affiliates

# EXHIBIT E
## Filed Under Seal

# EXHIBIT F

**Filed Under Seal**

# EXHIBIT G
## Filed Under Seal

# EXHIBIT H
**Filed Under Seal**