[Submitting Counsel below]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION<br>This Document relates to:<br><br>*Watkins, et. al v. Nurture, LLC, et al.*<br>Case No. 3:24-cv-02832-JSC | Case no. 24-MD-3101-JSC<br>MDL 3101<br>Hon. Jacqueline Scott Corley<br>**THIRD AMENDED PETITION** |

## INTRODUCTION

1.      This case involves two manufacturers, Hain Celestial Group, Inc. and Nurture, LLC (collectively "Defendant Baby Food Manufacturers," or "Manufacturer Defendants") and two retailers that *knowingly* sold baby food products ("Baby Foods") which contain dangerous levels of toxic heavy metals—mercury,[1] lead, arsenic, and cadmium (collectively "Toxic Heavy Metals"), which are all known to be severe neurotoxins—and how such toxic exposures caused or substantially contributed to Plaintiff developing lifelong brain damage and neurodevelopmental disorders. The products of these Baby Food Manufacturers were retailed by Amazon.com Services,

---

[1] To be clear, the type of organic mercury at issue here is methylmercury found in food, not ethylmercury contained in the thimerosal vaccine. Ethylmercury is rapidly excreted from the body and is not considered as toxic as methylmercury. Ethylmercury and vaccines are irrelevant to this litigation.

[2] ~~Ppb (or ppb) is used to measure the concentration of a contaminant in soils, sediments, and water. 1 ppb equals 1 μg (microgram) of substance per kg of solid (μg/kg). For the average baby weighing approximately 3kg, the quantities of Toxic Heavy Metals found in Defendants' Baby Foods, as explained below, pose significant health risks.~~

1

LLC and Whole Food Market Services, Inc. (collectively "Retailer Defendants"). The four Defendants are collectively referred to as "Defendants." Plaintiff JMW ("Plaintiff"), represented in this lawsuit by his parents and guardians *ad litem*, is a five-year-old boy who lives with several neurological and cognitive injuries, including lowered IQ and debilitating Autism Spectrum Disorder ("ASD") because he consumed poisonous Baby Foods manufactured, marketed, and sold by these Defendants. This case seeks to hold the Defendants accountable for their reprehensible conduct and ensure they are punished for permanently affecting Plaintiff's ability to live a fulfilling life.

2.     That Defendants' Baby Foods are contaminated with staggering amounts of Toxic Heavy Metals recently made headlines following research and a Congressional investigation. In February 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, released a report containing shocking details of Defendants' tainted Baby Foods based on the submission of internal test results and company documents. Specifically, the Subcommittee found that Defendants sold Baby Foods containing as much as 180 parts per billion ("ppb")[2] inorganic arsenic, 641 ppb lead, and 10 ppb mercury, and manufacture their Baby Foods using ingredients containing as much as 913.4 ppb arsenic and 886.9 ppb lead, far eclipsing domestic and international regulatory standards. By way of comparison, the U.S. Food and Drug Administration ("FDA") has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the U.S. Environmental Protection Agency ("EPA") has capped the allowable level of mercury in drinking water at 2 ppb. With a chilling note the Subcommittee concluded that "[m]anufacturers *knowingly* sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[3]

---

[2] Ppb (or ppb) is used to measure the concentration of a contaminant in soils, sediments, and water. 1 ppb equals 1 μg (microgram) of substance per kg of solid (μg/kg). For the average baby weighing approximately 3kg, the quantities of Toxic Heavy Metals found in Defendants' Baby Foods, as explained below, pose significant health risks.
[3] Staff Report, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb 4, 2021) ("Subcommittee Report") at 59 (emphasis added).

2

3.     The high levels of Toxic Heavy Metals found in Defendants' Baby Foods are, in part, a function of the ingredients used by Defendants to manufacture their Baby Foods, the setting of dangerously inflated internal limits which Defendants willingly flouted, disregard of regulatory standards, and corporate policies which failed to test finished products before market distribution, purchase by unknowing parents, and consumption by vulnerable infants.

4.     Defendants' malicious recklessness and callous disregard for human life has wreaked havoc on the health of countless vulnerable children, all so that Defendants could maximize profits while deliberately misleading parents regarding the safety of the Baby Foods they manufactured and sold. Accordingly, this lawsuit will not only ensure that Plaintiff is duly compensated for his tragic injuries and Defendants punished, but that future generations are protected from the poisonous products that Defendants pander as "food."

## Parties

**A. Plaintiff**

5.     Plaintiff is a citizen of Louisiana and no other state and currently resides in New Orleans, Louisiana. Defendants' Baby Foods consumed by Plaintiff were purchased in New Orleans, Louisiana and consumed by Plaintiff in New Orleans, Louisiana.

**B. Defendants**

6.     Defendant Hain Celestial Group, Inc. ("Hain") is a citizen of Delaware and Colorado with its principal place of business in Boulder, Colorado. Hain sells Baby Foods under the brand name Earth's Best Organics. Hain offers infant and baby formula and foods as well as toddler foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on the go." At all relevant times, Hain has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Louisiana and Orleans Parish.

7.     Defendant Nurture, LLC ("Nurture") is a Delaware limited liability company Nurture owns Happy Family Brands (including Happy Family Organics) and sells Baby Foods under the brand name HappyBaby. Nurture classifies its Happy Baby range of products according to three categories: "baby," "tot," and "mama." The "baby" category is comprised of foods,

3

including "starting solids," intended for age groups 0-7+ months, the "tot" category covers 12+ months, and "mama" includes infant formulas for newborn babies. At all relevant times, Nurture has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of HappyBaby within the State of Louisiana and Orleans Parish.

8.      Defendant Whole Food Market Services, Inc. ("Whole Foods") is a Texas corporation with its principal place of business in Austin, Texas. At all relevant times, Whole Foods retailed the Manufacturer Defendants' Baby Foods online and at its stores throughout Louisiana. At all relevant times, Whole Foods has conducted business and derived substantial revenue from its retailing of Baby Foods within the State of Louisiana and Orleans Parish. Whole Foods is a wholly owned subsidiary of Amazon.

9.      Defendant Amazon.com Services LLC ("Amazon") is a limited liability company organized under the laws of Delaware and having its principal place of business in the State of Washington. The sole member of Amazon.com Services LLC is Amazon.com Sales, Inc., which is a Delaware corporation having its principal place of business in the State of Washington. Amazon is authorized to and doing business in Orleans Parish and the State of Louisiana. At all relevant times, Amazon has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the State of Louisiana and Orleans Parish.

10.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendants DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiff at this time, who therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiff for the acts and omissions alleged herein below, and the resulting injuries to Plaintiff, and damages sustained by Plaintiff. Plaintiff will amend this Complaint to allege the true names and capacities of said DOE Defendants when that same is ascertained. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within

4

the United States of America including the State of Louisiana and including Orleans Parish, and said Defendants derived and derive substantial revenue therefrom.

## JURISDICTION AND VENUE

11.    Plaintiff originally filed this case in the Orleans Civil District Court in Orleans Parish, Louisiana. Venue is proper in that court under La. C.C.P. art. 74 because a substantial part of the events or omissions giving rise to this claim occurred in Orleans Parish, Louisiana, and because the damages sustained as a result of tortious and wrongful conduct complained of herein were sustained in Orleans Parish, Louisiana.

12.    A Louisiana Court's exercise of personal jurisdiction over these Defendants is proper under La. R.S. § 13:3201 because Defendants have sufficient minimum contacts with the State of Louisiana and intentionally availed themselves of the market within Louisiana through the promotion, sale, marketing, and distribution of their products. Additionally, Defendants caused tortious injury by acts and omissions in this judicial jurisdiction and caused tortious injury in this jurisdiction by acts and omissions outside this jurisdiction while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or co-owned and services rendered in this jurisdiction.

13.    On March 4, 2022, Defendants removed this case to the United States District Court for the Eastern District of Louisiana, alleging diversity jurisdiction. Plaintiff thereafter moved to remand. The District Court denied that motion on March 22, 2024, without issuing reasons for the denial. Plaintiff files this Second Amended Petition without waiving any future right to seek remand to the Orleans Civil District Court in Orleans Parish, Louisiana.

## FACTUAL ALLEGATIONS

### I.   Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods.

14.    In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing

5

"outcomes- based programs to measurably reduce babies' exposures to toxic chemicals,"[4] published a report investigating the presence of Toxic Heavy Metals in baby foods.[5] The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded tha "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury. All but nine of 168 baby foods contained at leas one metal; most contained more than one."[6] Specifically, the HBBF report identified "puffs and other snacks made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple. pear, grape and other fruit juices," and "carrots and sweet potatoes" manufactured by the Defendant Baby Food Companies as particularly high in Toxic Heavy Metals.[7]

15.    The results of the HBBF report were consistent with that of the FDA which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.[8] However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."[9] The HBBF's findings were by no means an outlier. Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead and cadmium concentrations in a large convenience sample of US baby foods."[10] The study detected lead in 37% of samples, and cadmium in 57%.[11] This was consistent with findings by researchers examining baby food products in other parts of the world.

---

[4] https://www.hbbf.org/solutions.
[5] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www healthybabyfood.org/sites/healthybabyfoods/files/2019- 10/BabyFoodReport FULLREPORT ENGLISH R5b.pdf).
[6] *Id*. at 6.
[7] *Id*. at 10-11.
[8] *Id*. at 6.
[9] *Id*. at 6.
[10] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant formulas and baby foods*, 651 SCI.TOTAL ENVIRON. 1, 822-827 (2019), available at: https://www.sciencedirect.com/science/artic1e/abs/pii/S0048969718334442?via%3Dihub.
[11] *Id*.

THRID AMENDED PETITION

## II. Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods, Sparking National Outrage.

16.　　On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including arsenic, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.[12]

17.　　The Subcommittee reported that the data submitted by the companies unequivocally revealed that a substantial number of Defendants' finished products and/or ingredients used to manufacture the Baby Foods are tainted with significant levels of Toxic Heavy Metals, namely inorganic arsenic, lead, and mercury.[13]

18.　　Specifically, the Congressional committee concluded that arsenic was present in baby foods. Nurture (Happy BABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over l00 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic. Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

19.　　Lead was present in baby foods made by all responding companies. Nurture (Happy BABY) knowingly sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead. Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

20.　　Moreover, Nurture (Happy BABY) sold finished baby food products containing as

---

[12] *See generally* Subcommittee Rpt.
[13] *Id.* at 2-3.

much as 10 ppb mercury. Hain (Earth's Best Organic) does not test for mercury in baby food.[14] However, independent testing by HBBF of Hain's Baby Foods confirm that Hain's products contain as much as 2.4 ppb of mercury.[15]

21.    These levels greatly surpass the limits allowed by U.S. regulatory agencies. Upon information and belief, there were no FDA regulations governing the presence of Toxic Heavy Metals in Baby Foods specifically (with the exception of infant rice cereal) during the time that JMW was consuming Baby Foods; to the extent such regulations existed, the quantities of Toxic Heavy Metals in Defendants' Baby Foods far exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic and 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to adult exposure, not infants. Compared to these thresholds, the test results of the Defendants' Baby Foods and their ingredients are 91 times greater than permitted arsenic levels, 177 times greater than permitted lead levels, and 5 times greater than permitted mercury levels.

22.    Moreover, compounding these troubling findings, the Manufacturer Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below. For example, the Subcommittee found that Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic and lead in some of its ingredients. But Hain routinely exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic. Hain justified these deviations based on "theoretical calculations," even after Hain admitted to FDA that its testing underestimated final product toxic heavy metal levels.[16]

23.    As found by the Subcommittee, the Defendants have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products. In August 2019, Hain held a closed-door meeting

---

[14] *Id.* at 2-4.
[15] *See* HBBF Rpt. at 19.
[16] *Id.* at 4-5.

with the FDA during which Hain delivered a presentation to the agency acknowledging the Toxic Heavy Metal problem in its Baby Food.[17] In the PowerPoint slides presented during the meeting—only made public by the Subcommittee—Hain confirmed that some of the ingredients in its Baby Food contain as much as between 108 to 129 ppb of arsenic, specifically noting "[p]reliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor."[18]

24.    Discovery will flesh out in greater detail the extent of Toxic Heavy Metals in the Baby Food sold by Defendants.

25.    At all times relevant to this litigation, the quantity of Toxic Heavy Metals in Defendants' Baby Foods was sufficient to cause neurological injury and/or exacerbate underlying neurological conditions injuries and/or act together with other factors to cause or exacerbate underlying neurological conditions or injuries to result in injuries that include cognitive impairment, lowered IQ, and a diagnosis of autism spectrum disorder.

### III.    Dangers of Toxic Heavy Metals to Babies and Children.

26.    According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically arsenic, lead, and mercury, pose a "major public health concern" for children.[19] The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."[20] Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number one among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), and mercury (third).[21]

27.    The threat presented by Toxic Heavy Metals to children's health is widely shared

---

[17] Hain, *PowerPoint Presentation to Food and Drug Administration: FDA Testing Result Investigation* (Aug. 1, 2019) ("2019 Hain & FDA Meeting"), available at:
https://oversight.house.gov/sites/democrats.oversight house.gov/files/2.pdf).
[18] *Id.* at *9.
[19] World Health Organization, *Children's Health and the Environment WHO training Package for the Health Sector* (October 2011), available at: https://www.who.int/ceh/capacity/heavy metals.txlf.
[20] OSHA, *Toxic Metals*, available at: https://www.osha.gov/toxic-metals.
[21] ATSDR, *ATSDR 's Substance Priority List* (2019), available at: www.atsdr.cdc.gov/spl/index.html#20l9spl.

by the global scientific community. As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases. Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."[22] Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.[23] And, the mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.[24] For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs.[25] According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[26] Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth."[27] In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

28.    Toxic Heavy Metals can have these devastating health outcomes for babies and children regardless of the method or route of exposure. Nothing about the baby food products

---

[22] Osman, et al., *Exposure routes and health effects of heavy metals on children*, 32 BIOMET ALS 563-573 (2019) available at: https://link.springer.com/article/10.1007%2Fsl 0534-019-00193-S#citeas.

[23] Stein, et al., *In harm's way: toxic threats to child development,* 23 J DEVBEHAV PEDIATR. 1 Sl3-S22 (2002).

[24] Gorini, et al., *The Role of Heavy Metal Pollution in Neurobehavioral Disorders: A Focus on Autism*, 1 REV. J. AUTISM DEV. DISORD. 1, 354-372 (2014), available at: https://link.springer.com/article/10.1007/s40489-014-0028-3.

[25] Del Rio, et al., *A comparison of arsenic exposure in young children and home water arsenic in two rural West Texas communities*, 17 BMC PUBLIC HEALTH 850 1-13 (2017), available at: https://bmcpublichealth.biomedcentral.com/articles/1O. 11 86/s12889-017-4808-4.

[26] Roni Caryn Rabin, *Some Baby Food May Contain Toxic Metals, US. Reports* (NY TIMES, Feb 4. 2021), available at: https://www nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html

[27] Gorini, et al. *supra*.

manufactured and sold by Defendants or the nutrients or ingredients that may be contained therein are sufficient to blunt, ameliorate, inhibit, or prevent the ill effects that exposure to Toxic Heavy Metals can have on babies and children.

### A. Exposure to Toxic Heavy Metals Has Been Consistently Associated with Autism in Pediatric Populations

29.     A chorus of regulators, research agencies and independent scientists are in broad agreement that exposure to heavy metals in early life is causally associated with ASD. The Centers for Disease Control ("CDC") in its toxicological profile of lead specifically observes that "neurodevelopmental effects in children have been associated with [lead]" at different quantities of exposure.[28] At doses of <10 μg/dL29,[29] the agency observed "[a]ltered mood and behaviors that may contribute to learning deficits, including attention deficits, hyperactivity, *autistic behaviors*, conduct disorders, and delinquency."[30] The U.S. National Institute of Health ("NIH") concurs, noting that "[p]renatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."[31] And, in July 2016, a large consortium consisting of the world's leading epidemiologists, autism experts, and medical organizations published a consensus statement which identified heavy metals such as lead and mercury as "*prime examples* of toxic chemicals that can contribute to…autism spectrum disorder[.]"[32]

30.     Such conclusions are based upon a substantial body of independent, peer-reviewed research conducted throughout various parts of the world over the last decade which has consistently observed a positive association between exposure to Toxic Heavy Metals and the development of ASD in children and infant populations. The literature is comprised of prospective

---

[28] ATSDR Toxicological Profile for Lead at 133, available at: https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf.
[29] This means effects observed at less than ten micrograms of lead per blood liter.
[30] *Id*. (emphasis added).
[31] NIH, *Autism Spectrum Disorder and the Environment* (April 2019), available at:
https://www.niehs.nih.gov/health/materials/autism_spectrum_disorder_and_the_environment_508.pdf
[32] Bennett, et al., *Project TENDR: Targeting Environmental Neuro-Developmental Risks The TENDR Consensus Statement* 124 ENVIRON. HEALTH. PERSPECT. 7 A118-A122 (2016), available at:
HTTPS://WWW.NCBI.NLM.NIH.GOV/PMC/ARTICLES/PMC4937840/. (emphasis added).

11

cohort studies where children's metal exposure is measured in early life and their risk of subsequently developing ASD evaluated; pre-natal studies where pregnant mothers' metal exposure is measured prior to assessing the risk of ASD in later born children; case-control and cross-sectional studies where children's metal exposure is measured contemporaneous with ASD diagnoses; as well as meta-analyses where individual studies are grouped together to derive an overall picture of the data.

31.     Repeatedly, the different study types evince a strong association between metal exposure and ASD risk. For example, a 2017 NIH-funded study of twins concluded that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD…[and] increases ASD risk and severity"[33] Similarly, a 2019 study and a 2021 study of metal exposure in pregnant mothers and the risk of subsequent ASD diagnosis in children respectively observed that "[arsenic] and [lead] levels in [amniotic fluids] tend to be positively associated with ASD risk, suggesting the possible role of prenatal exposure to toxic metals in the ASD development"[34] and "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD…in children. The most notable ones involved arsenic…mercury… and lead."[35]

32.     Such results have been replicated in prospective cohort studies of early life metal exposure, with a 2016 Korean study noting that "[e]ven low blood lead concentrations at 7–8 years of age are associated with more autistic behaviors at 11–12 years of age[.]"[36] Similarly, another prospective Korean study from 2017 "observed that higher blood mercury levels at late pregnancy, in cord blood, and at 2 and 3 years of age were positively associated with autistic behaviors among

---

[33] Arora. et al., *Fetal and postnatal metal dysregulation in autism*, 8 NATURE COMM. 1-10, 1, 5 (2017), available at: https://www.nature.com/articles/ncomms15493.

[34] Long, et al., *Autism spectrum disorders, endocrine disrupting compounds, and heavy metals in amniotic fluid: a case-control study* 10 MOL. AUTISM 1-19, 15 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/30647876/.

[35] Skogheim, et al. *Metal and essential element concentrations during pregnancy and associations with autism spectrum disorder and attention-deficit/ hyperactivity disorder in children*, 152 ENVIRON. INTL. 1-14, 1 (2021), available at: https://pubmed.ncbi.nlm.nih.gov/33765546/.

[36] Kyoung-Nam Kim et al., *Low-level lead exposure and autistic behaviors in school-age children* 53 EURO TOXICOLOGY 193-200, 193 (2016), available at: https://pubmed.ncbi.nlm.nih.gov/26877220/.

preschool-age children."[37]

33.     Furthermore, smaller human studies from around the world have observed similar results, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy metal exposure, particularly mercury, in the etiology of ASD.[38] Indeed, a 2014 Egyptian study noted that "[l]ead and mercury are considered as one of the main causes of autism."[39]

34.     On the basis of this robust body of data, several meta-analyses published in recent years report consistent associations between exposure to Toxic Heavy Metals and ASD in children with the authors of a 2017 meta-analysis specifically concluding: "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."[40]

_____

[37] Jia Ryu et al., *Associations of prenatal and early childhood mercury exposure with autistic behaviors at 5 years of age: the Mothers and Children's Environmental Health (MOCEH) Study*, 605-606 SCI. OF THE TOTAL ENVT. 251-257, 251 (2017), available at: https://pubmed ncbi.nlm.nih.gov/28667852/.

[38] Li, et al., *Blood Mercury, Arsenic, Cadmium, and Lead in Children with Autism Spectrum Disorder*, 181 BIOL TRACE ELEM RES 31-37, 31 (2018), available at: https://pubmed.ncbi.nlm.nih.gov/28480499/; *see also* Dickerson, et al., *Autism spectrum disorder prevalence and associations with air concentrations of lead, mercury, and arsenic*, 188 ENVIRON MONIT. ASSESS. 407 (2016); Mohamed, et al., *Assessment of Hair Aluminum, Lead, and Mercury in a Sample of Autistic Egyptian Children: Environmental Risk Factors of Heavy Metals in Autism*, BEHAV. NEUROL. (2015), available at: https://pubmed ncbi nlm nih.gov/26508811/; Adams, et al., *Toxicological Status of Children with Autism vs. Neurotypical Children and the Association with Autism Severity*, 151 BIOL. TRACE ELEM. RES 171-180 (2013), available at: https://pubmed ncbi nlm nih.gov/23192845/.

[39] Yassa, H., *Autism: A form of lead and mercury toxicity*, 38 Environ. Tox. & Pharm. 1016-1024 (2014), available at: https://pubmed.ncbi.nlm.nih.gov/25461563/ (emphasis added); *see also* Filon, et al., *Analysis of lead, arsenic and calcium content in the hair of children with autism spectrum disorder*, 20 BMC PUBLIC HEALTH 1-8 (2020), available at: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-020-08496-w; Fiore, et al., *Metal and essential element levels in hair and association with autism severity*, 57 JOURNAL OF TRACE ELEMENTS IN MEDICINE AND BIOLOGY 99-103 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/31630927/.

[40] Jafari, et al., *The association between mercury levels and autism spectrum disorders: A systematic review and meta-analysis*, 44 J. Trace Elem. Med. Biol. 289-297, 289 (2017), available at: https://pubmed.ncbi nlm nih.gov/28965590/; Saghzadeh & Rezai, S*ystematic review and meta- analysis links autism and toxic metals and highlights the impact of country development status: Higher blood and erythrocyte levels for mercury and lead, and higher hair antimony, cadmium, lead,   and mercury*, 79 PROG. NEURO-PSYCHOPHARMACOL. BIOL. PSYCHIATRY 340-368 (2017), available at: https://pubmed.ncbi nlm nih.gov/28716727/; Wang, et al., *Exposure to Inorganic Arsenic and Lead and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 21 CHEM RES. TOXICOL. 32, 1904-1919 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/31549506/; Sulaiman, et al., *Exposure to Aluminum, Cadmium, and Mercury and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 33 Chem. Res. Toxicol. 11, 2699-2718 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/32990432/; Yoshimasu, et al., *A meta-analysis of the evidence on the impact of prenatal and early infancy exposures to mercury on autism and*

*Footnote continued on next page*

13

35.    The fact that such results have been observed in multiple studies, conducted by different researchers, at different times, in different parts of the world, in children of varying ages, and measuring a variety of end-points (including hair, blood, and urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of ASD in children.

**IV.  Defendants Knowingly Sold Baby Foods Containing Dangerous Levels of Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children.**

36.    During the time that Defendants manufactured and sold Baby Foods in the United States, the weight of evidence showed that Defendants' Baby Foods exposed babies and children to unsafe levels of Toxic Heavy Metals capable of causing or exacerbating neurological injury and resulting ASD diagnoses, cognitive impairments, IQ loss, and other neurodevelopmental disorders and conditions.  Defendants failed to disclose this risk to consumers through any means.

37.    As discussed above, both independent testing, the Manufacturer Defendants' internal evaluations of their Baby Foods, and the Manufacturer Defendants' representations and disclosures to the Subcommittee and FDA reveal the presence of substantial amounts of Toxic Heavy Metals in Defendants' products at levels capable of causing the injuries complained of herein. As such, Defendants knew or should have known that their Baby Foods contain dangerous of Toxic Heavy Metals.

38.    Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market,[41] and the HBBF Report further confirmed such contamination of Defendants' Baby Foods.[42] And, as the Subcommittee found, the Manufacturer Defendants continued to sell their Baby Foods even after testing of both ingredients and finished products revealed the presence of substantial amounts of

---

*attention deficit/hyperactivity disorder in the childhood*, 44 NEURO TOXICOL. 121-131 (2014), available at: https://pubmed.ncbi nlm nih.gov/24952233/.
[41] *See* Gardener, et al., *supra*.
[42] *See* HBBF Rpt, *supra*.

Toxic Heavy Metals.[43]

39.     Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers, marketers, and retailers of Baby Foods, are held to the standard of experts responsible for keeping abreast of the latest scientific developments related to the dangers of contaminants in their products. Defendants failed to take action in protecting vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of neurological damage and developing neurodevelopmental disorders such as ASD and cognitive impairments such as loss of IQ.

40.     To be clear, the Manufacturer Defendants are able to manufacture Baby Foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals, or sampling their ingredients from other sources, as specifically acknowledged by Hain in its August 2019 presentation to the FDA: "Explore alternatives for Brown Rice ingredient to reduce risk." [44] At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of and/or risks associated with the levels of Toxic Heavy Metals in their Baby Foods. However, Defendants took no action, continued to manufacture, market, and sell their products with full knowledge of the risks posed by their Baby Foods, and misled consumers regarding the safety of their products, all to the harm of children.

### V.  Exemplary/ Punitive Damages Allegations (Against Manufacturer Defendants)

41.     Defendants' conduct as alleged herein was intentional, willful, wanton, oppressive, and done with reckless disregard for human life. Defendants' conduct is particularly reprehensible given that their toxic foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

---

[43] *See, e.g.*, Subcommittee Rpt. at 13-14.
[44] 2019 Hain & FDA Meeting at *10.

42.    Defendants were fully aware of the safety risks of Baby Foods, particularly the dangerous potential of their Baby Foods given the high content of Toxic Heavy Metals that have all been associated with neurodevelopmental injury and disorders in children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their Baby Foods as safe for consumption and go so far as claiming that they adhere to "the strictest standards in the world" and provide "baby's food full of nutrition while meeting standards strict enough for tiny tummies" as well as other statements and representations that hold out their Baby Foods as safe for consumption by infants and young children. In fact, as discussed above, Defendants routinely sold Baby Foods containing astronomical amounts of Toxic Heavy Metals, regularly flouted their own internal limits of Toxic Heavy Metals in Baby Foods, and failed to disclose to consumers that their products contained such dangerous contaminants.

43.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their Baby Foods were harmless to humans, and that full disclosure of the true risks of the Toxic Heavy Metals present in the Baby Foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, failure to test, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Parents were denied the right to make an informed decision about whether to purchase and Defendants' Baby Food for their children, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

44.    Pursuant to La. C.C.P. art. 3546, the injurious conduct at issue in this case occurred at each Defendants' principal place of business, where decisions regarding the marketing, design, manufacturing processes, and warnings on the products consumed by JMW were made.

45.    Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Plaintiff.

## PLAINTIFF SPECIFIC ALLEGATIONS

46.     Plaintiff was born on April 5, 2018, and diagnosed with ASD in early 2021, at approximately 2 years and 9 months of age.

47.     Plaintiff started consuming Baby Food products manufactured by Defendants Nurture and Hain prior to his ASD diagnosis. Plaintiff consumed substantial quantities of the Baby Food products manufactured by Defendants prior to his ASD diagnosis.

48.     Plaintiff's parents purchased these Baby Food products through Defendants Whole Foods and Amazon.

49.     Defendants' Baby Foods consumed by Plaintiff were purchased in New Orleans, Louisiana and consumed in New Orleans, Louisiana.

50.     Upon information and belief, the Baby Food products manufactured by Nurture and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead—exceeding that of any regulatory limits.

51.     Upon information and belief, as a direct and proximate result of consuming Nurture's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

52.     Upon information and belief, nothing about Nurture's Baby Foods, or the nutrients or ingredients contained therein, was sufficient to blunt, ameliorate, inhibit, or prevent the ill effects caused by exposure to the Toxic Heavy Metals contained in Nurture's Baby Foods.

53.     As a direct and proximate result of consuming Nurture's Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered neurological injury and was diagnosed with ASD.

54.     Upon information and belief, the Baby Food products manufactured by Hain and consumed by Plaintiff were all contaminated with substantial quantities of Toxic Heavy Metals, namely arsenic, mercury, and lead—exceeding that of any regulatory limits.

55.     Upon information and belief, as a direct and proximate result of consuming Hain's Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals, namely mercury, lead, and arsenic.

56. Upon information and belief, nothing about Hain's Baby Foods, or the nutrients or ingredients contained therein, was sufficient to blunt, ameliorate, inhibit, or prevent the ill effects caused by exposure to the Toxic Heavy Metals contained in Hain's Baby Foods.

57. As a direct and proximate result of consuming Hain' s Baby Foods—and the exposure to the Toxic Heavy Metals therein—Plaintiff suffered neurological injury and was diagnosed with ASD.

58. Based on prevailing scientific evidence, exposure to Toxic Heavy Metals at the levels contained in Defendants' Baby Foods can cause cognitive impairment, loss of IQ, and neurological injury resulting in ASD in humans.

59. Based on prevailing scientific evidence, nothing about the ingredients or total composition of Defendants' Baby Foods is sufficient to mitigate, ameliorate, inhibit, or otherwise diminish the toxic effects of the Toxic Heavy Metals contained therein.

60. Had any Defendant warned Plaintiff's parents that Defendants' Baby Foods could lead to exposure to Toxic Heavy Metals or, in turn, neurological damage, cognitive impairment, loss of IQ, or ASD, Plaintiff would not have consumed the Baby Foods.

61. Plaintiff alleges that as a direct and proximate result of Plaintiff's consumption of Baby Foods supplied and distributed by Defendants, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, cognitive impairment, loss of IQ, neurological damage, ASD, and other *sequelae*.

## CAUSES OF ACTION

### A. COUNT I: PRODUCTS LIABILITY—FAILURE TO WARN
#### (Against Manufacturer Defendants)

62. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

63. At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and

18

promoting Baby Foods, which are defective and unreasonably dangerous to consumers, including Plaintiff and his parents, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Baby Foods and Toxic Heavy Metals. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Baby Foods and aimed at a consumer market.

64.     Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff and his parents, and therefore had a duty to warn of the risks associated with the consumption of Baby Foods contaminated with Toxic Heavy Metals.

65.     At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff and his parents of dangers associated with Baby Foods. Defendants, as manufacturers, sellers, or distributors of food, are held to the knowledge of an expert in the field.

66.     At the time of the manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

67.     At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers of their products to users and consumers and to those who would foreseeably use or be harmed by Defendants' Baby Foods.

68.     Even though Defendants knew or should have known that Baby Foods posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use of and exposure to the products. The dangerous propensities of their products and the neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Baby Foods, as

described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the product, and were not known to end users and consumers, such as Plaintiff. The product warnings for Baby Foods in effect during the time period Plaintiff consumed Baby Foods were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Baby Foods consumption.

69.     Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, of the risks of exposure to their products. Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of Toxic Heavy Metals in their Baby Foods and the potential for consumed Baby Foods to expose children to Toxic Heavy Metals, and further, have made false and/or misleading statements concerning the safety of Baby Foods.

70.     At all relevant times, Defendants' Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

71.     Plaintiff was exposed to Defendants' Baby Foods without knowledge of their dangerous characteristics.

72.     At all relevant times, Plaintiff was exposed to Defendants' Baby Foods while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

73.     Plaintiff could not have reasonably discovered the defects and risks associated with Baby Foods prior to or at the time of Plaintiff consuming Baby Foods. Plaintiff relied upon the skill, superior knowledge, and judgment of the Defendants to know about and disclose serious health risks associated with using Defendants' products.

74.     Defendants knew or should have known that the information disseminated with their Baby Foods was inadequate, failed to communicate adequate information on the dangers of consumption, and failed to communicate warnings and instructions that were appropriate and

adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses

75. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff and his parents to avoid purchasing and consuming the products. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of consuming Baby Foods.

76. This alleged failure to warn is not limited to the information contained on Baby Foods labeling. The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium The ability to provide such warnings is not prohibited by any federal law.

77. Furthermore, Defendants possess a First Amendment right to make truthful statements about the products they sell, and no law could lawfully constrain that constitutional right.

78. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Baby Foods, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative products However, as a result of Defendants' concealment of the dangers posed by their Baby Foods, Plaintiff could not have averted his injuries.

79. Defendants' conduct, as described above, was reckless. Defendants risked the lives of babies and children, including Plaintiff, with knowledge of the safety problems associated with Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct

warrants an award of punitive damages.

80.    The Defendants' lack of adequate warnings and instructions accompanying their Baby Foods were a substantial factor in causing Plaintiff's injuries.

81.    The Defendants' lack of adequate warnings and instructions accompanying their Baby Foods caused or contributed to Plaintiff's injuries.

82.    As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, past and future medical expenses, lost income, and other damages.

83.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## ~~B.~~    COUNT II: PRODUCTS LIABILITY—DESIGN DEFECT
### (Against Manufacturer Defendants)

84.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

85.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff. These actions were under the ultimate control and supervision of Defendants.

86.    At all relevant times, Defendants' Baby Food products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or expose to infants and babies, including Plaintiff.

87.    Defendants' Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they were placed into the stream of commerce, they were Defendants' Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants and were

22

defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

88.    At all relevant times, the Baby Food products consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

89.    At all relevant times, Defendants knew or had reason to know that their Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

90.    Therefore, at all relevant times, Defendants' Baby Food products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendants' Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.    When placed in the stream of commerce, Defendants' Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

c.    Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products;

d.    Defendants did not sufficiently test, investigate, or study their Baby Foods and, specifically, the ability for Baby Foods to expose babies to high amounts of Toxic Heavy Metals;

e.    Exposure to Defendants' Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

f.    Defendants knew or should have known at the time of marketing Baby Foods that exposure to Toxic Heavy Metals contained in the Baby Foods could result in neurological injuries, cognitive impairments, and neurodevelopmental disorders—

23

specifically ASD—and other severe illnesses and injuries; and

g.   Defendants did not conduct adequate post-marketing surveillance of their Baby Foods.

91.   Defendants could have employed safer alternative designs and formulations. For example, the Defendants could have avoided use of certain ingredients high in Toxic Heavy Metals, avoided using pre-mix vitamins high in Toxic Heavy Metals, and/or sampled their ingredients from other sources.

92.   The likelihood that the design and formulation of the Baby Foods as sold by Defendants would cause JMW's neurological injury resulting in ASD and cognitive impairments and the severity of that injury outweigh any minimal burden on Defendants in using a safer alternative design as described herein.

93.   Plaintiff consumed Defendants' Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

94.   Defendants' Baby Food products were and are more dangerous than alternative products, and Defendants could have designed their Baby Food products to avoid harm to children. Indeed, at the time Defendants designed the Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

95.   At the time the Baby Food products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Baby Foods, as, for example, demonstrated by Hain's presentation to the FDA wherein Hain acknowledges the risk posed by specific ingredients in its Baby Foods.

96.   Defendants have intentionally and recklessly defectively designed the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

97.   The design defects in Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

98.   The design defects in Defendants' Baby Foods caused or contributed to Plaintiff's injuries.

24

99.    As a direct and proximate result of the Defendants' defective design of the Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

100.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### ~~C.~~    COUNT III: PRODUCTS LIABILITY—MANUFACTURING DEFECT
#### (Against Manufacturer Defendants)

101.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

102.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiff.

103.    At all relevant times, the Baby Foods consumed by Plaintiff were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

104.    At all relevant times, the Baby Foods consumed by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

105.    The Baby Foods consumed by Plaintiff were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that Defendants deviated materially from their manufacturing specifications and/or performance standards and/or such design and manufacture posed an unreasonable risk of harm to Plaintiff.

106.    The Defendants' Baby Foods are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of parents or children.

107.    The Defendants' Baby Foods create risks to the health and safety of babies that are far more significant and devastating than the risks posed by other baby food products, and which

25

far outweigh the utility of the Baby Foods products because of Defendants' manufacturing defects, which included but were not limited to: Failure to adequately inspect/test the Baby Foods during the manufacturing process; Failure to implement procedures that would reduce or eliminate the levels of Toxic Heavy Metals in Baby Foods; Failure to use ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture Baby Foods.

108.    Defendants have intentionally and recklessly manufactured the Baby Foods with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

109.    The manufacturing defects in Defendants' Baby Foods were substantial factors in causing Plaintiff's injuries.

110.    The manufacturing defects in Defendants' Baby Foods caused or contributed to Plaintiff's injuries.

111.    As a direct and proximate result of the Defendants' defective manufacture of the Baby Foods, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, and other damages.

112.    **WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

D.      **COUNT IV: PRODUCTS LIABILITY—BREACH OF EXPRESS WARRANTY**
**(Against Manufacturing Defendants)**

113.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

114.    Defendant Baby Food Manufacturers' Baby Food products are unreasonably dangerous because they do not, and did not, conform to the express warranty made at all relevant times by the Defendant Baby Food Manufacturers that their product was "baby food."

115.    The express warranty that the Defendant Baby Food Manufacturers' product was

26

"baby food" induced the parents of JMW to purchase and use the Baby Food as "baby food."

116.    At all times the Baby Foods were used in a reasonably anticipated or intended manner.

117.    Plaintiff's injuries were directly and proximately caused or contributed to because the express warranty that the Baby Food was in fact appropriate to feed to babies was untrue.

118.    In fact, the "food" Defendants sold was more appropriately warranted as rat food and was not healthy or something that a baby should ever ingest as food.

119.    **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V: REDHIBITION

### (Against Retailer Defendants)

120.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

121.    Whole Foods and Amazon represent and advertise that they take great care to ensure that the products they sell are safe for consumption. Whole Foods and Amazon represent and advertise that, in order to do so, they receive data on the products they sell, including manufacturer testing.

122.    Upon information and belief, Whole Foods and Amazon, the owner of Whole Foods, knew or should have known about the heavy metal levels in the Baby Foods sold to Plaintiff's parents and consumed by Plaintiff.

123.    Despite this actual or constructive knowledge, Whole Foods and Amazon sold Baby Foods to Plaintiff, which were contaminated with sufficient quantities of heavy metals to cause neurological injury resulting in ASD, IQ loss, and other neurodevelopmental disorders. As such, the Retailer Defendants are bad faith sellers under redhibition law.

124.    The Retailer Defendants, as bad faith sellers of Baby Foods, knew that the Baby Foods had a defect, namely that they were tainted by levels of heavy metals sufficient to cause

27

neurological injury capable of resulting in ASD or IQ loss, but omitted to declare it.

125.    Despite their knowledge of the levels of heavy metal contamination, the Retailer Defendants also declared that the Baby Foods they sold had a quality that they knew the products did not have, namely that they were healthy baby food and appropriate to feed to babies and young children.

126.    The Retailer Defendants had direct knowledge of the amount of tainted food Plaintiff consumed because they had records of how much of the Manufacturer Defendants' Baby Food products his parents purchased. Despite this knowledge, the Retailer Defendants continued to induce Plaintiff's parents to purchase Nurture and Hain's food by specifically promoting and suggesting Nurture's and Hain's baby food products to Plaintiff's parents for purchase.

127.    The Retailer Defendants even offered subscription discounts to encourage Plaintiff's parents to purchase additional and larger quantities of the tainted foods the Retailer Defendants knew Plaintiff was consuming.

128.    As a direct and proximate result of the Defendants' failure to declare the presence or levels of Toxic Heavy Metals in the Baby Foods, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

129.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### E.    COUNT VI: NEGLIGENCE

**(Against Retailer Defendants)**

~~120.~~130.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

~~121.~~131.    At all relevant times, the Retailer Defendants operated stores and/or online marketplaces as sellers of third-party products. The Retailer Defendants had physical custody of

28

the products at issue either in their distribution warehouses or in their physical stores. The Retailer Defendants also controlled the process of the transactions and delivery of the products at issue through their product fulfillment programs. In a recent unanimous decision, the U.S. Consumer Product Safety Commission determined that Amazon operates as a distributor, and as such was responsible under federal law for notifying consumers of certain hazardous products and remediating those hazards, given the control that Amazon exercises over products sold through "Fulfilled by Amazon."[45]

122.132.    At all relevant times, the Retailer Defendants were service providers engaged in the business of curating, selecting, testing, and monitoring of goods.

123.133.    At all relevant times, the Retailer Defendants held themselves out to the public as selecting, curating, and actively monitoring their products for safety through independent testing and evaluation of the products they sell.

## A.    Whole Foods[46]

124.1.    Amazon maintains a product safety team that monitors customer reviews for potential safety issues.

125.1.    Amazon tells consumers that its product safety team monitors the products sold on its site and that it may post warnings on the product page "in concerning situations." For example,

---

[45] Decision & Order, *In the Matter of Amazon.com, Inc.*, CPSC Dkt. No. 21-2, at 11, 27 (July 29, 2024), available at https://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/142%20-%20In%20the%20Matter%20of%20Amazon.com%20Inc.%20Decision%20and%20Order.pdfhttps://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/142%20-%20In%20the%20Matter%20of%20Amazon.com%20Inc.%20Decision%20and%20Order.pdf.

[46] Allegations regarding Whole Foods' negligence are included in this Third Amended Petition for preservation purposes. Plaintiffs understand the Court's order to allow amendment with respect to allegations regarding Amazon's Negligent Undertaking. Plaintiffs Second Amended Complaint, while alleging Negligent Undertaking against both Amazon and Whole Foods, alleged Negligence separate from Negligent Undertaking against those retailers as well. It is unclear to Plaintiffs whether the Court has dismissed the "pure" Negligence claims against Whole Foods or only the Negligent Undertaking claim. Nevertheless, in an abundance of caution and in keeping with the Court's Order with respect to this amendment, Plaintiffs have not substantively altered any allegations with respect to Whole Foods.

Amazon tells consumers that in concerning situations, it can "remove the product from the website," "contact sellers and manufacturers for more information," and/or "put warnings on the product detail page."47

126.1.   Amazon's product safety team monitored or should have monitored the customer reviews for Nurture's and Hain's baby food products. Monitoring these reviews revealed or would have revealed questions and concerns about heavy metals in Nurture's baby foods—and, upon information and belief, in Hain's baby foods—as early as 2017, years before Plaintiff was born.48

127.1.   Accordingly, Amazon's product safety team knew or should have known of these concerns and removed the products from its website, contacted Nurture and Hain for additional information, and/or put warnings on the product detail page for Nurture's and Hain's baby food products.

128.134.     Similarly, Whole Foods maintains a quality standards team that develops and maintains the standards for ingredients, products, and the sourcing of products prior to products being placed on Whole Foods' shelves.

129.135.     Whole Foods also maintains a list of acceptable and unacceptable ingredients.49

130.136.     Whole Foods employs a "Category Merchant" who is responsible for Baby Food products. The Category Merchant's duties include communicating the acceptable and unacceptable ingredient list to baby food suppliers.

131.137.     Whole Foods tells its product suppliers like Nurture and Hain to establish a process to identify environmental, health, safety, and ethical risks associated with their operational practices.

132.138.     In order to sell products at Whole Foods, companies like Nurture and Hain must comply with Whole Foods' list of acceptable/unacceptable ingredients.

---

7 https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X
48 Ex. A C Amazon Customer Q&A regarding Happy Baby Superfood Puffs; Ex. BD, Amazon Customer Reviews regarding Happy Baby Organics Superfood Puffs.
49 Ex. CA 11/4/2022 P. Brady Deposition exhibit 5, Whole Foods Food Ingredient Quality Standards

133.139.    Whole Foods and Amazon both manufacture their own private label baby food products. As such, Whole Foods and Amazon are experts in the field. As experts in the field, Whole Foods and Amazon were aware or should have been aware of the issues regarding toxic heavy metals in Baby Food.

134.140.    As manufacturers of their own baby food products and experts in the field, Whole Foods and Amazon were aware or should have been aware of the Congressional Report regarding toxic heavy metals in Nurture's and Hain's baby food.

135.141.    Indeed, under 21 C.F.R. § 109.7(b), manufacturers of food must at all times utilize quality control procedures which will reduce contamination to the lowest level currently feasible. This requirement applies regardless of any tolerance or action levels that may be set by the FDA or other regulatory bodies. Thus, given Amazon and Whole Foods expertise, safety monitoring, and ingredient control procedures and requirements, Amazon and Whole Foods knew or should have known that the heavy metals in Nurture's and Hain's Baby Food products were not reduced to the lowest levels feasible at the time as required under 21 C.F.R. § 109.7(b).

136.142.    Instead, Whole Foods and Amazon mislead consumers into believing that the Manufacturer Defendants' Baby Food products sold by Whole Foods and Amazon are safe and actively monitored for safety concerns.

137.143.    Despite Whole Foods' and Amazon's representations to consumers, Whole Foods and Amazon never chose to add toxic heavy metals to their acceptable/unacceptable ingredients list, place warnings on those product's pages on their websites, or remove those products from their shelves.

138.144.    Additionally, Whole Foods represents to consumers that it has "unparalleled quality standards" to ensure that the food they sell "meet[s] a higher standard."50 Yet, Whole Foods failed to address heavy metals in baby food in any way. Meanwhile, as early as 2012, Walmart, one of Whole Foods' competitors, set an internal limit for arsenic in finished baby food products at 23 parts per billion. Still, Whole Foods failed to take any action to limit heavy metals

---

50 Ex. DB 11/4/2022 P. Brady Deposition exhibit 2, 8/22/2019 Whole Foods' Code of Business Conduct

in baby food products sold in their stores.

**B.    Amazon's Product Safety Team Investigates and Commits to Warning about Safety Concerns.**

145.    Amazon maintains a product safety team that monitors customer reviews for potential safety issues.

146.    Amazon tells consumers that its product safety team monitors the products sold on its site and that it may post warnings on the product page "in concerning situations." For example, Amazon tells consumers that in concerning situations, it can "remove the product from the website," "contact sellers and manufacturers for more information," and/or "put warnings on the product detail page."51

147.    Amazon's product safety team monitored or should have monitored the customer reviews for Nurture's and Hain's baby food products. Monitoring these reviews revealed or would have revealed questions and concerns about heavy metals in Nurture's baby foods—and, upon information and belief, in Hain's baby foods—as early as 2017, years before Plaintiff was born.52

148.    One of these reviews concerned Nurture's Superfood Puffs Variety Pack. This variety pack contained multiple products, including Nurture's "Superfood Puffs Organic Grain Snack – Sweet Potato and Carrot."

149.    In responding to the customer question, Nurture wrote on August 21, 2018 that it had "strict, self-imposed quality standards and proactive testing at[sic] that is done by accredited expert laboratories." Nurture also claimed that it had "a proactive contaminant monitoring program to ensure that all of our products are safe for consumption."

150.    Then, as explained further below, in October 2019, Happy Baby Bright Futures revealed that this product, the Superfood Puffs Organic Grain Snack – Sweet Potato and Carrot,

---

51 https://www.amazon.com/gp/help/customer/display html?nodeId=GLD7VXFKV4AWU78X
52 Ex. **A** C Amazon Customer Q&A regarding Happy Baby Superfood Puffs; Ex. **B**D, Amazon Customer Reviews regarding Happy Baby Organics Superfood Puffs

THRID AMENDED PETITION

and sold by Amazon, contained as much as 295 ppb arsenic –a level almost three times the limit proposed by the FDA in 2016.

151.    Thus, by October 2019, Amazon's product safety team knew or should have known that Nurture's representations regarding its "quality standards" and "proactive testing" were false or misleading.

152.    Despite this report directly identifying Amazon as a seller of a product with nearly three times the FDA's proposed limit at the time, Amazon failed to remove or correct Nurture's representations regarding Nurture's foods. Amazon also failed to provide a separate warning to parents regarding this product.

153.    Then in November of 2020, JMW's parents purchased that product and JMW consumed it, unbeknownst of its arsenic content due to Nurture and Amazon's failures to warn of the defect.

### C.    Reputable Watchdog Organizations Implicate Amazon in the Sale of Contaminated Baby Food.

154.    But Amazon does not limit its monitoring only to customer reviews. Amazon also tells customers that its Product Safety Team affirmatively "investigates and acts on reported safety complaints" to "protect customers from risks of injury related to products sold on Amazon.com."[53] Amazon also tells consumers that it "proactively investigates and addresses reported safety complaints[.]"[54]

155.    In its public commitments to consumers like JMW and his parents, Amazon does not limit the sources of information it consults to identify, investigate, or evaluate safety complaints or concerns.

156.    Consider that Amazon is one of the largest corporations in the world. Corporations

---

[53] https://www.amazon.com/gp/help/customer/display html?nodeId=GLD7VXFKV4AWU78X
[54] https://www.amazon.com/gp/help/customer/display html?nodeId=GLD7VXFKV4AWU78X&ref =bsx_ro_dt_pa_link

like Amazon regularly monitor news and other publications for coverage that could be adverse to the corporation's business or reputation.

157.    Thus, consumers like JMW and his parents reasonably believe Amazon does more than merely pass on reports it receives from government entities. Rather, consumers like JMW and his parents rely upon Amazon's representations that Amazon will ***proactively investigate*** safety complaints available from reputable sources.

158.    Numerous safety complaints were made regarding Nurture's and Hain's baby food products as early as 2017, a year before JMW was born.

159.    For example, in December 2017 Healthy Baby Bright Futures ("HBBF") published a report entitled "Arsenic in 9 Brands of Infant Cereal." The report described rice cereal as "Infants' top source of arsenic" and described multiple studies showing arsenic's link to "IQ loss and other neurodevelopmental impacts for children exposed . . . during the first few years of life."[55]

160.    The report included testing that revealed that Hain's and Nurture's products contained as much as 92 ppb and 123 ppb arsenic, respectively.

161.    The report also noted that the FDA's 2016 draft guidelines included an action level of 100 ppb for arsenic in infant rice cereal, putting Nurture's products over the limit and Hain's products dangerously close to it.

162.    This 2017 HBBF report also identified Amazon as the seller of multiple products made by other manufacturers that tested well above 100 ppb arsenic, including a product with 235 ppb arsenic.

163.    In another example, in 2018 Consumer Reports published the article "Heavy Metals in Baby Food: What you Need to Know."[56] This report showed that "about two-thirds" of tested Baby Food products had "worrisome levels of at least one heavy metals" and that "fifteen of the foods would pose potential health risks to a child regularly eating just one serving or less per day." The report went on to say that "snacks and products containing rice and/or sweet potatoes were particularly likely to have high levels of heavy metals."

---

[55] https://hbbf.org/sites/default/files/2022-12/HBBF_ArsenicInInfantCerealReport_0.pdf
[56] https://www.consumerreports.org/health/food-safety/heavy-metals-in-baby-food-a6772370847/

THRID AMENDED PETITION

164.    In the 2018 Consumer Reports findings, Hain's and Nurture's products were both described as containing levels of heavy metals that would pose potential health risks from less than one manufacturer's recommended serving.

165.    Then in 2019, one year after JMW was born and while he continued to consume foods sold by Amazon, HBBF published their "What's in my baby's food" report.[57] The report tested 168 different baby food products. But the report was not limited to only the direct manufacturers of each product. Instead, the report specifically identified the retailers selling each product contaminated with heavy metals.

166.    Amazon featured prominently in the HBBF 2019 report. For example, the report includes a map of the retailers where the contaminated products were purchased and lists Amazon as an "online retailer."



167.    In another example, HBBF identifies Amazon.com as the seller of a Nurture/Happy Baby product containing 295 parts per billion Arsenic.

| HappyBABY | Superfood Puffs Organic Grain Snack - Sweet Potato & Carrot | Snack - rice puffs | 295 | 91 | 3.7 | 12.2 | 1.94 | Washington, DC | amazon.com |

168.    This product, the "Superfood Puffs Organic Grain Snack – Sweet Potato and

---

[57] https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf

THRID AMENDED PETITION

Carrot," is a product that JMW's parents purchased as late as December 2020 from Amazon.com and that JMW consumed.

169.    Amazon's product safety team knew or should have known of the HBBF report given the fact that HBBF specifically identified Amazon as a retailer selling contaminated baby foods.

### D.    Amazon Could No Longer Rely on Assumptions or Representations from the Manufacturing Defendants.

170.    Because Amazon should have known about the 2019 HBBF report, Amazon should not have continued to rely on any representations Nurture and Hain made regarding the safety of their foods that were sold on Amazon.com.

171.    While Nurture responded to customer reviews on Amazon.com saying that its foods were safe, Amazon now had information that directly contradicted Nurture's representations.

172.    The same is true for Hain with respect to any representations Hain made to Amazon directly or any assumptions Amazon made about Hain's products.

173.    Whatever representations either Hain or Nurture may have made to Amazon in order to sell their products on Amazon.com, those representations should have been evaluated in the light of a credible report showing that Nurture and Hain's foods contained levels of arsenic above 100 ppb, and in some cases as high as 455 ppb.

174.    Beyond customer reviews, in light of the credible public reports from organizations like HBBF, Consumer Reports, and Nutrition Facts, Amazon could no longer reasonably rely on the assumption that sealed containers of Nurture's and Hain's products were not contaminated.

175.    In light of these facts, Amazon's Product Safety Team, then, investigated or should have conducted an "investigation" as Amazon tells customers it will.

176.    In addition to monitoring and investigating product issues, Amazon provides customers like JMW and his parents with an "A-to-z Guarantee" that Amazon states "ensures that customers are covered an eligible for a full refund for any item they purchase . . . including helping

36

to resolve, in the unlikely event, valid personal injury or property damage claims."[58]

177.    Accordingly, Amazon's product safety team knew or should have known of these concerns and removed the products from its website, contacted Nurture and Hain for additional information, and/or put warnings on the product detail page for Nurture's and Hain's baby food products.

## E.    Amazon Had Actual and Imputed Knowledge of the Risks of the Manufacturing Defendants Products.

178.    In addition to what Amazon knew or should have known as a seller of baby food products. Amazon had actual knowledge of the industry-wide problem of heavy metals in baby food products.

179.    Amazon manufactured their own private label baby food products.

180.    Amazon began manufacturing their own private label baby food products many years before Plaintiff was born.

181.    Indeed, Amazon knew well before 2021 that there was an issue of heavy metals in baby food products. In response to question about whether Amazon's "Mama Bear" baby food products had been tested for heavy metals, Amazon told consumers that their baby foods have been and are tested for heavy metals.[59]

182.    As a manufacturer of baby food products Amazon was an expert in the field of baby food manufacturing.

183.    Thus, Amazon cannot reasonably state that it was knowledgeable of the issue of heavy metals in its own products, but simultaneously lacked any awareness of the issue with respect to other suppliers' products that Amazon sold.

184.    That said, beyond drawing an inference that Amazon knew of the reports regarding heavy metals in baby food industry-wide due to public reports, Louisiana law presumes such

---

[58] https://trustworthyshopping.aboutamazon.com/focus/product-safety
[59] https://www.amazon.com/ask/questions/Tx298ACHVYB48HI/ref=ask_ql_ql_al_hza

37

knowledge for Defendants like Amazon.

185.    Under Louisiana law, "a manufacturer is held to the knowledge and skill of an expert. It ***must keep abreast*** of scientific knowledge, discoveries, and advances ***and is presumed to know what is imparted thereby***." *Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 968-969 (La. 2003) (emphasis added) citing *Simeon v. Doe*, 618 So. 2d 848, 852 (La. 1993).

186.    Thus, Amazon, as an expert in baby food manufacturing, knew of the following non-exhaustive list of scientific knowledge, discoveries, and advances:

    a.    2017 HBBF Report, "Arsenic in 9 Brands of Infant Cereal;"

    b.    2017, NutritionFacts.org, "Arsenic in Infant Rice Cereal;"[60]

    c.    2017, Environmental Defense Fund, "Lead in Food: A Hidden Health Threat;"[61]

    d.    2018, FDA, "What FDA is Doing to Protect Consumers from Toxic Metals in Foods"[62]

    e.    2018 Consumer Reports, "Heavy Metals in Baby Food: What You Need to Know;"

    f.    2019 HBBF Report, "What's in My Baby's Food;"

    g.    2020 Clean Label Project, "Baby Food: A Puree of Plasticizers and Heavy Metals"[63]; and

    h.    All scientific research linking heavy metal exposure to neurodevelopmental disorders and detrimental effects.

187.    As experts in baby food manufacturing, Amazon knew or was presumed to have known of the defects featured in the Baby Food products at issue and their dangerous heavy metal content.

188.    Manufacturers of baby food products, like Amazon, were well aware of the industry-wide problem regarding heavy metals in baby food long before the Congressional report brought the issue to the public.

---

[60] https://nutritionfacts.org/video/arsenic-in-infant-rice-cereal/
[61] https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf
[62] https://www.fda.gov/food/conversations-experts-food-topics/what-fda-doing-protect-consumers-toxic-metals-foods
[63] https://cleanlabelproject.org/baby-food-white-paper/

38

189.    Amazon knew of the hidden defect which could injure a child and which could have easily been electronically communicated to Plaintiff's parents by placing a warning on the product pages.

**F.**



THRID AMENDED PETITION



40

### G.     Amazon Failed to Warn Plaintiff of the Defect in the Manufacturing Defendants' Food and Caused Plaintiff Harm.

207.     Plaintiff is a child completely reliant on the sellers of baby food to act as ordinary ethical sellers would in the face of reports that the products they sold, and are selling, for consumption by infants were and are contaminated with heavy metals.

208.     Given Amazon's actual and imputed knowledge of the defects contained in

---

[70] Ex. 65 at Hain-MDL-001-049576.
[71] Id.
[72] Id. at Hain-MDL-001-049575

41

Nurture's and Hain's foods and Amazon's representations about providing warnings in concerning situations, Amazon had a duty to disclose or warn JMW and his parents about these defects. Additionally, Amazon had a duty to disclose the presence of heavy metals in the Baby Food products they sold to Plaintiff's parents for the benefit of Plaintiff because they met all of the *Bunge* factors. *See e.g. First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 401-402 (E.D. La, April 12, 2016) (Engelhardt, K. presiding) citing *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1384 (La. 1990).

209.    Yet despite knowledge of the defective condition of the Nurture's and Hain's Baby Food, Amazon continued to sell them and failed to declare the defect or warn Plaintiff about the defect.

210.    At all times, the Baby Foods were used in a reasonably anticipated or intended manner.

211.    As a direct and proximate result of Amazon's conduct, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

~~139.~~212.    At all relevant times, the Retailer Defendants induced the public, including Plaintiff, to use their service by promoting themselves as service providers that selected, curated, and actively monitored products for sale at their physical locations and/or online platforms for safety through independent testing and evaluation of those products.

~~140.~~213.    The primary incentive to purchase Baby Foods from the Retailer Defendants was the services they provide—namely, the selection, curation, and active monitoring for the wholesomeness and safety of the products they sell, such that the ability to purchase a product from the Retailer Defendants amounts to an independent endorsement of its safety.

~~141.~~214.    As service providers engaged in the curation, selection, testing and monitoring of goods, including Baby Foods, the Retailer Defendants owed a duty to Plaintiff to conduct those activities in a way that would not pose an unreasonable risk of injury to Plaintiff.

~~142.~~215.    The Retailer Defendants breached their duty to comport themselves as an ordinarily prudent service provider when they failed to properly inspect, monitor, test, investigate,

and take other such steps as necessary to ensure their curation, selection, and sale of Baby Foods did not unreasonably pose a danger to their patrons who used their services to purchase Baby Foods.

143.216.    In a recent case involving Amazon, the Louisiana Supreme Court affirmed that in some circumstances retailers may also be liable for a negligent undertaking when injuries result from products they sell. *See Pickard v. Amazon.com, Inc.*, 2023-01596 (La. 6/28/24), 2024 WL 3218633, at \*\*6–9. Those circumstances are present here.

144.217.    First, the Retailer Defendants assumed a duty by undertaking the rendition of services to another, in this case by selling the Manufacturer Defendants' Baby Food products, which the Retailer Defendants should have recognized as necessary for the protection of a third person, in this case Plaintiff. The scope of the Retailer Defendants' involvement and the extent of their authority in this relationship—including their purported efforts to ensure product safety by, e.g., monitoring customer reviews, mandating quality standards, investigating products of concern, removing unsafe products, and notifying consumers of safety concerns—confirm that this was an affirmative undertaking.

145.218.    Second, the Retailer Defendants' failure to exercise reasonable care in performing their assumed duty makes them liable for Plaintiff's injuries. This failure increased the risk of harm to Plaintiff. By offering the Manufacturer Defendants' Baby Food products for sale and purporting, yet failing, to independently assure their safety, the Retailer Defendants exacerbated the risk that unsafe products would be eaten by consumers like Plaintiff. And Plaintiff suffered harm because he and his parents relied upon the Retailer Defendants' representations regarding the safety of the products they sold and the active monitoring and curating the Retailer Defendants represented that they conducted on the products they sold.

219.    Amazon also failed to exercise reasonable care in performing its assumed duty by failing to disclose or warn about the existence of heavy metals in Nurture's and Hain's foods. Amazon told consumers that it "proactively investigates and addresses reported safety complaints." Yet Amazon failed to appropriately investigate or address safety concerns Amazon raised to both Nurture and Hain. █████████████████████

█████████████████████████████████████████

220.    JMW then consumed products containing the defect that Amazon was aware of but failed to disclose. JMW was subsequently diagnosed with ASD following the consumption of these products.

~~146.~~221.    The negligence of the Retailer Defendants was a substantial factor in causing Plaintiff's injuries.

~~147.~~222.    The negligence of the Retailer Defendants caused or contributed to Plaintiff's injuries.

~~148.~~223.    As a direct and proximate result of the Retailer Defendants' negligence, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, past and future medical expenses, lost income, and other damages.

~~149.~~224.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### ~~F.    COUNT VI: REDHIBITION~~

### ~~(Against Retailer Defendants)~~

~~150.1.  Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.~~

~~151.1.  Whole Foods and Amazon represent and advertise that they take great care to ensure that the products they sell are safe for consumption. Whole Foods and Amazon represent and advertise that, in order to do so, they receive data on the products they sell, including manufacturer testing.~~

~~152.1.  Upon information and belief, Whole Foods and Amazon, the owner of Whole~~

44

Foods, knew or should have known about the heavy metal levels in the Baby Foods sold to Plaintiff's parents and consumed by Plaintiff.

153.1. Despite this actual or constructive knowledge, Whole Foods and Amazon sold Baby Foods to Plaintiff, which were contaminated with sufficient quantities of heavy metals to cause neurological injury resulting in ASD, IQ loss, and other neurodevelopmental disorders. As such, the Retailer Defendants are bad faith sellers under redhibition law.

154.1. The Retailer Defendants, as bad faith sellers of Baby Foods, knew that the Baby Foods had a defect, namely that they were tainted by levels of heavy metals sufficient to cause neurological injury capable of resulting in ASD or IQ loss, but omitted to declare it.

155.1. Despite their knowledge of the levels of heavy metal contamination, the Retailer Defendants also declared that the Baby Foods they sold had a quality that they knew the products did not have, namely that they were healthy baby food and appropriate to feed to babies and young children.

156.1. The Retailer Defendants had direct knowledge of the amount of tainted food Plaintiff consumed because they had records of how much of the Manufacturer Defendants' Baby Food products his parents purchased. Despite this knowledge, the Retailer Defendants continued to induce Plaintiff's parents to purchase Nurture and Hain's food by specifically promoting and suggesting Nurture's and Hain's baby food products to Plaintiff's parents for purchase.

157.1. The Retailer Defendants even offered subscription discounts to encourage Plaintiff's parents to purchase additional and larger quantities of the tainted foods the Retailer Defendants knew Plaintiff was consuming.

158.1. As a direct and proximate result of the Defendants' failure to declare the presence or levels of Toxic Heavy Metals in the Baby Foods, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

159.1. WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

45

G.        **COUNT VII: LOUISIANA PRODUCTS LIABILITY ACT**

**(Against Retailer Defendants)**

160.225.        Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

161.226.        Plaintiff further incorporates by reference each allegation set forth regarding the Manufacturer Defendants as if fully stated herein.

162.227.        Under the Louisiana Products Liability Act, Amazon and Whole Foods are sellers who are in the business of conveying title to or possession of the Baby Foods to consumers in exchange for money.

163.228.        As sellers, Amazon and Whole Foods are also "Manufacturers" under the Louisiana Products Liability Act because they exercised control over or influenced characteristics of the design, construction, or quality of the Baby Food products.

164.229.        Whole Foods exercised control over and influenced every ingredient of every product it allowed in its stores or sold on-line, including the Baby Food products at issue.

165.230.        Amazon, as the parent of Whole Foods (a wholly owned subsidiary), likewise exercised control and influence over every ingredient of every product allowed in Whole Foods' stores or sold online via Whole Foods.

166.231.        Indeed, following Amazon's purchase of Whole Foods, the number of ingredients on Whole Foods' unacceptable ingredients list increased.

167.232.        Amazon and Whole Foods operated both online and physical marketplaces of third-party products where they (i) had physical custody of the Baby Food products in their distribution warehouses and stores; and (ii) controlled the process of the transaction and delivery of those products to Plaintiff through their product fulfillment programs.

168.233.        The Baby Food products that Amazon and Whole Foods sold were unreasonably dangerous because of (i) their construction or composition, (ii) their design, (iii) their lack of adequate warnings, and (iv) their nonconformity to the Nurture's and Hain's express warranties.

169.234.        These defects existed in the Baby Food products at the time the products

46

left the Nurture's and Hain's possession. And, as explained above, Amazon and Whole Foods knew or should have known the Baby Food products were defective when Amazon and Whole Foods gained possession of the products.

~~170.~~235.     Moreover, Amazon and Whole Foods manufactured their own private label baby food products and thus were experts in the field of baby food manufacturing.

~~171.~~236.     Amazon and Whole Foods began manufacturing their own private label baby food products many years before Plaintiff was born.

~~172.~~237.     As experts in baby food manufacturing, Amazon and Whole Foods knew or are presumed to have known of the defects featured in the Baby Food products at issue and their dangerous heavy metal content. Experts in this field were well aware of the industry-wide problem regarding heavy metals in baby food long before the Congressional report brought the issue to the public.

~~173.~~238.     Despite knowledge of the defective condition of the Baby Food products, Amazon and Whole Foods failed to declare the defect to Plaintiff.

~~174.~~239.     At all times, the Baby Foods were used in a reasonably anticipated or intended manner.

~~175.~~240.     As a direct and proximate result of the Retailer Defendants' conduct, Plaintiff was injured and sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to, medical expenses, lost income, attorneys' fees, and other damages to be more fully shown at trial of this matter.

## JURY TRIAL DEMAND

~~176.~~241.     Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

177.242.    WHEREFORE, Plaintiff prays for judgment against Defendants as follows

    a.  actual or compensatory damages in such amount to be determined at trial and as provided by applicable law, including but not limited to:

        i.  past, present, and future physical pain and suffering;

        ii.  past, present, and future mental anguish and emotional distress;

        iii.  past, present, and future medical expenses;

        iv.  damages occasioned by temporary and/or permanent disability;

        v.  loss of wages and loss of earning capacity;

        vi.  economic loss;

        vii.  loss of enjoyment of life, past and future.

        viii.  exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

        ix.  pre-judgment and post-judgment interest;

        x.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

        xi.  any other general and equitable relief the Court may deem just and proper.

Dated: January 6, 2025

Respectfully submitted,

*/s/ Alexandra M. Walsh*
Alexandra M. Walsh (*pro hac vice*)
Anapol Weiss
14 Ridge Square NW, Suite 342
Washington, DC 20016
Tel: (202) 780-3014
Fax: (215) 875-7707
Email: awalsh@anapolweiss.com

Aimee H. Wagstaff *(SBN 278480)*
Madeleine Brumley Clavier (#37432)
Wagstaff Law Firm
940 N Lincoln St.
Denver, CO 80203
Tel: (720) 208-9402

48

Email:
awagstaff@wagstafflawfirm.com
mclavier@wagstafflawfirm.com

Dated: August 15, 2024

Respectfully submitted,

/s/ Alexandra M. Walsh

Alexandra M. Walsh (pro hac vice)

Walsh Law PLLC

14 Ridge Square NW, Suite 342

Washington, DC 20016

Tel: (202) 780-4127

Fax: (202) 780-3678

Email:


Aimee H. Wagstaff (pro hac vice)

Madeleine Brumley Clavier

(#37432) Wagstaff Law Firm

940 N Lincoln St.


Denver, CO 80203

Tel: (720) 208-9402

Email:

## CERTIFICATE OF SERVICE

49

I hereby certify that on January 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Alexandra M. Walsh*
Alexandra M. Walsh

50