R. Brent Wisner (SBN 276023)
rbwisner@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Tel: (310) 207-3233
Fax: (310) 820-7444

Aimee H. Wagstaff (SBN: 278480)
awagstaff@wagstafflawfirm.com
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, Colorado 80203
Telephone: 303.376.6360
Facsimile: 303.376.6361

*Co-Lead Counsel for Plaintiffs in MDL 3101*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION | Case No. 24-MD-301-JSC |
| | MDL No. 3101 |
| This document relates to: | Hon. Jacqueline Scott Corley |
| ALL ACTIONS | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' MASTER LONG-FORM COMPLAINT:** |

       1) **DEFENDANTS' MOTION TO DISMISS AND STRIKE**
       2) **DEFENDANT CAMPBELL SOUP**
       3) **COMPANY'S MOTION TO DISMISS**
       4) **DEFENDANT DANONE S.A.'S MOTION TO DISMISS**
       5) **DEFENDANT HERO AG'S MOTION TO DISMISS**
       6) **DEFENDANT NESTLÉ S.A.'S MOTION TO DISMISS**
       7) **DEFENDANT SUN-MAID GROWERS OF CALIFORNIA'S MOTION TO DISMISS**

**[REDACTED PUBLIC COPY]**

Date:       February 27, 2025
Time:      9:00 a.m. PT
Location: Courtroom 8
             19th Floor 450 Golden Gate Ave.
             San Francisco, CA 94102

## <u>TABLE OF CONTENTS</u>

Page

BACKGROUND ................................................................................................................ 6

   I.    Heavy Metals Are Neurotoxic and Especially Dangerous for Babies ................. 6

   II.   Defendants' Baby Foods Are Contaminated with Toxic Heavy Metals ............... 8

        A.    Independent Research Raises Concern Regarding the Levels of
             Heavy Metals in Defendants' Products ...................................................... 9

        B.    A Congressional Investigation Finds a Substantial Presence of
             Heavy Metals in Baby Foods Manufactured and Sold by Defendants .... 10

        C.    Defendants Abandoned Efforts to Reduce Metal Levels in their
             Baby Foods or to Label Their Products Properly ..................................... 11

        D.    Regulators Take Action to Curb Heavy Metals in Baby Foods .............. 13

   III.   All Defendants Have Knowingly Participated in Manufacturing and Selling
       Baby Foods Contaminated with Toxic Heavy Metals ......................................... 15

        A.    Beech-Nut and Hero Group ...................................................................... 15

             1.    Allegations ................................................................................... 15

             2.    Evidence ...................................................................................... 16

        B.    Gerber and Nestlé .................................................................................... 18

             1.    Allegations ................................................................................... 18

             2.    Evidence ...................................................................................... 20

        C.    Nurture and Danone ................................................................................. 27

             1.    Allegations ................................................................................... 27

             2.    Evidence ...................................................................................... 28

        D.    Plum, Campbell, and Sun-Maid ............................................................. 31

             1.    Allegations ................................................................................... 31

             2.    Evidence ...................................................................................... 33

        E.    Hain .......................................................................................................... 38

        F.    Sprout ....................................................................................................... 39

G.    Walmart ..................................................................................................41

IV.    Defendants Are Capable of Producing Safe Baby Foods ....................................42

**ARGUMENT** ............................................................................................................................**44**

I.    The Master Complaint Satisfies Rule 8..................................................................44

II.    The Rule 12(b)(1) Motions Fail ............................................................................49

A.    Plaintiffs' Injuries Are Traceable to Hero Group....................................52

B.    Plaintiffs' Injuries Are Traceable to Campbell .......................................56

C.    Plaintiffs' Injuries Are Traceable to Sun-Maid......................................59

D.    The Court Should Defer Any Remaining Questions to the Trier of Fact or Order Jurisdictional Discovery ......................................................60

III.    The Rule 12(b)(2) Motions Fail ............................................................................62

A.    The Court Has Specific Personal Jurisdiction over Nestlé S.A. ..............67

B.    The Court Has Specific Personal Jurisdiction over Hero Group.............71

C.    The Court Has Specific Personal Jurisdiction over Danone ...................72

D.    Any Remaining Questions Require Jurisdictional Discovery .................77

IV.    The Rule 12(b)(6) Motions Fail ............................................................................79

A.    The Master Complaint Satisfies *Iqbal* and *Twombly* ..............................80

B.    The Master Complaint Plausibly Alleges that Defendants' Baby Foods Are Defective Due to Their Detectable Levels of Heavy Metals .....................................................................................................82

C.    The Master Complaint Plausibly Alleges Manufacturing Defects...........89

D.    The Parent Defendants Are Proper Parties..............................................92

V.    The Rule 12(f) Motion Should Be Denied as to Baby Formula based Baby Food Products..................................................................................................96

**CONCLUSION**..........................................................................................................................**99**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asahi Metal Industry Co. v. Superior Court,*
    480 U.S. 102 (1987) ................................................................................... 64, 76, 79

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 79

*Austin v. Univ. of Oregon,*
    925 F.3d 1133 (9th Cir. 2019) ............................................................................... 45

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,*
    223 F.3d 1082 (9th Cir. 2000) ............................................................................... 65

*Bastidas v. Good Samaritan Hosp.,*
    No. C 13-04388 SI, 2014 WL 3362214 (N.D. Cal. July 7, 2014) .................... 93, 94, 95

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................................... 44, 79

*Beluca Ventures LLC v. Aktiebolag,*
    622 F. Supp. 3d 806 (N.D. Cal. 2022) ................................................................... 91

*Blissard v. FCA US LLC,*
    No. LACV1802765JAKJEMX, 2018 WL 6177295 (C.D. Cal. Nov. 9, 2018) ........ 91

*Boschetto v. Hansing,*
    539 F.3d 1011 (9th Cir. 2008) ......................................................................... 50, 77

*Bowen v. Energizer Holdings, Inc.,*
    118 F.4th 1134 (9th Cir. 2024) ........................................................ 49, 50, 51, 57, 61

*Bristol-Myers Squibb Co. v. Superior Ct. of California,*
    582 U.S. 255 (2017) ................................................................................................ 64

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .......................................................................................... 63, 65

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986) .................................................................... 50, 57, 77, 78

*Cervantes v. Zimmerman,*
    No. 17-CV-1230-BAS-NLS, 2019 WL 1129154 (S.D. Cal. Mar. 12, 2019) ........... 46

*Chicago, M. & St. P.R. Co. v. Minneapolis Civic and Commerce Assn.,*
    247 U.S. 490 (1918) ................................................................................................ 92

iii

*Clausen v. M/V NEW CARISSA*,
   339 F.3d 1049 (9th Cir. 2003) ................................................................................................ 84

*Concat LP v. Unilever, PLC*,
   350 F. Supp. 2d 796 (N.D. Cal. 2004) ................................................................................... 69

*Corazon v. Aurora Loan Servs.*, LLC,
   No. 11-00542 SC, 2011 WL 1740099 (N.D. Cal. May 5, 2011) ............................................ 46

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
   557 F.2d 1280 (9th Cir. 1977) ............................................................................................... 66

*D'Augusta v. Am. Petroleum Inst.*,
   117 F.4th 1094 (9th Cir. 2024) .............................................................................................. 80

*Davis v. Cranfield Aerospace Sols., Ltd.*,
   71 F.4th 1154 (9th Cir. 2023) ................................................................................................ 63

*Dehart v. Johnson & Johnson*,
   562 F. Supp. 3d 189 (D. Ariz. 2022) ..................................................................................... 89

*Destfino v. Reiswig*,
   630 F.3d 952 (9th Cir. 2011) ................................................................................................. 47

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ........................................................................................... 66, 74

*Dunson v. Cordis Corp.*,
   No. 16-CV-03076-SI, 2016 WL 3913666 (N.D. Cal. July 20, 2016) ..................................... 47

*Fantasy, Inc. v. Fogerty*,
   984 F.2d 1524 (9th Cir. 1993) ............................................................................................... 98

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) ............................................................................................... 63, 64, 65, 67

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) .............................................................................................................. 49

*Gagetta v. Walmart*, Inc.,
   646 F. Supp. 3d 1164 (N.D. Cal. 2022) ...................................................................... 86, 87, 89

*Good v. Am. Water Works Co., Inc.*,
   No. CV 2:14-01374, 2016 WL 5402230 (S.D. W. Va. Sept. 26, 2016) .................................. 51

*Grausz v. Hershey Co.*,
   713 F. Supp. 3d 818 (S.D. Cal. 2024) ................................................................................... 85

*Harris Rutsky & Co. Ins. Serv. v. Bell & Clements*,
   328 F.3d 1122 (9th Cir. 2003) ............................................................................................... 51

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Harris v. Cnty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ................................................................. 7

*Higginbottom v. Dexcom, Inc.*, 24-CV-0195-WQH-BLM,
    2024 WL 3823023 (S.D. Cal. Aug. 13, 2024) ......................................... 81

*Howard v. Sulzer Orthopedics, Inc.*,
    382 F. App'x 436 (6th Cir. 2010) ........................................................... 62

*In re Agent Orange Product Liability Litigation MDL No. 381*,
    818 F.2d 145 (2d Cir. 1987) ................................................................... 62

*In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
    730 F. Supp. 3d 1371 (J.P.M.L. 2024) ................................................... 99

*In re Boon Glob. Ltd.*,
    923 F.3d 643 (9th Cir. 2019) ................................................................. 63

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
    87 F.4th 315 (6th Cir. 2023) ................................................................... 48

*In re Gasoline Spot Litig.*,
    No. 20-CV-03131-JSC, 2020 WL 7431843 (N.D. Cal. Dec. 18, 2020) ........................ 51, 66, 78

*In re Roundup Prods. Liab. Litig.*,
    2024 WL 1974534 (N.D. Cal. May 2, 2024) ....................................... 5, 84

*In re Sagent Tech., Inc., Derivative Litig.*,
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) .................................................. 47

*In re Suboxone (Buprenorphine/Naloxone) FilmProds. Liab. Litig.*,
    1:24-MD-3092,2024 WL 5264278 (N.D. Ohio Dec. 31, 2024)................................. 46

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    785 F. Supp. 2d 925 (C.D. Cal. 2011)...................................................... 46

*In re Toyota Motor Corp.*,
    754 F. Supp. 2d 1208 (C.D. Cal. 2010).................................................. 91

*In re Toyota Motor Corp.*,
    785 F. Supp. 2d 883 (C.D. Cal. 2011)...................................................... 3

*In re Trader Joe's Co. Dark Chocolate Litig.*,
    726 F. Supp. 3d 1150 (S.D. Cal. 2024) ................................................... 85

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011) ......................................................................... 67, 71

*Laub v. U.S. Dep't of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ............................................................... 62

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) .................................................................. 50

*Littleton v. Experian Info. Sols., Inc.*,
    No. 5:15-CV-01619-EJD, 2015 WL 4638308 (N.D. Cal. Aug. 4, 2015) .................................. 48

*LNS Enterprises LLC v. Cont'l Motors, Inc.*,
    22 F.4th 852 (9th Cir. 2022) ............................................................ 63, 64

*Lucas v. City of Visalia*,
    726 F. Supp. 2d 1149 (E.D. Cal. 2010) .................................................................. 81

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .................................................................. 63

*Mate v. Societe Anonyme Des Galeries Lafayette*,
    No. 221CV07802VAPRAOX, 2023 WL 6786791 (C.D. Cal. July 26, 2023) .......................... 70

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .................................................................. 49

*Mine Workers v. Coronado Coal Co.*,
    259 U.S. 344 (1922) .................................................................. 51

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .................................................................. 47

*Nayab v. Cap. One Bank (USA), N.A.*,
    942 F.3d 480 (9th Cir. 2019) .................................................................. 79

*Norse v. City of Santa Cruz*,
    629 F.3d 966 (9th Cir. 2010) .................................................................. 50

*P & L Dev., LLC v. Gerber Prods. Co.*,
    715 F. Supp. 3d 435 (E.D.N.Y. 2024) .................................................................. 70

*Patterson v. Home Depot, USA, Inc.*,
    684 F. Supp. 2d 1170 (D. Ariz. 2010) ............................................................ 67, 76

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015) .................................................................. 63

*Posey v. San Francisco Unified Sch. Dist.*,
    No. 23-CV-02626-JSC, 2023 WL 8420895 (N.D. Cal. Dec. 4, 2023) .......................... 47

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) .................................................................. 96

*Reynolds v. EzriCare LLC*,
    700 F. Supp. 3d 830 (N.D. Cal. 2023) ........................................................ 5, 45, 921

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Roberts v. Cnty. of Riverside*,
    No. EDCV191877JGBSHKX, 2020 WL 3965027 (C.D. Cal. June 5, 2020) ............................ 47

*Saaiman v. Am. Gen. Life Ins. Co., Inc.*,
    No. 18-CV-596-BTM-AGS, 2019 WL 1864858 (S.D. Cal. Apr. 25, 2019) .............................. 95

*Sarmiento v. Bank of New York Mellon*,
    No. CIV. 10-00349 JMS, 2011 WL 884457 (D. Haw. Mar. 10, 2011) ................................... 96

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ................................................................................................. 5

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ......................................................................................... 65, 69

*State ex rel. Key Ins. Co. v Roldan*,
    587 SW3d 638 (Mo 2019) ................................................................................................... 62

*Stearns v. Select Comfort Retail Corp.*,
    763 F. Supp. 2d 1128 (N.D. Cal. 2010) .............................................................................. 81

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) .............................................................................. 7, 80

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ............................................................................................... 46

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) ...................................................................................................... 49, 59

*Trabakoolas v. Watts Water Techs., Inc.*,
    No. 12-CV-01172-YGR, 2012 WL 2792441 (N.D. Cal. July 9, 2012) .................................... 80

*Tucker v. Wright Med. Tech.*, Inc.,
    No. 11-CV-03086-YGR, 2013 WL 1149717 (N.D. Cal. Mar. 19, 2013) ................................. 89

*Underwood v. O'Reilly Auto Parts, Inc.*,
    699 F. Supp. 3d 1049 (D. Nev. 2023) ................................................................................. 90

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ............................................................................................... 45

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ........................................................................................... 51, 92, 95, 96

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ............................................................................................... 80

*United States v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ............................................................................................. 45

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Wallis v. Centennial Ins. Co.*,
  No. CIV. 08-02558 WBS, 2013 WL 3803971 (E.D. Cal. July 19, 2013) ...................... 93, 94, 95

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ................................................................................ 84

*whiteCryption Corp. v. Arxan Techs., Inc.*,
  No. 15-CV-00754-WHO, 2015 WL 3799585 (N.D. Cal. June 18, 2015) ..................... 93, 94, 95

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
  62 F.4th 517 (9th Cir. 2023) ................................................................................. 49

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ...................................................................................... 63, 72

*Yamashita v. LG Chem, Ltd.*,
  62 F.4th 496 (9th Cir. 2023) ........................................................................ 64, 67, 72

**Statutes**

28 U.S.C. § 1407 ........................................................................................... 61, 62

Cal. Civ. Proc. Code § 2025.230 .............................................................................. 4

Md. Code Ann. Health-Gen. § 21-330.4 ................................................................... 14

**Rules**

Fed. R. Civ. P. 8 ................................................................................................ passim

Fed. R. Civ. P. 12 ................................................................................................ 97

Fed. R. Evid. 201 ................................................................................................. 7

**Other Authorities**

Food Safety Program Assembly Bill (AB) 899 ........................................................... 14

CACI 1201 ........................................................................................................ 88

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

**<u>INTRODUCTION</u>**

2       Since at least 2012, baby foods sold by Defendants have been contaminated with the
3  neurotoxic heavy metals lead, arsenic, mercury, and cadmium.  These neurotoxic metals cause
4  brain damage and can interfere with the developing brain of a baby—a period of brain
5  development that sets the stage for the rest of their lives.  Thankfully, most babies exposed to
6  these toxic heavy metals are able to deal with them.  Any harm to their neurodevelopment is slight
7  and does not manifest as a clinical diagnosis.  For some babies, however, the interference with
8  brain development can manifest as a constellation of behaviors and symptoms known, clinically,
9  as autism spectrum disorder ("ASD") and/or attention deficit hyperactivity disorder ("ADHD").
10  Indeed, early life exposure to these toxic heavy metals has been shown, repeatedly, to increase the
11  risk of a child developing ASD and/or ADHD.

12       The dark truth, however, is that Defendants knew about this contamination and did not
13  take action to mitigate the risks.  They knew that their baby food products and ingredients
14  contained excessive levels of lead, arsenic, mercury, and cadmium.  They knew this because,
15  internally, they discussed the problem.  Some even tested and analyzed their products and
16  ingredients.  But, despite the clear health concerns and lack of transparency with parents, no
17  Defendant stopped selling all the contaminated products, took action to ensure the products they
18  sold did not contain these contaminants, or warned parents about which foods were contaminated.
19  Instead, they kept quiet and exposed millions of babies to these neurotoxic contaminants.  Their
20  justification: nobody stopped them.  Because baby food was largely unregulated by the U.S. Food
21  and Drug Administration ("FDA"), they were allowed to sell the contaminated baby foods,
22  regardless of the obvious and disturbing health consequences of doing.  Tort law, however, does
23  not recognize the "nobody stopped me" defense.  This is why this mass tort emerged.  The
24  unlucky babies that were not able to deal with the toxic heavy metals they ingested from
25  Defendants' baby food products have banded together to seek justice against the companies that
26  knowingly poisoned millions of babies and made billions doing it.

27       To be clear, baby food can be made without detectable toxic heavy metal in it.  Indeed,
28  several manufacturers currently do so and, historically, the data shows that these Defendants could

1

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

have done so, too.  There is no reason why babies need to be exposed to toxic heavy metals during the sensitive period of early life neurodevelopment.  And, as these Defendants have marketed themselves as nutritional specialists for babies, they have a special obligation to ensure that the foods they sell, knowing that they will be consumed by the most vulnerable population in our society, are safe.

The Master Long-Form Complaint (ECF No. 197) (July 15, 2024) ("Master Complaint") puts each Defendant on notice of the claims brought against them.  There is no confusion about what this case involves, nor can Defendants credibly state that the detailed Master Complaint fails to state a plausible claim.  And yet, in a series of disjointed motions filed by different subsets of Defendants, they each attempt to avoid liability by invoking various aspects of Rule 12.  But these motions are unavailing.  The Master Complaint does not need to prove Plaintiffs' case or establish complex scientific issues.  It simply needs to put Defendants on notice of the claims against them.  And, it more than meets that mark.  Defendants' largely conclusory arguments to the contrary all fail.

***Parent Defendants' Motions to Dismiss (ECF Nos. 275, 276, 277, 281, 284)***.  The Parent Defendants—Hero Group, Nestlé,[1] Danone, Campbell, and Sun-Maid—seek dismissal under Rules 12(b)(1), 12(b)(2), and 12(b)(6).  But all their arguments boil down to one contention: that they cannot be liable because they are mere parent entities.  The Master Complaint in no way contests the general principle that parent entities are not liable for their subsidiaries' acts merely because they own their subsidiaries.  If these Parent Defendants were mere stockholders, Plaintiffs would not be suing them.  But as the pleading alleges, and the evidence confirms, the Parent Defendants did not act as mere stockholders in the context of the conduct alleged.  Rather, as the pleading sets forth, each Parent Defendant contributed *directly* to the wrongdoing that injured Plaintiffs.  The Master Complaint provides specific examples of each Parent Defendant's involvement in and control over product manufacturing and design, all of which led their

---

[1] Per the Notice of Dismissal filed today (ECF No. 333), Plaintiffs have voluntarily dismissed Nestlé Holdings, Inc., at this time.  All references to "Nestlé" herein thus apply to Nestlé S.A.

1    subsidiaries to knowingly, and without warning, sell contaminated foods for babies to eat.

2    Defendants' response to these specific allegations, to the extent they respond at all, evokes

3    Monty Python's limbless Black Knight's claim that "it's just a flesh wound."  The Parent

4    Defendants simply assert that each specific allegation, standing alone, does not establish a

5    connection to a Plaintiff's injury.  Yet these allegations serve to illustrate the Parent Defendants'

6    overall roles in the problems with the baby food products at issue.  The Master Complaint alleges

7    that the Parent Defendants were not just stockholders.  They acted *through their subsidiaries* to

8    sell baby foods that contained unsafe levels of toxic contaminants—and no warnings of those

9    dangers—in the United States and thereby to injure Plaintiffs.  These allegations more than suffice

10   to defeat their Rule 12(b)(1) challenges.

11   Unsatisfied with these allegations, however, the Parent Defendants have opened the door

12   to evidence.  Some have submitted barebone factual materials purporting to prove their formal

13   corporate separation from their subsidiaries and/or to disprove their alleged involvement in and

14   control over relevant subsidiary conduct.  But the evidence discovered to date—which the Court

15   may consider in adjudicating Defendants' motions under Rules 12(b)(1) and 12(b)(2)—tells a very

16   different story.  Each of the Parent Defendants not only participated in establishing the purported

17   safety of these baby food products, they directly controlled the standards and dictated how much

18   toxic heavy metal would be allowed in these foods.  They were, thus, not merely interested

19   parents, they were active participants in the tortious conduct giving rise to these lawsuits.

20   If the Master Complaint did not name these Parent Defendants, their respective

21   subsidiaries would have arguments under Rule 19 that Plaintiffs had failed to name *necessary*

22   parties.  *See In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 904 (C.D. Cal. 2011) ("If an entity's

23   presence is critical to the disposition of important issues in the case, and/or its evidence will either

24   support the complaint or bolster the defense, it is a necessary party.").  The Parent Defendants had

25   responsibility for the baby foods at issue, and, as a result, they have much of the relevant evidence

26   about those products.  Indeed, in *N.C. v. Hain Celestial Group Inc.*, the California state-court

27   litigation from which the MDL discovery to date comes, many of the defense witnesses who

28   testified as the "persons most qualified" on the baby food brands at issue were employed by the

3

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    Parent Defendants, and many were direct reports to Parent Defendant officers and employees.

2    That is, Parent Defendant personnel testified *for* the Defendants' subsidiaries. *See* CAL. CIV.

3    PROC. CODE § 2025.230 ("If the deponent named is not a natural person … the deponent shall

4    designate and produce at the deposition those of its officers, directors, managing agents,

5    employees, or agents who are most qualified to testify on its behalf as to those matters to the

6    extent of any information known or reasonably available to the deponent."). Plaintiffs cannot

7    litigate this case against subsidiary entities that will consistently point the finger at their parents.

8        At the very least, and though wholly unnecessary, if the Court does not deny these motions

9    outright, then the Court should order jurisdictional discovery or an evidentiary hearing before

10    considering dismissal of the Parent Defendants. While the existing discovery from other

11    jurisdictions severely undercuts the Parent Defendants' arguments, that discovery remains

12    incomplete in important respects—as Plaintiffs have shown in other briefing. *See* Joint Discovery

13    Letter Brief (ECF No. 307) (Jan. 6, 2025). The Parent Defendants have so far refused to

14    participate in discovery or even informal information exchange in this MDL. If any question

15    remained about whether these Defendants are properly named (and it does not), further discovery

16    would provide a conclusive answer.

17        ***Collective Motion to Dismiss (ECF No. 300)***. The remaining Defendants raise arguments

18    that are squarely foreclosed by Circuit caselaw and the basic rules of pleading. First, they argue

19    that the 55-page, 242-paragraph Master Complaint fails to satisfy even the minimum requirements

20    of *Iqbal* and *Twombly*. Tellingly, though, the paragraphs they characterize as mere legal

21    conclusions can all be found in the Counts, where complaints generally state their legal

22    conclusions. *See* Defendants' Notice of Motion and Motion to Dismiss and Strike Master

23    Complaint, and Memorandum of Points and Authorities (ECF No. 300) ("Collective MTD") at 9.

24    The Court, and Defendants, can find the supporting factual allegations in the preceding 100-plus

25    paragraphs.

26        Second, Defendants argue that the Master Complaint fails to plausibly allege that the levels

27    of heavy metal that have been detected in Defendants' baby foods rendered those products

28    defective because the Master Complaint does not allege what level of heavy metal would be safe.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   The Master Complaint does not allege such a safe "threshold" dose of toxic heavy metals because

2   the FDA and every scientific body is clear: there is no safe level of these toxins for a baby to

3   consume.  Nor does the law of this Circuit require Plaintiffs to identify one.  *See In re Roundup*

4   *Prods. Liab. Litig.*, 2024 WL 1974534, at *6 (N.D. Cal. May 2, 2024) ("The indispensability of

5   'dose' is not supported by Ninth Circuit precedent ….  The authority seems to be to the

6   contrary.").  That said, the Master Complaint does identify levels at which heavy metals have been

7   linked to neurodevelopmental harm in the epidemiological literature, and it alleges that Plaintiffs

8   could be and were exposed to such levels by consuming Defendants' foods.  "There is nothing

9   inconsistent," and certainly nothing implausible, in asserting both "that scientific studies confirm

10  the danger of [a particular level of] exposure" and "that no one is sure whether" that exposure "is

11  the floor for risk."  *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013).

12  Defendants are free to pose their own (unscientific) view at the expert phase.  But the issue here is

13  pleading.  And the Master Complaint is sufficient.  As the Complaint alleges, Defendants are

14  capable of making safe baby food, i.e., baby food not contaminated with detectable levels of toxic

15  heavy metal.  They have chosen not to do so.

16      Third, Defendants argue that Plaintiffs cannot plausibly plead a manufacturing defect (i.e.,

17  that the baby foods at issue were not made as designed) when Plaintiffs do not yet know the exact

18  specifications for all baby foods at issue and when Plaintiffs also allege that Defendants' baby

19  foods were defectively designed.  But Plaintiffs need not allege unknown technicalities of product

20  design, nor "what part of the manufacturing process caused the defect."  *Reynolds v. EzriCare*

21  *LLC*, 700 F. Supp. 3d 830, 843 (N.D. Cal. 2023).  And, as the Federal Rules have long made clear,

22  complaints may contain alternative theories.  *See* FED. R. CIV. P. 8(d).

23      Finally, Defendants ask the Court to strike the Master Complaint's allegations regarding

24  aluminum and baby formula.  Plaintiffs agree not to pursue aluminum-related claims at this time.

25  But the attempt to strike formula-based baby foods makes little sense.  Baby formula is a type of

26  baby food—as Defendants illustrate by selling their baby formula products under the same baby

27  food brand name as the other products at issue.  Baby formula, accordingly, was included as a

28  "baby food" in the Congressional reports and repots by Healthy Babies Bright Futures ("HBBF")

that kickstarted this entire litigation.  Baby formulas, as a type of baby food, are contaminated with toxic heavy metals.  When Plaintiffs consumed those formulas, like when they consumed other baby foods, they were exposed to neurotoxins that caused their injury.  Formula-based baby food products must be included among the Defendants' products that exposed Plaintiffs to neurotoxic heavy metals in early life, i.e. the products that are at issue in this litigation, because they are part and parcel of a Plaintiff's claim against these Defendants.

With the minor exception of aluminum-related claims, all Defendants' motions to dismiss should be denied.

## BACKGROUND

I.  **HEAVY METALS ARE NEUROTOXIC AND ESPECIALLY DANGEROUS FOR BABIES**

The toxic heavy metals at issue in this case—lead (Pb), arsenic (As), mercury (Hg), and cadmium (Cd)—are well-established neurotoxins, i.e., chemicals that damage the nervous system by altering structure or function.  *See* Compl. ¶¶ 109–123.[2]  When that damage is inflicted on a baby's brain, it results in various behavioral issues.  Where a child exhibits a sufficient number of those issues, with sufficient severity, they are often diagnosed with autism (ASD) and/or attention deficit hyperactivity disorder (ADHD).

Lead is a well-documented and undisputed neurotoxin.  The FDA states that "[e]ven low lead exposure can harm children's health and development, specifically the brain and nervous system."  *Id.* ¶ 105.[3]  This is why, according to the FDA, "no safe level of lead exposure has yet been identified for children's health," which is consistent with other scientific and regulatory bodies' conclusions.  *Id.*  There is overwhelming epidemiological data directly linking exposure to lead and diagnoses of autism and/or ADHD.  *See id.* ¶¶ 109–123.  In one study, researchers from

---

[2] All references to "Compl." are to the Master Complaint (ECF No. 197) unless otherwise specified.

[3] On January 6, 2025, the final guidance document was released, which contains the same undisputed information.  *See* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-levels-lead-processed-food-intended-babies-and-young-children.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

the National Institute of Health compared lead levels found in the baby teeth of genetically identical twins, where one sibling had autism and the other did not. *See id.* ¶ 113. Testing showed that the autistic siblings had substantially higher levels of lead exposure as babies, as revealed by the lead deposits in their baby teeth. *See id.* Dozens of epidemiological studies, including large meta-analyses, have likewise clearly shown that ingestion of lead increases the risk of autism and ADHD. *See id.* ¶¶ 109–123.

Arsenic is simply poison. It has been used as a form of pest control, i.e., rat poison, for centuries. It provides no therapeutic value. Scientists and regulators agree that there is no safe level of exposure to arsenic. *See id.* ¶ 107. The FDA has linked exposure to inorganic arsenic during early childhood to "the risk of neurodevelopmental toxicity," noting that "infants and children may be particularly susceptible to adverse neurodevelopmental effects of exposure to inorganic arsenic[.]" FDA, *Guidance for Industry: Action Level for Inorganic Arsenic in Rice Cereals for Infants*, at 5, 6 (Aug. 2020)[4]; *see also* FDA, Action Level for Inorganic Arsenic in Apple Juice: Guidance for Industry, at 4 (June 2023)[5], ("[A] growing body of literature suggests an association with adverse neurodevelopmental effects in infants and children from exposure to inorganic arsenic[.]").[6] Numerous epidemiological studies, including large meta-analyses, have also consistently linked early life arsenic exposure to an increased risk of being diagnosed with autism and/or ADHD. *See Compl.* ¶¶ 111, 112, 116–123.

---

[4] Available at https://www.fda.gov/media/97234/download

[5] Available at https://www.fda.gov/media/86110/download

[6] Apart from discovery documents cited in response to the Parent Defendants' motions under Rules 12(b)(1) and 12(b)(2), this brief cites materials subject to judicial notice and relevant to all motions. The Court "may take judicial notice of undisputed matters of public record," as well as "documents not attached to" or expressly referenced in the complaint "if no party questions their authenticity and the complaint relies on those documents." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *see also* FED. R. EVID. 201; *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015). Here, such materials include, *e.g.*, the House Subcommittee reports, the Happy Babies Bright Futures (HBBF) reports, FDA guidance, and materials related to the Baby Food Council. These materials are matters of public record and/or relied upon in the Master Complaint. And their authenticity cannot be fairly disputed any more than the materials for which Defendants seek judicial notice. *See* Campbell Request for Judicial Notice (ECF No. 275-3) (Dec. 2, 2024).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Methylmercury (not to be confused with ethylmercury, a different, less toxic form of mercury found in vaccines) is another well-established neurotoxin. Its ability to cause brain damage is well-documented. Indeed, the phrase "mad as a hatter" refers to the methylmercury poisoning that hat makers experienced in the 18th and 19th centuries by rubbing the chemical into felt. Like arsenic and lead, methylmercury has repeatedly been linked to diagnoses of autism and ADHD. *See id*. ¶¶ 109–123. Cadmium, as well, is also another well-established toxin, having been shown in numerous studies to increase the risk of autism and ADHD. *See id*.

The ability of all these toxic heavy metals to injure babies is particularly acute. Babies have a reduced ability to mitigate or eliminate toxic heavy metals following ingestion. *See, e.g.*, *id*. ¶ 107. Furthermore, babies have less body weight than adults, and they absorb toxic heavy metals more than adults by 40 to 90%. *Id.* ¶ 106. Because babies undergo considerable neurodevelopment in their early years, interference with that development by exposure to toxic heavy metals is especially problematic. This is, in fact, why the FDA has issued special standards on allowable levels of lead for food intended to be consumed by babies, and why the FDA is in the process of establishing guidelines for arsenic, mercury, and cadmium.[7]

## II. DEFENDANTS' BABY FOODS ARE CONTAMINATED WITH TOXIC HEAVY METALS

In recent years, researchers, consumer advocacy groups, ongoing litigation, and Congress have shed light on the contamination of Defendants' baby food products with toxic heavy metals. The findings paint a bleak picture. Despite being aware—for decades—that their baby food products contained detectable levels of toxic heavy metals, Defendants continued to manufacture and sell contaminated baby foods, at times even increasing the levels of metals allowed in the products. Defendants failed to consistently test their products for metals. They failed to set or enforce metal limits. They failed to source alternative ingredients with lower metal content. And they failed to disclose the presence of metals to parents.

These failures have been brought to light through independent research, which led to a

---

[7] *See* https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Congressional investigation, which led to legislative action, regulatory actions, and litigation—all aimed at addressing problems that Defendants failed to address for decades.

### A. Independent Research Raises Concern Regarding the Levels of Heavy Metals in Defendants' Products

In October 2019, an alliance of nonprofit organizations, scientists, and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing "outcomes-based programs to measurably reduce babies' exposures to toxic chemicals," published a report (the "HBBF Report") investigating the presence of toxic heavy metals in baby foods.  Compl ¶ 39; Wisner Decl. Ex. 1 (HBBF Report).  The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury.  All but nine of 168 baby foods contained at least one metal; most contained more than one."  Compl ¶ 39; Wisner Decl. Ex. 1 (HBBF Report) at 6.  Specifically, the HBBF Report identified products manufactured and sold by all Defendants—including "puffs and other snacks made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple, pear, grape and other fruit juices," and "carrots and sweet potatoes"—as particularly high in toxic heavy metals.  Compl ¶ 39; Wisner Decl. Ex. 1 (HBBF Report) at 10-11.  This 2019 HBBF Report followed an earlier 2017 HBBF publication that had evaluated arsenic levels in nine brands of infant rice cereal, including the infant rice cereal products of five Defendants: Nurture, Gerber, Nestlé, Hain, and Beech-Nut.  *See* Wisner Decl. Ex. 2 (2017 HBBF Report).  The analysis found that "[a]ll but one of the 42 containers of infant rice cereal we tested had more arsenic than any of the 63 other cereals included in our study … [and] we found no evidence to suggest that any brand has reduced arsenic levels in rice cereal to amounts comparable to those found in other types of cereal."  *Id*. at 1, 4; *see also* Compl. ¶ 41.

The results of the 2019 HBBF Report were consistent with the FDA's tests in 2017, where the FDA detected one or more of the four toxic metals (lead, arsenic, mercury, and cadmium) in 33 of 39 types of baby food tested.  *See* Compl ¶ 40.  All these findings were by no means outliers.  Eight months before publication of the 2019 HBBF Report, a study conducted by scientists at the

University of Miami and the Clean Label Project had "examined lead … concentrations in a large convenience sample of US baby foods."  *Id.*; Wisner Decl. Ex. 3 (Gardener, et al. 2019).  The study detected lead in 37% of samples.  *Id.*

Similarly, earlier in 2018, the advocacy and research group, Consumer Reports, published a report following its testing of a variety of baby food products and concluded that "[a]bout two-thirds (68 percent) had worrisome levels of at least one heavy metal"; "[f]ifteen of the foods would pose potential health risks to a child regularly eating just one serving or less per day"; and "[s]nacks and products containing rice and/or sweet potatoes were particularly likely to have high levels of heavy metals."  Wisner Decl. Ex. 4 (Consumer Reports 2018) at 4.  These tests included products manufactured and sold by all Defendants.  *See id.* at 8.

### B.    A Congressional Investigation Finds a Substantial Presence of Heavy Metals in Baby Foods Manufactured and Sold by Defendants

On February 4, 2021, and September 29, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform published two reports detailing its findings that toxic metals—lead, arsenic, mercury, and cadmium—were present in "significant levels" in numerous commercial baby food products, including baby food products manufactured and sold by all Defendants.  Compl ¶ 42; *see* Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.); Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) (collectively the "Congressional Report").  Four Defendants—Hain, Gerber (Nestlé), Nurture (Danone), and Beech-Nut (Hero Group)—cooperated with the Committee's initial investigation, producing internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.  *See* Compl. ¶ 42; Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 2.  Three Defendants—Plum (Campbell), Walmart, and Sprout (Neptune)—initially refused to cooperate.  *See* Compl. ¶ 42.  The Congressional Report made several important findings:

*First*, some Defendants set dangerously high internal limits ("specifications" or "specs") for the maximum level of toxic heavy metals allowed in their baby foods.  *See id.* ¶¶ 43, 57.  Such

high limits—untethered to any consideration of the low levels at which metals are capable of damaging babies' brains—allowed Defendants to source and use ingredients that contained elevated levels of heavy metals to manufacture the baby foods consumed by Plaintiffs. *See id*. ¶ 57. In the highly competitive and lucrative baby food market, using contaminated ingredients allows each Defendant to retain greater market share. *See id*.

*Second*, some Defendants failed to implement *any* internal specifications for the amount of toxic heavy metals allowed in their ingredients or finished baby foods. By simply not looking at the issue, Defendants allowed certain highly contaminated ingredients and finished products to be used and sold to consumers. *See id*. ¶¶ 44, 46, 48, 50, 51, 58. This happened notwithstanding Defendants' specific knowledge of the risk of toxic heavy metals and their presence in ingredients and finished products.

*Third*, some Defendants did not routinely adhere to their own internal metal specifications or standards, allowing contaminated ingredients and finished products to be released as "exceptional releases" or other simpler terminology. *Id*. ¶ 59. This resulted in Defendants using ingredients, and manufacturing and selling baby foods, that contained levels of toxic heavy metals far higher than the levels internally set by Defendants. *See id*. In other instances, Defendants would test products only after putting them on the market—and, upon learning that products contain extremely high levels of toxic heavy metals, Defendants generally take no action to recall the product or warn parents about the issue. *See id*.

### C. Defendants Abandoned Efforts to Reduce Metal Levels in their Baby Foods or to Label Their Products Properly

In 2019, as concerns grew over the heavy metal contamination of some baby foods on the U.S. market, a consortium of the Defendants comprised of Beech-Nut, Campbell, Gerber, Hain, Nurture, and Sprout, as well as certain interested third-party groups such as the Environmental Defense Fund ("EDF") and HBBF, was formed with the intent to reduce heavy metals in baby food. *See* Compl ¶ 97; Wisner Decl. Ex. 7 (Baby Food Council Charter) at 1; Ex. 8 (Proposal to Baby Food Council) at 1. Notably, the consortium included Plum's parent company (Campbell), and its work was supported by a scientist from Nestlé, Gerber's parent company. *See* Wisner

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Decl. Ex. 7 at 4 (identifying participants).

Named the Baby Food Council ("BFC"), *see* Compl. ¶ 98, the consortium worked to develop a voluntary Baby Food Standard for acceptable amounts of heavy metals in baby food. The Baby Food Standard would have provided companies "with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products." *Id.* ¶ 99; Wiser Decl., Ex. 9 (EDF Press Release, Nov 5, 2021).[8]  The BFC specifically recognized that heavy metals can cause neurodevelopmental harm to babies' developing brains and that there is no safe level of exposure.  *See* Compl. ¶ 98; Wisner Decl. Ex. 7 (Baby Food Council Charter) at 1 ("acknowledging no known safe level in the food supply[.]"); Wisner Decl. Ex. 8 (Proposal to Baby Food Council) at 2 ███████████████████████████████████████████████████████ █████████████████████████████████████████████.

After several years of negotiations and discussions, including a proposed system for testing, the EDF and HBBF, as members of the BFC, proposed voluntary limits of 1 ppb for lead, consistent with a prior 2017 recommendation by the EDF.  *See* Compl. ¶ 100; Wisner Decl. Ex. 10 at Hain-MDL-001-048674. ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████.

Participation in the BFC was a little more than a façade—Defendants had no intention to self-regulate the toxic heavy metals in their products.  *See* Compl. ¶ 100. Defendants' resistance led the EDF and HBBF to leave the BFC in protest in November 2021.  *See id.* ¶¶ 101–02; Wisner Decl. Ex. 9 (EDF Press Release, Nov. 5, 2021); Wisner Decl. Ex. 12 (HBBF Press Release, Nov.

---

[8] *Available at* https://www.edf.org/media/edf-and-healthy-babies-bright-futures-withdraw-baby-food-council-after-companies-block-work.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

5, 2021).[9]

## D.    Regulators Take Action to Curb Heavy Metals in Baby Foods

The Congressional Report has spurred regulatory and legislative action on both the federal and state level.  In November 2021, the FDA launched the "Closer to Zero" program to "reduce dietary exposure to contaminants to as low as possible, while maintaining access to nutritious foods."[10]  Through this program, the FDA intends to establish action levels for heavy metals in baby foods (i.e., levels at which the food may be considered adulterated), to develop new testing methods for improved heavy metal detection, and to increase enforcement activities against baby food manufacturers.  As of January 6, 2025, the FDA has issued final guidance for lead, setting limits at 10 or 20 ppb for baby foods (10 ppb for fruits, 10 ppb for single or mixed vegetable purees/puddings, 20 ppb for single ingredient root vegetables, and 20 ppb for dry cereals) and 10 or 20 ppb for juices (10 ppb for apple juice or single-strength juice and 20 ppb for juice blends containing apple juice).[11]  The FDA has also issued draft guidance for lead in juices, arsenic in apple juice, and arsenic in rice cereal.[12,13] The proposed limit for arsenic in apple juice is 10 ppb.[14] These are in addition to the FDA's updated limit for lead in bottled drinking water, which is

---

[9] *Available at* https://www.hbbf.org/blog/2021-11/hbbf-leaves-baby-food-council-after-baby-food-companies-backpedal-commitments.

[10] Closer to Zero: Reducing Childhood Exposure to Contaminants from Foods, U.S. Food & Drug Admin. (last updated Dec. 3, 2024), https://www.fda.gov/food/environmental-contaminants-food/closer-zero-reducing-childhood-exposure-contaminants-foods.

[11] Action Levels for Lead in Food Intended for Babies and Young Children: Guidance for Industry (Jan. 2025), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-levels-lead-processed-food-intended-babies-and-young-children.

[12] Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance for Industry, U.S. Food & Drug Admin. (Jan. 2023), https://www.fda.gov/media/164684/download; Action Levels for Lead in Juice: Guidance for Industry, U.S. Food & Drug Admin. (Apr. 2022), https://www.fda.gov/media/157949/download.

[13] Action Level for Inorganic Arsenic in Apple Juice: Guidance for Industry, Food & Drug Admin. (June 2023), https://www.fda.gov/media/86110/download.

[14] Action Level for Inorganic Arsenic in Apple Juice, Supra Note 3.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

5 ppb.[15]  Additional draft guidance documents are expected for cadmium and arsenic this year.[16]

Several states, including California, Maryland, Pennsylvania, New York, and Illinois, have enacted or are considering laws to further regulate the presence of toxic heavy metals in baby foods.  California's Baby Food Protection Act (the "California Act"), signed in October 2023, was enacted to "enhance the safety of baby food products" by "publicly disclosing information to consumers about levels of the four toxic elements," to "promot[e] transparency in the industry," and to "enabl[e] consumers to make educated decisions associated with their health."[17] Cal. Health & Safe Code §§ 110962, *et seq*.  The California Act dictates the qualifications and testing standards that laboratories must use to test baby food products, as well as the timeframe within which baby food manufacturers must comply.  *See id*. §11092(c).  Beginning January 2024, baby food manufacturers were required to conduct monthly finished product testing at accredited laboratories for heavy metals.  *See id*. § 110962(b).  And beginning *this month*, baby food manufacturers must disclose these heavy metal test results both on their websites and directly on product packaging.  *See id*. § 110962(b)(2).  A QR-code will be on every product tested for heavy metals, linking consumers to a webpage containing heavy metal test results and information about the health effects of toxic metals on children.  *Id*.  This law will finally give parents an opportunity to make an informed decision about the baby foods they feed their children.

In August 2024, Maryland passed "Rudy's Law" with language nearly identical to the California Act.  The timeframes for testing and labeling compliance are January 2025 and January

---

[15] Lead in Food and Foodwares, U.S. Food & Drug Admin. (last updated Dec. 12, 2024), https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=For%20lead%2C%20this%20level%20is,that%20can%20leach%20from%20pipes.

[16] Closer to Zero, supra Note 1.

[17] *See* Food Safety Program Assembly Bill (AB) 899: Food Safety – Baby Food Frequently Asked Questions, *available at* https://www.cdph.ca.gov/Programs/CEH/DFDCS/Pages/FDBPrograms/FoodSafetyProgram/AB899FAQ.aspx#:~:text=AB%20899%20is%20a%20California,to%20meet%20particular%20labeling%20requirements

2026, respectively.  *See* MD. CODE ANN. HEALTH-GEN. § 21-330.4, *et seq*. Pennsylvania and New York are actively considering legislation similar to California and Maryland.

### III. ALL DEFENDANTS HAVE KNOWINGLY PARTICIPATED IN MANUFACTURING AND SELLING BABY FOODS CONTAMINATED WITH TOXIC HEAVY METALS

For the Court's ease of reference, this Part separately discusses (1) the allegations against each Defendant in the Master Complaint, along with judicially noticeable materials, which are relevant to all Defendants' motions, *see supra* n. 6, and (2) a sample of the evidence discovered to date that supports those allegations, which is relevant to Defendants' motions under Rules 12(b)(1) and 12(b)(2).

### A. Beech-Nut and Hero Group

#### 1. Allegations

Beech-Nut Nutrition Company ("Beech-Nut") is a U.S.-based company that sells baby food products throughout the country, *see* Compl. ¶ 10, and does not challenge personal or subject-matter jurisdiction here.  Since 2005, Beech-Nut has been wholly owned, controlled, and operated by Hero A.G. ("Hero Group"), a citizen of Switzerland.  *Id*. ¶¶ 10, 12.  The Master Complaint alleges that Hero Group "has been directly involved in the tortious conduct in the United States and its various states that give rise to" this MDL through its control over Beech-Nut. *Id*. ¶ 11.  Indeed, Hero Group openly claims Beech-Nut as its baby food brand, stating in its 2023 annual report that "Hero markets baby food in the US and Canada under the brand names Beech-Nut and Baby Gourmet."  *Id*. ¶ 10 (internal brackets omitted).  Thus, for example, Hero Group has "made executive-level decisions for Beech-Nut concerning the acquisition of testing machines need[ed] to test baby foods for heavy metal."  *Id*. ¶ 11.  Allegations against Beech-Nut in this suit accordingly "apply equally to Hero Group, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Beech-Nut's Contaminated Baby Foods at issue in this MDL."  *Id*. ¶ 13.

Beech-Nut baby foods have significant levels of heavy metals.  That much is not open to dispute: on June 8, 2021, four months after the first Congressional report, Beech-Nut *voluntarily recalled* its infant single grain rice cereal and "exited the rice cereal market completely,"

confirming in its recall notice that "its products exceed regulatory arsenic limits." *Id.* ¶ 44.  It is unknown whether Hero Group was involved in the decision to recall this product, as that would be something that would require additional discovery.  As noted in the Congressional Report, Beech-Nut and Hero Group had "used ingredients after they tested as high as 913.4 ppb arsenic," routinely using "additives that tested over 300 ppb arsenic to address product characteristics such as a 'crumb softness.'" *Id.*; *see* Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 3.  The second Congressional report further "noted that Beech-Nut rice cereal tested up to 125 ppb inorganic arsenic and averaged 85.47 ppb inorganic arsenic." *Id.*  Beech-Nut products also "used ingredients containing as much as 886.9 ppb lead," with 483 products containing over 5 ppb lead, 89 containing over 15 ppb lead, and 57 containing over 20 ppb lead.  *Id.*

Beech-Nut and Hero Group's "practice of testing ingredients, rather than finished products, for toxic heavy metals appears to have contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products." *Id.*  By testing only ingredients in isolation, Defendants willfully blinded themselves to the total amount of toxic heavy metals in the products that they put on the shelves for parents to buy and feed to their children.

### 2.  Evidence

To the extent necessary to refute Hero Group's jurisdictional arguments, discovery to date proves Hero Group's involvement in conduct giving rise to Plaintiffs' claims.  Even publicly available evidence suggests that Hero Group controls and directs Beech-Nut operations.  Hero Group's website indicates that Baby & Toddler Food is major category in its portfolio and that Beech-Nut is Hero Group's "**US-based baby food brand**." Wisner Decl. Ex. 13 (Hero Group Website).  In its 2023 Annual Report, Hero Group purports to "apply … the strictest quality control" to its Baby & Toddler Food brands, including Beech-Nut.  Wisner Decl. Ex. 14 (Hero Group Annual Report) at 17.  Hero Group also asserts (next to a picture of a toddler) that "[w]e rigorously test our products after selecting only the best ingredients" and that, "[a]t the factory level, the Head of Quality ensures that high standards are implemented." *Id.* at 229.  Hero Group even publicizes that it "has implemented … policies, processes, controls, and regular monitoring … to ensure high-quality products" out of concern for, among other things, the "potential

16

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  litigation" that might be "triggered by a serious food safety event." *Id.* at 47.

2        What the publicly available evidence suggests, discovery proves. According to Beech-

3  Nut's own VP for Quality Assurance, Jason Jacobs, Hero Group set ███████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████

11       The evidence confirms that Hero Group was in fact involved ██████████████

12 ████████████████████████████████████████████████

13 Hero Group also had a hand ████████████████████████████████████████

14 █████████████████████████████████████████████████

15 ███████████████████████████. In particular, Hero Group set the "parameters" for

16 heavy metal limits of lead, cadmium, and inorganic arsenic. ██████████████████████

17 ████████████████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22       The evidence further shows that Hero Group intentionally markets in, and profits from, the

23 United States through Beech-Nut:

24     With regards to North America, **Hero markets baby food in the US** and Canada
   under the brand names **Beech-Nut** and Baby Gourmet. In the US, Hero saw the

25     business recovering strongly for the second consecutive year. Beech-Nut posted
   an organic growth of 12.6% in 2023. The fast-growing toddler snacking business

26     coupled with **our** organic baby food sold in jars and pouches contributed to this
   successful year in the US.

27

28 Wisner Decl. Ex. 14 (Hero Group Annual Report) at 56 (emphases added).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

   **B. Gerber and Nestlé**

2

   **1. Allegations**

3      Nestlé S.A. ("Nestlé")[18] is a global food and beverage company with more than 2,000

4   brands.  Nestlé is a citizen of Switzerland and sells baby foods in the United States through its

5   subsidiary, Gerber Products Company ("Gerber").  *See* Compl. ¶ 16.  Gerber is a citizen of the

6   United States that sells baby food products under the brand name "Gerber" and that does not

7   contest personal or subject-matter jurisdiction here.  *See id*. ¶ 14.

8      The Master Complaint alleges that Nestlé exercised control and authority over the sale,

9   manufacture, and distribution of Gerber's contaminated baby food at issue in this MDL.  *See id*.

10   ¶ 18.  For example, employees and scientists at Nestlé trained and set safety standards at Gerber.

11   *See id*. ¶ 16.  Indeed, in other litigation, Gerber specifically identified scientists at Nestlé to testify

12   on behalf of Gerber regarding the safety of Gerber's baby food products.  *See id*.  Accordingly,

13   Nestlé has been directly involved in the tortious conduct in the United States and its various states

14   that gives rise to this case, and allegations against Gerber apply equally to Nestlé.  *See id*.

15      Gerber-branded baby food products often include high-arsenic ingredients.  The

16   Congressional investigation found, for example, that Gerber products had "us[ed] 67 batches of

17   rice flour that had tested over 90 ppb inorganic arsenic."  *Id*. ¶ 45; *see* Wisner Decl. Ex. 5 (Feb.

18   2021 Congress Rpt.) at 3.  Gerber baby food products regularly test above 100 ppb arsenic, with

19   its rice cereals averaging 87.43 ppb inorganic arsenic and at times reaching 116 ppb inorganic

20   arsenic.  *See* Compl. ¶ 45.  Congress likewise concluded that "Gerber's organic rice cereal," which

21   averaged 65.6 ppb inorganic arsenic and has reached 76 ppb inorganic arsenic, "is dangerous."

22   Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 3.  In other instances, the rice flour used to

23   manufacture Gerber baby foods for the U.S. market contained as much as 300 ppb arsenic,

24

---

25   [18] Nestlé S.A publicly refers to itself simply as "Nestlé" without including the formal the "S.A."
26   corporate designation.  *See e.g.,* Wisner Decl. Ex. 20 (Nestlé 2023 Annual Report) at 2 ("Nestlé's
     food and beverage portfolio caters to people at each stage of their life.  It starts with the first 1000
27   days[.]"); *id*. at 9 ("Nestlé has deep roots in infant nutrition[.]"); *id*. at 13 ("High standards of food
     safety and quality are non-negotiable at Nestlé and are fundamental in our engagement with
28   consumers.").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

notwithstanding the fact that Gerber and Nestlé often implemented stricter standards for baby foods sold in other countries.  *See* Compl. ¶¶ 45, 65–71.

Gerber-branded baby food products are also contaminated with elevated levels of lead. Gerber products used ingredients that tested as high as 48 ppb lead and many ingredients containing over 20 ppb lead.  *See id*. ¶ 45.  Finished Gerber products have tested at and/or above 50 ppb lead.  *See id*. ¶ 68.  Indeed, Gerber products have historically been sold with as much as 150 ppb lead.  *See id*.  Gerber carrot products have further been found to contain cadmium at levels above 5 ppb, with some containing more than 87 ppb.  *See id*. ¶ 69.

Gerber baby food products contain high levels of heavy metals because Gerber and Nestlé do little to prevent it.  Although Gerber and Nestlé were fully aware that it was feasible to source lower-lead ingredients, they proceeded to use high-lead ingredients in their baby foods.  *See id*. ¶ 68.  Moreover, though Gerber and Nestlé tested ingredients and, occasionally, finished products for arsenic and lead, their internal allowable limits were so high as to render their food unsafe.  *See id*. ¶ 65.  For baby foods generally, Gerber and Nestlé's limits between 2012 and 2019 were 40 ppb for lead, 20 ppb for arsenic, and 10 ppb for mercury.  *See id.*  For infant rice cereal, Gerber and Nestlé's lead limit between 2012 and 2017 was 100 ppb, with a "target" of 50 ppb in 2016 and 2017.  *See id*.  Between 2018 and 2019, Gerber and Nestlé set their lead limit at a still-dangerous 50 ppb.  *See id*.  For arsenic in rice cereal, Gerber and Nestlé did not have a limit between 2012 and 2015, merely a target of 100 ppb.  *See id*.  Between 2016 and 2018, they set the arsenic limit at 100 ppb; by 2019, they increased the arsenic limit to 130 ppb for cereals with 90% rice (and kept the limit at 100 ppb for other cereals).  *See id*.  For snack foods, Gerber and Nestlé had a lead limit of 150 ppb between 2012 and 2014, which was reduced to 100 ppb in 2016 and 2017, and then to 50 ppb in 2018 and 2019.  *See id*.  There was no limit for arsenic in snack food before 2016, again just a "target" of 100 ppb.  *See id*. ¶ 65.  A 100-ppb arsenic limit was set in 2016. *See id*.

Gerber and Nestlé rarely test for mercury in their baby foods, notwithstanding the fact that mercury is known to contaminate ingredients such as rice and poses a severe risk to babies' brain development.  *See id*. ¶¶ 45, 65–71.  For both infant cereal and snacks, Gerber and Nestlé imposed

19

1    a 30-ppb limit for mercury between 2012 and 2016, which they reduced to 10 ppb from 2017

2    onward.  *See id*. ¶ 65.

3        With these exceptionally high limits, Gerber and Nestlé sold baby foods that were

4    dangerous for babies to consume.  They did this knowingly.  *See id*.  Yet a Gerber spokesperson

5    even told the public that arsenic in baby food posed no health risk.  *See id*. ¶ 71.

6            **2.  Evidence**

7        To the extent necessary to refute Nestlé S.A.'s jurisdictional arguments, discovery to date

8    proves Nestlé S.A.'s involvement in conduct giving rise to Plaintiffs' claims.  Indeed, Defendants'

9    efforts to conceal the extent and risk of contamination is exemplified by Gerber and Nestlé

10   admitting internally in 2015 that ████████████████████████████

11   ███████████████████████████████████████████████

12   ███████████████████████████████████████████████

13   ███████████████████████████████.  Such spin is part of the pattern and

14   practice that resulted in Plaintiffs' significant injuries.

15       Nestlé S.A. is the ultimate parent company of Gerber.  Nestlé S.A's 2023 Annual Report

16   explains that it maintains and controls the safety standards for the Gerber baby food products at

17   issue in this MDL.  Specifically, the Annual Report represents that "we [Nestlé S.A.] apply

18   international standards and help raise the bar in our industry using rigorous processes and leading

19   scientific techniques."  Wisner Decl. Ex. 20 (Nestlé 2023 Annual Report) at 13.  The Annual

20   Report further explains that

21       [Nestlé S.A.] update[s] our food safety and quality systems to respond to
         considerations, such as tightening regulations, changes to suppliers or ingredients,
22       introduction of regenerative agriculture practices, new packaging and geopolitical
         developments.  In 2023, our Quality Assurance Centers, performed more than 4.1
23       million analytical tests for quality and food safety risk assessment and
         management.
24

25   Wisner Decl. Ex. 20 (Nestlé 2023 Annual Report) at 13.  The discovery to date proves in detail

26   that these statements apply specifically to Gerber.

27       Four general types of evidence confirm Nestlé's control over the safety of Gerber's baby

28   food products.  First is evidence related to the Congressional investigation, where the House

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Subcommittee on Economic and Consumer Policy found substantial presence of heavy metals in Defendants' baby food products, including Gerber products.  During this investigation, the CEO of Gerber wrote a letter to the Subcommittee explaining how both Gerber *and Nestlé* play an integral and significant role in assessing the safety of the Gerber baby food products sold in the United States.  *See* Wisner Decl. Ex. 23 (Gerber Letter to Congress).  Among myriad other references to Nestlé's involvement, the Gerber CEO specifically represented to Congress that:

- ████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████

- ████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
███████████████████████████

- ████████████████████████████████████████████████
████████████████████████████████████████████████

- ████████████████████████████████████████████████
█████████████████████████████████

- ██████████████████████████████████████████████
████████████████████████████████████

- ████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    • ████████████████████████████████████████

2    ██████████████████████████████████████████

3    ████████████████████████

4        All of this tracks with the Gerber CEO's representation to Congress that, while Gerber is

5    the entity that manufactures and sells the baby food products in the U.S., ████████████████

6    ██████████████████████████████████████████

7    ██████████████████████████████████████████████

8        On May 14, 2021, Gerber followed up with a second letter to the Subcommittee, this time

9    written by their attorneys.  *See* Wisner Decl. Ex. 24 (Gerber Second Letter to Congress).  ████

10   ██████████████████████████████████████████

11   ██████████████████████████████████████████

12   ██████████████████████████████████████

13   █████████████████████████████████████████████

14   ███████████████████████████████  This reference to Nestlé S.A., in

15   addition to the numerous references to "Nestlé" (which, again, is how Nestlé S.A. refers to itself in

16   public-facing documents), further illustrates Nestlé S.A.'s involvement in the safety of Gerber's

17   baby food products, Nestlé S.A.'s control over how those products are manufactured, and Nestlé

18   S.A.'s control over which products can be sold.[19]

19       Second, documents produced by Gerber demonstrate that Nestlé S.A. plays a central role

20   in dictating the scientific policies and standards used by Gerber in manufacturing baby food

21   products.  ███████████████████████████████████████

22   ██████████████████████████████████████████████

23   ██████████████████████████████████████████████

---

[19] Likewise, Gerber's website represents that, "[w]ith 24 research technology centers worldwide, Nestlé has the largest food research and development network of any food company.  The Nestlé Research Center, based near Lausanne, Switzerland, is the world's largest private facility for nutrition-related research."  *See* Wisner Decl. Ex. 22 (Gerber Website) at 2.  The Gerber website notes at the bottom that "[a]ll trademarks are owned by Societe des Produits Nestlé S.A., Vevey, Switzerland or used with permission."  And it says "©2024 Nestlé."

1

2

3

4

5

6

7

8

9

10

11

12

13

14     Moreover, nearly every Gerber-related scientific document discussing the neurotoxicity of

15 heavy metals originates from foreign Nestlé entities, including Nestlé S.A.

16

17

18

19

20

21

22

23

24

25

26

27

28     Third, substantial evidence demonstrates that decisions about the levels of heavy metals in

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    the Gerber baby food products at issue were made by Nestlé at the global level. ████████

2    ██████████████████████████████████████

3    ████████████████████████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████████████████████████

6    ███████████████████████████████████████████

7    █████████████████████████████████

8        Moreover, in the *N.C.* state litigation, the plaintiffs deposed six witnesses about Gerber

9    baby food products.  Several of these witnesses testified that they actually work at Nestlé,

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ███████████████████████████████████████████

14   ███████████████████████████████████████████

15   ███████████ ███████████████████████████████

16   ████████████████████████████████████████████

17   ███████████████████████████████████████████

18   ██████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████████████████████

21   ████████████████████████████████████████

22   ███████████████████████████████████████████

23   █████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████

27       And fourth, some key decisions regarding the safety of Gerber's baby food products were

28   made at the Nestlé Research Center ("NRC") and the Nestlé Strategic Business Unit ("SBU").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  Multiple witnesses in *N.C.* testified that Gerber relied on the NRC to assess scientific research and

2  food-safety literature and that the NRC would filter that information down to Gerber. ████

3  ████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12        Many documents produced to date confirm that Nestlé employees at the NRC and SBU

13 made key decisions and assessments about the safety of Gerber baby food products and the

14 ingredients and heavy metals in those products. ████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████ ████  ██████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 _____

27 [20] According to publicly available information, Karin Kraehenbuehl is a Senior Scientist in the

28 Quality & Safety Department at NRC and she holds herself out as working for "Nestlé S.A." *See*
   Wisner Decl. Ex. 41.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    ███████████████████████[21]

2              **C.  Nurture and Danone**

3                   **1.  Allegations**

4         As used herein, "Nurture" refers to both Nurture LLC and its predecessor, Nurture, Inc.

5    Nurture does business as "Happy Family Organics" and sells baby food products under the brand

6    names "Happy Baby," "Happy Tot," and "Happy Family," *see* Compl. ¶ 20, and does not

7    challenge jurisdiction here.  As noted in the initial Congressional report, even though "[i]nternal

8    company standards permit dangerously high levels of toxic heavy metals," "Nurture

9    (HappyBABY) sold all products tested, *regardless of how much toxic metal the baby food*

10   *contained*."  Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 4 (emphasis added).  Nurture's

11   typical baby food products contained 60 ppb inorganic arsenic, and more than 25% of those

12   products contained more than 100 ppb inorganic arsenic.  Some Nurture baby food products tested

13   as high as 180 ppb inorganic arsenic.  *See* Compl. ¶ 47.  Nearly 20% of the Nurture baby food

14   products that were tested were also found to contain more than 10 ppb lead.  Some Nurture

15

16   _____

17   [21] As seen above, Plaintiffs have a good faith basis to believe that Nestlé S.A., the parent company
     of Gerber, is a responsible party and is a proper defendant. In addition to Nestlé S.A., Plaintiffs
18   have learned through discovery to date in this MDL that another Nestlé entity, *Societe des
     Produits Nestlé S.A.,* may be a relevant defendant as well. ██████████████████████████████
19   ████████████████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████████████████████
20   ██████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████████████ The
     Societe des Produits Nestlé S.A. is located at Avenue Nestlé55 1800 Vevey, Switzerland. *Id.* This
23   is the exact same business address as Nestlé S.A. *See* Wisner Decl. Ex. 43. Plaintiff have reached
     out to counsel for both Nestlé S.A. and Gerber in a good faith attempt to understand which Nestlé
24   entity may be the proper party here, if not Nestlé S.A., but counsel for Defendants have declined
     to answer Plaintiffs' direct questions.  They have also refused to engage in any formal discovery
25   related to these issues.  Nestlé S.A. takes the position that it has no obligation to comply with
     formal or informal discovery efforts because there is purportedly no jurisdiction over it.  Gerber
26   takes the position that only discovery related to general causation is permitted and refuses to
     voluntarily comply with any discovery efforts related to ascertaining the role of the various Nestlé
27   entities in Gerber's baby foods.  This is the subject of a discovery letter that will be submitted to
     the Court at or near the time of the filing of this brief.
28

products on the market tested as high as 641 ppb lead.  *See id.*

Danone is the sole member of Nurture and has exercised extensive control over relevant aspects of Nurture's operations since 2013, including over personnel and business decisions relevant to this litigation.  *See id.* ¶ 20.[22]  Among other things, Danone employed, controlled, and/or trained "many of the scientists and researchers that monitored the safety of Toxic Heavy Metals in baby food"; "set standards" for heavy metal contamination followed (at least in theory) by Nurture; "made executive-level business decisions" regarding Nurture's baby food products; and "exercised control over Nurture's baby food selling in the United States."  *Id.* ¶ 21.  Danone also directed Nurture's testing for heavy metal contamination after Danone acquired Nurture in 2013.  *See id.* ¶ 22.  Nurture and Danone's negligent ingredient sourcing, reliance on inconsistently monitored third-party manufacturers, lackadaisical approach to testing, and insistence on selling even those products that tested above Danone's (already dangerously high) heavy metal limits all contributed to Plaintiffs' injuries.  *See id.* at ¶¶ 77–79.

### 2.  Evidence

To the extent necessary to refute Danone's jurisdictional arguments, the discovery to date has revealed to a far greater extent Danone's control over Nurture's day-to-day operations.

Nurture's managing officers are almost all Danone employees who are directly supervised by other Danone employees.  ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████  The current head of Nurture's Quality and Food Safety team, Rebecca Beaudin.██████████████████████████
█████████████████████████████████  David, who manages Nurture's relationships with

---

[22] Before its 2022 restructuring to a limited liability company, Nurture was incorporated as Nurture Inc.  Plaintiffs allege that Danone was the sole shareholder of Nurture Inc. at all relevant times.  *See* Compl. ¶ 20.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  third-party manufacturers, ███████████████████████████

2  ████ Maltese testified that ██████████████████████████

3  █████████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  ████████████████████████████████████ As of June

6  2017, Nurture's "quality and food safety supplier manager" was yet ████████████

7  █████████████████████████████████████████████

8  ████████████████████████████████████████████

9  █████████████████████████████████████████████████

10 █████████████████████████████████████████████

11       Nurture's food safety policies, including for heavy metals, are dictated by Danone and its

12 Europe-based scientists. █████████████████████████

13 █████████████████████████████████████████████

14 █████████████████████████████████████████████████

15 ██████████████████████████████████████████████

16 ███████████████████████████████████████████

17 ██████████████████████████████████████████████

18 █████████████████████████████████████████████████

19 ██████████████████████████████ Indeed, since at least 2014, ████████

20 ██████████████████████████████████████████████

21 ██████████████████████████████████████████

22 ███████████████████████████████████████████

23 ████████████████████████████ In internal Nurture discussions about

24 testing Nurture's baby food products for heavy metals, ████████████████████

25 ██████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 ████████████████████████████

28       Nurture does not set its own standards for heavy metals in baby food because ████████

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

2    Instead,

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Danone employees also intervened in sourcing Nurture's metal-contaminated ingredients.

19

20

21

22

23

24    Finally, evidence to date reveals that Danone also manufactured a range of Happy Family

25    products

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

2

3

4

5

6

7

8

9

10

11      **D. Plum, Campbell, and Sun-Maid**

12        **1. Allegations**

13      Plum, PBC ("Plum"), a citizen of Delaware and California with a principal place of

14 business in Fresno, has sold baby food under the brand "Plum Organics" since 2007 and does not

15 challenge jurisdiction here. *See* Compl. ¶ 24. From June 2013 to May 3, 2021, Plum was owned

16 by Campbell Soup Company ("Campbell"). *Id*.[23] During that time, the Master Complaint alleges

17 that "Campbell exercised control over Plum's baby food selling in the United States," *id*. ¶ 25, and

18 thus "allegations related to Plum between 2013 and May 3, 2021 apply equally to Campbell," *id*.

19 ¶ 27. As evidence of this control, the Master Complaint alleges that "many of the scientists and

20 researchers that monitored the safety of Toxic Heavy Metals in Plum's baby foods were directly

21 employed by Campbell or were directly controlled and trained by Campbell agents and

22 employees," and that "it was Campbell's attorneys that responded to Congressional inquiries about

23 heavy metals in Plum baby foods in 2019." *Id*. ¶ 25. Campbell does not dispute these allegations.

24      The House Subcommittee's inquiries were directed at Campbell as "the maker of Plum

25 Organics (Plum)." Wisner Decl. 6 (Sept. 2021 Congress Rpt.) at 2; *see also* Wisner Decl. Ex. 5

26

27    ——————————————

28 [23] Although not specifically alleged in the Master Complaint, Campbell notes in its Motion that it
took control of Plum on June 12, 2013. *See* Campbell MTD at 1.

1    (Feb. 2021 Congress Rpt.) at 2 (noting that the Subcommittee had "requested internal documents

2    and test results from seven of the largest manufacturers of baby food in the United States,"

3    including Campbell, "which sells baby food products under the brand name Plum Organics").

4    Campbell initially declined to cooperate.  *See* Compl. ¶ 42.  "Campbell refused to produce its

5    testing standards and specific testing results," thus "hid[ing] its policies and the actual level of

6    toxic heavy metals in its products" and leaving the Subcommittee "greatly concerned that their

7    lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in

8    their baby food products than their competitors' products."  Wisner Decl. Ex. 5 (Feb. 2021

9    Congress Rpt.) at 2, 44.  In lieu of testing, "Campbell provided a spreadsheet self-declaring that

10   every one of its products 'meets criteria,'" though "Campbell declined to state what those criteria

11   are."  *Id*. at 44; *see also* Compl. ¶ 48.

12       After the Subcommittee published its initial report and the recalcitrant Defendants "began

13   cooperating to varying degrees," the Subcommittee finally received heavy-metal test results for

14   some Plum products, "which confirmed the Subcommittee's concerns about the danger of some of

15   [those] products."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 2.  Within these results, over

16   half (54.5%) of Plum products had more than 5 ppb lead, "the maximum amount FDA allows in

17   bottled water," with lead levels as high as 73 ppb.  *Id*. at 4, 20.  Of the Plum-branded rice-based

18   Super Puffs tested between 2017 and 2019, all (100%) had more than 200 ppb arsenic, with an

19   average of 233.74 ppb arsenic (including 79 ppb inorganic arsenic), total arsenic levels as high as

20   470 ppb, and levels of inorganic arsenic as high as 225 ppb.  *See id*. at 3.  As the Subcommittee

21   noted in its follow-up report, these levels are significantly higher than the maximum amount of

22   inorganic arsenic than that FDA allows in bottled water (10 ppb).  *See id*.

23       Plum (and Campbell through Plum) sold products contaminated with these metals—and

24   thereby caused Plaintiffs' injuries—because they "did very little to ensure that the Plum baby food

25   products marketed for consumption by children are *not* contaminated with dangerous levels of

26   heavy metals."  Compl. ¶ 82 (emphasis added).  Campbell and Plum did not set any limits for the

27   amount of heavy metals in their finished products until April 2021, after the Subcommittee's

28   initial report.  *See id*. ¶ 83.  They started to test finished products for heavy metals only "in the

32

1   wake of public reports that exposed Plum baby food products as being contaminated with

2   dangerous levels of heavy metals." *Id*. ¶ 87.  Even then, they delayed setting heavy-metal limits

3   for ingredients, eventually setting limits only for certain metals (lead, arsenic, and cadmium).  *See*

4   *id*. ¶ 84.  Although these limits (100 ppb for lead and arsenic) were already dangerously high,

5   Plum baby food products continued to include ingredients that tested above those limits.  *See id*.

6   ¶ 85.  Campbell and Plum also conducted little oversight of the co-manufacturers who actually

7   make Plum baby foods.  Before 2017, they required only "assurances" from ingredient suppliers

8   that ingredients did not contain heavy metals; after 2017, they required only "scattershot" testing

9   of some ingredients.  *Id*. ¶ 86.  And they did not conduct any heavy-metal testing on Plum

10  products "prior to sale."  *Id*. ¶ 87.  In other words, when Campbell and Plum did find heavy metals

11  in their products, those products were on the shelves.

12          Campbell sold Plum to Sun-Maid in May 2021.  "Like Campbell," the Master Complaint

13  alleges, "Sun-Maid has exercised and continues to exercise direct control over the manufacture,

14  sale, and distribution of all Plum baby foods since May 3, 2021."  *Id*. ¶ 26.  As evidence of this

15  control, the Master Complaint alleges, and Sun-Maid again does not dispute, that "metal testing is

16  paid for directly and sent directly to Sun-Maid's scientists and executives, not directly to Plum,"

17  and that "[a]ll major executive functions related to Plum's operation were specifically transitioned

18  from Campbell to Sun-Maid."  *Id*.  Accordingly, allegations about Plum after May 3, 2021 "apply

19  equally to Sun-Maid."  *Id*. ¶ 27; *see also id*. ¶¶ 85–87 (applying same allegations to Sun-Maid for

20  this period); *id*. ¶ 82 (additionally alleging that "Plum and Campbell/Sun-Maid … did not

21  undertake an effort to source ingredients with the lowest amount of heavy metals available" and

22  "did not reformulate their products to ensure that they were being made with the lowest achievable

23  amount of heavy metals").

24          **2.  Evidence**

25          To the extent necessary to refute Campbell's jurisdictional arguments, discovery to date

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    proves Campbell's involvement in conduct giving rise to Plaintiffs' claims.[24]

2         Like other Parent Defendants, Campbell publicly claimed Plum as its baby food brand,

3    including in documents that Campbell has chosen to attach to support its motion to dismiss.  *See,*

4    *e.g.*, Ryan Decl. (ECF No. 275-2), Ex. C at 3, 13 (Campbell's 10-K submission from July 28,

5    2013, noting that Campbell's acquisition of Plum "provides the company [meaning Campbell]

6    with an attractive platform to extend its core categories" of products "and enhances the company's

7    [meaning Campbell's] access to a new generation of consumers," and that Campbell would "focus

8    on driving growth in ***its new Plum business***") (emphasis added); *id.*, Ex. E (Campbell's third-

9    quarter results for FY 2021, which include "*Plum* baby food and snacks" within "Campbell Soup

10   Company's earnings" for "Meals & Beverages"); *id.*, Ex. A at 9, 11, 25 (Campbell's 10-Q

11   submission on May 2, 2021, noting "the sale of ***our*** Plum baby food and snacks business, which is

12   included in ***our*** Meals & Beverages reportable segment") (emphases added).

13        These representations were not mere reflections of corporate formalities.  Once Campbell

14   acquired Plum, Campbell's logo appeared on Plum products.  *See, e.g.*, Wisner Decl. Ex. 63 (label

15   for Plum's "apple with spinach" puffs with Campbell's logo on the bottom right); Wisner Decl.

16   Ex. 64 (label for Plum's "sweet potato apple & corn" puffs with Campbell's logo on the bottom

17   right).  And, again, like other Parent Defendants, when it came time for the *N.C.* plaintiffs to

18   depose the "persons most qualified" to discuss various elements of Plum's baby food products—

19   including testing policies and procedures, formulas, health hazards, marketing, and regulatory

20   matters—many of the people who testified for Plum were *Campbell* officers and employees.  *See*

21   Wisner Decl. Ex. 65 ("Plaintiffs' Notice of Taking Deposition of Plum, PBC, D.B.A. Plum

22   Organics' Person(s) Most Qualified") (hereinafter "*N.C.* PMQ Notice").  These included:

23

24   _____

25   [24] Discovery about Sun-Maid's control over Plum's operations is admittedly not as developed
     because the underlying discovery from the N.C. case involved products that predated Sun-Maid's
26   involvement and, thus, have not been produced by Plum.  As seen, the relevant *N.C.* witnesses
     came from Campbell, and document discovery to date likewise focuses on Plum's operations
27   during the Campbell era.  In any event, Sun-Maid does not contest Plaintiffs' specific allegations
     about Sun-Maid's involvement in and control over Plum.  And Sun-Maid has lodged only a facial
28   jurisdictional challenge, which does not require Plaintiffs to produce evidence in response.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   • Tracy Hicks, a Campbell Manager for Global Analytical Chemistry and Senior Manager

2     for Chemical Safety, ███████████████████████████████████████████████

3     ████████████████████████████████████████████████

4     █████████████████████████████████████████████████████

5     ████████████████████████████████████████████

6     ████████████████████████████████████████████████

7     ███████████████████████████████████████████████

8     ████████████████████████████████████████████████

9     ██████████████████████████████████████

10  • Christina Strapp, who has held many positions at Campbell, including as Campbell's

11    Group Manager for the Plum brand, and who testified ████████████████████████

12    ██████████████████████████████████████████████

13    ████████████████████████████████████████

14    ████████████████████████████████████████

15    ██████████████████████████████████████████████

16    █████████████████████████████████████████████████

17    ██████████████████████████████████

18  • Annalisa Fornarelli, Campbell's Vice President of Food Safety and Quality, who testified

19    to, among other things, ████████████████████████████████████████

20    █████████████████████████████████████████████████

21    ████████████████████████████████████████████

22    █████████████████████████████████████████████████ and

23  • Jade Chong, Campbell's Director of Regulatory Affairs, who also testified on labeling

24    topics, such as █████████████████████████████████████████████

25    ████████████████████████████████████████████████

26    ███████████████████████████████████

27    These witnesses were employed exclusively by Campbell.  Their resumes and testimony

28  make no mention of employment by Plum and otherwise make clear that their work at Plum was at

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    Campbell's behest.  And they understood that they were designated ████████████

2    ████████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████

5        Their testimony thoroughly details Campbell's extensive involvement in the Plum brand,

6    particularly in conduct at the heart of Plaintiffs' claims—Plum's sale of defective baby foods.

7    Among several other things, these witnesses confirmed that *Campbell* initiated and directed the

8    heavy metal testing for Plum products—and that it did so only as a response to public reports of

9    the heavy metals in those products.  ████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ██████████████████████████████████

16       More witnesses corroborated these accounts.  Among other Campbell personnel, the *N.C.*

17   plaintiffs also received deposition testimony from Timothy Spitzenberger, Campbell's Principal

18   Scientist for Food Safety, to whom Plum's other witnesses generally deferred questions about the

19   heavy metal in Plum baby food products throughout their depositions.  *See* Wisner Decl. Ex. 73

20   (Spitzenberger resume).  Spitzenberger was not employed by Plum.  Yet he was responsible ██

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ██████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████

4 ████████████

5      Another witness—Steve DeMuri, who also held many positions at Campbell, including

6 Director of Operations Quality—███████████████████████████████████████████

7 ███████████████████████████████████████████████████████ His actions bear that

8 out, for better or worse.  In one instance, when DeMuri and others on his team learned that Plum

9 R&D was still sourcing rice from China as of 2015, they ███████████████████████████

10 ████████████████████████████████████████████████████

11 ██████████ In another instance, ████████████████████████████████████

12 ███████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████████

16 ███████████████████████████████████

17      It is little wonder, then, that the House Subcommittee's inquiries about the heavy metals in

18 Plum baby foods were directed at Campbell.  In response, Campbell did not hide behind its formal

19 parental status.  Campbell, directly, responded to Congress, and, among other things, confirmed

20 that ███████████████████████████████████████████████████

21 █████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████

27 ███████████████████████ The same goes for the Civil Investigative Demand that the New

28 Mexico Attorney General issued in the wake of the Subcommittee's initial report.  Campbell



1   responded through its attorneys to what ███████████████████

2   ████████████████████████████████████████████

3   ███████████████████████████

4        **E.  Hain[25]**

5        The Hain Celestial Group, Inc. ("Hain") sells baby foods under the brand name Earth's

6   Best Organics.  *See* Compl. ¶ 19.  Hain offers infant and baby formula and foods as well as toddler

7   foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on

8   the go."  *Id.*

9        Unlike certain other Defendants, Hain cooperated with the Congressional investigation.

10  The House Subcommittee's initial report noted that Hain sold baby food products containing as

11  much as 129 ppb inorganic arsenic, and used ingredients containing up to 309 ppb inorganic

12  arsenic.  *See* Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 3.  The Subcommittee found that

13  Hain used ingredients with high levels of lead, "including 88 that tested over 20 ppb lead and six

14  that tested over 200 ppb lead."  *Id.*  The report noted that Hain "used 102 ingredients in its baby

15  food that tested over 20 ppb cadmium" with some testing "much higher, up to 260 ppb

16  cadmium[.]"  *Id.*  The report also noted that Hain "set an internal standard of 200 ppb for arsenic,

17  lead, and cadmium in some of its ingredients" but, even with such high limits, routinely "exceeded

18  its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic."  *Id.* at 4.  The

19  report details how Hain knew that its baby food products were unsafe—even going so far as to

20  notify the FDA—but did not take any action to stop selling baby food that Hain conceded posed

21  safety concerns for babies.  *See id.* at 37–41.

22       Remarkably, Hain did not test its baby food products for heavy metals until 2020 (rice

23  cereal) and 2021 (other baby food).  *See* Compl. ¶ 72.  Instead, Hain tested some ingredients used

24  in its foods (but not all ingredients) and set specifications only for ingredients.  *See id.*  Those

25  specifications, however, would change wildly without explanation.  *See id.*  For example, prior to

26  ────────────────

27  [25] Because the remaining Defendants do not challenge personal or subject-matter jurisdiction, the
    remaining Background sections discuss only the allegations against them and the judicially

28  noticeable materials incorporated therein.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

August 2014, Hain's lead specification for Oat Flour was 200 ppb.  *See id*.  Then it was reduced to 50 ppb for four months, went back up to 100 ppb for three months, went back up to 200 ppb for a month, came down to 20 ppb for seven months, went to 25 ppb for six months, and then went back to 200 ppb for the next fourteen months.  *See id*.  When asked about this seemingly chaotic shifting of specifications, Hain had no explanation.  *See id*.

Because Hain only tested ingredients, and not finished products, Hain would underestimate metal exposure.  *See id*. ¶ 74.  For example, in August 2019, the FDA did what Hain had refused: it actually tested Hain's baby food products for heavy metals.  *See id*.  Specifically, the FDA tested Hain's rice cereal and found numerous samples in excess of 100 ppb of inorganic arsenic, with 80% above 90 ppb.  *See id*.  The FDA ordered Hain to conduct an investigation, wherein Hain was forced to concede that its ingredient testing approach underestimated arsenic content in its rice cereal products.  *See id*.  These concerns about Hain's rice cereal were independently confirmed by HBBF, which found 113 and 107 ppb of inorganic arsenic (and 138 and 126 ppb of total arsenic) in those same products.  *See id*.  As a result of the FDA-ordered investigation, Hain learned that its rice cereal exceeded FDA arsenic levels because Hain used a vitamin premix, which contained up to 3,000 ppb of arsenic and 4,000 ppb of lead.  *See id*.

Hain knew that its products contained high levels of toxic heavy metals and knowingly chose not to disclose that risk to consumers.  *See id*. ¶ 75.

### F.  Sprout

Sprout Foods, Inc. ("Sprout") sells baby foods under the brand name Sprout Organic Foods.[26]  The House Subcommittee found that Sprout is "the most reckless among baby food sellers on the market."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 17; *see* Compl. ¶ 50.

---

[26] The Master Complaint also names Neptune Wellness Solutions, Inc., which has been Sprout's parent entity since February 2021.  For the purposes of this litigation, "allegations related to Sprout after February 2021 apply equally to Neptune, unless otherwise specified, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Sprout's Contaminated Baby Foods at issue in this MDL."  Compl. ¶ 30.  In the Collective MTD, Neptune baldly "disputes the parent control and liability allegations in the complaint," Collective MTD at 1 n.1, but Neptune has not filed a separate motion to dismiss based on its parent status.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Sprout initially refused to cooperate with the House Subcommittee's investigation into toxic heavy metals in commercial baby food products.  According to the Subcommittee's first report, "Sprout's failure to respond raise[d] serious concerns about the presence of toxic heavy metals in its baby foods, as even limited independent testing has revealed the presence of toxic heavy metals in its products."  Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 46.  That report pointed to data from the earlier HBBF Report, which showed that Sprout's Organic Quinoa Puffs Baby Cereal Snack – Apple Kale contained 107 ppb total arsenic, 47 ppb inorganic arsenic, 39.3 ppb lead, and 41.5 ppb cadmium.  *See id*. at 47; Compl. ¶ 49.

Sprout eventually provided the Subcommittee with a "handful" of heavy metal test results for its products—a meager eleven results total.  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 2*; see* Compl. ¶ 50.  These documents "displayed a lax approach to testing for toxic heavy metals in its baby food."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 2.  Sprout "relies on its ingredient suppliers to test their ingredients for toxic heavy metals and only asks them to do so *once per year*."  *Id*. at 17 (emphasis in original); *see* Compl. ¶¶ 50, 89.  Sprout itself told Congress that, "because Sprout requires annual testing for heavy metals for its ingredients, rather than by lot, Sprout is unable to provide testing information for each lot as requested."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 17 (cleaned up); *see* Compl. ¶¶ 50, 90.  Hence the Subcommittee's conclusion that "Sprout's testing practices appear to be the most reckless among baby food manufacturers."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 3.  And "despite its representations to the Subcommittee," the Master Complaint alleges that Sprout in fact "did not require its raw ingredient suppliers to provide yearly heavy metal test results prior to the Subcommittee's inquiry into the company."  Compl. ¶ 50; *see also id*. ¶ 89.  Sprout employees were aware of issues with heavy metals in their products.  Compl. ¶ 92.  They made jokes about those issues and did nothing to address them until the Subcommittee issued its first report.  *Id.*

Once Sprout began testing the metal in its baby food products in 2021, it confirmed that they were severely contaminated.  Testing showed, on average, over 300 ppb arsenic in Sprout's puff products, with levels as high as 470 ppb, and exceptionally high metal levels in many other Sprout products—which Sprout has continued to market as safe.  *See id*. ¶¶ 91, 93.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

### G.  Walmart

Walmart sold baby food under a "private" brand called "Parent's Choice," which was manufactured by a different supplier but branded, promoted, and sold as a Walmart product.  *See* Compl. ¶ 94.

Walmart initially refused to comply with the Congressional investigation.  *See id*. ¶ 51. The House Subcommittee's report stated that "Walmart refused to produce any documents showing its internal testing policies, its testing results, or how Walmart treats ingredients and/or products that surpass any internal standards."  Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 43. The report goes on to explain that "Walmart's evasion is concerning, as even limited independent testing has revealed the presence of toxic heavy metals in its baby food."  *Id*.  After the initial report, and with mounting pressure from the media, Walmart decided to cooperate with the Congressional investigation.  In the second report, the Subcommittee explained that "Walmart provided documents revealing a concerning lack of attention to toxic heavy metal levels in baby food and an abandonment of its previously more protective standards."  Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 2.

It has now become clear that Walmart did not test its baby food products for toxic heavy metals whatsoever.  *See id*. at 21–22.  Instead, Walmart required that certain specifications be met for the products provided by its suppliers.  *See* Compl. ¶ 94.  These specifications were not enforced in any way.  Walmart did not require the submission of testing from suppliers, nor did it do any of its own testing.  *See id*.

Walmart's heavy metal specifications were also woefully inadequate.  Walmart only used limited specifications for lead and arsenic—there were no other specifications or limits for other toxic heavy metals.  *See id*. ¶ 95.  Specifically, Walmart imposed arsenic and lead specifications on food that contained juice or nectar, meaning there was no limit on all other baby food products. And, for the limited "nectar" and "juice" subset of products, Walmart set very high limits, allowing these foods to contain dangerously high levels of toxic heavy metals.  *See id*. Remarkably, after Consumer Reports issued a report identifying Walmart's baby food as having high levels of metal in 2017, instead of taking action to reduce heavy metal contamination,

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Walmart increased the allowable limit of arsenic in its food up to 100 ppb. *See id.* ¶ 96.   The

second Congressional report excoriated Walmart:

> In 2018, Walmart took a giant step backwards in protecting babies from toxic
> heavy metals.  For six years, Walmart set an internal maximum inorganic arsenic
> limit of 23 ppb for its finished baby foods.  However, in 2018, Walmart abandoned
> that more-protective standard, more than quadrupling it to a standard allowing 100
> ppb inorganic arsenic in its baby foods.  Walmart offered no justification for its
> extreme course reversal on protecting babies' neurological development.

Wisner Decl. Ex. 6 (Sept. 2021 Congress Rpt.) at 14.

## IV.        DEFENDANTS ARE CAPABLE OF PRODUCING SAFE BABY FOODS

The Court's review can and should begin and end with the Master Complaint's specific

and well-supported allegations that all Defendants have participated in manufacturing and selling

defective baby food products, contaminated with toxic heavy metals and devoid of any warnings

concerning that danger.  But throughout litigation over the heavy metals in their foods, including

here, Defendants have raised a false alarm that requiring them to produce better foods, with proper

warnings, will deprive babies of food generally.  That claim deserves a brief response.

The metal levels in Defendants' baby foods are not inevitable.  Although crops absorb

heavy metals through the environment, manufacturers can—and an increasing number *do*—

implement measures to drastically reduce metal contamination.  As the Master Complaint alleges,

"[s]uch designs are easily accomplished," including "by only using ingredients that contain non-

detectable levels of Toxic Heavy Metals and by testing finished products, before release, to ensure

they do not contain Toxic Heavy Metals within them."  Compl. ¶ 135.  For example, it is well-

known that rice tends to contain high arsenic content, that brown rice tends to be more

contaminated than white rice, that rice grown in regions such as California and Spain contain less

arsenic than rice grown in the Southeastern United States, and that available alternative ingredients

confer the same (if not more) nutritional value as rice-based products.[27]  Hain acknowledged as much in a 2019 closed-door meeting with the FDA, where it discussed the high arsenic content of Hains' brown rice cereal products and the need to explore alternatives.  Wisner Decl. Ex. 81 (Hain 2019 FDA Presentation) at 6 ("High Risk of Arsenic presence … sourcing region").

Defendants themselves have shown they are capable of manufacturing baby foods that do not contain detectable levels of heavy metals.  *See* Compl. ¶ 135 ("[T]here are examples of Defendants' finished products not containing detectable levels of Toxic Heavy Metals—even if, for that same product, there are instances where they did.").  For example, the 2019 HBBF Report found that Nurture and Danone had produced an oatmeal baby cereal that tested below 0.5 ppb for lead and that Beech-Nut, Gerber, and Nestlé had produced single-ingredient banana products that also tested below 0.5 ppb for lead.  *See* Wisner Decl. Ex. 1 (HBBF Rpt.) at 19, 23.  Plum and Campbell's internal metal testing from 2017 to 2019 ██████████████████

███████████████████████████████████████████████████████

█████████      And Hain's Senior Vice President, who oversaw the company's baby food production, acknowledged internally that, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

Each Defendant could—and should—have implemented any of the myriad measures available to ensure that the finished baby food products they put on the market to be consumed by babies did not contain detectable levels of metals.  Indeed, some baby food manufacturers have

---

[27] Su, et al., *Arsenic in brown rice: do the benefits outweigh the risks?* 10 FRONT. NUTR. 01-04 (2023,https://pmc.ncbi.nlm.nih.gov/articles/PMC10375490/#:~:text=The%20data%20demonstrated%20that%20inorganic,the%20type%20of%20rice%20consumed; Potera, C., Food Safety: U.S. *Rice Serves Up Arsenic* 115 ENVIRON. HEALTH PERSPECT. (2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1892142/#:~:text=Total%20arsenic%20levels%20in%20the,(0.10%20%CE%BCg%2Fg); American Academy of Pediatrics, *Parent Plus: Limit Infants' Exposure to Arsenic by Feeding a Variety of Grains* (May 19, 2016), https://publications.aap.org/aapnews/news/12490/Parent-Plus-Limit-infants-exposure-to-arsenic-by.

1   policies and practices in place to prevent manufacturing or selling baby foods with detectable

2   levels of toxic heavy metals.  Once Upon a Farm, for example, worked with accredited labs and

3   toxicologists to ensure that their products contained the lowest possible heavy metal levels.[28]  As

4   another example, Serenity Kids independently tests and ensures that the baby food products they

5   sell do not contain detectable levels of heavy metal.[29]  These examples belie the Defendants' claim

6   that producing baby food free of detectable levels of toxic heavy metals is impossible.  The truth is

7   this: holding Defendants liable for knowingly selling heavy-metal-contaminated baby food,

8   without warning parents, will not deprive babies of food.  It will only ensure that their food is safe.

9   <center>**ARGUMENT**</center>

10  **I.    THE MASTER COMPLAINT SATISFIES RULE 8**

11          Across their various motions, Defendants argue that the Master Complaint violates the

12  "group pleading" doctrine, and thus Rule 8, because it often refers to multiple Defendants at once.

13  This argument comes in two versions: in the first, Defendants argue that the Master Complaint

14  improperly refers to "Defendants" generally in allegations that apply to Defendants generally; in

15  the second, the Parent Defendants argue that the Master Complaint improperly refers to them

16  along with their subsidiaries when discussing their respective baby food products.  Both forms of

17  the argument are meritless.

18          As shown throughout this brief, the Master Complaint contains specific (and well-

19  supported) allegations about each Defendants' role in the conduct that caused Plaintiffs' injuries.

20  Rule 8 simply requires "a short and plain statement of the claim showing that the pleader is

21  entitled to relief."  FED. R. CIV. P. 8(a)(2).  The point of this requirement is "to give the defendant

22  fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*,

23

24  ───────────────

     [28] Kaitlin Willow, How to Avoid Heavy Metals in Baby Food: 9 Q&As With Jackie Bowen of

25  Clean Label Project, Once Upon a Farm (July 11, 2023),
     https://onceuponafarmorganics.com/blogs/upon-a-blog/how-to-avoid-heavy-metals-in-baby-

26  food?srsltid=AfmBOoousQLAPmKY9pY8dz4fZodyq7cL_GnfGqiWrl4R0HBCtA_OLEvw.

27  [29] Jenny Gold, California baby food labels will soon reveal levels of lead and mercury in their
     products, L.A. Times (Dec. 31, 2024), California baby food labels will soon reveal levels of lead

28  and mercury in their products | Nation World | rv-times.com.

<center>44</center>

1    550 U.S. 544, 555 (2007) (cleaned up).  No Defendant can credibly argue that the Master

2    Complaint fails to give fair notice when the Master Complaint contains multiple paragraphs

3    detailing the specific allegations against each Defendant—often beginning with relevant

4    Defendants' names in bold type.  *See, e.g.*, Compl. ¶¶ 44–52, 61–96.

5         All collective references to Defendants are therefore entirely proper under Rule 8's "liberal

6    pleading standard."  *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 n.4 (9th Cir. 2019).  It so

7    happens that all Defendants injured Plaintiffs in a similar way, namely by manufacturing and

8    selling baby foods contaminated with toxic heavy metals and not warning of that danger.  But the

9    Master Complaint specifically alleges that each Defendant did so, and how.  *See, e.g.*, Compl.

10   ¶¶ 10–13, 61–64 (Beech-Nut and Hero Group); *id.* ¶¶ 14–18, 65–71 (Gerber and Nestlé); *id.* ¶¶ 19,

11   72–75 (Hain); *id.* ¶¶ 20–23, 76–80 (Nurture and Danone); *id.* ¶¶ 24–27, 81–87 (Plum, Campbell,

12   and Sun-Maid); *id.* ¶¶ 28–30, 88–93 (Sprout); *id.* ¶¶ 31, 94–96 (Walmart).

13        There is no rule against otherwise referring to Defendants as "Defendants" in allegations

14   that apply to them all, rather than listing each of them each time.  Yes, "everyone did everything,"

15   but only in the sense that each Defendant committed similar wrongdoing with regard to its specific

16   products at issue.  *See Reynolds v. EzriCare LLC*, 700 F. Supp. 3d 830, 842 (N.D. Cal. 2023)

17   (rejecting group-pleading argument where the plaintiff "clearly allege[d] what role [the defendant]

18   played in each claim" by "identif[ying] [the defendant] as an apparent manufacturer" and alleging

19   that the defendant "packaged, labeled, marketed, advertised, supplied, distributed, and sold the

20   product that injured [the plaintiff]") (internal quotation marks and brackets omitted); *see also*

21   *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) (even under Rule

22   9(b)'s heightened pleading requirement, "[t]here is no flaw in a pleading … where collective

23   allegations are used to describe the actions of multiple defendants who are alleged to have

24   engaged in precisely the same conduct"); *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904

25   F.3d 667, 681 (9th Cir. 2018) ("If a group pleading against similarly situated defendants can

26   satisfy Rule 9(b), then it can also satisfy the lesser notice pleading standard of Rule 8.").

27        Defendants' citations are relevant only in contrast.  As an initial matter, none of those cases

28   dealt with master complaints in MDLs, much less in MDLs with multiple defendants.  The Master

1    Complaint must provide notice to each Defendant, but one of its main purposes is to survey the

2    claims against all Defendants.  *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg.,*

3    *Sales Pracs., & Prods. Liab. Litig.*, 785 F. Supp. 2d 925, 931 (C.D. Cal. 2011) ("Consolidation of

4    a master complaint is merely a procedural device designed to promote judicial economy[.]")

5    (cleaned up); *Cervantes v. Zimmerman*, No. 17-CV-1230-BAS-NLS, 2019 WL 1129154 at *4

6    (S.D. Cal. Mar. 12, 2019) ("A master complaint is a procedural device which is used to streamline

7    pretrial motions and discovery.") (cleaned up).  In cases that are actually analogous to this one,

8    courts reject Defendants' argument.  Recently, for example, the MDL court overseeing *In re*

9    *Suboxone (Buprenorphine/Naloxone) Film Products Liability Litigation*, 1:24-md-3092 (N.D.

10   Ohio), rejected a group-pleading argument because, even though the complaint there "tend[ed] to

11   make its allegations generally, without regard to which specific Defendant engaged in particular

12   alleged conduct," it nevertheless "contain[ed] sufficient information to identify the legal theories

13   on which Plaintiff asserts liability against each remaining Defendant."  *In re Suboxone*

14   *(Buprenorphine/Naloxone) Film Prods. Liab. Litig.*, No. 1:24-MD-3092, 2024 WL 5264278, at

15   *14 (N.D. Ohio Dec. 31, 2024).  This was true even though the complaint could be read to assert a

16   failure-to-warn claim against defendants who could not be liable for failure to warn; the court was

17   satisfied with the plaintiff's clarification in briefing.  *See id.*

18        In many of Defendants' preferred cases, the underlying problem was not with the

19   collective nature of the allegations but with the allegations themselves, which were either *vague* or

20   *nonexistent*—problems not present here.  *See infra* Part IV.A.  In *Swartz*, the complaint alleged

21   misconduct by only two defendants and simply alleged that the rest had sufficient forum contacts,

22   which was clearly insufficient to state a *prima facie* jurisdictional case against any of them.  *See*

23   *Swartz v. KPMG LLP*, 476 F.3d 756, 765–66 (9th Cir. 2007).  In *Corazon*, the plaintiff lodged

24   allegations against multiple defendants regarding a particular loan without tying any particular

25   misconduct to any particular defendant, even when "alleg[ing] misconduct by a singular

26   defendant."  *Corazon v. Aurora Loan Servs.*, LLC, No. 11-00542 SC, 2011 WL 1740099, at *4

27   (N.D. Cal. May 5, 2011).  In *Sagent*, the plaintiffs sued thirteen board members for fiduciary

28   breaches over a period of time without even attempting to allege how defendants, who had joined

46

the board later in the time period, could be responsible for actions earlier in the time period, or how defendants who had left the board could be responsible for later actions. *See In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1094 (N.D. Cal. 2003). And in *Posey*, the group allegations were similarly implausible. *See Posey v. San Francisco Unified Sch. Dist.*, No. 23-CV-02626-JSC, 2023 WL 8420895, at *4 (N.D. Cal. Dec. 4, 2023) ("What facts support a plausible inference Defendant Fong was negligent in hiring and retaining herself?").

In Defendants' other cases, the plaintiffs failed to provide *any* distinction between different defendants. *See, e.g.*, Defendant Hero AG's Notice of Motion and Motion to Dismiss Master Complaint (ECF No. 281) (Dec. 2, 2024) ("Hero Group MTD") at 13 (collecting such cases). In *Murthy*, for example, the plaintiffs "claim[ed] broadly that 'the government' continues" to suppress speech through social media, requiring the Court to "confirm that *each* government defendant continues to engage in the challenged conduct," which the Court proceeded to do. *Murthy v. Missouri*, 603 U.S. 43, 69–72 (2024) (finding that some claims failed to satisfy traceability, not Rule 8). In *Destfino*, the plaintiffs sued many disparate defendants—twenty-nine individuals, ten businesses, and a church—without any allegations, even after multiple opportunities to amend, about defendants' roles in an alleged fraud scheme. *See Destfino v. Reiswig*, 630 F.3d 952, 958–59 (9th Cir. 2011). Similarly in *Dunson*, a case about two specific medical devices, the complaint named two manufacturer defendants but wholly "fail[ed] to distinguish among" their responsibilities for the specific devices. *Dunson v. Cordis Corp.*, No. 16-CV-03076-SI, 2016 WL 3913666, at *3 (N.D. Cal. July 20, 2016). And in *Roberts*, the plaintiff alleged "[w]ithout any individualization" that fifteen different government defendants, each with different roles, participated in his wrongful conviction. *Roberts v. Cnty. of Riverside*, No. EDCV191877JGBSHKX, 2020 WL 3965027, at *4 (C.D. Cal. June 5, 2020). Even so, the court granted leave to amend and advised that "Plaintiff need not specify" which defendants were responsible for his injuries "if all [d]efendants are responsible for the conduct alleged or if [p]laintiff does not possess the necessary information to specify." *Id*. As the court noted, "when a group of defendants is small, closely related, or engaged in the same wrongful conduct, group pleading can be sufficient to offer fair notice of the wrongs alleged." *Id*. at *3.

Simply put, none of those cases is like this one. Plaintiffs, here, do not sue, for example, Gerber or its parent entity over defects in Hain's products. Nor is there any danger that Gerber or its parent entity might think so. Each Defendant can read the Master Complaint, find their names, know why Plaintiffs have sued them, and know why they are included in allegations that apply to all Defendants.

Moreover, no Parent Defendants dispute that they sold baby foods "through" their respective subsidiaries. They do not dispute that they owned their subsidiaries, that their subsidiaries sold baby foods, that they (as parent entities) ultimately profited from these sales, or that these subsidiary brands were the means by which they did so. Nor do they offer any way to describe this situation other than as conducting business "through" a subsidiary. *Cf.* Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 2 (noting that Campbell sells baby foods "under" the brand name Plum Organics).

Rather, the Parent Defendants argue that they cannot be subject to liability or personal jurisdiction merely because the Master Complaint refers to them and their respective subsidiaries in tandem. And that is true enough. The question under the law is whether the allegations (and, where appropriate, supporting evidence) show that a given Parent Defendant has subjected itself to this suit through its own actions, whether on its own behalf or through its control over its subsidiary as its agent. Plaintiffs' allegations more than satisfy that requirement. *See infra* Parts II, III, IV.D. Thus, there is no group-pleading problem. Unlike in *Littleton*, the collective references to Defendants, including to Parent Defendants and their subsidiaries, are backed by Defendant-specific allegations that let them each "know exactly what Plaintiff[s] ha[ve] placed at issue." *Littleton v. Experian Info. Sols., Inc.*, No. 5:15-CV-01619-EJD, 2015 WL 4638308, at *2 (N.D. Cal. Aug. 4, 2015). This case is even less like *du Pont*, where the plaintiff—worried about the presence of "ubiquitous" chemicals in his bloodstream, but without any idea "what companies manufactured the particular chemicals in his bloodstream" or even "whether those chemicals might someday make him sick"—chose to sue ten out of "the thousands of companies that have manufactured chemicals of this general type." *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315, 318 (6th Cir. 2023). The heavy metals that injured Plaintiffs are present in

48

1  the environment.  But Plaintiffs allege how they were exposed to excessive amounts of those

2  metals through the consumption of baby food, and each Defendants' role in that toxic exposure.

3      The second version of Defendants' Rule 8 argument thus overlaps with and depends on the

4  Parent Defendants' arguments under Rules 12(b)(1), 12(b)(2), and 12(b)(6)—in some cases

5  explicitly so.  *See* Defendant Sun-Maid Growers of California's Notice of Motion and Motion to

6  Dismiss the Master Complaint, and Memorandum of Points and Authorities (ECF No. 276) (Dec.

7  2, 2024) ("Sun-Maid MTD") at 9–10; Nestlé S.A.'S Notice of Motion and Motion to Dismiss

8  Plaintiffs' Master Complaint and Memorandum of Points and Authorities in Support Thereof

9  (ECF No. 277) (Dec. 2, 2024) ("Nestlé S.A. MTD") at 16–17.  For the reasons herein, they also

10  fail.

11  **II.        THE RULE 12(b)(1) MOTIONS FAIL**

12      Three Parent Defendants—Campbell, Sun-Maid, and Hero Group—challenge the Court's

13  subject-matter jurisdiction over this MDL, focusing on the traceability requirement for Article III

14  standing.  Standing requires an actual, concrete injury that is fairly traceable to the defendant and

15  that is likely to be redressed by a favorable court decision.  *See Friends of the Earth, Inc. v.*

16  *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  In a multi-plaintiff action like

17  this one, only one plaintiff needs standing for the action to proceed.  *See Town of Chester, N.Y. v.*

18  *Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).  Defendants here do not dispute that Plaintiffs have

19  suffered redressable injuries.  Instead, they argue that they did not cause those injuries and thus

20  that the injuries are not traceable to them.

21      For standing purposes, causation must be "plausible," and a "causation chain does not fail

22  simply because it has several 'links.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)

23  (internal quotation marks omitted).  If a plaintiff's injury was "not the result of the independent

24  action of some third party not before the court," and if there is at least a "substantial probability"

25  that the defendant caused the injury, traceability is satisfied.  *Winsor v. Sequoia Benefits & Ins.*

26  *Servs., LLC*, 62 F.4th 517, 525 (9th Cir. 2023) (internal quotation marks omitted).

27      Defendants generally frame their standing arguments as "facial" challenges, arguing that

28  Plaintiffs' allegations "are insufficient on their face to invoke federal jurisdiction." *Bowen v.*

49

1  *Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 n.6 (9th Cir. 2024) (internal quotation marks

2  omitted).  Facial challenges "are adjudicated under the familiar Rule 12(b)(6) standard," *id*. at

3  1143 n.7, meaning that the court must "[a]ccep[t] the plaintiff's allegations as true," "dra[w] all

4  reasonable inferences in the plaintiff's favor," and "determin[e] whether the allegations are

5  sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117,

6  1121 (9th Cir. 2014).

7          Campbell and Hero Group have submitted some evidence to support their assertions that

8  they had no involvement with the baby foods sold under their names.  To whatever extent this

9  purported evidence informs their standing arguments, then these Defendants are not simply raising

10 a facial challenge.  They also raise a "factual" challenge, i.e., one that "contests the truth of the

11 plaintiff's factual allegations" in support of jurisdiction.  *Bowen*, 118 F.4th at 1142 n.6 (internal

12 quotation marks omitted).[30]  Factual challenges generally require a plaintiff to "support her

13 jurisdictional allegations with competent proof" sufficient to establish standing "by a

14 preponderance of the evidence."  *Leite*, 749 F.3d 1117 at 1121 (internal quotation marks omitted).

15 And the court generally "may resolve … factual disputes itself" under "the same evidentiary

16 standard that governs in the summary judgment context," *id*. at 1121–22, which requires "the

17 proponent [to] set out facts that it will be able to prove through admissible evidence," *Norse v.*

18 *City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

19         "[W]here pertinent facts bearing on the question of jurisdiction are controverted … or where

20 a more satisfactory showing of the facts is necessary," the court should grant jurisdictional discovery

21 before resolving a factual challenge.  *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535,

22 540 (9th Cir. 1986) (internal quotation marks and citations omitted); *accord Boschetto v. Hansing*,

23 539 F.3d 1011, 1020 (9th Cir. 2008).  Indeed, "[w]here further discovery on an issue 'might well'

24 demonstrate facts sufficient to constitute a basis for jurisdiction, it is an abuse of discretion to deny

25

26 ――――――――――――――――――
[30] Since Sun-Maid does not point to evidence beyond the Master Complaint, its Rule 12(b)(1)

27 arguments can be analyzed only "under the rubric for a facial challenge to jurisdiction, *i.e.*,
the Rule 12(b)(6) standard."  *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1149 & n.13

28 (9th Cir. 2024).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    it." *In re Gasoline Spot Litig.*, No. 20-CV-03131-JSC, 2020 WL 7431843, at *7 (N.D. Cal. Dec. 18,

2    2020) (J. Corley) (quoting *Harris Rutsky & Co. Ins. Serv. v. Bell & Clements*, 328 F.3d 1122, 1135

3    (9th Cir. 2003)).

4         That said, "when the issue of standing is intertwined with an element of the merits of the

5    plaintiff's claim," then the court should not grant dismissal on standing grounds. *Bowen*, 118

6    F.4th at 1144 (cleaned up). In that case, a court "faced with a factual attack on standing pursuant

7    to Rule 12(b)(1) … must leave the resolution of material factual disputes to the trier of fact." *Id.*

8         These Parent Defendants base their traceability arguments on their status as parent entities.

9    Plaintiffs' arguments cannot be fairly traced to them, the argument goes, because Plaintiffs were

10   injured by baby foods sold by their subsidiaries. Yet courts have long recognized, including in

11   cases Defendants cite, that "a parent need not commit a tort completely independently of its

12   subsidiary in order to be liable." *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374,

13   2016 WL 5402230, at *9 (S.D. W. Va. Sept. 26, 2016). Where a parent entity "'be[comes] directly

14   involved' as a participant in particular actions," whether "alone or in concert with the subsidiary,"

15   the parent is liable for resulting tort claims. *Id.* at *10 (quoting *United States v. Bestfoods*, 524

16   U.S. 51, 72 (1998)); *see also Bestfoods*, 524 U.S. at 65 (discussing "the rule that the parent

17   'corporation is itself responsible for the wrongs committed by its agents in the course of its

18   business'") (quoting *Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 395 (1922)) (internal

19   brackets omitted). Although this liability involves agents (subsidiaries), the liability is direct

20   (rather than vicarious). *See Bestfoods*, 524 U.S. at 64–65; *Good*, 2016 WL 5402230, at **8–10;

21   *see also infra* Part IV.D. And if parent entities can be directly *liable* when "the alleged wrong can

22   seemingly *be traced* to the parent through the conduit of its own personnel and management,"

23   *Bestfoods*, 524 U.S. at 65 (emphasis added; internal quotation marks omitted), then parent entities

24   can necessarily be subject to suit under Article III on the same basis.

25        The Parent Defendants thus cannot simply point to their status as parent entities. Nor can

26   they distance themselves from the conduct at issue simply by referring to their subsidiaries as

27   "indirect" subsidiaries or with other such labels, by which they merely seem to mean that they

28   own their respective subsidiaries by ultimately owning their stock. That is by definition what a

1  parent company is.  *See Bestfoods*, 524 U.S. at 61 (noting that a parent corporation is "so-called

2  because of control through ownership of another corporation's stock").  The question is whether

3  the Parent Defendants themselves participated, by directing their subsidiaries or otherwise, in

4  relevant misconduct.  As seen above, the Master Complaint alleges that they all did.  Their Rule

5  12(b)(1) motions fail for that reason alone.  But their more specific arguments fail as well.

6  **A.      Plaintiffs' Injuries Are Traceable to Hero Group**

7  The Master Complaint contains substantial allegations that, through its ownership and

8  control of Beech-Nut and Beech-Nut's activities, Hero Group was directly involved in and

9  responsible for the contaminated Beech-Nut baby food products at issue in this MDL.

10  Hero Group maintains complete ownership and operational control of Beech-Nut, which

11  Hero Group itself identifies as one of its brands.  *See* Compl. ¶ 10.  Hero Group's involvement

12  with that brand extends beyond mere ownership to executive-level decision-making, including, for

13  example, decisions about procuring the testing equipment necessary to detect heavy metals in

14  Beech-Nut baby food products.  *See id.* ¶ 11.  Hero Group has substantial commercial presence in,

15  and derives significant revenue from, the United States baby food market through Beech-Nut's

16  operations.  *See id*.  Hero Group's own 2023 annual report, as referenced in the Master Complaint,

17  explicitly acknowledges that "Hero *markets* baby food in the US and Canada under the brand

18  names Beech-Nut and Baby Gourmet."  *Id*. ¶ 10 (emphasis added).  The Master Complaint further

19  alleges that "Beech-Nut, along with Hero Group, used ingredients after they tested as high as

20  913.4 ppb arsenic," as well as high levels of lead, and that Beech-Nut and Hero Group's policy of

21  testing ingredients, rather than finished products, contributed to their failure to detect the

22  dangerous levels of heavy metals in Beech-Nut baby foods.  *See id*. ¶ 14.  And the Master

23  Complaint alleges that, due to Hero Group's control over Beech-Nut, all allegations against

24  Beech-Nut—including all allegations regarding failure to warn, design defects, and manufacturing

25  defects—apply equally to Hero Group.

26  Plaintiffs' injuries are therefore directly traceable to Hero Group's actions as alleged in the

27  Master Complaint.  Plaintiffs suffered brain injuries resulting in their diagnoses of ASD and/or

28  ADHD.  These injuries resulted from the heavy metals in Beech-Nut's baby food.  And the facts

1   alleged in the Master Complaint establish that Hero Group had direct control over the safety (and

2   lack thereof) of Beech-Nut baby foods: Hero Group was directly involved with the manufacturing

3   and testing of those food through its executive-level decisions for Beech-Nut; Hero Group

4   knowingly contributed to the risk that Beech-Nut products would reach the shelves with dangerous

5   levels of heavy metals by failing to require finished-product testing; Hero Group eventually

6   learned of the dangerous levels of heavy metals in Beech-Nut ingredients; and yet Hero Group

7   failed to warn consumers of the dangerous levels of heavy metals in Beech-Nut products.  These

8   factual allegations state a plausible claim against Hero Group directly and, consequently, that

9   Plaintiffs' injuries are traceable to Hero Group.  Hero Group's Rule 12(b)(1) motion should be

10  denied for this reason alone.

11       But to the extent necessary, evidence supports Plaintiffs' allegations.  Hero Group contends

12  that it is "functionally a holding company" far removed from Beech-Nut's relevant operations.

13  Hero MTD at 9.  Competent proof shows otherwise.  Hero Group's annual reports have

14  consistently acknowledged its role in the manufacturing, marketing, and sale of baby food in the

15  United States.  In 2018, Hero Group stated:

16          The Hero [Baby & Toddler Food] [BTF] category provides great-
            tasting, nutritional, safe food for babies and toddlers from four
17          months upwards.  Our portfolio covers cereals, meals, and fruits and
            snacks of the highest quality and adapted to babies' requirements.
18          As well as regular BTF, we have a strong competence in organic
            BTF.  *We manufacture and sell our food under various brands*
19          *across North America*, Europe and MEA [Middle East & Africa].
            Investments in packaging, technology and ingredients ensure we
20          maintain our leading position in key markets.

21  Wisner Decl. Ex. 84 (Hero Annual Report 2018) at 24 (emphasis added).  In 2020, Hero Group

22  stated:

23          As a category, our mission is to help parents provide goodness of
            nature foods to their little ones so they grow up enjoying a healthy,
24          natural and varied diet.  *At Hero, we are committed to designing*
            *natural, organic, nutritionally well-balanced, and sustainable baby*
25          *and toddler food and snacks*.  We know we have a key role to play
            in helping parents bring up a new generation of babies who will love
26          natural, healthy foods.

27          Our promise comes to life and is evident across our wide array of
            trusted brands and product portfolios in the BTF category across
28          North America, Europe, Turkey and MEA [Middle East & Africa].

---

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

> Our range covers cereals, meals, and snacks of the highest quality
> and are adapted to babies' requirements from weaning onwards.

2

> We leverage our extensive infant nutrition knowledge and expertise
> to constantly improve our product offering through recipe upgrades,
> more sustainable packaging, and new technologies to help us
> maintain our leading positions in key markets.

3

4

5    Wisner Decl. Ex. 85 (Hero Annual Report 2020) at 44 (emphasis added).  And as noted in the

6    Master Complaint, in 2023 Hero Group admitted:

7

> With regards to North-America, Hero **markets baby food in the US**
> and Canada under the brand names **Beech Nut** and Baby Gourmet.
> In the US, Hero saw the business recovering strongly for the second
> consecutive year.  Beech-Nut posted an organic growth of 12.6% in
> 2023.  The fast-growing toddler snacking business coupled with our
> organic baby food sold in jars and pouches contributed to this
> successful year in the US.

8

9

10

11   Wisner Decl. Ex. 14 (Hero Annual Report 2023) at 56 (emphasis added).

12          Beech-Nut's contractual relationships concerning the manufacture and safety of baby food

13   products demonstrate Hero Group's role in Beech-Nut's operations—and explicitly confirm that,

14   when conducting business within the United States, ███████████████████████

15   ████████████████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ████████████████████████  For example, the 2017 Co-Pack Agreement between Beech-

18   Nut and the Hain Celestial Group ████████████████████████████

19   ████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████

23   ██████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████

27   ████████████████████████████████████████████████

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

2

3          Evidence further shows that Hero Group had a strong hand in the specifications for

4   individual Beech-Nut products.

5

6

7                                            The specification mandates that

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    In line with its control over the marketing, production, and quality control of Beech-Nut

2    products, Hero Group was directly involved in responding to reports about heavy metals in Beech-

3    Nut foods.  For example, Garmt Nieuwsma, who was at the time an Innovation Analyst for Hero

4    Group,[31] emailed Jacobs (Beech-Nut's VP for quality assurance) about Hero's sustainability

5    strategy.  That email included



15    This sampling of the evidence shows that Hero Group marketed baby food in the U.S.

16    through Beech-Nut; set quality policies for Beech-Nut foods sold in the U.S., including limits for

17    the heavy metals in those foods; dictated quality agreements with Beech-Nut's co-manufacturers;

18    and drove strategy for Beech-Nut's response to the public discovery of high metal levels in Beech-

19    Nut baby food products.  Plaintiffs' injuries stemming from the heavy metals in Beech-Nut's baby

20    food are fairly traceable to Hero Group.

21    **B.  Plaintiffs' Injuries Are Traceable to Campbell**

22    Unlike some other Parent Defendants, Campbell has not submitted a declaration purporting

23    to dispute Plaintiffs' jurisdiction-related allegations.  Campbell has instead elected to submit some

24    public documents—namely, Campbell's 10-Q, 10-K, and 8-K submissions from May 2021, July

---

[31] On his LinkedIn page Mr. Nieuwsma, who is now Hero's Sustainability & Transformation Manager, describes his position as Innovation Analyst as "[w]ithin HERO I am responsible for scouting important trends & developments regarding our core categories and translating this knowledge into the organization."  Wisner Decl. Ex. 93.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

2013, and June 2021, respectively, *see* Ryan Decl. (ECF No. 275-2), Exs. A, C, D, & E; Plum's Certificate of Good Standing from the Delaware Secretary of State, *see id*., Ex. B; Statements by Foreign Corporations related to Plum, *see id*. Exs. F & G; and Plum Name Change and trademark filings, *see id*. Exs. H–L—all for the apparent purpose of establishing that Plum is a corporation formally separate from Campbell, *see* Defendant Campbell Soup Company's Notice of Motion and Motion to Dismiss Plaintiffs' Master Long-Form Complaint (ECF No. 275) (Dec. 2, 2024) ("Campbell MTD") at 6–7.  No one disputes that Plum is a corporation formally separate from Campbell.  Just as owning a subsidiary is not itself sufficient to subject a parent to jurisdiction, however, Plum's status as a subsidiary is not itself sufficient to refute Plaintiffs' allegations that Campbell subjected itself to this suit through its control and direction of relevant Plum conduct. And as seen above, even Campbell's exhibits undermine its claimed separation from Plum.  *See supra* Background Part III.D.2.

Notwithstanding its evidentiary submissions, then, Campbell has not in fact mounted a factual challenge to subject-matter jurisdiction, because Campbell's submissions do not in fact "controver[t]" any "pertinent facts bearing on the question of jurisdiction" here.  *Butcher's Union Local No. 498*, 788 F.2d at 540.  Campbell's jurisdictional arguments should therefore be "adjudicated under the familiar Rule 12(b)(6) standard," with Plaintiffs' allegations accepted as true and all reasonable inferences drawn in Plaintiffs' favor.  *Bowen*, 118 F.4th at 1143 n.7.  But Campbell's arguments fail whether based on the allegations or the evidence.

Campbell does not dispute—or even mention in its jurisdictional argument—the Master Complaint's specific allegations that "many of the scientists and researchers that monitored the safety of Toxic Heavy Metals in Plum's baby foods were directly employed by Campbell or were directly controlled and trained by Campbell agents and employees" or that "it was Campbell's attorneys that responded to Congressional inquiries about heavy metals in Plum baby foods in 2019." Compl. ¶ 25.  These allegations alone suffice to demonstrate Campbell's involvement in the safety of Plum products such that injuries from the unsafety of those products are fairly traceable to Campbell.  Campbell's Rule 12(b)(1) motion can be dismissed for this reason alone.

Campbell's only rebuttal is that Plaintiffs have somehow "fail[ed] to allege that they

1    consumed any Campbell Soup Company product." Campbell MTD at 6; *see also id*. at 1. The

2    Master Complaint unquestionably *alleges* that they did: Campbell's own motion notes that the

3    Master Complaint refers to Plum products sold from June 2013 to May 2021 as "Campbell and

4    Plum's baby food." *Id*. at 1 (quoting Compl. ¶ 48); *see also, e.g.*, Compl. ¶ 87 ("Plum and

5    Campbell/Sun-Maid continued and continue to sell baby food contaminated with elevated levels

6    of heavy metals without first testing to ensure their safety"). If Campbell means to challenge that

7    allegation—and thus to argue that products sold by a subsidiary food company, to the ultimate

8    profit of a parent food company, are somehow not also the parent's products—that is a factual

9    argument for which Campbell submits no support. Indeed, there is none. Campbell itself claimed

10   Plum as its baby food brand and Plum profits as its own. *See, e.g.*, Ryan Decl. (ECF No. 275-2),

11   Ex. A at 9, 11, 25. Plum product labels bore Campbell's logo. *See* Wisner Decl. Ex. 63 (Plum

12   "apple with spinach" puffs); Wisner Decl. Ex. 64 (Plum "sweet potato apple & corn" puffs). And

13   as detailed above, Campbell was intimately involved in the quality of Plum products, particularly

14   their heavy metal content. Campbell personnel set the (dangerously high) heavy metal limits for

15   Plum ingredients, oversaw the (incomplete) testing of Plum products, and dictated sourcing

16   decisions. *See supra* Background Part III.D.2. ████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████ For all intents and

20   purposes, and certainly for purposes of this case, Plum products were Campbell products.

21          That is not to say that Plum and Campbell were entirely "indistinguishable" or a "single

22   entity." Campbell MTD at 6. Plaintiffs do not allege that Plum was a sham company. But

23   Plaintiffs do allege that Campbell directly controlled and participated in conduct relevant to this

24   suit. Those well-supported allegations establish both liability and traceability. Campbell's own

25   submissions show that, when Campbell sold Plum to Sun-Maid, Campbell "agreed to ***indemnify***

26   the buyer for certain claims against the Plum baby food and snacks business alleging ***the presence***

27   ***of heavy metals*** in the products manufactured or sold" before sale. Ryan Decl. (ECF No. 275-2),

28   Ex. A at 9 (emphases added). There is no other way to read that agreement, especially not with

1  inferences duly drawn in favor of the non-moving party, than as a recognition that Campbell (and

2  for that matter, Sun-Maid) could bear liability for injuries resulting from the heavy metals in Plum

3  baby food products.

### C.  Plaintiffs' Injuries Are Traceable to Sun-Maid

5          Bringing only a facial challenge, Sun-Maid contests standing for two reasons.  First, Sun-

6  Maid suggests that Plaintiffs cannot state injuries traceable to Sun-Maid because many individual

7  Plaintiffs' "alleged period of consumption and/or date of diagnosis" predates Sun-Maid's

8  acquisition of Plum.  Sun-Maid MTD at 11.  But, as a "master" complaint, the allegations will be

9  adopted and incorporated into a short form complaint by individual plaintiffs that did consume

10  Sun-Maid baby food products.  And, indeed, Sun-Maid does not, and cannot, contend that *all*

11  Plaintiffs fail to allege consumption and/or diagnosis during the time that Sun-Maid owned Plum.

12  Sun-Maid itself cites a case filed in this MDL where Plaintiff allegedly began consuming

13  Defendants' baby food products "in 2019 and … was diagnosed with ASD at age 3," i.e., in 2022.

14  *Id*. at 12.  This individual complaint does not allege that Plaintiff stopped consuming any

15  particular Defendant's baby food products before diagnosis.  *See* Compl. ¶¶ 139–42 (ECF No. 1),

16  *K.W. v. Beech-Nut Nutrition Co., et al.*, Case No. 3:24-cv-06475 (Sept. 13, 2024) ("*K.W.*

17  Compl.").  With all reasonable inferences drawn in Plaintiffs' favor, these allegations necessarily

18  mean that this Plaintiff consumed, and was injured by, Plum products after Sun-Maid acquired

19  Plum in 2021.  *See also* Sun-Maid MTD at 12 (citing another case where Plaintiff allegedly began

20  consuming Defendants' baby foods in 2018 and was diagnosed at age 3, i.e., the year Sun-Maid

21  acquired Plum).  Sun-Maid also fails to mention, for example, *J.L.*, where the complaint alleges

22  that the Plaintiff "consumed Defendant's Baby Food products at various times *through 2022*"—as

23  the other Plaintiffs similarly allege.  Compl. ¶¶ 113–14 (ECF No. 1), *J.L. v. Beech-Nut Nutrition

24  Co., et al.*, Case No. 3:25-cv-00154 (Jan. 6, 2025) (emphasis added); *see also, e.g.*, *K.W.* Compl.

25  ¶ 140.  And putting aside any potential issues in other individual cases, Sun-Maid again fails to

26  mention the "simple rule" that, where "there are multiple plaintiffs," "[a]t least *one* plaintiff must

27  have standing."  *Town of Chester*, 581 U.S. 433 at 439 (emphasis added).  Under this simple rule,

28  Sun-Maid's first facial argument fails.

Second, Sun-Maid argues that individual Plaintiffs' complaints "parrot" the allegations in the Master Complaint. Sun-Maid MTD at 11. That is not an argument for dismissing the Master Complaint itself, which is what Sun-Maid has moved to dismiss. All the underlying individual complaints will be supplanted with the Master Complaint and individual short form complaints. So, seeking redress on soon-to-be obsolete complaints is a red herring. Regardless, there is no Article III problem with repeating allegations that are themselves sufficient to establish standing. The Master Complaint and individual complaints allege that Plaintiffs consumed Plum baby foods and were injured by the excessive heavy metals in them. Sun-Maid acknowledges that at least some Plaintiffs allege consumption and injury during the time that Sun-Maid owned Plum. And Plaintiffs need not prove specific causation within their complaints. The Master Complaint and individual complaints also allege that Sun-Maid, not Plum, paid for and received the results of metal tests on Plum products, and that "[a]ll major executive functions related to Plum's operation"—which Campbell had conducted when Campbell owned Plum—"were specifically transitioned from Campbell to Sun-Maid." *Id*. Sun-Maid contests neither allegation. It does assert (conclusorily) that the first "is not a basis upon which relief may be granted." Sun-Maid MTD at 10. Yet testing was fundamental to monitoring the heavy metal content of baby food products, which is what this suit is about; Sun-Maid itself quotes the Master Complaint's opening allegation "that Defendants *should* have been 'systematically testing and screening finished products for Toxic Heavy Metals *before* the foods are released for consumption.'" *Id*. (quoting Compl. ¶ 2) (emphasis in original). The Master Complaint alleges that Sun-Maid and the other Defendants failed to perform that duty, among others, and that some Plaintiffs were injured as a result. On the face of the Complaint, those injuries are fairly traceable to Sun-Maid.

### D. The Court Should Defer Any Remaining Questions to the Trier of Fact or Order Jurisdictional Discovery

For the reasons above, the Court has subject-matter jurisdiction over Hero Group, Campbell, and Sun-Maid, just as it does over all other Defendants that have (correctly) not challenged subject-matter jurisdiction. If any questions remained, however, that would not be cause for dismissal. The crux of Defendants' standing argument (traceability) is also the crux of

their liability.  *See Bestfoods*, 524 U.S. at 72 (parent entity can be liable where "the alleged wrong can seemingly be traced to the parent").  The allegations alone, and especially when coupled with the evidence above, more than suffice to resolve Defendants' Rule 12(b)(1) motions as they have chosen to frame them: aside from proving the undisputed fact of their subsidiaries' formal corporate separateness, these Parent Defendants offer nothing to dispute the specific allegations or evidence that they controlled and acted through their subsidiaries.  Any further dispute on that score—i.e., on whether these Defendants, like others, caused Plaintiffs' injuries—goes directly to the merits of Plaintiffs' claims.  As such, "the resolution" of any such disputes should be left "to the trier of fact."  *Bowen*, 118 F.4th at 1144.

At the very least, the Court should not grant the Rule 12(b)(1) motions without first ordering jurisdictional discovery.  Although some Defendants have produced discovery in state-court litigation, which they have reproduced here, that discovery was far from comprehensive, and it did not include any discovery directly on Hero Group, Campbell, or Sun-Maid.  Any lingering questions about these Parent Defendants' roles likely reflect gaps in that discovery.  The state-court litigation involved a smaller set of products than the ones at issue in this MDL and did not directly name Hero Group or Sun-Maid.  The state-court litigation thus has produced little discovery from Sun-Maid and Hero, and while some of Campbell's employees were deposed on behalf of Plum, many of those deponents were either unprepared or never completed their depositions.  ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████[32]

And, here, all Parent Defendants have so far refused to participate in any MDL discovery, even after repeated efforts to engage in that discovery informally and formally.  As explained in Plaintiffs' separate discovery briefing, this discovery is directly relevant to Plaintiffs' claims.  And

---

[32] Plaintiffs have since learned that Mr. Spitzenberger has unfortunately passed away, so this evidence will need to be pursued elsewhere.

1    it is the type of discovery that, even within the more limited scope of the state-court litigation, has

2    revealed Parent Defendants' roles in relevant conduct.  Accordingly, this is not the sort of case

3    where "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis

4    for jurisdiction."  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (internal

5    quotation marks omitted).  That is the only sort of case where "a refusal to grant discovery to

6    establish jurisdiction is not an abuse of discretion."  *Id.*  If the Court is not inclined to deny these

7    motions outright, on the merits, then jurisdictional discovery is warranted.

8    **III.        THE RULE 12(b)(2) MOTIONS FAIL**

9        Three Parent Defendants—Nestlé, Hero Group, and Danone—challenge personal

10    jurisdiction.  All rely on their status as parent entities.

11        The MDL statute grants nationwide personal jurisdiction for pretrial coordination.  *See*

12    28 U.S.C. § 1407(a).  This Court may therefore exercise personal jurisdiction to the same extent as

13    any transferor court, meaning that "[c]ontacts with the United States, and not a particular state, are

14    what matters" here.  *Howard v. Sulzer Orthopedics, Inc.*, 382 F. App'x 436, 442 (6th Cir. 2010);

15    *see also In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 145, 163 (2d Cir.

16    1987) ("Congress may, consistent with the due process clause, enact legislation authorizing the

17    federal courts to exercise nationwide personal jurisdiction …. One such piece of legislation is 28

18    U.S.C.A. § 1407 (1982), the multidistrict litigation statute.").[33]

19

20

21

---

22   [33] For this reason, Nestlé S.A.'s argument that it is not subject to personal jurisdiction in Missouri

23   under that state's long-arm statute is irrelevant.  This is an MDL.  And as shown herein, all
     Defendants are subject to specific personal jurisdiction in states, like California, whose courts may

24   exercise personal jurisdiction to the extent allowed by the Due Process Clause.  Accordingly, this
     brief discusses domestic forums generally, while at times using California to exemplify why

25   personal jurisdiction is proper under the Due Process Clause and therefore in this MDL.
     Regardless, the Missouri Supreme Court has held that Missouri's long-arm statute "is construed to

26   extend the jurisdiction of the courts of this state over nonresident defendants to that extent
     permissible under the Due Process Clause."  *State ex rel. Key Ins. Co. v Roldan*, 587 SW3d 638,

27   643 (Mo 2019).  Plaintiffs' arguments under the Due Process Clause thus apply equally to

28   Missouri cases.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    Plaintiffs here invoke specific personal jurisdiction, which depends on forum contacts.[34]  A

2  non-resident defendant will "have sufficient contacts to be subject to specific personal

3  jurisdiction" where the defendant has "purposefully avail[ed] himself of the privilege of

4  conducting business in the forum" and "the claim … arise[s] out of," or relates to, "the forum-

5  related activities."  *In re Boon Glob. Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019) (internal quotation

6  marks omitted); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362

7  (2021) (discussing the "relates to" standard).  "[T]he exercise of jurisdiction" also "must comport

8  with fair play and substantial justice," meaning that "it must be reasonable."  *In re Boon Glob.*

9  *Ltd.*, 923 F.3d at 651.  If so, then the Due Process Clause permits a court to exercise specific

10  personal jurisdiction.  *See id.*

11    For tort cases, courts in this Circuit "apply a 'purposeful direction'" standard to determine

12  purposeful availment, "look[ing] to evidence that the defendant has directed his actions at the

13  forum state, even if those actions took place elsewhere."  *Picot v. Weston*, 780 F.3d 1206, 1212

14  (9th Cir. 2015).[35]  This requirement is merely meant to exclude "random, fortuitous, or attenuated

15  contacts."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

16    To be sure, this Circuit has also required "something more than the mere placement of a

17  product into a stream of commerce" to establish purposeful availment.  *LNS Enterprises LLC v.*

18  *Cont'l Motors, Inc.*, 22 F.4th 852, 860 (9th Cir. 2022) (internal quotation marks omitted).  But

19  "the range of what constitutes 'something more'" is relatively broad.  *Id.*  At one end is the

20  casebook staple, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), which was

21

22    ───────────────

[34] This brief focuses on specific personal jurisdiction because it plainly exists and suffices to
23  defeat these Parent Defendants' motions.  But Plaintiffs do not concede a lack of general personal
jurisdiction, which jurisdictional discovery, if ordered, may reveal.  Among other bases,
24  Defendants may be subject to general personal jurisdiction in states that require consent to their
jurisdiction in order to do business within them.  *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122,
25  134–36 (2023).  And under 28 U.S.C. § 1407(a), jurisdiction within those states may establish
jurisdiction in this MDL.
26
[35] That said, there is no "iron-clad doctrinal dichotomy" between "purposeful direction" and
27  "purposeful availment"; specific personal jurisdiction ultimately depends on "the extent of the
defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims."
28  *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023).

1   "completely lacking the 'something more' that would have allowed the forum state to assert

2   personal jurisdiction over two of the defendants," *LNS Enterprises LLC*, 22 F.4th at 860.  Those

3   defendants were "fully independent corporations whose relations with each other and with [the

4   other defendants] were contractual only." *Id*. (internal quotation marks and brackets omitted).

5   They conducted no activity "whatsoever" in the forum and did not so much as "solicit business …

6   through advertising reasonably calculated to reach" the forum.  *Id*. (internal quotation marks

7   omitted).  At the other end is the more recent decision in *Ford Motor Co.*, where the defendants

8   advertised, sold, and serviced cars in the relevant forum states—which the Supreme Court

9   considered to be "a veritable truckload of contacts."  592 U.S. at 371.  As the Ninth Circuit has

10  recognized, however, a defendant need not have that "number of contacts with a state" to establish

11  purposeful availment.  *LNS Enterprises LLC*, 22 F.4th at 861.  After all, under *Ford Motor Co.*,

12  "exploiting a market in the forum State" suffices to show that "the defendant deliberately reached

13  out beyond its home."  592 U.S. at 359 (internal quotation marks and brackets omitted);[36] *see also*

14  *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112 (1987) (purposeful availment can

15  also be established by "designing the product for the market in the forum State, advertising in the

16  forum State, establishing channels for providing regular advice to customers in the forum State, or

17  marketing the product through a distributor who has agreed to serve as the sales agent in the forum

18  State").  And here, in the context of an MDL, which allows for personal jurisdiction in any state,

19  the activity directed at the "state" means any state in the Union—any activity directed to the

20  United States of America.

21          To establish the next requirement—that the plaintiff's claims arise from or relate to the

22  defendant's forum contacts—the plaintiff generally must have suffered injury in the forum.  *See*

23  *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 265–66 (2017).  But the

24

---

25  [36] To the extent that this statement—which says nothing of "something more"—conflicts with
26  prior Circuit caselaw, the Supreme Court's statement controls.  *See Yamashita v. LG Chem, Ltd.*,
    62 F.4th 496, 504–05 (9th Cir. 2023) (noting that personal jurisdiction exists under *Ford* "where,
27  for example, 'a company … serves a market for a product in the forum State and the product
    malfunctions there'") (quoting *Ford*, 592 U.S. at 363).  In any event, personal jurisdiction exists
28  here under any applicable standard.

---

64

1    plaintiff need not show that the defendant's forum contacts caused the injury.  Due process

2    requires only "an affiliation between the forum and the underlying controversy," in other words,

3    that the plaintiff's claims "arise out of *or relate to* the defendant's contacts with the forum."  *Ford*

4    *Motor Co.*, 592 U.S. at 362 (emphasis in original).  This standard "contemplates that some

5    relationships will support jurisdiction without a causal showing."  *Id.*  So, for example, the

6    plaintiffs in *Ford Motor Co.* did not need to allege that they bought defective Ford vehicles in the

7    states where they brought suit.  Nor did they even allege that Ford's forum contacts were what

8    "turn[ed]" them into "Ford owner[s]."  *Id.* at 367.  The "possibilit[y]" that Ford's other business in

9    the forum states led the plaintiffs to purchase Fords in other states sufficed to establish that

10    plaintiffs' claims related to Ford's forum contacts, and thus "underscored the aptness of finding

11    jurisdiction."  *Id.*

12        The first two jurisdictional requirements normally resolve the third (reasonableness).

13    When a defendant exploits a market in a forum, it is generally "not unreasonable to subject it to

14    suit" in that forum.  *Ford Motor Co.*, 592 U.S. at 363.  Thus, where the first two jurisdictional

15    requirements are met, the burden shifts to the defendant to make "a compelling case that the

16    presence of some other considerations would render jurisdiction unreasonable."  *Burger King*

17    *Corp.*, 471 U.S. 462 at 477.  And such cases are rare, because "[m]ost such considerations usually

18    may be accommodated short of finding jurisdiction unconstitutional."  *Id.*

19        The Parent Defendants seeking dismissal under Rule 12(b)(2) here have submitted short

20    declarations to support their assertions.  These declarations do not trump Plaintiffs' well-supported

21    allegations.  When a Rule 12(b)(2) motion "is based on written materials rather than an evidentiary

22    hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts," and the court

23    "only inquire[s] into whether the plaintiff's pleadings and affidavits make a *prima facie* showing

24    of personal jurisdiction."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir.

25    2004) (internal quotation marks omitted).  "[T]he *prima facie* jurisdictional analysis requires [the

26    court] to accept the plaintiff's allegations as true" and therefore to "adopt the plaintiff's version of

27    events" for purposes of the analysis.  *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d

28    1082, 1087 (9th Cir. 2000) (internal brackets omitted).  Although "the plaintiff cannot simply rest

65

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   on the bare allegations of its complaint," any "uncontroverted allegations in the complaint must be

2   taken as true" and any "[c]onflicts between parties over statements contained in affidavits must be

3   resolved in the plaintiff's favor."  *Id*.

4        As under Rule 12(b)(1), "[d]iscovery may appropriately be granted where pertinent facts

5   bearing on the question of jurisdiction are controverted or where a more satisfactory showing of

6   the facts is necessary."  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th

7   Cir. 1977).  "If the pleadings and other submitted materials raise issues of credibility or disputed

8   questions of fact with regard to jurisdiction," the proper course would be to deny the Rule 12(b)(2)

9   motions, because Plaintiffs would necessarily have made a *prima facie* jurisdictional case.  *See id*.

10  at 1285.  The Court would then "have the discretion to take evidence at a preliminary hearing in

11  order to resolve the contested issues."  *Id*.  Only if the dispute reaches an evidentiary hearing in

12  this manner is a plaintiff required to "establish the jurisdictional facts by a preponderance of the

13  evidence."  *Id*.

14       Here too, the Parent Defendants seeking dismissal on jurisdictional grounds base their

15  arguments on their parental status.  But just as parent entities can be subject to suit under Article

16  III where they commit torts through their subsidiaries, parent entities can be subject to specific

17  personal jurisdiction based either on their own "sufficient, direct contacts with the forum state," *id*.

18  at 650, or on the contacts of a subsidiary that "acts as [the parent's] agent" in relevant actions, *Doe

19  v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (internal quotation marks omitted); *see also In

20  re Gasoline*, 2020 WL 7431843, at *8 ("[N]either the Ninth Circuit nor the Supreme Court have

21  ruled out agency as a basis for specific jurisdiction.")  Once again, therefore, the question is not

22  whether the parent entities are parent entities, but whether they contributed to the defects in the

23  baby foods that injured Plaintiffs in this MDL.  The Master Complaint alleges, and discovery to

24  date proves, that they did—including by directing and participating in the conduct that likewise

25  establishes specific jurisdiction over their respective subsidiaries.  None of those subsidiaries

26  challenges personal jurisdiction.  The Parent Defendants cannot evade this MDL Court's personal

27  jurisdiction either.

28       To be clear, at the outset, this is not simply a case where some distributor, somewhere, put

66

products bearing Defendants' names in the stream of commerce and those products reached a domestic forum. Plaintiffs argue, the Master Complaint alleges, and discovery to date proves that the Parent Defendants were directly involved in the relevant aspects of the baby food products at issue—their ingredients, their specifications, and their safety. Those products are pervasively marketed and sold throughout the relevant forums, which explains why none of the subsidiary Defendants challenges personal jurisdiction. Those subsidiaries committed their wrongful acts in tandem with and at the direction of their Parents. It is that involvement in goods directed at domestic markets that subjects the Parent Defendants to jurisdiction here. *See Ford*, 592 U.S. at 359, 363; *Yamashita v. LG Chem, Ltd.,* 62 F.4th 496, 504-05 (9th Cir. 2023); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881–82 (2011) ("This Court has stated that a defendant's placing goods into the stream of commerce with the expectation that they will be purchased by consumers in the forum State may indicate purposeful availment."); *Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170 (D. Ariz. 2010) (foreign parent defendant subject to personal jurisdiction where its domestic subsidiary disseminated products manufactured according to the parent's defective design).

### A. The Court Has Specific Personal Jurisdiction over Nestlé S.A.

Nestlé S.A. has sold and marketed baby food products through Gerber to a nationwide market in the United States. *See* Wisner Decl. Ex. 20 (Nestlé S.A. 2023 Annual Report) at 35 (describing sales by geographic markets). As a result, Nestlé S.A. has deliberately reached out beyond its home and expressly aimed its activities at the United States, California, and other domestic forums. *See Ford Motor Co.*, 592 U.S. at 359 ("exploiting a market" suffices to show that a defendant "deliberately reached out beyond its home") (internal quotation marks and brackets omitted). Indeed, Gerber's own CEO made numerous representations to the U.S. Congress about Nestlé S.A.'s direct and substantial control over the levels of heavy metals in the Gerber baby food products at issue. *See supra* Background Part III.B.2. Gerber's letter to Congress is significant for at least two reasons. First, it shows that both Gerber and Nestlé play an interrelated role in the baby food products at issue in this case: Gerber manufacturers and sells the products, while Nestlé assesses the safety and risks of those products and determines what level of

1    heavy metals are acceptable in the Gerber products that are sold to consumers.  The conduct of

2    Nestlé is therefore directly relevant to this case, because Nestlé controls the baby food products

3    that can be sold by setting and maintaining the contaminant guidance levels for heavy metals in

4    Gerber baby food products.  Second, the letter shows that, when Gerber was confronted by

5    Congress about the heavy metals in Gerber baby food products, Gerber defended its products by

6    pointing to the policies, procedures, and management decisions made *by Nestlé*.  If Gerber's

7    response to Congress was to point to the policies, procedures, and management decisions made by

8    its parent company, it will presumably do the same in front of a jury.

9         As detailed above, the Gerber CEO's representations were true.  Nestlé S.A. made safety

10    and risk decisions about the ingredients used in Gerber baby food products, ███████████████

11    ████████████████████████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████████████████████████████

14    ███████████████████████████████████████████████████████  This

15    document illustrates that, though Gerber might work directly with suppliers, it is Nestlé that makes

16    the high-level decisions about how Gerber does so.

17        ███████████████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████████████

19    ██████████████████████████████████████████████████████████████

20    ███████████████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████████████████

24    ██████████████████████████████████████████████████████████

25    ██████████████████████████████████████████████████████████

26    ███████████████████████████████████████████████████████████

27    █████████████████████████████████████████████████████████████

28    ████████████████████████████████████████████████████████████████████

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  ████████████████████

2      All Gerber baby food that was sold and consumed in the United States was required to

3  conform to **Nestlé's** product specifications.  **Nestlé** directly controlled the levels of heavy metals

4  allowed in the Gerber baby food products.  And U.S.-based Gerber employees would regularly

5  communicate with and take direction from Nestlé employees in Switzerland about safety issues

6  related to the heavy metals in Gerber baby foods.  *See Concat LP v. Unilever, PLC*, 350 F. Supp.

7  2d 796, 813 (N.D. Cal. 2004) (asserting jurisdiction over foreign parent company in part because

8  the entities at issue "exchange[d] relevant business information").  Nestlé S.A. exercised

9  significant control over Gerber related to the sale of baby food products in the United States.  As a

10  result, Nestlé purposefully availed itself of the relevant forums; Plaintiffs' claims arise from and

11  relate to Nestlé's business in the relevant forums; and Nestlé is fairly haled into this MDL Court

12  for claims arising from Gerber baby food products.

13      Because Plaintiffs have satisfied the first two prongs of the specific jurisdiction test, Nestlé

14  has the burden of presenting a "compelling case" as to why it would be unreasonable to exercise

15  jurisdiction over it.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.

16  2004).  The "burdens" proffered by Nestlé S.A. are not compelling.  Nestlé S.A. claims that "it

17  would be extremely burdensome for Nestlé S.A. to litigate in the United States."  Nestlé S.A.

18  MTD at 22.  Nestlé S.A. is an international corporation represented here by U.S.-based counsel.

19  Nestlé S.A. also claims that, because its principal place of business is in Switzerland, "any

20  potentially relevant evidence and witnesses would be located there."  *Id*.  That assertion only

21  undercuts Nestlé S.A.'s representations to Plaintiffs and the Court that Nestlé S.A. has no relevant

22  evidence (namely, heavy metal testing) and that it was not involved in Gerber's baby food in any

23  manner.  *See* Wisner Decl. Ex. 97 (email correspondence between MDL 3101 Plaintiffs' Co-Lead

24  Counsel and Counsel for Defendant Nestlé); *See* Wisner Decl. 102 (Dec. 12, 2024 CMC Trans.) at

25  6. Nestlé S.A. cannot have it both ways; it cannot disclaim any connection to the litigation while

26  claiming that it should be excused from the litigation simply because some its "potentially relevant

27  evidence and witnesses" may be located abroad.  If anything, this assertion supports Nestlé S.A.'s

28  continued role in the case, and at least warrants further discovery.  Moreover, counsel have already

1    traveled to Switzerland to conduct discovery on a Nestlé scientist that *Gerber* noticed for

2    deposition.  So, whether or not Nestlé S.A. is a defendant in this case will not influence whether

3    discovery will be needed from Nestlé S.A. or whether the litigants will need to conduct discovery

4    in Switzerland.

5        Nestlé S.A. broadly claims that "Courts within the Ninth Circuit have routinely dismissed

6    claims against nonresident corporate defendants under circumstances similar to those here."

7    Nestlé S.A. MTD at 9.  Nestlé's cases are clearly distinguishable.  In *Mate v. Societe Anonyme*

8    *Des Galeries Lafayette,* the court found no connection between the claims and the forum-related

9    activities because the plaintiffs only alleged that the nonresident corporate defendant had a

10   "website accessible to consumers in the United States and shipp[ed] products to the United States"

11   and the website at issue did not appear to use any infringing artwork of the plaintiffs'.  *Mate v.*

12   *Societe Anonyme Des Galeries Lafayette*, No. 221CV07802VAPRAOX, 2023 WL 6786791, at *2

13   (C.D. Cal. July 26, 2023).  Here, by contrast, evidence shows that Nestlé S.A. directly controlled

14   the product specifications and amounts of heavy metals in the very products that were sold in the

15   United States and consumed by Plaintiffs—which directly relate to the claims in this MDL.  In

16   other words, unlike in *Mate*, here the actions of the foreign defendants are directly related to the

17   injuries incurred by Plaintiffs.

18       In *P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435 (E.D.N.Y. 2024), the

19   plaintiff attempted to link Nestlé S.A. to the conspiracy at issue with the mere "conjecture" that

20   the word "Switzerland" in certain documents meant Nestlé S.A.  *Id*. at 455–56.  The court found

21   that, "[w]ithout more," the word "Switzerland" was not sufficient to establish Nestlé S.A.'s role in

22   the case.  *Id*.  Here, again by contrast, Plaintiffs have put forth concrete facts directly linking

23   Nestlé S.A.'s actions to their claims in this case—namely through its control of the amount of

24   heavy metals in Gerber baby food products sold in the United States.  This evidence separates this

25   case from *P & L*, and from all other cases on which Defendants rely, and thoroughly refutes the

26   bald assertions in Nestlé's proffered declaration.  *See also infra* Part III.D.

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

### B.  The Court Has Specific Personal Jurisdiction over Hero Group

Hero Group purposefully availed itself, through its agent Beech-Nut, of domestic forums, including California.  As detailed above, Hero Group's claim that it was "functionally a holding company," and not involved in any of Beech-Nut's "relevant operations," is simply false.  Hero Group MTD at 9.  Hero Group attempts to dispute the Master Complaint's detailed allegations with a declaration from its Legal Counsel, Ricardo Matos, who says that Hero Group had nothing to do with Beech-Nut's baby foods.  ECF No. 281-1 at 1.  The evidence discovered to date shows otherwise.

Hero Group was, in fact, intimately involved in Beech-Nut's manufacturing, marketing, and sales of baby food within the U.S. market.  *See supra* Background Part III.C.2, Argument Part II.A.  Beech-Nut's website allows parents to search for products at stores near them, including in California, *see* Wisner Decl. Ex. 98 (Beech-Nut Webpage: Find Nearby), and provides an option for parents to search for WIC-eligible products by state, including in California, *see* Wisner Decl. Ex. 99 (Beech-Nut Webpage: "Find WIC-Eligible, Beech-Nut Baby Foods In Your State").  And Beech-Nut is expressly the brand through which Hero Group says that "Hero markets baby food in the US."  Wisner Decl. Ex. 14 (Hero 2023 Annual Report) at 56.  Beech-Nut also sourced a number of ingredients from California and California suppliers.  *See* Wisner Decl. Ex. 96 (Heavy Metals History Excel Spreadsheet).  Given that Hero mandated product specifications, quality policies, contractual agreements, and requirements for certificates of assurance, Beech-Nut's use of California suppliers for baby food ingredients and testing of those ingredients for heavy metals is directly attributable to Hero. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████

In an effort to minimize its forum contacts, Hero Group relies on *J. McIntyre*, 564 U.S.

71

873.  The reliance is misplaced.  There, the foreign manufacturer's only connection to the forum state, New Jersey, was that "up to four machines ended up in New Jersey" through an "independent" distributor that was not "under J. McIntyre's control."  *Id*. at 878, 886.  Here, Hero Group's contacts with California and other domestic forums are systemic and pervasive. Hero Group's Beech-Nut products did not just happen upon California and other forums, as did the machines in question in *J. McIntyre*.  Hero Group took purposeful steps to manufacture, market, and sell its Beech-Nut products in domestic forums, all while controlling the quality of those products.  *See, e.g.,* Wisner Decl. Ex. 87 at BEECH-BF-MDL-0000028913.

Given that Hero Group's Beech-Nut products permeate the relevant forums, Plaintiffs' claims arise from, and relate to, Hero Group's forum contacts.  Claims relate to a defendant's forum contacts "where, for example, 'a company … serves a market for a product in the forum State and the product malfunctions there.'"  *Yamashita v. LG Chem, Ltd.,* 62 F.4th 496, 504-05 (9th Cir. 2023) (quoting *Ford*, 592 U.S. at 363).  Hero Group actively sells and markets dozens of Beech-Nut baby food products containing unsafe levels of heavy metals.  Plaintiffs allege injuries that were caused by and related to those products.  Hero Group "should have foreseen the risk that its contacts might cause injuries like that of [Plaintiffs]," because Hero Group should have (and did) know that selling baby foods with unsafe levels of heavy metals would increase the risk of developmental harm.  *Id*. at 506.

Finally, the exercise of personal jurisdiction over Hero Group in this MDL is reasonable. As the Supreme Court explained in *Ford*, "[a]n automaker regularly marketing a vehicle in a State … has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there[.]"  592 U.S. at 368 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. 286 at 297).  A baby food manufacturer, like Hero Group, that regularly markets and sells its baby foods in relevant forums likewise has "clear notice" that it may be subject to jurisdiction there.

### C.  The Court Has Specific Personal Jurisdiction over Danone

Danone purposely availed itself of the laws of the United States and directed Nurture to do the same.  Its arguments to the contrary are unavailing for several reasons.

First, there is only one "Danone."  Danone S.A. makes no public delineation between it or

1    any other Danone entity.  To the world, there is only one Danone: Danone S.A.  And though

2    Danone now claims in court that Danone S.A. is a separate entity from any of its subsidiaries in

3    the United States, Danone's practices contradict that claim.  Indeed, any conflation between

4    Danone S.A. and its subsidiaries stems from ***Danone's*** actions to conflate the entities.

5        Take the LinkedIn profiles for the Danone employees who testified for Nurture in *N.C.*

6    Each profile links to Danone S.A. and no other entity.  For example, Magdelena Bartosik, who

7    worked for Danone before it acquired Nurture, listed her Danone employer as simply "Danone."[37]

8    And clicking the "Danone" link on her LinkedIn resume leads to the LinkedIn page for Danone,

9    S.A.,[38] which lists the company's location as "Paris."  The same is true for Rebecca Beaudin,

10   currently Danone's Global Director of Quality and Food Safety.  She lists eight different roles

11   over nearly 20 years at "Danone."  At no point has she publicly claimed that she worked for any

12   entity other than Danone S.A.  Indeed, while her current work location is listed as the "Greater

13   Paris Metropolitan Region," each of her seven previous work locations was in the United States,[39]

14   and each is listed under Danone S.A.'s heading.  This pattern holds true for other Danone

15   employees (David Maltese and Phillip Steinbach).  Thus, even domestic employees with

16   responsibility over Nurture work for "Danone"—meaning Danone S.A.

17       Danone's own statements show that it purposefully availed itself of markets throughout the

18   United States.  In 2016, Danone S.A. posted a video to its Twitter account, which lists the

19   company's location as "Paris, France," with the caption "Who we are, how we work: discover

20   Danone at a glance!"[40]  In the video, Danone states:

21   • "We are a global food company"

22   • "We operate in over 140 countries."

23   • "We began in Europe, but today more than 60% of our sales come from other

24       geographies."  This statement is accompanied by an image that says "United States: 9%."

25   ───────────────────

26   [37] https://www.linkedin.com/in/magdelena-bartosik-5798319/

27   [38] https://www.linkedin.com/company/danone/

     [39] https://www.linkedin.com/in/rebecca-beaudin-92934aa/?originalSubdomain=fr

28   [40] https://x.com/Danone/status/695244818612490240

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  • "We are in close proximity to 900 million consumers."

2  Now, in court, Danone claims that it is but a mere holding company with no employees. Yet

3  Danone tells the world that Danone S.A. employs thousands of people, and it makes no effort to

4  claim in public that these employees work for anyone other than Danone S.A.

5  Second, despite claiming to be a mere holding company, Danone S.A. exercised

6  substantial control over Nurture's operations in the United States, particularly regarding food

7  safety standards and ingredient sourcing.  Courts look beyond corporate formalities to the reality

8  of the parent company's involvement when assessing purposeful direction.  *See Doe v. Unocal*

9  *Corp.*, 248 F.3d 915, 926 (9th Cir. 2001).  This Court should do so here.

10  The Danone employees mentioned above (and others) provided direction, training, and

11  conducted activities on behalf of or in conjunction with Nurture in the United States.  For

12  example, as alleged in the Master Complaint, "many of the scientists and researchers that

13  monitored the safety of Toxic Heavy Metals in baby food were directly employed by Danone or

14  were directly controlled and trained by Danone agents and employees."  Compl. ¶ 21.  Danone

15  also "set standards, made executive-level business decisions, and exercised control over Nurture's

16  baby food selling in the United States."  *Id*.  Discovery has borne these allegations out.  *See supra*

17  Background Part III.C.2.

18  Third, Danone trained Nurture regarding heavy metals and their potential to cause brain

19  damage in babies. ███████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ██████████████████████████████████████████████

25  █████████████████████████

26  ██████████████████████████████████████████████████

27  ███████████████████████████████ This audit was done as a Danone

28  employee.  Although his LinkedIn page claims that he worked for Nurture in 2016 as a "supplier

74

1   quality manager," his emails at that time were sent from a ███████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████

4       And fourth, Danone dictated Nurture's food safety policies and superficially required

5   Nurture's compliance.  As also noted above, ████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ██████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ██████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ██████  *see also supra* Background Part III.C.2.

16  ██████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████  Nurture and Danone then repeatedly sold foods that exceeded these internal

19  limits.  For example, ██████████████████████████████████

20  ████████████████████████████████████████

21  ██████████████████████████████████████

22  ██████████████████████████████████████████

23  ██████████████████████████████████████████

24  ██████████████████████████  Yet, as the Master Complaint alleges, Nurture and Danone sold

25  foods where tests showed that the foods contained as much as 180 ppb inorganic arsenic, and

26  Nurture and Danone sold products that contained as much as 641 ppb lead.  *See* Compl. ¶ 79.

27  ██████████████████████████████████████████

28  ████████████████████████████████████████████

75



19    Danone's actions—like other Parent Defendants' actions—resemble and exceed those of

20  the defendant in *Patterson*, 684 F. Supp. 2d 1170.  There, Krause-Werk, a foreign company that

21  manufactures ladders at facilities in Europe, had created a wholly owned subsidiary in the United

22  States to distribute its ladders in the United States.  *See id.* at 1173.  The parent (Krause-Werk)

23  trained the domestic subsidiary's employees on the parent's manufacturing processes.  *See id.*  The

24  *Patterson* court found on those facts that Krause-Werk met the purposeful availment requirement

25  because it had placed its design of the ladders into the stream of commerce and directed that

26  design toward U.S. consumers.  *See id.* at 1182–83.  Citing *Asahi*, 480 U.S. 102, the court noted

27  that a defective or negligent design may be sufficient to establish specific jurisdiction when a

28  defendant directs the design to a particular forum.  *See Patterson,* 684 F. Supp. 2d at 1183. ▮

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ██████████████████████████████ Those products then entered the stream of

6 commerce in the United States and reached domestic forums, to which they were directed.  Just

7 like Krause-Werk, Danone should have anticipated being hauled into court, including this MDL

8 Court, if and when its products harmed residents of jurisdictions throughout the United States.  *See*

9 *id.*

10       Danone does not meaningfully dispute that, if it has purposefully availed itself of domestic

11 forums, then the second personal-jurisdiction requirement is met, too.  The claims in this MDL

12 clearly arise from and relate to Danone S.A.'s alleged (and proven) activities directed specifically

13 at the United States.  The claims stem directly from Danone S.A.'s control over Nurture's food

14 safety standards and heavy metal testing.  Danone's European-based food safety team set

15 Nurture's heavy metal standards, trained Nurture employees about contamination risks, and was

16 the exclusive source of Nurture's scientific analysis of heavy metal toxicity.  These activities form

17 the core of Plaintiffs' claims regarding the toxic heavy metals in Nurture's baby food products.

18       The exercise of jurisdiction over Danone S.A. is reasonable given its substantial, ongoing

19 involvement in Nurture's U.S. operations.  Danone S.A. has already demonstrated its ability to

20 litigate in U.S. courts, and its extensive control over Nurture's U.S. operations shows that

21 defending this action would not pose an undue burden.  Moreover, this MDL Court has a strong

22 interest in adjudicating claims involving the safety of baby food products sold to U.S. consumers,

23 particularly when the foreign parent company exercises direct control over safety standards.

### D.  Any Remaining Questions Require Jurisdictional Discovery

25       Jurisdictional discovery should "be granted where pertinent facts bearing on the question

26 of jurisdiction are controverted … or where a more satisfactory showing of the facts is necessary."

27 *Butcher's Union Local No. 498*, 788 F.2d at 540 (internal quotations and citations omitted);

28 *accord, e.g.*, *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).  If the Court is unable to

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   determine that these Parent Defendants were sufficiently involved in relevant conduct for

2   Plaintiffs' claims against them to proceed, that is only because discovery to date is incomplete.

3   *See supra* Argument Part II.D.  Discovery to date has revealed the evidence cited above, which

4   clearly establishes direct parental involvement.  That said, there is every reason to believe that

5   further discovery would yield "a more satisfactory showing of the facts."  *Butcher's Union Local*

6   *No. 498*, 788 F.2d at 540 (internal quotation marks omitted).

7         At a minimum, the Court should not accept the Defendants' declarations without allowing

8   Plaintiffs to test their assertions.  Nestlé S.A., for example, has proffered a declaration from its

9   General Counsel, Silvan Jampen.  *See* ECF No. 277-1 ("Declaration of Silvan Jampen").  Jampen

10  states that he has held his position at Nestlé S.A. since only June 1, 2023.  *Id.* at 2.  Based on his

11  declaration, there is no evidence that he was a Nestlé S.A. employee during the entire time period

12  at issue.  Jampen further states that his declaration is based, in part, on "reasonably available

13  documents," which Plaintiffs should be permitted to review.  And at best, Jampen's declaration

14  only puts relevant facts in dispute.  For example, he states that "Nestlé S.A. does not set or enforce

15  any standards or specifications for products manufactured by Gerber."  *Id.* at 3.  ███████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████

24  ███████.  *See In re Gasoline*, 2020 WL 7431843, at *7-8 (allowing jurisdictional discovery).[41]

25  ───────────────────────

26  [41] The same goes for the Declaration of Andrew Glass, the current Deputy General Counsel and
    Secretary of Nestlé Holdings, to the extent Nestlé S.A. relies on it.  Nestlé Holdings, the holding

27  company for Nestlé's U.S. brands, has been voluntarily dismissed from this suit.  And in any
    event, Glass states that he has held his position at Nestlé Holdings since only January 1, 2021, the

28

Although Hero Group—which was not directly named in state-court litigation—has been the subject of relatively less discovery, the evidence discovered to date likewise contradicts its proffered declaration. *See supra* Argument Part III.B. And the evidence discussed above entirely refutes the Danone declarant's assertions that Danone S.A. "does not source ingredients for Nurture products," "contract with co-manufacturers in connection with Nurture products," or "set standards or specifications with respect to heavy metal levels in Nurture products." ECF No. 284-1 at 2–3; *see, e.g.,* ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ If the Court does not deny these Defendants' motions outright, as it should, then the Court should at least allow Plaintiffs the opportunity to test the truth of these assertions and to discover whatever further facts might be needed to establish jurisdiction.[42]

## IV.    THE RULE 12(b)(6) MOTIONS FAIL

"To survive a motion to dismiss" under the well-known *Iqbal*/*Twombly* standard, the "complaint must contain sufficient factual matter, accepted as true" and construed in the light most favorable to the plaintiff, "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord, e.g.*, *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 487 (9th Cir. 2019). This is not a "probability requirement." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

tail end of the relevant time period for this suit. *See* ECF No. 282-1 at 2. The bald statements in his declaration do nothing to even put in dispute the well-supported allegations of Nestlé's involvement in and control over Gerber's relevant operations.

[42] In addition to the relevant discovery that Plaintiffs have already been pursuing—and that Defendants have refused to provide—such further discovery could include, as just one example, the steps that Defendants have taken to ensure that they can continue selling baby food products under the California Baby Food Protection Act discussed above. *See Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112 (1987) (purposeful availment can be established by, among other things, "designing the product for the market in the forum State").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    defendant is liable for the misconduct alleged." *Id*.  This determination is "context-specific" and

2    "requires the reviewing court to draw on its judicial experience and common sense." *Id*.

3         When ruling on a Rule 12(b)(6) motion, "a court generally is limited to the allegations in

4    the complaint." *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (internal

5    quotation marks omitted).  But the Court may also consider "documents attached to the complaint,

6    documents incorporated by reference in the complaint, or matters of judicial notice." *United*

7    *States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).[43]

8         **A.**    **The Master Complaint Satisfies *Iqbal* and *Twombly***

9         The Collective MTD argues that "numerous paragraphs in the Master Complaint simply

10   copy and paste elements of various causes of action," and thus, apparently, that the Master

11   Complaint fails to provide the requisite "short and plain statement of the facts underlying

12   Plaintiffs' claims."  Collective MTD at 9.  The actual paragraphs that Defendants cite give this

13   argument away.  All are from the Counts.  None are from the preceding hundred-plus paragraphs

14   of detailed factual allegations.

15        There is of course no rule against reciting the elements of a plaintiff's causes of action in a

16   complaint.  That is a natural way to give a defendant notice of the plaintiff's "claim" for relief.

17   Fᴇᴅ. R. Cɪᴠ. P. 8(a)(2).  And the natural place for that recitation is in the Counts, where the

18   plaintiff states why the complaint's factual allegations amount to a legal entitlement to relief.  To

19   be sure, plaintiffs cannot rely *only* on a generic statement of a cause of action; they cannot just

20   state the law with no facts.  *See, e.g.*, *Trabakoolas v. Watts Water Techs., Inc.*, No. 12-CV-01172-

21   YGR, 2012 WL 2792441, at *4 (N.D. Cal. July 9, 2012) (a plaintiff cannot simply allege that a

22   defendant's product "ha[s] a manufacturing defect") (internal quotation marks omitted).  But that

23   is not what the Master Complaint does.  Defendants pick out a few paragraphs reciting some of the

24

25   _____

     [43] The Collective MTD correctly does not rely on other materials outside the pleadings.  That
26   would convert the motion into a motion for summary judgment, *see Ritchie*, 342 F.3d at 907,
     which would be adjudicated under a different standard and which could not properly be
27   adjudicated at this juncture with discovery still ongoing.  This portion of this brief therefore relies
     only upon the allegations and judicially noticeable materials.  *See Stewart v. Screen Gems-EMI*
28   *Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015).

1  legal elements of some of Plaintiffs' claims.  *See* Collective MTD at 9 (citing Compl. ¶ 173

2  (element of strict-liability design-defect claim), ¶ 175 (same), ¶ 178 (same), ¶ 221(A) (one of

3  many allegations regarding element of negligent-design claim), ¶ 228 (element of same claim)).

4  Yet Defendants skip right over the many paragraphs explaining how each Defendant contributed

5  to the presence of dangerous levels of heavy metals in their baby food products, and thus how each

6  Defendants' conduct gives rise to these claims.  *See, e.g.*, Compl. ¶¶ 61–64 (explaining Beech-Nut

7  and Hero Group's pattern and practice of selling contaminated baby foods); *id*. ¶¶ 65–71

8  (explaining Gerber and Nestlé's pattern and practice of selling contaminated baby foods); *id*.

9  ¶¶ 72–75 (explaining Hain's pattern and practice of selling contaminated baby foods); *id*. ¶¶ 76–

10  80 (explaining Nurture and Danone's pattern and practice of selling contaminated baby foods); *id*.

11  ¶¶ 81–87 (explaining Plum, Campbell, and Sun-Maid's pattern and practice of selling

12  contaminated baby foods); *id*. ¶¶ 88–93 (explaining Sprout's pattern and practice of selling

13  contaminated baby foods); *id*. ¶¶ 94–96 (explaining Walmart's pattern and practice of selling

14  contaminated baby foods).  If anything, the Master Complaint has more detail about Defendants'

15  misconduct than Rule 8 requires.

16      Once again, then, the Master Complaint's detailed factual allegations make this case

17  nothing like the cases cited by Defendants.  As those cases show, claims are unduly conclusory,

18  and therefore subject to dismissal, where plaintiffs' proposed legal conclusions are unaccompanied

19  by underlying facts—not where, as here, defendants attempt to isolate the legal conclusions and

20  ignore the underlying facts.  *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1147

21  (N.D. Cal. 2010).  Defendants here know "what aspect of [the baby foods'] design" or

22  manufacture "made [them] defective" according to the Master Complaint: the presence of

23  dangerous levels of heavy metals and the lack of any warning.  *Higginbottom v. Dexcom, Inc.*, 24-

24  CV-0195-WQH-BLM, 2024 WL 3823023, at *15 (S.D. Cal. Aug. 13, 2024).  They know this

25  because the Master Complaint "identif[ies]/explain[s]" it.  *Lucas v. City of Visalia*, 726 F. Supp.

26  2d 1149, 1155 (E.D. Cal. 2010) (internal emphasis omitted); *see also infra* Parts IV.B & IV.C.

27      Defendants' *Iqbal*/*Twombly* arguments otherwise overlap with their meritless group-

28  pleading and threshold-dose arguments.  Those arguments are no stronger under the guise of *Iqbal*

81

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1   and *Twombly*.

2   **B.  The Master Complaint Plausibly Alleges that Defendants' Baby Foods
3       Are Defective Due to Their Detectable Levels of Heavy Metals**

4   Plaintiffs allege three alternative theories of defect, all premised on the fact that toxic

5   heavy metals should not be present in food products consumed by babies.  First, Plaintiffs allege

6   that Defendants failed to warn consumers about the presence of detectable levels of heavy metals

7   in their baby food products.  *See* Compl. ¶ 133.  Second, Plaintiffs allege that Defendants' baby

8   foods were defective as manufactured to the extent that the products were not intended to contain

9   detectable levels of heavy metals.  *See id*. ¶ 134.  And third, Plaintiffs allege that the products

10  were defective by design if Defendants did intend their baby foods to contain heavy metals.  *See*

11  *id*. ¶ 135.  Defendants assert four interrelated reasons why Plaintiffs' defect theories are

12  purportedly implausible.  None are persuasive.

13  *First*, Defendants assert that Plaintiffs' defect theory is implausible because, according to

14  Defendants, it is not tethered to an "objective or fixed standard."  Collective MTD at 10.

15  Defendants contend that detectable metal levels cannot render their products defective because

16  testing sensitivity increases over time, and thus "'a detectable' level today may be many times

17  below an 'undetectable' level years earlier."  *Id*.  As alleged in the Master Complaint, however,

18  Defendants' products were defective to the extent that they "contained detectable levels of Toxic

19  Heavy Metals … *assuming state of the art analytical testing*[.]"  Compl. ¶ 133 (emphasis added).[44]

20  To the extent that Defendants manufactured and sold products containing detectable levels of

21  metals as identified by current state-of-the-art technology, Plaintiffs plausibly allege that such

22  products were defective.  The fact that future technology may be able to detect metals at lower

23

24  ───────────────

    [44] For context, the state-of-the-art analytical testing for heavy metals dating back to the early
25  1980s (and, by definition, throughout the time period relevant in this litigation) is Inductively
    Coupled Plasma Mass Spectrometry ("ICP-MS").  *See* Wisner Decl., Ex. 61 (Wilschefski &
26  Baxter (2019)) at 115 ("ICP-MS was first developed over 30 years ago.").  ICP-MS is capable of
    detecting contaminants such as lead, arsenic, and mercury at as low as 0.001 ppb, though many
27  ICP-MS testing instruments have a detection limit around 0.6 ppb.  *See* Wisner Decl., Ex. 62
    (FDA Elemental Analysis Manual for Food) at 3 (identifying limits of detection for lead, arsenic,
28  mercury, and cadmium as low as 1.2 ppb, 1.27 ppb, 0.861 ppb, and 0.408 ppb, respectively).

1    levels certainly does not help Defendants who sold products with metal levels detectable even by

2    *less-sensitive* instruments.  And to the extent that Defendants sold baby food without first testing

3    its metal content through a sufficiently sensitive testing instrument available at the time of the

4    Master Complaint, Plaintiffs plausibly allege that Defendants were negligent.  *See id.* ¶¶ 143, 145

5    ("At all relevant times, Defendants had a duty to properly test … Defendants failed and

6    deliberately refused to investigate, study, test … their product[.]").

7        *Second*, Defendants assert that the Master Complaint does not provide notice of how

8    Defendants' products are defective as compared to other foods because Plaintiffs do not identify a

9    minimum (or "threshold") dose of exposure below which there is no harm.  *See* Collective MTD at

10   10–11.  There is no such thing as a threshold dose for toxic heavy metals.  Regulators and

11   scientific bodies agree that there is no safe level of exposure to toxic heavy metals.  *See* Compl.

12   ¶ 105.  The Court need look no further than the FDA's recently published Final Lead Guidance.

13   *See* Wisner Decl. Ex. 59 (FDA 2025 Final Lead Guidance) at 5 ("No safe level of lead exposure

14   has been identified for protecting children's health.").[45]  Even if the risk decreases with dose, the

15   heavy metals at issue can cause injury at *any* dose.

16       The factual premise of Defendants' argument is therefore false.  To see why, consider

17   smoking and lung cancer.  Although everyone agrees that smoking causes lung cancer (i.e.,

18   general causation), there is no minimum number of cigarettes (i.e., a threshold dose) that scientists

19   claim is safe.  Tobacco smoke is probably the best-studied carcinogen in human history, and yet

20   nobody believes there is a threshold dose or that establishing one is even possible.  This makes

21   sense.  Some people smoke their entire lives and never develop lung cancer.  Some people smoke

22   very little and develop lung cancer.  Similarly, based on the known mechanisms by which metals

23

---

24   [45] *See also* Columbia Mailman School of Public Health, *Arsenic Levels Decline for Highly
     Exposed U.S. Communities Following Regulation* (June 27, 2023) ("[T]here is no known safe
25   level of exposure to inorganic arsenic."), https://www.publichealth.columbia.edu/news/arsenic-
     levels-decline-highly-exposed-u-s-communities-following-regulation; Bose-O'Reilly, et al.,
26   *Mercury Exposure and Children's Health* 40 Curr Probl Pediatr Adolesc Health Care. 8, 1-
     52 (2011),
27   https://pmc.ncbi.nlm.nih.gov/articles/pmc3096006/#:~:text=mercury%20is%20a%20high
     ly%20toxic,frequently%20in%20many%20different%20ways.
28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    can harm early neurodevelopment, it would be impossible to say that there is zero risk from any

2    metal exposure.  It would be equally impossible to say that a baby would need to have been

3    exposed to a specific dose in order to develop an increased risk of neurodevelopmental issues.

4    Some children are able to tolerate higher levels of metal exposure than other children, who may

5    experience neurodevelopmental issues following low levels of exposure.  Whether the dose makes

6    the poison here depends on the person.  Accordingly, whether a specific dose increases a baby's

7    risk of neurodevelopmental harm is a case-specific question that will require consideration of that

8    specific Plaintiff's susceptibilities.  Defendants may (and no doubt will) argue that a particular

9    Plaintiff was not exposed to enough heavy metals through Defendants' products for those products

10   to be considered a cause of the Plaintiff's injuries.  But that argument must wait for the specific-

11   causation phase and expert discovery—it is not a pleading issue.

12        Legally, moreover, there is no *requirement* that Plaintiffs plead—much less prove—a

13   threshold dose.  As the Ninth Circuit has held:

14        [T]hat the minimum threshold level of [toxin] necessary to cause harm … has not yet
15        been established with any degree of certainty does not render [expert testimony
          inadmissible] …While 'precise information concerning the exposure necessary to
16        cause specific harm [is] beneficial, such evidence is not always available, or
          necessary, to demonstrate that a substance is toxic[.]'
17

18   *Clausen v. M/V NEW CARISSA,* 339 F.3d 1049, 1059 (9th Cir. 2003) (quoting *Westberry v.*

19   *Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)); *see also In re Roundup Prods. Liab.*

20   *Litig.*, 2024 WL 1974534, at *6 (N.D. Cal. May 2, 2024) ("The indispensability of 'dose' is not

21   supported by Ninth Circuit precedent ….  The authority seems to be to the contrary.").  Even so,

22   Plaintiffs allege throughout the Master Complaint that the epidemiological literature has identified

23   specific doses of metal exposure capable of causing neurodevelopmental harm that manifests as

24   ASD/ADHD, and that babies can be exposed to such doses through consumption of Defendants'

25   baby food products.  *See* Compl. ¶ 126 ("Defendants manufactured and sold baby food products

26   that, with just a couple of servings, are capable of exposing a baby to lead levels at or above the

27   2.2 ug/day considered by the FDA to be associated with neurodevelopmental harm."); *id.* ¶ 125

28   ("[C]onsumption of Defendants' baby foods, including but not limited to infant rice cereal and

84

rice-based snack baby food products manufactured and sold by Defendants[,] can expose babies to levels of arsenic above that associated with neurodevelopmental harm in the scientific literature."). This is more than sufficient, at the pleading stage, to state a plausible claim that "cumulative exposure" to the "detectable amount of [metals] in baby food [is] a contributing factor to potential neurodevelopmental harm." *Id*. ¶¶ 126, 136.

Defendants cite two inapposite cases—neither involving personal injuries—for their assertion that Plaintiffs must allege a minimum threshold dose. The first, *Grausz v. Hershey Co.*, 713 F. Supp. 3d 818 (S.D. Cal. 2024), concerned alleged violations of state consumer protection statutes. *See id*. at 824. Unlike here, the plaintiffs in *Grausz* did not allege that metal exposure caused a specific injury (such as ASD/ADHD), but asserted that metal exposure was associated with a host of unspecific adverse effects such as "neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death." *Id*. at 828. The *Grausz* plaintiffs also did not plead that the *levels* of metals in the defendants' products were associated with any adverse effects, whereas Plaintiffs allege that cumulative exposure to the metals in Defendants' baby food products—including at dangerous levels reported in the epidemiological literature, which Plaintiffs could reach by consuming baby foods with the metal levels that Congress and others have already identified in Defendants' products—can manifest in diagnoses of ASD/ADHD. *See* Compl. ¶¶ 124-127. The *Grausz* opinion does not stand for the proposition that Plaintiffs must do more to plead a minimum threshold dose, or even that Plaintiffs must plead a minimum threshold at all. In fact, there is no discussion of threshold dose anywhere in the opinion.

Defendants' second case, *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d 1150 (S.D. Cal. 2024), likewise involved claims under state consumer protection statutes. The court held that there was a "disconnect … between [p]laintiffs' allegations about the potential harms posed by Heavy Metals as a general matter and whether these Heavy Metals are unreasonably hazardous *at the particular levels* in the specific Products at issue in this case." *Id*. at 1170. That case, thus, stands in contrast to this one, where the Master Complaint specifically alleges that exposure to the identified levels of metals in Defendants' products can cause the neurodevelopmental effects at issue. *See* Compl. ¶¶ 124–127, 136 ("[E]xisting publicly available

85

evidence indicates that consumption of Defendants' baby food products can expose infants to Toxic Heavy Metals, and that depending on [the] specific milieu of products consumed by each Plaintiff and each Plaintiff's specific susceptibility and circumstances, Defendants' baby food products contributed to each Plaintiff's Toxic Heavy Metal burden during [the] critical period of infant neurodevelopment.").  Plaintiffs' position that heavy metals may also harm neurodevelopment at lower levels is simply a recognition of the scientific and regulatory consensus, and it does not somehow absolve Defendants of notice of the specific bases of Plaintiffs' claims.

*Third*, Defendants attempt to impose an improper proof standard at the pleading stage by arguing that Plaintiffs must demonstrate "how [Defendants'] baby foods allegedly created a greater risk than that which comes just from living in the world and eating food (which all children must do)."  Collective MTD at 12–13.  As Defendants point out, metals are everywhere.  But that is a red herring.  This case is not about how much metal is contained in unidentified products in the U.S. food supply or whether a child was exposed to heavy metals from non-baby-food sources.  Rather, this case is narrowly focused on whether exposure to the levels of metals found in *Defendants' baby food products*, as alleged in the Master Complaint, is capable of harming neurodevelopment.  *See, e.g.*, Compl. ¶¶ 124–127, 136, 68 ("Although Gerber … and Nestlé were fully aware that it was very feasible to source lower-lead ingredients, they proceeded to use high-lead ingredients in their baby foods.").  The extent to which exposure to other, hypothetical sources of metals—from food, soil, air, or water—contributed to the neurodevelopmental harm of a particular Plaintiff is a dispute, to the extent even relevant, to be resolved at trial, not the pleading stage.  The Master Complaint identifies the products at issue and the levels of metals found in Defendants' products—metal levels that can, and did, interfere with Plaintiffs' neurodevelopment sufficient to result in diagnoses of ASD/ADHD.  *See id*. ¶¶ 42–54, 61–96, 105–106, 109–132, 133–139, Appendix A.  Nothing more is required.[46]

_____

[46] Defendants' reliance on *Gagetta v. Walmart*, Inc., 646 F. Supp. 3d 1164 (N.D. Cal. 2022), undercuts their argument.  When faced there with the same argument that Defendants make here,

Whether Defendants' baby food products contain more or less toxic heavy metals than other non-baby foods is, therefore, immaterial.  Whether or not other foods contain toxic heavy metals does not change whether the baby foods manufactured and sold by these Defendants—and consumed by Plaintiffs—were defective.  Even if Defendants can show that other foods contain equally high levels of toxic heavy metals, they might succeed in identifying other unsafe products (especially if intended to be consumed by babies), but they will not succeed in showing that their baby food products were safe.

*Fourth*, Defendants argue that Plaintiffs fail to state plausible defect claims because it is "impossible" to manufacture baby food products without detectable levels of metals.  Collective MTD at 13–14.  This argument fails on multiple fronts.

As an initial matter, Plaintiffs allege that it is possible to produce safe baby foods by, for example, choosing ingredients that, after testing, are shown to not contain detectable levels of metals.  *See* Compl. ¶ 135 ("Such designs are easily accomplished, by only using ingredients that contain non-detectable levels of Toxic Heavy Metals and by testing finished products, before release, to ensure they do not contain Toxic Heavy Metals within them.").  Thus, if Defendants have the choice between two batches of carrots—one contaminated with metal, the other not contaminated with detectable levels of metal—Defendants should select the batch with undetectable metal levels.  If Defendants are not able to source carrots with undetectable levels of metals, Defendants should omit carrots from the formula and manufacture the baby food product with alternative ingredients that test at undetectable levels.  The *N.C.* court acknowledged as much when faced with Defendants' same "metals are everywhere" argument.  *See* Wisner Decl. Ex. 60 (N.C. August 26, 2022 Tr.) at 32:19-33:5 ("And I get it that [Defendants'] argument is those

---

the court held that "this is a question of fact that *cannot* be resolved on a motion to dismiss."  *Id*. at 1179 (emphasis added).  The court dismissed only the implied warranty claim because such a claim requires a "showing that that the products failed to conform[ ] to the standard performance of like products used in the trade," and the plaintiffs did not "plead sufficient facts that the herbs and spices they purchased were unfit for their ordinary purpose as food products."  *Id*. (internal quotation marks and italics omitted).  Plaintiffs here are not making any warranty claims.  Thus, the ultimate finding of *Gagetta* is inapposite.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1    carrots are made just as mother nature made them.  But the plaintiff's argument might well be:

2    Well, [ingredients with detectable levels of metals] shouldn't have been in baby food[.]").

3           This allegation must be accepted at true at this stage.  And it is true.  Consistent with

4    Plaintiffs' allegations, the FDA has explicitly determined:

> It is possible in some cases for manufacturers who have found elevated lead levels in
> sources of food intended for babies and young children to choose sources of food or
> food ingredients with lower lead levels *or no detectable lead*.  Manufacturers should
> conduct increased testing of foods that are historically known to contain elevated lead
> levels; this is particularly important for ingredients or processed foods intended for
> babies and young children.  Additionally, manufacturers should examine and modify
> their facilities, processes, and equipment to ensure that they are not contributing to lead
> in their products.

Wisner Decl. Ex. 59 (FDA 2025 Final Lead Guidance) at 5 (emphasis added).

           Moreover, Plaintiffs do not bring only design and manufacturing defect claims.  Plaintiffs

also allege that Defendants' products were defective because Defendants *failed to warn* of the

presence of detectable levels of metals in their foods.  *See* Compl. ¶ 133 ("Defendants' baby food

products that contained detectable levels of Toxic Heavy Metals … were defective as it relates to

warnings because no Defendant has ever warned about the presence of Toxic Heavy Metals in

their baby foods.").  It is irrelevant to this claim whether it was feasible for Defendants to

manufacture baby foods without detectable levels of metals.  Defendants, across the board, failed

to warn consumers of the presence—or levels—of metals in their baby foods, thereby depriving

Plaintiffs' parents of the opportunity to make an informed choice and resulting in Plaintiffs'

exposure to elevated metal levels capable of interfering with neurodevelopment.  *See id.* ¶ 136.  As

California's Baby Food Protection Act takes effect and requires heavy metal testing results on

baby food product labels, Defendants will be forced to give parents the chance to make a choice.

But they have never done so on their own.  To the contrary, by emphasizing that their products are

"organic," they have suggested that their products are safe and healthy despite knowing that their

products were contaminated with high levels of toxic heavy metals.  *See, e.g.*, *id.* ¶¶ 80, 93.

           In any event, whether it is feasible to produce baby foods without detectable levels of

metals ultimately requires resolving fact-intensive issues that are improper to resolve at the

1    pleading stage.  *See Gagetta,* 646 F. Supp. 3d at 1179 ("[T]his is a question of fact that cannot be

2    resolved on a motion to dismiss.").  Defendants identify no issue with Plaintiffs' dose allegations

3    that properly call for dismissal at this stage.

4         **C.    The Master Complaint Plausibly Alleges Manufacturing Defects**

5         The Court should likewise deny Defendants' challenge to the Master Complaint's

6    manufacturing defect claims.

7         A manufacturing defect exists where the plaintiff "[(1)] has been injured by the product;

8    (2) the injury occurred because the product was defective; and (3) the defect existed when the

9    product left the hands of the defendant."  *Tucker v. Wright Med. Tech.*, Inc., No. 11-CV-03086-

10   YGR, 2013 WL 1149717, at *10 (N.D. Cal. Mar. 19, 2013); CACI 1201 ("Strict Liability—

11   Manufacturing Defect—Essential Factual Elements").  A product is defectively manufactured

12   (rather than defectively designed) if "the product differs from the manufacturer's intended result

13   or from other ostensibly identical units of the same product line."  *Id.* (internal quotation and

14   citation omitted).

15        The Master Complaint satisfies all these elements.  First, it is undisputed that the Master

16   Complaint alleges that Plaintiffs were injured by the baby food products identified in the

17   Complaint.  *See, e.g.*, Compl. ¶ 169.  Second, the Master Complaint alleges that the injury

18   occurred because of the baby foods' defect (namely, their levels of toxic heavy metals).  *See, e.g.*,

19   *id.*  Third, the Master Complaint alleges that the defects existed in the baby food products when

20   they left the hands of the Defendants.  *See, e.g.*, *id.* ¶ 161.  The Master Complaint further alleges

21   that, if Defendants did not intend to manufacture baby foods contaminated with toxic heavy

22   metals, then their products' defects were manufacturing defects.  *See, e.g.*, *id.* ¶ 163 & n.1.

23        Defendants nonetheless argue that Plaintiffs must "identify/explain how the product either

24   deviated from the defendant's intended result/design or how the product deviated from other

25   seemingly identical product models."  Collective MTD at 14 (cleaned up).  But as courts in this

26   Circuit have explained, Plaintiffs need not provide a "detailed technical discussion of Defendants'

27   design and manufacturing specifications … to survive a motion to dismiss."  *Dehart v. Johnson &*

28   *Johnson*, 562 F. Supp. 3d 189, 194 (D. Ariz. 2022).  In *Dehart*, for example, the plaintiff simply

alleged that the medical device at issue was "manufactured in a manner that deviated materially from Defendants' design specifications" and "was cut in such a manner creating unintended sharp edges in this product which in turn caused [harm]." *Id.* at 193. Those allegations were enough to state a manufacturing defect claim. *See id.*

The Master Complaint is just as (and indeed far more) detailed. Plaintiffs allege that Defendants sold products with toxic heavy metals that were not supposed to be in the products, either due to improper sourcing or by failing to adhere to their own internal specifications. Plaintiffs are not, at this stage, required to provide "a fine level of pleading detail." *Id.* at 194. Other courts in this Circuit agree. *See, e.g.*, *Underwood v. O'Reilly Auto Parts, Inc.*, 699 F. Supp. 3d 1049, 1060 (D. Nev. 2023) (allegation that defendant included benzene in product despite awareness of extreme degree of risk associated with benzene exposure, "while lacking in detail," was sufficient to allege a manufacturing defect).

Even if Plaintiffs needed something more, the Master Complaint has it. For example, the Master Complaint alleges:

- Defendants did not routinely adhere to their own internal metal specifications or standards. *See* Compl. ¶ 59.

- Defendants used ingredients and manufactured and sold baby foods that contained levels of Toxic Heavy Metals far higher than what was internally set by Defendants. *See id.*

- Defendants tested products after they had been put on the market, learning about the products' extremely high levels of toxic heavy metals after-the-fact (and then taking no action to recall the product or warn consumers about the issue). *See id.*

- The water used at some of the facilities where the baby foods were manufactured contained toxic heavy metals that, in turn, ended up in the finished baby food products sold for consumption by babies. *See id.* ¶ 54.

- Defendants' baby food products thus contained detectable levels of toxic heavy metals that, by design, were not supposed to be there. *See id.* ¶ 134. After all, toxic heavy metals do not provide any nutritional or therapeutic value to babies, or fully-grown humans, and toxic heavy metals are poisonous to neurodevelopment. *See id.*

90

1    As an illustration, consider the Master Complaint's allegations about Nurture.  Nurture

2  began testing its finished baby food products in 2013, after it was acquired by Danone.  *See id*.

3  ¶ 76.  Nurture and Danone knew of the dangers that the heavy metals in their food posed to

4  children.  *See id*. ¶ 78.  Yet they failed to test those products for heavy metals with any frequency,

5  or to test products before they were released for sale.  *See id*. ¶ 76.  The story is no different for

6  any other Defendant.  At all relevant times, each Defendant knew that heavy metals should not be

7  in their products, yet they sold products with heavy metal content beyond their own specifications

8  and limits (to the extent they had any).  *See, e.g.*, *id*. ¶ 59.  Defendants chose to allow these metals

9  in their products, and not to inform parents, because they knew parents would not buy their

10  products with knowledge of that defect.  But, if Defendants did not intend the defect, then it is a

11  manufacturing defect—because the defect emerged from the way the products were made.

12    Defendants cite *In re Toyota*, which supports *Plaintiffs'* argument here.  When dismissing

13  the manufacturing defect claim in that case, the court noted that "a bare allegation that the product

14  has a manufacturing defect is an insufficient legal conclusion."  *In re Toyota Motor Corp.*, 754

15  F. Supp. 2d 1208, 1222 (C.D. Cal. 2010) (internal quotations and citations omitted).  And so it is.

16  The court there faced a mere allegation that the car at issue "failed to conform with its

17  manufacturing specifications," because the complaint had failed to explain what those

18  specifications were or how they related to the injury or to the defect alleged to have caused injury.

19  *Id*.  The Master Complaint here bears no resemblance.  It identifies relevant specifications for the

20  allowable heavy metal content of Defendants' baby food products—Defendants allegedly set

21  them.  And it explains how Defendants' deviations from these specifications led to Plaintiffs'

22  neurodevelopmental disorders and related injuries.

23    Finally, it is irrelevant to Plaintiffs' manufacturing defect claim that Plaintiffs also assert a

24  design defect claim.  Plaintiffs may "raise alternative and even inconsistent claims."  *Beluca*

25  *Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 812–13 (N.D. Cal. 2022); *see* FED. R. CIV. P.

26  8(d).  Indeed, plaintiffs assert both manufacturing and design defect claims all the time.  *See, e.g.*,

27  *Blissard v. FCA US LLC*, No. LACV1802765JAKJEMX, 2018 WL 6177295, at *6 (C.D. Cal.

28  Nov. 9, 2018) ("[T]he presence of design defect allegations in a complaint does not preclude

1    pleading a manufacturing defect in the alternative."); *Reynolds*, 700 F. Supp. 3d 830 at 838. There

2    is nothing inconsistent about alleging that Defendants' products were contaminated with toxic

3    heavy metals *either* because they were intended to be *or* because of a manufacturing defect. The

4    metals got there one way or another, and Plaintiffs were injured as a result. If Defendants wish to

5    concede that they designed their products to contain toxic heavy metals, they are welcome to do

6    so. Otherwise, Plaintiffs' well-pled manufacturing defect claim may proceed.

7    **D.    The Parent Defendants Are Proper Parties**

8    Some Parent Defendants repeat their standing and personal-jurisdiction arguments as

9    Rule 12(b)(6) arguments, contending that the Master Complaint also fails to state a claim against

10   them because their formal corporate separation from their baby food brands shields them from

11   liability for those brands. As seen above, these arguments fail in light of the allegations and

12   discovery to date. For Rule 12(b)(6) purposes, they also fail in light of the allegations alone.

13   Defendants make much of the "general principle," as articulated by the Supreme Court in

14   *Bestfoods*, that "a parent corporation (so-called because of control through ownership of another

15   corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*,

16   524 U.S. 51, 61 (1998). Defendants neglect to mention what the Supreme Court went on to say:

17   "But there is an *equally fundamental* principle of corporate law, applicable to the parent-subsidiary

18   relationship as well as generally, that the corporate veil may be pierced and the shareholder held

19   liable for the corporation's conduct" in various circumstances. *Id*. at 62 (emphasis added). As

20   particularly relevant here,

21        principles of corporate separateness "have been *plainly and repeatedly* held not
     applicable where stock ownership has been resorted to, not for the purpose of
22   participating in the affairs of a corporation in the normal and usual manner, but
     for the purpose … of controlling a subsidiary company so that it may be used as a
23   mere *agency or instrumentality* of the owning company."

24

25   *Id*. (quoting *Chicago, M. & St. P.R. Co. v. Minneapolis Civic and Commerce Assn.*, 247 U.S. 490,

26   501 (1918)) (emphases added). As noted, such direct parental involvement establishes direct

27

28

92

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1  parental liability.  *See id.* at 64–65; *see also supra* Argument Part II.[47]

2        The Parent Defendants thus cannot get themselves dismissed from this MDL merely by

3  pointing to their parental status.  There is a difference between "[n]ormal parental involvement,"

4  which does not give rise to liability, and "direc[t] participat[ion] in its subsidiary's alleged bad

5  acts," which does.  *Bastidas v. Good Samaritan Hosp.*, No. C 13-04388 SI, 2014 WL 3362214, at

6  *4 (N.D. Cal. July 7, 2014).  Normal parental involvement includes the "'monitoring of the

7  subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and

8  articulation of general policies and procedures.'"  *Id.* (quoting *Bestfoods*, 524 U.S. at 72).  These

9  activities are "consistent with the parent's investor status."  *Bestfoods*, 524 U.S. at 72.[48]  But it is a

10  different story "when 'the alleged wrong can seemingly be traced to the parent through the conduit

11  of its own personnel and management and the parent is directly a participant in the wrong

12  complained of.'"  *Bastidas*, 2014 WL 3362214, at *4 (quoting *Bestfoods*, 524 U.S. at 72).  In that

13  case, the parent entity is more than a mere stockholder or investor, and it may be subject to

14  liability.  *See id.*

15        The Master Complaint alleges that each Parent Defendant was more than a mere

16  stockholder.  Each Parent Defendant "has been directly involved in the tortious conduct in the

17  United States and its various states that give rise to these lawsuits" though the control that each

18  Parent Defendant exercised over the design, manufacturing, and, ultimately, safety of its

19  respective baby food brand.  Compl. ¶ 11 (Hero Group); *see also id.* ¶ 16 (Nestlé) (same); *id.* ¶ 21

20  (Danone) (same); *id.* ¶ 25 ("Campbell exercised control over Plum's baby food selling in the

21

22  ───────────────

23  [47] Courts in this Circuit also recognize that parent entities can be liable for aiding and abetting
their subsidiaries' wrongdoing.  *See whiteCryption Corp. v. Arxan Techs., Inc.*, No. 15-CV-00754-
24  WHO, 2015 WL 3799585, at *4 (N.D. Cal. June 18, 2015) (considering this theory even where
not clearly argued).  Even if the facts alleged herein did not suffice to establish the Parent
25  Defendants' direct liability through their control over their subsidiary agents, the allegations
would at least suffice to state a claim for aiding and abetting.

26  [48] Since *Bestfoods* was discussing policies consistent with "investor status," this reference is
27  properly understood to cover administrative matters like "billing guidelines," not the pervasive
control over product quality policies alleged here.  *Wallis v. Centennial Ins. Co.*, No. CIV. 08-
28  02558 WBS, 2013 WL 3803971, at *4 (E.D. Cal. July 19, 2013).

1   United States until May 3, 2021."); *id*. ¶ 26 ("Sun-Maid has since [May 3, 2021] been directly

2   involved with all aspects of the safety and testing of Plum's baby food products.").  Underlying

3   these general allegations are more specific allegations about each Parent Defendants' involvement.

4   Hero Group "made executive-level decisions for Beech-Nut concerning the acquisition of testing

5   machines need[ed] to test baby foods for heavy metal."  *Id*. ¶ 11.  Nestlé's employees and

6   scientists "set safety standards at Gerber," conducted training under those standards, and testified

7   in state-court litigation "on behalf of Gerber regarding the safety of Gerber's baby food products."

8   *Id*. ¶ 16.  Danone "set standards" and "made executive-level business decisions" regarding

9   Nurture's baby food products and either employed or directly controlled and trained "many of the

10  scientists and researchers that monitored the safety of toxic heavy metals in [Nurture's] baby

11  food."  *Id*. ¶ 21.  Campbell likewise employed or directly controlled and trained "many of the

12  scientists and researchers that monitored the safety of toxic heavy metals in Plum's baby foods,"

13  and Campbell attorneys responded to the Congressional Subcommittee's inquiries about heavy

14  metals in Plum baby foods, which were directed at Campbell.  *Id*. ¶ 25.  And after Sun-Maid took

15  over from Campbell "[a]ll major executive functions related to Plum's operation," Sun-Maid has

16  paid for metal testing of Plum products, the results of which are "sent directly to Sun-Maid's

17  scientists and executives," not Plum's.  *Id*. ¶ 26.

18      These allegations by no means cover the full extent of the Parent Defendants' involvement

19  in their respective baby food brands.  But neither are they "[n]ormal parental involvement."

20  *Bastidas*, 2014 WL 3362214, at *4.  These allegations indicate "pervasive and continual" control

21  by each Parent Defendant over its respective subsidiary, including over the matters directly at

22  issue here—in short, the safety of their baby foods.  *Wallis v. Centennial Ins. Co., Inc.*, No. CIV.

23  08-02558 WBS, 2013 WL 3803971, at *4 (E.D. Cal. July 19, 2013).  Each Parent Defendant has

24  "moved beyond the establishment of general policy and direction for the subsidiary" and has "in

25  effect taken over performance of the subsidiary's day-to-day operations in carrying out that

26  policy" with regard to the heavy metals that injured Plaintiffs.  *whiteCryption Corp. v. Arxan*

27  *Techs., Inc.*, No. 15-CV-00754-WHO, 2015 WL 3799585, at *2 (N.D. Cal. June 18, 2015)

28  (cleaned up).  Acquiring testing machines and test results, training and controlling the employees

94

1  in charge of food safety, testifying on behalf of a subsidiary: these "are eccentric under accepted

2  norms of parental oversight," not the actions of a mere investor.  *Bestfoods*, 524 U.S. 51 at 72.

3       Claims against parent entities are frequently dismissed because plaintiffs fail to allege

4  enough facts to overcome the "general principle" of corporate independence.  *Id*. at 61.  This case

5  clears the bar.  In *Wallis*, the district court denied a parent entity's motion to dismiss on the basis

6  of its parental status because the parent's alleged control over its subsidiary was sufficiently

7  pervasive and continual to establish an agency relationship.  Specifically, the parent had "assumed

8  responsibility" for litigation over an insurance policy issued by the subsidiary, much like Nestlé

9  (and other Parent Defendants) have assumed responsibility in litigation over their subsidiary's

10  baby foods by, *e.g.*, providing Parent employees as the persons most qualified to testify about the

11  design, manufacturing, and safety of those foods.  *Wallis,* 2013 WL 3803971, at *4.  These

12  litigation-related "acts appear[ed] to be the quotidian responsibilities that" the subsidiary "would

13  normally complete."  *Id*.  And the parent's assumption of tasks that its subsidiary would

14  "normally" handle sufficed at the dismissal stage to allow claims against the parent to proceed.

15       By contrast, in *whiteCryption* this Court found a parent entity's alleged involvement "too

16  sporadic" to subject the parent to liability on agency grounds.  *whiteCryption,* 2015 WL 3799585,

17  at *3.  That involvement consisted of a few alleged statements by parent executives and employees

18  related to the contract at issue, none of which, on their face, suggested parental control over the

19  subsidiary's contractual obligations.  *See id*.  These allegations are a far cry from the Parent

20  Defendants' alleged control over their subsidiaries' baby foods.  Likewise in *Saaiman*, the court

21  found that the plaintiffs' allegations simply failed to suggest parental involvement in a particular

22  life-insurance policy issued by a subsidiary; indeed, the plaintiff tried to draw that connection

23  based on references to *other* companies in some correspondence.  *See Saaiman v. Am. Gen. Life*

24  *Ins. Co., Inc.*, No. 18-CV-596-BTM-AGS, 2019 WL 1864858, at **4–5 (S.D. Cal. Apr. 25, 2019).

25  In *Bastidas*, this Court observed that plaintiffs can state an agency theory in cases with "dual

26  status individuals"—i.e., "directors and officers holding positions with a parent and its

27  subsidiary"—by alleging facts showing that such "individuals were acting in the parent's interest,

28  and not the subsidiary's, when they engaged in the challenged conduct."  *Bastidas*, 2014 WL

3362214, at *4 (quoting *Bestfoods*, 524 U.S. 51 at 69). In that case, the plaintiffs had alleged "no facts" to that effect. *Id.* In this case, the Master Complaint alleges that relevant officers and employees were officers and employees *of the Parent Defendants*, acting in the Parent Defendants' interest, when they engaged in the conduct alleged.

Defendants' other cited cases are similarly inapposite. In *Sarmiento*, for example, a parent entity was named as a defendant "solely" because it was a parent entity; the complaint "fail[ed] to outline facts that would shed any light on why" the parent was included; and the plaintiffs "ignored this argument" in their dismissal briefing. *Sarmiento v. Bank of New York Mellon*, No. CIV. 10-00349 JMS, 2011 WL 884457, at *3 (D. Haw. Mar. 10, 2011). None of that is true here. And in *Ranza*, the plaintiff attempted only to establish "*general* personal jurisdiction." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1065 (9th Cir. 2015) (emphasis added). Although the Ninth Circuit denied that attempt, the Court noted that the alleged contacts "may have sufficed to establish specific jurisdiction." *Id.* at 1069.

The mere fact of owning a subsidiary, or sharing employees, or setting high-level administrative policies does not establish parental liability. But Plaintiffs allege far more. Simply put, the Master Complaint alleges what every parent did wrong and how they did it through their involvement in and control over their subsidiary baby food businesses. Thus, no parent has a claim for dismissal under Rule 12(b)(6).

## V.    THE RULE 12(f) MOTION SHOULD BE DENIED AS TO FORMULA-BASED BABY FOOD PRODUCTS[49]

Exposing the developing brain of a baby to toxic heavy metals can cause neurodevelopmental harm that manifests as ASD and/or ADHD. This lawsuit alleges that those exposures occurred from consumption of Defendants' baby foods, i.e., products aimed to provide sustenance to babies. Baby formula is a type of baby food. Indeed, because the product is ingested at the earliest ages, at the point of some of the most rapid brain development, it poses

---

[49] Having consulted with experts, Plaintiffs do not intend to pursue claims related to aluminum contamination in Defendants' baby foods. To the extent a future plaintiff would like to include such a claim, they will need to add those allegations into their short form complaint.

some of the most acute risks.  Accordingly, the HBBF report, which is what spurred the Congressional investigation and, ultimately, led to this litigation, specifically identifies baby formula as one of the types of baby food products that HBBF tested and that contained toxic heavy metals.  *See* Compl ¶ 39; Wisner Decl. Ex. 1 (HBBF Report) at 12, 20.  Nurture, Hain, Gerber, Walmart, and Plum all manufacture and sell formula-based baby food products under the *same* baby food product brands, i.e., Happy Baby (Nurture), Parent's Choice (Walmart), Earth's Best Organics (Hain), Gerber, and Plum Organics.  These products are sold in the same aisle and in same section of the grocery store as other baby foods and are specifically marketed according to stages and age ranges—again, like all baby food.  Indeed, parents often use baby formula and other baby food products like rice cereal at the same time—mixing them together.  According to the HBBF report, the Defendants' formula-based baby food products *all* contain arsenic and lead. *See id*. at 20.  In the Congressional Report, the Subcommittee also incorporated baby formula as one of the baby food products at issue.  *See, e.g.*, Wisner Decl. Ex. 5 (Feb. 2021 Congress Rpt.) at 35 ("Nurture conveyed to the Subcommittee that after January of 2019, it had a goal threshold of 50 ppb for lead in all of its baby food products—infant formula, cereals, and wet foods.  However, in the test results that Nurture provided to this Subcommittee, it was still using 100 ppb as an internal guideline after January 2019.").  Indeed, the employees responsible for infant formula-based baby foods are the same employees responsible for other baby foods within these Defendants' companies.  They do not distinguish infant formula as a non-baby food product within their corporate structures.

This is why baby formula is listed as one the baby food products that are at issue in this litigation—products sold by Defendants that some Plaintiffs consumed, which were contaminated with toxic heavy metals and, thus, contributed to those Plaintiffs' neurodevelopmental harm.  If, as Plaintiffs allege, a Plaintiff consumed a Defendant's formula-based baby food product, in addition to other baby foods, and that product contained toxic heavy metals, then baby formula would be one of the products that contributed to the overall body burden of toxic heavy metal that the Plaintiff experienced because of the Defendant's products and, thus, would have contributed to the Plaintiff's injury.

1    Under Rule 12(f), the Court may strike an "insufficient defense, or any redundant,

2    immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  The purpose of a Rule 12(f)

3    motion is to avoid spending time and money litigating spurious issues.  *See Fantasy, Inc. v.*

4    *Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).  A

5    matter is immaterial if it has no essential or important relationship to the claim for relief pleaded.

6    *See id*. at 1527.  A matter is impertinent if it does not pertain and is not necessary to the issues in

7    question in the case.  *See id*.

8    Here, Defendants invoke Rule 12(f) to strike the formula-based baby food products listed

9    on Appendix A to the Master Complaint, but they do not explain why striking these products from

10   the Appendix is appropriate under Rule 12(f).  In fact, it is undisputed that Plaintiffs allege that

11   (1) these formula-based baby food products are manufactured and sold by these Defendants under

12   the same baby food brand; (2) these formula-based baby food products were consumed by certain

13   Plaintiffs as babies; (3) these formula-based baby food products contain toxic heavy metals; and

14   (4) these formula-based baby food products likely contributed to certain Plaintiffs' toxic heavy

15   metal body burden.  These products are, thus, part of the milieu of Defendants' baby food products

16   that Plaintiffs consumed and are a necessary part of this case.

17   Defendants argue that baby formula is different than other baby foods because it has

18   different regulations.  But that is yet another red herring.  Different regulations govern different

19   types of baby foods—from rice cereal to juice to baby formulas—but that does not mean rice

20   cereal or baby formula are not part of this lawsuit.  Defendants market and sell various forms of

21   baby food, designed to be consumed by babies, and different regulations and standards govern

22   those different types of foods.  That surely does not serve as a basis to strike allegations in a

23   complaint about one of those baby foods.  Doing so would effectively force any plaintiff that

24   believes Defendants' formula-based baby foods contributed to their injury to file a separate

25   lawsuit in a different court even though that plaintiff's injury is the same, even though the theory

26   of liability and causation is the same, and even though the Defendants are the same.  There is

27   simply no basis to strike formula-based baby food products from Appendix A.  This case has

28   always considered formula-based baby food to be part of this litigation.

Defendants also cite the JPML's order creating this MDL to suggest that formula-based baby food products were not meant to be part of this MDL. But that is simply untrue. The JPML was very clear about what this MDL would entail:

> Plaintiffs in each action, who are minors, allege they were exposed to elevated quantities of toxic heavy metals (namely, arsenic, lead, cadmium, and mercury) from consuming defendants' baby food products and, as a result, suffered brain injury that manifested in diagnoses of autism spectrum disorder (ASD) and/or attention deficit hyperactivity disorder (ADHD). ***All actions share common issues of fact regarding the presence of heavy metals in defendants' products***, ***their knowledge of and testing for heavy metals in their products, whether the presence of these heavy metals could have caused plaintiffs' alleged injuries, and whether defendants adequately warned of the presence of heavy metals in their products.***

*In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 730 F. Supp. 3d 1371, 1372 (J.P.M.L. 2024) (emphasis added). At no time did the JPML state or suggest that this MDL was limited to baby food products that contain grains or fruits. Rather, the MDL was formed to deal with heavy metal contamination in the Defendants' *products* that were consumed by Plaintiffs—one of which includes the formula-based baby food products that these Defendants sold and that were contaminated with toxic heavy metals. This is why baby formula is listed as a baby food product in the Congressional reports and the HBBF reports—the very documents that started this entire litigation. The motion to strike should be denied as it pertains to formula-based baby foods.

## CONCLUSION

For the foregoing reasons, and with the exception of Defendants' motion to strike allegations related to aluminum, Defendants' motions should be denied.

Dated: January 16, 2025                    Respectfully Submitted,

COOPER LAW PARTNERS PLLC

By: */s/ Joseph O. Masterman*
Joseph O. Masterman (*pro hac vice*)
joe@cooperlawpartners.com
1717 Pennsylvania Ave. NW, Suite 1025
Washington, DC 20006
Telephone: (202) 866-0173

*Plaintiffs' Steering Committee Member*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

2      By: */s/ R. Brent Wisner*
       R. Brent Wisner (SBN: 279023)
3      rbwisner@wisnerbaum.com
       WISNER BAUM, LLP
4      100 Drakes Landing Rd., Suite 160
       Greenbrae, CA 94904
5      Telephone: (310) 207-3233
       Facsimile: (310) 820-7444
6

7      By: */s/ Aimee H. Wagstaff*
       Aimee H. Wagstaff (SBN: 278480)
8      awagstaff@wagstafflawfirm.com
       WAGSTAFF LAW FIRM
9      940 N. Lincoln Street
       Denver, Colorado 80203
10     Telephone: 303.376.6360

11     *Co-Lead Counsel for Plaintiffs in MDL 3101*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

## **CERTIFICATE OF SERVICE**

2

I certify that on January 16, 2025, I electronically filed the foregoing Opposition with the

3

Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of

4

record.

5

6

7

By: *R. Brent Wisner*
R. Brent Wisner (SBN: 279023)

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28