UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: BABY FOOD PRODUCTS
LIABILITY LITIGATION

Case No.  24-md-03101-JSC

This document relates to:

ALL ACTIONS

**AMENDED ORDER RE DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STRIKE**

Re: Dkt. Nos. 275, 276, 277, 281, 282, 284, 300

On April 11, 2024, the Judicial Panel on Multidistrict Litigation centralized in this Court 10 pending actions involving common questions of fact.  (Dkt. No. 1.)[1]  Plaintiffs in these cases— and over 100 subsequently filed actions—allege the presence of toxic heavy metals in baby food caused children to develop autism spectrum disorder ("ASD") and attention deficit hyperactivity disorder ("ADHD").  Defendants comprise various baby food manufacturers as well as the foreign and domestic parent companies of those entities.  The Master Complaint asserts seven causes of action under strict products liability and negligence theories: 1) failure to warn (strict products liability); 2) manufacturing defect (strict products liability); 3) design defect (strict products liability); 4) failure to warn (negligence); 5) manufacturing defect (negligence); 6) design defect (negligence); and 7) general negligence.  Defendants move to dismiss the Master Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  Defendants also move to strike certain portions of the Master Complaint pursuant to Rule 12(f).

Having considered the parties' submissions, and with the benefit of oral argument heard on February 27, 2025, the Court GRANTS in part and DENIES in part Defendants' motions to

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

United States District Court
Northern District of California

dismiss.  The Court GRANTS the motion to strike references to aluminum and tentatively GRANTS the motion to strike references to infant formula from the Master Complaint.

## DISCUSSION

This Order addresses seven pending motions, which are grouped as follows: 1) jurisdictional motions brought by foreign parent companies of subsidiary manufacturer defendants; 2) Rule 12(b)(6) motions brought by domestic parent companies of subsidiary manufacturer defendants; and 3) a collective Rule 12(b)(6) and 12(f) motion brought by the manufacturer defendants.

"In an MDL, the transferee court applies the law of its circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 823 (N.D. Cal. 2023) (citation omitted).  For each of the subsequent sections, the Court sets out the relevant standard, and when appropriate, discusses state-law discrepancies.

## I.    JURISDICTION OVER FOREIGN PARENT DEFENDANTS

Three Foreign Parent Defendants move to dismiss on jurisdictional grounds: Nestlé S.A., a Swiss parent to Defendant Gerber Products Company; Hero AG, a Swiss parent to Defendant Beech-Nut Nutrition Company; and Danone S.A., a French parent to Defendant Nurture, LLC.[2] All three Foreign Parent Defendants argue the Court lacks personal jurisdiction over them.  Hero AG further argues the Court lacks subject-matter jurisdiction.  The Court briefly addresses the question of subject-matter jurisdiction prior to performing the personal jurisdiction analysis.[3]

### A.    Subject-Matter Jurisdiction

A complaint must be dismissed when the district court lacks subject-matter jurisdiction to

---

[2] A fourth parent company, Nestlé Holdings, Inc., also moved to dismiss for lack of personal jurisdiction, or in the alternative, for failure to state a claim.  (*See* Dkt. No. 282.)  Plaintiffs have since voluntarily dismissed their claims against Nestlé Holdings, Inc.  (Dkt. No. 333.)  Therefore, the motion to dismiss is DENIED AS MOOT.

[3] Additionally, both Hero AG and Danone S.A. argue Plaintiffs fail to state a claim under Rule 12(b)(6).  (Dkt. Nos. 281 at 21-22 (Hero AG), 284 at 28 (Danone S.A.).)  The Court does not reach those arguments as the motions can be resolved on personal jurisdiction grounds.

1   hear the dispute.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-22 (9th Cir.

2   2010).  Article III of the United States Constitution limits federal courts "to deciding cases and

3   controversies," which requires the plaintiff to have standing to bring suit.  *Bova v. City of*

4   *Medford*, 564 F.3d 1093, 1095 (9th Cir. 2009) (cleaned up).  To establish standing, the plaintiff

5   must plausibly allege three elements:

6               (1) it has suffered an 'injury in fact' that is (a) concrete and
                particularized and (b) actual or imminent, not conjectural or
7               hypothetical; (2) the injury is fairly traceable to the challenged action
                of the defendant; and (3) it is likely, as opposed to merely speculative,
8               that the injury will be redressed by a favorable decision.

9   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000).

10  Further, it is "[t]he party asserting federal subject-matter jurisdiction [who] bears the burden of

11  proving its existence."  *Chandler*, 598 F.3d at 1122.

12          Hero AG's motion focuses on standing's causation prong.  "To show causation, the

13  plaintiff must demonstrate a causal connection between the injury and the conduct complained

14  of—the injury has to be fairly traceable to the challenged action of the defendant, and not the

15  result of the independent action of some third party not before the court."  *Salmon Spawning &*

16  *Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008).  Moreover, "[p]roximate

17  causation is not a requirement of Article III standing, which requires only that the plaintiff's injury

18  be fairly traceable to the defendant's conduct."  *Lexmark Int'l, Inc. v. Static Control Components,*

19  *Inc.*, 572 U.S. 118, 134 n.6 (2014).

20          Hero AG argues Plaintiffs fail to plausibly allege standing since the Master Complaint

21  contains "no allegations specific to Hero AG that would trace an individual plaintiff's alleged

22  injuries *to Hero AG*."  (Dkt. No. 281 at 23 (emphasis in original).)  But this argument is not a

23  distinct challenge to subject-matter jurisdiction so much as a reiteration of Hero AG's challenge to

24  the sufficiency of Plaintiffs' allegations under Rule 12(b)(6).[4]  But even if considered through a

25  standing lens, Hero AG's argument does not take it far.  When questions of subject-matter

26  jurisdiction are entwined with questions of fact going to the merits of the case, the court must

27  _____

28  [4] As explained in footnote 3, *supra*, the Court does not reach the 12(b)(6) argument since Hero
    AG's motion can be resolved on personal jurisdiction grounds.

United States District Court
Northern District of California

1    defer the jurisdictional question until a ruling on the merits.  *See Safe Air for Everyone v. Meyer*,

2    373 F.3d 1035, 1039 (9th Cir. 2004) (citing *Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138,

3    139 (9th Cir.1983)) (holding a "[j]urisdictional finding of genuinely disputed facts is inappropriate

4    when 'the jurisdictional issue and substantive issues are so intertwined that the question of

5    jurisdiction is dependent on the resolution of factual issues going to the merits' of an action").

6    Such is the case here, as Hero AG argues Plaintiffs fail to allege sufficient facts to establish Hero

7    AG's involvement in heavy metal testing of Beech-Nut's baby food—the core of the products

8    liability and negligence claims.

9         So, Hero AG's motion is DENIED to the extent it asserts a lack of subject-matter

10   jurisdiction.

11        **B.     Personal Jurisdiction**

12        To exercise personal jurisdiction over a nonresident defendant, the defendant must have

13   had at least "minimum contacts" with the forum "such that the exercise of jurisdiction 'does not

14   offend traditional notions of fair play and substantial justice.'"  *Schwarzenegger v. Fred Martin*

15   *Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (citation omitted).  Personal jurisdiction can be

16   either general or specific.  General personal jurisdiction arises when "the defendant's contacts with

17   the forum state [are] 'so continuous and systematic as to render [it] essentially at home in the

18   forum State.'"  *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023) (citation omitted).

19   To determine specific personal jurisdiction in tort cases, the court inquires "whether a defendant

20   'purposefully direct[ed] his activities' at the forum state, applying an 'effects' test that focuses on

21   the forum in which the defendant's actions were felt, whether or not the actions themselves

22   occurred within the forum."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433

23   F.3d 1199, 1206 (9th Cir. 2006) (citation omitted).

24        Absent a federal statute governing personal jurisdiction, a district court applies the long-

25   arm statute of the forum state to determine the court's reach.  *See Yamashita*, 62 F.4th at 502.  In

26   the case of an MDL, "the [transferee] court is entitled to exercise personal jurisdiction over each

27   defendant only to the same degree that the original transferor court could have."  *In re JUUL Labs,*

28   *Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 674 (N.D. Cal. 2020).  So,

United States District Court
Northern District of California

4

the Court must refer to the long-arm statutes of the transferor courts' forum states.  Given the variety of states implicated by this MDL, the Court conducts the personal jurisdiction analysis under the most permissive standard, that is, permitting jurisdiction to the full extent the United States Constitution allows.

Lastly, "[w]here a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger*, 374 F.3d at 800.  The court assumes the truth of any uncontested allegations, but a defendant may dispute facts through supporting affidavits or evidence.  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020).  Once the defendant has raised a factual dispute as to the complaint's jurisdictional allegations, the burden shifts to the plaintiff to "make a *prima facie* showing of jurisdictional facts."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (citation omitted).

Here, Plaintiffs do not meaningfully discuss general personal jurisdiction over the Foreign Parent Defendants.[5]  Consequently, the Court addresses only the specific personal jurisdiction analysis.  So, under the purposeful direction test, Plaintiffs must make a *prima facie* showing that the Foreign Parent Defendants directed activities involving the manufacture of baby food to the forum states.  As Plaintiffs clarified at the hearing, their theory of purposeful direction is that Foreign Parent Defendants set heavy metal testing limits for the baby food products.

Further, Plaintiffs do not advance an alter ego theory of specific personal jurisdiction.  Rather, Plaintiffs base their arguments either on Defendants' "own 'sufficient, direct contacts with the forum state,' [] or on the contacts of a subsidiary that 'acts as [the parent's] agent' in relevant actions."  (Dkt. No. 380-3 at 75 (citations omitted).)  Though the Supreme Court rejected the agency theory of general personal jurisdiction in *Daimler AG v. Bauman*, the Court noted the potential relevance of agency to the specific personal jurisdiction analysis.  571 U.S. 117, 135 n.13

---

[5] Plaintiffs state they "do not concede a lack of general personal jurisdiction, which jurisdictional discovery, if ordered, may reveal."  (Dkt. No. 380-3 at 72 n.34.)  However, Plaintiffs do not otherwise advance any arguments to dispute the Foreign Parent Defendants' assertion that general personal jurisdiction does not exist.  Therefore, the Court addresses only those arguments on specific personal jurisdiction where Plaintiffs have contested Defendants' position.

United States District Court
Northern District of California

(2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.").  That said, the Ninth Circuit in *Williams v. Yamaha Motor Co*., 851 F.3d 1015, 1024 (9th Cir. 2017), noted "the *Daimler* Court's criticism of the *Unocal* [agency] standard found fault with the standard's own internal logic, and therefore applies with equal force regardless of whether the standard is used to establish general or specific jurisdiction." Recognizing agency may play some role in the specific jurisdiction analysis, the Ninth Circuit further held "the parent company must have the right to substantially control its subsidiary's activities" to affect personal jurisdiction.  *Id*. at 1024-25.  The Court interprets *Yamaha Motor Co.* to hold allegations regarding an agent relationship between parent and subsidiary are relevant to otherwise valid theories of personal jurisdiction—namely, the parent's own direct contacts with the forum or the existence of an alter ego relationship with the subsidiary.

Therefore, the Court considers whether Plaintiffs have plausibly alleged the Foreign Parent Defendants' own contacts with the forum permit personal jurisdiction, including whether they had "the right to substantially control" heavy metal testing by their subsidiaries.

### 1. Nestlé S.A.

Nestlé S.A. challenges personal jurisdiction via sworn affidavits.  In sum, Nestlé S.A. states it "is the ultimate parent of hundreds of separate corporate entities within the Nestlé group all over the world," (Dkt. No. 277-1 ¶ 6), and it "is not registered to do business in the United States," (*id*. ¶ 3).  Moreover, Nestlé S.A. does not "control the manufacturing, advertising, distributing, marketing, contracting, or sales activities of Gerber Products Company," its subsidiary.  (*Id*. ¶ 5.)  Indeed, Gerber and Nestlé S.A. "maintain separate books and accounting, file separate taxes, have separate offices, and have separate employees, officers, and directors." (*Id*. ¶ 7.)  As to the Master Complaint's allegations regarding heavy metal testing, Nestlé S.A. states it "does not have any input into, or control over, the day-to-day operations of Gerber" (*id*.), nor is it "involved in the setting or enforcement of any heavy metal levels by Gerber for its own products," (*id*. ¶ 9).  Given these sworn statements, the burden shifts to Plaintiffs to make a *prima facie* showing of jurisdictional facts.

Plaintiffs' evidence generally falls within five categories: 1) annual reports and marketing

materials; 2) documents involving employees of various Nestlé entities; 3) documents concerning heavy metal testing; 4) letters from Gerber to Congress; and 5) Nestlé S.A.'s ownership of certain intellectual property.  Ultimately, none of this evidence satisfies Plaintiffs' burden to make a *prima facie* showing of specific personal jurisdiction.

To start, Plaintiffs present a 2023 Nestlé annual report to suggest Nestlé S.A. sells baby food products in the United States.  (Dkt. No. 382-21.)  However, "separate corporate entities presenting themselves as one online does not rise to the level of unity of interest required to show companies are alter egos" for purposes of personal jurisdiction.  *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016); *see also Zeichner v. Nord Sec. Inc.*, No. 24-CV-02462-JSC, 2024 WL 4951261, at *3 (N.D. Cal. Dec. 2, 2024); *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1006 (N.D. Cal. 2020) (collecting cases).  The cited material from the annual report does not mention Nestlé S.A. but instead discusses the Nestlé group broadly, which includes many distinct corporate entities with "Nestlé" in their name.

Plaintiffs simply assume that any reference to "Nestlé" must refer to Nestlé S.A.  For instance, Plaintiffs claim "Nestlé S.A. made safety and risk decisions about the ingredients used in Gerber baby food products, including the decision to 'exclusively use California rice in all of [their] rice-containing infant nutrition products.'"  (Dkt. No. 380-3 at 77.)  But to support this claim, Plaintiffs rely on a document that does not mention Nestlé S.A., and instead has "Nestlé Nutrition" and "Gerber" logos at the top.  (Dkt. No. 381-24 at 2.)  As Nestlé S.A.'s affidavits establish, Gerber does business as "Nestlé Nutrition North America."  (Dkt. No. 373-1 ¶ 8.)  Plaintiffs go on to cite an email by Ryan Carvalho, whom they claim, without evidence, is a Nestlé S.A. employee.  (Dkt. No. 380-3 at 77.)  Yet even that email shows in Dr. Carvalho's signature line that he is employed by "Nestlé Nutrition, North America," i.e. Gerber.  (Dkt. No. 380-19 at 2.)  This pattern continues for various individuals that Plaintiffs claim were employees of Nestlé S.A., such as Colin Servais, Kim Aylesworth, and Jennifer Dressel.  The Aylesworth and Dressel deposition transcripts both confirm their employment for Nestlé Nutrition North America, meaning Gerber.  (Dkt. No. 373-4 at 2 (Dressel); Dkt. No. 373-3 at 2 (Aylesworth).)  As for Mr. Servais, Nestlé S.A.'s affidavit states he has never been employed by Nestlé S.A. nor does he

United States District Court
Northern District of California

report to the company.  (Dkt. No. 373-1 ¶¶ 13, 15.)  Plaintiffs' evidence only indicates Mr. Servais

had an "@Nestlé.com" email address and was located in Vevey, Switzerland.  Collective

branding, such as a shared email domain name, is common to the parent-subsidiary relationship

and does not alter the Court's reasoning.  *See In re Cal. Gasoline Spot Mkt. Antitrust Litig*., 2021

WL 4461199, at *4 (N.D. Cal. Sept. 29, 2021).  Nor does Mr. Servais' mere presence in Vevey—

where various Nestlé entities are located (Dkt. No. 373-1 ¶ 5)—serve as evidence that he worked

for Nestlé S.A., specifically.  Last, Plaintiffs cite to the deposition of Lyle Pater, Director of

Quality at Gerber, who testified the Nestlé Research Center evaluated Gerber products' safety.

(Dkt. No. 380-20 at 6.)  But this evidence does not establish personal jurisdiction over Nestlé S.A.,

since the Nestlé Research Center is a different entity.  (Dkt. No. 373-1 ¶¶ 9-10.)

The remaining evidence cited in opposition to Nestlé S.A.'s motion fares no better.

Plaintiffs claim Nestlé S.A. set allowable limits for arsenic and other heavy metals, but cite to a

document titled "Nestlé Infant Nutrition Specification" as support.  (Dkt. No. 380-15 at 2.)  Once

again, "Nestlé Infant Nutrition" is a dba for Gerber.  (Dkt. No. 373-1 ¶ 8.).  Then, Plaintiffs

attribute "key decisions" made by the Nestlé Research Center and Strategic Business Unit to

Nestlé S.A.  (Dkt. No. 380-3 at 77.)  However, neither the Nestlé Research Center nor the

Strategic Business Unit are part of Nestlé S.A. (Dkt. No. 373-1 ¶¶ 9-10), and Plaintiffs' cited

exhibit confirms Nestlé Research Center authored the document, (Dkt. No. 380-16 at 2.)  The

same goes for Plaintiffs' references to a bevy of emails sent by Karin Kraehenbuehl, an "SBU

Nutrition Contaminant Expert."  (Dkt. No. 380-25.)  Nestlé S.A. has provided a sworn affidavit

that Ms. Kraehenbuehl has "never been an officer or employee of Nestle S.A." and "has no direct

reporting obligations to Nestlé S.A. or any Nestlé S.A. employee."  (Dkt. No. 373-1 ¶¶ 9, 16.)

Plaintiffs must controvert these statements with evidence of their own, but none of the cited

documents indicate Ms. Kraehenbuehl worked for Nestlé S.A.[6]  (*See* Dkt. Nos. 380-24, 380-25,

---

[6] Plaintiffs also supplied a ResearchGate profile for Ms. Kraehenbuehl, which mentions Nestlé
S.A.  (Dkt. No. 382-42.)  It is unclear from this webpage printout whether Ms. Kraehenbuhl
authored the profile herself, but even if she had, it states that she works for the Nestlé Research
Center.  (*Id*.)  Absent any other supporting evidence, this ambiguous online profile alone cannot
satisfy Plaintiffs' burden to make a *prima facie* showing of Nestlé S.A.'s involvement in setting
Gerber's heavy metal standards.

1   380-26.)

2       Additionally, Plaintiffs refer to a letter sent by Gerber to Congress, which reads in part:

3           Together with its parent company, Nestlé S.A., Gerber has 24
            research technology centers worldwide—the largest research and
4           development network of any food company. Nestlé's research
            network includes over 4,800 scientists and researchers as well as
5           partnerships with industry, scientific institutions, and academia across
            the globe."
6

7   (Dkt. No. 380-13 at 4.)  The reference to Nestlé S.A., they argue, shows the parent company's

8   "involvement in the safety of Gerber's baby food products."  (Dkt. No. 380-3 at 31.)  The Court

9   disagrees.  Plaintiffs' cited passage does not distinguish between Nestlé S.A. and Gerber as to the

10  research technology centers.  And even if it did, the passage says nothing about whether Nestlé

11  S.A. operated or controlled those research centers as opposed to functioning as a mere parent

12  company.  Indeed, the general representations made in the letter do not permit a reasonable

13  inference as to Nestlé S.A.'s specific conduct.  And to establish a *prima facie* showing of

14  jurisdiction, Plaintiffs must provide evidence of that specific conduct, such as whether Nestlé S.A.

15  performed research itself, or set and enforced heavy metal testing standards.

16      Last, Plaintiffs refer to various documents which note the intellectual property rights

17  contained therein belong to "Nestlé S.A., Vevey, Switzerland."  (Dkt. No. 380-3 at 32.)  To start,

18  some of the cited materials refer to Societe des Produits Nestlé S.A. (*see, e.g.*, Dkt. No. 382-23),

19  which is a different entity from Nestlé S.A., (Dkt. No. 373-1 ¶ 7).  But even assuming Nestlé S.A.

20  owns those intellectual property rights, that fact alone does not establish *prima facie* jurisdiction

21  here.  *See, e.g.*, *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1297 (S.D. Cal. 2003) (holding

22  the use of intellectual property among subsidiaries, such as trademark and tradename, did not

23  warrant attributing the subsidiary's contacts with the forum to the parent entity); *Nestlé USA, Inc.*

24  *v. Crest Foods, Inc.*, No. LA-CV-1607519, 2017 WL 3267665, at *8 (C.D. Cal. July 28, 2017)

25  (same).  Plaintiffs do not explain how Nestlé S.A.'s ownership of intellectual property rights

26  shows its direct involvement in the forum with respect to heavy metal testing.  Nor do Plaintiffs

27  articulate how those rights indicate Nestlé S.A. controlled the heavy metal testing of subsidiaries

28  and directed them to perform certain activities in the forum.

United States District Court
Northern District of California

9

Collectively, Plaintiffs' proffered evidence conflates any usage of the word "Nestlé" with the distinct corporate entity, Nestlé S.A. The evidence does not support a *prima facie* showing that Nestlé S.A., specifically, conducted any relevant activities in the United States, nor controlled subsidiaries' heavy metal testing.

Even under the most permissive federal standard of specific personal jurisdiction, Plaintiffs have not met their burden. Therefore, the Court GRANTS the motion to dismiss for lack of personal jurisdiction and does not address individual state long-arm statutes.

## 2.    Hero AG

Hero AG also contests personal jurisdiction via sworn affidavit. Per the affidavit, Hero AG is a Swiss company with no presence in the United States and "does not manufacture, advertise, market, distribute, or sell in the United States any baby food products . . . ." (Dkt. No. 281-1 ¶¶ 4-5.) Hero AG is the parent-thrice-removed from Beech-Nut through other subsidiaries, such as Hero USA Inc. and Hero Beteiligungen AG. (*Id*. ¶ 7.) "Hero AG does not control the day-to-day management of Beech-Nut nor supervise the operations of Beech-Nut." (*Id*. ¶ 8.) Further, "Beech-Nut has its own Executive Team, including its own General Counsel," and that "Executive Team makes independent decisions regarding the operation of Beech-Nut." (*Id*.) Indeed, Hero AG maintains separate books and records, does not share any employees with Beech-Nut, and does not share assets or board members with Beech-Nut. (*Id*. ¶¶ 9-12.) Based on this evidence, the burden shifts to Plaintiffs to make a *prima facie* showing of jurisdiction.

Here, too, Plaintiffs fail to meet their burden. Plaintiffs' evidence can be grouped into four categories: 1) annual reports and marketing; 2) deposition testimony of Beech-Nut employees; 3) documents regarding Beech-Nut's heavy metal testing; and 4) certain contracts signed by Hero AG. As above, Plaintiffs routinely fail to distinguish between references to "Hero AG" and other entities with "Hero" in the name.

First, Plaintiffs cite to a Hero Group annual report from 2023 as well as the Hero Group website to suggest Hero AG is a US-based baby food brand and controls Beech-Nut's operations. (Dkt. No. 380-3 at 25.) As the Court previously noted, shared branding and marketing materials between a parent and subsidiary do not suffice to establish personal jurisdiction over a parent

10

entity.  *See, e.g.*, *Reynolds*, 481 F. Supp. 3d at 1006 (collecting cases).  Indeed, "Hero Group" does not refer to any actual entity, but rather is shorthand for all affiliated entities under the Hero AG umbrella.  (Dkt. No. 376 ¶ 3.)  In response, Plaintiffs refer to a footnote in the annual report which states: "Hero AG is the legal entity for the Hero Group. Both names are used interchangeably in this section." (Dkt. No. 382-15 at 31.)  This, they argue, indicates references to "Hero Group" must mean Hero AG across various documents.  The Court disagrees.  A lone footnote says little—if anything—about other documents, and further, the language itself refers only to that section of the annual report, which discussed corporate governance and capital structure.  (*Id.*)  Ultimately, none of the cited portions in either the website or the annual report describe Hero AG, specifically.  Plaintiffs' assertion that references in those materials to "policies, processes, controls, and regular monitoring" must refer to Hero AG, does not follow from the non-specific language in the documents.  (*See* Dkt. Nos. 382-14, 382-15.)

Second, Plaintiffs rely on the deposition testimony of Jason Jacobs, VP for Quality Assurance at Beech-Nut, and Jaspreet Pabbi, Beech-Nut's Quality Director.  They cite to portions of the transcripts where Mr. Jacobs notes that "Hero" sets the quality policy for "all companies within the Hero Brand."  (Dkt. No. 380-3 at 26.)  As to Mr. Pabbi, Plaintiffs cite a portion of the deposition where he explains why he added "Hero Group" to his resume.  (*Id.*)  But neither deposition aids Plaintiffs in establishing Hero AG played a role in Beech-Nut's heavy metal testing.  Mr. Jacobs does not specify which Hero entity he is referring to, nor does the attorney deposing him ask for clarification.  (Dkt. No. 380-7 at 3-4.)  On Mr. Jacobs' testimony alone, all the Court can determine is that some Hero entity was involved in setting unidentified policies.  It is just as likely a reference to Hero USA Inc., or Hero Beteiligungen AG, or any other entity with "Hero" in the name, as it is Hero AG.  Mr. Pabbi's deposition testimony only states he listed "Hero Group" on his resume because "[i]t's a parent company of Beech-Nut, globally known." (Dkt. No. 382-17 at 4.)  But Beech-Nut has multiple parent companies with "Hero" in the name, including Hero USA Inc. and Hero Beteiligungen AG.  The mere reference to "Hero Group," a collective term for the Hero umbrella of subsidiaries, says nothing of Hero AG's specific involvement in quality assurance of Beech-Nut baby food.

Third, Plaintiffs cite documents concerning heavy metal testing that mention "Hero Group," to argue Hero AG was involved in the testing.  (Dkt. No. 380-3 at 26.)  These documents do not mention Hero AG, and only refer either to "Hero," "Hero Group," or other entities such as "Hero Espana."  (*See* Dkt. Nos. 380-9, 380-10.)  Further, Plaintiffs allege Hero AG "made executive-level decisions for Beech-Nut concerning the acquisition of testing machines need [sic] to test baby food for heavy metal."  (Dkt. No. 197 ¶ 11.)  Controverting this allegation, Hero AG then submitted an affidavit stating:

> Hero AG does not dictate what capital expenditures Beech-Nut makes. Once Hero AG approves Beech-Nut's capital expenditure budget, it is up to Beech-Nut to determine which projects to fund with those approved funds. And Beech-Nut uses its own capital, not Hero AG's capital, to fund the projects. Hero AG did not dictate whether Beech-Nut purchased any testing machine, nor did Hero AG supply the funds for any such purchase.

(Dkt. No. 376 ¶ 6.)  To make a *prima facie* showing, Plaintiffs merely cite an email chain where an individual with the title "VP SC Hero Group" mentions the funding for additional equipment would require replacement of an existing budget initiative.  (Dkt. No. 380-8 at 2.)  The title of the speaker does not indicate whether he is employed by Hero AG.  Nor does the cited email establish anything other than Beech-Nut's total budget allocation decisions involve a parent entity.  Further, even if Hero AG were involved in setting Beech-Nut's overall budget, that fact does not establish control sufficient to warrant specific personal jurisdiction over the parent entity.  *See, e.g.*, *Pitt v. Metro. Tower Life Ins. Co.*, No. 18-CV-06609, 2020 WL 1557429, at *7 (N.D. Cal. Apr. 1, 2020) (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1074 (9th Cir. 2015)) ("The Ninth Circuit has held that a parent company may finance a subsidiary without imputing the subsidiary's contacts to the parent.").

Last, Plaintiffs present evidence of agreements involving Hero AG to make their *prima facie* showing.  (Dkt. No 380-3 at 80.)  The first comes from an email chain among Beech-Nut employees, where one individual mentions, among a series of bullet points: "Quality Agreement— Hero has new agreement for all co-manufacturers to use.  Janeen is reviewing and will share with the Watershed team at the next quarterly call."  (Dkt. No. 381-17 at 3.)  The email contains no further explanation as to the contents of this agreement, nor does the email chain specify which

Hero entity issued the agreement. As the Court has repeated, mere references to "Hero" or "Hero Group" do not serve as evidence of Hero AG's specific involvement in the activities of its subsidiaries. The second agreement comes from 2017 and includes a non-disclosure provision signed by a representative of Hero AG. That provision notes "the Parties intend to enter into discussions regarding a possible future cooperation in respect of certain business transactions, which may involve multiple country organizations of the parties." (Dkt. No. 381-16 at 40.) The Hero AG representative signs on behalf of the "Hero Group of companies" since the agreement may implicate various subsidiaries within the Hero Group umbrella. (*Id*.) This kind of cross-entity transaction falls within the ordinary operation of the parent-subsidiary relationship. Moreover, Hero AG's capacity to sign an NDA on behalf of various Hero entities does not say anything about its involvement in heavy metal testing for Beech-Nut. A parent company can engage in "macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Ranza*, 793 F.3d at 1074. If this kind of macro-management cannot serve as evidence of indirect contacts under an alter ego theory, then it surely cannot serve as evidence of Hero AG's direct contact with the forum.

Even under the most permissive federal standard of specific personal jurisdiction, Plaintiffs have not met their burden. Therefore, the Court GRANTS the motion to dismiss for lack of personal jurisdiction and does not address individual state long-arm statutes.

### 3.    Danone S.A.

In step with the other Foreign Parent Defendants, Danone S.A. challenges personal jurisdiction by submitting sworn affidavits. These affidavits attest that Danone S.A. does not manufacture or sell any product, is not registered to conduct business in the United States, and has no licenses, books and records, or real property located in the United States. (Dkt. No. 284-1 ¶¶ 4, 11-13.) Danone S.A. is the ultimate parent company to 291 food-related subsidiaries across 70 countries, and five distinct entities exist between Danone S.A. and Nurture, LLC. (*Id*. ¶¶ 4, 8.) These intermediate entities include four U.S.-based entities and one French entity. (*Id*. ¶ 8.) Further, Danone S.A. states "it is not involved in Nurture, LLC's day-to-day affairs and does not exercise control over Nurture products sold in the United States." (*Id*. ¶ 10.) Indeed, Danone S.A.

13

does not source ingredients for Nurture, contract with co-manufacturers on Nurture's behalf, set standards related to heavy metals in any Nurture product, monitor for the presence of heavy metals in Nurture products, or train any other individual to do so.  (*Id.* ¶¶ 18-20.)  As with the other Foreign Parent Defendants, the burden shifts to Plaintiffs to make a *prima facie* showing of specific personal jurisdiction over Danone S.A.

Plaintiffs do not carry their burden.  Despite the voluminous catalogue of exhibits appended to the Opposition, Plaintiffs once again conflate any reference to "Danone" with the distinct entity Danone S.A.  As publicly available documents show, there are nearly 100 different entities across the Danone S.A. portfolio with the word "Danone" in the name.  (Dkt. No. 379-2.) Non-specific references to "Danone" in documents and testimony tell the Court little more than some company among dozens may be involved.  Turning to Plaintiffs' evidence, the documents can be organized into six general categories: 1) marketing and branding materials; 2) documents and testimony regarding the location of certain Danone employees as well as the reporting structure between Nurture and Danone; 3) documents regarding training of Nurture employees by Danone employees; 4) Danone's involvement in setting food safety policies; 5) Danone's role in sourcing ingredients for Nurture products; and 6) Danone's manufacture of baby food products at a facility in Opole, Poland.  This evidence does not establish a *prima facie* showing of jurisdiction.

To begin, Plaintiffs cite various Danone marketing materials to assert "any conflation between Danone S.A. and its subsidiaries stems from ***Danone's*** actions to conflate the entities." (Dkt. No. 380-3 at 82 (emphasis in original).)  As support, Plaintiffs refer to a video on social media platform, X, which includes statements such as "[w]e are a global food company" and "[w]e operate in over 140 countries," among others.  (*Id.*)  Such statements amount to no more than collective marketing and do not establish specific personal jurisdiction over the parent entity, i.e. Danone S.A.  *See, e.g.*, *Reynolds*, 481 F. Supp. 3d at 1006 (collecting cases).  Further, the X account cited mentions only "Danone," not Danone S.A.  Though Plaintiffs *assume* the company's location in Paris, France, shows the account belongs to Danone S.A., they fail to consider that well over a dozen companies with "Danone" in the name are headquartered in France.  (Dkt. No. 379-2 at 5.)

United States District Court
Northern District of California

Next, Plaintiffs argue "Nurture's managing officers are almost all Danone employees who are directly supervised by other Danone employees," and cite to the deposition testimony of Anne Laraway, Magdelena Bartosik, Rebecca Beaudin, David Maltese, and Philip Steinbach. (Dkt. No. 380-3 at 37-38.) Since Danone S.A. has attested none of these individuals ever worked for Danone S.A. or reported to a Danone S.A. employee (Dkt. No. 379-1 ¶¶ 4-6), the Court looks to Plaintiffs' proffered evidence to determine whether a factual dispute exists. The Laraway deposition transcript only states that she reports to someone at "Danone" without specifying which Danone entity. (Dkt. No. 380-28 at 3.) As to Ms. Bartosik's testimony, she only reports she worked for a Danone entity in Europe, which is a parent company to Happy Family Brands. (*See* Dkt. Nos. 382-47 at 3, 380-29 at 3-4.) Danone S.A. is not the only parent company of Happy Family Brands located in Europe. (*See* Dkt. No. 284-1 ¶ 8.) Additionally, the transcript clarifies that Ms. Bartosik reported to "Jonathan Gray, who is VP of R&I in Danone North America." (Dkt. No. 380-29 at 4.) "Danone North America" is not Danone S.A. (*See* Dkt. No. 379-2 at 10-11.) Plaintiffs claim Rebecca Beaudin is a Danone S.A. employee, but in her deposition she testified she was "the vice president of quality and food safety sourcing and design, Danone North America." (Dkt. No. 380-30 at 3.) Moreover, the Maltese depositions establish that Mr. Maltese works for Danone North America (Dkt. No. 380-31 at 3), and that Mr. Steinbach worked "directly with Happy Family in the capacity as the quality and food safety supplier manager," (Dkt. No. 381-28 at 6.) The cited portions of Mr. Maltese's deposition do not say for which, if any, Danone entity Mr. Steinbach worked. Lastly, Plaintiffs indicate that the LinkedIn profiles of Ms. Bartosik, Ms. Beaudin, Mr. Maltese, and Mr. Steinbach state these individuals worked for "Danone," and then conclude that means Danone S.A. (Dkt. No. 380-3 at 82.) Once again, Plaintiffs conflate entities—a non-specific reference to "Danone" may refer to any of nearly 100 different companies.

To support the assertion that Danone S.A. employees trained Nurture employees regarding heavy metals and their potential health impacts, Plaintiffs rely on Mr. Maltese's deposition testimony about Philip Steinbach. (*Id*. at 83-84.) However, as the Court discussed above, Danone S.A. provided a sworn affidavit stating Mr. Steinbach was not a Danone S.A. employee and did

not report to one.  (Dkt. No. 379-1 ¶ 4.)  Further, the deposition testimony Plaintiffs rely on does

not confirm for which, if any, Danone entity Mr. Steinbach worked.  (Dkt. No. 381-28 at 6.)

Regardless of Mr. Steinbach's involvement in heavy metal testing with Nurture, those facts do not

support jurisdiction over Danone S.A., a parent company many steps removed from Nurture's

operations.

　　　　Plaintiffs' next group of evidence relates to their argument that Danone S.A. dictates

Nurture's food safety policies.  (Dkt. No. 380-3 at 38.)  Plaintiffs fall back on deposition

testimony from many of the Danone North America employees discussed previously.  But as the

Court noted, these non-specific references to "Danone" do not dispute Danone S.A.'s evidence

that it is not involved in, nor controls, heavy metal testing among subsidiary companies.  Indeed,

some of Plaintiffs' cited documents explicitly refer to different Danone entities.  For instance,

Plaintiffs present an email chain involving Mr. Steinbach, which states:

> The DNELN GLOBAL Safe Food Standards shall be used as official
> internal limits, unless national requirements (FDA-EPA for the USA)
> are stricter. In all cases DNELN products must comply with the local
> legislation in the markets where the products are sold. The Global
> Safe Food Standards are the minimum accepted standard for product
> manufacturing by Danone Nutricia Early Life Nutrition —including
> Happy Family Brands.

(Dkt. No. 381 at 2.)  Plaintiffs assume the standards referenced in this email were set by Danone

S.A. despite the explicit reference to "Danone Nutricia Early Life Nutrition," a different Danone

entity.  (*See* Dkt. No. 379-2 at 14.)  The remaining cited evidence similarly relies on non-specific

references to support jurisdiction.  In both the Beaudin and Laraway deposition transcripts,

Plaintiffs highlight testimony regarding "Danone's Food Safety Center" located in Europe (Dkt.

No. 380-30 at 9), or food safety experts in Amsterdam, (Dkt. No. 381-20 at 4).  Plaintiffs assume

the testimony refers to Danone S.A, but neither deposition transcript says as much.  Further,

Plaintiffs do not explain why reference to an Amsterdam expert would indicate Danone S.A.'s

involvement.  The same goes for Plaintiffs' other cited documents, such as the email chain

involving Mary Sonnen, which Plaintiffs argue shows Danone S.A. set mandatory internal limits

on heavy metals.  (Dkt. No. 380-3 at 84.)  The email suggests Ms. Sonnen works for Happy

Family Brands, and the standards referred to do not indicate they came from Danone S.A.  (Dkt.

16

No. 381-23 at 27-28.)

Two categories of evidence remain: documents regarding the sourcing of ingredients for Nurture, and documents regarding baby food manufacturing in Opole, Poland.  Neither helps Plaintiffs to establish their *prima facie* case.  As to the sourcing documents, the lone evidence involves an email chain between David Maltese and Jason Rosecast.  The email chain discusses whether Nurture could reformulate a product involving spinach at the request of an employee of a third-party broker.  (Dkt. No. 381-3 at 2-3.)  It does not mention Danone S.A., and Mr. Maltese does not work for Danone S.A.  Nor does the email state Mr. Maltese or Mr. Rosecast actually agreed to reformulate the product based on the sourcing question raised by the third-party broker.  (*Id*. at 2.)  In sum, the document says nothing about Danone S.A.

Last, Plaintiffs cite an email in which Jeanette O'Rourke—Nurture's Senior Supplier Quality Manager—stated "Happy Family will be transitioning some manufacturing to our parent company (Danone's) facility in Opole, Poland for production . . . ."  (Dkt. No. 381-4 at 6.)  Danone S.A.'s affidavit notes the Opole facility "is owned and operated by a Polish entity in which an indirect subsidiary of Danone S.A. (numerous layers removed from Danone S.A. itself) holds an equity interest." (Dkt. No. 379-1 ¶ 8.)  Plaintiffs' only evidence regarding control of the Opole facility is the O'Rourke email, which says nothing more than "(Danone's) facility."  This does not controvert Danone S.A.'s sworn affidavit, especially since there are Danone S.A. subsidiary entities in Poland with Danone in their name.  (*See* Dkt. No. 379-2 at 8.)  Without evidence connecting Danone S.A., specifically, to the forum, Plaintiffs cannot meet their burden to make a *prima facie* showing of specific personal jurisdiction here.

Even under the most permissive federal standard of specific personal jurisdiction, Plaintiffs have not met their burden.  Therefore, the Court GRANTS the motion to dismiss for lack of personal jurisdiction and does not address individual state long-arm statutes.

### C.     Jurisdictional Discovery

"A district court has discretion in permitting a plaintiff to conduct jurisdictional discovery."  *Reynolds*, 481 F. Supp. 3d at 1009 (citing *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)).  The discovery request should be granted "where

United States District Court
Northern District of California

United States District Court
Northern District of California

pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986).   However, "where a plaintiff's claim 'of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery.'" *Reynolds*, 481 F. Supp. 3d at 1009 (citing *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)).

Here, Plaintiffs claim "there is every reason to believe that further discovery would yield 'a more satisfactory showing of the facts,'" yet do not identify such reasons explicitly.  (Dkt. No. 380-3 at 87 (citation omitted).)  Instead, Plaintiffs rely on a combination of fairness arguments and citations to evidence the Court already discussed above.  For instance, Plaintiffs observe the Jampen Declaration in support of Nestlé S.A.'s motion to dismiss is based, in part, on "reasonably available documents."  (*Id.*)  They then argue, without citing any authority, that "Plaintiffs should be permitted to review" those documents.  (*Id.*)  The Court will not invent reasons why this may be justified when Plaintiffs have not ventured to provide any in the first instance.

In addition, Plaintiffs cite to several documents they claim directly controvert the sworn affidavits submitted by the Foreign Parent Defendants.  The Court addressed this evidence in the personal jurisdiction analysis, and for each document, Plaintiffs either relied on a non-specific reference to "Nestlé," "Hero Group," or "Danone" or a reference to a different subsidiary entity under the Foreign Parent Defendants.  Based on the Court's review of Plaintiffs' proffered evidence—and absent further explanation as to what new information would be uncovered through jurisdictional discovery—the Court DENIES Plaintiffs' request.

## II.    DOMESTIC PARENT DEFENDANTS' RULE 12(b)(6) MOTIONS

The Master Complaint names two domestic parent companies to Defendant Plum, PBC as defendants: The Campbell's Company[7] and Sun-Maid Growers of California.  (Dkt. No. 197 ¶¶ 25-26.)  The Campbell's Company was parent of Plum until May 3, 2021, when ownership was

---

[7] The Master Complaint names "Campbell Soup Company" as a defendant.  (Dkt. No. 197 ¶ 25.)  As noted in Campbell's reply brief, "[e]ffective November 19, 2024, The Campbell Soup Company changed its name to The Campbell's Company."  (Dkt. No. 369 at 6 n.1.)  The Court, therefore, refers to Defendant as "The Campbell's Company" or "Campbell."

transferred to Sun-Maid.  (*Id.* ¶ 25.)  Both Domestic Parent Defendants move to dismiss the Master Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

As a preliminary matter, the Court notes the Domestic Parent Defendants' Rule 12(b)(1) traceability argument does not differ materially from Hero AG's argument discussed in Part I.A., *supra*.  Indeed, Domestic Parent Defendants similarly argue Plaintiffs lack standing because they have failed to allege an injury traceable to the conduct of Campbell or Sun-Maid.  (*See, e.g.*, Dkt. Nos. 275 at 12-13 (Campbell), 276 at 16-17 (Sun-Maid).)  For the reasons stated in the Court's analysis of Hero AG's 12(b)(1) argument, the Court DENIES the Domestic Parent Defendants' motions to dismiss to the extent they are premised on a lack of subject-matter jurisdiction.

Now, the crux of the motions at issue is a 12(b)(6) challenge to allegations about Campbell's and Sun-Maid's direct involvement in the heavy metal testing of Plum products.  The standard for adjudicating a motion under Rule 12(b)(6) is not disputed.  In reviewing a complaint, the district court must assume the plaintiffs' allegations are true and draw all reasonable inferences in their favor.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  That said, the Court need not construe as true conclusory statements or unreasonable inferences.  *Id.*

Plaintiffs do not rely on an alter ego theory of liability.  (Dkt. No. 380-3 at 67 ("Plaintiffs do not allege that Plum was a sham company.")  Rather, Plaintiffs assert the Domestic Parent Defendants are liable for their direct involvement in the alleged tortious conduct.  (*Id.* at 102.)  All parties rely on the Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), to establish the standard for a parent company's direct liability related to acts involving a subsidiary.  In *Bestfoods*, the Court considered whether a parent company could be held liable for violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) in a facility owned by its subsidiary.  *Id.* at 55.  The Court began its analysis with a fundamental principle of corporate law: "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Id.* at 61.  However, the Court went on to observe that derivative liability for the acts of a subsidiary differs from a parent company's direct liability.  *Id.*  The Court noted that direct liability manifests when "'the alleged wrong can seemingly be traced to the parent through the conduit of its own

United States District Court
Northern District of California

1    personnel and management' and 'the parent is directly a participant in the wrong complained of.'"

2    *Id*. at 64 (citation omitted).  So, *Bestfoods* recognizes a difference between derivative theories of

3    liability (*e.g.*, an alter ego theory) and direct liability based on the parent company's own actions

4    through its personnel and management.

5            To determine when a parent company's actions amount to direct involvement in its

6    subsidiary's bad acts, the *Bestfoods* Court provided a touchstone.  There, the Court considered

7    whether the parent's actions were "consistent with the parent's investor status, such as monitoring

8    of the subsidiary's performance, supervision of the subsidiary's finance and capital budget

9    decisions, and articulation of general policies and procedures . . . ."  *Id*. at 72.  Such routine

10    conduct "should not give rise to direct liability."  *Id*.   Ultimately, "[t]he critical question is

11    whether, in degree and detail, actions . . . by an agent of the parent alone are eccentric under

12    accepted norms of parental oversight of a [subsidiary]."  *Id*.

13            Since *Bestfoods*, some district courts have applied this standard when confronted with

14    questions of direct parent liability.  *See, e.g.*, *Bastidas v. Good Samaritan Hosp*., No. 13-CV-

15    04388, 2014 WL 1022563, at *7 (N.D. Cal. Mar. 13, 2014); *Emerson v. N. Tr. Corp*., No. 23-CV-

16    00241, 2023 WL 11884593, at *14 (N.D. Cal. Nov. 15, 2023).  Even so, the Court has

17    reservations about the applicability of *Bestfoods* to the instant case.  To begin, the Court in

18    *Bestfoods* interpreted a federal statute, CERCLA, which established potential liability for "any

19    person who at the time of disposal of any hazardous substance owned or operated any facility."

20    *Bestfoods*, 524 U.S. at 55 (citing 42 U.S.C. § 9607(a)(2)).  The Court addressed only a narrow

21    question—whether a parent company could be considered an "operator" of a subsidiary's facility

22    under the language of CERCLA.  Interpretation of the term "operator" within a specific federal

23    statute likely does not control interpretation of the state products liability law at issue here.

24    Further, as the Court's order on the Retailer Defendants' Motion to Dismiss indicates, whether a

25    defendant is liable as a manufacturer often requires consideration of state statutory and common

26    law.  *See In re Baby Food Prods. Liab. Litig*., No. 24-CV-2832, 2024 WL 4982984, at *1-*2

27    (N.D. Cal. Dec. 3, 2024) (interpreting the definition of "manufacturer-seller" under the Louisiana

28    Products Liability Act).

That said, the parties have not briefed the issue under applicable state law and appear to agree *Bestfoods* applies.  Consequently, the Court engages with the parties' arguments on their terms.  So, under *Bestfoods*, the Court considers whether Plaintiffs have plausibly alleged Campbell and Sun-Maid acted outside the accepted norms of parental oversight and directly participated in the heavy metal testing of Plum's baby food.

### A.    The Campbell's Company

The Master Complaint relies on two fundamental allegations related to Campbell's involvement in Plum's heavy metal testing.  First, Campbell responded to congressional inquiries regarding Plum's baby food products and internal thresholds for certain heavy metals. (Dkt. No. 197 ¶¶ 25, 48.)  And second, Campbell either employed or "directly controlled and trained" the "scientists and researchers that monitored the safety of Toxic Heavy Metals in Plum's baby food." (*Id*. ¶ 25.)  Neither allegation permits a reasonable inference that Campbell was involved in setting heavy metal limits for Plum's baby food.

As to the first allegation, Plaintiffs offer further elaboration:

> Campbell provided Congress with a self-serving spreadsheet declaring that every one of its products sold through Plum "meets criteria", while declining to state what those criteria were. Disturbingly, Campbell admitted that, for mercury (a powerful neurotoxin), Campbell and Plum have no criterion whatsoever, stating: "No specific threshold established because no high-risk ingredients are used." However, despite Campbell and Plum having no mercury threshold, Campbell and Plum still marked every food as "meets criteria" for mercury.

(*Id*. ¶ 48.)  However, Campbell's report of heavy metal testing results to Congress only establishes Campbell possessed that information at some point.  The allegations do not address the basis of liability, namely whether Campbell actually set those heavy metal thresholds or conducted the testing itself.  Additionally, Campbell's knowledge of existing criteria for heavy metals does not appear "eccentric under accepted norms of parental oversight."  *Bestfoods*, 524 U.S. at 72. Indeed, the Court in *Bestfoods* mentioned "monitoring of the subsidiary's performance" as an activity within the realm of conventional parent oversight.  *Id*.  Absent additional allegations, the Court cannot reasonably infer that Campbell's knowledge of Plum's heavy metal testing criteria was acquired through the involvement of Campbell's own employees or agents in the testing

process.

Plaintiffs' second allegation is conclusory and cannot support their claims.  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.")  The Master Complain states:

> [M]any of the scientists and researchers that monitored the safety of Toxic Heavy Metals in Plum's baby foods were directly employed by Campbell or were directly controlled and trained by Campbell agents and employees.

(Dkt. No. 197 ¶ 25.)  From this allegation it is unclear whether Plaintiffs allege Campbell employees monitored the safety of the Plum products, or if instead, Campbell controlled and trained Plum employees.  Plaintiffs offer no supporting factual allegations about those Campbell employees, such as how, when, or under what circumstances they monitored toxic heavy metals.  Nor do Plaintiffs allege any underlying facts regarding how Campbell "directly controlled and trained" Plum employees.  To advance their claims against Campbell, Plaintiffs must offer some factual basis for the allegation that Campbell scientists and researchers exercised control over the testing process.  Plaintiffs have failed to meet the pleading standard.

The remaining allegations against Campbell offer little more than unsupported conclusions.  For instance, Plaintiffs assert Campbell failed to take reasonable steps to eliminate heavy metals from their products:

> Campbell/Sun-Maid knew that the heavy metal contents of the ingredients used in its products varied by growing region and supplier, they did not undertake an effort to source ingredients with the lowest amount of heavy metals available. And, despite knowing that certain ingredients carry a higher risk for heavy metal contamination, Plum and Campbell/Sun-Maid did not reformulate their products to ensure that they were being made with the lowest achievable amount of heavy metals.

(*Id.* ¶ 82.)  But these allegations presume Campbell had a duty to intervene in Plum's operations. Without plausibly alleging Campbell undertook to set the threshold levels of heavy metals for the products, or conducted the testing itself, these subsequent allegations fail to state a products liability or negligence claim.  Under *Bestfoods*, Plaintiffs' theory of liability against Campbell is

22

based on its direct involvement in the alleged tortious conduct.  (Dkt. No. 380-3 at 102.)  To advance under that theory, Plaintiffs must plausibly allege Campbell directly set the heavy metal standards at issue or performed the heavy metal testing.  The Master Complaint fails to do so.

At the hearing, Plaintiffs raised an additional argument regarding Campbell's involvement in heavy metal testing: Campbell participated in the Baby Food Council, which involved various manufacturers and proposed voluntary limits on heavy metals in baby food.  The Master Complaint discusses this council, but Plaintiffs do not allege anything regarding Campbell's specific conduct.  (Dkt. No. 197 ¶¶ 97-103.)  Nor do they allege Campbell's actions on the Council establish its involvement in Plum's manufacturing processes or heavy metal testing. Plaintiffs' Opposition attempts to supplement the Master Complaint's allegations by referencing the Council's charter, an Environmental Defense Fund press release, and a proposal made to the Council.  (Dkt. No. 380-3 at 21.)  But on a Rule 12(b)(6) motion, the Court can only consider the Master Complaint's allegations.  To survive a motion to dismiss, Plaintiffs must allege facts permitting a plausible inference that Campbell directly participated in setting heavy metal criteria or testing the products.  On these allegations alone, Plaintiffs have not done so.

Accordingly, the Court GRANTS Campbell's motion to dismiss for failure to state a claim.

### B.       Sun-Maid Growers of California

Plaintiffs' claims against Sun-Maid rely on a lone allegation: heavy "metal testing is paid for directly and sent directly to Sun-Maid's scientists and executives, not directly to Plum."  (Dkt. No. 197 ¶ 26.)  This allegation is insufficient.  Even if true, Sun-Maid's payment for heavy metal testing or receipt of results does not permit a plausible inference that Sun-Maid's own employees or agents were directly involved in heavy metal testing.  Plaintiffs do not allege Sun-Maid interprets these results, takes any action related to the results, or was involved in the underlying testing.  Nor do Plaintiffs allege Sun-Maid requires any particular kind of testing or sets any parameters for the testing.  Merely paying for the tests fits comfortably within traditional parent activities, such as supervision of a subsidiary's budget.  *See Bestfoods*, 524 U.S. at 72.

The remainder of Plaintiffs' allegations about Sun-Maid are conclusory.  For instance, Plaintiffs claim Sun-Maid has "been directly involved with all aspects of the safety and testing of

Plum's baby food products." (Dkt. No. 197 ¶ 26.)  This is effectively a recitation of the standard for direct liability of a parent company.  Plaintiffs do not allege any actual conduct by Sun-Maid that would constitute involvement in "all aspects of the safety and testing" of Plum's products. Further, Plaintiffs allege:

> All major executive functions related to Plum's operation were specifically transitioned from Campbell to Sun-Maid. Like Campbell, Sun-Maid has exercised and continues to exercise direct control over the manufacture, sale, and distribution of all Plum baby foods since May 3, 2021.

(*Id*.)  However, the transition of operations from one parent company to another does not permit a reasonable inference that the new parent then acted in precisely the same way as the previous parent.  Plaintiffs do not allege any additional facts by which the Court could infer allegations regarding Campbell's actions apply equally to Sun-Maid.  The Master Complaint's remaining allegations at paragraphs 82 through 87 recite the alleged failures of Sun-Maid to establish heavy metal standards or reformulate products to remove heavy metals.  But such allegations mean nothing without first establishing Sun-Maid was involved in heavy metal testing and had a concomitant duty to act.  Consequently, Plaintiffs have failed to plausibly allege their products liability claims against Sun-Maid.

The Court GRANTS Sun-Maid's motion to dismiss for failure to state a claim.

## III.    COLLECTIVE DEFENDANTS RULE 12(b)(6) MOTION

The manufacturers of the baby food products at issue bring a separate, collective motion to dismiss the Master Complaint under Federal Rule of Civil Procedure 12(b)(6).  Defendants Nurture, LLC, Hain Celestial Group, Inc., Beech-Nut Nutrition Company, Walmart Inc., Gerber Products Company, Sprout Foods, Inc., Plum, PBC, and Neptune Wellness Solutions, Inc. all join the motion.  (*See* Dkt. No 300 at 3-5.)  These manufacturer defendants raise two arguments.  First, they assert the Master Complaint must be dismissed because Plaintiffs' theory of defect is standardless, as Plaintiffs do not allege a threshold dose of heavy metal exposure that would cause ASD or ADHD.  (*Id*. at 21-24.)  Rather, Plaintiffs allege *any* detectable amount of heavy metals in baby food could cause injury.  (Dkt. No. 197 ¶ 126.)  Second, Defendants argue Plaintiffs have not plausibly alleged a manufacturing defect claim, since they do not allege the manufacturers

1    deviated from their product designs.  (Dkt. No. 300 at 25.)

2         **A.    Plaintiffs' Theory of Defect**

3         Defendants do not argue for dismissal under all the various state laws that govern the

4    underlying plaintiffs' claims.  Instead, Defendants refer to California law as an exemplar, and

5    Plaintiffs do not oppose this approach in their briefing.  Since the parties have presented the issue

6    in this way, the Court addresses Defendants' arguments under California law, noting that

7    individual differences in state law—to the extent they exist—would apply to relevant plaintiffs.

8         Here, Defendants rely on two district court cases to argue a plaintiff must allege a

9    threshold dose of a toxic substance to survive a Rule 12(b)(6) motion: *Grausz v. Hershey Co.*, 713

10   F. Supp. 3d 818 (S.D. Cal. 2024), and *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp.

11   3d 1150 (S.D. Cal. 2024).  The Court disagrees with Defendants' reading of the cases.  In *Grausz,*

12   the district court confronted a putative class action brought by consumers of Hershey's chocolate

13   products, which they alleged contained lead and cadmium.  713 F. Supp. 3d at 823.  The plaintiffs

14   subsequently brought claims for violation of California's consumer protection laws based on

15   Hershey's failure to disclose the presence of these metals on the products' labels.  *Id.* at 824.  To

16   advance their fraudulent omission theory, the *Grausz* plaintiffs had to plausibly allege the lead and

17   cadmium created an "unreasonable safety hazard."  *Id.* at 827.  Ultimately, the district court

18   dismissed the claims because the plaintiffs had failed to allege whether the amounts of metals in

19   the chocolate were "actually enough to cause the health effects" alleged in the complaint.  *Id.* at

20   828.  The court further noted the plaintiffs did "not plead the amounts of the substances in

21   Hershey's Products have created an *unreasonable* safety hazard."  *Id.* (emphasis in original).

22   Defendants argue Plaintiffs have similarly failed to allege the amount of heavy metals required to

23   cause ASD or ADHD, and therefore, the motion should be granted.  However, the facts in *Grausz*

24   are distinguishable.

25        First, the *Grausz* plaintiffs did not allege they experienced the anemia, kidney damage,

26   seizures, coma, or death they purported *could* be caused by lead.  *Id.*  Plaintiffs here differ in that

27   they allege concrete injuries in the form of ASD and ADHD they developed from consuming

28   Defendants' baby food.  (*See, e.g*, Dkt. No. 197 ¶ 136.)  Second, Plaintiffs allege that detectable

amounts of heavy metals in baby food are sufficient to cause the injuries they experienced.  (*Id*.)

They also allege that a plaintiff's "genetic susceptibilities, medical history, and other factors" can

influence the effect of the heavy metals on their health.  (*Id*. ¶ 124.)  This differs from *Grausz*,

where the plaintiffs failed to plead the amounts in the Hershey's chocolate could actually cause

negative health effects.  713 F. Supp. 3d at 828.  And finally, the standard for a fraudulent

omission claim differs from a design defect claim under California law.  The *Grausz* plaintiffs

needed to plausibly allege an "unreasonable safety hazard," but a design defect can survive under

two theories: "(1) if the product has failed to perform as safely as an ordinary consumer would

expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the

relevant factors . . . the benefits of the challenged design do not outweigh the risk of danger

inherent in such design."  *Gonzalez v. Autoliv ASP, Inc*., 154 Cal. App. 4th 780, 786 (2007).  Here,

Plaintiffs have also alleged the risks posed by Defendants' products outweighed any benefits (Dkt.

No. 197 ¶ 178D), a theory the *Grausz* court did not have to consider.  So, the Court does not read

*Grausz* to require a plaintiff in a products liability case to plead a threshold dose of a toxic

substance to advance their claim.

Defendants' second case, *In re Trader Joe's Co. Dark Chocolate Litig.*, involved similar

claims under California's consumer protection laws.  The *Trader Joe's* plaintiffs alleged various

dark chocolates sold by the company contained arsenic, cadmium, and lead.  *In re Trader Joe's

Co. Dark Chocolate Litig*., 726 F. Supp. 3d at 1159.  As in *Grausz*, the district court determined

the plaintiffs had failed to allege an unreasonable safety hazard because there was "a disconnect in

the [complaint] between Plaintiffs' allegations about the potential harms posed by Heavy Metals

as a general matter and whether these Heavy Metals are unreasonably hazardous at the particular

levels in the specific Products at issue in [the] case."  *Id*. at 1170.  That said, the court went on to

observe:

> While the Court recognizes Plaintiffs may not be able to pinpoint a
> specific level at which these Products would become an unreasonable
> safety hazard or unfit for human consumption, they have to at least
> provide some connection between the general harms possible from
> Heavy Metals and the levels of Heavy Metals in these Products.

*Id*.  So, *In re Trader Joe's Co. Dark Chocolate Litig.*, does not stand for the proposition that a

United States District Court
Northern District of California

1    plaintiff *must* allege a threshold dose. Rather, the specific facts of the case indicated a pleading

2    deficiency, since the plaintiffs had not connected the potential harms caused by heavy metals with

3    the products they consumed. Further, *In re Trader Joe's Co. Dark Chocolate Litig.* is also

4    distinguishable from the instant case for the reasons stated in the Court's analysis of *Grausz*.

5        In sum, there is no ironclad rule that Plaintiffs must allege the threshold dose of a toxic

6    substance to advance their claims, and the Court will not require as much here.

7        **B.    Plaintiffs' Manufacturing Defect Claim**

8        Defendants assert—and Plaintiffs do not contest—the elements of a manufacturing defect

9    claim do not materially differ among the jurisdictions comprising the transferor courts. (*See* Dkt.

10   No. 300 at 25 n.11.) So, the Court refers to the California law standard set out by the parties. "A

11   manufacturing defect occurs when an item is manufactured in a substandard condition." *Gonzalez*

12   *v. Autoliv ASP, Inc.*, 154 Cal. App. 4th 780, 792 (2007). "Such a defect is often demonstrated by

13   showing the product performed differently from other ostensibly identical units of the same

14   product line." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002). Here,

15   Plaintiffs have plausibly alleged a manufacturing defect claim.

16       Throughout the Master Complaint, Plaintiffs allege various Manufacturer Defendants

17   prepared internal product specifications for heavy metals in ingredients and completed products.

18   (*See, e.g.*, Dkt. No. 197 ¶¶ 72, 95.) Plaintiffs also allege Manufacturer Defendants failed to

19   consistently adhere to those specifications. (*Id*. ¶¶ 57-59, 163.) This alleged inconsistent

20   application meant different batches of a product may have had different levels of heavy metals

21   based on which ingredients were deemed acceptable. (*See, e.g.*, *id*. ¶ 135.) These allegations lay

22   out a plausible theory that one instance of a product may differ from another in the amount of

23   heavy metals, depending on whether the product specification was actually applied. Accepting the

24   truth of these allegations, the manufacturing defect claim advances.

25       Defendants deploy three counterarguments, none of which alters the Court's reasoning.

26   First, Defendants note Plaintiffs alleged they "do not know the Defendants' intended design for

27   their baby food products—as there has been no discovery obtained to date concerning product

28   formulation, product/ingredient specifications, and testing methodologies/capabilities . . . ." (*Id*.)

United States District Court
Northern District of California

So, Defendants argue, Plaintiffs cannot allege the products differed from their intended design since Plaintiffs do not know the design.  (Dkt. No. 370 at 13.)  However, Plaintiffs need not know, nor allege all details of a design at the pleading stage.  *See, e.g.*, *Dehart v. Johnson & Johnson*, 562 F. Supp. 3d 189, 194 (D. Ariz. 2022) ("Although the SAC does not offer a detailed technical discussion of Defendants' design and manufacturing specifications, the Court is not persuaded that such a fine level of pleading detail is necessary to survive a motion to dismiss.").  Elsewhere in the Master Complaint, Plaintiffs allege the existence of product specifications for heavy metals in various baby food products.  (*See* Dkt. No. 197 ¶¶ 72, 95.)  Though Plaintiffs may not know about other components of the baby food products' design, they address the element of the design that underlies their manufacturing defect claim—that is, the product specifications.

Second, Defendants claim that Plaintiffs allege departures from the product specifications *as a matter of policy* as opposed to in individual manufacturing instances.  (Dkt. No. 370 at 14 (emphasis added).)  They assert this activity amounts to a design defect, not a manufacturing defect.  But Defendants substitute the actual language of the Master Complaint for their own.  Plaintiffs allege certain manufacturers "routinely" failed to adhere to product specifications, but do not allege this was the policy of all manufacturer defendants.  (Dkt. No. 197 ¶ 59.)  Further, the Master Complaint alleges that inconsistent use of the specifications resulted in some products having detectable levels of heavy metals, while others did not.  (*Id*. ¶ 135.)  Accordingly, the Master Complaint does not allege a uniform policy regarding Defendants' product specifications.

Last, Defendants argue Plaintiffs' theory that any detectable amount of heavy metals equates to a defect is incompatible with the manufacturing defect claim.  (Dkt. No. 370 at 15.)  As Defendants explain, if any detectable amount of heavy metals is a defect, then compliance with product specifications is a moot point, since all specifications permit some detectable amount of heavy metals.  (*Id*. at 14.)  However, the Master Complaint does not include allegations regarding every product specification for every manufacturer defendant.  Nor do Plaintiffs allege all specifications, by definition, permit a detectable amount of heavy metals in the finished product.  Drawing inferences in favor of the non-movant, it is reasonable to infer that some product specifications, when complied with, would reduce the heavy metal content of baby food below the

1    detection threshold.

2    * * *

3    For the above-stated reasons, the Court DENIES the motion to dismiss for failure to state a

4    claim.

5    **IV.    MOTION TO STRIKE**

6    Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an

7    insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The

8    function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise

9    from litigating spurious issues by dispensing with those issues prior to trial . . . ."  *Whittlestone,*

10   *Inc. v. Handi-Craft Co*., 618 F.3d 970, 973 (9th Cir. 2010) (citation omitted).  "Motions to strike

11   are generally disfavored" and "should only be granted if the matter sought to be stricken clearly

12   has no possible bearing on the subject matter of the litigation."  *Gutzalenko v. City of Richmond*,

13   No. 22-CV-02130, 2024 WL 1141689, at *2 (N.D. Cal. Mar. 15, 2024).

14   Defendants move to strike references to infant formula and aluminum in the Master

15   Complaint, which they argue are outside the scope of this litigation.  In response, Plaintiffs note

16   that "[h]aving consulted with experts, [they] do not intend to pursue claims related to aluminum

17   contamination in Defendants' baby foods.  To the extent future plaintiffs would like to include

18   such a claim, they will need to add those allegations into their short form complaint."  (Dkt. No.

19   380-3 at 105 n.49.)  At the hearing, the Court confirmed aluminum-related claims will not be

20   addressed in the MDL.

21   Therefore, the Court GRANTS the motion to strike references to aluminum in the Master

22   Complaint as immaterial.  Specifically, the references to "aluminum" on ECF pages 4 (line 3), 27

23   (lines 3 and 10), 29 (lines 15-19 in the table), and 33 (lines 24 and 25) of the Master Complaint are

24   stricken.

25   As to infant formula, the Court indicated during the February 27, 2025 hearing that it

26   would not issue a final ruling on the motion to strike without further argument from the parties.

27   So, the parties will have an opportunity to address the issue once again at the March 27, 2025 case

28   management conference.  In advance of argument, the Court issues this tentative ruling

United States District Court
Northern District of California

GRANTING the motion to strike.

Two reasons underlie the Court's position.  First, infant formula was not considered in the motion to transfer before the Judicial Panel on Multidistrict Litigation ("JPML").  In the briefing on that motion, Plaintiffs identified the products at issue as including "Jars/Tubs; Pouches; Puffs; Cereals; Snacks; and Yogis (yogurt-based foods)."  Brief in Support of Plaintiffs' Motion for Transfer of Actions at 6 n.2, *In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, No. 3101 (U.S.J.P.M.L. Jan 04, 2024), ECF No. 1.  Further, Plaintiffs represented to the Panel that this litigation was not about all consumables, and singled out rice products and root vegetable products as significant sources of heavy metals.  *See* Transcript of Hearing at 24, *In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, No. 3101 (U.S.J.P.M.L. Jan 04, 2024), ECF No. 125 ("The reason why they had different levels of exposure is because this is not a litigation about all baby food.  It's a litigation about specific baby foods.  Most baby food is actually safe.  But certain products, rice products, root vegetable products have crazy amounts of lead, arsenic, and mercury in them.").  Per the briefing and the hearing on the motion to transfer, these "specific baby foods" did not include infant formula, and the Panel's decision did not refer to any formula products.  So, the record demonstrates the JPML did not consolidate before this Court infant formula claims.

Second, infant formula presents different factual and legal considerations compared to baby food products such as jars/tubs, pouches, puffs, cereals, snacks, and yogis.  For instance, a separate and expansive regulatory framework exists for infant formula, since it is for special dietary use as a substitute for human milk.  *See, e.g.*, 21 U.S.C. § 350(a) (detailing nutrient content, manufacturing, and reporting requirements, among others); 21 C.F.R. Parts 106, 107.  This framework under the Federal Food, Drug, and Cosmetic Act may raise distinct legal questions that are otherwise inapplicable to baby food.  Moreover, the addition of infant formula to this MDL would generate new factual questions regarding the mechanisms of causation as well as expand the scope of discovery.  Though the Court does not consider infant formula as part of the MDL, this does not preclude any plaintiffs from raising these claims separately in a proper venue or upon remand to the transferor court.  Plaintiffs can also ask the JPML to consolidate

infant formula claims into this action, a question the Panel has not yet considered (and Defendants have not had the opportunity to address before the Panel).

Plaintiffs' argument for including infant formula relies on the Happy Babies Bright Futures Report ("HBBF") and the House of Representatives' Subcommittee reports. (Dkt. No. 380-3 at 106.) They assert all these reports—which set this litigation in motion—addressed infant formula, and so, infant formula has always been a part of these cases. But this argument misses the point. Whether these reports were included in underlying complaints of the original centralized cases does not speak to how the motion to transfer was argued before the JPML. Plaintiffs had the opportunity to make their case for centralization, and they did not raise infant formula claims for consideration in that forum.

The Court tentatively GRANTS the motion to strike references to infant formula in the Master Complaint as immaterial. Specifically, the references to infant formula on ECF pages 8 (line 5) and 9 (lines 13 and 27) of the Master Complaint are tentatively stricken. Additionally, the references to infant formula products on Appendix A to the Master Complaint are tentatively stricken. A final ruling will not be made until after the March 2025 case management conference.

## V.    CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss. Specifically, the motions are resolved as follows:

- Defendant Nestlé S.A.'s motion to dismiss for lack of personal jurisdiction is GRANTED.

- Defendant Nestlé Holdings, Inc.'s motion to dismiss for lack of personal jurisdiction is DENIED AS MOOT, since Plaintiffs have voluntarily dismissed their claims.

- Defendant Hero AG's motion to dismiss for lack of personal jurisdiction is GRANTED.

- Defendant Danone S.A.'s motion to dismiss for lack of personal jurisdiction is GRANTED.

- Plaintiffs' request for jurisdictional discovery is DENIED.

- Defendant Campbell Soup Company's motion to dismiss for failure to state a claim is

GRANTED, with leave to amend.

- Defendant Sun-Maid Growers of California's motion to dismiss for failure to state a claim is GRANTED, with leave to amend.

- Collective Defendants' motion to dismiss for failure to state a claim is DENIED. Further, the motion to strike allegations regarding aluminum is GRANTED. The motion to strike allegations regarding infant formula from the Master Complaint is taken under submission. The Court issues a tentative ruling GRANTING the motion. The Court will hear from the parties at the March 2025 case management conference prior to issuing a final ruling.

Should Plaintiffs choose to amend the Master Complaint, they must do so within 30 days of this Order.

This Order disposes of Docket Nos. 275, 276, 277, 281, 282, 284, and 300.

**IT IS SO ORDERED.**

Dated: April 2, 2025

JACQUELINE SCOTT CORLEY
United States District Judge