**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION | Case No. 24-MD-3101-JSC |
| | MDL 3101 |
| This document relates to: | Hon. Jacqueline Scott Corley |
| ALL ACTIONS | **FIRST AMENDED MASTER LONG-FORM COMPLAINT** |
| | **DEMAND FOR JURY** |

 Plaintiffs in those cases consolidated and filed into this Multi-District Litigation ("MDL") submit this First Amended Master Long-Form Complaint ("Complaint") against the below-named Defendants. Plaintiffs seek equitable relief, monetary restitution, and/or compensatory and punitive damages. Plaintiffs make the following allegations based upon personal knowledge and information and belief, as well as the investigation carried out by Plaintiffs' Lead Counsel, Plaintiffs' Steering Committee, and Plaintiffs' Liaison Counsel.

 This Complaint does not constitute a waiver or dismissal of any claims asserted in individual actions, and Plaintiffs reserve the right to amend this Complaint based upon newly discovered facts and/or evidence.

 The purpose of this Complaint is to provide general allegations as they apply to each Defendant, which can then be adopted in part or in whole by individual Plaintiffs filing Short-Form Complaints.  This Complaint in addition to a filed Short Form Complaint, constitute each Plaintiffs' pleading under Fed. R. Civ. P. 3.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

PARTIES .................................................................................................................................2

    I.    Plaintiffs ...................................................................................................................2

    II.    Defendants ...............................................................................................................3

        A.    Beech-Nut ......................................................................................................4

        B.    Gerber ...........................................................................................................5

        C.    Hain ...............................................................................................................9

        D.    Nurture ..........................................................................................................9

        E.    Plum ............................................................................................................12

        F.    Sprout .........................................................................................................15

        G.    Walmart ......................................................................................................16

JURISDICTION AND VENUE ............................................................................................16

FACTUAL ALLEGATIONS ................................................................................................17

    I.    Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods .......17

    II.    Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Manufactured and/or Sold by Defendants, Sparking National Outrage ...........18

    III.    Defendants Engaged in a Pattern and Practice of Selling Contaminated Baby Foods and Failed to Reduce Metal Levels ...............................................................................23

    IV.    Defendants Abandon Efforts to Reduce Metal Levels in Baby Foods ........................33

    V.    The Dangers of Toxic Heavy Metals and Metal Exposure Through Consumption of Baby Foods ....................................................................................................................34

        A.    Exposure to Toxic Heavy Metals Has Been Consistently Associated with Neurodevelopmental Harm, i.e., Autism and ADHD in Pediatric Populations 35

        B.    Defendants' Baby Foods Contain Toxic Heavy Metals Capable of Interfering with Early Neurodevelopment ................................................................................39

    VI.    Defendants Knowingly Sold Baby Foods Containing Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children and Thus Breeched their Duty of Care in Selling Contaminated Baby Foods ............................40

    VII.    Defendants' Baby Food Products Were Defective Due to Insufficient Warnings, Manufacturing Defects, and/or Design Defects to the Extent the Baby Food Products Contained Detectable Levels of Toxic Heavy Metal ..................................................41

VIII.    Exemplary / Punitive Damages Allegations ....................................................43

CAUSES OF ACTION ..................................................................................................44

I.    COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN .................44

II.    COUNT II: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT ...47

III.    COUNT III:  STRICT PRODUCTS LIABILITY – DESIGN DEFECT ...................49

IV.    COUNT IV: NEGLIGENCE – FAILURE TO WARN........................................52

V.    COUNT V:  NEGLIGENCE – MANUFACTURING ..........................................55

VI.    COUNT VI:  NEGLIGENCE – PRODUCT DESIGN.................................56

VII.    COUNT VII:  GENERAL NEGLIGENCE .................................................59

JURY TRIAL DEMAND ..............................................................................................61

PRAYER FOR RELIEF ................................................................................................61

**INTRODUCTION**

1.      Defendants *knowingly* sold baby food products contaminated with lead, arsenic, mercury, cadmium, and aluminum (collectively "Toxic Heavy Metals").  They did this knowing that Toxic Heavy Metals, when consumed by babies, are known to cause brain damage and neurodevelopmental harm.  Thus, to the extent Defendants sold baby food that contained detectible amounts of Toxic Heavy Metals (collectively "Contaminated Baby Food") those products were defective in their manufacture, design, and labeling.  Babies are the most vulnerable segment of the population, and they rely on that food for healthy neurodevelopment.  Defendants justify this callous disregard for the welfare of babies because, until recently, there were no regulations governing the presence of Toxic Heavy Metals in baby foods—and, because there were no regulations, they were free to do as they pleased.

2.      These lawsuits aim to stop Defendants from poisoning infants with Contaminated Baby Food.  Baby food *should* be safe.  It should *not* be contaminated with Toxic Heavy Metals. Period.  By sourcing ingredients from farms that have non-detectable levels of heavy metal (using sufficiently sensitive testing), avoiding certain ingredients all together, and systematically testing and screening finished products for Toxic Heavy Metals *before* the foods are released for consumption, these Defendants would be able to provide baby food products free of detectable levels of Toxic Heavy Metals.  And, if some levels are truly unavoidable, or if Defendants believe the identified levels are safe, then, at the very least, Defendants must warn parents/guardians/caregivers about the presence of these Toxic Heavy Metals so they can make informed decisions about what they are feeding their baby.  Anything short of proper design, manufacture, and warning, is unacceptable— especially for an industry that touts itself as providing the most important sources of neurodevelopment for the most vulnerable population of society.

3.      Plaintiffs, here, are all children that live with brain injuries and neurodevelopmental harm caused by exposure to the Defendants' Contaminated Baby Food, which has manifested in diagnoses of autism spectrum disorder ("ASD") and/or attention deficit hyperactivity disorder ("ADHD").  Their parents/guardians/caregivers were never warned that the Defendants' food contained Toxic Heavy Metals and, thus, were never able to make an informed decision about

1

whether to feed their babies Defendants Contaminated Baby Foods.  The consequences are stark—there is an unprecedented epidemic of ASD and ADHD spreading throughout the American population, driven, in part, by the systematic neurodevelopmental poisoning of infants from these Defendants' Contaminated Baby Foods.

4.    This case seeks to hold the Defendants accountable for their reprehensible conduct by compensating each Plaintiff harmed by the Defendants' Contaminated Baby Foods, and ensure each Defendant is punished to deter such conduct in the future.

**PARTIES**

**I.    Plaintiffs**

5.    Plaintiffs, each, are children who live with brain injuries and neurodevelopmental harm caused by exposure to the Defendants' Contaminated Baby Food, which has manifested in a diagnosis of ASD and/or ADHD.

6.    Plaintiffs allege that as a direct and proximate result of each Plaintiff's exposure to Toxic Heavy Metals from consumption of Defendants' Contaminated Baby Foods, they suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, brain injury manifesting as the neurodevelopmental disorders ASD and/or ADHD, other permanent physical deficits, permanent bodily impairment, and other *sequelae*.  Plaintiffs' injuries required medical intervention to address the adverse neurological effects and damage caused by  exposure to Toxic Heavy Metals in Defendants' Contaminated Baby Foods.  Additionally, each Plaintiff has suffered severe mental and physical pain, including but not limited to, pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress and have and will sustain such injuries, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes, into the future, as determined by the Trier of Fact.

7.    The product warnings for the Contaminated Baby Foods in effect during the time period Plaintiffs consumed the Contaminated Baby Foods were non-existent, vague, incomplete and/or otherwise inadequate, both substantively and graphically, to alert consumers to the presence of Toxic Heavy Metals in the Contaminated Baby Foods and/or the potentially severe health risks

associated with Toxic Heavy Metal exposure in babies.  Thus, each Defendant did not provide adequate warnings to consumers including Plaintiffs, their parents, guardians and/or caregivers, and the general public about the presence of Toxic Heavy Metals in the Contaminated Baby Foods consumed by Plaintiffs and the potential risk of the serious adverse events associated with Toxic Heavy Metal exposure in infancy.

8.      Had Plaintiffs or their parents/guardians/caregivers been adequately warned by the Defendants of the potential for exposure to Toxic Heavy Metals from consumption of Defendants' Baby Foods, and/or the potential for such exposure to result in harm, Plaintiffs, or their parents/guardians/caregivers would not have purchased, used and/or consumed Contaminated Baby Foods or would have taken other steps to potentially mitigate the harm caused by exposing a baby to Toxic Heavy Metals.

**II.     Defendants**

9.      The following are the Defendants listed in this Complaint.  These Defendants can be named or not named by individual Plaintiffs in their Short Form Complaint, and the omission of a Defendant here does not preclude the addition of other Defendants within a Short Form Complaint.[1]

In alphabetical order:

1.   Beech-Nut Nutrition Company ("Beech-Nut")

2.   The Campbell's Company ("Campbell")

3.   Danone North America, PBC ("Danone North America")

4.   Danone Nutricia Nederland BV ("Danone Early Life Nutrition" or "Danone ELN")

5.   Gerber Products Company ("Gerber")

6.   Hain Celestial Group, Inc. ("Hain")

7.   Neptune Wellness Solutions ("Neptune")

---

[1] Plaintiffs' original Master Complaint also named Danone S.A., the ultimate corporate parent of Nurture; Hero A.G., the ultimate corporate parent of Beech-Nut; and Nestle S.A., the ultimate corporate parent of Gerber.  The Court has dismissed those entities from this MDL.  And in keeping with that decision, this Master Complaint does not name those entities as Defendants.  Plaintiffs maintain that their prior allegations, as well as the information discovered to date in this MDL and in concurrent state-court litigation, suffice to state a claim and to establish jurisdiction over these entities, and Plaintiffs reserve all rights to litigate that issue at the appropriate juncture.

8.  Nestlé USA, Inc. ("Nestlé USA")

9.  Nestlé Enterprises S.A. ("Nestle Enterprises")

10. Société des Produits Nestlé S.A. ("SPN")

11. Nurture, LLC ("Nurture")

12. Plum, PBC ("Plum")

13. Sprout Foods, Inc. ("Sprout")

14. Sun-Maid Growers of California ("Sun-Maid")

15. Walmart, Inc. ("Walmart")

**A.    Beech-Nut**

10.     Defendant Beech-Nut Nutrition Company ("Beech-Nut") is a citizen of Delaware and New York with its principal place of business located at 1 Nutritious Pl., Amsterdam, New York 12010.  Beech-Nut branded baby foods aim at infants 4+ months up to 12+ months and include a variety of cereals, "jars," and "pouches" for these age groups.  At all relevant times, Beech-Nut has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.

11.     Beech-Nut is wholly owned by Hero A.G., aka Hero Group ("Hero Group"), a citizen of Switzerland, with its principal place of business located at Karl Roth-Strasse 8, 5600, Lenzburg, Switzerland.  The relationship between Beech-Nut and Hero Group was formed in 2005.  Prior to that, starting in 1998, Beech-Nut was owned and operated by the Milnot Holding Corporation, and prior to that, starting in 1989, Beech-Nut was owned and operated by Ralston Purina, and prior that, starting in 1979, Beech-Nut was owned and operated by Nestlé.

12.     On information and belief, other Hero Group entities were directly involved in the content and quality of the Beech-Nut Baby Foods at issue, including decisions and actions related to sourcing ingredients, setting limits for Toxic Heavy Metals, and testing for Toxic Heavy Metals. Information discovered to date in this litigation and concurrent state-court litigation indicates that Beech-Nut undertook the tortious conduct alleged herein at the direction of or in tandem with Hero Group entities, but discovery has not enabled Plaintiffs to specifically identify all relevant Hero Group entities within the complex corporate chain.  Plaintiffs reserve all rights to pursue claims

against additional Hero Group entities that further discovery may reveal.

13.    For the purposes of this Complaint, allegations related to Beech-Nut apply equally to any responsible Hero Group entities, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Beech-Nut's Contaminated Baby Foods at issue in this MDL.

**B.    Gerber**

14.    Defendant Gerber Products Company ("Gerber") is a citizen of Michigan and Virginia with its principal place of business located at 1812 N. Moore Street, Arlington, Virginia 22209. Gerber sells Baby Foods under the brand name Gerber.  Gerber organizes its products into broad categories of "formula," "baby cereal," "baby food," "snacks," "meals & sides," "beverages," and "organic."  At all relevant times, Gerber has conducted business and derived substantial revenue from its manufacturing, labeling, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.  Gerber is a wholly owned subsidiary of and is directly controlled by Nestlé Holdings, Inc.

15.    Gerber is part of the Nestlé family of companies ultimately owned by Nestlé S.A. ("Nestlé"), a citizen of Switzerland, with its principal place of business located at Avenue Nestlé 55, 1800 Vevey, Switzerland.  Nestlé is a global food and beverage company with more than 2,000 brands.  Nestlé sells baby foods under its subsidiary, Gerber, a wholly owned subsidiary of Nestlé Holdings, Inc. ("NHI"), a citizen of Delaware and Virginia with its principal place of business located at 1812 N. Moore Street, Arlington, Virginia 22209, which is in turn a wholly owned subsidiary of Nestlé S.A.

16.    The relationship between Gerber, NHI, and Nestlé was formed in 2007.  Prior to that, starting in 1994, Gerber was owned and operated by Novartis, one of the largest pharmaceutical companies in the world.  However, in 2007, Gerber was sold to Nestlé for $5.5 billion.

17.    Along with Gerber, other Nestlé entities were directly involved in the content and quality of the Gerber Baby Foods at issue, including decisions and actions related to sourcing ingredients, setting limits for Toxic Heavy Metals, and testing for Toxic Heavy Metals.

18.    Nestlé USA, Inc. ("Nestle USA"), a wholly owned subsidiary of Nestlé S.A., is a Delaware corporation with its headquarters located at 1812 North Moore Street, Arlington, Virginia

22209.  First incorporated in 1920, Nestlé USA has approximately 36,000 employees and is the parent company of Gerber Products Company.

19.     Nestlé USA employees were decision makers about the safety of Gerber Baby Foods and ingredients, including the amount of Toxic Heavy Metals in those foods.  Nestlé USA was responsible for testing Gerber's Baby Food products for heavy metals at its Nestlé Quality Assurance Center in Solon, Ohio.  Because Baby Food products that contain rice typically have the highest Toxic Heavy Metal levels, *where* the rice is procured/sourced greatly impacts the safety of the finished products.  Nestlé USA was aware of rice's impact on Toxic Heavy Metals levels and was responsible for procuring the rice for Gerber's Baby Food products.  ████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████

20.     Nestlé USA was further involved in consumer messaging regarding the safety of Gerber's Baby Food.  ███████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

MASTER LONG-FORM COMPLAINT

to heavy metals.

21. Defendant Nestlé Enterprises S.A., a wholly owned subsidiary of Nestlé S.A., is a citizen of Switzerland with a principal place of business located at Avenue Nestlé 55, 1800 Vevey, Switzerland.  Founded in 1999, Nestlé Enterprises S.A. has approximately 1,000 employees.  Nestlé Enterprises S.A. controlled the safety of Gerber Baby Foods, including the levels of Toxic Heavy Metals in those foods.

22. Defendant Société des Produits Nestlé S.A. ("SPN"), a wholly owned subsidiary of

Nestlé S.A., is a citizen of Switzerland with a principal place of business located at Avenue Nestlé 55, 1800 Vevey, Switzerland.  SPN was founded in 1936 and has approximately 2,500 employees. Gerber's litigation productions to date demonstrate that SPN employees were also decision makers regarding the amount of Toxic Heavy Metals in Gerber Baby Foods.  ████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

23.     On information and belief, other Nestlé entities were directly involved in the content and quality of the Gerber Baby Foods at issue, including decisions and actions related to sourcing ingredients, setting limits for Toxic Heavy Metals, and testing for Toxic Heavy Metals.  Information discovered to date in this litigation and concurrent state-court litigation indicates that Gerber undertook the tortious conduct alleged herein at the direction of or in tandem with Nestlé entities, but discovery has not enabled Plaintiffs to specifically identify *all* relevant Nestlé entities within the complex corporate chain.  Plaintiffs reserve all rights to pursue claims against additional Nestlé entities that further discovery may reveal.

24.     For the purposes of this Complaint, unless specifically stated otherwise, Nestlé USA, Nestlé Enterprises S.A., SPN, and any other responsible Nestlé entities shall be collectively referred to as "Nestlé entities."  Further, allegations related to Gerber apply equally to these Nestlé entities, as each Defendant exercised authority and control over the sale, manufacture, and distribution of

8

Gerber's Contaminated Baby Foods at issue in this MDL.  At all relevant times, the named Nestlé entities have conducted business and derived substantial revenue from the manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.

### C.    Hain

25.    The Hain Celestial Group, Inc. ("Hain") is a citizen of Delaware and New York with its principal place of business located at 1111 Marcus Ave., Lake Success, New York 11042.  Hain sells baby foods under the brand name Earth's Best Organics.  Hain offers infant and baby formula and foods as well as toddler foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on the go."  At all relevant times, Hain has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.

### D.    Nurture

26.    Defendant Nurture, LLC ("Nurture") is a citizen of Delaware and New York with its principal place of business located at 40 Fulton St., 17th Floor, New York, New York 10038-1850.  Nurture does business as (i.e., dba) "Happy Family Organics" and sells baby foods under the brands Happy Baby, Happy Tot, and Happy Family.  Nurture classifies its Happy Baby range of products according to three categories: "baby," "tot," and "mama."  The "baby" category is comprised of foods, including "starting solids," intended for age groups 0-7+ months, the "tot" category covers 12+ months, and "mama" includes infant formulas for newborn babies.  At all relevant times, Nurture has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of baby foods within this judicial district and throughout the United States.

27.    Nurture was founded in 2003 by Shazi Visram, started selling baby food products in 2006, and was acquired in May 2013 by Danone S.A. ("Danone"), a citizen of France, with its principal place of business located at 17 Boulevard Haussmann, 75009 Paris, France.  Danone is a global food and beverage company built on four businesses:  Essential Dairy and Plant-Based Products, Waters, Early Life Nutrition, and Medical Nutrition.  Danone sells products in over 120

markets.  As of 2023, Danone generated sales of 27.6 billion euros, with 6.9 billion in sales in North America and 8.5 billion in sales attributable to Specialized Nutrition, which includes Early Life Nutrition.  Danone sells baby food through its subsidiary, Nurture.  Upon information and belief, Happy Family Holding Company LLC is the only member of Nurture LLC. Danone US, LLC is the sole member of Happy Family Holding Company LLC. Danone US, Inc. is the sole member of Danone US, LLC. Danone US, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York. Danone  S.A. owns 100% of Danone US, Inc. Prior to 2022, Nurture was incorporated under Delaware law as Nurture, Inc., of which 100% of all stock was owned by Danone.

28.    Along with Nurture, other Danone entities were directly involved in the content and quality of the Nurture Baby Foods at issue, including decisions and actions related to sourcing ingredients, setting limits for Toxic Heavy Metals, and testing for Toxic Heavy Metals.

29.    Defendant Danone North America, PBC, is a citizen of Delaware with its principal places of business at 1 Maple Ave, 3rd Floor, White Plains, NY 10605, and 1900 Cherry St. Louisville, CO 80027.

30.    The Danone North America quality and food safety department oversees all Danone North America Brands, including Nurture.  Accordingly, all of Nurture's quality and food safety personnel are Danone North America personnel.  Among other things, this department audits and manages Nurture products produced at contract manufacturers.  Ultimately, the safety of Nurture's food is the responsibility of Danone North America's Quality and Food Safety Department.

31.    Many of Nurture's managing officers are Danone North America employees who are directly supervised by other Danone North America employees.  Nurture's Director of Product Development, Magdelena Bartosik, whose responsibilities include selecting the ingredients to be used in Nurture's baby food products, reports directly to Danone North America's Vice President of Research and Innovation.  The current head of Nurture's Quality and Food Safety team, Rebecca Beaudin, is a Danone North America employee.  David Maltese, who manages Nurture's relationships with third-party manufacturers, is a Danone North America employee. ████████



1   ████████████████.  Because Nurture does not manufacture any of its own food, all food is

2   sourced from third-party manufacturers, Mr. Maltese's management of those third-party

3   manufacturers is particularly impactful at Nurture with respect to the safety of its products.  Danone

4   North America also intervened in sourcing Nurture ingredients.  ████████████████████

5   ████████████████████████████████████████

6       32.   ████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████

9       33.   Defendant Danone Nutricia Nederland BV ("Danone Early Life Nutrition" or

10  "Danone ELN") is a citizen of the Netherlands with its principal place of business located at

11  Einsteinlaan 20, 2719 EP, Zoetermeer.  As of 2023, Danone ELN employed 208 full-time workers.

12      34.   ████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████

20      35.   ██████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████████

26  ████████████████████████████████

27      36.   On information and belief, other Danone entities were directly involved in the content

28  and quality of the Nurture Baby Foods at issue, including decisions and actions related to sourcing

11

ingredients, setting limits for Toxic Heavy Metals, and testing for Toxic Heavy Metals.  Information discovered to date in this litigation and concurrent state-court litigation indicates that Nurture undertook the tortious conduct alleged herein at the direction of or in tandem with Danone entities, but discovery has not enabled Plaintiffs to specifically identify *all* relevant Danone entities within the complex corporate chain.  Plaintiffs reserve all rights to pursue claims against additional Danone entities that further discovery may reveal.

37.    For the purposes of this Complaint, unless specifically stated otherwise, Danone North America, Danone ELN, and any other responsible Danone entities shall be collectively referred to as "Danone entities."  Further, allegations related to Nurture or Happy Family/Happy Baby apply equally to these Danone entities, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Nurture's Contaminated Baby Foods at issue in this MDL.  At all relevant times, the named Danone entities have conducted business and derived substantial revenue from the manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.

**E.    Plum**

38.    Defendant Plum, PBC ("Plum") is a citizen of Delaware and California with its principal place of business located at 6795 N. Palm Ave., 2nd Floor, Fresno, California 93704.  Plum sells Baby Foods under the brand name "Plum Organics" and has done so since 2007.  Starting June 12, 2013, and until May 3, 2021, Plum was directly controlled and owned by Defendant Campbell.  Plum's products are divided into groups according to the targeted infant or toddler age and/or type of food product.  For example, there are five groups designated for the youngest infants: Stage 1 (4+ months old), Stage 2 (6+ months old), Stage 3 (6+ months old), "Super Puffs," and "Little Teethers."  At all relevant times, Plum has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of baby foods within this judicial district and throughout the United States.

39.    Defendant The Campbell's Company ("Campbell") is a Citizen of New Jersey with its principal place of business located at One Campbell Pl., Camden, New Jersey 08103.  Campbell sells food and beverages and was the parent company of Plum until May 3, 2021, wherein Campbell sold

Plum to Defendant Sun-Maid, a few months after the first heavy metal lawsuits were filed. Campbell sold baby food under the brand name Plum Organics through Plum. Once Campbell acquired Plum, Campbell's logo appeared on Plum products. Indeed, many of the scientists and researchers that monitored the safety of Toxic Heavy Metals in Plum's baby foods were directly employed by Campbell or were directly controlled and trained by Campbell agents and employees. For example, it was Campbell's attorneys that responded to Congressional inquiries about heavy metals in Plum baby foods in 2019.

40.     When it came time for the plaintiffs in state-court litigation to depose the "persons most qualified" to discuss various elements of Plum's baby food products—including testing policies and procedures, formulas, health hazards, marketing, and regulatory matters—many of the people who testified for Plum were Campbell officers and employees. These included Tracy Hicks, a Campbell Manager for Global Analytical Chemistry and Senior Manager for Chemical Safety, ██████ ████████████████████████████████████████████████ ████████████; Christina Strapp, who served as Campbell's group Manager for the Plum brand, ███ ██████████████████████████████████████████; Annalisa Fornarelli, Campbell's Vice President of Food Safety and Quality, ████████████████████████████████████████████ ██████████████████████████████████████████████████████; and Jade Chong, Campbell's Director of Regulatory Affairs, ████████████████████████.

41.     These witnesses were employed exclusively by Campbell, and they detailed Campbell's involvement in the content and quality of Plum's Baby Foods. Among other things, they confirmed that Campbell initiated and directed the heavy metal testing for Plum products—and that it did so only as a response to public reports of the heavy metals in those products. Other Campbell employees corroborated this account, including Timothy Spitzenberger, Campbell's Principal Scientist for Food Safety. Although employed by Campbell, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████ Another Campbell employee, Steve DeMuri, ████████████████████████

13

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████

7    42.    Campbell similarly confirmed its control over the Plum brand to Congress.  In

8 response to Congress's inquiries about the Toxic Heavy Metals in Plum Baby Foods, Campbell

9 stated, among other things, ████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████

14    43.    Campbell exercised control over Plum's baby food selling in the United States until

15 May 3, 2021.  At all relevant times, Campbell conducted business and derived substantial revenues

16 from its manufacturing, advertising, distributing, selling, and marketing of baby foods within this

17 judicial district and throughout the United States.

18    44.    Defendant Sun-Maid Growers of California ("Sun-Maid") is a citizen of California

19 with its principal place of business located at 6795 N. Palm Ave., Fresno, California 93711.  Sun-

20 Maid sold baby food through Plum, starting on May 3, 2021.  Sun-Maid acquired Plum from

21 Campbell on May 3, 2021.  Sun-Maid has since been directly involved with all aspects of the safety

22 and testing of Plum's baby food products, as evidenced by the fact that metal testing is paid for

23 directly and sent directly to Sun-Maid's scientists and executives, not directly to Plum.  On

24 information and belief, Plum did not develop for itself all the functions handled by Campbell upon

25 Plum's sale to Sun-Maid.  Rather, all major executive functions related to Plum's operation were

26 specifically transitioned from Campbell to Sun-Maid, including, on information and belief, the

27 above-described responsibilities over sourcing, testing, and setting heavy-metal limits for Plum Baby

28 Foods. ████████████████████████████████████████████████

1

2

45.     Like Campbell, Sun-Maid has exercised and continues to exercise direct control over the manufacture, sale, and distribution of all Plum baby foods since May 3, 2021.  At all relevant times, Sun-Maid conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district.

46.     For the purposes of this Complaint, allegations related to Plum between 2013 and May 3, 2021 apply equally to Campbell, unless otherwise specified, and allegations related to Plum after May 3, 2021 apply equally to Sun-Maid, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Plum's Contaminated Baby Foods at issue in this MDL.

**F.      Sprout**

47.     Defendant Sprout Foods, Inc. ("Sprout") is a citizen of Delaware and New Jersey with its principal place of business located at 50 Chestnut Ridge Rd, Montvale, New Jersey 07645.  Sprout sells Baby Foods under the brand name Sprout Organic Foods. Sprout organizes its Baby Foods selection according to three categories: Stage 2 (6 months+); Stage 3 (8 months+); and Toddler. Sprout was founded in 2008 and was sold to Defendant Neptune Wellness Solutions in February 2021.  Since Neptune acquired Sprout, it has exercised managerial control over the company, and thus has exercised direct control over the sale of Sprout baby food since that time.  At all relevant times, Sprout has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within the United States.

48.     Defendant Neptune Wellness Solutions, Inc. ("Neptune") is a citizen of Florida and Canada, with its primary place of business in the United States located at 1044 N. US Highway 1 - Suite 101, Jupiter, Florida 33477.  Neptune has sold baby food through its controlled subsidiary, Sprout, since February 2021.  Neptune has exercised control over Sprout's baby food selling, and has been directly involved with all aspects of food safety testing and specification setting for Sprout's baby foods.  Neptune also appears to have dictated all public relations and public facing actions by Sprout since the lawsuits related to Contaminated Baby Foods were filed.  Neptune, thus, has been directly involved in the tortious conduct in the United States and its various states that gives rise to

these lawsuits.  At all relevant times, Neptune conducted business and derived substantial revenues from its manufacturing, advertising, distributing, selling, and marketing of baby foods within this judicial district and throughout the United States.

49.    For the purposes of this Complaint, allegations related to Sprout after February 2021 apply equally to Neptune, unless otherwise specified, as each Defendant exercised authority and control over the sale, manufacture, and distribution of Sprout's Contaminated Baby Foods at issue in this MDL.

### G.    Walmart

50.    Defendant Walmart, Inc. ("Walmart") is a citizen of Delaware and Arkansas with its principal place of business located at 702 S.W. 8th St. Bentonville, Arkansas 72716. Walmart sells Baby Foods under the private label brand "Parent's Choice."  The foods are manufactured by co-manufacturers, but are sold under Walmart's private label using Walmart's name.  Walmart's Parent's Choice offers a wide selection of baby foods ranging from "sweet potatoes & corn" to "toddler cookies" and "yogurt bites".  At all relevant times, Walmart has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district and throughout the United States.

### JURISDICTION AND VENUE

51.    As an MDL transferee court, this Court has subject matter and personal jurisdiction to the same extent as the respective transferee courts do.  In general, federal courts have subject matter jurisdiction over each of the actions under 28 U.S.C. § 1332(d) because Plaintiffs are citizens of states other than states where Defendants are citizens.  In addition, each Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.  However, this complaint does not purport to establish or refute subject matter jurisdiction in any given individual's case.

52.    This Court has personal jurisdiction over Defendants because their significant contacts related to this litigation in each State makes personal jurisdiction proper over any of them.

53.    In particular, this Court has personal jurisdiction over Defendants for cases filed in this District insofar as Defendants are authorized and licensed to conduct business in the State of California, maintain and carry on systematic and continuous contacts in this judicial district, regularly

transact business within this judicial district, and regularly avail themselves of the benefits of this judicial district.

54. Additionally, Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

55. Venue is proper in this District for pretrial purposes for all cases because this litigation was centralized here under 28 U.S.C. § 1407.

56. Venue is proper in this District under 28 U.S.C. § 1391(a) for cases filed here because a substantial part of the events and omissions giving rise to those Plaintiffs' claims occurred in this district.

57. The Defendant Danone entities, Nestlé entities, and Neptune are subject to personal jurisdiction in the relevant judicial districts insofar as they are authorized and licensed to conduct business in their respective states. Additionally, these Defendants maintain and carry on systematic and continuous contacts in these judicial districts, regularly transact business within these districts, and regularly avail themselves of the benefits of these districts. These Defendants caused tortious injury by acts and omissions in these judicial districts and by acts and omissions outside these districts while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in these districts.

## FACTUAL ALLEGATIONS

### I.   Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods

58. In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing "outcomes-based programs to measurably reduce babies' exposures to toxic chemicals," published a report investigating the presence of Toxic Heavy Metals in baby foods. The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury. All but nine of 168 baby foods contained at least one metal; most contained more than

MASTER LONG-FORM COMPLAINT

one."  Specifically, the HBBF report identified "puffs and other snacks made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple, pear, grape and other fruit juices," and "carrots and sweet potatoes" manufactured by the Defendants as particularly high in Toxic Heavy Metals.

59.    The results of the HBBF report were consistent with that of the U.S. Food and Drug Administration ("FDA") which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.  However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."  The HBBF's findings were by no means an outlier.  Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead…concentrations in a large convenience sample of US baby foods."  The study detected lead in 37% of samples.

60.    Moreover, earlier in 2017, HBBF commissioned a study to evaluate the presence of arsenic in infant rice cereal products sold in the U.S., and the potential risks to children's neurodevelopment posed by contamination levels.  The findings were concerning.  The authors concluded that "exposures to arsenic from infant rice cereal approach or exceed existing health-based limits for arsenic levels…leaving little room for additional exposures from other dietary sources, such as snacks, apple juice, and drinking water…Our analyses of arsenic exposures from infant rice cereal during the first year of life suggest that these exposures are not insignificant, and may place infants at risk for adverse health effects."

## II.    Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Manufactured and/or Sold by Defendants, Sparking National Outrage

61.    On February 4, 2021, and September 29, 2021, respectively, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published two reports detailing its findings that Toxic Heavy Metals—including lead, arsenic, mercury, and cadmium—were present in "significant levels" in numerous commercial Baby Food Products.  Four companies—Hain, Gerber (Nestlé), Nurture (Danone), and Beech-Nut—produced internal testing policies, test results for ingredients and finished products, and

1    documentation about what the companies did with ingredients and/or finished products that exceeded

2    their internal testing limits.  Three companies—Plum (Campbell), Walmart, and Sprout—initially

3    refused to cooperate.

4           62.     Congress reported that the data submitted by the companies unequivocally revealed

5    that a substantial number of Defendants' finished products and/or ingredients used to manufacture the

6    Baby Foods are tainted with Toxic Heavy Metals, namely lead, arsenic, mercury, and cadmium.

7    And, where the Defendants did set internal limits for the amount of metals they allowed in their

8    foods, Defendants routinely flouted their own limits and sold foods that consistently tested above

9    their limits.  Congress found the following:

10          63.     **Beech-Nut.**  Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic.

11   Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product

12   characteristics such as "crumb softness."  On June 8, 2021, four months following the Congressional

13   findings, Beech-Nut issued a voluntary recall of its infant single grain rice cereal and exited the rice

14   cereal market completely.  In its recall, Beech-Nut confirmed that its products exceed regulatory

15   arsenic limits.  And, Beech-Nut used ingredients containing as much as 886.9 ppb lead, as well as

16   483 products that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that

17   contained over 20 ppb lead.  In its follow up Report in September 2021 Congress specifically focused

18   on Defendants Beech-Nut and Gerber's infant rice cereals.  Congress noted that Beech-Nut rice

19   cereal tested up to 125 ppb inorganic arsenic and averaged 85.47 ppb inorganic arsenic.  Beech-Nut's

20   practice of testing ingredients, rather than finished products, for toxic heavy metals appears to have

21   contributed to its failure to detect the dangerous inorganic arsenic levels in its recalled products.

22   Lastly, Beech-Nut does not even test for mercury in baby food.

23          64.     **Gerber.**  Gerber used high-arsenic ingredients, using 67 batches of rice flour that had

24   tested over 90 ppb inorganic arsenic.  Gerber used ingredients that tested as high as 48 ppb lead; and

25   used many ingredients containing over 20 ppb lead.  Gerber rarely tests for mercury in baby foods.

26   In the September 2021 follow-up Congressional report, it was revealed that Gerber's rice cereal

27   tested up to 116 ppb inorganic arsenic, and their average rice cereal product contained 87.43 ppb

28   inorganic arsenic, which is even higher than the amount contained in Beech-Nut's average rice cereal

1    product.  While Beech-Nut recalled some of its products and completely discontinued sales of its rice

2    cereal, Gerber and other Nestlé entities have taken no such actions to protect children.

3         65.    **Hain (Earth's Best Organic).**  Hain sold finished baby food products containing as

4    much as 129 ppb inorganic arsenic.  Hain typically only tested its ingredients, not finished products.

5    Documents show that Hain used ingredients testing as high as 309 ppb arsenic.  Hain used ingredients

6    containing as much as 352 ppb lead.  Hain used many ingredients with high lead content, including

7    88 that tested over 20 ppb lead and six that tested over 200 ppb lead.  And, Hain does not even test

8    for mercury in its baby food. However, independent testing by HBBF of Hain's Baby Foods confirm

9    that Hain's products contain as much as 2.4 ppb of mercury.

10        66.    **Nurture (HappyBABY).**  Submissions from Danone North America showed that

11   Nurture sold baby foods after tests showed they contained as much as 180 ppb inorganic arsenic.

12   Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic.

13   Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

14   Nurture sold finished baby food products that tested as high as 641 ppb lead.  Almost 20% of the

15   finished baby food products that Nurture tested contained over 10 ppb lead.  Moreover, Nurture sold

16   finished baby food products containing as much as 10 ppb mercury.

17        67.    **Plum.**  Plum, along with Campbell, refused to cooperate with the Congressional

18   investigation.  Instead of producing any substantive information, Campbell provided Congress with a

19   self-serving spreadsheet declaring that every one of its products sold through Plum "meets criteria",

20   while declining to state what those criteria were.  Disturbingly, Campbell admitted that, for mercury

21   (a powerful neurotoxin), Campbell and Plum have *no criterion* whatsoever, stating: "No specific

22   threshold established because no high-risk ingredients are used."  However, despite Campbell and

23   Plum having no mercury threshold, Campbell and Plum still marked every food as "meets criteria"

24   for mercury.  Congress noted that "[t]his misleading framing—of meeting criteria that do not exist—

25   raises questions about what [Plum's] other thresholds actually are, and whether they exist."  This

26   suspicion is confirmed by HBBF's independent testing which confirms the presence of Toxic Heavy

27   Metals in Plum Baby Food, which found excess levels of lead, arsenic, and mercury in Plum's Just

28   Sweet Potato Organic Baby Foods; Just Peaches Organic Baby Food; Just Prune Organic Baby Food;

Pumpkin Banana Papaya Cardamom; Apple, Raisin & Quiona Organic Baby Food; Little Teethers Organic Multigrain Teething Wafers-Banana with Pumpkin; and Mighty Morning Bar-Blueberry Lemon-Tots.  Furthermore, as discussed further below, based upon information and belief, Plaintiffs submit that Campbell and Plum's pattern and practice of failing to test ingredients, willingly flouting their own internal standards, and selling products notwithstanding internal acknowledgement of their high metal content, follows that of the other Defendants discussed in this Complaint, and discovery here will further flesh out the extent of Campbell and Plum's culpable conduct.

68.    **Sprout**.  Sprout initially refused to cooperate with the House Subcommittee's investigation, and as such the Subcommittee stated that Sprout's failure to respond "raises serious concerns about the presence of toxic heavy metals in its baby foods."  The Subcommittee noted that independent data from the HBBF Report confirmed that Sprout's baby foods are indeed tainted.  For example, the HBBF Report observed that Sprout's Organic Quiona Puffs Baby Cereal Snack-Apple Kale contained 107 ppb total arsenic, 47 ppb inorganic arsenic, 39.3 ppb lead, and 41.5 ppb cadmium.

69.    As outlined in the Subcommittee's Addendum Report, Sprout eventually provided a "handful of documents" to the Subcommittee, and the documents provided "displayed a lax approach to testing for toxic heavy metals in its baby food."  Sprout relies on its ingredients suppliers to test their ingredients for toxic heavy metals and only asks the suppliers to test once a year.  Upon information and belief, despite its representations to the Subcommittee, Sprout did not require its raw ingredient suppliers to provide yearly heavy metal test results prior to the Subcommittee's inquiry into the company.  Sprout provided only 11 toxic heavy metal test results to the Subcommittee stating that "[b]ecause Sprout requires annual testing for heavy metals for its ingredients, rather than by lot, Sprout is unable to provide testing information for each lot as requested." The Subcommittee called this testing the "the most reckless among baby food sellers on the market."

70.    **Walmart**.  Walmart refused to cooperate with the House Subcommittee's investigation into its baby foods products, and as such, the Subcommittee was "greatly concerned" that Walmart "might be obscuring the presence of higher levels of toxic metals in their baby food products." The Subcommittee noted that independent data from the HBBF Report confirmed that

MASTER LONG-FORM COMPLAINT

Walmart's baby foods are indeed tainted. For example, the HBBF Report observed that one of Walmart's products contained 56.1 ppb total arsenic, and 26.1 ppb cadium. Another product contained 108 ppb total arsenic, 66 ppb inorganic arsenic, 26.9 ppb lead, and 2.05 ppb mercury.

71.    Following the publication of the Subcommittee Report, Walmart provided documents to the Subcommittee. On September 29, 2021, the House Subcommittee released a subsequent report entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods." The Subcommittee report addendum described the documents from Walmart as "revealing a concerning lack of attention to toxic heavy metal levels in baby food and an abandonment of its previously more protective standards." Walmart does not appear to conduct any testing of its baby food products. Walmart sets maximum arsenic and lead levels and asks the manufacturer of its private label to self-certify, but Walmart does not appear to collect any test data or check the accuracy of those certifications. Walmart does not require any mercury or cadmium testing and does not set any standards for mercury or cadmium levels.

72.    The metal concentrations discussed above and further below surpass the limits allowed by U.S. regulatory agencies. There are no FDA final regulations governing the presence of Toxic Heavy Metals in the majority of Baby Foods with the exception of 100 ppb inorganic arsenic in infant rice cereal and some recently finalized limits for lead in certain baby food categories. To the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendants' Baby Foods exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to *adult* exposure, not infants. Compared to these thresholds, the test results of the Defendants' baby foods and their ingredients are multiple folds greater than the permitted metal levels. They are also far greater than permitted by the FDA's final guidance for lead, issued January 6, 2025, which sets limits at 10 or 20 ppb for baby foods (10 ppb for fruits, 10 ppb for single or mixed vegetable purees/puddings, 20 ppb for single ingredient root vegetables, and 20 ppb for dry cereals) and 10 or 20 ppb for juices (10 ppb for apple juice or single-strength juice and 20 ppb for juice blends containing apple juice), and the FDA's proposed limit for arsenic in apple juice (10 ppb). Moreover,

compounding these troubling findings, the Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below.

73. As Congress observed, the Defendants have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products.

### III. Defendants Engaged in a Pattern and Practice of Selling Contaminated Baby Foods and Failed to Reduce Metal Levels

74. Several factors drive the Toxic Heavy Metal contamination of Defendants' baby foods, all of which are within Defendants' control.

75. *First*, at various times, all Defendants sourced ingredients that contained elevated levels of Toxic Heavy Metals. These ingredients were then used to manufacture the baby foods consumed by Plaintiffs, thereby exposing Plaintiffs to Toxic Heavy Metals that cause brain damage and other neurodevelopmental harm. One way for Defendants to "deal" with this issue involved relegating any testing of Toxic Heavy Metals to suppliers and co-manufacturers, who were required to certify that Toxic Heavy Metals were below a certain threshold. Defendants would audit those results, discover that the reported certifications were false or inaccurate, and then take no action to stop the use of those ingredients or finished products.

76. *Second*, some Defendants implemented dangerously high internal limits ("specifications" or "specs") for the maximum level of Toxic Heavy Metals that Defendants allowed in the baby foods. Such high limits—untethered to any consideration of the low levels at which metals are capable of damaging babies' brains—allowed Defendants to source and use ingredients that contained elevated Toxic Heavy Metals to manufacture the baby foods consumed by Plaintiffs. In the highly competitive and lucrative baby food market, using contaminated ingredients allows each Defendant to retain greater market share.

77. *Third*, some Defendants failed to implement *any* internal specifications for the amount of Toxic Heavy Metals allowed in ingredients or finished baby foods. By simply not looking at the issue, certain highly contaminated ingredients and finished products were allowed to be used and sold

to consumers. This would happen notwithstanding the Defendants' specific knowledge of the risk of Toxic Heavy Metals and their presence in ingredients and finished products.

78. *Fourth,* Defendants did not routinely adhere to their own internal metal specifications or standards, allowing contaminated ingredients and finished products to be released as "exceptional releases" or other simpler terminology. This resulted in ingredients being used and baby foods manufactured and sold that contained levels of Toxic Heavy Metals far higher than what was internally set by Defendants. In other instances, Defendants would test products that had been put on the market after-the-fact, learn about the products containing extremely high levels of Toxic Heavy Metals, and then take no action to recall the product or warn consumers about the issue.

79. *Fifth*, upon information and belief, Defendants' manufacturing practices also contributed to contamination. For example, the water used at some of the facilities where the baby foods were manufactured contained Toxic Heavy Metals which, in turn, ended up in the finished baby food product sold for consumption by babies.

80. **Beech-Nut**. Beech-Nut and responsible Hero Group entities did not test their finished baby foods for heavy metals, only ingredients. And, Beech-Nut regularly accepted ingredients testing far higher than its internal limits for Toxic Heavy Metals. It justified such deviations as "exceptional releases." For example, Beech-Nut "exceptionally released" 160,000 pounds of sweet potatoes for its baby food products notwithstanding the ingredient testing twice as high as Beech-Nut's internal heavy metal limit for lead.

81. Moreover, Beech-Nut did not adequately test ingredients for heavy metals by limiting ingredient lots and ingredient quantities that were subject to metal testing. For example, if a supplier supplied ingredients below a certain amount, Beech-Nut would not test anything and simply use the ingredient in the finished product. Furthermore, in deciding to violate their own internal limits, Beech-Nut took advantage of the fact that the FDA does not routinely test baby foods for Toxic Heavy Metals.

82. Upon information and belief, Beech-Nut went so far as to manipulate testing practices by continually re-testing ingredients that tested above internal specs until obtaining a result that was at or below the internal specs, knowing full well that the ingredient was nonetheless contaminated.

83.     Beech-Nut's internal specifications varied wildly by ingredient, with Beech-Nut allowing very high levels of Toxic Heavy Metals for certain ingredients, and insisting on lower levels for others.  Thus, certain products like rice flour, were allowed to have very high levels of metals like arsenic and lead, even in products that were 90% or more rice.  Beech-Nut did this because there were no regulations governing Toxic Heavy Metal in baby food and, therefore, to remain competitive in the baby food marketplace, Beech-Nut used contaminated ingredients because they were readily available.

84.     **Gerber.**  Gerber and Nestlé entities tested ingredients and, occasionally, finished products.  However, while Gerber and Nestlé entities were the only Defendants to test both ingredients and finished products with any regularity, they set high heavy metal limits that rendered their food unsafe.  For baby foods generally, between 2012 and 2019, Gerber and Nestlé entities set a limit of 40 ppb for lead, 20 ppb for arsenic, and 10 ppb for mercury.  For infant rice cereal, between 2012 and 2017, Gerber and Nestlé entities set a lead limit of 100 ppb, with a "target" of 50 ppb in 2016 and 2017.  Between 2018 and 2019, Gerber and Nestlé entities set a lead limit for 50 ppb.  For arsenic in rice cereal, between 2012 and 2015, Gerber and Nestlé entities did not have a limit, merely a target of 100 ppb.  Then, between 2016 and 2018, it set the arsenic limit at 100 ppb.  By 2019, Gerber and Nestlé entities increased the arsenic limit to 130 ppb for cereals with 90% rice (and kept the limit at 100 ppb for other cereals).  For snack foods, Gerber and Nestlé entities had a lead limit of 150 ppb between 2012 and 2014. It was reduced to 100 ppb in 2016 and 2017, and then went down to 50 ppb in 2018 and 2019.  There was no limit for arsenic in snack food prior 2016, just a "target" of 100 ppb.  Then a 100-ppb arsenic limit was set starting in 2016.  For both infant cereal and snacks, Gerber and Nestlé entities imposed a 30-ppb limit for mercury in infant cereal between 2012 and 2016, and reduced it to 10 ppb from 2017 onward.  With these exceptionally high limits, Gerber and Nestlé entities sold baby foods that were dangerous for infant consumption.  They did this knowingly.

85.     Gerber and Nestlé entities would also audit and re-test Toxic Heavy Metal results submitted by suppliers, and find that the certification from suppliers were incorrect or false.  Gerber and Nestlé entities would nonetheless use the certified results and release products despite the ingredients not meeting specifications or being safe for infant consumption.

86.     Gerber and Nestlé entities often used high-arsenic ingredients, for example, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.  Furthermore, Gerber and Nestlé entities regularly sold baby food products testing over 100 ppb arsenic, at times reaching 116 ppb, and their average rice cereal product contained 87.43 ppb inorganic arsenic.  Indeed, this is why Congress noted that "Gerber's organic rice cereal is dangerous…"  In other instances, Gerber permitted as much as 300 ppb of arsenic in the rice flour ingredient used to manufacture its U.S. baby foods, notwithstanding the fact that Gerber often implemented stricter standards for baby foods sold in other countries.

87.     Gerber's baby foods are also contaminated with elevated levels of lead.  Gerber and Nestlé entities used ingredients that tested as high as 48 ppb lead and used many ingredients containing over 20 ppb lead.  Furthermore, Gerber and Nestlé entities sold baby food products testing at and/or above 50 ppb of lead.   Indeed, Gerber and Nestlé entities have historically permitted as much as 150 ppb lead in their baby food products.  Although Gerber and Nestlé entities were fully aware that it was very feasible to source lower-lead ingredients, they proceeded to use high-lead ingredients in their baby foods.  Gerber and Nestlé entities rarely test for mercury in their baby foods. This is notwithstanding the fact that mercury is known to contaminate ingredients such as rice and poses a severe risk to babies' brain development.

88.     The February 4, 2021 Congressional Report found Gerber carrots tested for cadmium at levels above 5 ppb, with some containing more than 87 ppb of cadmium.  These are exceptionally high levels.

89.     Moreover, compounding these troubling findings, Gerber and Nestlé entities historically only tested certain ingredients of its baby food products and only occasionally tested the finished products consumed by babies.  It was not until recently that Gerber and Nestlé entities started to implement finished product testing on a more regular basis.

90.     Gerber and Nestlé entities have known since at least the 1990s that inorganic arsenic was neurotoxic and caused developmental issues.  Despite this knowledge, in 2012, when Gerber's infant rice cereal was on the front page of a Consumer Report article on arsenic, a Gerber spokesperson told the public that arsenic in baby food posed no health risk.

91.    **Hain.**  Hain did not test its baby food products for heavy metals until 2020 (rice cereal) and 2021 (other baby food).  Instead, Hain tested some ingredients used in their foods (but not all ingredients).  Ingredients were required to meet specific specifications for each specific ingredient. Those specifications, however, would change wildly without explanation.  For example, prior to August 2014, Hain's lead specification for Oat Flour was 200 ppb.  Then it was reduced to 50 ppb for four months, went back up to 100 ppb for three months, went back up to 200 ppb for a month, came down to 20 ppb for seven months, went to 25 ppb for six months, and then went back to 200 ppb for the next fourteen months.  When asked about this seemingly chaotic shifting of specifications, Hain could not explain it.

92.    Hain would routinely accept ingredients that tested above specifications and use them in baby foods anyway.  These "exceptional" releases were made because there were no FDA regulations specifically preventing them.

93.    Because Hain only tested ingredients, and not finished products, they would underestimate metal exposure.  For example, in August 2019, the FDA did what Hain had refused: it actually tested Hain's baby food products for heavy metals. FDA sampled Hain's rice cereal and found levels in excess of 100 ppb.  FDA tested 20 of Hain's rice cereal products (all manufactured by Beech-Nut for Hain) sold between September 2017 and June 2018, and found 9 samples in excess of 100 ppb of inorganic arsenic, and 16 (80%) above 90 ppb.  The FDA raised concern about Hain's failure to test finished product, and asked Hain to conduct an investigation. These concerns about Hain's rice cereal were independently confirmed by HBBF, where they found 113 and 107 ppb of inorganic arsenic (138 and 126 ppb of arsenic) in those same products.  As a result of the FDA-ordered investigation, Hain learned that its rice cereal exceeded FDA arsenic levels because Hain never accounted for the arsenic added to the product from the vitamin premix.  Hain discovered that the vitamin premix specification was 3,000 ppb for arsenic and 4,000 ppb for lead.  They realized that their products needed to be tested in finished form to actually estimate the levels of heavy metals in their foods.  Hain also realized that the use of brown rice was contributing to the high levels of arsenic, so, thereafter, they started using white rice (as opposed to brown rice) to reduce arsenic levels and began testing rice cereal regularly.

94.    Hain's inept process of monitoring the safety of their baby foods resulted in products being sold that contained Toxic Heavy Metals, and this was done with full knowledge of the risks. When asked why Hain did not warn consumers of the Toxic Heavy Metals in their foods, Hain responded that if they warned, people would not buy their products.

95.    **Nurture.**  Since 2006, Defendant Nurture, under the name Happy Family Organics, has sold a wide variety of baby food products.  It was not until 2013—seven years after sales began—and after the Danone acquisition, that Nurture and Danone entities started testing its finished baby food products for lead.  This testing, however, remained infrequent and occurred only after the products had been released to the public—not as a condition of product release.  Indeed, as of July of 2021, Nurture was still not testing every batch or lot of its baby food products for heavy metals and was not including heavy metal testing as a condition of release.

96.    Nurture and Danone entities took a lackadaisical approach to sourcing oversight.  For example, Nurture and Danone entities partnered with co-manufacturer companies to make many of their baby food products, a common practice within the industry.  However, Nurture and Danone entities did not always require those co-manufacturers to provide information regarding the farms where ingredients were grown.  Although Nurture and Danone entities advertise to consumers that they have "Farmer Partners" who they "trust to grow our ingredients," Nurture and Danone entities did not even participate in selecting the farms from which co-manufacturers sourced their ingredients. As a result, Nurture and Danone entities do not even know all of the individual farms that grow their food, making it impossible to ensure that all of their ingredients were sourced from approved farms. To make matters worse, they chose not to require all of their suppliers to have specifications addressing limits for heavy metals in acceptable products.  This practice all but ensured that Nurture and Danone entities would never have a fully accurate picture of the levels of heavy metals in their ingredients or whether there were particular farms or regions that should be avoided.

97.    And yet, all the while, Nurture and Danone entities knew that toxic heavy metals in their baby food could cause brain damage in children.  Not only did Nurture and Danone entities know of the dangers heavy metals in their food posed to children, they also trained their employees on that specific risk.  For example, Nurture and Danone entities knew that dangerous levels of arsenic

1    existed in the rice that served as the base for many of its baby food products. Despite this knowledge,

2    Nurture never removed rice from its products.

3        98.    But in full view of this knowledge and with full understanding of their lackadaisical

4    ingredient oversight approach, Nurture and Danone entities chose to rarely test their finished products

5    for toxic heavy metals. And when they did test their products, they sold them regardless of what the

6    tests showed. For example, Danone entities and Nurture sold baby foods after tests showed they

7    contained as much as 180 ppb inorganic arsenic. Over 25% of the products Nurture tested before sale

8    contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product

9    it sold contained 60 ppb inorganic arsenic. Danone entities and Nurture sold finished baby food

10    products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that

11    Nurture tested contained over 10 ppb lead. Moreover, Danone entities and Nurture sold finished

12    baby food products containing as much as 10 ppb mercury. But Nurture never issued a recall for

13    these products. Indeed, nothing indicates that Nurture made any changes to its policies or approaches

14    toward heavy metals monitoring to ensure that baby food with this level of heavy metal

15    contamination was not released to the public.

16        99.    The guiding light for Nurture and Danone entities' choices was always money. They

17    chose their infrequent testing and lack of heavy metal specifications policies based on cost. They

18    chose not to inform parents of the presence of heavy metals in their foods because they knew parents

19    would then not purchase their products. They capitalized on the term "organic" that featured

20    prominently on their labels, knowingly exploiting consumers' widespread confusion that "organic"

21    means free of heavy metals. And, they implemented policies of refusing to provide testing results of

22    their products to consumers, even when parents asked, because they knew the effect such information

23    would have on their sales.

24        100.    **Plum.** Plum was founded in 2007 and has sold a wide variety of baby food products

25    under the name Plum Organics since that time. Plum was owned and controlled by Campbell from

26    June 2013 until roughly May 2021 when Plum was sold to Sun-Maid.

27        101.    Despite Plum's public facing statements that "little ones deserve the very best food

28    from the very first bite" and despite understanding that environmental toxins like heavy metals can

MASTER LONG-FORM COMPLAINT

cause neurodevelopmental disorders in children, Plum and Campbell/Sun-Maid did very little to ensure that the Plum baby food products marketed for consumption by children are not contaminated with dangerous levels of heavy metals. For example, though Plum and Campbell/Sun-Maid knew that the heavy metal contents of the ingredients used in its products varied by growing region and supplier, they did not undertake an effort to source ingredients with the lowest amount of heavy metals available. And, despite knowing that certain ingredients carry a higher risk for heavy metal contamination, Plum and Campbell/Sun-Maid did not reformulate their products to ensure that they were being made with the lowest achievable amount of heavy metals.

102.    Plum and Campbell failed to set limits on the amount of heavy metals that could be present in Plum's finished baby food products. From 2007 to at least April 2021, they did not set *any* limits for the amount of lead, arsenic, mercury, cadmium, or aluminum that their finished products could contain.

103.    Plum and Campbell also failed to set limits on the amount of heavy metals that could be present in the ingredients used in Plum's baby food products. Prior to 2016, they did not set limits for the amount of heavy metals that could be present in the ingredients used in Plum products. When Plum and Campbell did begin to implement heavy metal limits for Plum ingredients (in or around 2017), it did so only for lead, arsenic, and cadmium. As of April 2021, Plum and Campbell still had no limits for the amount of mercury and aluminum that could be in the ingredients used in their baby food products.

104.    When Plum did set some heavy metal limits (for lead and arsenic for ingredients only) it set those limits several times in excess of what was achievable for most ingredients. For example, despite certain fruits and vegetables normally containing less than 5 ppb lead or arsenic, Plum set the heavy metal limits for all Plum ingredients for lead and arsenic at 100 ppb. And, even still, despite setting these limits dangerously high, Plum and Campbell/Sun-Maid still utilized ingredients that tested in excess of those limits.

105.    Plum and Campbell/Sun-Maid also conducted very little oversight of their co-manufacturers to ensure that the heavy metal limits for ingredients used in Plum products were adhered to. For example, prior to 2017, Plum and Campbell did not require the ingredient suppliers

they contracted with to submit heavy metal testing data but instead relied on supplier assurances that the ingredients did not contain heavy metals and/or complied with all government regulations regarding heavy metals. When Plum and Campbell/Sun-Maid did begin to require testing on some of the ingredients used in its products for lead and arsenic, those efforts were scattershot and did not extend to all lots of all ingredients used in Plum baby food products. Where verification testing was conducted on ingredients, it was often done in an unaccredited lab.

106. Despite not having a comprehensive ingredient testing program to ensure that Plum food marketed for babies was not contaminated with Toxic Heavy Metals, Plum and Campbell/Sun-Maid also did not conduct heavy metal testing on Plum products prior to sale. Plum only first conducted finished product testing in the wake of public reports that exposed Plum baby food products as being contaminated with dangerous levels of heavy metals. Upon information and belief, no rigorous heavy metal testing program on ingredients and finished product was ever implemented and Plum and Campbell/Sun-Maid continued and continue to sell baby food contaminated with elevated levels of heavy metals without first testing to ensure their safety.

107. **Sprout.** Sprout's baby foods are contaminated with Toxic Heavy Metals. For example, the HBBF Report observed that Sprout's Organic Quiona Puffs Baby Cereal Snack-Apple Kale contained 107 ppb total arsenic, 47 ppb inorganic arsenic, 39.3 ppb lead, and 41.5 ppb cadmium. These levels are all highly dangerous for consumption by an infant.

108. Sprout's testing and oversight are extremely lacking. Sprout claims that it relies on its ingredients suppliers to test their ingredients for some Toxic Heavy Metals and only asks the suppliers to test once a year—a frequency that cannot ensure any safety. However, upon information and belief, despite its representations, Sprout did not require its raw ingredient suppliers to provide yearly heavy metal test results prior to the Subcommittee's inquiry into the company.

109. Sprout provided only 11 toxic heavy metal test results to the Subcommittee stating that "[b]ecause Sprout requires annual testing for heavy metals for its ingredients, rather than by lot, Sprout is unable to provide testing information for each lot as requested." The Subcommittee called this testing the "the most reckless among baby food sellers on the market."

110. Since it began testing in 2021, the results observed in Sprout's food are disturbing.

For example, testing showed, on average, over 300 ppb of arsenic in Sprout's puff products, with levels as high as 470 ppb.  Testing on other Toxic Heavy Metals also shows exceptionally high levels in various Sprout products.  Sprout's consistent failure to test, regulate, or monitor their baby food products, has led to the sale of an alarming number of baby food products that were contaminated with Toxic Heavy Metals.

111.    Internal documents within Sprout confirm that the companies were aware of these issues, even made jokes about it, but took no action to take reasonable care to avoid harm to infants until Congress blew the whistle on Sprout—and then, only after Sprout initially refused to cooperate with a Congressional investigation.

112.    Despite these findings, Sprout continues to market its products as safe, stating on its website, "[i]f it isn't safe, healthy, and delicious, we don't make it."  Considering they never tested their products prior to 2021, this statement is, at best, an overstatement.

113.    **Walmart.** Walmart sold baby food under a "private" brand called "Parent's Choice", which was manufactured by a different supplier but branded, promoted, and sold as a Walmart product. Walmart did not test it for Toxic Heavy Metals whatsoever.  Instead, Walmart required certain specifications be met for the products provided by its suppliers, which included some limits of heavy metals.  These specifications were not enforced in any way.  Walmart did not require the submission of testing from suppliers, nor did it do any of its own testing.

114.    The only efforts to police Toxic Heavy Metals in their Parent's Choice baby food involved generic specifications for lead and arsenic—there were no other specifications or limits for other Toxic Heavy Metals—which for most baby food products resulted in there being no limits. The following chart reflects Walmart's Toxic Heavy Metal specifications prior to December 2018.

| Type of Food | Lead | Arsenic | Mercury | Cadmium | Aluminum |
|---|---|---|---|---|---|
| Dry baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Dry baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Wet baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Wet baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Yogurt baby food products | *None* | *None* | *None* | *None* | *None* |

115.    In December 2018, Walmart changed its specification to 100 ppb of inorganic arsenic

for all dry baby foods, making the products even less safe. Thus, for the vast majority of Walmart's baby food products, there was never a limit for any Toxic Heavy Metals.

**IV.    Defendants Abandon Efforts to Reduce Metal Levels in Baby Foods**

116.    In 2019, as concerns grew over contamination of certain baby foods on the U.S. market, a consortium of the Defendants comprised of Beech-Nut, Plum/Campbell, Gerber, Hain, Nurture, and Sprout, as well as certain interested third party groups such as the Environmental Defense Fund ("EDF") and HBBF, were formed with the intention "of reducing heavy metals in young children's food."

117.    The consortium was named the Baby Food Council ("BFC"). The BFC involved the sharing of common testing data on the levels of metal contamination of Defendants' baby foods, a grant to Cornell University to further study the issue, and a proposed "voluntary Baby Food Standard to limit the amounts of heavy metals in baby food." The BFC specifically recognized the risk of neurodevelopmental harm caused by Toxic Heavy Metals to the developing brain of infants and that there were no safe levels of exposure.

118.    The Baby Food Standard "would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products."

119.    After several years of negotiations and discussions, including a proposed system for testing, the EDF and HBBF proposed voluntary limits of 1 ppb for lead. The baby food companies, however, rejected the proposal outright. Participation in the BFC was little more than a façade—they had no intention of self-regulating their products as it related to Toxic Heavy Metals.

120.    This led EDF and HBBF to leave the BFC in protest in 2021. They explained their departure publicly, noting that Defendants "all decided to backpedal on this project—even though the standard was designed to protect babies' brain development" and provide adequate notice to consumers regarding the presence of Toxic Heavy Metals on Baby Food labeling. EDF explained:

> EDF cofounded the Council because we believed there was a shared commitment to
> reduce levels of lead, arsenic and cadmium in baby food products to better protect
> children's developing brains from these toxins … Unfortunately, the companies chose
> to cease the Council's development of a voluntary Baby Food Standard that it had
> begun in late 2020. The Standard would have provided companies with a common

framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products. Negotiations failed to provide an alternative approach that EDF felt was sufficient to drive down levels of lead, arsenic and cadmium in baby food."

121.    HBBF explained:

Healthy Babies Bright Futures is focused on tangibly reducing neurotoxic exposures to babies.  The baby food companies' refusal to jointly set limits for heavy metals in baby food has shown that the Council will no longer be the powerful mechanism for this important work that the initial plans had promised.  The baby food companies' decision to stop progress on a voluntary standard for heavy metals in baby food is a disappointment … What started as dedication has turned into delay and intention has become inaction.  So HBBF has decided to put our effort into other initiatives that will move the needle on this important issue.

122.    In short, the Defendants opted to continue "self-regulating," the same self-regulation which exposed—and continued to expose—Plaintiffs to Toxic Heavy Metals in Defendants' baby foods.

## V.    The Dangers of Toxic Heavy Metals and Metal Exposure Through Consumption of Baby Foods

123.    According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically lead, arsenic, mercury, and cadmium pose a "major public health concern" for children. The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."  Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number *one* among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).

124.    The threat presented by Toxic Heavy Metals to children's health is widely shared by the global regulatory and scientific community.  For example, the FDA has set an Interim Reference Level ("IRL") of 2.2 micrograms/day for lead exposure through baby food products.  That is the amount of lead exposure at or above which the agency considers associated with adverse neurodevelopmental effects in babies.  The FDA, in its guidance documents for inorganic arsenic and lead in baby food products has repeatedly acknowledged the dangers of heavy metals to the neurodevelopment of infants.

Even low lead exposure can harm children's health and development, specifically the brain and nervous system. Neurological effects of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Lead exposures also may be associated with immunological, cardiovascular, renal, and reproductive and/or developmental effects…Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time…Even though no safe level of lead exposure has yet been identified for children's health, the IRL serves as a useful benchmark in evaluating the potential for adverse effects of dietary lead. In particular, FDA is focused on the potential for neurodevelopmental effects from lead exposure, as review of the scientific literature indicates that *such adverse effects of lead consistently occur at a blood lead level associated with FDA's IRL for children*. (emphasis added).

125.    As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases.  Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."  Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.

126.    The mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.  For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs.  According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."

127.    Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth."  In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

### A. Exposure to Toxic Heavy Metals Has Been Consistently Associated with Neurodevelopmental Harm, i.e., Autism and ADHD in Pediatric Populations

128.    It is well-known that exposure to Toxic Heavy Metals in early life can interfere with neurodevelopment at exceedingly low levels of exposure.  And, one of the ways in which such

interference with neurodevelopment can present in a child is in the form of the neurodevelopmental disorders ASD and ADHD. As the U.S. Centers for Disease Control observed in its 2020 Toxicological Profile for Lead, at just ≤10 μg/dL: "The following neurobehavioral effects in children have been associated with [lead]: "Altered mood and behaviors that may contribute to learning deficits, including *attention deficits, hyperactivity*, *autistic behaviors*, conduct disorders, and delinquency." (emphasis added). Likewise, the NIH states: "prenatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."

129. Such conclusions have likewise been reached by a consortium of the country's leading epidemiologists, pediatricians, and medical groups, noting that Toxic Heavy Metals such as lead and mercury are "prime examples of toxic chemicals that can contribute to learning, behavioral, or intellectual impairment, as well as specific neurodevelopmental disorders such as ADHD or autism spectrum disorder."

130. Multiple studies, reviews, and meta-analyses conducted throughout various parts of the world over the last decade have consistently observed that early life exposure to heavy metals can cause brain injury and, specifically, brain injury which manifests as ASD.

131. For example, four meta-analyses published in 2014, 2017, 2019 and 2020, respectively, observed consistent associations between exposure to arsenic, cadmium, and mercury and ASD in children; with the authors in all three studies recommending – based on the data – that exposure to such metals in children be reduced as much as possible, and one of the study authors specifically concluding that "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."

132. In a recent 2017 NIH-funded prospective observational study, the authors examined the risk of ASD outcome in twins based on their respective body burden of lead. The study concluded in no uncertain terms that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD, and suggests a role for elemental dysregulation in the etiology of ASD."

133. Similarly, a large, prospective study from 2016 in Korean school children observed that low levels of lead exposure in early life are associated with autism, the authors specifically

concluding: "even low blood lead concentrations…are associated with more autistic behaviors… underscoring the need for continued efforts to reduce lead exposure."

134.    Studies have repeatedly observed strong associations between exposure to cadmium and aluminum and neurodevelopmental disorders such as ASD, as observed by a recent study: "Environmental exposure to…cadmium (Cd)… and aluminum (Al) has been associated with neurodevelopmental disorders including autism spectrum disorder (ASD)."  For example, a study from 2014 evaluated the body burden of lead, cadmium, and arsenic in children with autism compared to controls and noted that, in addition to lead and arsenic, "our study demonstrated elevation in the levels of…cadmium…in a child with autism," while an earlier study noted that "autism may be associated with significant alterations of some rare element concentrations, including Cd…"  Such results have been confirmed by meta-analyses which "show *significant associations* between ASD and the metals Al [and[ Cd."  And, such earlier data is further supported by recent research, with a 2023 systematic review and meta-analysis concluding that "compared with the healthy control group, the ASD group had higher concentrations of Cd, Pb, arsenic, and Hg. These 4 heavy metals play different roles in the occurrence and progression of ASD."

135.    Repeated associations between early life Toxic Heavy Metal exposure and ASD have also been observed during the pre-natal timeframe, lending further strength to the findings of post-natal studies.  For example, in a 2021 study by Skogheim and colleagues, the authors prospectively assessed the relationship between pre-natal metal exposure in various biomarkers and autism risk. The study concluded that "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD and ADHD in children. The most notable ones involved arsenic…mercury…and lead. Our results suggest that even population levels of these compounds may have negative impacts on neurodevelopment."

136.    Similarly, in a study by the research group assessing the New Hampshire Birth Cohort, the authors evaluated the neurotoxic effects of heavy metals during various stages of pregnancy and concluded: "Our results support the hypothesis that exposure to…As in mid to late pregnancy may be neurodevelopmentally harmful."

137.    Such results have been replicated in studies throughout the world, including China,

MASTER LONG-FORM COMPLAINT

Korea, the U.S., Europe, and Egypt, implicating arsenic, mercury, and lead in pediatric diagnoses of autism and autistic behaviors, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy metal exposure, particularly mercury, in the etiology of ASD." Indeed, a 2015 Egyptian study noted "[e]nvironmental exposure to these toxic heavy metals, *at key times in development*, may play a **causal** role in autism." (emphasis added).

138.     Exposure to Toxic Heavy Metals, specifically lead, has also been repeatedly associated with the development of ADHD in children, as demonstrated by numerous studies.

139.     No fewer than four large meta-analyses, conducted in four different continents (North America, South America, Europe and Asia), and some employing a cross-sectional design, have observed a consistent association between various metals and ADHD in children. Indeed, the authors of the meta-analysis from Spain noted that "the evidence from the studies allowed us to establish that there is an association between lead and ADHD and that even *low levels of lead raise the risk*." (emphasis added).

140.     The findings from the meta-analyses have been replicated in several Chinese studies from 2006, 2014, and 2018, respectively. Notably, the authors of the 2014 Chinese study observed that "[e]xposure to lead even at low levels correlates with attention-deficit/hyperactivity disorder (ADHD). However, lead-contaminated environments are often *contaminated with other heavy metals that could exacerbate lead-induced ADHD*." (emphasis added).   This is particularly relevant—and disturbing—as children who consumed Defendants' baby foods were repeatedly exposed to a cocktail of Toxic Heavy Metals that, synergistically, further increased their risk of developing ADHD.

141.     Moreover, studies have observed a dose-response relationship between exposure to Toxic Heavy Metals and ADHD, as demonstrated by the 2016 Spanish study Donzelli, *et al.*  Another 2016 cross-sectional study from Spain was conducted on 261 children aged 6-9 to examine the association between exposure to arsenic and ADHD.  After adjusting for potential confounders, the authors observed a dose-response relationship between urine arsenic levels and inattention and impulsivity scores, concluding that "[urine arsenic] levels were associated with impaired attention/cognitive function, *even at levels considered safe*.  These results provide additional

1    evidence that postnatal arsenic exposure impairs neurological function in children." (emphasis

2    added).

3        142.    The fact that such results, and many more, have been observed in multiple studies,

4    conducted by different researchers, at different times, in different parts of the world, in children of

5    multiple ages, utilizing different study methods (prospective, case-control and cross-sectional

6    epidemiological analyses) and measuring a variety of end-points (including hair, blood, and urine),

7    strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development

8    of ASD and ADHD in children.

9    **B.    Defendants' Baby Foods Contain Toxic Heavy Metals Capable of Interfering**
         **with Early Neurodevelopment**
10

11        143.    As illustrated above, Toxic Heavy Metal exposure is capable of inflicting damage to

12   the developing brain at extremely low doses.  And, upon information and belief, Defendants

13   manufactured and sold baby foods containing Toxic Heavy Metals that can, under certain

14   circumstances (based upon the genetic susceptibilities, medical history, and other factors of the

15   exposed child) interfere with a baby's neurodevelopment sufficient to cause conditions such as ASD

16   and ADHD.

17        144.    As an initial matter, the study commissioned by HBBF and discussed above

18   specifically evaluated the propensity for arsenic exposure through consumption of infant rice cereal

19   to impact early life neurodevelopment.  Following analyses of the levels of arsenic exposure from

20   consumption of infant rice cereal, the authors concluded "that high consumers of infant rice cereal

21   (i.e., infants eating three servings per day) eating products currently on the U.S. market would have a

22   daily arsenic intake of 0.35-0.67 µg/kg bw/day…per the Tsuji et al. (2015) lower-bound estimate for

23   an RfD for the neurodevelopmental effects of arsenic (0.4 µg/kg bw/day), high consumers of infant

24   rice cereal may also be at risk for this endpoint.  Even in average consumers of infant rice cereal (i.e.,

25   one serving per day), our estimates of arsenic intakes (0.15 to 0.29 µg/kg bw/day) leave little room

26   for exposures to arsenic from other sources."  Thus, consumption of Defendants' baby foods,

27   including but not limited to infant rice cereal and rice-based snack baby food products manufactured

28   and sold by Defendants can expose babies to levels of arsenic above that associated with

neurodevelopmental harm in the scientific literature.

145.    Defendants manufactured and sold baby food products that, with just a couple of servings, are capable of exposing a baby to lead levels at or above the 2.2 ug/day considered by the FDA to be associated with neurodevelopmental harm.  Each source of lead exposure is cumulative—making any detectable amount of Toxic Heavy Metal in baby food a contributing factor to potential neurodevelopmental harm.

146.    Similarly, upon information and belief, Defendants were aware of the neurotoxic propensities of lead, arsenic, and mercury at low levels, but proceeded to manufacture and sell Baby Foods containing arsenic and lead levels that, upon information and belief, Defendants considered as capable of inflicting neurodevelopmental harm.

## VI.    Defendants Knowingly Sold Baby Foods Containing Toxic Heavy Metals and Knew or Should Have Known of the Risks of Such Exposures in Children and Thus Breeched their Duty of Care in Selling Contaminated Baby Foods

147.    During the time that Defendants manufactured and sold baby foods in the United States, the weight of evidence showed that Defendants' baby foods exposed babies and children to Toxic Heavy Metals.  Defendants failed to disclose this risk to consumers through any means.

148.    As discussed above, both independent testing, the Defendants' internal evaluations of their baby foods, and the Defendants' representations and disclosures to Congress and the FDA reveal the presence of Toxic Heavy Metals in Defendants' products.  As such, Defendants knew or should have known that their baby foods contain Toxic Heavy Metals with an attendant risk of causing neurodevelopmental harm.

149.    Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market, and the HBBF Report further confirmed such contamination of Defendants' baby foods.  And, as the Congressional investigation found, the Defendants continued to sell their baby foods even after testing of both ingredients and finished products revealed the presence of Toxic Heavy Metals.

150.    Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for

decades.  Defendants, as manufacturers and sellers of baby foods, are held to the standard of experts and responsible for keeping abreast of the latest scientific developments related are held to the dangers of contaminants in their products.  Defendants failed to take action to protect vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of brain injury which can manifest as neurodevelopmental disorders such as ASD, ADHD, and related *sequalae*.

151.    To be clear, the Defendants are able to manufacture baby foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals or sampling their ingredients from other sources.  At the very least, Defendants were under a duty to warn unsuspecting parents of the presence of Toxic Heavy Metals in their Baby Foods.

**VII.    Defendants' Baby Food Products Were Defective Due to Insufficient Warnings, Manufacturing Defects, and/or Design Defects to the Extent the Baby Food Products Contained Detectable Levels of Toxic Heavy Metal**

152.    All of Defendants' baby food products that contained detectable levels of Toxic Heavy Metals (or constituted finished products wherein the ingredients contained detectable levels of Toxic Heavy Metals), assuming state of the art analytical testing, were defective as it relates to warnings because no Defendant has ever warned about the presence of Toxic Heavy Metals in their baby foods.  Because discovery is ongoing, a complete list of Defendants' specific baby foods that contained detectable levels of Toxic Heavy Metals is not known at this time.  Based on publicly available testing data, including data reported by HBBF and Congress, the vast majority of Defendants' products contain detectable levels of Toxic Heavy Metals in them, rendering them each defective as it relates to warnings.  Attached as Appendix A to this Complaint is a list of the Defendants' products now known to be defective.  This list, however, is not comprehensive and shall be amended as discovery is obtained.

153.    Defendants' baby food products are also defective as manufactured, as they contain detectable Toxic Heavy Metals which are not supposed to be there, by design.  Toxic Heavy Metals do not provide any nutritional or therapeutic value to infants or fully-grown humans.  They are only

poisonous to neurodevelopment.  None of these baby food products, by design, should contain Toxic Heavy Metals in them and, thus, to the extent the products contain detectable levels of Toxic Heavy Metals in them, those are manufacturing defects.  Based on publicly available data, most of Defendants' baby food products contain some detectable levels of Toxic Heavy Metals in them. However, as the levels of Defendants' baby food products are not known yet, nor do Plaintiffs have a complete list of Defendants' baby food products or their formulations—information that will be obtained through discovery—Plaintiffs cannot identify each baby food product that contained a manufacturing defect.  However, Appendix A is a running list of baby food products sold by Defendants.

154.    If Defendants specifically designed their baby food products to contain Toxic Heavy Metals, meaning their presence was not the product of a manufacturing defect, then the products were defective by design.  Toxic Heavy Metals should not be present in foods that are being consumed by infants and products should be designed to not have detectable levels of toxic heavy metal in them. Such designs are easily accomplished, by only using ingredients that contain non-detectable levels of Toxic Heavy Metals and by testing finished products, before release, to ensure they do not contain Toxic Heavy Metals within them.  This is possible because there are examples of Defendants' finished products not containing detectable levels of Toxic Heavy Metals—even if, for that same products, there are instances where they did.  Thus, Defendants were able to design baby food products to not contain detectable levels of toxic heavy metals, and to the extent that each Defendants' design contemplated there being detectable levels of Toxic Heavy Metals in baby food, the design, itself, was defective.  Because Plaintiffs do not know the Defendants' intended design for their baby food products—as there has been no discovery obtained to date concerning product formulation, product/ingredient specifications, and testing methodologies/capabilities—Plaintiffs cannot specify which baby food products were defectively designed versus which ones were not. That said, Appendix A, a running list of the Defendants' baby food products that, with further discovery, may yield information that will allow Plaintiffs to identify whether the product was defectively designed.

155.    Whether the Defendants' products were defective due to inadequate warnings,

1    manufacturing errors, or by design, the existing publicly available evidence indicates that

2    consumption of Defendants' baby food products can expose infants to Toxic Heavy Metals, and that

3    depending on specific milieu of products consumed by each Plaintiff and each Plaintiff's specific

4    susceptibility and circumstances, Defendants' baby food products contributed to each Plaintiff's

5    Toxic Heavy Metal burden during critical period of infant neurodevelopment.  Each Plaintiff, thus,

6    alleges that this cumulative exposure from Defendants' products to Toxic Heavy Metals, substantially

7    contributed to causing neurodevelopmental harm that manifested as ASD and/or ADHD.  Moreover,

8    each Plaintiff alleges that had these baby food products not been defective—by having sufficient

9    warnings, being correctly manufactured, and/or designed properly—each Plaintiff would not have

10    been exposed to levels of Toxic Heavy Metals in Defendants' baby food products that would have

11    contributed to the neurodevelopmental harm that manifested as ASD and/or ADHD.

## VIII.    Exemplary / Punitive Damages Allegations

13    156.    Defendants' conduct as alleged herein was done with reckless disregard for human

14    life, oppression, and malice.  Defendants' conduct is particularly reprehensible given that their toxic

15    foods were directed at vulnerable babies—a population group far more susceptible than adults to the

16    neurotoxic dangers of heavy metals.

17    157.    Defendants were fully aware of the safety risks of Contaminated Baby Foods,

18    particularly the dangerous potential of Toxic Heavy Metals on neurodevelopment in infants and

19    children.  Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to

20    mislead consumers.  Indeed, Defendants repeatedly market their baby foods as safe for consumption

21    and go so far as claiming that they adhere to "the strictest standards in the world;" and provide

22    "baby's food full of nutrition while meeting standards strict enough for tiny tummies," as well as

23    other statements and representations that hold out their baby foods as safe for consumption by

24    infants.  Indeed, each Defendant falsely reassured parents/guardians/caregivers that their baby foods

25    would foster healthy neurodevelopment when consumed even though they knew their baby foods

26    exposed infants' developing brains to potent neurotoxic heavy metals.  In actual fact, as discussed

27    above, Defendants routinely sold Contaminated Baby Foods, regularly flouted their own internal

28    limits of Toxic Heavy Metals and failed to disclose to consumers that their products contained such

dangerous contaminants.

158.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that their baby foods were heathy and safe for infants, and that full disclosure of presence and/or risks of the Toxic Heavy Metals present in the baby foods would limit the amount of money Defendants would make selling the products. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, failure to test, false advertising, and deceptive omissions as more fully alleged throughout this Complaint. Parents/guardians/caregivers were denied the right to make an informed decision about whether to purchase Defendants' baby food for their babies without knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' welfare and rights.

<strong>CAUSES OF ACTION</strong>

**I.    COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

159.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

160.    At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting baby foods, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of baby foods in the form of the presence of Toxic Heavy Metals.  These actions were under the ultimate control and supervision of Defendants.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold baby foods and aimed at a consumer market.

161.    Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Contaminated Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn about the presence of and risks associated with exposure to Toxic Heavy Metals from the consumption of Contaminated

Baby Foods.

162.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn each Plaintiff of dangers associated with exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods.  Defendants, as a manufacturer, seller, or distributor of food, are held to the knowledge of an expert in the field.

163.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of exposure to Toxic Heavy Metals in the Contaminated Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such toxins.

164.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by exposure to the Toxic Heavy Metals in Defendants' Baby Foods.

165.    Even though Defendants knew or should have known that the presence of Toxic Heavy Metals in Contaminated Baby Foods posed a risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as Plaintiffs.  The product warnings for Contaminated Baby Foods in effect during the time period Plaintiffs consumed those foods were inadequate, both substantively and graphically, to alert consumers to the presence of and health risks associated with exposure to the Toxic Heavy Metals from Contaminated Baby Food consumption.

166.    At all relevant times, Defendants' Contaminated Baby Foods reached the intended

consumers, handlers, and users or other persons coming into contact with these products, including Plaintiffs, without substantial change in their condition as manufactured, sold, distributed, labeled, and marketed by Defendants.

167.    Plaintiffs were exposed to the Toxic Heavy Metals in Defendants' Contaminated Baby Foods without knowledge of the potential for such exposure to Toxic Heavy Metals from consumption of the products and the dangerous characteristics of the toxins.

168.    At all relevant times, Plaintiffs were exposed to the Toxic Heavy Metals in the Defendants' Contaminated Baby Foods while consuming the foods for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

169.    Plaintiffs could not have reasonably discovered the defects and risks associated with exposure to the Toxic Heavy Metals in the Contaminated Baby Foods prior to or at the time of Plaintiffs consuming those foods.  Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with exposure to the toxins in Defendants' products.

170.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid consuming the products and, in turn, exposure to the Toxic Heavy Metals.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to the Toxic Heavy Metals in the Contaminated Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

171.    This alleged failure to warn is not limited to the information contained on Contaminated Baby Foods labeling.  The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with exposure to Heavy Metals in Contaminated Baby Foods through other non-labeling mediums, i.e., promotion,

advertisements, public service announcements, and/or public information sources.  But the Defendants did not disclose these known risks through any medium. The ability to provide such warnings is not prohibited by any federal law.

172.     Furthermore, Defendants possess a First Amendment Right to make truthful statements about the products they sell, and no law could lawfully restrict that constitutional right. This included making statements about the presence of and risks associated with Toxic Heavy Metals in Contaminated Baby Foods.

173.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with exposure to the toxins in their Contaminated Baby Foods, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative products.  However, as a result of Defendants' concealment of the dangers posed by the Toxic Heavy Metals in their Contaminated Baby Foods, Plaintiffs could not have averted their exposures.

174.     Defendants' conduct, as described above, was reckless.  Defendants risked the lives of babies and children, including Plaintiffs, with knowledge of the safety problems associated with Contaminated Baby Foods, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to warn or inform the unsuspecting public.

175.     The Defendants' lack of adequate warnings and instructions accompanying their Contaminated Baby Foods caused each Plaintiff's injuries.

176.     As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of exposure to the Toxic Heavy Metals in their Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

177.     **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**II.     COUNT II: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**

178.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

179.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiffs.

180.    At all relevant times, the Contaminated Baby Foods consumed by Plaintiffs were expected to and did reach Plaintiff without a substantial change in their condition as manufactured, handled, distributed, and sold by Defendants.

181.    At all relevant times, the Contaminated Baby Foods consumed by Plaintiffs were used in a manner that was foreseeable and intended by Defendants.

182.    The Contaminated Baby Foods consumed by Plaintiffs were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that Defendants deviated materially from their design and manufacturing specifications and/or such design and manufacture posed an unreasonable risk of harm to Plaintiffs. [2]  Baby food should not, by design, contain any detectable levels of Toxic Heavy Metals in them.  Thus, Defendants' Contaminated Baby Foods contain manufacturing defects.

183.    The Defendants' Contaminated Baby Foods contained Toxic Heavy Metals because, while in the control and possession of Defendants, they manufactured ingredients and used manufacturing processes that result in the finished product being contaminated with Toxic Heavy Metals.  Had Defendants properly manufactured (directly or through co-manufacturers) the baby foods, they would not have contained detectable levels of Toxic Heavy Metals in them and, thus, would not have contained a manufacturing defect.

184.    Nothing under federal law limited or restricted Defendants from taking action to reduce or eliminate the Toxic Heavy Metals from being present in their baby foods.

185.    This manufacturing defect caused each Plaintiff to be exposed to Toxic Heavy Metals through ingestion of the Contaminated Baby Foods which, in turn, caused neurodevelopmental harm

---

[2] If, through discovery and further litigation, it is discovered that Defendants' baby food products contained detectable levels of Toxic Heavy Metals by design, then Plaintiffs will pursue a design defect claim (Count III) in the alternative.

MASTER LONG-FORM COMPLAINT

that manifested as ASD and/or ADHD.

186.    The exposure to the Toxic Heavy Metals in the Contaminated Baby Foods creates risks to the health and safety of babies that are far more significant than the risks posed by non-Contaminated Baby Food products, and which far outweigh the utility of the Contaminated Baby Foods products because of Defendants' manufacturing defects.

187.    Defendants have intentionally and recklessly manufactured the Contaminated Baby Foods with wanton and willful disregard for the rights and health of Plaintiffs, and with malice, placing their economic interests above the health and safety of Plaintiffs.

188.    As a direct and proximate result of the Defendants' defective manufacture of the Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

189.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## III.    COUNT III:  STRICT PRODUCTS LIABILITY – DESIGN DEFECT

190.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

191.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiffs.  These actions were under the ultimate control and supervision of Defendants.

192.     At all relevant times, Defendants' Baby Food products were designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use or consumption by infants and babies, including Plaintiffs.

193.    Defendants' Contaminated Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they were placed into the stream of commerce, they were unreasonably dangerous and dangerous to an extent beyond that which an

ordinary consumer would contemplate.

194.    Defendants' Contaminated Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

195.    At all relevant times, the Contaminated Baby Food products consumed by Plaintiffs were expected to and did reach Plaintiffs without a substantial change in its condition as designed, manufactured, handled, distributed, and sold by Defendants.

196.    At all relevant times, Defendants knew or had reason to know that their Contaminated Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

197.    Therefore, at all relevant times, Defendants' Baby Food products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

        A.    When placed in the stream of commerce, Defendants' Contaminated Baby Food products were unreasonably dangerous in that they contained Toxic Heavy Metals that posed a risk of causing interference with neurodevelopment in babies that manifests as the neurodevelopmental disorders ASD, ADHD and related *sequalae* when used in a reasonably anticipated manner;

        B.    When placed in the stream of commerce, Defendants' designed Contaminated Baby Food products to contain unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

        C.    Defendants, by design, did not sufficiently test, investigate, or study their Contaminated Baby Food products;

        D.    Exposure to the Toxic Heavy Metals in Defendants' Contaminated Baby Food products present a risk of harmful effects that outweigh any potential utility stemming from their use;

E.     Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Food products which would have alerted the public to risks; and

F.     Defendants could have employed safer alternative designs and formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any detectable level of Toxic Heavy Metals.

198.    Plaintiffs consumed Defendants' Contaminated Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

199.    Defendants' Contaminated Baby Food products were and are more dangerous than alternative products, and Defendants could have designed their Contaminated Baby Food products to avoid harm to children.  Indeed, at the time Defendants designed the Contaminated Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

200.    At the time the Contaminated Baby Food products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby Foods.

201.    Defendants intentionally and recklessly defectively designed the Contaminated Baby Foods with wanton and willful disregard for the rights and health of Plaintiffs, and with malice, placing their economic interests above the health and safety of Plaintiffs.

202.    The design defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiffs' injuries.

203.    As a direct and proximate result of the Defendants' defective design of the Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

204.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

1

**IV.    COUNT IV: NEGLIGENCE – FAILURE TO WARN**

2      205.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as

3  if fully stated herein.

4      206.    At all relevant times, Defendants engaged in the business of testing, developing,

5  designing, manufacturing, marketing, selling, distributing, and promoting baby foods. Defendants

6  knew, or, by the exercise of reasonable care, should have known that their Contaminated Baby Foods

7  are not accompanied with adequate warnings concerning the dangerous characteristics of exposure to

8  Toxic Heavy Metals from consumption. These actions were under the ultimate control and

9  supervision of Defendants.

10      207.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled,

11 distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their

12 Contaminated Baby Foods, and in the course of same, directly advertised or marketed the products to

13 consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated

14 with the presence of and exposure to Toxic Heavy Metals from consumption of Contaminated Baby

15 Foods.

16      208.    At all relevant times, Defendants had a duty to properly test, develop, design,

17 manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide

18 proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not

19 cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a

20 continuing duty to warn Plaintiff of dangers associated with the presence of and exposure to Toxic

21 Heavy Metals from consumption of Contaminated Baby Foods.  Defendants, as a manufacturer,

22 seller, or distributor of food products, are held to the knowledge of an expert in the field.

23      209.    At the time of manufacture, Defendants could have provided warnings regarding the

24 presence of and risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby

25 Foods because they knew or should have known exposure to Toxic Heavy Metals from consumption

26 of Contaminated Baby Foods was dangerous, harmful and injurious when the Contaminated Baby

27 Foods were consumed by Plaintiffs in a reasonably foreseeable manner.

28      210.    At all relevant times, Defendants failed and deliberately refused to investigate, study,

MASTER LONG-FORM COMPLAINT

test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' Contaminated Baby Foods.

211.    Defendants knew or should have known that exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods posed a risk of harm, but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The dangerous propensities of exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as the Plaintiffs.

212.    At all relevant times, Plaintiffs were exposed to Toxic Heavy Metals through consumption of the Contaminated Baby Foods while using the products for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

213.    Defendants knew or should have known that the non-extant warnings disseminated with their Contaminated Baby Foods were inadequate, failed to communicate adequate information on the presence of and dangers of exposure to toxins contained therein, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

214.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the product and, in turn, prevented exposure to the Toxic Heavy Metals contained therein.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to the Toxic Heavy Metals in the Contaminated Baby Foods; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure to the toxins contained therein; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Toxic Heavy Metals from

consumption of the Contaminated Baby Foods.

215.    A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

216.    This alleged failure to warn is not limited to the information contained on the labeling of Defendants' Contaminated Baby Foods. Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

217.    Furthermore, Defendants possess a First Amendment Right to make truthful statements about the products they sell, and no law could lawfully restrict that constitutional right.

218.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with the presence of and exposure to Toxic Heavy Metals in the Contaminated Baby Foods, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative products.  However, as a result of Defendants' concealment of the dangers posed by their Contaminated Baby Foods, Plaintiffs could not have averted their injuries.

219.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with Contaminated Baby Foods, and suppressed this knowledge from the general public. Defendants made conscious decisions not to warn or inform the unsuspecting public.

220.    The Defendants' lack of adequate warnings and instructions accompanying their Contaminated Baby Foods were a substantial factor in causing Plaintiffs' injuries.

221.    As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

222.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## V.    COUNT V:  NEGLIGENCE – MANUFACTURING

223.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

224.    At all relevant times, the Defendants manufactured, tested, marketed, sold, and distributed the Contaminated Baby Foods that Plaintiffs consumed.

225.    The Defendants had a duty to exercise reasonable care, in the manufacturing, testing, marketing, sale, and distribution of baby foods.

226.    The Defendants knew or, by the exercise of reasonable care, should have known, that exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods rendered the foods carelessly manufactured, dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner.

227.    The Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

228.    Without limitation, examples of the manner in which Defendants breached their duty to exercise reasonable care in manufacturing Contaminated Baby Foods, included:

A.    Failure to adequately inspect/test the Contaminated Baby Foods, and their ingredients, during and after the manufacturing process;

B.    Failure to implement procedures that would reduce or eliminate Toxic Heavy Metals in baby foods;

C.    Failure to investigate suppliers and ingredient sources to reduce and eliminate the risk of ingredients containing Toxic Heavy Metals; and

D.    Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture baby food.

229.    A reasonable manufacturer under the same or similar circumstances would have

implemented appropriate manufacturing procedures to better ensure the quality and safety of their product.

230.    Plaintiffs were harmed directly and proximately by the Defendants' failure to use reasonable care in the manufacture of their Contaminated Baby Foods.  Such harm includes exposure to Toxic Heavy Metals, which can cause or contribute to interference with early neurodevelopment which manifests as ASD, ADHD, and related *sequalae*.

231.    Defendants' improper manufacturing of Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Contaminated Baby Foods, including Plaintiffs.

232.    The defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiffs' injuries.

233.    As a direct and proximate result of the Defendants' improper manufacturing of Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

234.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## VI.    COUNT VI:  NEGLIGENCE – PRODUCT DESIGN

235.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

236.    Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of Contaminated Baby Foods.

237.    The Defendants owed a duty to all reasonably foreseeable users to design a safe product.

238.    The Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods because the products exposed babies to Toxic Heavy Metals.

239.    The Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods by negligently designing the foods with ingredients and/or components contaminated with Toxic Heavy Metals.

240.    The Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods by negligently designing and formulation, in one or more of the following ways:

A.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

B.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods were unreasonably dangerous in that they were hazardous and posed a risk of neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated manner;

C.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

D.    Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products;

E.    Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic Heavy Metals; and

F.    Exposure to the Toxic Heavy Metals in Contaminated Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

241.    Defendants knew or should have known at the time of marketing Contaminated Baby Foods that exposure to Toxic Heavy Metals contained in the Baby Foods could result in interference with early neurodevelopment that that manifests as ASD, ADHD and other severe illnesses and

injuries.

242.    Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Foods.

243.    Defendants could have employed safer alternative designs and formulations.  For example, the Defendants could have avoided use of certain ingredients contaminated with Toxic Heavy Metals, avoided using pre-mix vitamins contaminated with Toxic Heavy Metals, and/or sampled their ingredients from other sources.

244.    The Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs.  There was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby Foods.

245.    A reasonable company under the same or similar circumstances would have designed a safer product.

246.    Plaintiffs were harmed directly and proximately by the Defendants' failure to use reasonable care in the design of their Contaminated Baby Foods.  Such harm includes exposure to Toxic Heavy Metals, which can cause or contribute to interference with neurodevelopment that manifests as ASD, ADHD, and related *sequalae*.

247.    Defendants' defective design of Contaminated Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of consumers of the Baby Foods, including Plaintiffs.

248.    The defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiffs' injuries.

249.    As a direct and proximate result of the Defendants' negligent design of the Contaminated Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

250.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such

other and further relief as this Court deems just and proper.

**VII.   COUNT VII:  GENERAL NEGLIGENCE**

251.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

252.    Plaintiffs plead claims for negligence under all theories that may be actionable under any applicable state laws.

253.    Defendants owed Plaintiffs a duty to act with reasonable care.

A.    Defendants owed a duty because they distributed and promoted their products as safe for children to consume.

B.    Defendants owed a duty because their conduct created a risk of harm to Plaintiffs and caused Plaintiffs actual harm.

C.    Defendants owed a duty because the risk of harm to Plaintiffs was embedded in, and an inherent component of, their negligent business practices.

D.    Defendants owed a duty because they designed, manufactured, controlled, distributed, and sold their products to Plaintiffs.

254.    Defendants breached their duty to Plaintiffs.

255.    Defendants' negligence includes, but is not limited to, their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Contaminated Baby Foods in one or more of the following respects:

A.    Failure to implement procedures that would reduce or eliminate Toxic Heavy Metals in baby foods;

B.    Failure to investigate suppliers and ingredient sources to reduce and eliminate the risk of ingredients containing Toxic Heavy Metals; and

C.    Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture baby food.

D.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

E.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods were unreasonably dangerous in that they were hazardous and posed a risk of neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated manner;

F.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

G.    Defendants, by design, did not conduct adequate post-marketing surveillance of their Contaminated Baby Food products which would have alerted the public to risks; and

H.    Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic Heavy Metals;

I.    Defendants could have employed safer alternative designs and formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any detectable level of Toxic Heavy Metal.

J.    Defendants did not sufficiently test, investigate, or study their Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients used to manufacture the foods and/or the finished products; and

K.    Exposure to the Toxic Heavy Metals in Contaminated Baby Foods presents a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

256.    Defendants knew or should have known that their products contained detectable levels of heavy metals that created an unreasonable risk of harm to children who consumed their products.

257.    At all relevant times, the Defendants knew or should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

258.    As a proximate result of Defendants' negligence, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss, and damages including, but not limited to past and future medical expenses, lost

income, and other damages.

259.    **WHEREFORE**, each Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### JURY TRIAL DEMAND

260.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

### PRAYER FOR RELIEF

261.    WHEREFORE, each Plaintiff requests that the Court enter judgment in Plaintiffs' favor and against the Defendants for:

    a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

    c.    pre-judgment and post-judgment interest;

    d.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    e.    any other relief the Court may deem just and proper.

Dated:  April 16, 2025                    Respectfully submitted,

*/s/ R. Brent Wisner*
R. Brent Wisner (SBN: 276023)
100 Drakes Landing Road, Suite 1750
Greenbrae, CA 94904
Tel: 310-820-6231
rbwisner@wisnerbaum.com

*Co-Lead Counsel for Plaintiffs in MDL 3101*

*/s/ Aimee H. Wagstaff*
Aimee H. Wagstaff (SBN: 278480)
940 N. Lincoln Street
Denver, Colorado 80203
Telephone: 303.376.6360
Facsimile: 303.376.6361

awagstaff@wagstafflawfirm.com

*Co-Lead Counsel for Plaintiffs in MDL 3101*

MASTER LONG-FORM COMPLAINT

# APPENDIX A

# A. Beech-Nut Products

### Jars

1   Stage 1 Apple
2   Stage 1 Banana
3   Stage 1 Beef & Beef Broth
4   Stage 1 Butternut Squash
5   Stage 1 Carrots
6   Stage 1 Chicken & Chicken Broth
7   Stage 1 Green Beans
8   Stage 1 Organics Apple
9   Stage 1 Organics Carrots
10  Stage 1 Organics Pear
11  Stage 1 Organics Sweet Potato
12  Stage 1 Organics Prunes
13  Stage 1 Organics Pumpkin
14  Stage 1 Pear
15  Stage 1 Prunes
16  Stage 1 Sweet Potato
17  Stage 1 Turkey & Turkey Broth
18  Stage 2 Apple
19  Stage 2 Apple & Banana
20  Stage 2 Apple & Blackberries
21  Stage 2 Apple & Blueberries
22  Stage 2 Apple & Kale
23  Stage 2 Apple, Cinnamon & Granola
24  Stage 2 Apple, Mango & Kiwi
25  Stage 2 Apple, Pear & Banana
26  Stage 2 Banana
27  Stage 2 Banana & Strawberries
28  Stage 2 Banana, Blueberries & Green beans
29  Stage 2 Banana, Orange & Pineapple
30  Stage 2 Carrots, Sweet Corn & Pumpkin
31  Stage 2 Chicken, Apple & Carrot
32  Stage 2 Chicken, Apple & Corn
33  Stage 2 Chicken, Pear & Zucchini
34  Stage 2 Corn & Sweet Potato
35  Stage 2 Garden Vegetables
36  Stage 2 Guava, Pear & Strawberries
37  Stage 2 Mango
38  Stage 2 Mango, Apple & Avocado
39  Stage 2 Mixed Vegetables
40  Stage 2 Organics Apple, Kiwi & Spinach
41  Stage 2 Organics Apple, Pumpkin & Granola
42  Stage 2 Organics Apple, Raspberries & Avocado

# A. Beech-Nut Products

| | |
|---|---|
| 43 | Stage 2 Organics Banana |
| 44 | Stage 2 Organics Banana, Cinnamon & Granola |
| 45 | Stage 2 Organics Banana, mango & Sweet Potato |
| 46 | Stage 2 Organics Butternut Squash & Sweet Corn |
| 47 | Stage 2 Organics Pear, Kale & Cucumber |
| 48 | Stage 2 Peach |
| 49 | Stage 2 Pear |
| 50 | Stage 2 Pear & Blueberries |
| 51 | Stage 2 Pear & Pineapple |
| 52 | Stage 2 Pear & Raspberries |
| 53 | Stage 2 Peas, Green Beans & Asparagus |
| 54 | Stage 2 Pineapple, Pear & Avocado |
| 55 | Stage 2 Pumpkin & Cinnamon |
| 56 | Stage 2 Spinach, Zucchini & Peas |
| 57 | Stage 2 Squash |
| 58 | Stage 2 Sweet Carrots |
| 59 | Stage 2 Sweet Corn & Green Beans |
| 60 | Stage 2 Sweet Peas |
| 61 | Stage 2 Sweet Potato |
| 62 | Stage 2 Turkey, Apple & Sweet Potato |
| 63 | Stage 3 Naturals Superblends Apple, Yogurt, Cinnamon & Oat |
| 64 | Stage 3 Naturals Superblends Banana, Chickpea & Kale |
| 65 | Stage 3 Naturals Superblends Carrot, Corn & Chickpea |
| 66 | Stage 3 Naturals Superblends Mango, Carrot, Yogurt & Oat |
| 67 | Stage 3 Organics Sweet Potato & Barley |

**Pouches**

| | |
|---|---|
| 68 | Stage 2 Apple & Kale |
| 69 | Stage 2 Apple, Mango & Carrot |
| 70 | Stage 2 Apple, Mango & Spinach |
| 71 | Stage 2 Apple, Peach & Strawberries |
| 72 | Stage 2 Apple, Pumpkin & Cinnamon |
| 73 | Stage 2 Apple, Sweet Potato & Pineapple |
| 74 | Stage 2 Banana, Apple & Blueberries |
| 75 | Stage 2 Banana, Apple & Strawberry |
| 76 | Stage 2 Banana, Blueberries & Avocado |
| 77 | Stage 2 Banana, Cinnamon & Granola |
| 78 | Stage 2 Banana, Pear & Sweet Potato |
| 79 | Stage 2 Carrot Zucchini & Pear |
| 80 | Stage 2 Carrot, Apple & Pineapple |
| 81 | Stage 2 Peach, Apple & Banana |
| 82 | Stage 2 Pear, Banana & Raspberries |
| 83 | Stage 2 Pear, Mango & Squash |

# A. Beech-Nut Products

84    Stage 2 Pumpkin, Zucchini & Apple
85    Stage 2 Squash, Peas & Pears
86    Stage 2 Zucchini, Spinach & Banana
87    Stage 3 Apple, Yogurt, Cinnamon & Oat
88    Stage 4 Yogurt, Banana & Mixed Berry
89    Stage 4 Yogurt, Banana & Strawberry

**<u>Cereals</u>**
90    Multigrain Cereal
91    Oatmeal Cereal
92    Organic Oatmeal Cereal
93    Rice Cereal

**<u>Bars</u>**
94    Apple & Spinach Fruit & Veggie
95    Banana & Pumpkin Fruit & Veggie
96    Banana Fuity Oat
97    Strawberry Fruity Oat

**<u>Yogurt Melts</u>**
98    Apple & Pumpkin Fruit & Veggie
99    Apple, Carrot, Mango & Yogurt Melties with Probiotics
100   Banana, Blueberry & Green Beans Fruit & Veggie
101   Pear, Mango, Spinach & Yogurt Melties with Probiotics
102   Strawberry, Apple & Yogurt

**<u>Baked Crisps</u>**
103   Sweet Potato

## B. Gerber Products

**Jars and Tubs**

1   Stage 1 - 1st Butternut Squash
2   Stage 1 - 1st Carrot
3   Stage 1 - 1st Foods Apple
4   Stage 1 - 1st Foods Banana
5   Stage 1 - 1st Foods Prune
6   Stage 1 - 1st Foods Sweet Potato
7   Stage 1 - 1st Green Bean
8   Stage 1 - 1st Natural Apple
9   Stage 1 - 1st Natural Banana
10  Stage 1 - 1st Pea
11  Stage 1 - 1st Peach
12  Stage 1 - 1st Pear
13  Stage 2 - 2nd Apple Avocado
14  Stage 2 - 2nd Apple Banana with Mixed Cereal
15  Stage 2 - 2nd Banana Plum Grape
16  Stage 2 - 2nd Foods Apple
17  Stage 2 - 2nd Foods Apple Banana with Oatmeal
18  Stage 2 - 2nd Foods Apple Blueberry
19  Stage 2 - 2nd Foods Apple Strawberry Banana
20  Stage 2 - 2nd Foods Apricot Mixed Fruit
21  Stage 2 - 2nd Foods Banana
22  Stage 2 - 2nd Foods Banana Apple Pear
23  Stage 2 - 2nd Foods Banana Blackberry Blueberry
24  Stage 2 - 2nd Foods Banana Carrot Mango
25  Stage 2 - 2nd Foods Banana Orange Medley
26  Stage 2 - 2nd Foods Banana Pear Zucchini
27  Stage 2 - 2nd Foods Beef and Gravy
28  Stage 2 - 2nd Foods Butternut Squash
29  Stage 2 - 2nd Foods Carrot
30  Stage 2 - 2nd Foods Carrot Potato Pea
31  Stage 2 - 2nd Foods Chicken and Gravy
32  Stage 2 - 2nd Foods Cinnamon with Oatmeal
33  Stage 2 - 2nd Foods Green Bean
34  Stage 2 - 2nd Foods Ham and Gravy
35  Stage 2 - 2nd Foods Mango
36  Stage 2 - 2nd Foods Pea
37  Stage 2 - 2nd Foods Peach
38  Stage 2 - 2nd Foods Pear
39  Stage 2 - 2nd Foods Pear Pineapple
40  Stage 2 - 2nd Foods Prune Apple
41  Stage 2 - 2nd Foods Sweet Potato
42  Stage 2 - 2nd Foods Sweet Potato Turkey with Whole Grains Dinner
43  Stage 2 - 2nd Foods Turkey and Gravy
44  Stage 2 - 2nd Natural Apple Zucchini Peach
45  Stage 2 - 2nd Natural Spinach Kale
46  Stage 2 - 2nd Pear Guava
47  Stage 3 - 3rd Banana Blueberry Rice pudding
48  Stage 3 - 3rd Garden Veggies & Rice

# B. Gerber Products

49  Stage 3 - 3rd Pasta Marinara
50  Stage 3 - 3rd Pasta Primavera

### Pouches

51  Toddler Pouched Organic Banana Mango
52  Toddler Pouches Apple Mango Strawberry
53  Toddler Pouches Banana Blueberry
54  Toddler Pouches Banana Blueberry Purple Carrot Greek Yogurt Purple Carrot Greek Yogurt Mixed Grains
55  Toddler Pouches Banana Pear Zucchini
56  Toddler Pouches Fruit & Yogurt Peaches & Cream
57  Toddler Pouches Fruit & Yogurt Strawberry Banana
58  Toddler Pouches Fruit & Yogurt Very Berry
59  Toddler Pouches Natural Apple Pear Peach
60  Toddler Pouches Natural Apple Sweet Potato with Cinnamon
61  Toddler Pouches Organic Apple Mango Raspberry Avocado Oatmeal
62  Toddler Pouches Organic Apple Purple Carrot Blueberry with Yogurt
63  Toddler Pouches Organic Banana Mango Avocado Quinoa Vanilla
64  Toddler Pouches Organic Banana Raspberry & Yogurt with Vanilla
65  Toddler Pouches Organic Banana Strawberry Beet Oatmeal
66  Toddler Pouches Organic Mango Peach Carrot Sweet Potato Oatmeal
67  Stage 2 - 2nd Foods Pouches Apple Strawberry Banana
68  Stage 2 - 2nd Foods Pouches Natural Banana
69  Stage 2 - 2nd Foods Pouches Organic Apple Blueberry Spinach
70  Stage 2 - 2nd Foods Pouches Organic Apple Carrot Squash
71  Stage 2 - 2nd Foods Pouches Organic Apple Kale Fig
72  Stage 2 - 2nd Foods Pouches Organic Apple Peach
73  Stage 2 - 2nd Foods Pouches Organic Apple Raspberry Acai Berry
74  Stage 2 - 2nd Foods Pouches Organic Apple Zucchini Spinach Strawberry
75  Stage 2 - 2nd Foods Pouches Organic Banana Acai Berry Mixed Grain
76  Stage 2 - 2nd Foods Pouches Organic Banana Blueberry Blackberry Oatmeal
77  Stage 2 - 2nd Foods Pouches Organic Carrot Apple Mango
78  Stage 2 - 2nd Foods Pouches Organic Pear Mango Avocado
79  Stage 2 - 2nd Foods Pouches Organic Pear Peach Strawberry
80  Stage 2 - 2nd Foods Pouches Organic Purple Carrot Banana Acai Cardamom
81  Stage 2 - 2nd Foods Pouches Organic Squash Apple Sweet Potato
82  Stage 2 - 2nd Foods Pouches Organic Squash Pear Peach with Basil

### Cereals

83  Apple Cinnamon Oatmeal & Barley Cereal
84  Banana & Cream Oatmeal & Barley Cereal
85  Banana Apple Strawberry Multigrain Cereal
86  DHA & Probiotic Rice Cereal
87  Lil'Bits Oatmeal Banana Strawberry Cereal
88  Multi Grain Cereal
89  Multigrain Cereal
90  Oatmeal
91  Oatmeal Banana Probiotic Cereal
92  Organic Oatmeal
93  Organic Oatmeal Banana Cereal

# B. Gerber Products

94    Organic Oatmeal Millet Quinoa Cereal
95    Organic Single-Grain Rice
96    Probiotic Oatmeal, Lentil, Carrots & Peas
97    Probiotic Rice Banana Apple Cereal
98    Single Grain Rice Cereal
99    Whole Wheat Apple Blueberry Cereal
100   Whole Wheat Cereal

**Puffs Snacks**
101   Apple Cinnamon Puffs
102   Apple Sweet Potato Lil' Crunchies
103   Banana Puffs
104   Blueberry Puffs
105   Cranberry Orange Organic Puffs
106   Fig Berry Organic Puffs
107   Garden Tomato Lil' Crunchies
108   Mild Cheddar Lil' Crunchies
109   Organic Apple Puffs
110   Organic Banana Raspberry Baby Pops
111   Organic Lil' Crunchies White Bean Hummus
112   Organic Lil' Crunchies White Cheddar Broccoli
113   Peach Puffs
114   Ranch Lil' Crunchies
115   Strawberry Apple Puffs
116   Sweet Potato Puffs
117   Vanilla Maple Lil' Crunchies
118   Vanilla Puffs
119   Veggie Dip Lil' Crunchies

**Biscuits and Cookies**
120   Animal Crackers
121   Arrowroot Biscuits
122   Banana Cookies
123   Lil' Biscuits
124   Organic Honey Biscuits

**Grain Bars**
125   Apple Cinnamon Soft Baked Grain Bars
126   Banana Mango Organic Grain & Grow Soft Baked Grain Bars
127   Date & Carrot Organic Date & Carrot Fruit & Veggie Bars
128   Organic Raspberry Pomegranate Grain & Grow Soft Baked Grain Bars
129   Strawberry Banana Soft Baked Grain Bars

**Teethers/Wafers**
130   Apple Harvest Teether Wheels
131   Banana Cream Teether Wheels
132   Banana Peach Teethers
133   Banana Soothe 'n' Chew

## B. Gerber Products

| | |
|---|---|
| 134 | Banana Yogurt Blends Snacks |
| 135 | Blueberry with Whole Grains Yogurt Blends Snack |
| 136 | Mango Banana Carrot Organic Teethers |
| 137 | Mango Raspberry Teethers |
| 138 | Organic Teethers Blueberry Apple Beet |
| 139 | Peach Yogurt Melts |
| 140 | Strawberry Apple Spinach Teethers |
| 141 | Strawberry Banana Yogurt Blends Snack |

# C. Hain Products

### Jars

1  Apple Butternut Squash
2  Apple Cinnamon Oatmeal
3  Apples
4  Apples & Apricots
5  Apples & Blueberries
6  Apples & Plums
7  Banana Mango
8  Bananas
9  Bananas Peaches & Raspberries
10  Carrots
11  Chicken & Chicken Broth
12  Chicken & Rice
13  Corn & Butternut Squash
14  Peach Oatmeal Banana
15  Pears
16  Pears & Mangos
17  Pears & Raspberries
18  Peas
19  Sweet Potato Apricot
20  Sweet Potato Chicken
21  Sweet Potatoes
22  Tender Chicken & Stars
23  Turkey & Turkey Broth
24  Vegetable Turkey
25  Winter Squash

### Pouches

26  Apple Peach Oatmeal Fruit and Grain Puree
27  Apple Strawberry Baby Food Puree
28  Apple Sweet Potato Pumpkin Blueberry Baby Food Puree
29  Banana Blueberry Banana Food Puree
30  Banana Raspberry Brown Rice Fruit and Grain Puree
31  Beef Medley
32  Butternut Squash Pear Baby Food Puree
33  Carrots & Broccoli Veggie Puree
34  Cheesy Past with Veggies
35  Chicken Casserole
36  Chicken Pot Pie
37  Four Bean Feast Organic Protein Pouch
38  Orange Banana Baby Food Puree
39  Pasta with Tomato & White Bean
40  Peach Mango Baby Food Puree

# C. Hain Products

41  Pear Carrot Apricot Baby Food Puree
42  Pumpkin & Spinach Veggie Puree
43  Spinach Lentil and Brown Rice Veggie & Protein Puree
44  Squash & Sweet Peas Veggie Puree
45  Sweet Garbanzo Barley Veggie & Protein Puree
46  Sweet Potato & Beets Veggie Puree
47  Sweet Potato Apple Baby Food Puree
48  Turkey Quinoa Apple Sweet Potato
49  Veggie Lentil Bake Organic Protein Pouch
50  Wholesome Breakfast Apple Raisin
51  Wholesome Breakfast Blueberry Banana
52  Wholesome Breakfast Strawberry Peach Pear with Yogurt Oat & Quinoa Baby Puree
53  Wholesome Breakfast Sweet Potato Cinnamon

### Cereals
54  Organic Rice Cereal Babies First Solid Food
55  Organic whole Grain Multi – Grain Cereal
56  Organic Whole Grain Oatmeal Cereal

### Snacks
57  Apple Sunny Days Snack Bars
58  Blueberry Breakfast Biscuits
59  Honey Crunchin'Grahams
60  Oatmeal Cinnamon Organic Letter of the Day Cookies
61  Organic Crunchin'Crackers
62  Organic Garden Veggie Straws
63  Organic Peanut Butter Puffs
64  Strawberry Sunny Days Snack Bars
65  Sweet Potato Carrot Sunny Days Snack Bars
66  Veggie Crunchin'Crackers

### Frozen Entrees and Meals
67  Frozen Baked Chicken Nuggets Value Size
68  Frozen Baked Chicken Nuggets
69  Frozen Baked Popcorn Chicken Nuggets
70  Frozen Gluten Free Broccoli & Cheese Nuggets
71  Frozen Gluten Free Veggie Nuggets
72  Frozen Mini Beef Meatballs
73  Frozen Plant Based Protein Nuggets
74  Organic Frozen Chicken Fries
75  Organic Frozen Mini Pancakes Blueberry

### Fruit Yogurt Smoothies

# C. Hain Products

76      Mixed Berry Fruit Yogurt Smoothie
77      Peach Banana Fruit Yogurt Smoothie
78      Pear Mango Fruit Yogurt Smoothie
79      Pineapple Orange Banana Fruit Yogurt Smoothie
80      Strawberry Banana Fruit Yogurt Smoothie

**<u>Electrolyte Solution</u>**
81      Apple Orange Electrolyte Solution
82      Grape Electrolyte Solution

# D. Nurture Products

### Jars

1   Apple & Spinach
2   Apples & Blueberries
3   Apples, Mangos & Beets
4   Apples, Oats & Cinnamon
5   Bananas & Strawberries
6   Bananas & Sweet Potatoes
7   Bananas, Blueberries & Beets
8   Carrots
9   Carrots & Peas
10  Green Beans
11  Pears
12  Pears & Kale
13  Pears & Prunes
14  Pears, Mangos & Spinach
15  Pears, Pineapple & Avocado
16  Sweet Potatoes

### Pouches

17  Stage 1 Mangos
18  Stage 1 Prunes
19  Stage 2 Apple, Kale & Oats
20  Stage 2 Apples & Carrots
21  Stage 2 Apples, Blueberries & Oats
22  Stage 2 Apples, Guavas & Beets
23  Stage 2 Apples, Kale & Avocados
24  Stage 2 Apples, Pumpkin & Carrots
25  Stage 2 Apples, Spinach & Kale
26  Stage 2 Apples, Sweet Potatoes & Granola
27  Stage 2 Bananas, Beets & Blueberries
28  Stage 2 Bananas, Pineapple, Avocado & Granola
29  Stage 2 Bananas, Plums & Granola
30  Stage 2 Bananas, Raspberries & Oats
31  Stage 2 Bananas, Sweet Potatoes & Papayas
32  Stage 2 Black Beans, Beets & Bananas
33  Stage 2 Broccoli & Carrots with Olive Oil + Garlic
34  Stage 2 Carrots, Strawberries & Chickpeas
35  Stage 2 Green Beans, Spinach & Pears
36  Stage 2 Pear, Raspberries & Oats
37  Stage 2 Pears, Kale & Spinach
38  Stage 2 Pears, Mangos & Spinach
39  Stage 2 Pears, Peas & Broccoli
40  Stage 2 Pears, Pumpkin & Passion Fruit

## D. Nurture Products

41      Stage 2 Pears, Pumpkin, Peaches & Granola
42      Stage 2 Pears, Squash & Blackberries
43      Stage 2 Pears, Squash & Oats
44      Stage 2 Pears, Zucchini & Peas
45      Stage 2 Peas, Bananas & Kiwi
46      Stage 2 Purple Carrot & Cauliflower with Avocado Oil + Oregano
47      Stage 2 Purple Carrots, Bananas, Avocados & Quinoa
48      Stage 2 Squash, Chickpeas & Spinach with Avocado Oil & Sage
49      Stage 2 Squash, Pears & Apricots
50      Stage 2 Sweet Potatoes with Olive Oil +Rosemary
51      Stage 2 Sweet Potatoes, Mangos & Carrots
52      Stage 2 Zucchini, Apples, Peas, Quinoa & Basil
53      Stage 3 Harvest Vegetables & Chicken with Quinoa
54      Stage 3 Root Vegetables & Turkey with Quinoa
55      Stage 3 Vegetables & Beef medley with Quinoa
56      Stage 4 Apples & butternut Squash + Super Chia
57      Stage 4 Apples, Acai, Coconut Milk & Oats + Super Chia
58      Stage 4 Apples, Cinnamon, Yogurt & Oats
59      Stage 4 Apples, Mangos & Kale + Super Chia
60      Stage 4 Apples, Spinach, Peas & Broccoli + Super Chia
61      Stage 4 Apples, Sweet Potatoes, Carrots & Cinnamon + Super Chia
62      Stage 4 Bananas, Beets & Strawberries
63      Stage 4 Bananas, Beets, Squash & Blueberries
64      Stage 4 Bananas, Blueberries, Yogurt & Oats
65      Stage 4 Bananas, Carrots & Strawberries
66      Stage 4 Bananas, Dragonfruit, Coconut milk & Oats + Super Chia
67      Stage 4 Bananas, Mangos & Spinach
68      Stage 4 Bananas, Peaches & Mangos + Super Chia
69      Stage 4 Bananas, Spinach & Blueberries
70      Stage 4 Carrots, Bananas, Mangos & Sweet Potatoes
71      Stage 4 Pears, Bananas, Sweet Potato & Pumpkin + Super Chia
72      Stage 4 Pears, Beets & Blackberries
73      Stage 4 Pears, Beets & Blueberries + Super Chia
74      Stage 4 Pears, Blueberries & Spinach
75      Stage 4 Pears, Green Beans & Peas + Super Chia
76      Stage 4 Pears, Kiwi & Kale
77      Stage 4 Pears, Mangos & Spinach + Super Chia
78      Stage 4 Pears, Peaches, Pumpkin & Apples
79      Stage 4 Pears, Raspberries, Carrots & Butternut Squash
80      Stage 4 Spinach, Apples, Sweet Potatoes & Kiwi
81      Stage 4 Zucchini, Pears, Chickpeas & Kale

**Cereals**

# D. Nurture Products

82    Oatmeal
83    Oats & Quinoa

### Puffs

84    Apple & Broccoli
85    Banana & Pumpkin
86    Kale & Spinach
87    Purple Carrot & Blueberry
88    Strawberry & Beet
89    Sweet Potato & Carrot

### Snacks

90    Creamies Apple, Spinach, Pea & Kiwi
91    Creamies Strawberry, Raspberry & Carrot
92    Greek Yogis Banana Mango
93    Greek Yogis Blueberry & Purple Carrot
94    Greek Yogis Mixed Berry
95    Greek Yogis Strawberry
96    Greek Yogis Strawberry Banana
97    Snackers Creamy Spinach & Carrot
98    Snackers Tomato & Basil
99    Teethers Apple, Carrot & Cinnamon Muffin
100   Teethers Blueberry & Purple Carrot
101   Teethers Mango & Pumpkin with Amaranth
102   Teethers Pancake & Waffle Mix
103   Teethers Pea & Spinach
104   Teethers Strawberry & Beet with Amaranth
105   Teethers Sweet Potato & Banana
106   Teethers Waffle/Muffin Mix

### Bars

107   Apple + Cinnamon Fruit & Oat
108   Banana + Chocolate Fruit & Oat
109   Bananas & Carrots
110   Blueberry & Raspberry Fruit & Oat
111   Mango & Sweet Potato Fruit, Veggie & Oat
112   Raspberry & Butternut Squash Fruit, Veggie & Oat

### Bowls

113   Beef & Quinoa Fiesta with vegetable Salsa
114   Cheese & Spinach Ravioli
115   Cheesy Lentils & Quinoa
116   Mac & Cheese

# D. Nurture Products

117    Squash Ravioli
118    Turkey Bolognese
119    Veggies & Wild Rice with Mushrooms & Parmesan Bowl

**<u>Cookies</u>**

120    Cinnamon & Sweet Potato + Flaxseed Multi-grain
121    Vanilla Oat + Flaxseed Multi-grain

# E. Plum Products

**Pouches**

1. Stage 1 Peaches
2. Stage 1 Sweet Potato
3. Stage 1 Mangos
4. Stage 1 Prunes
5. Stage 2 Pear, Blueberry, Avocado & Granola
6. Stage 2 Strawberry, Banana & Granola
7. Stage 2 Mango, Carrot & Coconut Cream
8. Stage 2 Butternut Squash, Carrot, Chickpea & Corn
9. Stage 2 Peach, Banana & Apricot
10. Stage 2 Sweet Potato, Apple & Corn
11. Stage 2 Apple & Carrot
12. Stage 2 Guava, Pear & Pumpkin
13. Stage 2 Apple, Spinach & Avocado
14. Stage 2 Apple, Raisin & Quinoa
15. Stage 2 Apple, Blackberry & Coconut Cream
16. Stage 2 Banana & Pumpkin
17. Stage 2 Apple, Raspberry, Spinach & Greek Yogurt
18. Stage 2 Pea, Kiwi, Pear & Avocado
19. Stage 2 Pear, Green Bean & Greek Yogurt
20. Stage 2 Pear & Mango
21. Stage 2 Peach, Pumpkin, Carrot & Cinnamon
22. Stage 2 Banana, Zucchini & Amaranth
23. Stage 2 Mango, Sweet Potato, Apple & Millet
24. Stage 2 Mango, Yellow Zucchini, Corn & Turmeric
25. Stage 2 Apple & Broccoli
26. Stage 2 Apple, Plum, Berry & Barley
27. Stage 2 Pear, Spinach & Pea
28. Stage 2 Apple, Cauliflower & Leek
29. Stage 2 Carrots, Beans, Spinach & Tomato
30. Stage 2 Pumpkin, Spinach, Chickpea & Broccoli
31. Stage 2 Kale, Corn, Carrot & Tomato
32. Stage 2 Pear, Purple Carrot & Blueberry
33. Stage 3 Carrot, Spinach, Turkey, Corn, Apple & Potato
34. Stage 3 Carrot, Sweet Potato, Corn, Pea, Chicken
35. Stage 3 Carrot, Chickpea, Pea, Beef & Tomato
36. Stage/Mighty 4 Banana, Blueberry, Sweet Potato, Carrot, Greek Yogurt & Millet
37. Stage/Mighty 4 Banana, Kiwi, Spinach, Greek Yogurt & Barley
38. Stage/Mighty 4 Banana, Peach, Pumpkin, Carrot, Greek Yogurt & Oats
39. Stage/Mighty 4 Guava, Pomegranate, Black Bean, Carrot & Oat
40. Stage/Mighty 4 Mango, Pineapple, White Bean, Butternut Squash & Oats
41. Stage/Mighty 4 Pear, Cherry, Blackberry, Strawberry, Black Bean, Spinach & Oats
42. Stage/Mighty 4 Strawberry Banana, Greek Yogurt, Kale, Oat & Amaranth

# E. Plum Products

| | |
|---|---|
| 43 | Stage/Mighty 4 Sweet Potato, Banana & Passion Fruit, Greek Yogurt & Oats |
| 44 | Mighty Morning Banana, Blueberry, Oat, Quinoa |
| 45 | Mighty Protein & Fiber Banana, White Bean, Strawberry & Chia |
| 46 | Mighty Protein & Fiber Pear, White Bean, Blueberry Date & Chia |
| 47 | Mighty Veggie Carrot, pear, Pomegranate & Oats |
| 48 | Mighty Veggie Spinach, Grape, Apple & Amaranth |
| 49 | Mighty Veggie Sweet Potato, Apple, Banana & Carrot |
| 50 | Mighty Veggie Zucchini, Apple, Watermelon & Barley |

**Super Puffs**

| | |
|---|---|
| 51 | Apple with Spinach |
| 52 | Blueberry with Purple Sweet Potato |
| 53 | Mango with Sweet Potato |
| 54 | Strawberry with Beet |

**Teethers**

| | |
|---|---|
| 55 | Apple with Leafy Greens |
| 56 | Banana with Pumpkin |
| 57 | Blueberry |

**Bars**

| | |
|---|---|
| 58 | Almond Butter |
| 59 | Apple Cinnamon |
| 60 | Apple Cinnamon & Oatmeal Bar |
| 61 | Blueberry |
| 62 | Blueberry & Oatmeal Bar |
| 63 | Blueberry Lemon |
| 64 | Jammy Sammy |
| 65 | Mighty Snack bars |
| 66 | Peanut Butter |
| 67 | Peanut Butter & Grape Bar |
| 68 | Peanut Butter & Strawberry Bar |
| 69 | Pumpkin Banana |
| 70 | Strawberry |

**Mashups**

| | |
|---|---|
| 71 | Applesauce Blueberry Carrot |
| 72 | Applesauce Carrot & Mango |
| 73 | Applesauce Strawberry & Banana |
| 74 | Applesauce Strawberry & Beet |

**Teensy Snacks**

| | |
|---|---|
| 75 | Berry |

# E. Plum Products

76      Peach

# F. Sprout Products

**Pouches**

1. Toddler Apple with Apricot & Strawberry
2. Toddler Berry Grape
3. Toddler Blueberry Banana
4. Toddler Peach
5. Toddler Strawberry
6. Toddler Strawberry and Banana with Squash
7. Toddlers Butternut Squash with pineapple and Papaya
8. Toddlers Green Veggies
9. Toddlers Kiwi with Super blend banana & spinach
10. Toddlers Purple Carrot, Strawberry & Grape
11. Toddlers Sweet potato Peach & Carrots
12. Stage 2 Apple Banana, Butternut Squash
13. Stage 2 Apple Blueberry
14. Stage 2 Apple, Oatmeal Raisin with Cinnamon
15. Stage 2 Apricot Peach, Pumpkin
16. Stage 2 Apricot, Banana, Chickpea Fig
17. Stage 2 Blueberry, Banana Oatmeal
18. Stage 2 Butternut Blueberry Apple with Beans
19. Stage 2 Butternut, Carrot & Apple with Beef Broth
20. Stage 2 Carrot Chickpeas, Zucchini Pear
21. Stage 2 Carrot, Apple, Mango
22. Stage 2 Mixed Berry Oatmeal
23. Stage 2 Peach Oatmeal with Coconut Milk & Pineapple
24. Stage 2 Pear, Kiwi, Peas, Spinach
25. Stage 2 Strawberry, Apple, Beet, Red Beans
26. Stage 2 Strawberry, Pear, Banana
27. Stage 2 Sweet Potato, Apple, Spinach
28. Stage 2 Sweet Potato, White Beans with Cinnamon
29. Stage 2 Vegetables & Pear with Chicken Broth
30. Stage 3 Butternut Chickpea Quinoa Dates
31. Stage 3 Creamy Vegetables with Chicken
32. Stage 3 Garden Vegetables Brown Rice with Turkey
33. Stage 3 Harvest Vegetables Apricot with Chicken
34. Stage 3 Market Vegetable Pear with Turkey
35. Stage 3 Pumpkin Apple Red Lentin with Cinnamon
36. Stage 3 Root Vegetables Apple with Beef
37. Stage 3 Sweet Pea Carrot Corn White Bean

**Toddler Meals**

38. Baby Burrito Bowl
39. Butternut Mac & Cheese
40. Pasta with Veggie Sauce

# F. Sprout Products

41     Veggie Power Bowl


**<u>Puffs</u>**

42     Apple Kale Power Puffs
43     Carrot Peach Mango Plant


**<u>Snacks</u>**

44     Crinkles Cheddar and Spinach
45     Crinkles Pumpkin and Carrot
46     Crispy Chews Apples & Strawberry
47     Crispy Chews Beet & Berry
48     Crispy Chews Orchard Fruit & Carrot
49     Curlz Broccoli
50     Curlz Sweet Potato & Cinnamon
51     Curlz White Cheddar Broccoli
52     Wafflez Blueberry Apple
53     Wafflez Pumpkin Butter & Jelly

# G. Walmart Products

### Jars and Tubs

1    Stage 1 Apple Baby Food
2    Stage 1 Banana Food
3    Stage 1 Butternut Squash Baby Food
4    Stage 1 Carrot Baby Food
5    Stage 1 Natural Apple Baby Food
6    Stage 1 Pear Baby Food
7    Stage 2 Apple Strawberry Baby Food
8    Stage 2 Banana Baby Food
9    Stage 2 Butternut Squash Pineapple Baby Food
10   Stage 2 Sweet Potato Baby Food

### Pouches

11   Apple
12   Banana
13   Banana Berry Burst
14   BBQ Seasoned Chicken Roasted Corn
15   Berry & Oats
16   Blueberry Apple Yogurt
17   Blueberry Kale Rice
18   Butternut Squash
19   Carrot Zucchini Broccoli
20   Cheesy Potato
21   Chicken Noodle
22   Green Bean
23   Macaroni and Cheese
24   Mango Banana Kale
25   Organic Pear
26   Pea White Chicken
27   Root Veggies Apple
28   Strawberry Banana Yogurt
29   Strawberry Carrot Quinoa
30   Strawberry Yogurt
31   Sweet Potato Apple Grape
32   Sweet Potato Cinnamon
33   Sweet Potato Turkey
34   Tropical Burst

### Puffs

35   Banana Puffs
36   Blueberry Puffs
37   Peach Mango Puffs
38   Strawberry Apple Puffs

# G. Walmart Products

39    Strawberry Yogurt Puffs
40    Sweet Potato Puffs


**<u>Snacks</u>**
41    Blueberry Rice Rusks
42    Organic Apple Rice Rusks
43    Organic Banana Rice Rusks
44    Organic Strawberry Rice Rusks


**<u>Yogurt Bites</u>**
45    Banana Yogurt Bites
46    Cherry Vanilla Yogurt Bites
47    Mixed Berry Yogurt Bites
48    Peach Yogurt Bites
49    Strawberry Yogurt Bites