

August 22, 2025

Hon. Jacqueline Scott Corley
450 Golden Gate Avenue
19th Floor, Courtroom 8
San Francisco, CA 94102

***In re: Baby Food Products Liability Litigation* (MDL 3101)**
Joint Letter Brief Re: Discovery Dispute over Two Document Requests Issued to Defense Expert Dr. Stephan Sanders

Dear Judge Corley,

After meeting and conferring, the parties seek the Court's resolution of a dispute over two document requests issued to defense expert Dr. Stephan Sanders. Counsel for Plaintiffs (Joseph Masterman) and Defendants (Neelum Wadhwani) conferred over these requests for approximately fifteen minutes by videoconference on August 15, 2025. The parties' positions are as follows.

### A. Plaintiffs' Position

Defendants have offered Dr. Sanders as an expert in pediatric neurogenetics to testify about the causes and neurobiology of autism spectrum disorder (ASD). Dr. Sanders's deposition occurred on August 8, 2025. Before and during that deposition, Plaintiffs requested certain categories of relevant documents in his possession, including the two at issue here.

First, Plaintiffs requested "all communications with or materials sent to or received from any other expert retained by Defendants in this litigation." Ex. A at 8 (Defs.' Resps. & Objs. to Sanders Not. of Dep. & Req. for Prod. of Docs.). Subject to objections, Defendants represented that they had no documents responsive to this request. *See id*. At deposition, however, Dr. Sanders testified that he did—specifically, that he has had relevant communications with defense experts Elise Robinson, Eric Fombonne, and Matthew State. Dr. Sanders stated that he has not discussed this particular case with these other experts. Yet they are all colleagues with whom, as someone who works in the field of autism, he has collaborated and communicated about issues relevant to this case. *See* Ex. B at 68 (Excerpts of Draft Tr. of Sanders Dep.) (Dr. Sanders: "So I have worked in the field of autism for a long time. As a result I know Dr. Robinson, Dr. State, and Dr. Fombonne, because they're all experts in the field of autism"); *id*. at 69 (Dr. Sanders: "Dr. Fombonne is a colleague in my field who I've melt [sic] on several occasions. He's someone I interact with a conferences. Dr. Robinson is someone who I've collaborated with and we've written manuscripts together."); *id*. at 69 ("These are colleagues in my field and I have had extensive communications with them regarding matters outside of this case."); *id*. at 70 ("I have worked with them in the field of autism as a collaborator but we have not had any discussion about the matters in this case.").

Indeed, Dr. Sanders recalled "a really explicit discussion of the etiology of autism" with Dr. State when they "were asked to debate the matter at UCL" a few years ago. *Id*. at 70–71.

11111 Santa Monica Boulevard, Suite 1750, Los Angeles, CA  90025

100 Drakes Landing Rd, Bldg. 100B, Suite 160, Greenbrae, CA 94904  |  2101 L Street, N.W., Suite 300, Washington, D.C. 20037

(310) 207-3233  |  wisnerbaum.com  |  (202) 466-0513



Although Dr. Sanders claimed that he did not have records or substantive emails about this event, and that this was the only such discussion he could recall, defense counsel confirmed at the parties' subsequent meet-and-confer that Dr. Sanders had not done an inventory of his email.

Communications between a party's experts are discoverable. *See, e.g.*, *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 516 (N.D. Cal. 2012). Such communications are generally relevant because they may have informed an expert's opinions and may provide material for cross-examination. And they are plainly relevant here. Dr. Sanders studies the etiology of autism and has testified that he collaborates and communicates with three other defense experts in that work. Those communications will contain information that at the very least relates to, if not contradicts, his opinions here (*i.e.*, that ASD is primarily genetic, develops prenatally, and has not been reliably associated with the "environmental" exposure of heavy metals in commercial baby food).

Defendants' objections to searching for and producing these communications, *see* Ex. A at 8, are meritless. Defendants have attempted to limit this request to communications "regarding this litigation." *Id.* But that of course is not the limit of relevance. *See, e.g.*, FED. R. CIV. P. 26 Advisory Committee Note (2010) (counsel may seek discovery into unprotected communications "about the opinions expressed" and about "alternative analyses . . . or approaches to the issues on which [experts] are testifying, whether or not the expert considered them in forming the opinions expressed"). Nor is this request unduly burdensome. Plaintiffs seek the relevant communications that Dr. Sanders himself has identified. That request can be satisfied with targeted searches for his communications with Drs. State, Robinson, and Fombonne about the causes of autism.

Second, during deposition, Plaintiffs requested Dr. Sanders's case file from *Langevin v. PBHMC Inc.* (Arizona Superior Court), a case in which he had testified within the last four years. *See* Ex. B at 54. This request came after Dr. Sanders indicated not only that such a file exists, *see id*. at 58–59, but also that the case involved issues relevant to his opinions in this one. That case concerned a child with autism who had been exposed to radiation in utero. *See id*. at 54–55. That child also had a variant in a gene (RFX 3) associated with autism. According to Dr. Sanders, he opined "that autism was predominantly genetic, but also that variant in the gene RFX 3 alone was probably not sufficient to lead to autism, it would need other factors, for example common genetic background." *Id*. at 55. And though he did not opine on whether radiation had caused the plaintiff's autism, another expert did, and Dr. Sanders was familiar with his opinions. *See id*. at 57.

Experts' work in other cases is yet another source of relevant discovery, even where parties seek only to discover an expert's rate for cross-examination purposes. *See, e.g.*, *Silgan Containers v. Nat'l Union Fire Ins.*, No. C 09-05971 RS LB, 2011 WL 1058861, at *7 (N.D. Cal. Mar. 23, 2011). Hence why the Federal Rules require experts to disclose their testimony from the prior four years. *See* FED. R. CIV. P. 26(a)(2)(B)(v). And again, the requested information is plainly relevant here. Dr. Sanders offered an opinion on behalf of a plaintiff with autism who was exposed to an "environmental" factor potentially associated with autism, and he opined that the plaintiff's autism was probably not due only to a genetic variant. His file from that case is therefore likely to contain information relevant to his opinion that Plaintiffs' autism is not due to the environmental factor asserted in this case, if not clear fodder for cross-examination.





Defendants have no valid ground to refuse to search for and produce this file, either. To be sure, as they emphasize, this case deals with a different type of exposure than *Langevin* did. But Defendants have chosen to proffer Dr. Sanders to opine here that autism is predominantly genetic. They have thereby put at issue the role of gene-environment interaction in autism's etiology, an issue also implicated in *Langevin*. Differences in exposure do not render the requested discovery wholly unlikely to yield relevant information. Defendants have also objected that the *Langevin* file might contain confidential health information of that plaintiff. But they have not said why that concern, if founded, cannot be solved with redactions. And they cannot claim that such redactions would be unduly burdensome when they have not even searched for these documents.

For these reasons, Plaintiffs respectfully request that the Court order Defendants to produce both categories of documents as described herein.

### B. **Defendants' Position**

Dr. Sanders is one of the world's leading experts on the role of genetics in the etiology of autism.  In this case, he is testifying as an expert on the causes and neurobiology of autism and ADHD, and on the specific question of whether exposure to lead and arsenic in certain commercial baby foods has been established as a cause of ASD and ADHD.  In connection with his work in this MDL and a prior California case involving the same issues (*NC v. Hain Celestial* [LA Sup. Ct. 2021]), Dr. Sanders disclosed (1) his professional associations with certain experts in the field who are also defense experts in this case, and (2) his prior expert testimony in *Langevin v. PBHMC Inc.* (Ariz. Super. Ct.), a case alleging that a wholly different environmental exposure (radiation) via a wholly different route of exposure (maternal CT scan) during a wholly different developmental window (prenatal) played a role in a particular's child autism.  Despite having known about Dr. Sanders' non-litigation affiliations with other defense experts and his expert work in *Langevin* for more than two years, Plaintiffs have now decided for the first time, that they are entitled to sweeping discovery into both topics.  For numerous reasons, these requests should be rejected.

*First*, Plaintiffs are not entitled to ordinary-course, professional communications between defense experts that are unrelated to this litigation.  Drs. Sanders, State, Robinson, and Fombonne are preeminent experts in the field of autism research and, as such, may have met and/or collaborated with one another in various professional settings over the course of their careers.  But as each of these experts testified at deposition, they have *never* communicated with one another about the question of baby food and/or heavy metals and autism etiology *or* about anything related to this litigation.  Dr. Sanders testified unambiguously that he has "not had any discussion" with any of the defense experts "about the matters in this case."  Sanders Tr. 75:15-19; *id.* at 75:7-9.  Drs. Robinson, State, and Fombonne were asked similar questions and gave the same response.[1]

---

[1] Draft Robinson Tr. 214:19-215:7 (Q. Are you familiar with any of the other experts that have been designated for the defense in this case? A. Yes. I know some of their names. I have not -- oh, Matt State, Stephan Sanders, Eric Fombonne, and I have not discussed it with any of them.  Q. Have you had any communications with them about metals and its effects on brain development or autism?  A. None.  Q. Did you have any discussions with them



The Advisory Committee Notes to Rule 26(b) state that parties may be permitted to inquire about "communications the expert had with anyone other than the party's counsel *about the opinions expressed*." Fed. R. Civ. 26(b) Advisory Committee Note (2010). But nothing in Rule 26(b) or the Advisory Committee Note suggests that parties are entitled to professional communications an expert may have related to his general area of expertise that occur wholly outside the context of the litigation in which they are testifying. Nor does the Rule provide any basis for discovery into an expert's non-litigation communications simply because they may have included professional colleagues who are also experts in the same case.

Plaintiffs appear to assert that all communications between Drs. Sanders, State, Robinson, and Fombonne that touch on the "etiology of autism" broadly defined, are discoverable, irrespective of whether those communications relate in any way to the core issues in this litigation. There is simply no support for this sweeping and burdensome request. Much of Dr. Sanders' career has focused on researching the genetic etiology of autism, and it is thus unsurprising that he has interacted and at times collaborated with other defense experts on topics related to autism etiology. Dr. State, for example, was Dr. Sanders' doctoral and post-doctoral supervisor at Yale University. Over the course of the roughly 17 years they have known and worked together, the two have collaborated on various scientific papers and participated in panels (like the one Dr. Sanders referenced at deposition) that relate to the etiology of autism. Dr. Sanders has likewise researched and published scientific papers with Dr. Robinson. Once again, none of these papers or presentations have related *in any way* to heavy metals and/or baby food. The burden associated with requiring Dr. Sanders to search through and produce all of his communications with these colleagues that touch on the "etiology of autism" broadly is therefore far outweighed by the minimal relevance of any such communications to his opinions in this case. Indeed, if everything Dr. Sanders, Dr. State, and Dr. Robinson have ever said to each other about the "etiology of autism" could be viewed as related to "the opinions expressed in this case," then virtually every communication Dr. Sanders has ever had with these colleagues would be subject to discovery. Rule 26(b) does not contemplate such a result.[2]

The single case Plaintiffs cite to support their request is inapposite. In *In re Application of Republic of Ecuador*, several defense experts communicated directly with one another about the issues in the case and the substance of their expert opinions. 280 F.R.D. 506 (N.D. Cal. 2012). The defendant then identified those intra-expert communications as "work product" on a privilege log.

---

prelitigation regarding those topics? A. No.); Draft State Tr. 60:18-61:21 (testifying that he has discussed "nothing with regard to baby food, with regard to the specific allegations in this case, no recent conversations around any of the literature that we're discussing here … with any of the other experts," and agreeing that he has discussed "nothing with respect to lead or arsenic either" with those experts); Draft Fombonne Tr. 44:8-45:14 (testifying that he and Dr. State "know each other as colleagues" and that he met Dr. Robinson "fairly recently … unrelated, of course, to this [litigation]").

[2] Tellingly, Plaintiffs have never produced any communications between their own experts who testified to having professional affiliations similar to Dr. Sanders'. Dr. Guilarte and Dr. Aschner, as well as Dr. Ritz and Dr. Jones, testified to their long professional and personal affiliations, collaborations, and communications on topics that overlap with their opinions to the same extent as any communications Dr. Sanders may have had with defense experts in this case. Plaintiffs cannot claim that defendants are obligated to abide by a rule that they have not followed.



In that context, where experts were communicating specifically about their opinions in that litigation, the court held that such communications may be subject to discovery. *Id.* at 516. Nothing in the court's opinion suggested that Rule 26(b) permits discovery into every ordinary-course, professional communication an expert may have had with colleagues in the field who also happen to be testifying experts, simply because some of those communications may touch at the highest level on topics discussed in the litigation. The Court should reject Plaintiffs' attempt to open the doors to this kind of burdensome and intrusive fishing expedition here.

**Second**, Plaintiffs have no basis to demand Dr. Sanders' "case file" from *Langevin v. PBHMC Inc.* (Arizona Superior Court). Plaintiffs' primary theory of relevance is that Dr. Sanders' work for the plaintiffs in *Langevin* may provide fodder for cross-examination in this case. But as Dr. Sanders' deposition testimony made clear, his opinions in that case have no bearing on—and are in no way inconsistent with—the opinions he offers here.

First, *Langevin* involved a wholly different alleged exposure—namely, prenatal exposure to high levels of radiation via a CAT scan during the mother's first trimester of pregnancy. As Dr. Sanders explained at deposition, that kind of "very, very, very unusual" prenatal exposure (Sanders Tr. 62:5-12) has absolutely no overlap with *postnatal* exposure to trace amounts of naturally occurring heavy metals in baby food, which Plaintiffs are alleging here. Second, as Dr. Sanders also testified, he offered *no* opinion in *Langevin* on the plaintiff's theory that prenatal radiation exposure could be causal factor in autism. Instead, as in this case, his opinions focused on the predominant role of genetics in the etiology of autism. And finally, there is no inconsistency whatsoever between Dr. Sanders' opinions in this case and in *Langevin*. As Plaintiffs acknowledge, Dr. Sanders opined in Langevin "that autism was predominantly genetic, but also that [the plaintiff's specific genetic] variant in the gene RFX 3 alone was probably not sufficient to lead to autism, it would need other factors, *for example common genetic background*." *See supra* at 2 (quoting Sanders Tr. 60:22-61:1). In other words, Dr. Sanders opined on the role of genetics in the etiology of autism and offered no opinion whatsoever about any theoretical non-genetic causes. Nothing in those opinions—which Dr. Sanders described in detail during his deposition—provides any ground for impeachment here.

Moreover, Plaintiffs vague and overbroad request for the entire "case file" from *Langevin* raises significant privilege and privacy concerns. Plaintiffs are plainly not entitled to any work product from that case (such as draft expert reports) that the *Langevin* defendants themselves would not have been able to obtain from Dr. Sanders. Moreover, the underlying materials Dr. Sanders relied on in forming his opinions in that case, as well as his actual expert report, inevitably contain confidential health information of the mother and child. Disclosing that material in this case would raise concerns under HIPPA and any protective order in place in *Langevin*. Given the minimal relevance of this case file to Dr. Sanders' opinions here and the highly confidential and sensitive nature of the information therein, Plaintiffs' belated request for these materials should be denied.

//

//



Respectfully submitted,

| | |
|---|---|
| By: */s/ R. Brent Wisner*<br>R. Brent Wisner (SBN: 279023)<br>**WISNER BAUM, LLP**<br>11111 Santa Monica Blvd., Suite 1750<br>Los Angeles, CA 90025<br>Telephone: (310) 207-3233<br>E-mail: rbwisner@wisnerbaum.com | By: */s/ Brooke Killian Kim*<br>Brooke Killian Kim (SBN 239298)<br>**DLA PIPER LLP (US)**<br>4365 Executive Drive, Suite 1100<br>San Diego, CA 92121<br>Telephone: (619) 699-3439<br>E-mail: brooke.kim@dlapiper.com |
| By: */s/ Aimee H. Wagstaff*<br>Aimee H. Wagstaff (SBN: 278480)<br>**WAGSTAFF LAW FIRM**<br>940 N. Lincoln Street<br>Denver, CO 80203<br>Telephone: (303) 376-6360<br>E-mail: awagstaff@wagstafflawfirm.com | *Liaison Counsel for Defendants* |
| *Co-Lead Counsel for Plaintiffs* | |