# Exhibit 33

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

) Case No.

IN RE: BABY FOOD PRODUCTS  )

LIABILITY LITIGATION     ) 24-MD-3101-JSC

)

_____) MDL 3101

This document relates to:  )

)

ALL ACTIONS        )

_____)

* CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER *

VIDEOTAPED DEPOSITION of HANNAH E. GARDENER, SC.D.

Thursday, July 31, 2025

9:07 a.m.

DLA Piper LLP

33 Arch Street

Boston, Massachusetts 02110-1447

Job No.: 2500

Pages: 1 - 329

Reported By: Michelle Keegan, RMR, CRR, CSR

---

**Page 2**

1  A P P E A R A N C E S :
2
3  WISNER BAUM
   By: Pedram Esfandiary, Esq.
4  By: Monique Alarcon, Esq.        (Zoom)
   11111 Santa Monica Boulevard, Suite 1750
5  Los Angeles, California 90025
   Phone: (310) 207-3233
6  Email: pesfandiary@wisnerbaum.com
   Email: malarcon@wisnerbaum.com
7  Counsel for Plaintiffs
8
9  BRADY LAW GROUP
   By: Steven J. Brady, Esq.       (Zoom)
   1015 Irwin Street
10 San Rafael, California 94901
   Phone: (415) 517-7300
11 Email: mail@bradylawgroup.com
   Counsel for Plaintiffs
12
13 ANAPOL WEISS
   By: Holly H. Dolejsi, Esq.       (Zoom)
14 60 South 6th Street, Suite 2800
   Minneapolis, Minnesota 55402
15 Phone: (651) 376-2872
   Email: hdolejsi@anapolweiss.com
16 Counsel for Plaintiffs
17
18 WAGSTAFF & CARTMELL
   By: Diane K. Watkins, Esq.       (Zoom)
   4740 Grand Avenue, Suite 300
19 Kansas City, Missouri 64112
   Phone: (816) 701-1140
20 Email: dwatkins@wcllp.com
   Counsel for Plaintiffs
21
22 CLAGGETT & SYKES
   By: Heather Bishop, Esq.        (Zoom)
23 4101 Meadows Lane, Suite 100
   Las Vegas, Nevada 89107
24 Phone: (516) 247-9643
   Email: heather@claggettlaw.com
25 Counsel for Plaintiffs

---

**Page 3**

1  APPEARANCES (Continued)
2
3  GORDON, REES, SCULLY, MANSUKHANI, LLP
   By: Michael R. Klatt, Esq.
4  2705 Bee Caves Road, Suite 220
   Austin, Texas 78746
5  Phone: (512) 391-0197
   Email: mklatt@grsm.com
6  Counsel for Defendant Sprout Foods Inc.
7
8  COVINGTON & BURLING LLP
   By: Elizabeth T. Fouhey, Esq.
   One City Center, 850 Tenth Street, NW
9  Washington, D.C. 20001
   Phone: (202) 662-5607
10 Email: efouhey@cov.com
   Counsel for Defendant Hain Celestial Group, Inc.
11
12 DECHERT LLP
   By: Will W. Sachse, Esq.
13 Cira Centre, 2929 Arch Street
   Philadelphia, Pennsylvania 19104
14 Phone: (215) 994-4000
   Email: will.sachse@dechert.com
15 Counsel for Defendant Plum, PBC
16
17 POLSINELLI
   By: Whitney Mayer, Esq.       (Zoom)
   1717 Arch Street, Suite 2800
18 Philadelphia, Pennsylvania 19103
   Phone: (215) 267-3051
19 Email: wmayer@polsinelli.com
   Counsel for Defendant Neptune Wellness
20 Solutions, Inc.
21
22 DLA PIPER LLP (US)
   By: Noorvik Minasian, Esq.       (Zoom)
   2000 Avenue of the Stars, Suite 400
23 North Tower
   Los Angeles, California 90067
24 Phone: (310) 595-3142
   Email: noorvik.minasian@dlapiper.com
25 Counsel for Defendant Nurture, LLC

---

**Page 4**

1  APPEARANCES (Continued)
2
3  DLA PIPER (US)
   By: Brenna D. Kelly, Esq.       (Zoom)
4  One Liberty Place
   1650 Market Street, Suite 5000
5  Philadelphia, Pennsylvania 19103
   Phone: (215) 656-2428
6  Email: brenna.kelly@us.dlapiper.com
   Counsel for Defendant Nurture, LLC
7
8  DAVIS WRIGHT TREMAINE LLP
   By: P. Andrew McStay, Jr., Esq.     (Zoom)
9  By: Ashley Vulin, Esq.        (Zoom)
   560 SW 10th Avenue, Suite 700
10 Portland, Oregon 97205
   Phone: (503) 778-5302
11 Email: andymcstay@dwt.com
   Email: ashleyvulin@dwt.com
12 Counsel for Defendant Amazon.com Services LLC
13
14 KING & SPALDING LLP
   By: Carmen Toledo, Esq.       (Zoom)
15 1180 Peachtree Street, NE, Suite 1600
   Atlanta, Georgia 30309
16 Phone: (404) 572-3438
   Email: ctoledo@kslaw.com
17 Counsel for Defendants Beech-Nut Nutrition
   Company and Walmart Inc.
18
19 Also Present:
20  Gil Whitney, Videographer
21
22
23
24
25

## Page 5

I N D E X

Videotaped Deposition of:                     Page

HANNAH E. GARDENER, SC.D.

By Mr. Klatt                     8

By Mr. Sachse                    298

E X H I B I T S

No.                                            Page

Exhibit 1  Defendants' Notice of Deposition   14
           of Hannah Gardener, Sc.D., and
           Request for Production of
           Documents
Exhibit 2  Expert Report of Hannah            22
           Gardener, Sc.D.
Exhibit 3  Rebuttal Expert Report of Hannah   25
           Gardener, Sc.D.
Exhibit 4  University of Miami Curriculum     38
           Vitae of Hannah Gardener, Sc.D.
Exhibit 5  "Summary of Invoices for the       62
           Expert Services of Dr. Hannah
           Gardener"
Exhibit 6  "Autism Spectrum Disorders         85
           (ASD)"
Exhibit 7  "Heavy metals and phthalate       108
           contamination in prenatal
           vitamins and folic acid
           supplements"
Exhibit 8  Transcript, "Hannah Gardener      173
           Testifies at [Rhode Island]
           Senate Hearing - March 7, 2017"
Exhibit 9  "EPA, Biomonitoring - Lead"       209

## Page 6

EXHIBITS (continued)

Exhibit 10  List of four questions proposed   274
            by Attorney Klatt

* Original exhibits retained by court reporter *

** Documents quoted on the record are
transcribed as read **

## Page 7

P R O C E E D I N G S

1    THE VIDEOGRAPHER:  We are now on the
2    record.  Today's date is July 31st, 2025, and the
3    time is 9:07 a.m.
4        My name is Gil Whitney.  I am the
5    videographer for Hartford Reporting & Technology
6    in the case of Baby Food Products Liability
7    Litigation, MDL Number 3101.
8        This deposition is being taken at 33 Arch
9    Street, Boston, Massachusetts, in the United
10   States District Court for the Northern District of
11   California, San Francisco Division.
12       The deponent today is Hannah E. Gardener,
13   Sc.D.
14       The court reporter today is Michelle
15   Keegan, and she will now swear the witness after
16   the counsel identify themselves for the record.
17       MR. KLATT:  Mike Klatt for defendant
18   Sprout Foods, Inc.
19       MS. FOUHEY:  Elizabeth Fouhey on behalf of
20   the Hain Celestial Group.
21       MR. SACHSE:  Will Sachse on behalf of
22   Plum.
23       MR. ESFANDIARY:  Pedram Esfandiary for the
24   plaintiffs and Dr. Gardener.

## Page 8

1    MR. KLATT:  I don't know if anyone on the
2    video wants to make an appearance.
3        MS. VULIN:  Ashley Vulin with Davis Wright
4    Tremaine, appearing on behalf of Amazon.
5        MS. TOLEDO:  Carmen Toledo from King &
6    Spalding for defendants Beech-Nut Nutrition
7    Company and Walmart, Inc.
8        HANNAH E. GARDENER, SC.D.,
9    having been satisfactorily identified and duly
10   sworn by the Notary Public, was examined and
11   testified as follows:
12       EXAMINATION BY COUNSEL FOR
13   DEFENDANT SPROUT FOODS, INC.
14   BY MR. KLATT:
15   Q. Good morning, Dr. Gardener.
16   A. Good morning.
17   Q. My name is Mike Klatt.  We met just a
18   couple of minutes ago for the first time.
19   Correct?
20   A. Correct.
21   Q. All right.  Nice to meet you this morning.
22       Can you just state your full name for the
23   record.
24   A. My name is Hannah Gardener.
25   Q. Okay.  You've given depositions before,

## Page 9

1    haven't you?
2        A. I have.
3        Q. I just want to give you a few reminders.
4    I'm sure you know these things.
5        Is there any reason here today that you
6    can't give full, truthful, and complete answers,
7    whether it's due to medications, any stressful
8    events in your life, anything else going on?
9        A. No.
10        Q. Okay. You understand we can take a break
11    anytime you need one as long as there's not a
12    question pending?
13        A. Yes, I do.
14        Q. And the court reporter would appreciate
15    and I would appreciate if you could give verbal
16    answers rather than "uh-huhs" or "mm-hmms." I'll
17    try to remember to correct you if you do that.
18        I've read your testimony in the past. It
19    doesn't seem like that's a problem, but if you
20    could just keep that in mind that would be great.
21        A. Sure. I've gotten a little bit better
22    over time, but I'm not perfect with that.
23        Q. Try not to get in a hurry. If you would,
24    let me finish my question before you start your
25    answer, and I will try to let you finish your

## Page 10

1    answer before I start my question, next question,
2    if that's okay.
3        A. Sounds good.
4        Q. But in fairness, if you would give
5    responsive answers, I think the day will go
6    quicker and also that will avoid us having to
7    repeat questions and things like that. Is that
8    fair?
9        A. Yes.
10        Q. Okay. Thank you. And of course, if you
11    don't understand my question -- and that's very
12    possible -- please let me know and I'll be happy
13    to rephrase it so you can understand it. Is that
14    fair?
15        A. Yes, I will.
16        Q. Okay. I count that you've given at least
17    five previous depositions before your deposition
18    here today. And I'll just tick them off and then
19    ask you if there are any others.
20        I have an indication that you gave two
21    depositions in the NC versus Hain case in
22    California state court, one in December 2021 and
23    one in April of 2023. Does that sound correct?
24        A. I don't remember exactly how many. That
25    sounds farther in the past than I would have

## Page 11

1    guessed, but I don't know exactly when the dates
2    were. I don't know if it's exactly -- if it's two
3    or one or three.
4        Q. And I know that it's been a while since
5    you were deposed in that case, but does it seem
6    accurate that you gave two depositions in the
7    case?
8        A. Yeah. So there was a -- was it the Sargon
9    hearing? I don't know if that counts.
10        Q. Well, I was going to come to that in a
11    minute. I was just asking you about depositions
12    right now.
13        A. I don't recall exactly how many there
14    were. Two sounds fair.
15        Q. Okay. I have noted that you gave a
16    deposition in a case called In Re Plum Baby Food
17    Litigation in Northern California federal court.
18    Does that sound fair?
19        A. Is that -- there's a class action? Yeah.
20    I think I've given a few on the class action at
21    this point.
22        I know there was one in person. There was
23    one on Zoom. So I can -- I think that the one in
24    person was the class action. I think there have
25    been at least two.

## Page 12

1        Q. Okay. Also indication that you've given a
2    deposition in Abbott Infant Formula Products
3    Liability Litigation. Do you remember that?
4        A. Maybe that was the one that was in person.
5    Maybe I'm getting confused. Maybe the Plum was on
6    Zoom and the Abbott one was in person, now that
7    you say that.
8        Q. Do you recall the subject of your
9    testimony in the Abbott infant formula case?
10        A. They've all been about heavy metals in
11    baby food products.
12        Q. Or in that case, it was infant formula?
13        A. Yeah. Sorry. I was including infant
14    formula in my characterization of baby foods.
15        Q. And then I know in March of this year,
16    March 6th, 2025, you gave a deposition in the
17    Landon R. case in California state court. Do you
18    recall that?
19        A. Yes. Here. That was the one that was
20    here.
21        Q. You're talking about here at the DLA --
22        A. In this room.
23        Q. I'm sorry. We're talking over each other.
24        You had given a deposition in the
25    Landon R. case in this exact location in

Page 13

1  March 2025. Is that correct?
2      A. That is correct.
3      Q. And we're talking about the DLA office
4  here in Boston?
5      A. Yes.
6      Q. Do you live in Boston?
7      A. I live in the suburbs of Boston.
8      Q. Which suburb?
9      A. I live in Medfield, Massachusetts.
10     Q. Okay. Do you recall any other depositions
11  you've given other than the ones we've just
12  enumerated?
13     A. There was a -- I had a little deposition
14  for a private matter in probably 2019 regarding a
15  sort of, like, real estate land dispute in my
16  neighborhood.
17     Q. That's the only other one that you have
18  given?
19     A. I don't remember exactly. Like, I can't
20  say for sure that your counts were correct, but I
21  can't think of any other ones, off the top of my
22  head.
23     Q. And let me go back because a minute ago
24  you mentioned about testifying at a Sargon hearing
25  in the NC case, I believe.

Page 14

1      A. I think it was that case.
2      Q. And that was a baby foods case. Correct?
3      A. That is correct.
4      Q. You testified remotely in that?
5      A. I did.
6      Q. As opposed to being actually in court.
7  Correct?
8      A. That is correct.
9      Q. And that was just testimony with the
10  lawyers and the judge involved? There was no jury
11  involved in that?
12     A. I don't recall there being a jury.
13     Q. Have you ever given testimony in a
14  courtroom where there was a jury?
15     A. I have never given testimony in a
16  courtroom with a jury.
17     Q. Okay.
18         MR. KLATT: Let's mark as the first
19  exhibit to your deposition. If we could mark this
20  as Exhibit Number 1.
21         (Exhibit 1 marked for identification)
22         MR. KLATT: Pedram, it's just the notice.
23     A. I was scared you were going to have some
24  proof that somehow I had been in a court with a
25  jury. I was curious to see how bad my memory

Page 15

1  really was.
2         MR. ESFANDIARY: The crux of the case.
3      Q. I didn't think you had, but I just wanted
4  to make sure.
5      A. No.
6      Q. We're showing you what's been marked as
7  Exhibit Number 1 to your deposition, Dr. Gardener,
8  and it's "Defendants' Notice of Deposition of
9  Hannah Gardener, Sc.D. and Request for Production
10  of Documents."
11         Have you seen Exhibit 1 before you came
12  here today?
13     A. Sorry. I need to get acquainted.
14     Q. Sure.
15     A. Is this something from the past, from --
16     Q. No. This is something that was served in
17  this case -- just turn to the back -- just a
18  couple of weeks ago, on July 14th.
19         I gather you haven't seen that before
20  today?
21     A. I think I have, but I figured I -- the
22  most responsible thing would be to read it.
23     Q. I'll just represent to you if you've seen
24  it, it is the notice. There's nothing new there.
25         MR. KLATT: Pedram, let's go off the

Page 16

1  record if she's going to take some time to review
2  that.
3         MR. ESFANDIARY: Sure.
4         THE VIDEOGRAPHER: We're off the record,
5  9:19 a.m.
6         (Off the record, 9:19 a.m. to 9:20 a.m.)
7         THE VIDEOGRAPHER: Back on the record,
8  9:20 a.m. Please proceed.
9  BY MR. KLATT:
10     Q. So, Dr. Gardener, I think during our brief
11  break off the record you established you have seen
12  Exhibit Number 1 before today. Correct?
13     A. I believe so. Like I said when we were
14  off the record, I thought more recently than
15  July 14th. I haven't taken the time to read it
16  all, so I can't verify that it's different from
17  what I'm familiar with.
18     Q. When you reviewed it previously, did you
19  identify any documents you had that were
20  responsive to the notice?
21     A. Yes.
22     Q. Did you bring any of those with you today?
23     A. No.
24     Q. What did you identify that was responsive
25  to the notice?

Page 17

```
 1        MR. ESFANDIARY:  Without disclosing
 2   attorney ex parte communications.
 3        Q.  Whenever I ask you a question today, I'm
 4   not asking you for the substance of any
 5   communications you've had with the plaintiff's
 6   attorney.  I might ask you who you've talked to,
 7   but I won't ask you the substance.
 8        If you would, identify what materials you
 9   have that are responsive to Exhibit Number 1.
10        A.  Sure.  So in response to this, I sent my
11   CV to my lawyer.  I expect they sent it to you.
12        Q.  Yes.  We'll mark that in a minute.
13        Go ahead.
14        A.  And then I asked questions about --
15        MR. ESFANDIARY:  Don't reveal any
16   communications with attorneys.
17        Q.  Other than your CV, did you have materials
18   responsive to the request in Exhibit 1?
19        A.  No.  I mean, I'm a professor of
20   biostatistics.  There was a request for, like,
21   anything I've ever done about biostatistics, which
22   would be, like, too vast and unreasonable to
23   provide everything I've ever discussed about
24   biostatistics.  I discuss it every single day in
25   my career for 18 years.  But I had nothing to
```

Page 18

```
 1   produce that was related to this case.
 2        Q.  All right.  Well, let's go to the actual
 3   page Number 4 in Exhibit Number 1.  And you'll see
 4   Request For Production No. 1, it doesn't ask you
 5   for anything you've ever written.  It asked you
 6   for your file in this case, including published
 7   and unpublished literature.
 8        Do you have such a file?
 9        A.  I don't know what you mean by "file."
10        Q.  Do you have any materials relating to this
11   case?
12        A.  Sure.
13        Q.  Okay.  So that would be your file.
14        And where do you keep that?
15        A.  On my computer.
16        Q.  Okay.  Did you bring that with you today?
17        A.  I did not.
18        Q.  Okay.  Look at Request No. 2, "All
19   document(s) setting forth or referring to, in
20   whole or in part, the data or other information"
21   you considered "to prepare your opinions in this
22   case."
23        Do you have such documents?
24        A.  Yes.  There's a long list of, like,
25   reference material that I have sort of added over
```

Page 19

```
 1   the years.  And my understanding is that the
 2   lawyers in this case have a long record of that
 3   and have shared that with you.
 4        Q.  Okay.  Let's look at Request No. 4, "All
 5   document(s) reflecting unpublished data, including
 6   but not limited to your own data reviewed by or
 7   relied upon by you to provide the opinions offered
 8   in this case."
 9        Do you have any such unpublished data?
10        A.  I have no unpublished data related to
11   opinions in this case that -- that formed my
12   opinions in this case.
13        Years ago I published a paper on heavy
14   metal contamination in baby food that -- we
15   published it on lead and cadmium, but we also did
16   analyze data on arsenic and mercury.
17        So I guess that would be -- I have
18   knowledge of contamination of baby food with
19   arsenic from that work.
20        Q.  And you said you published a paper
21   resulting from that?
22        A.  That is correct.
23        Q.  And did you conclude in that paper that
24   arsenic in baby food caused autism?
25        A.  So in that paper we did not include
```

Page 20

```
 1   arsenic.  So in that paper we included cadmium and
 2   lead.  We did not publish our findings for arsenic
 3   and mercury.
 4        Q.  Did you conclude in that paper that any
 5   heavy metal caused autism, ASD, autism spectrum
 6   disorder or ADHD?
 7        A.  So in that paper we were looking at heavy
 8   metal contamination in baby food.  We studied -- I
 9   can't remember how many samples.  It was like
10   between over a hundred, I want to say, different
11   baby food samples.
12        We measured the contamination in those
13   baby food samples with lead and cadmium.  There
14   were no people in that study, so there were no --
15   there were no children, there were no adults.  We
16   were looking at the extent of contamination of
17   that baby food with lead and cadmium.
18        We also did analyze arsenic and mercury,
19   but we did not publish the results for arsenic and
20   mercury.
21        So I do have that data on arsenic and
22   mercury, actually probably on an old computer
23   because now that was really a long time ago that
24   we analyzed that data.
25        Q.  So in answer to my question, you did not
```

Page 21

1  conclude in that published paper that lead,
2  cadmium, arsenic, or mercury caused autism, autism
3  spectrum disorder or attention deficit
4  hyperactivity disorder. Correct?
5      A. That paper was not related to that. That
6  paper was all about how heavily contaminated baby
7  food is with lead and cadmium.
8      Q. And you didn't draw any conclusions about
9  the health outcomes as a result of that, in that
10 paper. Correct?
11     A. I'd have to look at the paper. I'm
12 assuming you have it. But in terms of what we
13 wrote in the discussion, I don't recall our
14 discussion in -- what we wrote in the discussion
15 about the implications of that high level of
16 contamination.
17     Q. Let's -- just so we're clear today, let's
18 get a few terms defined.
19         If I use "ASD," can we agree I'm referring
20 to autism spectrum disorder?
21     A. Yes, I understand that.
22     Q. If I say "ADHD," we're referring to
23 attention deficit hyperactivity disorder?
24     A. Yes, I understand that.
25     Q. Let's continue looking at Exhibit

Page 22

1  Number 1, Request 5, "All document(s)
2  constituting, setting forth, referring to, in
3  whole or in part, exhibits to be used as a summary
4  or support for your opinions, which you prepared."
5         Do you have any such thing?
6      A. "All documents constituting, setting
7  forth, or referring to, in whole or in part,
8  exhibits" -- that's a mouthful of a sentence for a
9  nonlawyer -- "exhibits to be used as a summary of
10 or support of your opinions."
11         Meaning, like, the papers?
12     Q. Whatever --
13     A. I guess I don't know what the question is
14 here.
15     Q. Have you created any exhibits to be used
16 as part of your opinions or testimony in the case?
17     A. I'm not exactly sure exactly what
18 constitutes an exhibit, but I created a report.
19 And that report --
20     MR. KLATT: Let's mark that.
21     (Exhibit 2 marked for identification)
22     Q. Do you recognize what we've marked as
23 Exhibit 2, Dr. Gardener?
24     MR. ESFANDIARY: Do you have a copy for
25 me, Mike?

Page 23

1      MR. KLATT: You know what, I don't. I'm
2  sorry.
3      MR. ESFANDIARY: I can bust out my
4  computer here.
5      A. This looks like my report.
6      Q. Your report in this case, in the baby food
7  MDL?
8      A. Yes.
9      Q. And I believe the date of that report is
10 May 23rd, 2025. Is that correct?
11     A. That is correct. That's on here.
12     Q. I know you prepared reports in previous
13 baby food cases, in the NC case and in the
14 Landon R. case. Do you remember those reports?
15     A. Yes. And it's really hard for me to keep
16 them all, like, which one is which. But there's
17 also -- I've prepared reports on heavy metal
18 contamination in class action lawsuits as well.
19     Q. I'm specifically asking about the cases in
20 which it's alleged that heavy metals caused or
21 contributed to ASD or ADHD.
22         And my understanding is you've written
23 reports in the NC case, in the Landon R. case, and
24 in this case, the baby food MDL. Is that correct?
25     A. That is correct. But also in multiple

Page 24

1  class action lawsuits. Those are broader in terms
2  of my responsibility wasn't just ASD and ADHD but
3  also other outcomes. But ASD and ADHD were in
4  those reports. That's why I think it's probably
5  most responsible for me to include those as well.
6      Q. Did you -- do you recall needing to go
7  back and correct anything that you wrote in your
8  report either in the NC case or in the Landon R.
9  case?
10     A. Yeah. There was one sentence that I
11 needed to, like -- there was a sentence that
12 didn't sound right. I don't remember exactly what
13 sentence it was. I corrected it at one of the
14 depositions. Like, the sentence didn't make
15 sense. It's correct in here.
16         But other than that, I don't recall any
17 other corrections nor do I remember what sentence
18 it was.
19     Q. Do you remember whether that was in the NC
20 or the Landon R. case?
21     A. Actually, now that I am thinking about it,
22 I corrected it in the deposition that was taken by
23 Zoom, which would have been in one of the class
24 action cases.
25         But actually, I think that sentence had

Page 25

1    been in -- so I don't think -- maybe it was never
2    actually corrected on the record. It was, like --
3    it was supposed to say "do not" and it was -- it
4    was like a sentence that didn't make sense.
5        But now that I think about it, that
6    sentence might have actually been in the
7    earlier -- in the earlier reports, but the
8    correction was made in the class action lawsuit.
9        But there was some overlap between, you
10   know -- I copied and pasted some things that
11   applied because in the class action lawsuits I
12   talk about sort of the broad health effects of the
13   contamination of baby food with heavy metal.
14       So in sections where I talked about ASD
15   and ADHD, I didn't reinvent the wheel; I copied
16   and pasted. So I think that sentence might have
17   been in one of the earlier reports.
18       Q. So as we sit here today, is there anything
19   else that you can recall from either the NC report
20   you wrote or the Landon R. report you wrote that
21   you would want to correct or change today?
22       A. Not that I can think of.
23       Q. Okay.
24       MR. KLATT: Let's mark the next exhibit.
25       (Exhibit 3 marked for identification)

Page 26

1        Q. The court reporter has handed you what
2    we've marked as Exhibit Number 3. Dr. Gardener,
3    do you see that?
4        A. Yes, I do.
5        Q. And what is Exhibit Number 3?
6        A. It looks like my reference list.
7        Q. And it's also -- if you look at the cover
8    page, it says "Rebuttal Expert Report of Hannah
9    Gardener." Correct?
10       A. Yes.
11       Q. And it's dated July 15th, 2025, just a
12   little over two weeks ago. Correct?
13       A. Correct.
14       Q. What's your understanding of the purpose
15   of your writing a rebuttal report in the case?
16       A. So, like, the rebuttal was indicating that
17   I had not -- that none of my opinions were changed
18   after seeing some slight -- slightly different
19   estimates from the toxicologists in this case
20   about the levels of lead and arsenic in
21   hypothetical menus of baby foods related to this
22   case.
23       Q. You're referring to menus for which
24   Dr. Jones calculated heavy metal levels. Is that
25   correct?

Page 27

1        A. That is correct.
2        Q. Do you know Dr. Jones personally?
3        A. I do not.
4        Q. Did you try to, yourself, verify any of
5    the data that she reported?
6        A. I did not.
7        Q. You relied totally on her calculations.
8    Is that correct?
9        A. I relied on her calculations for what they
10   were, for the amount of arsenic and lead in these
11   hypothetical baby food menus across different
12   brands of baby food.
13       Q. So you don't know Dr. Jones personally.
14   Correct?
15       A. I do not. I don't know anything about
16   Dr. Jones. I've never met Dr. Jones.
17       Q. Do you know what Dr. Jones' field of
18   expertise is?
19       A. My understanding -- I'm not even sure if
20   Dr. Jones is a he or she. My understanding is
21   that Dr. Jones is a toxicologist, and that is
22   about all I know about Dr. Jones.
23       Q. Are you sure about her being a
24   toxicologist?
25       A. I'm not even sure about the "her." I have

Page 28

1    been told that Dr. Jones is a toxicologist.
2        Q. And I'll represent to you as far as I know
3    she is a woman as well. So you can assume that.
4        A. Okay. Then I'll refer to her as "she."
5        Q. Was there anything else that you intended
6    to do with your rebuttal report other than just
7    discuss the revised numbers that Dr. Jones
8    provided?
9        A. No. That is all I did in my rebuttal
10   report.
11       Q. And also attached to your rebuttal report
12   is an updated materials considered list of
13   Dr. Hannah Gardener. Do you see that?
14       A. Yes, I do.
15       Q. And is this the list you prepared and
16   provided to attorneys?
17       A. I have not prepared this list --
18       Q. Okay.
19       A. -- and I have never provided it. What has
20   happened is over time the lawyers in this case
21   have really taken the responsibility for creating
22   and maintaining this spreadsheet.
23       I basically -- my relationship with the
24   lawyers in this case and in related cases has now
25   been over several years. And every time I sort of

Page 29

1  write a report or work on this more, I increase
2  the number of articles that I tell them that I
3  have read and cited in the report that contribute
4  to my opinions.
5      And they keep this list of everything that
6  I have read.
7      Like, I cannot say for sure that there are
8  things that I have read that are not in this list.
9  There probably are, because I read things, you
10 know, all the time that contribute to my general
11 understanding of epidemiology and neurotoxicity,
12 nor can I say that there's anything --
13     Q. I understand that. But what I'm asking
14 you, when is the last time that you verified the
15 accuracy of the updated materials considered list
16 of Dr. Hannah Gardener that has been marked as
17 part of Exhibit 3?
18     A. I have never, like, gone through this, you
19 know, really carefully and made sure that it's
20 super correct. I basically tell the lawyers,
21 like, you know, iteratively throughout the whole
22 process, these are all the papers that I have
23 read. But I've never -- I don't have a
24 spreadsheet to verify it off of.
25     Q. Have you gone back at any time to verify

Page 30

1  that, in fact, you've read every article that's
2  listed in Exhibit 3?
3      A. If I did, I -- I mean, there are 556
4  articles. So I can guarantee you that there are
5  articles in this list that I have read, if I
6  looked at it, I wouldn't recognize it.
7      A few days ago I was reading a paper and I
8  was like, wow, this is a really great paper. And
9  I looked up and I saw I was an author on it many
10 years ago.
11     So as you can see, I have published, you
12 know, over 140 papers. I read papers all day,
13 every day. I cannot possibly remember every
14 single paper I have read.
15     So I guarantee you if I saw a paper, if
16 you handed me some of these papers, I wouldn't --
17 it would be as if I was reading it anew. I
18 wouldn't recall it easily.
19     Q. But are you representing to us that you
20 have read and reviewed every paper listed in
21 Exhibit 3 at some point in time?
22     A. Most likely. Like, you know, I can't
23 say -- my understanding is that this is a list
24 that the lawyers for the plaintiff --
25     THE WITNESS: Is that right?

Page 31

1      A. -- the lawyers for the plaintiff have
2  accumulated based on what I have told them that I
3  have read.
4      Is it possible that there's a paper that I
5  read that I forgot over so many years to tell them
6  about? Possibly. I don't actually think that
7  there's any papers that they think I have read
8  that I haven't actually read.
9      Q. But it's accurate, you haven't gone back
10 through to verify that you've read every paper
11 that you've listed in Exhibit 3. Correct?
12     A. That is correct. I don't have a list to
13 compare it to. I have never done any -- spent any
14 time systematically reviewing this list for its
15 accuracy.
16     Q. Do you know whether you've ever removed
17 any references that were in a previous materials
18 considered list in --
19     A. Not that --
20     Q. I'm talking about either for the NC case,
21 the Landon R. case or this case.
22     A. Not that I can recall ever seeing.
23     I think what you're asking is have I ever
24 seen a list on here and said, "Oh, no, I haven't
25 read that" and removed it. I can't recall doing

Page 32

1  that.
2      Q. Or that you read it but thought it's
3  something you no longer rely on. Have you done
4  that?
5      A. Well, I guess my understanding is that
6  I -- it's hard to say what I rely on versus what I
7  don't.
8      I feel like everything I've ever read in
9  my brain is sort of in there when I'm creating
10 this report.
11     And to be honest, the list is probably
12 bigger if you think about the fact that when I
13 think about these papers I think about them from a
14 statistical standpoint. And so therefore, in
15 doing that, I rely on textbooks from my years at
16 Harvard. I rely on statistical papers that I read
17 at Harvard and throughout my entire career.
18     Q. Understood.
19     MR. ESFANDIARY: Don't interrupt.
20     MR. KLATT: I just would like her to
21 answer the question I asked.
22     MR. ESFANDIARY: I know. But, Mike, I
23 think we have an agreement -- actually, it's on
24 the record that you-all would stop interrupting
25 witnesses.

Page 33

```
 1          MR. KLATT:  But we need responsive
 2   answers, in the interest of time.
 3          MR. ESFANDIARY:  She's being responsive.
 4          MR. KLATT:  Well, Pedram, my specific
 5   question was has she ever removed an article from
 6   the materials considered.
 7          MR. ESFANDIARY:  She was in the middle of
 8   responding to that question.
 9          MR. KLATT:  Talking about everything she's
10   reviewed in her career.
11          MR. ESFANDIARY:  Yeah, because she is a
12   scientist with a very long background.
13          MR. KLATT:  I understand.  But let's -- my
14   specific question --
15          MR. ESFANDIARY:  I know, I know.
16   Mike, please don't interrupt me.
17          You asked her a question and she was in
18   the middle of responding to it and you interrupted
19   her.  So please stop doing that.
20          And, Doctor, feel free to give complete
21   answers.
22          MR. KLATT:  Complete but responsive
23   answers.  Yes.
24          MR. ESFANDIARY:  Go ahead and reask your
25   question.
```

Page 34

```
 1   BY MR. KLATT:
 2      Q. Let me reask my question.  It's a very
 3   specific question.  Do you recall ever removing an
 4   article from either this materials considered list
 5   or a previous materials considered list in either
 6   the NC or the Landon R. case?
 7          MR. ESFANDIARY:  You can answer again.
 8      A. So I apologize, I thought that was
 9   actually two questions ago, and I thought I had
10   answered that.  And then I thought there was a new
11   question on the record that I was answering.
12      Q. Can you answer this one?
13      A. Yes.  So going back to that question, like
14   I said before, I don't recall ever seeing a paper
15   in this list either now or in the past and saying,
16   "Oh, wait, I haven't -- I didn't actually read
17   that" and removing it.  I don't recall ever doing
18   it.
19      Q. And you also don't recall going back and
20   saying, "Oh, I don't rely on that paper anymore so
21   I'm going to take it off the list"?
22      A. I think that was the second question that
23   I thought was the answer.
24          In creating this report, I relied on
25   everything that I have read about this matter.  So
```

Page 35

```
 1   my understanding is that everything that
 2   contributes that I have read about this topic I'm
 3   supposed to include in here.
 4          Some of those papers are not cited to.  I
 5   think what you're saying is when you rely on them,
 6   are they cited to your report.
 7          My understanding is there are some papers
 8   in here that I have read, that I have considered,
 9   but they're not cited to in my report.
10          In my report, the ones I have cited to
11   would be the ones I relied on, I would say.
12      Q. Let me follow up on a very specific
13   question I have.
14          In looking at these lists of materials
15   considered, either whether it was in the NC case,
16   the Landon R. case, or this case, have you ever
17   looked and seen a reference in the list, one or
18   more, that you say, "You know what, I don't rely
19   on that anymore.  I'm removing it from the list."
20   That's my very specific question.
21          MR. ESFANDIARY:  Objection.  I think --
22      Q. Not what you did rely on.  Whether there's
23   something that you identified and removed that you
24   no longer rely on.
25          MR. ESFANDIARY:  Objection.  I think the
```

Page 36

```
 1   question has been asked and answered.
 2          But you can answer it again.
 3      A. I guess I'm not really clear, then, on
 4   sort of what the definition of "relied" -- I have
 5   to think about this.
 6      Q. Okay.  I'll withdraw that question.
 7          MR. ESFANDIARY:  Hold on.  She was in the
 8   middle of responding to your question.
 9          Please go on.
10      A. I don't even actually think that there's
11   any papers that I cited that then I removed that
12   citation in my report.  So I can't think of an
13   example of something where I was like, oh, this
14   contributed to my understanding of this field of
15   science and it no longer contributes to it.
16          Like, I don't recall any example in terms
17   of what you're asking about.
18      Q. That's the answer to my question.  Thank
19   you.
20          Let's go back to Exhibit 2, which is your
21   report in this case.  Correct?
22      A. Yes.  That's correct.
23      Q. Did anyone assist you in writing this
24   report?
25          MR. ESFANDIARY:  Objection to the extent
```

Page 37

1    it calls for attorney-expert communications.
2         I would instruct you to not disclose
3    those. But if you can testify independent of
4    that, feel free to do so.
5         A. The writing is mine, the opinions are all
6    mine, but I have had help -- a lot of help over
7    time in terms of formatting it.
8         Like the format, the required formats have
9    changed between cases. There have been sort of
10   suggestions in terms of -- I guess the word is
11   "formatting," where to put things, how to
12   structure it.
13        Like, there have been changes, I guess,
14   over time in terms of how the charges have been
15   communicated to me, so my writing has been
16   responsive to that.
17        Q. Excluding any communications with
18   attorneys, has anyone else other than you assisted
19   you in writing your report in this case?
20        A. No. Like, I haven't used any research
21   assistants or, you know, any other people.
22        Q. You exactly anticipated my question. So
23   you have not used any research assistant, fellow,
24   graduate student, anyone else to assist you in
25   writing the report. Is that correct?

Page 38

1         A. That is correct. I have not.
2         MR. KLATT: Let's mark the next exhibit.
3         (Exhibit 4 marked for identification)
4         Q. A minute ago you mentioned, Dr. Gardener,
5    that you had provided the attorneys with an
6    updated CV. And this is what we were provided
7    recently.
8         Is that what you were referring to, what
9    we've marked now as Exhibit 4, your CV?
10        A. Yes. This is my updated CV that I sent
11   them last week, I think.
12        Q. When did you update it?
13        A. I updated it last week.
14        Q. Do you recall what you added?
15        A. Yup. So I can't be sure all the things I
16   added. The one that I had -- I think what they
17   had sent you, a CV from March, I want to say, was
18   the last time I had sent them a CV. And that was
19   before I was promoted to associate professor, so
20   my new CV reflects that big promotion.
21        I'm constantly publishing. So my updated
22   CV reflects publications that are in PubMed since
23   March. My updated CV, I had a presentation this
24   week at the Alzheimer's Association International
25   Conference. I had other -- I actually had a few

Page 39

1    presentations at this meeting this week, at the
2    AAIC.
3         I had some abstracts presented at an AHA
4    meeting in March. I had a bunch of -- from
5    February -- actually, those ones probably had
6    already been in there.
7         The American Academy of Neurology meeting
8    was in April. I included the abstract that I
9    presented there.
10        Q. What was that abstract on?
11        A. Outcomes of reperfusion therapies for
12   acute ischemic stroke in patients with preexisting
13   dementia.
14        Q. It's true that you've written a fair
15   amount on stroke. Correct?
16        A. Yes.
17        Q. In terms of the presentations that you've
18   made to, I think you said, the American Academy of
19   Neurology. Correct?
20        A. Yes.
21        Q. You mentioned the AHA. What is that?
22        A. The American Heart Association, which is
23   also the American Stroke Association.
24        Q. And AAIC, what is that?
25        A. That's the Alzheimer's Association

Page 40

1    International Conference. It's going on this
2    whole week.
3         Q. Would it be accurate to say that in 2025
4    you've made no presentations to any scientific
5    organization regarding heavy metals and autism or
6    ADHD?
7         A. I definitely haven't done any
8    presentations this year about autism or ADHD. I
9    don't recall any about lead or arsenic either.
10        Q. In terms of the scientific presentations
11   you've made this year, do they deal with any
12   subjects other than Alzheimer's or stroke?
13        A. Yes.
14        Q. What?
15        A. So I've done a lot of presenting about
16   PFAS, per- and polyfluoroalkyl substances.
17        Q. And what, specifically, subject were you
18   addressing with those presentations?
19        A. The need for more research on them, study
20   on them, mostly in relation to dementia but really
21   in relation to neurological consequences of them
22   in general.
23        Q. Can infants and children be exposed to
24   those substances?
25        A. Yes.

Page 41

1    Q. Can they have neurocognitive harm to
2    children and infants?
3    A. From PFAS?
4    Q. Yes.
5    A. Yes.
6    MR. ESFANDIARY:  Belated objection.  That
7    calls for an undisclosed opinion.
8    Q. Do you believe that PFAS can cause or
9    contribute to autism or ADHD in children?
10   MR. ESFANDIARY:  Objection, beyond the
11   scope of Dr. Gardener's expert testimony in this
12   case and calls for an unsolicited opinion.
13   Q. I'm just asking your expert opinion as
14   someone who has presented in the field.
15   MR. ESFANDIARY:  That's beyond the scope
16   of what she's here to talk about.
17   But if you have an opinion.
18   MR. KLATT:  She can answer.
19   A. I haven't delved into that literature
20   fully, really.  My grant and my work is focused on
21   late-life cognitive impairment due to PFAS.  And
22   actually, the study population that I'm working in
23   was largely not even exposed when they were very
24   young.
25   Q. Based on what you know about PFAS, in your

Page 42

1    professional activities, do you entertain the
2    possibility that they may cause or contribute to
3    autism or ADHD in children?
4    MR. ESFANDIARY:  Objection, it calls for
5    an undisclosed opinion beyond the scope of
6    Dr. Gardener's expert report and opinions in this
7    case.
8    A. So I want to take a minute and say that I
9    gave an oath at the beginning, starting this
10   morning, that -- and I take that really seriously
11   in terms of talking here about things that I am
12   very confident based on my -- what I have read and
13   prepared for today.
14   And I don't want to be providing opinions
15   on matters that I can't confidently provide that
16   oath for.  I did not come here today prepared to
17   talk about PFAS in relation to autism and ADHD.
18   I probably could give that oath today,
19   talking about PFAS and dementia.
20   You know, I didn't come here necessarily
21   prepared to do that, but I have so much sort of
22   very recent expertise in that that if you wanted
23   to ask me questions about PFAS in relation to
24   late-life cognitive decline, I would feel
25   confident, the way I feel confident here talking

Page 43

1    about lead and arsenic in relation to ASD and
2    ADHD.
3    But I am not prepared to provide any sort
4    of reliable opinions under oath about PFAS and
5    ADHD.
6    Q. You hold yourself out as an expert in diet
7    and other environmental causes of neurologic
8    diseases.  Correct?
9    A. I do.
10   Q. So I understand that with respect to
11   different subjects you may be at different places
12   along the continuum of scientific knowledge and
13   confidence.
14   But as someone who purports to be an
15   expert in that field, are you at least
16   entertaining the hypothesis as a scientist that
17   PFAS might cause or contribute to autism or ADHD?
18   MR. ESFANDIARY:  Objection.
19   This has gone as far as it should.  I'm
20   going to instruct you not to answer that question.
21   MR. KLATT:  That's not --
22   MR. ESFANDIARY:  Take it up with Corley.
23   MR. KLATT:  I'm sorry?
24   MR. ESFANDIARY:  Take it up with Judge
25   Corley.

Page 44

1    MR. KLATT:  I will.
2    Q. I'm not asking you to disclose any
3    litigation opinions.  I'm asking you to disclose
4    hypotheses, thoughts, concepts that you'd
5    entertained as a scientist who has worked in the
6    field.
7    Have you entertained the hypothesis, as a
8    scientist who's an expert on diet and other
9    environmental causes for neurologic diseases, that
10   PFAS might potentially cause ASD or ADHD in young
11   children and infants?
12   MR. ESFANDIARY:  Objection, beyond the
13   scope of Dr. Gardener's expert report and
14   testimony in this case.
15   I instruct you not to answer that
16   question.
17   MR. KLATT:  We'll have to go to the judge
18   on this and come back.
19   MR. ESFANDIARY:  Go for it.
20   MR. KLATT:  All right.  What's your -- are
21   you basing that instruction on some sort of
22   privilege?
23   MR. ESFANDIARY:  No.  It's the federal
24   rules of procedure on expert testimony.
25   MR. KLATT:  That's not a basis for

1  instructing a witness not to answer.
2      MR. ESFANDIARY: Do you want to interrupt
3  me or do you want to let me answer your question?
4      MR. KLATT: I'll interrupt you to say
5  that's not a basis under the federal rules, but
6  you can go ahead and state your objection.
7      MR. ESFANDIARY: I just want to make sure
8  we get something straight on the record. You
9  don't interrupt me and I don't interrupt you at
10  all. Let's get that one straight. So when I'm
11  speaking, afford me the --
12      MR. KLATT: Say what you're going to say.
13      MR. ESFANDIARY: You just did it again.
14  Afford me the respect of finishing
15  responding to your question.
16      I'm basing that objection and instruction
17  not to answer on the Federal Rules of Civil
18  Procedure that dictate an expert's deposition
19  testimony shall be limited to the topics on which
20  they have been disclosed.
21      There's ample case law on this in the
22  Northern District of California and other
23  jurisdictions.
24      If you want to move to compel on that,
25  feel free to do so. I'm going to maintain my

1  objection and instruction to the witness.
2      MR. KLATT: It's a totally inappropriate
3  and invalid objection, and you know it, and you're
4  just obstructing the deposition.
5      MR. ESFANDIARY: Okay. I disagree, but go
6  ahead.
7      MR. KLATT: Why don't we take a short
8  break, if that's all right.
9      MR. ESFANDIARY: Sure.
10      THE VIDEOGRAPHER: This concludes Media
11  Number 1. Going off the record, 9:58 a.m.
12      (Recess, 9:58 a.m. to 10:10 a.m.)
13      THE VIDEOGRAPHER: This is the beginning
14  of Media Number 2. Going back on the record,
15  10:10 a.m.
16  BY MR. KLATT:
17      Q. If we could return to your CV that you
18  recently provided.
19      A. Yes. Exhibit 4.
20      Q. Exhibit 4. Thank you.
21      I know you said a minute ago that you
22  previously published on the subject of autism.
23      A. Yes.
24      Q. When is the last time you have published
25  work on autism or ASD?

1      A. It looks like the book chapter that I was
2  invited to write was published around 2014.
3      Q. Have you published anything about autism
4  or ASD since 2014?
5      A. Not that I can recall, off the top of my
6  head.
7      Q. Let's talk about ADHD. Have you ever
8  published anything on ADHD?
9      A. Not that I can recall, off the top of my
10  head.
11      Q. Have you ever made a presentation to any
12  scientific organization or body on autism or ASD?
13      A. Yes, definitely on autism.
14      Q. And when and where was that?
15      A. So I've given multiple presentations early
16  on in my career about autism to the department of
17  pediatrics at the University of Miami, I think to
18  the department of endocrinology at the University
19  of Miami.
20      Q. When would that have been, Dr. Gardener?
21      A. I can probably find it. That was early in
22  my career, so that would have been in 2008, maybe
23  2009 too. I don't have all of these -- I don't
24  have every talk that I've ever given.
25      Q. Where are you looking?

1      A. Under "Selected Invited Talks."
2      Q. What page is that on Exhibit 4?
3      A. Pages -- that was listed on page 26.
4      Q. And what on page 26 were you referring to?
5      A. So near the top, right above "Teaching,"
6  "Prenatal, perinatal, and neonatal risk factors
7  for autism, University of Miami, department of
8  pediatrics, September 2008."
9      Q. So that was 17 years ago. Correct?
10      A. That is correct.
11      Q. Have you made any presentation on autism
12  since 2008 to any scientific or educational body?
13      A. I don't recall. I don't think so.
14      Q. What about for ADHD? Have you made any
15  presentation to any scientific or educational body
16  since -- or at any time ever, really, about ADHD?
17      A. A presentation? Not that I recall.
18      Q. You teach at the University of Miami, but
19  you live in Boston. Is that correct?
20      A. That is correct.
21      Q. Do you ever go to Miami to teach classes
22  in person or do you do it all remotely from
23  Boston?
24      A. So I teach a biostatistics class and it's
25  on Zoom. We offered to have some lectures in

1  person, and students like it by Zoom.
2  Q. Do you ever teach classes in person?
3  A. I provide lectures in person. But the
4  class that I teach and the sort of class, like,
5  invited lecturers for formal classes are all on
6  Zoom these days.
7  Q. Okay. And how long has that been the
8  case?
9  A. On Zoom? Since the pandemic.
10  Q. Prior to the pandemic, did you go teach
11  courses at the University of Miami in person?
12  A. So I had planned to -- before I moved back
13  to Boston, I sort of had planned to do a class and
14  then I moved back to Boston.
15  And it wasn't really until the pandemic
16  and, you know, how everything turned to Zoom that
17  we were able to sort of see how I could teach
18  biostatistics.
19  Q. When you said "when we moved back to
20  Boston," were you moving from Miami?
21  A. That is correct. I used to live in Miami.
22  Q. What years did you live in Miami?
23  A. I lived in Miami until I moved, towards
24  the end of 2012.
25  Q. To Boston?

1  A. Or mid 2012, to Boston.
2  Q. And how long had you lived in Miami up to
3  that time?
4  A. About six years. Six or seven years.
5  Q. And what was it that took you to Miami in
6  the first place?
7  A. My ex-husband's job was -- when I was
8  still in grad school, so we sort of moved there.
9  But I was still at Harvard, so I was sort of going
10  back and forth for a year.
11  Q. When you finished grad school, you then
12  moved permanently to Miami. Is that correct?
13  A. Well, the last year of grad school -- grad
14  school was four years. The last year of grad
15  school I would say I was in Miami just as much as
16  I was in Boston.
17  I was doing teaching assistant work, but
18  all of my research -- like, my classes had all
19  been finished. So the only really reason I needed
20  to be in Boston was to be a teaching assistant to
21  meet with professors.
22  So I would say that last year of grad
23  school I was probably in Miami just as much as I
24  was in Boston. And then I got a postdoc at the
25  University of Miami.

1  Q. What year are you referring to that you
2  were finishing up here in Boston and moving to
3  Miami?
4  A. I believe that was 2007.
5  Q. So you were in Miami basically from 2007
6  through 2012 and then moved back to Boston. Is
7  that correct?
8  A. Well, I guess it was 2006. I guess 2006
9  was when I really started living in Miami just as
10  much as living at my parents' house in Boston.
11  I sort of didn't really have a home. My
12  ex-husband was in Miami, my parents in Boston, and
13  I was sort of going back and forth doing my last
14  year.
15  And then it was 2007 that I defended and
16  graduated and started my job, my postdoc at the
17  University of Miami. I think that was September
18  of 2007, and then it was 2012 that I moved back to
19  Boston.
20  Q. Between 2007 and 2012, did you ever teach
21  any regular classes at the University of Miami?
22  A. They asked me to. We talked about it.
23  But I was sort of fully funded with research and
24  with training in my department.
25  So in terms of, like, was I teaching?

1  Yes. I had all these residents and young doctors
2  who I was training in terms of, like, epi methods,
3  biostatistics. But I wasn't teaching a formal
4  class like I have been for the past several years.
5  Q. Okay. When is the first time in your
6  career you started teaching a formal class?
7  A. Well, I was a teaching assistant when I
8  was at Harvard. That was -- those were formal
9  classes. There were several of them. And then it
10  was 2001 or -- they probably started talking to me
11  about it in 2001, but I can't remember when I
12  started teaching, whether it was 2001 or 2002.
13  I'm sorry. 2021, 2022.
14  Q. I was going to -- I was a little confused
15  there. So let me make sure I understand on the
16  record.
17  You started teaching a formal class in
18  biostatistics for the first time in about 2020,
19  2021 at the University of Miami?
20  A. I think it was 2021 or 2022, around there.
21  I think this past year was my -- it was either my
22  fourth or fifth year teaching this class.
23  Q. And that was the first time you'd actually
24  taught a formal class since graduate school.
25  Correct?

Page 53

1     A. That is correct. I had done, like,
2 lecturing in other people's classes, which is very
3 common. And I had done a lot of teaching in terms
4 of, like, training residents, early career
5 physicians, about research methods, how to do --
6 more like mentorship, which we in the university
7 setting consider teaching.
8     Q. But I'm referring to what you called
9 formal classroom teaching. That began in 2020,
10 2021 up to now. Correct?
11     A. You know, it's on my CV, so I can --
12     Q. Great. Even better.
13     A. So it looks like the first class started
14 it would have been January of 2022. So all the
15 prep was in 2021.
16     Q. And that class is biostatistics?
17     A. It is called statistical methods for
18 clinical and translational research. It is both
19 epidemiology and biostatistics.
20     Q. Okay. Other than that class, have you
21 done any other formal classroom teaching at the
22 University of Miami?
23     A. I'll give, like, guest lectures. In terms
24 of formal teaching, we -- so I'm the director of
25 the biostatistics core for the Florida Stroke

Page 54

1 Registry. And we have a community health worker
2 course that we teach for -- to teach community
3 health workers about stroke. And I teach the
4 epidemiology section on that class.
5     Q. Okay. And you teach along with some other
6 instructors who do other aspects of the class?
7     A. Yup. So mostly physicians, physical
8 therapists. Other people teach the other topics.
9     Q. You said a few minutes ago that you'd been
10 promoted to research assistant professor at the
11 University of Miami, and I think you indicated
12 that on your most recent CV. Is that correct?
13     A. No, that's not correct.
14     Q. Okay. Then tell me where I'm wrong.
15     A. I was promoted to research associate
16 professor.
17     Q. Oh, I'm sorry. Yes.
18     A. I had been research assistant professor
19 and now I'm associate.
20     Q. I went on the department of neurology at
21 the University of Miami Miller School of Medicine
22 website, and I see that there are a number of
23 people in the department who are described as
24 assistant professors or associate professors and a
25 then few others, a smaller number are called

Page 55

1 either research assistant professors or research
2 associate professors.
3     Can you explain for us what the difference
4 is between a research associate professor and just
5 an associate professor in the department of
6 neurology at the University of Miami Miller School
7 of Medicine?
8     A. I thought you were going to ask why I am
9 not even either of those, why I'm listed as a
10 scientist. And that was just because I haven't
11 updated my page there in forever.
12     So it sounds like I'm appropriately listed
13 as a research associate professor.
14     So some people are clinical. So I'm not a
15 physician. I don't see patients. So my job in
16 the -- I'm not a neurologist. I'm an
17 epidemiologist, so I do research. I'm not a
18 clinician.
19     Q. Meaning you don't see and diagnose
20 patients with neurological illnesses. Correct?
21     A. Correct. I'm not a clinician. I'm not in
22 the hospital. I'm not in the clinical setting.
23     And there are people who may do that but
24 still their sort of primary role is research. My
25 expertise is as an epidemiologist in the

Page 56

1 department.
2     Q. And you're an Sc.D., not an MD. Correct?
3     A. That is correct. I have a doctorate of
4 science.
5     Q. And so therefore, it would be accurate to
6 say, following from what you just testified,
7 you've never diagnosed an infant or a child with
8 ASD, autism, or attention deficit hyperactivity
9 disorder. Correct?
10     A. That is correct. I don't do any
11 diagnosing, any sort of treating or diagnosing.
12 I'm not a clinician. I don't have patients.
13     Q. Focusing on Exhibit 4 again, your most
14 recent CV, the one dated July 2025. You have it
15 there in front of you?
16     A. I do.
17     Q. You say your current academic rank is
18 research associate professor.
19     So does the denomination or term "research
20 associate professor" indicate that you're not
21 clinical? I'm trying to understand the
22 distinction between a research associate professor
23 and a simple associate professor within the
24 department of neurology at the University of
25 Miami.

Page 57

```
 1        What's the distinction between research
 2   associate and just associate?
 3        A. That's a very good question.  I'm not
 4   actually sure.  I was really excited to be
 5   promoted.  I don't actually know about those
 6   distinctions.
 7        Q. Is the research associate professor a
 8   tenure track position?
 9        A. I am not -- I am not tenured, if that's --
10   yeah.  And maybe I will be one day, maybe not.
11        Q. Do you understand currently that you're on
12   a tenure track?
13        A. It sounds like you're telling me I'm on a
14   tenure track.
15        Q. I'm just asking you if that's your
16   understanding.
17        A. It sounds like you're my boss and, you are
18   on a tenure track.
19        I haven't paid that much attention to it.
20   It's not like it's a supreme goal of mine.  I have
21   a lot of confidence and security.
22        Whether I get formal tenure one day or
23   not, I haven't paid that much attention to that.
24        Q. Who is your supervisor or superior at the
25   University of Miami Miller School of Medicine that
```

Page 58

```
 1   you report to?
 2        A. So I have several.  There's a department
 3   chair who I work very, very closely with.
 4        Q. Who is that?
 5        A. His name is Jose Romano.
 6        Q. Who else?
 7        A. And then there's the vice chair of
 8   research, which is -- I would say she's probably
 9   my main person that I report to, that I interact
10   with.  Her name is Tatjana Rundek.
11        Q. R-U-N-D-E-K?
12        A. Oh, her name?  I was like, am I in DEK?
13   R-U-N -- I was like I don't even --
14        Q. I was trying to spell her name.
15        A. R-U-N-D-E-K.
16        Q. Anyone else that you report to or consider
17   your supervisor there?
18        A. The chair of my department for many, many
19   years tragically passed away a couple of years
20   ago.  And I would have had him -- added him to the
21   list.  He was our department chair forever.
22        Q. Who was that?
23        A. Ralph Sacco.  He was the president of the
24   American Academy of Neurology, he was the
25   president of the American Heart Association, and
```

Page 59

```
 1   he was also the chair of our department.
 2        And he was my mentor.  He was the person
 3   who hired me.  And really just a really great
 4   leader of our department.  I would have added --
 5   he died just very recently.
 6        Q. Did Dr. Sacco or has Dr. Rundek or
 7   Dr. Romano ever told you, Dr. Gardener, you're on
 8   a tenure track here at the University of Miami, so
 9   keep up the good work, or something along those
10   lines?
11        A. They tell me keep up the fabulous work all
12   the time.  They have been, you know, my
13   cheerleaders and just an unbelievable support
14   system from Day 1.
15        Q. What have they told you about tenure
16   track?
17        MR. ESFANDIARY:  Before you answer that
18   question, there's someone waiting in the waiting
19   room.  Can you let them in, please?  Steve Brady.
20   Thank you so much.
21        I'm sorry.  Please continue.
22        A. Have I had conversations with Tatjana?
23        I mean, she wants me to go very far in my
24   career, up to the top.  You know, I don't recall
25   the specifics of our conversation.  I don't have,
```

Page 60

```
 1   like, a timeline.  Like, I'm not in the process of
 2   applying for tenure.  That's not . . .
 3        Q. I understand.  And Dr. Sacco and
 4   Dr. Romano and Dr. Rundek have never told you
 5   specifically, Dr. Gardener, you're on a tenure
 6   track here in Miami.  Correct?
 7        A. I guess they've never said those words.
 8        Q. Okay.
 9        A. We probably have talked about sort of
10   timelines of when.  To me, it feels -- I mean, I
11   just got promoted this year to research associate
12   professor, which was actually -- I guess we had
13   conversations when I moved to Boston.  We had
14   conversations about when can I get back to Miami.
15        At the time, modern-day life with Zoom and
16   my ability to be a director in the department, to
17   be a leader and all the things that are going on
18   in my career right now felt inconceivable living
19   far away.
20        I mean, when I moved to Boston in 2012,
21   nobody -- there was no faculty that were -- that
22   was remote.  They felt really desperate that I was
23   leaving.
24        We weren't actually sure if I would be
25   moving back to Miami.  And they said we would love
```

Page 61

1  to try this whole remote thing.  It was really
2  unprecedented.  Now it's not at all unprecedented.
3  There are other faculty that work remotely, of
4  course.
5      So I went to this scientist track.  The
6  ability to -- part of being a professor is
7  providing service to the university and to the
8  department.
9      And prior to the pandemic we couldn't
10  figure out how I could do all the service
11  components.  That was sort of the stumbling block
12  for many years in terms of my promotion, how could
13  I provide service to the department, to the
14  university, if I lived all the way in Boston and I
15  couldn't come as frequently as they wanted me to
16  come.
17      Once the pandemic hit and all of our, you
18  know, committee meetings and leadership meetings
19  are on Zoom, now that's much more conceivable.
20      So we talked more about this move
21  would mean in terms of my trajectory back in 2012
22  than we are now in 2025.
23      Q. So you're in your 13th year at Miami.
24  Correct?
25      A. No.  I'm in my 18th year.  Remember I

Page 62

1  started in 2007.
2      Q. I'm sorry.  You're right.
3      But going back to the question I asked
4  you, and I think before the lengthy answer you may
5  have answered it, but Dr. Sacco, Dr. Romano, and
6  Dr. Rundek have never said the words
7  "Dr. Gardener, you're on the tenure track."
8  Correct?
9      A. I don't know if they've ever said those
10  words.
11      Q. You don't recall, as you sit here today?
12      A. No.  Like saying that sentence, I don't
13  recall.
14      Q. Okay.
15      A. I guess what's most pertinent is that it's
16  not like this is something I'm actively working
17  towards or something that's impossible now that I
18  am remote.  It takes some time and process.
19      MR. KLATT:  Object to the
20  nonresponsiveness and move to strike everything
21  beginning with "I guess."
22      Let's mark this as the next exhibit.
23      (Exhibit 5 marked for identification)
24      A. Do you want me to answer that question
25  again?

Page 63

1      Q. No.  That's just an objection I need to
2  make sometimes for the record.
3      A. Okay.
4      MR. ESFANDIARY:  What number is this, 5?
5      MR. KLATT:  Exhibit 5, I believe.
6      Q. Dr. Gardener --
7      MR. KLATT:  That's what I said.
8      MR. ESFANDIARY:  Their experts are being
9  paid more.
10      Q. Dr. Gardener, we're looking at what we
11  marked as Exhibit 5, which was provided to us.
12      Did you prepare Exhibit 5, this "Summary
13  of Invoices for the Expert Services of Dr. Hannah
14  Gardener"?
15      A. I did not.
16      Q. So you didn't prepare Exhibit 5.  Correct?
17      A. I did not.  It's very exciting to me.  It
18  doesn't quite feel real, but I'm not at the same
19  time formally doubting it by any means on the
20  record.
21      Q. So I assume this relates to work you've
22  done on baby food litigation.  Is that correct?
23  Referring to Exhibit 5.
24      A. This says "Summary of Invoices for the
25  Expert Services of Dr. Hannah Gardener."

Page 64

1      So I guess maybe you tell me.  I'm not
2  exactly sure what this is.
3      Q. Have you never seen it before?
4      A. I have never seen it before, as evidenced
5  by my reaction.  It was like, "Whoa."
6      Q. It was provided to us by your attorney, so
7  that's why I'm asking you about it.
8      A. Okay.
9      Q. Do you think that Exhibit 5 is incorrect
10  in any respect?
11      A. Not necessarily.  I did not prepare this.
12  I have no reason to say it's either correct or
13  incorrect.  I can't verify it, and I don't know
14  what it encompasses.
15      Like you said, there have been many cases.
16  I don't know what this is inclusive of or
17  exclusive of.
18      Q. Do you know whether Exhibit 5 includes
19  invoices for what you refer to as the baby food
20  class actions or does Exhibit 5 only refer to the
21  baby food cases specifically alleging ASD and ADHD
22  that you've been involved in?
23      A. I have no idea.
24      Q. Okay.  Let's look at the very first line.
25      And it looks like the first invoice begins

Page 65

1  on March 11th, 2021, a little over four years ago.
2  Does that sound right to you about the time you
3  first got involved in baby food litigation?
4      A. No. Because the first payment would have
5  been for a retainer.
6      Q. Okay. And what amount was the retainer?
7      A. Probably $5,000.
8      Q. Do you recall when that was paid?
9      A. Nope. But my guess is that typically --
10  and maybe this isn't -- maybe I didn't do that
11  back then. But typically there would have been a
12  $5,000 retainer.
13      So this is a summary of invoices, so I
14  guess I would not have invoiced for a retainer.
15      Q. You wouldn't do that?
16      A. I don't think I've ever invoiced for a
17  retainer.
18      Q. Do you require a retainer in all cases in
19  which you consult with attorneys?
20      A. There could have been some early cases
21  where I wasn't doing that yet. But certainly
22  since 2021, I would have asked for a retainer.
23  But I've never sent an invoice for a retainer.
24      Q. And do you bill against the retainer?
25      A. So I do a retainer billed against the last

Page 66

1  invoice. So I guess I'll subtract that one from
2  the last one.
3      So I guess it makes sense if this was the
4  invoices that it wouldn't because I've never
5  invoiced just for that first initial payment. It
6  will come off of something.
7      Q. I'm looking at the last line before the
8  total.
9      A. Yup.
10      Q. The line on Exhibit 5, the summary of
11  invoices where the date is December 23rd, 2024 to
12  March 6th, 2025 and the amount is $85,615. Do you
13  see that, Dr. Gardener?
14      A. I do.
15      Q. Do you know what that amount that was
16  billed for time between December 23rd, 2025 and
17  March 6th, 2025 was for?
18      A. I think it was -- well, considering the
19  fact that this -- that Exhibit 2, the date was
20  May 23rd, is that this would have -- this would
21  have covered a lot of the preparation for this
22  report.
23      Are you asking what I did for --
24      Q. Exactly. I'm asking what you did between
25  December 23rd, 2024 and March 6th, 2025, which, by

Page 67

1  the way, was the date of your deposition in the
2  Landon R. case, I believe, for which you billed
3  $85,615.
4      A. That's very helpful. That anchors it
5  because I was trying to figure it out.
6      So yeah, that would have been for the
7  deposition of the Landon R. It would have been
8  for all the preparation and reports leading up to
9  that.
10      Q. You wrote both an original report and a
11  rebuttal report in the Landon R. case. Correct?
12      A. I don't recall. But if I did, that
13  probably would have -- I guess the rebuttal would
14  have been before the deposition so it would have
15  included the rebuttal too.
16      Q. Your hourly rate is $650 an hour?
17      A. That is correct. But it's $700 an hour
18  for deposition.
19      Q. Oh, it is? Has it always been more for
20  depositions?
21      A. No.
22      Q. When did you make that change?
23      A. I don't recall.
24      Q. Do you recall if you charged $700 an hour
25  for your Landon R. deposition in March of this

Page 68

1  year?
2      A. I don't recall exactly. I might have.
3      Q. When were you contacted about this case?
4  And when I say "this case," I'm referring to the
5  baby foods MDL for which you wrote your May 23rd,
6  2025 report.
7      A. I have no idea. They all sort of bleed
8  together and there is often an overlap.
9      So when I first got the email about this
10  one, honestly, I have no idea.
11      Q. Do you have any reason to dispute that
12  you've been paid $323,688 so far in baby food
13  litigation?
14      A. I can't confirm or deny it. I didn't
15  create this.
16      Q. Does that sound like a reasonable amount?
17      A. Honestly, based on my reaction when I was
18  like, "Whoa." I mean, I know the transcript can't
19  reflect how much my eyes bulged.
20      If you had asked me 15 minutes ago to
21  guess, I would not have guessed that number.
22      Q. You would have guessed a larger or smaller
23  number?
24      A. I probably would have guessed a smaller
25  number. But children are expensive. So it

Page 69

1    doesn't shock me.
2        Q. What do you mean by "children are
3    expensive"?
4        A. I guess that, like -- I'm like, wow, I
5    spent a lot of money. You know, camp and college
6    and dance and basketball. Yeah.
7        So I guess I would not have expected that.
8    Yeah. I don't have a bank account with that money
9    just sitting there for me to have seen it so
10   readily.
11       Q. How do you keep track of the time you
12   spend on baby food litigation?
13       A. Notes. Like a spreadsheet or notes of the
14   time and what I'm doing and the date.
15       Q. So let's say you spend two hours composing
16   a report. On the spreadsheet you'll enter the
17   date, you'll enter two hours and something like
18   "drafting report." Is that how you keep track?
19       A. Yeah. I don't know if you've seen my
20   invoices. I know they have been produced in other
21   depositions.
22       But what I'll do is I'll say the date,
23   I'll say the number of hours to the tenth of an
24   hour -- yeah, tenth of an hour -- and I'll say
25   broadly "literature review" or "writing the

Page 70

1    deposition" or "writing a rebuttal" or "email with
2    the lawyers" or "a conversation with the lawyers"
3    and the hourly rate for that activity multiplied
4    by the time spent, how much that day cost. And I
5    do it by the day, and I add them up.
6        Q. Going back to your testimony about $650 an
7    hour for your work, is that for everything that
8    you do except testimony?
9        A. It would be for the trial. So, like, the
10   slight increase in rate is for depositions and for
11   trial too.
12       Q. You're talking about actual testimony,
13   deposition or trial testimony?
14       A. Deposition or being at -- yeah. I guess I
15   don't really understand your question.
16       Q. You just went through a number of
17   activities you did: writing reports, talking with
18   attorneys, emailing, reviewing things. I think
19   for all those activities, my understanding is you
20   charge $650 an hour. Correct?
21       A. That is correct.
22       Q. Then if you have to testify either in a
23   deposition like today or in court, you charge $700
24   an hour. Correct?
25       A. That is correct.

Page 71

1        Q. And you don't recall exactly when you made
2    that switch. Correct?
3        A. I don't. It wasn't in 2021, but it has
4    been subsequent to that.
5        Q. Okay. So other than those two rate
6    levels, $650 an hour, $700, do you charge any
7    other hourly rate for any other activity relating
8    to baby food cases?
9        A. Right now, no.
10       Q. Approximately -- and I realize you might
11   not have the records in front of you, but
12   approximately how much time in hours have you
13   spent on baby food litigation, including writing
14   your report in this case, your rebuttal report,
15   getting ready for this deposition, beginning,
16   let's say, right after March 6th, 2025 when you
17   gave your Landon R. deposition up to today as we
18   sit here, July 31st, 2025?
19       So in that time period, what's your best
20   estimate of the number of hours you've spent on
21   baby food litigation?
22       A. I don't know. I haven't counted it up.
23   Not even like a rough -- like, I haven't --
24       Q. Have you kept track of it somewhere?
25       A. I have.

Page 72

1        Q. On this spreadsheet you referred to?
2        A. Yes.
3        Q. Okay. Can you just look back at that for
4    us and just report to us when you get the
5    transcript the number of hours you spent, just
6    number of hours you spent between March 6th, 2025
7    and today, July 31st, 2025?
8        MR. ESFANDIARY: Before you answer that
9    question, you can submit that to us separately.
10       MR. KLATT: Do you have any objection to
11   providing that number?
12       MR. ESFANDIARY: I don't think so, but I
13   think the understanding we've had and what we've
14   received from you guys is a summary of invoices
15   that we've received throughout the course of
16   litigation. We did the same thing in the Landon
17   case. But we can talk offline.
18       MR. KLATT: I'm just trying to get an
19   update in addition to the information contained
20   on --
21       MR. ESFANDIARY: If we could get the same
22   thing from your guys, then sure. But if not, then
23   no.
24       MR. KLATT: I'm sure that will be worked
25   out.

Page 73

BY MR. KLATT:

Q. As we sit here today, obviously you've spent probably some significant amount of time writing your report that we've marked as Exhibit 2, writing your rebuttal report, Exhibit 3, preparing for the deposition today, since March 6th. Correct?

A. That is correct.

Q. Can you even estimate for me, would it be more or less than 100 hours?

A. Oh, I don't think it would be more than 100 hours.

Q. Can you estimate -- and again, I'm not going to hold you to it. Can you estimate whether it would be more or less than 50 hours?

A. I don't think it's -- I don't know. I shouldn't surmise.

Q. What did you do exactly to prepare to give this deposition today?

A. I read my report a couple times. I had two brief conversations with Pedram. What else did I do? I read some papers over again. My guess is -- I don't know -- 12 or so. 12, 15, maybe.

Q. 12 to 15 articles?

Page 74

A. Yeah.

Q. Your report that we've marked as, what? Exhibit 2, I believe, is over 100 pages long. Correct?

A. That is correct.

Q. You said you've read that report several times since you finished it. Correct?

A. That is correct. I have not read every single page. For example, I did not -- every time I read it I don't, you know, review, for example, my qualifications. I skipped to around page 17.

Q. How long does it take for you to review from page 17 to the conclusion of the report?

A. I'm not sure exactly.

Q. Would it be more?

A. It would take over an hour. Absolutely.

Q. Having read through your report that we've marked as Exhibit 2 several times since you finished it, May 23rd, 2025, have you seen anything in there that you want to correct?

A. I've seen typos. I've seen a couple typos.

Q. Other than typos, have you seen anything substantive that you'd want to correct in your report that we've marked as Exhibit 2?

Page 75

A. No, I haven't found anything substantive.

Q. And you said you had a couple of conversations with Mr. Esfandiary before the deposition. Is that correct?

A. That is correct.

Q. Were those in person or via some other communication method?

A. We had one conversation on Zoom and one just on the phone.

Q. So only two conversations regarding this deposition?

A. That is correct.

Q. And approximately how long did each of those last?

A. I want to say our conversation was about 15 minutes on the phone, and the Zoom maybe an hour.

Q. And when did those take place?

A. We had a conversation yesterday and we had a Zoom maybe two weeks ago.

Q. Since you prepared your report in this case on May 23rd, 2025, have you had conversations with any other attorneys regarding baby food litigation other than the two you've had with Mr. Esfandiary?

Page 76

A. Yup. Yes. I had a conversation with his colleague Holly. And I think all of the conversations that I've had have included Holly, but there might have been other people on some of the -- now I'm, like, doubting did I even -- I did have two conversations with Pedram.

I've definitely had conversations with someone named Holly. Oh, I had conversations with Holly in relation to --

MR. ESFANDIARY: Don't disclose content.

Q. Don't give me the substance. Well, it was in relation to baby food litigation. Correct?

A. Yup. Yes.

Q. And how many conversations have you had with Holly?

A. I think two.

Q. And what was the communication method? In person? Zoom?

A. There was one on the phone and one on Zoom.

Q. When did those take place?

A. I mean, I shouldn't say -- I'm not positive about any of this.

Q. I understand.

A. I've had a lot of conversations with a lot

Page 77

1  of people, so I could be incorrect about some of
2  these things. I just want to say that.
3       I keep very good records. I just have not
4  memorized what those are.
5       Now I forget even what -- the question was
6  the method?
7       Q. Yeah. How did you communicate in these
8  conversations that you had with Holly?
9       A. I know I've had at least one Zoom with
10 Holly and one phone conversation with Holly, I'm
11 pretty sure.
12      Q. Other than Pedram or Holly, have you
13 communicated with any other attorneys regarding
14 baby food litigation since writing your May 23rd,
15 2025 report?
16      A. There were definitely other lawyers or a
17 other lawyer on at least one of the Holly Zooms,
18 but I don't remember what that person's name --
19 I'm really bad with names. I can picture her, but
20 I don't know her name.
21      Q. You don't know Holly's last name?
22      A. Oh, Holly's last name? That wasn't what I
23 was referring to.
24      Q. You're referring to someone else?
25      A. Yeah. But also, I can't actually tell you

Page 78

1  what Holly's last name is. Holly is probably
2  listening and is horrified.
3       Q. Is Holly an attorney?
4       A. Yes, Holly is an attorney.
5       Q. Do you know if she is with Wisner Baum,
6  Mr. Esfandiary's firm, or some other firm?
7       A. I am not positive.
8       I'm sorry, Holly.
9       Q. To the best of your estimation, since your
10 report, May 23rd, 2025, in this case, that we've
11 marked as Exhibit 2, you have had approximately
12 four phone conversations with attorneys in the
13 baby food litigation?
14      A. Oh, since March 6th? Is that what you're
15 asking?
16      Q. I actually was referring to your report,
17 the May 23rd date. Let's move it back to
18 March 6th.
19      Since March 6th, 2025, can you estimate
20 how many conversations you've had with attorneys
21 either in person or via Zoom or other
22 communication method regarding baby food
23 litigation?
24      A. I haven't had any meetings in person.
25 This is the first time since my last deposition

Page 79

1  that I have seen any of the attorneys in person.
2  I just can't recall, like, how many Zooms or how
3  many phone calls. I just --
4       Q. Do you know if any nonattorneys were
5  present on any of these Zooms or phone calls?
6       A. I don't, like -- on the Zooms, I don't ask
7  for people's credentials, so I don't know. I
8  don't even know Pedram's credentials. I'm
9  assuming he's an attorney.
10      Q. That may not be a valid assumption, so you
11 better check that.
12      A. Bottom line, in any of these matters I've
13 never asked when people have emailed me or I'm on
14 the phone or on zoom, I don't ask for people's
15 credentials.
16      Q. In addition to reading your report and the
17 conversations you've referred to, you said you'd
18 read some papers, maybe as many as a dozen, in
19 preparation for your deposition. Do you recall
20 which papers those were?
21      A. I can't tell you, off the top of my head.
22 No. I'm really bad with names.
23      Q. Why did you select those approximately
24 dozen papers to review before the deposition?
25      MR. ESFANDIARY: Without disclosing the

Page 80

1  substance of any communications with counsel.
2       A. I mean, you know, I guess I don't know how
3  to answer that, then.
4       Q. So other than attorneys bringing certain
5  articles to your attention or asking you to review
6  them, did you choose to review any articles
7  yourself to prepare for today's deposition?
8       A. No.
9       Q. In preparing for today's deposition, did
10 you review any other documents other than your
11 report of May 23rd, 2025 that we've marked as
12 Exhibit 2 or these approximately dozen or so
13 articles that you've referred to? Did you review
14 any other written materials to prepare for your
15 deposition?
16      A. To prepare for today? No. I have read
17 other things. But if you're asking with the
18 intent to prepare for today . . .
19      Q. What other things have you read?
20      A. I was sent some of the other expert
21 reports from the other side. And I didn't have
22 time to read the entirety of them, but I read some
23 parts of those.
24      Q. And when did that happen?
25      A. Three weeks ago, four weeks ago.

Page 81

1    Q. Is that before you prepared your rebuttal
2  report in the case?
3    A. I think so.
4    Q. In --
5    A. I'm not sure. It's hard to remember,
6  like, what -- but it feels like -- when was my --
7    Q. I think your rebuttal report is dated
8  July 15th, so it's a little over two weeks ago.
9    A. Yeah. I think I would have read those --
10  where did that go? Oh, this one. Yeah. I think
11  that would have been before then, I guess.
12    Q. In preparing for today's deposition, did
13  you review any documents or articles that you had
14  not reviewed before preparing your report, your
15  May 23rd, 2025 report? Did you review any new
16  articles relating to your opinions?
17    A. There was one new article that popped up
18  yesterday.
19    Q. And do you know the author or the subject
20  matter?
21    A. Yup. So the -- I'm pretty sure the
22  person's name is Brown. It was a recently
23  published article looking at lead levels in
24  children who were autistic. And I have seen that.
25  Probably -- yeah.

Page 82

1    Q. Do you recall, did you print out a copy or
2  did you review it online?
3    A. I reviewed it online.
4    Q. What journal was it in?
5    A. I don't recall.
6    Q. And where were the -- was it children or
7  adults? Where were the subjects of the study
8  located?
9    A. In order to confidently say that, I'd have
10  to find it. It was children.
11    Q. And you don't recall where they were
12  located?
13    A. I do not recall, off the top of my head.
14    Q. Do you recall the results of the study?
15    A. My understanding was that it was -- I
16  mean, I shouldn't surmise.
17    Q. I'm just asking for your best
18  recollection.
19    A. It was a study just including kids who
20  were autistic, I believe, and looking at their
21  blood lead levels and looking at correlates of
22  those blood lead levels. Basically making the
23  argument that -- and so it was not in the United
24  States, now that I'm saying I recall that, for
25  more, like, widespread blood lead level screening.

Page 83

1    Q. And I'm sorry if I just asked this, but do
2  you recall the journal?
3    A. I do not.
4    Q. And what led you to find this article?
5    A. It popped up -- it's on one of my devices.
6    Q. Do you have some sort of dinger or alert
7  system that you use to bring new articles to your
8  attention?
9    A. I don't.
10    Q. So how is it that this popped up?
11    A. I don't actually remember how -- like how
12  I found it. It must have been on PubMed. That
13  was the only new thing that I saw.
14      I don't recall -- I actually don't
15  remember when it was published. I know it was
16  published in 2025. And then I scanned my report
17  to see that if it was in there, and I think it was
18  published since my report. But that did come up,
19  so that was something I read yesterday.
20    Q. Did it change any opinions that you have
21  in your report?
22    A. No. I have no corrections to be made to
23  my report.
24    Q. Would you add it now to your materials
25  considered list?

Page 84

1    A. Yes, I would.
2    Q. Okay.
3    MR. KLATT: And again, we'd ask if she
4  could supplement with that.
5    MR. ESFANDIARY: Sure.
6    A. I had meant to tell Pedram that I saw it
7  and then I just forgot.
8    Q. Okay. Is it correct, Dr. Gardener, that
9  you hold no other academic appointments other than
10  at the University of Miami Miller School of
11  Medicine?
12    A. That is correct. No other -- no other
13  universities. I'm also -- I was just talking to
14  the chair of the biostatistics department to get
15  another -- to get -- she wanted me to have an
16  appointment in her department too, but at no other
17  universities.
18    Q. Okay. Has that appointment happened yet
19  or is that just something under discussion?
20    A. I don't think so. I was just going to
21  actually email her with my -- in relation to my
22  promotion and say, you know, is it going to be in
23  that department too? So I don't think so.
24    MR. KLATT: Let's mark this as an exhibit,
25  if we can.

Page 85

1     (Exhibit 6 marked for identification)
2     Q. Showing you something we've marked as
3 Exhibit 6. And I'll represent to you,
4 Dr. Gardener, this is from the University of Miami
5 Miller School of Medicine, the John P. Hussman
6 Institute for Human Genomics, the HIHG.
7     Are you familiar with that institute?
8     A. The HIHG, yes. I work with them a lot.
9     Q. And it says, the title of this from their
10 web page is, "Autism Spectrum Disorders or ASD."
11 Do you see that?
12     A. Yes.
13     Q. And I want to see their description and
14 see what you think about it.
15     It says, "Autism is one of several
16 conditions that fall under the general category of
17 autism spectrum disorder or ASD."
18     Do you agree with that?
19     A. That's what it says. Yes.
20     Q. And you agree with that?
21     MR. ESFANDIARY: Objection. I think it's
22 beyond the scope of her testimony.
23     Go ahead.
24     A. "Autism is one of several conditions that
25 fall under the general category" . . .

Page 86

1     So I think you asked me earlier when we
2 were talking about ASD, we were referring to
3 autism. And so yes.
4     Q. And then skipping on down, it says "Twin
5 sibling and family studies have demonstrated a
6 strong role for genetic factors underlying
7 autism." Do you see that?
8     A. I do.
9     Q. Do you also agree with that yourself?
10     A. I'm not here to opine about the role of
11 genetics in autism, but I have stated in my report
12 that there's a genetic contribution.
13     Q. So you would agree with that statement
14 from the Hussman Institute at the University of
15 Miami. Correct?
16     A. I mean, to the extent that it echoes --
17 it's sort of a broad statement that echoes what
18 I've said in my report, that there is a strong
19 role for genetics in autism.
20     Q. And then it continues, "Previous studies
21 in large families and autism typical
22 neurodeveloping populations have identified a
23 large number of genes and genetic variants that
24 are associated with the development of autism."
25 Do you see that?

Page 87

1     A. I do.
2     Q. And do you have any reason to disagree
3 with that?
4     A. I don't.
5     Q. And then it goes on to say, "Researchers
6 at the John P. Hussman Institute for Human
7 Genomics, the HIHG, are continuing to conduct
8 studies to understand the genetic basis of autism
9 and how these genes and genetic variants act to
10 alter neuronal function leading to the behavioral
11 characteristics seen in autism." Did I read that
12 correctly?
13     A. You did.
14     Q. And do you agree with that?
15     A. So I'm not involved in this research that
16 they're doing.
17     Q. You're not involved with the autism
18 spectrum research that the John P. Hussman
19 Institute for Human Genomics in Miami is doing?
20     A. No.
21     Q. What is your interaction with them?
22     A. So I do a lot of work with people at the
23 HIHG on genetics of stroke, dementia, subclinical
24 vascular outcomes. So we look at the genetics of
25 carotid atherosclerosis. We have looked at

Page 88

1 genetics of carotid disease in general, some
2 cardiac biomarkers. We've looking at genetics of
3 life's essential 8. Right now the paper that I'm
4 working on with them right now is looking at that.
5     I just wrote a grant with them looking at
6 genetics and the interaction of genetics and
7 nonmedical drivers of health, what we used to call
8 social determinants of health, but not in relation
9 to autism. More in relation to neurovascular
10 diseases, stroke, dementia, carotid arthro, MRI,
11 white matter disease, things like that.
12     Q. Have you ever had a grant looking at any
13 aspect of autism or attention deficit disorder,
14 ADHD?
15     A. I have not. I take that back.
16     So there may have been -- in my work at
17 Harvard there may have been -- I don't think it
18 was grant funded, but I don't -- looking back, my
19 thesis, I don't recall the funding that provided
20 support for, like, the professor that I was
21 working with for that.
22     Q. And when was your thesis?
23     A. When did I graduate? When did I present
24 my thesis?
25     Q. Right.

Page 89

1    A. 2007.
2    Q. So about 18 years ago. Right?
3    A. That is correct. I've been an
4 epidemiologist for 18 years.
5    Q. You've referred to the Hussman
6 Institute -- and am I saying that correctly? Is
7 it Hussman?
8    A. Yeah. We call it the HIHG.
9    Q. The HIHG. You call it the HIHG as a
10 nickname?
11    A. It's the abbreviation that you see right
12 here.
13    Q. So looking further at Exhibit 6, down near
14 the bottom, "The HIHG says recent studies using
15 cutting-edge DNA sequencing technologies have
16 identified numerous genetic mutations that appear
17 to be involved in autism, suggesting that in most
18 cases rare variants in genes are driving
19 development of autism." Did you see that?
20    A. Yup.
21    Q. Do you have any reason to disagree with
22 that?
23    A. That it's rare variants versus other kinds
24 of variants?
25    Q. Correct.

Page 90

1    A. I have not been involved in this research.
2 I am not here to opine about that, what kinds of
3 variants in genes, whether they're inherited or --
4    Q. Do you have an opinion about that?
5    A. I do not. Nope.
6    Q. And then it goes on to say, "The HIHG says
7 these rare variants tend to fall into classes of
8 genes that regulate neuronal function by altering
9 the balance between excitatory and inhibitory
10 signals in the brain."
11    Do you agree or disagree with that
12 statement or not have an opinion?
13    A. I don't have -- this is not work that I
14 have been involved in or that I'm prepared to talk
15 about.
16    Q. And the last sentence in Exhibit 6 from
17 the HIHG says, "By finding the genetic factors
18 that cause autistic disorders and understanding
19 how these factors alter brain cell function, HIHG
20 researchers hope to gain valuable insights into
21 how autism develops, with the goal of improving
22 diagnostic and treatment approaches."
23    Do you have any basis to agree or disagree
24 with that statement?
25    A. No. I've not been involved with this, so

Page 91

1 I can't say what they're hoping to do or -- I've
2 not been involved. I have no opinion.
3    Q. But you agree that genetic factors cause
4 autistic disorders. Correct?
5    MR. ESFANDIARY: Objection, misstates the
6 testimony.
7    Q. I'm just asking if you agree with that
8 statement.
9    A. So let me find -- in my report I talk
10 about the fact that absolutely there's a role for
11 genetics. In fact, I talk about the importance of
12 genetics in terms of the causal role of lead and
13 arsenic.
14    Q. I know you don't agree with this, but if
15 lead and arsenic were proven not to have a role in
16 autism, would you believe genetic factors still
17 were playing a role?
18    MR. ESFANDIARY: Objection, incomplete
19 hypothetical, calls for speculation.
20    A. That would depend on -- you're saying in
21 this hypothetical world where in 50 years we got
22 it all wrong about one thing, would we also
23 necessarily be getting it wrong on another thing?
24 Who knows?
25    Q. Do you believe that children who aren't

Page 92

1 exposed to lead and arsenic can develop autism due
2 to genetic causes?
3    A. Show me a kid who's not been exposed to
4 lead and arsenic. It doesn't -- such a child does
5 not exist.
6    Q. So every child is exposed to lead and
7 arsenic?
8    A. Yes.
9    Q. And they're exposed to lead and arsenic
10 from a number of different sources. Correct?
11    A. That is correct.
12    Q. Is there a child in the world who's not
13 exposed to lead or arsenic?
14    MR. ESFANDIARY: Objection, calls for
15 speculation.
16    A. That's a hypothetical.
17    Q. Okay. But you would agree that the vast
18 majority of children in the United States and
19 around the world are all exposed to lead and
20 arsenic even before they're born. Correct?
21    MR. ESFANDIARY: Objection, overbroad,
22 calls for speculation.
23    A. I talked in my report just about how
24 significant the contamination of baby food is with
25 lead and arsenic and the fact that children are

Page 93

1    exposed throughout their entire -- throughout
2    their entire lives.
3        I mean, you know, it's really hypothetical
4    whether there's a child that exists somewhere.
5        Q. Well, let's talk about exposure to lead
6    and arsenic other than what you believe is
7    exposure via baby food.
8        Are babies exposed to lead and arsenic in
9    the womb before they're born?
10       MR. ESFANDIARY:  Objection, overbroad,
11   calls for speculation and beyond the scope.
12       Q. That's not speculative at all, is it?
13       MR. ESFANDIARY:  All kids at all times?
14       Q. You know that the vast majority of
15   children are exposed to lead and arsenic while
16   they're in the womb.  Correct --
17       MR. ESFANDIARY:  Objection --
18       Q. -- Dr. Gardener?
19       MR. ESFANDIARY:  -- calls for speculation,
20   overbroad.
21       A. Are you talking about from all the
22   contaminated food or just in general?
23       Q. Well, just answer my question first.
24       Do you believe that unborn babies in their
25   mother's wombs, in utero, are exposed to lead and

Page 94

1    arsenic?
2       MR. ESFANDIARY:  Objection, incomplete
3   hypothetical, calls for speculation, beyond the
4   scope.
5       A. That's hypothetical whether there's a
6   child out there that exists that isn't, you know,
7   exposed to lead or arsenic.  It's a hypothetical.
8   These are pervasive exposures.
9       Q. So as pervasive exposures, all pregnant
10   mothers are exposed to lead and arsenic before
11   they get pregnant and while they're pregnant.
12   Correct?
13       MR. ESFANDIARY:  Objection, calls for
14   speculation, overbroad, beyond the scope.
15       A. It depends.  I guess theoretically there
16   could be such a child.
17       Q. Well, wait a second.  We're talking about
18   mothers now.  Almost all mothers -- and let's
19   limit it to the United States.  Virtually every
20   mother in the United States during her lifetime is
21   exposed to lead and arsenic.  Correct?
22       MR. ESFANDIARY:  Objection.  One second.
23   It calls for speculation, overbroad.
24       Q. It's not speculative at all, is it,
25   Doctor?

Page 95

1       MR. ESFANDIARY:  Beyond the scope.
2       A. I thought you were talking about the
3   children of those mothers.
4       Q. We'll get to them in a minute.  Let's talk
5   about the mothers.  Adult mothers in the United
6   States are routinely exposed to lead and arsenic
7   throughout their lifetimes.  Correct?
8       MR. ESFANDIARY:  Objection, calls for
9   speculation, overbroad, beyond the scope.
10       A. You know, like, that is -- it's
11   hypothetical.  I can't say that every single, you
12   know, mother is definitely exposed.  I would
13   expect, if not all, the vast majority are exposed
14   to lead and arsenic during pregnancy, when they
15   were children.
16       Q. As adults.  Correct?
17       A. People are exposed to lead and arsenic as
18   adults.  Yes.
19       Q. As we sit here today, you and I are
20   exposed to lead and arsenic in the air we breathe,
21   in the water we drink, in the food we eat, and all
22   sorts -- if we come into contact with dust and
23   dirt.  Correct?
24       MR. ESFANDIARY:  Objection, calls for
25   speculation, overbroad, beyond the scope.

Page 96

1       A. Yes, people are exposed, you know, in many
2   ways.  I talked about that in my report.
3       Q. And you understand that women -- men and
4   women, but women in particular, can sequester
5   heavy metals in their bones before they're
6   pregnant.  Correct?
7       MR. ESFANDIARY:  Objection, beyond the
8   scope.
9       A. Sequester?
10       Q. Yeah.  You know heavy metals can be
11   sequestered in bone in humans.  Correct?
12       A. I never use the term "sequester."
13       Q. What term would you use?
14       A. "Accumulate."
15       Q. Sure.  Great.  You understand that lead
16   and other heavy metals can be accumulated in adult
17   human bone during the course of their lifetimes.
18   Correct?
19       A. Yes.
20       Q. And you understand that pregnant women,
21   because they have active bone turnover, can
22   release lead and other heavy metals into their
23   bloodstream which then expose their unborn child
24   to it.  Correct?
25       A. Yes.

1    Q. What are the levels of lead and other
2  heavy metals that on average U.S. children are
3  exposed to from their mothers while they're in the
4  womb before they're born?
5    A. I don't have a statistic for that, off the
6  top of my head.
7    Q. You don't have any level you could give me
8  on average or median level?
9    A. That's what I thought you were asking
10  about, the median level.  No, I don't know that
11  number, off the top of my head.
12    Q. But you do know that mothers release lead
13  and other heavy metals from their bones into their
14  bloodstream during pregnancy.  Correct?
15    A. That is typically true.
16    Q. And you know that bone metabolism is
17  particularly active during pregnancy and so you
18  can have even increased release during pregnancy
19  beyond what you would have when you're not
20  pregnant.  Correct?
21    A. I have not thoroughly reviewed the data on
22  bone metabolism during pregnancy.
23    Q. Would you believe that if an unborn infant
24  is exposed to lead and arsenic and other heavy
25  metals in the womb before birth that that could be

1  a potential cause of autism and attention deficit
2  disorder later in their lives?
3    MR. ESFANDIARY:  Objection, calls for an
4  undisclosed opinion, beyond the scope of the
5  report, calls for speculation, incomplete
6  hypothetical.
7    A. I mean, I did refer to the prenatal
8  literature, to some extent.  I would say it's less
9  than the postnatal literature in relation to lead
10  and arsenic in relation to ASD and ADHD.
11    But there is literature.  It's beyond the
12  scope of this because we're talking about
13  postnatal exposure, but I did rely on the prenatal
14  exposure to some extent in forming these opinions.
15    And I'm happy to read those sections of my
16  report.
17    Q. Mr. Esfandiary can have you do that in his
18  time if he wants to.  I'm just asking you, you
19  believe that children can develop autism due to
20  exposure to lead and other heavy metals prenatally
21  while they're in the womb.  Correct?
22    MR. ESFANDIARY:  Objection, beyond the
23  scope of her expert testimony in this case, calls
24  for speculation, overbroad.
25    A. I can say there are studies that have

1  related prenatal exposure to arsenic and lead in
2  relation to autism, but I haven't done the -- like
3  the thorough literature review and analysis to
4  opine about that to the same degree.
5    My charges are related to postnatal
6  exposure.  I've brought in some information about
7  prenatal because it did help inform my opinion.
8  But I haven't done the -- I haven't scrutinized
9  that literature to add that to my opinions.  It
10  wasn't part of my charge.
11    Q. Well, unrelated to your charge, I'm
12  talking to you as an epidemiologist, as a
13  scientist who's a self-professed expert in diet
14  and other environmental causes of neurologic
15  disease.
16    You believe that prenatal exposure to
17  lead, arsenic or other -- and other heavy metals
18  to an unborn infant while they're still in the
19  womb can cause autism or ADHD.  Correct?
20    MR. ESFANDIARY:  Objection, beyond the
21  scope of her expert opinions in this case, asked
22  and answered, calls for speculation.
23    You can answer it again.
24    A. So I want to remind you that I took an
25  oath here.  And I take that really, really

1  seriously.  And that oath applies to my charge and
2  to what I've come here to opine about today.
3    I don't think it's responsible -- because
4  this is a formal setting.  This isn't just you and
5  I at lunch talking about our opinions.  This is a
6  formal setting where I've taken an oath, so it
7  would not be responsible for me to be opining
8  about topics that are not in here.
9    I haven't done this rigorous analysis of
10  those prenatal exposures.  Maybe I'll be asked to
11  in the future, in which case, you know, then I
12  would need to form those opinions and really do
13  that level of research.
14    But I take this really seriously, so I
15  don't feel comfortable just sort of, you know,
16  telling you my opinions about things, even those
17  that I have expertise on.
18    Q. Do you think it's important in formulating
19  your opinions in the case to determine whether
20  with respect to autism and ADHD the die is already
21  cast in utero before a child is ever born due to
22  exposure to lead or arsenic?
23    A. Can you -- I'm not exactly -- the question
24  was sort of -- it took a turn.
25    Q. Okay.  I'm talking about the prenatal

Page 101

1  period. I'm talking about when babies are in the
2  womb. Do you understand that?
3      A. Yes.
4      Q. Okay. I'm talking about the fact we've
5  already established that mothers can release heavy
6  metals from their bone and from their bloodstream
7  in -- crosses the placenta and gets to the baby.
8  Correct?
9      A. Correct.
10     Q. And this is a time of critical
11 neurodevelopment in the womb. Correct?
12     A. Yes. I do believe that there's a lot of
13 neurodevelopment that occurs prenatally.
14     Q. So it would be important in expressing
15 your opinions in this case to be able to rule out
16 the fact that prenatal exposure to heavy metals in
17 the womb causes ASD or ADHD in children. Correct?
18     A. No.
19     Q. It's not important?
20     A. No.
21     Q. Do you understand there's going to be a
22 general causation hearing in this case in
23 December, December 2025, in federal court in
24 San Francisco?
25     A. I don't know about the date. No.

Page 102

1      Q. Do you understand that the judge in that
2  case is Judge Corley?
3      A. No.
4      Q. Do you understand that Judge Corley may be
5  entitled to ask you questions at that hearing if
6  you appear and testify?
7      A. I've never testified. I would say that
8  I'm fairly unfamiliar with how that all plays out,
9  who asks questions when.
10     Every one of my family is a lawyer. I've
11 seen plenty of real-life cases. I've watched my
12 father. But I haven't paid attention to the
13 don't know all the rules. I can say I will follow
14 all of them.
15     Q. I would hope so.
16     A. Whatever the judge is allowed to ask me
17 and I am expected to answer, I will answer to the
18 best of my abilities.
19     But if you're asking what I'm familiar
20 with in terms of what the judge may or may not ask
21 about, I'm not fully versed on that. I haven't
22 been through it yet.
23     Q. Is your father a lawyer?
24     A. He is.
25     Q. And do you have other close relatives who

Page 103

1  are attorneys?
2      A. They're all. They're all attorneys.
3      Q. Siblings?
4      A. Yes.
5      Q. How many?
6      A. My brother is an attorney, my
7  sister-in-law is an attorney, my mother -- she's
8  retired. Actually, she's still an attorney.
9      MR. ESFANDIARY: Mike, I could use a
10 bathroom break. We've been going for over an
11 hour.
12     MR. KLATT: Let me ask just one or two
13 more questions and then we'll break.
14     Q. If you testify in December at the
15 causation hearing and Judge Corley asks you,
16 Dr. Gardener, as someone whose work has centered
17 around diet and other environmental causes for
18 neurologic illnesses, what is your opinion whether
19 prenatal exposure to babies in their mother's
20 wombs to lead and arsenic can cause autism at that
21 point in time, how are you going to answer her?
22     MR. ESFANDIARY: Objection, calls for
23 speculation.
24     A. I mean, I guess I would want to sort of
25 learn from the lawyers in this case and any other

Page 104

1  lawyers in my life about, like, you know, what am
2  I supposed to say to a judge when they ask me
3  about something that's touched upon in my report
4  but isn't, like, the central focus, is not part of
5  my charge, what am I supposed to do?
6      And I will do whatever I'm supposed to do
7  professionally in that setting.
8      Q. As a scientist, is it important to you to
9  rule out other possible alternative causes of
10 autism and ADHD in children other than baby food?
11     A. To rule them out? Like, is it -- like, do
12 I need to say mothers who jump rope during
13 pregnancy -- in order to say if lead and arsenic
14 cause autism, do I need to know whether mothers
15 who jump rope during their pregnancy, does that
16 cause autism? No. That's not important.
17     What I would need to rule out is the
18 possibility that lead and arsenic could -- like,
19 as an epidemiologist, I understand that autism,
20 ADHD, and virtually all chronic conditions are
21 multifactorial.
22     If we were talking about a condition that
23 was really entirely genetic, like having high
24 lipoprotein (a), even high lipoprotein (a) isn't
25 100 percent genetic, but it's very, very, very,

Page 105

1  very genetic.
2      I guess I would need to -- in order to
3  form opinions about other factors, I would need to
4  know if those factors were even, like, possible.
5  Like, that is the crux here.  I talked
6  about that in my report.  But that doesn't mean
7  having to rule out everything else.
8      MR. KLATT:  We can take break.
9      MR. ESFANDIARY:  Perfect.  Thank you.
10     THE VIDEOGRAPHER:  This concludes Media
11  Number 2.  Going off the record at 11:27 a.m.
12     (Recess, 11:27 a.m. to 11:37 a.m.)
13     THE VIDEOGRAPHER:  This begins Media
14  Number 3.  Going back on the record, 11:37 a.m.
15  BY MR. KLATT:
16     Q. You said earlier, Dr. Gardener, that you
17  worked with people at the HIHG, the Hussman
18  Institute for Human Genomics at the University of
19  Miami Miller School of Medicine?
20     A. Yes, I did.
21     Q. Who do you work with there?
22     A. I have worked with Susan Blanton.
23     Q. Who else?
24     A. Liyong Wang.
25     Q. Anyone else?

Page 106

1      A. What's his name?  I'm blanking on the
2  guy's name.  I've worked in the past with Susan
3  Slifer.
4      Q. How do you spell her name?
5      A. S-L-I-F-E-R.
6          I don't remember the guy's name who I just
7  wrote a . . .
8      Q. Have you ever told any of the people
9  you've worked with at the HIHG, Hussman Institute
10  for Human Genomics at the University of Miami,
11  your opinion that trace heavy metals in baby food
12  causes autism?
13     A. I don't think so.  I've never had an
14  occasion to -- I've never talked with them about
15  autism.
16     Q. So you haven't proposed that you
17  collaborate with them on any study about genetics
18  and autism and heavy metals and autism.  Would
19  that be correct?
20     A. Never.  No.  All of my work with the HIHG
21  people has been in relation to dementia, late-life
22  cognitive decline, cognitive function, cognitive
23  impairment, stroke, and then subclinical vascular
24  outcomes like carotid disease.
25     Q. And no one at the Hussman Institute for

Page 107

1  Human Genomics at the University of Miami has ever
2  told you they think baby food is causing autism or
3  ADHD.  Correct?
4      A. I have never had a conversation with
5  anyone at the Hussman Institute for Human Genomics
6  about autism, that I recall, or ADHD.
7      Q. So no one there has told you they think
8  that baby food causes or plays a role in autism,
9  ASD, or ADHD.  Correct?
10     A. I've never had any conversations with
11  anyone at the HIHG about baby food or about autism
12  or about ADHD.
13     Q. But autism is a major area of their
14  research.  Correct?
15     A. I don't know what percentage of their
16  research . . .
17     Q. Do you know they're conducting ongoing
18  studies of families whose children have autism and
19  siblings of children who have autism to determine
20  the genetic basis for autism?  Are you aware of
21  that?
22     A. I am not aware of any of their work
23  outside of sort of what I have collaborated on.
24     Q. So they haven't asked you to have any
25  input on their studies of autism.  Correct?

Page 108

1      A. We work on issues related to dementia,
2  cognitive impairment, cognitive decline, stroke.
3  We're very busy with the topics that we have
4  covered.  I don't have time to work with them on
5  autism.
6      Q. So my question is, no one at the Hussman
7  Institute for Human Genomics at the University of
8  Miami Miller School of Medicine has ever asked you
9  to collaborate with them on a study about autism.
10  Correct?
11     A. I've never had any conversations with
12  anyone at the HIHG about autism, baby food.  I
13  have extensive collaboration with them about
14  dementia, cognitive impairment, stroke, and then
15  subclinical vascular outcomes.
16     Q. Were you aware of their work on the
17  genetics of autism before I brought that to your
18  attention today?
19     A. I have been aware they do some autism
20  research.  What it is, the extent, who works on
21  it, how much, what they have found, I'm not
22  familiar with.
23     MR. KLATT:  Let's mark this.
24     (Exhibit 7 marked for identification)
25     A. Every time you do this I feel like I'm

1  bracing myself for some article I've coauthored.
2      Q. You've read my mind.
3          So what I've just handed you is Exhibit 7.
4  And you're correct, it is an article that you
5  appear to have coauthored with Jaclyn Bowen and
6  Sean Callan.  Correct?
7      A. Correct.
8      Q. And the title of the article is "Heavy
9  metals and phthalate" --
10         Is that the way you say that?
11     A. That is correct.
12     Q. "Heavy metals and phthalate contamination
13 in prenatal vitamins and folic acid supplements."
14 Correct?
15     A. Correct.
16     Q. And you say -- that was published this
17 year?
18     A. Yeah, I guess it was.
19     Q. February of 2025.  Correct?
20     A. I guess so.
21     Q. In "Environmental Research"?
22     A. That is correct.
23     Q. And in the abstract you say the objective,
24 "The goal is to characterize the contamination of
25 prenatal vitamins and folate/folic acid

1  supplements with lead, cadmium, and phthalates."
2  Correct?
3      A. That is correct.
4      Q. And so in your introduction here,
5  Dr. Gardener, you say, "Fetal development is a
6  vulnerable period for exposure to toxicants,
7  including heavy metals and endocrine disrupting
8  compounds, EDCs."  Correct?
9      A. Correct.
10     Q. You go on to say, "Exposure to heavy
11 metals (e.g. lead and cadmium) and EDCs (e.g.
12 phthalates) in utero have been shown to result in
13 pregnancy complications and impairments in
14 neurodevelopment, cognitive and behavioral health,
15 growth, metabolic and cardiovascular health, and
16 reproductive health throughout childhood."
17 Correct?
18     A. Correct.
19     Q. And you cite, it looks like, maybe 20
20 papers there in support of those statements.  Is
21 that correct?
22     A. I cited 22.
23     Q. And those all relate to in utero effects.
24 Correct?
25     A. Presumably.

1      Q. "In utero" means in the womb before birth.
2  Correct?
3      A. Correct.
4      Q. And then you go on to say, "Phthalates
5  represent a class of plasticizers that are
6  frequently added to plastics, including tubing and
7  packaging, as well as fragranced personal care and
8  cleaning products."  Correct?
9      A. Correct.
10     Q. And phthalates are ubiquitous in the
11 environment, are they not?
12         MR. ESFANDIARY:  Objection, calls for
13 opinions that are beyond the scope of
14 Dr. Gardener's opinions in this case.
15     A. So phthalates are found in PVC, plastic,
16 in fragrance products, like I mentioned here in
17 some plastics.
18     Q. They're in a wide range of consumer
19 products.  Correct?
20         MR. ESFANDIARY:  Objection, beyond the
21 scope of Dr. Gardener's opinions.
22     A. It depends on how you define "wide range."
23 I mean, it's mostly like plastics and ingredients
24 in, like, personal care products.  Like to make
25 fragrance stick to you.

1      Q. For example, phthalates are used in vinyl
2  flooring, in wall coverings?
3          MR. ESFANDIARY:  Objection, beyond the
4  scope.
5      A. Not necessarily.  So you can make PVC
6  without phthalates.  Phthalates is one type of
7  plasticizers.  I would say it used to be the most
8  common type of plasticizer, but now it's more
9  often that it's or it's highly frequent that it's
10 replaced with other types of plasticizers like
11 organotins.
12     Q. But my question is phthalates are used in
13 vinyl floorings and wall coverings.  Some, not
14 necessarily all of them, but some.  Correct?
15     A. Phthalates are used in some flooring, some
16 wall coverings.
17     Q. They're used in plastic packaging.
18 Correct?
19     A. Phthalates can be used in some plastic
20 packaging.
21     Q. And phthalates can be used in shampoos,
22 soaps, lotions, perfumes.  Correct?
23         MR. ESFANDIARY:  Objection.  Beyond the
24 scope of Dr. Gardener's disclosed opinions.
25     A. It depends on the product.  Some -- I am

1  not sort of fully versed in all the regulations
2  about plasticizer use right now.
3       But yeah.  When I think of those sort of
4  products, phthalates is a potential exposure.
5       Q. That's what you meant when you were
6  referring to phthalates being frequently added to
7  fragranced personal care and cleaning products.
8  Correct?
9       A. Right.  I mean, like, phthalates, they're
10 not on products as, like, an ingredient.  You're
11 not going to see that, that I've seen.  But they
12 can be -- what you'll often see is the term
13 "fragrance," which is an undisclosed, ambiguous
14 ingredient that can include phthalates.
15      Q. In products like shampoos, soaps, lotions,
16 perfumes.  Correct?
17      MR. ESFANDIARY:  Objection, beyond the
18 scope.
19      A. Phthalates can be in perfumes, lotions,
20 shampoos, personal care products.
21      Q. They can be in detergents and household
22 cleaners too.  Right?
23      MR. ESFANDIARY:  Same objection.
24      A. They can -- I think about it more in,
25 like -- like dryer sheets and things like that.

1  But they can be in cleaning products and
2  fragranced items to make fragrance stick.
3       Q. Phthalates can be plasticizers in
4  children's toys.  Correct?
5       MR. ESFANDIARY:  Objection, beyond the
6  scope of Dr. Gardener's opinions.
7       A. Now they're highly regulated in children's
8  toys.
9       Q. But they have been historically in
10 children's toys.  Correct?
11      A. Historically phthalates have been in some
12 children's toys.  Yes.  In PVC toys.
13      Q. Going on -- well, let me ask you this:  Do
14 you think phthalates in and of themselves are
15 capable of causing autism, autism spectrum
16 disorder, or ADHD in children via either in utero
17 exposure or postbirth exposure?
18      MR. ESFANDIARY:  Objection, calls for
19 undisclosed opinion, beyond the scope of
20 Dr. Gardener's opinions in this case.
21      Q. You can answer.
22      A. So in this situation, you said autism or
23 autism spectrum disorder, which is different than
24 how you've worded things in the past.
25      Was there an importance for that

1  distinction?
2       Q. Not important at all.  I'll rephrase it.
3       Is it your opinion that phthalates are
4  capable of causing ASD or ADHD or both in children
5  due to either their exposure in utero before birth
6  or after birth postnatally in infancy and early
7  childhood?
8       MR. ESFANDIARY:  Objection, calls for
9  opinions, beyond the scope of Dr. Gardener's
10 disclosed opinions in this case.
11      If you have an opinion, you can offer it.
12      A. I haven't researched that at all.  I
13 actually can't recall any papers that I have read
14 on phthalates and autism, again, at all recently.
15 So I'm not able to provide an opinion on that.
16      Q. Well, let's go back up to the first two
17 sentences in your article.  You say, "Fetal
18 development is a vulnerable period for exposures
19 to toxicants, including heavy metals and endocrine
20 disrupting compound (EDCs)."
21      And then in very next sentence you say,
22 "Exposure to heavy metals (e.g. lead and cadmium)
23 and EDCs (e.g. phthalates) in utero have been
24 shown to result in pregnancy complications and
25 impairments in neurodevelopment, cognitive and

1  behavioral health, growth, metabolic and
2  cardiovascular health, and reproductive health
3  throughout childhood."  Correct?
4       A. Uh-hmm.  Yes.
5       Q. So you believe phthalates are capable of
6  causing impairments in neurodevelopment, cognitive
7  and behavioral health, either due to a child's
8  exposure in utero or after birth.  Correct?
9       MR. ESFANDIARY:  Objection, calls for
10 undisclosed opinions in this case.  Beyond the
11 scope.
12      Doctor, if you have an opinion, you can
13 offer it.
14      A. So no.  The way that this sentence is
15 written with all these -- with all of these
16 references does not imply that phthalates have
17 been shown to result in all of those things.
18      This is more general about, you know, I
19 mentioned phthalates falls under this EDC umbrella
20 and metals and EDCs in general have been
21 associated with all these different outcomes.
22      That does not imply that each one of these
23 compounds have been -- that I've included
24 references for each one of these compounds in all
25 of those outcomes.

Page 117

```
 1        Q. Phthalates is the one example of an
 2   endocrine disrupting compound that you pointed out
 3   in this article.  Correct?
 4        A. This is correct.
 5        Q. Do you believe phthalates in utero can
 6   result in impairments in neurodevelopment,
 7   cognitive and behavioral health?
 8        MR. ESFANDIARY: Objection, calls for
 9   undisclosed opinions, beyond the scope of
10   Dr. Gardener's disclosed opinions in this case.
11        A. I am not prepared to opine on that.  Like,
12   I have not done any systematic review of that
13   data.
14        Q. But that's what you told the world in
15   publishing this article, that you believed that
16   endocrine disrupting compounds, in particular
17   phthalates, in utero have been shown to result in
18   pregnancy complications and impairments in
19   neurodevelopment, cognitive and behavioral health.
20   Correct?
21        A. Where do you see that?  In particular
22   phthalates have been --
23        Q. I read the second sentence in your
24   article, your 2025 article.
25        A. Yeah.  No.  What I am saying is that heavy
```

Page 118

```
 1   metals and EDCs have been shown to result in all
 2   of these different outcomes.
 3        I gave phthalates as an example, but it's
 4   not like -- it's not like this list of references
 5   includes a reference for phthalates in relation to
 6   all those.
 7        That might exist.  I don't know.  The
 8   reviewers would not have read it that way.  My
 9   colleagues would not have interpreted it that way.
10   It's not like -- I think what you're interpreting
11   this sentence to mean, that I could sit here and
12   say based on this sentence I have done a
13   literature review to say that phthalates -- in
14   this whole sentence, phthalates cause all of these
15   different outcomes.
16        That's not what this sentence implies.
17   Scientists would not read it that way.  And if it
18   exists, it might, it might not.  I am not here to
19   prepare to opine on phthalates in relation to all
20   of these things today.
21        Q. Why did you say phthalates, as an example,
22   in utero have been shown to result in pregnancy
23   complications and impairments in neurodevelopment,
24   cognitive and behavioral health?
25        Why did you put that in this article?  It
```

Page 119

```
 1   could be read by any scientist or doctor out
 2   there.
 3        MR. ESFANDIARY: So hang on.  There was
 4   two questions there.  It's compound.
 5        Which one are you asking her?
 6        Q. When you put this sentence in the article
 7   to be read by scientists, laypeople, physicians
 8   out there in the world and you used phthalates as
 9   an example, why did you include phthalates as
10   something in utero that has been shown to result
11   in pregnancy complications, impairments in
12   neurodevelopment, cognitive and behavioral health?
13        A. Because this study was about -- the EDCs
14   that were the focus of this study were phthalates.
15        So it could -- people might be reading
16   this study and be like, all right, endocrine
17   disrupting chemical, how does this relate here?  I
18   wanted to make it clear that phthalates were a
19   type of endocrine disrupting chemical.
20        Q. Well, let me just ask you, apart from what
21   you said in the article, is it your opinion that
22   endocrine disrupting compounds, including
23   phthalates, in utero can cause impairments in
24   neurodevelopment, cognitive and behavioral health?
25   Is that your opinion?
```

Page 120

```
 1        MR. ESFANDIARY: Objection, calls for an
 2   undisclosed opinion, beyond the scope of
 3   Dr. Gardener's testimony in this case.
 4        A. Yes, I am going to repeat it again.  I'm
 5   here under oath.  I'm here.  My words matter.  And
 6   my words are, you know, trusted.  I want to be
 7   really careful to only talk about topics that I'm
 8   prepared to talk about under oath.  I take that
 9   really, really carefully.
10        I am not prepared to talk under oath about
11   the impact of in utero exposure to phthalates with
12   all of these outcomes today.
13        Q. Aren't you careful when you write a
14   journal article that's published in a
15   peer-reviewed journal to be careful about your use
16   of words?
17        A. Absolutely.  And I would love for all of
18   those scientists to read it.  I am extremely
19   careful.  My colleagues, we all review these
20   papers.  It's peer-reviewed.
21        This was peer-reviewed and published by
22   one of the most respected journals out there,
23   "Environmental Research."  So it's extremely
24   important for me to pass and excel in that very
25   rigorous review process and to make sure that it
```

1 is well understood by the scientific community.
2 It's also very understood that people who
3 don't have this training, lawyers, would not
4 understand accurately every sentence I've read.
5 My parents are both extremely smart.
6 They're both lawyers. There's a lot of sentences
7 in here that they would not understand correctly.
8 It's not surprising that this sentence,
9 that we might not totally be on the same page
10 about this sentence.
11 I wrote this for a scientific, for a
12 medically trained audience.
13 Q. Exactly. And did any peer reviewer of
14 this article say, Dr. Gardener, don't suggest in
15 here that EDCs, for example, phthalates, in utero
16 have been shown to result in impairments in
17 neurodevelopment, cognitive and behavioral health?
18 A. No, they did not.
19 Q. Okay.
20 A. If they had, something like that, I would
21 absolutely change the sentence.
22 The peer reviewers for "Environmental
23 Research" are top of the line. This is a really
24 esteemed journal. If you get asked to review for
25 this journal, you are far more likely to say yes

1 than many other journals.
2 And if a reviewer, a trusted reviewer, had
3 said, "This sentence, I think you're really
4 stretching here, that doesn't sound right, it's
5 going to be misinterpreted for this audience," I
6 would have absolutely taken that into
7 consideration.
8 Q. And so you were perfectly willing to
9 represent in this article, as approved by peer
10 reviewers, that endocrine disrupting compounds,
11 including phthalates, in utero have been shown to
12 result in impairments in neurodevelopment,
13 cognitive and behavioral health. Correct?
14 A. So in terms of this sentence, what we said
15 is that exposure to heavy metals and EDCs have
16 been shown to result in all of those.
17 That does not mean that EDCs -- that every
18 single metal and every single EDC have been shown
19 for all of those different outcomes.
20 It's well understood in the medical field
21 what we're saying, that heavy metals -- the point
22 is that heavy metals and endocrine disrupting
23 compounds have been shown -- and specifically in
24 utero exposure have been shown to have very
25 wide-ranging health effects, in the literature.

1 And that was the point of this sentence.
2 Q. So let me ask you as an expert in diet and
3 other environmental causes for neurologic
4 diseases, is it your opinion that endocrine
5 disrupting compounds, including phthalates, in
6 utero can cause impairments in neurodevelopment,
7 cognitive and behavioral health, like you stated
8 in the article? Is that your opinion or not?
9 MR. ESFANDIARY: So I think this has been
10 asked and answered multiple times. I will object
11 again to beyond the scope of Dr. Gardener's
12 proffered expert opinion in this case.
13 Q. Is it your opinion that phthalates and
14 other endocrine disrupting compounds in utero can
15 cause impairments in neurodevelopment, cognitive
16 and behavioral health, or not?
17 MR. ESFANDIARY: Same objections, beyond
18 the scope.
19 A. I take this oath really seriously. You
20 know, my opinions when I'm talking about them here
21 are opinions that have been really, really
22 scrutinized. Not just opinions that I would have,
23 you and me, at lunch.
24 That was not part of my charge. I did not
25 come here today prepared to provide an expert

1 witness level opinion on EDCs, including
2 phthalates as well as other EDCs, in relation to
3 all of these outcomes.
4 Q. But you're willing to represent that in
5 the peer-reviewed medical literature. Correct?
6 A. I was absolutely comfortable writing this
7 sentence. All of my colleagues were comfortable
8 writing this sentence. The reviewers were
9 comfortable with me publishing this sentence. The
10 esteemed editors of this esteemed journal were
11 comfortable with me writing that sentence.
12 That is very different than me providing
13 you with my opinions under oath in this
14 circumstance. It's different because the
15 implications of the sentence and the situation
16 that we're in right now are very different.
17 Q. You're saying you use more rigor in
18 forming legal opinions than you do scientific
19 opinions in the published literature? Is that
20 what you're saying?
21 MR. ESFANDIARY: No. You're misstating
22 the testimony.
23 Go ahead.
24 A. They're just totally different.
25 First of all, you are misunderstanding the

Page 125

1   sentence. So that's just the first step.
2       But if you were not misunderstanding the
3   sentence, there is a very different -- there's a
4   big difference between writing these sentences
5   where it's understood, where I'm part of a
6   scientific community and trusted how scientists
7   who are the target audience for this will read
8   this sentence, and this setting where I'm actually
9   talking about things under oath in a -- in a
10  situation that carries a huge weight for a lot of
11  people, including you.
12      I mean, it's out of respect for everyone
13  in this situation that my responsibility here is
14  much greater than a sentence written in an article
15  that a lay audience person might not interpret
16  totally correctly.
17      Q. This isn't just any article, is it,
18  Dr. Gardener? This is an article published, as
19  you've just said, in a reputable peer-reviewed
20  medical or scientific journal. Correct?
21      A. That is correct.
22      Q. Do you apply a different standard for
23  opinions you express in peer-reviewed medical
24  journal articles in highly respected journals than
25  you do in giving opinions in the courtroom?

Page 126

1       A. It's very, very different. It's a very,
2   very different process.
3       Q. And you use a different methodology?
4       A. No. I use a similar methodology.
5       But you are reading this sentence --
6   you're reading this sentence with -- differently
7   than scientists would read it, which is -- you're
8   a lawyer. That's okay. I don't want to be
9   offensive to you in how you're reading this
10  sentence.
11      But it's really different than sitting
12  here under oath in a very, very high-stakes
13  situation than wondering how a lawyer might
14  misread a sentence in an introduction to a very,
15  very important piece of science.
16      Q. Exhibit 7, this article we've been talking
17  about for the last 15 minutes or so, are your
18  words. Correct?
19      A. They are. Yes.
20      Q. I have not misread them at all. Correct?
21  I have read them exactly like you wrote them in
22  the article. Correct?
23      A. No. What I keep saying is I think you are
24  misreading them. I don't mean to be offensive. I
25  am a scientist --

Page 127

1       Q. What did I --
2       MR. ESFANDIARY: Don't interrupt her.
3   Please finish your answer.
4       A. I understand you are a lawyer. You're
5   going to read this sentence differently than a
6   scientist would.
7       The scientists who coauthored this with
8   me, who reviewed it, who edited the paper, I
9   assume read it the way that it was intended,
10  saying that heavy metals in general and EDCs have
11  caused a wide range of health outcomes.
12      That doesn't . . .
13      I can tell you're about to interrupt me so
14  I stopped.
15      Q. Are you saying that I read your words into
16  the record inaccurately?
17      A. You read the actual -- I actually can't
18  remember if you read the actual -- you did say "in
19  particular phthalates" and it said "e.g.," which
20  is "for example phthalates."
21      So this does not -- in the scientific
22  world, this does not mean that phthalates have
23  been proven to cause all of these different
24  outcomes. It's just -- it was a general sentence
25  saying that heavy metals and endocrine disrupting

Page 128

1   chemicals have been shown in the literature. I
2   didn't write "in the literature." To result in
3   all of these -- in this broad range of outcomes.
4       Q. The reason that I said "in particular
5   phthalates" is that's the one example of an
6   endocrine disrupting compound you chose to
7   illustrate in this article. Correct?
8       A. Yes. And I did that because that is the
9   one endocrine -- the one type of endocrine
10  disrupting chemical that we were measuring in this
11  article. Because there are plenty of people who
12  would read this study who might not know what
13  phthalates are. Might be like, oh, endocrine
14  disrupting chemicals. I know what that is.
15  Phthalates fall under that category.
16      Q. I'm going to read the sentence again, and
17  I just want you to tell on the record whether I
18  read the sentence, the words you wrote, without
19  adding anything.
20      A. Sure.
21      Q. I'm referring to Exhibit 7 in the
22  introduction, the second sentence -- let's start
23  with the first sentence.
24      "Fetal development is a vulnerable period
25  for exposure to toxicants, including heavy metals

Page 129

1  and endocrine disrupting compounds (EDCs)."
2      Did I read that correctly?
3      A. You read that correctly.
4      Q. The next sentence, "Exposure to heavy
5  metals (e.g." --
6      Which means "for example."  Correct?
7      A. Correct.
8      Q. -- "lead and cadmium) and EDCs (e.g.
9  phthalates)" --
10     Meaning "for example phthalates."
11 Correct?
12     A. Correct.
13     Q. -- "in utero have been shown to result in
14 pregnancy complications and impairments in
15 neurodevelopment, cognitive and behavioral health,
16 growth, metabolic and cardiovascular health, and
17 reproductive health throughout childhood."
18     That's your words and I read them
19 accurately.  Correct?
20     A. Yes, you did.
21     Q. Let's continue on.  The bottom of that
22 paragraph you say, "Lead" --
23     And I'm going to read your words.  Tell me
24 if I get any of them wrong.
25     "Lead, cadmium, and phthalates are

Page 130

1  clinically relevant and ubiquitous environmental
2  toxicants to which pregnant people are frequently
3  exposed in the United States and globally."
4      Did I read that correctly?
5      A. You did.
6      Q. And then you have several citations to
7  support that.  Correct?
8      A. Correct.
9      Q. What did you mean by your use of the word
10 "ubiquitous" here?
11     MR. ESFANDIARY:  One second.  Insofar as
12 you're asking about phthalates, I'm going to lodge
13 an objection to beyond the scope of Dr. Gardener's
14 testimony and opinions in this case.  To the
15 extent you're talking about lead and was cadmium,
16 that's acceptable.
17     MR. KLATT:  No.
18     MR. ESFANDIARY:  Yes.
19     MR. KLATT:  No, there's no such objection.
20 That's completely out of line.
21     Your objections have been speaking
22 objections.  They go beyond what Judge Corley
23 permits.  She allows "objection" and you can state
24 a one- or two-word grounds.  It doesn't need any
25 explanation.

Page 131

1      What you just did right then, Pedram, was
2  totally inappropriate.  And I guarantee you I can
3  show you Judge Corley's opinions or we can go to
4  her where she has sanctioned people for going
5  beyond those types of objections.
6      MR. ESFANDIARY:  Okay.  So I disagree with
7  all of that.  I was just reiterating my objection
8  that to the extent you're asking about compounds
9  and chemicals that are not the subject of this
10 litigation, that are not being pursued in this
11 litigation, that there are no claims regarding in
12 this litigation, I'm going to continue to object
13 as beyond the scope in the same manner that you
14 guys have objected when we deposed your experts
15 about compounds and chemicals and matters that are
16 not within the 10-yard lines of their opinions in
17 this case.
18     Please let me finish before you interrupt.
19     So I'm going to continue lodging the same
20 objection to the extent you're asking about
21 phthalates.
22     To the extent you want to ask about heavy
23 metals, that's fair game and you're welcome to do
24 so.
25     MR. KLATT:  You know there's no limitation

Page 132

1  under the rules to ask an expert witness their
2  opinion about scientific matters that they claim
3  to be an expert on.
4      MR. ESFANDIARY:  You are asking her about
5  that.  I'm just objecting.
6      MR. KLATT:  That's not a valid objection.
7  You can make the objection.  You can say
8  "objection, I believe it's irrelevant, move on" or
9  whatever.  But you don't need to give a speech
10 about what you think is within the scope or
11 without the scope.  That's not an appropriate
12 objection.
13     MR. ESFANDIARY:  Well, you're asking me,
14 you're challenging me on the basis of my
15 objection.  So I'm just explaining to you what
16 they are.
17     Please, Counsel, continue asking questions
18 of Dr. Gardener.
19     MR. KLATT:  Could you read the last
20 question before we had the little exchange.
21     (Pending question read)
22     A. I just want to explain, I'm not prepared
23 to provide expert opinions about phthalates today.
24 That wasn't part of my charge or what I, you know,
25 prepared for this.

1    And, like, under oath, I just didn't -- I
2  didn't prepare for, you know, to provide that kind
3  of expert testimony like I did about the heavy
4  metals.
5    MR. SACHSE: Move to strike as
6  unresponsive.
7    Q. Dr. Gardener, you wrote an article on
8  prenatal exposure to heavy metals and phthalates
9  in February 2025. Correct?
10   A. That is correct.
11   Q. And as an expert who purports to be having
12  much of their work relating to diet and other
13  environmental exposures causing neurologic
14  diseases, I'm entitled to ask you about your
15  opinions as a scientist, not just things the
16  lawyers have told you to restrict your opinions to
17  in this case. Do you understand that?
18   MR. ESFANDIARY: Hang on. Whoa, whoa,
19  whoa. That was very compound.
20   I object to the colloquy and I continue to
21  object as beyond the scope. Questions related to
22  phthalates are not the subject of this
23  examination.
24   Doctor, if you have an opinion, you can
25  offer it.

1    A. I just want to say I am not a lawyer, so I
2  don't actually know your rules in your profession
3  about what you're allowed to ask about or not.
4    So it sounded like you were asking me if
5  I'm aware of what you, as a lawyer, are entitled
6  to do in this situation. And that's not -- I am
7  not aware. I am not at all trained, not one bit,
8  in the scope of what you're allowed to do here or
9  not.
10   That's why Pedram is here. And you guys
11  can discuss this. But I don't want you -- I don't
12  want to purport to be aware of what you are or are
13  not allowed to do.
14   Q. Do you hold yourself out as a scientific
15  expert on diet and other environmental causes for
16  neurologic diseases?
17   A. Yes, I do. My understanding is that the
18  definition of being an expert is knowing a lot
19  more, significantly more than the general public
20  on a topic. That's what I've been told is the
21  definition. And I absolutely do.
22   Q. Did you write a peer-reviewed journal
23  article in what you described is an eminently
24  respected medical journal in February 2025 about
25  phthalate and heavy metal contamination in utero?

1    A. I did. I want --
2    MR. ESFANDIARY: Don't interrupt her.
3    MR. KLATT: Wait. That's the response.
4  She doesn't need to respond beyond that.
5    MR. ESFANDIARY: You don't need to tell
6  her what she needs to respond. She needs to be
7  able to finish answering the question, so stop
8  interrupting her. You need to stop it.
9    MR. KLATT: You know what? We're just
10  wasting a lot of time. We're going to come back.
11   MR. SACHSE: Let's go off the record.
12   MR. ESFANDIARY: No, I'm not willing to go
13  off the record. Please finish. Continue.
14   MR. KLATT: We're going to call the judge,
15  Pedram. This is totally inappropriate.
16   MR. ESFANDIARY: Answer the question,
17  Doctor.
18   A. So when you write a peer-reviewed study --
19   MR. KLATT: This is totally nonresponsive.
20   MR. ESFANDIARY: Don't interrupt her.
21  Please finish answering the question.
22   MR. KLATT: We're just burning time.
23  We'll be back here.
24   MR. ESFANDIARY: You can answer the
25  question, Doctor.

1    A. When you write a peer-reviewed study,
2  you -- every sentence in the introduction, in the
3  discussion, you are not purporting to, you know,
4  provide an expert opinion on. The introduction
5  and the discussion is to set up the scientific
6  question and the importance.
7    So, you know, I want to make that very
8  clear.
9    You're not -- just because you wrote a
10  sentence in the introduction or the discussion
11  does not mean that based on that sentence you are
12  prepared for an eight-hour deposition or an expert
13  report on that. There's a really big difference.
14   If this was a review article about
15  phthalates and reproductive health, that would be
16  very different than having those -- that be part
17  of a sentence in the introduction on something
18  else.
19   This paper is not about the associations
20  between lead and cadmium and phthalates in all of
21  these outcomes.
22   Earlier you asked me have I ever written
23  about lead and cadmium in neurodevelopment, and I
24  said no. And I think what you're trying to get at
25  is, oh, now I have, now I've actually published on

1  this.
2      And so I think I have actually
3  misunderstood.  Earlier you said have you
4  published on this?  And I said no.  And now you're
5  sort of implying gotcha, you actually have
6  published on this.
7      That's really different than having a
8  sentence in an introduction.
9      MR. KLATT:  Objection to the long
10 narrative answer beyond everything after "I did."
11     MR. SACHSE:  Move to strike.
12     MR. KLATT:  Move to strike.
13 BY MR. KLATT:
14  Q. So let's go back to the article.  You,
15 Dr. Hannah Gardener, wrote in February 2025 in a
16 peer-reviewed journal, "Lead, cadmium and
17 phthalates are clinically relevant and ubiquitous
18 environmental toxicants to which pregnant people
19 are frequently exposed in the United States and
20 globally."
21     I read those words correctly.  Correct?
22  A. You did.
23  Q. What is the word you chose to use here,
24 "ubiquitous," what is the meaning of that in this
25 sentence?

1   A. They're frequent exposures from different
2  sources.
3   Q. In the environment?
4   A. As opposed to what?
5   Q. Is that what you're referring to?
6   A. I guess I don't know what would be the --
7  when you said "in the environment," I guess I
8  don't understand.
9   Q. All right.  So --
10  A. Where else would they be than in the
11 environment?
12  Q. You would agree they're frequent exposures
13 in the environment in the United States.  Correct?
14  A. Yes.
15  Q. In pregnant --
16  A. I would say, like, the point of this
17 sentence is that these are common environmental
18 exposures.  They're not -- this isn't like --
19 these aren't toxics that 1 percent of the
20 population is exposed to.  These are exposures
21 that --
22  Q. Are ubiquitous?  They're everywhere.
23 Right?
24  A. No, they're not everywhere.  Ubiquitous
25 doesn't -- I mean, you know, words matter here in

1  this legal setting.
2   Q. Yeah.  I agree.
3   A. In a general, you know -- if you and I
4  were at lunch, I might say they're everywhere.
5      But here, Hannah Gardener has said
6  these -- they're everywhere.  They're in this
7  coffee cup.  I'm not saying they're necessarily in
8  this coffee cup, but they're frequent exposures.
9   Q. And they're frequent exposures to men,
10 women, adults, pregnant people, to children out
11 there in the environment.  Correct?
12  A. These are -- lead, cadmium, and phthalates
13 are frequent exposures to men, to women, to
14 children, to babies.  Yes.  I was not implying --
15  Q. To pregnant mothers?
16  A. Yes.  In this sentence I was specifically
17 talking about pregnant people.  But they're not
18 specific to pregnant people.
19  Q. Let's go to the next paragraph where
20 you're talking about prenatal vitamins.  And
21 "prenatal" means before birth.  Correct?
22  A. That is correct.  Although plenty of
23 people take prenatal vitamins prior to conception
24 and long after pregnancy.
25  Q. You say, "Several recent studies have

1  explored prenatal vitamins as a source of heavy
2  metal exposure during development," with studies.
3  Correct?
4   A. That is correct.
5   Q. And it continues on, "particularly because
6  they are ingested daily for months on end by most
7  pregnant women."  Correct?
8   A. That is correct.
9   Q. "Indeed, several studies have found
10 prenatal vitamins are a significant source of
11 maternal and fetal exposure to toxic metals."
12     Did I read that correctly?
13  A. That is correct.
14  Q. Why would maternal and fetal exposure be
15 something worthy of your concern here?
16  A. Because this study was about prenatal
17 vitamins.
18  Q. And the prenatal and fetal time period is
19 a critical window for neurodevelopment.  Correct?
20  A. Where do you see that in this sentence?
21  Q. I'm just asking you.  Is the that true?
22  A. Oh, so this has nothing to do with this?
23  Q. I'm just asking you.
24  A. Sorry.  Can you ask that question again?
25 I was focused on this paper.

Page 141

```
 1        MR. KLATT:  Could you read the question
 2   back, please?
 3        (Pending question read)
 4        A. Neurodevelopment occurs during the
 5   prenatal period.  Yes.  It also occurs --
 6   neurodevelopment of course continues on after.
 7   But yes, neurodevelopment, there's a lot of
 8   neurodevelopment during the prenatal period.
 9        Q. In fact, turn to the very last page of the
10   article, page 5.  You, Dr. Gardener, say, "Given
11   the critical role of prenatal development on
12   overall health, more attention needs to be paid to
13   understanding the implications of metal exposure
14   during this critical window."  Correct?
15        A. Sorry.  Where -- I didn't see where you
16   were.
17        Q. The very last sentence.
18        MR. ESFANDIARY:  Right here.
19        A. Oh, the very -- yeah.
20        Q. Let me read it again because I want to
21   make sure that I read it correctly.
22        Your words are, "Given the critical role
23   of prenatal development on overall health, more
24   attention needs to be paid to understanding the
25   implications of metal exposure during this
```

Page 142

```
 1   critical window."  Correct?
 2        A. Correct.
 3        Q. The critical window being the prenatal
 4   period.  Correct?
 5        A. Correct.  Because a lot of people don't
 6   realize that the prenatal period affects pretty
 7   much every single part of our health.
 8        Q. Including future nerve development and
 9   cognition.  Correct?
10        A. Everything.  I mean, most people -- I
11   mean, of course exposures after -- it's not like
12   just because the prenatal period is relevant for
13   dementia doesn't mean that we're not all --
14        I spent this entire week at the
15   Alzheimer's Association meeting.  We're all
16   looking at different risk factors throughout the
17   entire life course.  That does not mean that the
18   prenatal -- just because there's a role for
19   prenatal development doesn't mean that there isn't
20   also, of course, a substantial role for every, you
21   know -- every period after that.  It doesn't mean
22   that, oh, we're not looking at what people are
23   doing at age 60 in relation to their risk of
24   dementia.  Of course not.
25        MR. KLATT:  Object to --
```

Page 143

```
 1        A. Even though plenty of people already have
 2   dementia at that point.
 3        MR. KLATT:  Object to the nonresponsive
 4   portion of the answer.
 5        Q. Go to page 4 of Exhibit 7, your article on
 6   heavy metals and phthalates.  And I'm looking at
 7   the right-hand column.
 8        Are you with me on page 4?
 9        A. Yes.
10        Q. And not the very last paragraph but the
11   next-to-last paragraph.
12        A. The one that starts with, "This study did
13   not"?
14        Q. Yes.
15        And I wanted to read a sentence and make
16   sure that I read your words correctly.
17        "It is crucial to consider that people
18   often take prenatal vitamins daily for many years
19   during the period prior to conception through the
20   postpartum period, including the time of pregnancy
21   and lactation.  As a result, this represents a
22   frequent chronic long-term exposure often with the
23   same brand and type of vitamin consumed for the
24   entire duration among the most vulnerable segment
25   of the population."
```

Page 144

```
 1        Are those your words?
 2        A. Yes.
 3        Q. And then down at the bottom of that page
 4   you say, "Conversely, increased consumption of
 5   calcium and iron may act as antagonists for lead
 6   and cadmium."
 7        Did I read your words correctly?
 8        A. Going on to page 5?
 9        Q. Yes.
10        A. Yup.
11        Q. What do you mean when you say "consumption
12   of calcium and iron may act as antagonists for
13   lead and cadmium"?  What does that mean?
14        A. It's what I talked about in my expert
15   report, that on a cellular basis the lead competes
16   with calcium and iron for receptors.  It's exactly
17   what I talked about at length in my report.
18        Q. And what does it mean for calcium and iron
19   to be antagonists for lead and cadmium?  What does
20   it mean, "antagonist" as you use it in that
21   sentence?
22        A. So they're competing for receptors.  Lead
23   can mimic those receptors.
24        Q. Do you know in the diet of a child who
25   eats either commercial or homemade baby food, does
```

Page 145

1   the amount of calcium and iron they consume far
2   exceed any trace heavy metals in the food they
3   consume?
4       A. In terms of the, like -- the milligrams,
5   for example?
6       Q. Exactly.  Exactly.
7       A. Oh, my God.  If it didn't, children would
8   have all been dead.  I mean, we're talking
9   about -- we're talking about one of the most
10  potent neurotoxins here.
11      Q. So you're saying there's far more
12  consumption of calcium and iron in the diet of a
13  child who eats commercial or homemade baby food
14  than there is any trace lead or cadmium.  Correct?
15      A. That's not what this sentence says.
16      Q. But do you believe that?
17      A. It would depend on the child.
18      Q. So I'm talking about in a normal child's
19  diet.  And I think you just said that in order to
20  live, children have to be exposed to far more iron
21  and calcium than they would any trace heavy
22  metals.  Correct?
23      A. What do you mean by "trace heavy metals"?
24      Q. Trace heavy metals, the ones we've been
25  talking about: lead, arsenic.

Page 146

1       A. So yeah, the lead exposure is significant.
2   But it is such a potent neurotoxin that if you ate
3   as much lead as many typical children eat of
4   calcium and iron, that would be catastrophic.
5       Q. So the typical child consumes far more
6   iron and calcium in their normal diet than any
7   trace heavy metal like lead.  Correct?
8       MR. ESFANDIARY: Objection, overbroad.
9       A. I can't say for every single -- for every
10  single child.  I mean, lead --
11      Q. Typically.
12      A. Lead is so toxic that it would not --
13  yeah.  An understanding of this whole topic needs
14  to reflect the fact that lead is so toxic at such
15  small doses that one would never expect that you
16  would eat the same amount of lead that you would
17  eat in terms of calcium.
18      Q. Do you agree that calcium and iron are
19  regular components of a child's diet whether they
20  eat commercial baby food or homemade baby food?
21      MR. ESFANDIARY: Objection, overbroad,
22  calls for speculation.
23      A. Many children eat calcium and iron.  I
24  don't have a stat to tell you about how the median
25  amount among kids in the United States --

Page 147

1       Q. Did you feed your own children food that
2   was rich in calcium and iron?
3       A. I guess it depends on how you define
4   "rich."  One of my children didn't eat a lot of --
5   not much dairy at all, but I made sure that my
6   children, to the best of my ability -- actually, I
7   shouldn't say I made sure.  I did my best to make
8   sure that my kids got what was needed in terms of
9   calcium and iron.
10      Overall, my kids ate a pretty typical
11  diet.
12      Q. And why was it important for them to get
13  calcium and iron?
14      MR. ESFANDIARY: Objection.  Getting kind
15  of beyond the scope of Dr. Gardener's testimony in
16  this case.
17      But if you have an opinion, Dr. Gardener,
18  go ahead.
19      A. Why was it important for my children?
20  Because calcium and iron are good for children.
21  They're important nutrients for children to get
22  for their growth and development, without getting
23  into any specifics about my own children.
24      Q. Do you know specifically why iron and
25  calcium are important for infants and children's

Page 148

1   development?
2       A. They're important for all sorts of -- for
3   all sorts of different health markers.  I'm not
4   prepared to opine on all of the ways that calcium
5   and iron benefit children today.
6       Q. But certainly in your own experience, it
7   was important to see that your children got enough
8   calcium and iron in their diet?
9       A. Did I think about it very much?  You know,
10  no.  I actually thought a lot more, a lot more
11  about limiting their exposure to lead and arsenic.
12  That was the bigger challenge.
13      Q. Did your children eat commercial baby
14  foods?
15      A. One of my children, my first child -- my
16  first child -- I guess both of my children have
17  eaten commercial baby foods.  In fact, you know,
18  they have as older kids too.  Applesauce pouches
19  are things that actually older children sometimes
20  eat too.  But they both have eaten some commercial
21  baby food.
22      Q. Are they grown now?
23      A. They are.
24      Q. Are they adults?
25      A. No, they're not adults, but they are

Page 149

1  tweens and teens.
2      Q. And I'm sorry, did you say you had two
3  children or three?
4      A. I have two children.
5      Q. Okay. Go back to the article. I just
6  have one -- maybe one more question about it.
7  Exhibit 7. And I'm going to page 5.
8          After the sentence we just read about the
9  antagonist, it's the very next sentence. You
10  say -- and these are your words. Make sure I read
11  them correctly.
12      "It has been suggested that iron
13  deficiency can cause the absorption of lead and
14  cadmium," and you cite an article there. Correct?
15      A. Correct.
16      Q. I think we can put that aside.
17      MR. ESFANDIARY: Hey, Mike. It's 12:30.
18  When were we thinking of doing lunch? And we've
19  been going about an hour.
20      MR. KLATT: I'm happy to do it now if
21  you'd like.
22      THE VIDEOGRAPHER: This concludes Media
23  Number 3. Going off the record, 12:31 p.m.
24      (Lunch recess, 12:31 p.m. to 1:19 p.m.)
25

Page 150

1      A F T E R N O O N   S E S S I O N
2      THE VIDEOGRAPHER: This is the beginning
3  of Media Number 4. Going back on the record,
4  1:19 p.m.
5  BY MR. KLATT:
6      Q. Good afternoon, Dr. Gardener. We've had a
7  lunch break for a little while. Correct?
8      A. Correct.
9      Q. Before the lunch break, in questioning
10  this morning I had asked you questions about a
11  presentation you'd made regarding PFAS that you
12  testified to that you made earlier this year. And
13  then I asked you some follow-up questions about
14  PFAS that you were instructed not to answer.
15          We've had a discussion off the record, and
16  I'm going to go back and ask the court reporter to
17  read those questions that you were instructed not
18  to answer and I'm going to ask you to answer those
19  to the best of your ability on the record.
20      A. Okay. I wasn't sure which presentation
21  you were asking about.
22      MR. KLATT: We're not on the record yet?
23      THE VIDEOGRAPHER: We are on the record.
24      Q. You had mentioned earlier this morning
25  that there was some presentation you had made

Page 151

1  regarding PFAS. So I was asking you follow-up
2  questions. You would know better than I what
3  presentation you were referring to.
4      A. I don't remember which -- I don't remember
5  the context about which presentation. But just
6  general presentations that I've made about PFAS?
7      MR. KLATT: Why don't we go off the
8  record.
9      THE VIDEOGRAPHER: Off the record,
10  1:20 p.m.
11      (Recess, 1:20 p.m. to 1:25 p.m.)
12      THE VIDEOGRAPHER: On the record,
13  1:25 p.m.
14      Please proceed.
15  BY MR. KLATT:
16      Q. Dr. Gardener, we took a short break to go
17  back and figure out when we -- this whole subject
18  of PFAS first came up in the deposition this
19  morning, and the court reporter read back to you
20  that testimony.
21          Now I'm going to ask her to read the first
22  question you were instructed not to answer, and I
23  would ask that you answer that, subject to any
24  objection.
25      MR. KLATT: Could you go ahead and read

Page 152

1  that question about PFAS.
2      (Record read)
3      MR. ESFANDIARY: Objection, beyond the
4  scope.
5      You can answer.
6      A. I am not prepared to offer opinions about
7  PFAS in relation to autism and ADHD. I haven't
8  really studied that.
9      Q. Based on -- well, let me back up.
10          What was your presentation about? Because
11  you did reference some sort of nerve developmental
12  consequences of PFAS as part of your presentation.
13  What did that entail?
14      A. Yeah. So I remember there was a slide
15  showing basically all that we know about, like,
16  how PFAS affects different sorts of health
17  outcomes. And there may have been things about
18  neurodevelopmental outcomes on there.
19          The point of the slide was to basically
20  say there's been all this, you know, research on
21  PFAS in relation to so many different health
22  outcomes. I'm including some of the ones I'm
23  looking at.
24          So in my grant I'm looking at the
25  association between PFAS and lipid profiles. And

Page 153

1   it's really well understood now that increased
2   exposure to PFAS deleteriously impacts lipid
3   profiles.
4           But what is really much less known is how
5   PFAS impacts atherosclerosis, carotid
6   atherosclerosis, which impacts the delivery of
7   blood to your brain.
8           And there have been no prospective
9   longitudinal studies, really no, like, strong epi
10  studies on PFAS in relation to dementia, in
11  relation to late-life cognitive impairment and
12  cognition in general, and talking about how that
13  is a substantial gap in the literature that my
14  grant is going to fill, is starting to fill.
15       Q. In coming to your opinions in this case
16  about lead and arsenic in autism, ADHD, what
17  methodology have you employed to rule out any
18  potential role of PFAS as a cause of ADHD or ASD
19  in infants or young children?
20       A. It's not necessary to rule out PFAS as a
21  cause of these things.
22           For example, so this whole week, other
23  than today, I'm attending the Alzheimer's
24  Association meeting.  It's the biggest Alzheimer's
25  Association meeting that happens annually.

Page 154

1           This week it's in Toronto, and there are
2   so many lecturers talking about how diet impacts
3   dementia, how exercise, how sleep, the gut
4   microbiome, there's lectures about how heavy
5   metals impact dementia risk.
6           None of that necessitates ruling out PFAS.
7   Nobody is like, whoa, we can't actually say
8   anything about exercising in relation to dementia
9   risk because Hannah Gardener's study on PFAS
10  hasn't ruled out PFAS.
11           It is very well understood that dementia
12  is multifactorial, that there's so many causes of
13  dementia, including genetics and including
14  environmental, lifestyle exposures.
15           And talking about the causality of those
16  exposures does not mean that we have ruled out the
17  impact of PFAS.
18           The exact same is true for autism.  We
19  don't need to rule out or rule in PFAS as a
20  causal -- as a cause of autism in order to say
21  that lead and arsenic exposure causes autism or
22  ADHD.
23           I think it's probably very well understood
24  that we knew that smoking causes lung cancer
25  before we really understood that radon also causes

Page 155

1   lung cancer.
2           The fact that radon causes lung cancer
3   does not mean that smoking doesn't cause lung
4   cancer or that smoking definitely causes lung
5   cancer.
6           All these sort of chronic diseases are
7   well understood to be multifactorial.
8           I don't need to write a whole expert
9   report on PFAS in relation to autism in order to
10  say with confidence that my opinion is that lead
11  and arsenic exposure are causally associated with
12  autism and ADHD.
13       Q. Being an expert, as you've indicated, on
14  environmental causes for neurologic diseases,
15  based on your scientific knowledge base and
16  opinion, do you think it's possible that PFAS may
17  be causing or contributing to ASD or autism?
18       MR. ESFANDIARY:  Objection, beyond the
19  scope of Dr. Gardener's opinion and testimony in
20  this case.
21       A. I am not prepared to opine here under
22  oath, something I take really, really seriously.
23       MR. ESFANDIARY:  Please don't interrupt
24  her.
25       Q. We'll take that for granted.  But go

Page 156

1   ahead.
2       A. I am not prepared here to provide expert
3   witness opinions about PFAS in relation to autism
4   and ADHD.
5           You want to ask me about PFAS in relation
6   to dementia?  I have done that level of research.
7       Q. Did any of the studies that you rely on
8   for your opinions about lead and arsenic being
9   potential causes of ASD or ADHD, did any of those
10  studies examine potential alternative chemicals
11  like PFAS or phthalates?
12       A. I would have to go back and look.  Many of
13  the studies did look at chemicals beyond lead and
14  arsenic.
15           For example, a lot of them included other
16  metals in their analyses.  Other studies did look
17  at other chemicals, but I don't remember sort of
18  which ones looked at which.
19           That wasn't sort of the aspect of the
20  studies that I was including in my report, so I
21  can't refer to my report in -- I might have some
22  mention of in quoting reports to sort of say which
23  studies looked at which.
24           I would say most of them didn't just look
25  at lead or didn't just look at arsenic.  Most of

Page 157

1  them did actually measure multiple compounds.
2      Q. Do you recall any looking at the potential
3  effects of PFAS as a cause of either ASD or ADHD?
4      A. Did any measure PFAS?  I can't recall.
5  It's possible that none of these ones did.
6      Q. And same question about phthalates.  Do
7  you recall any studies that you cited in your
8  report concerning lead and arsenic in ASD or ADHD,
9  did any of those studies, to your recollection,
10  evaluate the potential for phthalates to be a
11  cause of ASD or ADHD?
12      A. I don't recall.  But again, it is assumed
13  that, even from an environmental toxin standpoint,
14  that my opinions about lead and arsenic causing
15  ASD and ADHD don't require that other
16  environmental toxins also cause these, nor does
17  the fact that other environmental toxins causing
18  these rule out the fact that lead and arsenic --
19  one of the Hill criteria is, you know, do -- have
20  these metals caused related neurodevelopmental
21  outcomes or similar outcomes and do other related
22  compounds cause ASD and ADHD.
23      And there is sort of -- there is that
24  analogy.  But that's not a requirement.  It's not
25  a requirement that other similar compounds cause

Page 158

1  these outcomes for lead and arsenic to also cause
2  these.
3      And these are not the same -- phthalates
4  are not heavy metals.  PFAS are not heavy metals.
5  They're distinct compounds.
6      Q. Do you agree that to determine whether the
7  exposure to ASD in a particular child has caused
8  ASD or ADHD, you'd also need to consider other
9  factors like phthalates and PFAS?
10      A. So that's an issue of specific causation
11  that's not part of my charge.  What I look at is
12  on a population-wide level.
13      On a population-wide level we don't need
14  that.  We know that lead and arsenic can cause ASD
15  and ADHD even when there are other causes of those
16  as well.
17      In terms of the methodologies of specific
18  causation, that's not part of my charge.  And I
19  should not be opining on that methodology.
20      Q. Do you think it would be important to
21  consider other factors as alternative causes for
22  ASD or ADHD in a particular child?
23      MR. ESFANDIARY:  Objection, beyond the
24  scope.
25      A. That's not really -- that's not, like,

Page 159

1  part of my charge.  As an epidemiologist, I'm
2  trained to think about this on a population-wide
3  level.
4      Of course on a population-wide level we
5  expect that these outcomes are multifactorial.  We
6  understand that there are many environmental
7  toxins as well as genetic factors that contribute
8  to the causation of these outcomes, just like it's
9  very intuitive, I think, for people to understand
10  that stroke and dementia, which I study all the
11  time, are multifactorial.
12      Just because blood pressure is very, very
13  important in terms of stroke etiology does not
14  mean that smoking isn't, doesn't mean that alcohol
15  consumption isn't, and it doesn't mean that PFAS
16  might be as well.  We don't have that strong
17  evidence yet.
18      There's suggested links with stroke, but
19  it's not like we don't study PFAS as a potential
20  risk factor for stroke just because we know that
21  smoking and high blood pressure and diabetes cause
22  stroke.
23      Q. What methodology do you use when you're
24  looking at studies on a population level to rule
25  out things like phthalates and PFAS and brominated

Page 160

1  flame retardants, for example, as potential causes
2  of autism or ADHD?
3      A. On a population-wide level, if I were to
4  rule it out, I would look at the evidence.
5      Q. And have you done that in this case?
6      A. Sorry.  Have I done what?
7      Q. Looked at the evidence on the potential
8  causation of autism -- excuse me.  Start over.
9      Have you looked in this case at the
10  potential causation of PFAS, phthalates, or
11  brominated flame retardants, for example, to rule
12  them out as causes of autism or ASD on a
13  population level?
14      A. As part of this case, no.  So my role in
15  this case is to consider the evidence for
16  causation for lead and arsenic.  That is
17  irrelevant, whether brominated flame retardants or
18  PFAS or phthalates, organotins are ruled in or
19  ruled out.  It is irrelevant to lead and arsenic.
20      So if we ruled -- if someone ruled those
21  in, that doesn't mean that my evidence about lead
22  and arsenic is not also present.
23      So for example, if we're trying to think
24  about does smoking cause lung cancer or not, you
25  can make that causal determinant without ruling in

1  or ruling out radon.  You want to consider it.
2  You want to think about it, especially if the two
3  things were perfectly correlated, which we know
4  that they're not.
5      The fact that radon causes lung cancer
6  does not actually mean that smoking does or does
7  not cause lung cancer.  We have to look at the
8  literature on smoking.
9      So my charge here had nothing to do, was
10  not particular to those other chemicals.  And it's
11  not -- they're not so closely related where, you
12  know, oh, if the literature said to me, you know
13  what, we can't say that PFAS causes autism.  That
14  would not make me be like, oh, you know, lead and
15  arsenic can't cause autism.
16      Q. Using your example of lung cancer, I think
17  you've pointed out not all causes -- not all lung
18  cancers are caused by smoking.  Correct?
19      A. There are plenty of people who get lung
20  cancer who never smoked.  I mean, according to the
21  data.
22      So for those people, they did not smoke,
23  so smoking could not have caused their lung
24  cancer.
25      I mean, secondhand smoke for those people,

1  sure.  They could have.  But smoking is not a
2  necessary cause of lung cancer.  You can get lung
3  cancer and never have smoked a cigarette in your
4  entire life.
5      Q. Nor is lead or arsenic a necessary cause
6  of autism or ADHD.  Correct?
7      A. That's a hypothetical.  There are many
8  people who have never once smoked a cigarette.  I
9  haven't seen a large scale study of, you know --
10  of autism and ADHD in which, you know, everyone
11  has a blood lead level of zero, you know.
12      So that's a question that's left to be
13  determined.  That wasn't actually part of my
14  charge.
15      As I spoke -- as I wrote about in my
16  report, it may -- when we're talking about
17  specific causation -- my report saying that lead
18  and arsenic can cause autism on a population-wide
19  basis does not mean -- does not indicate how
20  etiologically relevant it is for each and every
21  child.
22      That's an issue of specific causation, and
23  that's not part of my charge.  And that would
24  require, you know, considering all sorts of
25  history, life history and exposures for those

1  individual children.
2      Q. And exposures like phthalates, PFAS, and
3  brominated flame retardants.  Correct?
4      MR. ESFANDIARY:  Objection, beyond the
5  scope.
6      A. I can't say that.  I'm not here saying
7  those are all risk factors for autism and ADHD.
8      That's not part of my charge here, just
9  like what I can say confidently on a
10  population-wide basis, we can say that lead and
11  arsenic cause autism and ADHD, in the absence of a
12  convincing body of literature on so many different
13  compounds, just like we epidemiologists came to
14  say smoking causes lung cancer, even in the
15  absence of -- back in those days, we didn't know
16  anything about PFAS.  PFAS was just starting to be
17  used.
18      That doesn't mean that we're now not able
19  to say that PFAS causes -- that smoking causes --
20  we're not reconsidering whether smoking causes
21  lung cancer because of lack of data on PFAS.
22      Q. Is it your belief that all causes of
23  autism and ASD are the result of lead or arsenic
24  exposure?
25      A. That question makes no sense.  Sorry.

1      Do you want to rephrase it?
2      Q. Is there a group in the population that
3  has ASD and ADHD for which lead or arsenic was not
4  a cause?
5      MR. ESFANDIARY:  Objection, calls for
6  speculation.
7      A. I would say that's an issue of specific
8  causation.  I mean, I'm here to talk about on a
9  population-wide level.
10      Q. That's not what I'm asking --
11      MR. ESFANDIARY:  Don't interrupt her.
12      Q. That's what I'm asking you.  I'm asking
13  you on a population level whether you think there
14  is a group of children whose ASD and/or ADHD has
15  nothing to do with exposure to lead or arsenic.
16      MR. ESFANDIARY:  Calls for speculation.
17      A. I'm here to say that lead and arsenic are
18  causally associated with autism and ADHD.
19      How relevant they are for each individual
20  person, that's an issue of specific causation.  In
21  the epidemiology world, we think about a time
22  machine, like, could we go back and create that
23  hypothetical child and have, you know, there be no
24  lead and arsenic in this world and would that
25  child still get autism.

Page 165

1    That's more of a theoretical concern for
2  epidemiologists that was not part of my charge.
3    My charge was to look at on a
4  population-wide basis, are lead and arsenic
5  causally associated with ASD and ADHD. And, you
6  know, I can read you my opinion, but they are,
7  yes.
8    Q. As part of your methodology in arriving at
9  your conclusions in this case, did you consider
10  that there are population-level segments whose ASD
11  and ADHD was not caused by exposure to lead or
12  arsenic?
13    A. So the fact that lead and arsenic cause
14  ASD and ADHD does not mean that they have to be
15  etiologically relevant for everyone. Just like
16  smoking causes lung cancer, but that doesn't mean
17  that it's etiologically relevant for everyone.
18    We know that high blood pressure is so
19  etiologically relevant for stroke on a
20  population-wide level, but that doesn't mean that
21  you can't have a stroke with very low blood
22  pressure.
23    Sadly, it would be great, you know, if
24  just because a really strong exposure for an
25  outcome like hypertension and stroke meant that

Page 166

1  you couldn't get stroke without it, that would
2  make -- that would make so many people like me who
3  don't have high blood pressure rest easy at night.
4  Then I could say, oh, guess what? I don't have
5  the ability to get stroke.
6    Sadly, it does not work that way.
7    MR. KLATT: Object to nonresponsiveness of
8  the answer.
9    A. Do you want to ask the question in another
10  way?
11    Q. Do you believe that lead and/or arsenic
12  exposure is a necessary cause of ASD and ADHD?
13    A. I believe that lead and arsenic exposure
14  on a population-wide level causes ASD and ADHD.
15    That does not mean that you can -- that
16  you need to be exposed to those to get autism and
17  ADHD. Just like what I was saying, you don't need
18  to have high blood pressure in order to get a
19  stroke. You don't need to smoke in order to get
20  lung cancer.
21    We know that smoking is so important for
22  lung cancer, but that does not mean that it's --
23  that it's necessary, that you can't get lung
24  cancer without smoking.
25    It would be so great if that were true. I

Page 167

1  mean, it would be so great if we could wipe out,
2  you know, lead and arsenic from baby food.
3    We see that levels have decreased over
4  time because companies are getting more
5  responsible, but that doesn't mean that, you know,
6  if we completely wiped out lead and arsenic from
7  baby food that nobody is going to have arsenic --
8  nobody is going to have ASD and ADHD.
9    I don't think that that would be true.
10  But they are so causally relevant that lead and
11  arsenic are causally associated with ASD and ADHD.
12    Q. Let me follow up on that. If it were
13  feasible to make all baby foods commercially
14  produced or homemade baby foods completely lead
15  free, arsenic free, do you think that children,
16  infants, children, babies in utero, would still be
17  exposed to lead and arsenic from other sources in
18  the environment other than food?
19    MR. ESFANDIARY: Objection, incomplete
20  hypothetical, calls for speculation.
21    A. That's a hypothetical. I mean, it would
22  be great. You know, I hope one day -- I know that
23  the lead and arsenic levels are going down because
24  we know it's feasible. We know that companies
25  could have been reducing their levels of lead and

Page 168

1  arsenic in baby food all along. It should not
2  have waited until recently to go down.
3    But there's a long way to go. Baby food
4  is still contaminated with lead and arsenic. So
5  what you're describing is a hypothetical future
6  situation in which there needs to be lead and
7  arsenic removed from other things too.
8    Would that happen simultaneously? Who
9  knows.
10    Q. Is it your testimony that the only source
11  of lead and arsenic exposure to infants and young
12  children is from baby food and no other source?
13  Is that what you're testifying to today?
14    A. I'll read you from my report because I
15  talk in my report about where lead can be found
16  and where arsenic can be found.
17    Q. My question is other than baby food.
18    A. Yes. I understand your question.
19    So on page 33 of -- these have got
20  different labels. Now this says Gardener 2.
21    Q. That's the correct exhibit number.
22    A. Yeah. It just didn't have my name before.
23  Now it has my name on there.
24    Now in Exhibit Gardener 2, on page 39 of
25  my report.

1  Q. Hang on just a second. Let me get there.
2      Okay. Go ahead, Dr. Gardener.
3      A. On the bottom of page 33, lead is a heavy
4  metal found in many sources including paint,
5  pipes, ceramics, bullets, crystal, soldiers --
6  solders --
7      Q. Solders?
8      A. Yes, solders.
9      -- gasoline, antiques, and cosmetics and
10  contaminates soil, dust, water and food.
11     Q. So if we excluded arsenic and lead from
12  food, we'd still be all exposed, including infants
13  and children, to arsenic in soil, dust, and water.
14  Correct?
15     A. So what you're talking about is a
16  hypothetical future. We don't know. Maybe at
17  that time of that hypothetical future the other
18  sources would have been eliminated too. I hope we
19  get to see that time when the baby food
20  manufacturers, you guys are reducing the exposure.
21     The exposure has also been reduced in
22  other areas too; for example, paint and toys. The
23  exposure to lead from those sources are also
24  decreasing.
25     You're presenting a hypothetical future.

1  Q. I'm not presenting -- go ahead. I'm not
2  presenting anything hypothetical. I'm looking at
3  what you just read.
4      You said, "Lead is a heavy metal found in
5  many sources and it contaminates soil, dust, and
6  water."
7      That's apart from food. Correct?
8      A. Yes, but it's also -- and part of the
9  contamination of food is because of contamination
10  from soil and water.
11     Q. But --
12     A. So, you know, it will be much harder to
13  eliminate it from food without eliminating it from
14  soil and dust. So you're talking about a
15  hypothetical future where we have figured out how
16  to totally eliminate it from food despite its
17  continued presence in soil and water. That's a
18  hypothetical.
19     Q. Well, let's ask about a real-world
20  example.
21     Can children, including infants, come into
22  direct contact with lead and arsenic from contact
23  with soil?
24     A. Children can and do come into contact with
25  lead from soil. And that's part of the reason why

1  they also come in contact with it from food,
2  because food is grown in soil.
3      MR. KLATT: Object to --
4      Q. Go ahead.
5      A. It is possible that you have a
6  hypothetical child that doesn't eat. That doesn't
7  mean that that child is not going to be exposed to
8  heavy metals in soil.
9      Q. Okay. Listen to my question carefully,
10  Dr. Gardener. I'm simply asking about soil, not
11  about food.
12     Can a child, an infant crawling around, be
13  exposed to lead and arsenic from direct contact
14  with soil?
15     MR. ESFANDIARY: Objection, calls for
16  speculation, overbroad.
17     A. It depends on the child. But some
18  children are exposed to lead from soil.
19     Q. Are some children exposed to lead from
20  water?
21     A. Some children are exposed to lead from
22  water.
23     Q. Are some children exposed to arsenic from
24  water?
25     A. Some children are exposed to arsenic from

1  water. And again, both -- water is a contributor
2  to food, so that's part of the reason why food is
3  contaminated.
4      Q. For example, if water is used to make
5  infant formula, a child may be exposed to lead or
6  arsenic in the water used to make infant formula.
7  Correct?
8      A. Yes. So some of the infant formula,
9  those -- the jugs of infant formula, the source of
10  that lead or arsenic may be from the water or from
11  the ingredients outside the water, the formula
12  ingredients itself.
13     And same with food. They could be -- it
14  could be from different parts of the food, the
15  ingredients, including water.
16     Q. All right. But my question is confined to
17  simply water exposure. Can children be exposed to
18  lead and arsenic simply from coming into contact
19  with or ingesting water?
20     A. Some children are exposed to lead and
21  arsenic from water. Lead and arsenic are both
22  contaminants in some water sources, so children
23  can be exposed to lead and arsenic from water.
24     Q. Now let's look at the other example that
25  you read from your report, dust.

1          Can infants and children in the U.S. be
2     exposed to lead and arsenic through coming into
3     contact with dust, whether inside or outside the
4     home?
5          A. Some children are exposed to lead and
6     arsenic inside and outside the home from dust.
7          Q. I want to talk to you for a minute about
8     something that I brought to your counsel's
9     attention right before the lunch break, and that
10    was your testimony in front of the Rhode Island
11    Senate --
12         MR. ESFANDIARY:  Do you have an extra
13    copy?
14         MR. KLATT:  I do.  In fact, the court
15    reporter courteously marked that as Exhibit 8.
16         (Exhibit 8 marked for identification)
17         Q. First of all, let's establish,
18    Dr. Gardener, you recall testifying in front of
19    the Rhode Island State Senate in March of 2017
20    about brominated flame retardants?
21         A. I do.
22         Q. What brought that testimony about?
23         A. So I was hired by an organization to
24    deliver this testimony.  They -- I don't know what
25    the right words were.  I don't know if they were

1     in support of the bill or they were a driving
2     force.  I don't really -- I don't know really how
3     that all works.  Its senate representatives, I
4     guess, are the ones that bring the bill forth.
5          The organization Clean Water Rhode
6     Island -- I can't remember -- it was like Clean
7     Water Rhode Island or something.  They found me
8     and they told me about this bill that they -- that
9     was going before the senate and the house in Rhode
10    Island about restrictions for -- that all
11    brominated -- yeah, all brominated flame
12    retardants.  And they asked me to testify.
13         Q. And were you put under oath?  Do you
14    recall?
15         A. Probably.
16         Q. If you don't remember -- if you don't
17    remember --
18         A. I think in those situations -- actually, I
19    don't actually recall whether you get put under
20    oath or not for that.
21         Q. And you're aware that your statement is on
22    YouTube now?
23         A. The video.  There's a video of me.
24         Q. Yes.
25         A. That wonderful video of me.  I had the

1     flu, so . . .
2          Q. Have you reviewed it recently?
3          A. I have watched bits of it and cringe
4     because I was so sick and I look quite ill, I
5     think.
6          Q. Well, it wasn't apparent to me watching
7     it.
8          I've transcribed it here.  We can call it
9     up and go through it.  It's about seven minutes.
10         I'll represent to you that this is an
11    accurate transcription.  And you're free to
12    disagree with anything here if you have a basis
13    now in 2025 to disagree.
14         But I direct your attention to the third
15    paragraph.  And you said back in 2017, "A 2011
16    study of baby products found that 80 percent of
17    products tested contained a halogenated flame
18    retardant additive."
19         Do you recall that?
20         A. Do I recall saying that sentence?
21         Q. Yeah.
22         A. No.  That was eight years ago, so I don't
23    recall.  I'm not disputing that I didn't say that.
24    It's just a sentence I said eight years ago.  I
25    don't remember if I said that sentence or not.

1          Q. Do you recall the 2011 study of baby
2     products that found 80 percent of them contained a
3     halogenated flame retardant additive?
4          A. I do not recall that study.
5          Q. And then you went on to say, "Flame
6     retardants are not physically bound to the
7     products in which they are applied.  They migrate
8     out of the home products and into the air in homes
9     and accumulate in house dust."
10         Is that an accurate statement, to your
11    knowledge, as we sit here today?
12         MR. ESFANDIARY:  Objection, beyond the
13    scope.
14         A. That sentence makes a lot of sense to me.
15    I'm not here sort of prepared -- I did not think I
16    would be providing any opinions today about flame
17    retardants.
18         Q. I'm just asking about opinions that you
19    expressed to the Rhode Island State Senate in
20    2017.  You don't have any reason to dispute that,
21    do you?
22         A. I don't have reason to dispute this.  No.
23         Q. And then you go on to say, "People are
24    exposed through inhalation, by ingesting with
25    ingestion when dust gets on our hands and

Page 177

1  therefore into our mouths and through the skin."
2  Correct?
3      A. That's what this says. It sounds very
4  inarticulate. But if that's how I said that,
5  that's how I said that.
6      Q. Is it true that lead and arsenic can get
7  into the human body, whether in a child or an
8  adult, through inhalation and by dust getting on
9  their hands and into their mouths and through the
10  skin?
11      MR. ESFANDIARY: Objection, beyond the
12  scope.
13      MR. KLATT: I'm asking about lead and
14  arsenic.
15      MR. ESFANDIARY: I'm sorry. Go ahead.
16      A. Inhalation, definitely. Dermal exposure
17  at least for lead is more challenging. Inhalation
18  is definitely an important exposure source. And I
19  would say that's true for arsenic too. The data
20  on dermal exposure with lead I would say is a
21  little bit --
22      MR. ESFANDIARY: Hey, Mike, we don't have
23  to leave the room. I just need to use the
24  restroom quickly.
25      MR. KLATT: Do you want to go off the

Page 178

1  record and take a break?
2      MR. ESFANDIARY: Just two minutes. I
3  don't want to eat up time here.
4      THE VIDEOGRAPHER: That concludes the
5  Media Number 3 [sic]. Going off the record at
6  2:01 p.m.
7      (Recess, 2:01 p.m. to 2:04 p.m.)
8      THE VIDEOGRAPHER: This is the beginning
9  of Media Number 5. Going back on the record,
10  2:04 p.m.
11  BY MR. KLATT:
12      Q. Dr. Gardener, I'm picking up again after
13  our short break with Exhibit 8, which is the
14  transcription of your Rhode Island Senate
15  testimony in March of 2017.
16      And I'm going to the next sentence, which
17  says, "Babies and children are more highly exposed
18  as they spend more time crawling and playing on
19  the floors and have increased hand-to-mouth
20  contact." Correct?
21      A. Correct.
22      Q. And do you believe that to be true?
23      A. Well, so I was talking about more exposed
24  to halogenated flame retardant that migrates out
25  of the products. And, I mean -- yeah. I'm not

Page 179

1  disputing that.
2      Q. Do you agree that babies and children are
3  more highly exposed to both lead and arsenic as
4  they spend more time crawling and playing on
5  floors and have increased hand-to-mouth contact?
6      A. That's definitely true. I mean, first of
7  all, they're more exposed than adults in general,
8  especially to lead.
9      In this context, we tend to think about
10  lead more in this context than arsenic. But to
11  the extent that arsenic would be in house dust --
12  basically, babies and children tend to be more
13  exposed to house dust than adults because they're
14  crawling around, they're playing more on the
15  floor, and they have all this hand-to-mouth
16  contact.
17      Q. Are you aware of the EPA, federal
18  government's EPA, stating that house dust is the
19  most frequent source of lead exposure to infants
20  and young children?
21      A. Can you show me where that is?
22      Q. Sure. Well, I will come to that. Let's
23  finish up with Exhibit 8, and I'll come to that in
24  a minute.
25      And then going back to Exhibit 8 and

Page 180

1  referring to your testimony about flame
2  retardants, you say, "In addition, they" --
3  meaning, I assume, babies and children -- "are
4  also exposed through their breast milk."
5      And you're talking about flame retardants
6  there. Correct?
7      A. Correct.
8      Q. Is it also true that babies are exposed to
9  lead and arsenic through breast milk, nursing?
10      MR. ESFANDIARY: Objection, overbroad,
11  calls for speculation.
12      A. I would need to look -- I haven't looked
13  at data at all recently about the amount of lead
14  and arsenic in breast milk. But in general, those
15  can be exposure sources depending on the
16  mother's . . .
17      Q. As part of formulating your opinions in
18  this case, did your methodology include ruling out
19  the role that lead or arsenic exposure in breast
20  milk may play in what you believe to be children
21  developing ASD or ADHD as a consequence of lead or
22  arsenic exposure?
23      A. I ruled it in. My opinion is that lead
24  and arsenic exposure do -- are causally associated
25  with ASD and ADHD. I didn't rule that out. I

Page 181

1  ruled that in irrespective of their exposure
2  source.
3       Q. Okay. And one exposure source would be
4  breast milk. Correct?
5       A. It can be for some children. And plenty
6  of children don't breast-feed, so it really
7  depends -- it's a hypothetical.
8       It depends on the amount of lead and
9  arsenic contamination in the breast milk, whether
10 the baby breast-feeds, how long, how much. But
11 yeah, absolutely. My opinion in this case is that
12 lead and arsenic are causally associated with
13 autism and ADHD.
14      Q. And we earlier talked about how those
15 exposures to lead and arsenic can even occur to
16 children in the nine months that they're in the
17 womb before birth. Correct?
18      MR. ESFANDIARY: Objection, overbroad,
19 calls for speculation.
20      A. So we're switching away from breast -- so
21 they're not breast-feeding in the womb --
22      Q. Absolutely.
23      A. -- but they're still exposed to -- and
24 breast milk is made from the mother's blood and
25 they are exposed to the mother's blood.

Page 182

1       I should say the blood of anyone who's
2  breast-feeding them. It does not necessarily need
3  to be their mother.
4       So yes, when they are exposed to blood
5  from their mother in the womb, that can be
6  contaminated with lead and arsenic.
7       Q. So babies in the United States or anywhere
8  in the world, for that matter, can be exposed to
9  lead and arsenic through the mother's blood for
10 the nine months of gestation and then for the
11 first three or four months of either infant
12 formula or breast-feeding before they ever
13 encounter baby food, solid baby food, whether
14 commercially prepared or homemade. Correct?
15      MR. ESFANDIARY: Objection, overbroad.
16      A. So I testified and studied the
17 contamination of infant formula with heavy metals.
18 And I think that that's absolutely health
19 relevant.
20      It's not that lead and arsenic from
21 certain exposures are not important, not
22 etiologically relevant and they are etiologically
23 relevant from other exposures. It does not
24 matter. What matters is that they are exposed to
25 lead and arsenic.

Page 183

1       Just like I study PFAS. And there's all
2  this accumulating evidence about all the
3  deleterious health effects of PFAS. Nobody, not
4  once in all of my talks, all the talks I've seen,
5  all of the talks I've given, all the conversations
6  I've had, the PFAS from the couches don't matter.
7  The PFAS from this chair, it doesn't matter. The
8  PFAS from this water doesn't matter.
9       It's PFAS. It all matters. Nobody cares
10 from an etiological perspective where the PFAS is
11 coming from. That's not relevant.
12      What's relevant is the exposure. How
13 much, what are the different types of PFAS
14 compounds, because there are thousands of them.
15 The exposure source, just like for lead and
16 arsenic, does not matter. It is that you are
17 being exposed, how much, when.
18      Q. So let me go back to my question.
19      For the nine months that a baby's in
20 gestation before birth and then for the four to
21 six months that the infant is alive and feeding
22 either through breast milk or infant formula
23 before it ever encounters commercial or homemade
24 baby food, for that 13- to 15-month period from
25 conception until it starts eating, he or she

Page 184

1  starts eating commercial or homemade baby food,
2  that child is being exposed to lead and arsenic?
3       A. First of all, some babies start eating
4  before four months, and a lot of babies wait until
5  long after four months to start eating baby food.
6  So I want to clarify that.
7       But as I talked about in my -- written
8  about in my report and talked about today, there
9  are many sources of exposure for lead and arsenic.
10      And my opinions are really centered around
11 postnatal exposure to lead and arsenic. But I
12 also brought in some discussion, although not as
13 rigorous as a whole report, on the impacts of
14 prenatal exposure to lead and arsenic, but I did
15 also bring that up.
16      But it is clear that there are multiple
17 exposure sources, Number 1. And Number 2, the
18 exposure source doesn't matter.
19      What matters is that the baby is being
20 exposed. And whether it's because they were
21 chewing the paint from the windowsill or if the
22 paint from the windowsill chipped off and was in
23 the dust and it got into their mouths from the
24 dust or from their food, it does not matter.
25      What matters is their exposure. Nobody

Page 185

1  outside of -- really cares about what the exposure
2  source is but rather how much is being exposed.
3      From an etiological perspective, where it
4  really matters what the exposure source is, the
5  exposure source matters in that it helps us figure
6  out where do we devote our energy to reduce and
7  eliminate the exposure.
8      So it's not that it matters from the
9  health consequences but rather from the solution.
10     Q. I think maybe you misunderstood my
11  question or got sidetracked. I have a very
12  specific question. I understand that you think
13  the source of lead or arsenic exposure doesn't
14  matter. I'd like to shift to the time frame of
15  lead and arsenic exposure.
16     It is a true fact that babies in the
17  United States and around the world are exposed to
18  lead and arsenic for nine months during gestation
19  before they're even born and then for the two to
20  four to six months, however long before they ever
21  start eating either commercial or homemade baby
22  food. Correct?
23     MR. ESFANDIARY: Objection, overbroad,
24  calls for speculation.
25     A. So as I talked about in this report, baby

Page 186

1  food is not the only exposure source to lead and
2  arsenic. Typically babies are exposed -- people
3  are exposed throughout their entire lives,
4  starting at conception. In general, there is
5  exposure.
6      That does not mean -- just because you're
7  exposed prenatally does not mean that your
8  postnatal exposure to lead and arsenic is not
9  etiologically relevant, just like just because
10  you're exposed postnatally does not mean your
11  prenatal exposure is irrelevant.
12     I've been in litigation about infant
13  formula. And they make this huge, big deal, oh,
14  the exposure to the infant formula doesn't matter.
15     Our baby food is filled with lead and
16  arsenic. It's all -- the babies are not just --
17  they're not just consuming infant formula.
18  They're also eating all this heavily contaminated
19  baby food as if -- that doesn't mean that the
20  contamination in infant formula is irrelevant.
21     And I'll say that again in this situation.
22  Just because your breast milk and infant formula
23  and in utero exposures are present does not mean
24  that the exposure to baby food or in general to
25  children and babies is not etiologically relevant.

Page 187

1      MR. KLATT: Object to the responsiveness
2  of the answer, everything after "there are many
3  sources of exposure for lead and arsenic."
4      Q. Let's focus, if you would, Dr. Gardener --
5  I'm focused on the time period. I understand your
6  opinion is there are a lot of different sources of
7  lead and arsenic exposure. I understand you
8  believe they can occur postnatally. I'm focused
9  on the time period.
10     You agree with me that babies in the
11  United States and elsewhere are exposed to lead
12  and arsenic for the nine months of gestation
13  before birth and for the three, four, five, six
14  months before they ever encounter commercial baby
15  food. Correct?
16     MR. ESFANDIARY: Objection, overbroad,
17  calls for speculation.
18     Q. Focusing just on the time period.
19     A. Sorry. Can you repeat the question?
20     (Pending question read)
21     A. Yes. So there's definitely, you know --
22  for most children -- I can't say for every single
23  child out there. But in general, babies are
24  exposed to lead and arsenic prenatally.
25     I talked about that in my report, studies

Page 188

1  on prenatal exposure to lead and arsenic in
2  relation to ASD and ADHD as well as during
3  infancy.
4      I've been involved in litigation about
5  heavy metal contamination in infant formula. And
6  it's not just infant formula. Babies and children
7  are exposed to heavy metals from other sources
8  during infancy as well.
9      Q. And did you make any effort in the
10  methodology you used to come to your opinions in
11  this case to rule out these other sources of
12  exposure to lead and arsenic that babies and
13  infants have before they ever encounter commercial
14  baby food?
15     A. So I talked about that in my report. I
16  talked about studies on prenatal exposure to lead
17  and arsenic. I considered that. I talked about
18  that. I talked about the fact that that -- that
19  it might -- the data from there might be slightly
20  outside of the etiologically relevant window that
21  we're talking about in this case. But it can help
22  inform our opinions about temporality.
23     Q. We've already established today that the
24  gestation period an infant undergoes for nine
25  months is a critical time in terms of

Page 189

1  neurodevelopment. Correct?
2      A. There are neurodevelopmental processes
3  that occur in utero as well as for years and years
4  after birth.
5      You know, there's neurogenesis going on
6  right now. The stress that I'm feeling today is
7  actually impacting my brain architecture and yours
8  probably too. Maybe you're not as stressed out
9  from this; this is part of your job. But all of
10  these exposures actually impact our brain
11  architecture and the metabolites in our brain and
12  how our brains work.
13      But the in utero period and during infancy
14  and childhood is a period of rapid growth and
15  development. And therefore, it can have a bigger
16  role in terms of shaping brain and behavior.
17      Q. Just to wrap up this question on time
18  period. So it's true that it's typical for babies
19  in the U.S. to be exposed to arsenic and lead for
20  a full year, the nine months of gestation plus
21  approximately three months postnatally, to lead
22  and arsenic before they ever encounter baby food.
23  Correct?
24      A. Lead and arsenic are exposures that are
25  really lifelong. It's starting with gestation.

Page 190

1  What's typical is that babies are exposed in utero
2  to lead and arsenic and other heavy metals and
3  throughout all of life.
4      Q. Let's go back and finish up with
5  Exhibit 8, the testimony about the flame
6  retardants.
7      A. Okay.
8      Q. And I'm going back to that same third
9  paragraph on the first page.
10      You say, "Brominated flame retardants are
11  most notorious for their associations with
12  impaired development and neurotoxicity." Correct?
13      A. Yup. That's what I see here.
14      Q. And is that a true fact?
15      A. It's been eight years that the -- that
16  sentence might not be as true anymore. They could
17  be more notorious at this point -- in the past
18  eight years, the research on cardiac toxicity
19  could have ballooned.
20      And maybe I would have written the
21  sentence that way. It sounds like in 2017, it
22  sounds like the most amount of research was, on
23  brominated flame retardants was in relation to
24  impaired development and neurotoxicity.
25      Q. And are you aware of any research on

Page 191

1  brominated flame retardants and neurotoxicity
2  since 2017 that would change the statement you
3  made to the Rhode Island Senate back then?
4      A. Like whether since then we have found that
5  they're actually not associated with impaired
6  development and neurotoxicity?
7      Q. Correct.
8      A. I have not seen anything to refute that
9  sentence since then, but it could be. I have not
10  followed that literature as intently as I did when
11  I was asked to do all the necessary research for
12  this.
13      Q. And the last sentence there, "Children who
14  are more exposed in the womb and in infancy are
15  more likely to be born preterm, with low birth
16  weight, with suboptimal neonatal health, lower IQ,
17  and exhibit impairments in cognition, motor
18  skills, and behavior, including attention,
19  impulsivity and anxiety."
20      Did I read that correctly?
21      A. Yes.
22      Q. And is that true?
23      A. Because it's a transcript, it sounds like
24  it just came out of nowhere without references.
25      But I think I did provide for this a

Page 192

1  reference list. I think I had a written copy with
2  references.
3      But you know, I haven't followed this
4  literature as intently to see how that literature
5  has maybe strengthened since 2017 or more things
6  to add.
7      Q. Brominated flame retardants, the PFAS we
8  talked about earlier, the phthalates, the
9  endocrine disrupters that we talked about earlier,
10  all those things are ubiquitous. They're all
11  around us every day. Correct?
12      A. Those are all endocrine disrupting
13  chemicals. And they're all decreasing, like,
14  substantially.
15      So the amount of regulations in terms of
16  brominated flame retardants since 2017 is just --
17  I mean, this was written at a time when, like, all
18  couches had brominated flame retardants.
19      It was like, you know, 2025 was my dream
20  at this time where it's pretty much impossible to
21  find a couch with brominated flame -- I don't even
22  know if anyone makes couches with brominated flame
23  retardants.
24      I was talking about brominated flame
25  retardants and baby products. People aren't

Page 193

1  adding brominated flame retardants to baby
2  products anymore. Not at all.
3       The amounts of exposure, at least in new
4  products, since 2017 has just plummeted. The
5  exposures to certain PFAS have plummeted based on
6  regulations.
7       Some PFAS are not as regulated. Their
8  exposures have stayed steady. Some have actually
9  increased. But like the two that had regulation,
10  PFOA, PFOS, they've plummeted but they still
11  remain prevalent because a lot of people have
12  older items in their home.
13       So it's not like the exposure is nothing,
14  that just because these things are regulated it's
15  nothing.
16       Just like heavy metals in baby food. Now
17  there's regulation, so the exposures are going to
18  decrease a lot.
19       That's the beauty of regulations is that
20  it protects us. Maybe not enough, but it does
21  protect us.
22       But still, I mean, there's no definition
23  of what the term "ubiquitous" is. But are
24  children still exposed to brominated flame
25  retardants? To varying degrees. Some kids, you

Page 194

1  know, their homes, their mattresses, their
2  furniture, their electronics were all old and so
3  there's a lot of dust from brominated flame
4  retardants in their homes. So it's all of varying
5  degree, just like with lead and arsenic.
6       Children are exposed, babies are exposed
7  to varying amounts of lead and arsenic.
8       Q. Are you aware that people have raised the
9  issue whether exposure to brominated flame
10  retardants in the home are a cause of autism or
11  ADHD?
12       A. So I am not prepared to opine here about
13  that research like I can about lead and cadmium.
14       Trusting that your transcript was correct,
15  it does suggest that as of March 7th, 2017, there
16  was data to suggest that brominated flame
17  retardants was associated with many aspects of
18  neonatal health, including cognition, motor
19  skills, behavior, including attention,
20  impulsivity, and anxiety.
21       So those are all -- these are all topics
22  that I talk about in my report.
23       But the fact of the matter is, whether --
24  the degree to which brominated flame retardants
25  play a causal role in autism and ADHD do not

Page 195

1  detract from nor do they confirm my conclusions
2  that lead and arsenic are causally associated with
3  autism and ADHD.
4       If I did a thorough report on brominated
5  flame retardants in relation to autism and ADHD
6  and I found that, you know what, if a lawyer
7  called me today and said, you know, I want to
8  do -- I want to have a lawsuit about brominated
9  flame retardants in relation to autism and ADHD,
10  and I might find there's some evidence, but
11  there's not enough for me to say that, you know,
12  confidently under oath my conclusion from a
13  scientific perspective is that brominated flame
14  retardants are causally associated with autism and
15  ADHD.
16       And no lawyer has ever called me and asked
17  me that. But if they did, I would go through a
18  rigorous process. But that would not mean that
19  this report on lead and arsenic would either be
20  more valid or less valid because brominated flame
21  retardants can be causally associated with ASD and
22  ADHD even while lead and arsenic are too.
23       Or we could find that they're not causally
24  associated. That doesn't mean that lead and
25  arsenic can't be. They're distinct compounds.

Page 196

1       MR. KLATT: Object to the responsiveness
2  of the answer. After everything "I'm not prepared
3  to opine here about that research," I move to
4  strike it.
5       Q. Do you remember what my question was?
6       A. Do you want to read it again?
7       Q. Sure. Are you aware that people have
8  raised the issue whether exposure to brominated
9  flame retardants in the home are a cause of autism
10  or ADHD?
11       A. So I haven't reviewed that literature very
12  carefully. This sentence implies that there is --
13  that there is sort of speculation about that.
14       I mean, we're talking about attention,
15  impulsivity. Those are hallmarks of ADHD.
16       Q. Okay.
17       A. But at the same time, the fact that I
18  didn't include autism and ADHD here suggests that
19  maybe that research wasn't there in 2017.
20       Q. Do you think -- as a scientist involved in
21  issues of environmental causes of neurologic
22  diseases, do you think it's worthwhile for the
23  potential of brominated flame retardants to cause
24  autism or ADHD is worth scientific study?
25       A. I mean, I think -- so I think what your

Page 197

1    question is -- as someone who reviews NIH grants,
2    you know, if I saw an NIH grant where someone was
3    looking at this association, whether I would think
4    that it was of high merit would partly depend on
5    the scientific rigor of it.
6        I mean, I think we need to better
7    understand -- I still think we need to better
8    understand the health effects of all types of
9    brominated flame retardants even though their
10   exposure sources are decreasing.
11       Some people might say we're regulating it
12   so much and it's decreasing, it's less relevant.
13   We already know that -- we know that they're
14   harmful.
15       Just because we know that compounds are
16   harmful does not mean that we don't want to still
17   understand all of their causes. We know that lead
18   and arsenic are so, so, so toxic.
19       But that doesn't mean that, oh, once we've
20   decided that then we don't keep continuing to
21   research that. Just because we know that PFAS are
22   so harmful doesn't mean that we don't want to
23   better understand whether they also cause
24   dementia. Just because we know they cause certain
25   cancers and have immune consequences doesn't mean

Page 198

1    we don't also need to understand whether they
2    cause dementia or not.
3        Q. Do you remember my question?
4        A. Yeah.
5        Q. Do you remember I asked you if it's
6    worthwhile for the potential cause of --
7    brominated flame retardants with relationship to
8    ADHD or ASD is worth studying?
9        A. Yeah. That was my answer to that
10   question.
11       Q. I didn't ask you anything about lead or
12   arsenic or even PFAS. I was specifically focusing
13   on brominated flame retardants.
14       You would agree with me it's worth
15   scientific study to see whether those ubiquitous
16   chemicals can potentially cause or contribute to
17   autism and ADHD. Correct?
18       A. I guess I wasn't -- I didn't come prepared
19   to opine on what people should or should not
20   research, what different funding agencies should
21   or should not fund.
22       I don't have personal plans to study this.
23   But if someone came to me and said, you know, I'm
24   going to conduct a big study on brominated flame
25   retardants and ASD, I won't be like, Don't do

Page 199

1    that, we don't need that.
2        But at the same time, I haven't kept up
3    with that research to say where are the gaps?
4    Where are the gaps? Where should you focus? What
5    should you do?
6        Q. And if somebody came to you with a
7    scientifically appropriate grant proposal to study
8    the effects of PFAS as a potential cause of autism
9    and ADHD or ASD and ADHD, you'd think that's
10   worthy of study as well. Correct?
11       A. It would depend on the study. I'd have to
12   look at it. I'd have to -- I'm not about to --
13   I'm not inclined to shoot down anyone's idea of
14   what to study.
15       And when I review grants for NIH, which
16   they ask me to do, it's not my role to say what
17   doesn't deserve to be studied. I have no plans to
18   study that, if that's what you're asking me about.
19       Q. No.
20       A. Nobody has asked me to study that. And I
21   would need to review that literature really
22   carefully in order to identify what are the gaps,
23   what gaps do we need to fill, like I did in terms
24   of PFAS and dementia, for example.
25       Q. My question is very simple.

Page 200

1        As someone whose work has centered around
2    environmental causes of neurologic diseases, do
3    you think the subject of PFAS's potential
4    causative relationship to ASD or ADHD is worth
5    scientific study?
6        A. I think studying all environmental risk
7    factors for ASD and ADHD are important. That's
8    why I'm here today talking about the fact that
9    lead and arsenic are causally associated with ASD
10   and ADHD.
11       I mean, if I didn't think that advocating
12   and understanding these associations were
13   important, I wouldn't be here.
14       Q. What other environmental causes, in your
15   opinion, apart from the heavy metals lead and
16   arsenic, are potential causes of ASD and ADHD?
17       MR. ESFANDIARY: Objection, beyond the
18   scope.
19       A. So I'm here prepared under oath to talk
20   about lead and arsenic and ASD and ADHD. I have
21   written about -- I have a book chapter. I've
22   written about some other environmental risk
23   factors for ASD.
24       But I am not here to opine, I haven't
25   rigorously written about those ones like I have

Page 201

1    for lead and arsenic.
2        So I would say I'm not here to -- I'm not
3    prepared to really opine about the literature of
4    the other risk factors.
5        Q. And what were the other risk factors for
6    ASD that you've previously written about?
7        A. So I wrote about prenatal complications,
8    prenatal, perinatal, and neonatal complications.
9        Q. Such as?
10       A. Cesarean birth.
11       Q. Is that a risk factor for ASD and ADHD?
12       A. I don't recall exactly the -- what I said
13   about it. I'd have to look. And it was a while
14   ago.
15       The literature, I did a meta-analysis.
16   The effect estimates may have changed, the
17   literature could have evolved. I'm not here to
18   speak confidently about the entire up-to-date
19   literature on those other risk factors for ASD and
20   ADHD.
21       Q. And you're talking about other
22   environmental risk factors for ADHD and ASD?
23       A. I think that's what you just asked me
24   about.
25       Q. Okay. I just wanted to make sure that's

Page 202

1    what we were talking about. Correct?
2        A. That's what we're talking about today.
3    Yeah.
4        Q. Is it your opinion, Dr. Gardener, that
5    baby food with any level of lead or arsenic is
6    capable of causing ASD or ADHD in some children?
7        A. So as long as the baby food has lead or
8    arsenic, it will contribute or can contribute to
9    the body burden of the lead and arsenic to babies
10   who consume it.
11       And what we have seen is that there is no
12   safe level of lead. There's no threshold below
13   which we can confidently say that those levels --
14   on a population-wide basis, that exposure level to
15   lead or arsenic is irrelevant.
16       But whether it causes or contributes to
17   the ASD or ADHD for any individual child, that's
18   beyond my scope and that really more relates to
19   the individual circumstances of that child.
20       How much of that baby food was consumed,
21   when, what are the specific circumstances, the
22   health history and, like, all the factors that go
23   into that child's ability to metabolize and
24   detoxify those metals and that whole health
25   history, that relates to specific causation, which

Page 203

1    is beyond my scope.
2        Q. But assume with me that you had one jar
3    of, say, peaches that had an average amount of
4    lead in it. Let's say 5 parts per billion. Is it
5    your testimony that that one jar of peaches,
6    5 parts per billion of lead, is capable of causing
7    autism or ADHD -- ASD or ADHD, in some population
8    of children?
9        MR. ESFANDIARY: Objection, incomplete
10   hypothetical.
11       A. First, it needs to be consumed. Just
12   sitting on the shelf --
13       Q. Of course.
14       A. So first of all, it needs to be consumed.
15   And you need to know how much of it is consumed,
16   when is it consumed, by whom is it consumed.
17       On a population-wide level, if that baby
18   food is consumed, it's going to impact the body
19   burden of lead and arsenic in the babies or
20   children who consume it. The more they consume
21   it, the more their exposure, the more it will
22   contribute to their body burden.
23       And what we know is that in the literature
24   there is a no safe level of these highly toxic
25   contaminants that has been established.

Page 204

1        And what the literature shows is that a
2    higher exposure increases risk. But the degree of
3    risk will depend on, you know, for example, how
4    much is consumed. And whether it's etiologically
5    relevant for a specific child will depend on that
6    specific child's determinants.
7        For me, I could have eaten -- my children,
8    they could have eaten that jar of baby food all
9    day every day and they might not have gotten
10   autism. Children vary in terms of their
11   proclivity and their vulnerability to these
12   environmental toxins.
13       We know that smoking causes lung cancer,
14   but there are plenty of people that smoke all day
15   every day for their entire lives and never get
16   lung cancer. Because just like the case here,
17   people vary in terms of their susceptibility to
18   get an outcome that's associated with the
19   exposure.
20       Q. Is smoking one cigarette sufficient to
21   cause lung cancer?
22       A. It depends on the person. I mean, what we
23   know is that smoking causes DNA damage. The more
24   you smoke, the higher your risk. So there are
25   people out there who smoking one cigarette may be

Page 205

1    causally associated with their lung cancer.  Other
2    people smoke all day every day, never get lung
3    cancer.
4          People vary in terms of their proclivity.
5    And we know that no amount of smoking -- you're
6    not supposed to smoke any cigarettes.
7          There's no amount of lead that's safe.
8    There's no amount of arsenic that's safe.
9          Q. So there are some children out there that
10   could consume a single jar or a single pouch of
11   baby food that has lead in it and that could cause
12   their autism or ADHD.  Correct?
13         MR. ESFANDIARY:  Objection.
14         Q. Just like you said with one cigarette
15   causing lung cancer.
16         MR. ESFANDIARY:  Incomplete hypothetical.
17         A. It depends on that child and their
18   circumstances.  That's really an issue of specific
19   causation.
20         Q. But I'm asking -- I realize there can be
21   one child somewhere that is uniquely sensitive to
22   something.  But I'm talking about on a population
23   level where we're talking about literally millions
24   of kids eating baby food.
25         Do you think that there are some children

Page 206

1    within that population that would develop autism,
2    ASD, or ADHD from consuming one jar or one pouch
3    of baby food that has some content of lead in it?
4    5 parts per billion?
5          A. You just answered your question.  You just
6    said at the beginning of your question, you said
7    "I know that there's some child out there."
8          So I'm going to agree with, you know, what
9    you said.  You said you know -- yes.  Children
10   differ in their susceptibility.  And baby food
11   needs to be safe for the population.
12         There are many kids out there who would
13   appear fine even if their house paint is filled
14   with lead.
15         I grew up in a house where the paint was
16   filled with lead.  I made it to Harvard, graduated
17   with almost perfect grades.  Made it to Dartmouth,
18   graduated with almost perfect grades.
19         That does not mean that the amount of lead
20   that was really high in the house paint in the
21   house that I grew up in was safe.  That doesn't
22   mean that paint companies should be like, we don't
23   need to take the lead out of house paint.  Look at
24   Hannah.  Look how great she did.  Look at how
25   great she's doing at this deposition today even

Page 207

1    with all the lead that she was exposed to.  That's
2    not how it works.  It probably also gave me a
3    little anxiety today too.  But whatever.
4          We need to make these products safe for
5    the population in general.  We took lead out of
6    house paint because it was dangerous for the
7    population, because there were so many people
8    people that could not have -- that had more
9    vulnerability that I had for whatever reason to
10   that -- the lead in that house paint.
11         And the same needs to be true for other
12   exposures too.  Just because plenty of kids ate
13   tons of baby food do not end up autistic does
14   not mean that lead in baby food does not cause
15   autism.
16         Q. Are you offering an opinion in this case
17   on the dose of lead or arsenic that increases the
18   risk in some children?
19         A. So my opinions are all laid out here.  My
20   opinions, I agree with the scientific consensus
21   from so many organizations.  The American Academy
22   of Pediatrics, the CDC, the FDA, the WHO, every
23   major scientific body has said there's no safe
24   level of lead.  And I agree with that.
25         Maybe one day we will find that there's

Page 208

1    exposure that -- there's tiny, tiny exposures that
2    people really today are not exposed to that
3    actually are not deleterious.  But based on the
4    current environmental landscape and all of the
5    scientific literature, there is no safe level of
6    lead.
7          There's no level that we see in the
8    literature where we can confidently say that
9    exposure is safe from an autism perspective.  We
10   see that the higher the dose, the increased risk
11   of ADHD and ASD.
12         My charge was not to give a dose that was
13   safe.  I would not have been able to do so.
14         My charge related to whether the exposure
15   sources from baby food in these hypothetical menus
16   and from what I know about heavy metals in baby
17   food, whether that's meaningful, whether --
18   because if it was not meaningful, then this would
19   not be meaningful.
20         This was a part of my charge and my task
21   that was really added this time around to say,
22   like, is this a relevant exposure source.
23         And we do know it is a relevant exposure
24   source.  For a large portion of kids, food is
25   their primary exposure source.

1   MR. KLATT:  Okay.  Why don't we take a

2 break.

3   THE VIDEOGRAPHER:  This concludes Media

4 Number 5.  Going off the record, 2:47 p.m.

5   (Recess, 2:47 p.m. to 3:04 p.m.)

6   (Exhibit 9 marked for identification)

7   THE VIDEOGRAPHER:  This is the beginning

8 of Media Number 6.  Going back on the record,

9 3:04 p.m.

10 BY MR. KLATT:

11   Q. Dr. Gardener, I think you joked earlier

12 about how the deposition was stressful for you.

13 Does that in any way interfere with your ability

14 to give full, complete, and truthful answers to my

15 questions today?

16   A. I don't think so.

17   Q. Okay.  I'll show you what is marked as

18 Exhibit 9.  I alluded to it earlier.  It's from

19 the EPA website on biomonitoring for lead.  Do you

20 see Exhibit 9 there?

21   A. I do.

22   Q. I'm just looking at the very first

23 paragraph.  It says, "Lead is a naturally

24 occurring metal used in production of fuels,

25 paints, ceramic products, batteries, solder, and a

1 variety of consumer products.  The use of leaded

2 gasoline in lead-based paint was eliminated or

3 restricted in the United States.  However,

4 children continue to be exposed to lead due to the

5 widespread distribution of lead in the

6 environment."

7   Do you see that?

8   A. I do.

9   Q. And I think earlier I had indicated the

10 EPA said something about exposure to house dust.

11   So if you would turn -- probably the

12 easiest way to do this is to go from the back,

13 four pages from the back.  It looks like this.  It

14 says, "About the lead indicators."

15   A. Yup.

16   Q. Do you see that page?

17   A. I do.

18   Q. And I'm looking at the second paragraph

19 under "About the lead indicators."

20   And it said -- EPA says, "Lead is a

21 naturally occurring metal used in the production

22 of fuels, paints, ceramic products, batteries,

23 solder, and a variety of consumer products."

24   Do you have any reason to disagree with

25 that?

1   A. I mean, it's a little weird to say it's

2 naturally occurring in batteries since batteries

3 aren't really natural materials.  But it is what

4 it is.  Yeah.  The sentence is --

5   Q. Lead is an element.  Correct?

6   A. That's true.

7   Q. In that sense, it's naturally occurring.

8 Correct?

9   A. Okay.  I mean, I think it's weird to say

10 that in this synthetic product something is

11 natural.

12   Q. I don't want to get into a debate with

13 you.  It says it's a naturally occurring metal,

14 which it is, used in the production of these

15 things.  Correct?

16   A. Uh-hmm.  Yes.  Correct.

17   Q. And you would agree with that?

18   A. Yes.

19   Q. It is --

20   A. Yes.

21   Q. And then it says, "The use of leaded

22 gasoline and lead-based paint was eliminated or

23 restricted in the United States beginning in the

24 1970s, resulting in substantial reductions in

25 exposure to lead."  Correct?

1   A. Correct.

2   Q. And is that consistent with your

3 understanding as well?

4   A. Yes.

5   Q. Meaning all of us who were born before the

6 1970s were exposed to massive amounts of lead.

7 Correct?

8   A. Well, people varied in how much they were

9 exposed to in the past.  And currently, there are

10 people today who are exposed to more than people

11 who were born in 1950.  But as a population, the

12 lead levels have decreased.

13   Q. Do you have any idea how much the blood

14 lead levels on average in children have decreased

15 in the United States from the 1970s to the 2020s?

16   A. The amount -- like, the population

17 averages, I don't know, off the top of my head.

18 It's been substantial.

19   Q. The next sentence says, "However, children

20 continue to be exposed to lead due to the

21 widespread distribution of lead in the

22 environment."  Do you see that?

23   A. I do.

24   Q. And I think you've talked about that

25 earlier.  Correct?

1  A. Correct.
2  Q. Currently in the United States the major
3  source of early childhood lead exposure is
4  lead-contaminated house dust. Do you see that?
5  A. I do see that.
6  Q. And a major contributor to lead in house
7  dust is deteriorated or disrupted lead-based
8  paint. Do you see that?
9  A. I do.
10  Q. Do you have any reason to disagree with
11  the EPA that currently in the United States a
12  major source of early childhood lead exposure is
13  lead-contaminated house dust?
14  A. I would definitely say that a major source
15  is lead-contaminated house dust.
16  But, as I talked about in my report, there
17  have been many recent studies that have shown that
18  for the majority of children who are at the lower
19  end of the spectrum of lead that food is the
20  biggest contributor to their body lead burden.
21  Q. Do you know what studies you're referring
22  to?
23  A. I can pull up an example. I'm looking.
24  So here is one example. The Zartarian,
25  et al., paper from 2017.

1  Q. What page of your report are you referring
2  to?
3  A. Page 85.
4  Q. Okay. Go ahead.
5  A. So the majority of children age 1 to 6,
6  food is the primary contributor to blood lead
7  levels.
8  Q. I'm sorry. Where are you reading?
9  A. The first sentence under 2, under "Lead."
10  "Likewise, the consumption of food has
11  long been recognized to be a relevant exposure
12  source for lead. And for the majority of children
13  age 1 to 6, food is the primary contributor to
14  blood lead levels."
15  And the citation for this was Zartarian,
16  et al., 2017.
17  Q. Is it true that homemade baby food is a
18  source of lead and arsenic exposure?
19  A. Sorry. We're switching gears suddenly. I
20  was just like -- I was expecting . . .
21  Q. You're talking about food exposure?
22  A. Yeah.
23  Q. I'm wondering, that can be any foods,
24  whether it's commercial baby food, whether it's
25  store-bought food, homemade baby food. In your

1  opinion, it can all be a source of lead or arsenic
2  exposure. Correct?
3  A. Homemade baby food can also be an exposure
4  source for lead and arsenic.
5  I don't recall them breaking this up in
6  the Zartarian 2017 paper. But if you have it, we
7  can take a look. But what they talked about --
8  and there are other references to -- this was the
9  easiest one for me to find -- for the majority of
10  young children food is the primary contributor to
11  blood lead levels.
12  Q. Is it -- let me ask you this.
13  In your report, did you review, evaluate,
14  and consider longitudinal studies of the total
15  diet of early childhood, not specific nutrients
16  but the entire diet and diet quality and how it
17  relates to subsequent neurocognitive outcomes?
18  Are you aware of any studies like that?
19  A. So you're talking about did I include
20  studies in this report about sort of food diet
21  behaviors in relation to neurocognitive outcomes?
22  I don't recall any citations to that in
23  this report. It was more in relation to diet as
24  it relates to or as it interacts with heavy
25  metals.

1  Q. But I'm just asking whether you saw any
2  studies in your review or considered any studies
3  longitudinally that looked at what were the diets
4  of children, say, at six months, twelve months,
5  and then looked subsequently a few years later to
6  see whether the quality of the diet related to
7  their neurocognitive outcomes for better or worse?
8  A. So irrespective of heavy metals, what's
9  the association --
10  Q. Correct.
11  A. -- between dietary patterns and
12  neurocognitive outcomes, you said?
13  Q. Exactly right.
14  A. I'm not prepared to offer an opinion on
15  that.
16  Q. Did you review any studies about that in
17  preparation for your opinions in the case?
18  A. In relation -- did it impact my opinions
19  in this case? No.
20  Q. Did you evaluate any studies of that?
21  A. So there were some studies that did look
22  at diet and diet patterns. But for this, I
23  related it more to as it could interact with heavy
24  metals.
25  Q. Did you see in these studies that you

Page 217

1    considered, did you cite any in your report?
2        A. Yes. So I talked about -- the report is
3    so long now.
4        So for example, if you go to page 100.
5        Q. Go ahead.
6        A. So a few studies have tried to directly
7    address the question about whether simultaneous
8    dosing of nutrients from food impacts lead -- body
9    lead burden. These studies have not addressed the
10   interactions between nutrients from food and lead
11   and neurodevelopment.
12       This is Kordas, et al., 2018. And they
13   conducted a cross-sectional study of children age
14   5 to 8 in Uruguay that included two 24-hour
15   recalls, and they looked at the associations
16   between consumption of several nutrients and foods
17   with blood and urine lead concentrations.
18       They found that dietary intake of iron,
19   vitamin C, and zinc were unassociated with lead
20   biomarkers.
21       In addition to these findings for iron,
22   vitamin C, and zinc, the results also showed no
23   associations for the consumption of iron-rich
24   foods or vitamin C-rich foods.
25       Calcium and milk or dairy intake were

Page 218

1    associated with lower urine lead levels with
2    statistical significance and lower blood lead
3    levels without statistical significance.
4        And the results showed the intake of
5    calcium explained most of the association from
6    milk and dairy with urine lead concentrations, as
7    the associations for milk and dairy became
8    nonsignificant when dietary calcium was included
9    in the models.
10       These findings lead the authors to
11   conclude that in contrast to individual nutrients,
12   some of which had been found to impair the
13   intestinal absorption of lead, little evidence is
14   available in which foods, food groups, or dietary
15   patterns could effectively prevent lead exposure
16   or lower children's blood lead levels.
17       Despite the fact that this study was
18   cross-sectional and contradictory, most of the
19   supplementation trials on calcium were still
20   informative and contributed to my opinions.
21       Q. I see that you didn't quote from Kordas
22   their statement that aside from the question of
23   whether extrapolations can be made to children,
24   these studies clearly indicate that studying
25   single nutrients does not approximate food dietary

Page 219

1    consumption and its effect on lead absorption.
2        So did you evaluate any studies that
3    considered food and dietary consumption as a whole
4    in outcome as opposed to focusing on specific
5    nutrients?
6        A. Yes. This study did -- this study did
7    both. It looked at food and nutrients.
8        It would be assumed that any contribution
9    to the foods would be through these nutrients,
10   which have been hypothesized at a
11   cellular level to compete with each other.
12       But the question would be even if these --
13   on a cellular level these nutrients compete with
14   each other, the question would still remain.
15       If we did find that, which as I laid out
16   in this report we really don't have strong
17   evidence for, the question would be, all right,
18   when it's diluted in a food, does that matter?
19       Like, the calcium question I think is
20   really relevant because there's so many warnings
21   about lead contamination in calcium supplements.
22       If calcium was the answer to lead, we
23   wouldn't be getting warnings about lead
24   contamination in calcium supplements themselves.
25   In fact, that's one of the big sort of lead

Page 220

1    warnings out there.
2        Q. Do you recall that Kordas also said
3    opinions may vary, but it seems prudent to adhere
4    to current recommendations with the understanding
5    that they represent a benefit for children's
6    nutritional status.
7        The guidelines on iron-rich foods or iron
8    supplements to correct existing iron deficiency in
9    children exposed to lead, especially in children 2
10   to 3 years old or younger who are growing rapidly
11   and have high physiological demands for iron, may
12   be particularly important.
13       MR. ESFANDIARY: And just for the record,
14   Counsel is reading from a study by Kordas that he
15   has not marked as an exhibit and is not in front
16   of Dr. Gardener.
17       MR. KLATT: I'm happy to mark it as an
18   exhibit.
19       A. So your question was do I recall sentences
20   in a paper? No, I do not recall the sentences.
21       Q. That you quoted in your report.
22       A. I don't recall sentences in any of the
23   papers that I have included in my report,
24   including my own papers. So any paper, I would
25   need to --

Page 221

1    Q. I'll show you that in just a minute.
2        Before I get to that, let me ask you this:
3    When evaluating potential heavy metal exposures,
4    the heavy metal exposures studies that you relied
5    on involving postnatal heavy metal levels, to what
6    extent did you also consider as part of your
7    methodology prenatal heavy metal exposure that
8    we've established will occur in almost every
9    child?
10    A. For example, on page 22 I wrote, "For the
11    same reason, I included in my literature reviews
12    studies on prenatal exposure to heavy metals. The
13    prenatal period represented a different
14    etiological period from the one in question in
15    this legal matter. However, I found this
16    literature highly informative in this case because
17    it also allayed my concerns about temporality and
18    reverse causation in addition to helping me
19    understand biological plausibility.
20        "As an example, in the early autism risk
21    longitudinal investigation, increased blood lead
22    levels during pregnancy were associated with an
23    increased risk of ASD, though there was no
24    association for urine lead levels."
25        And then in each section --

Page 222

1    Q. So --
2        MR. ESFANDIARY: Don't interrupt.
3        Q. I wanted to ask you about that particular
4    study. I'm sorry. Were you finished?
5        A. So you had asked me how -- to what extent
6    I considered it. And so I figured I'd point out
7    the places in my report where I discussed it.
8        Q. I know that you cited in your report
9    studies of prenatal lead exposure and its
10    relationship to the outcomes of ASD or ADHD.
11        But how did you take those studies into
12    account when considering and citing the postnatal
13    studies of lead and arsenic?
14        A. So I took them into account because what
15    they did is they helped allay my concerns about
16    potential for reverse causation. They helped
17    inform my questions about temporality.
18        Q. Well, if a child is exposed prenatally,
19    then obviously if you look at that child
20    postnatally for their lead levels, you can't
21    distinguish whether that exposure occurred pre- or
22    postnatally. Correct?
23        MR. ESFANDIARY: Objection, vague and
24    ambiguous.
25        Q. All right. We've established today that

Page 223

1    almost all children are exposed prenatally to lead
2    and arsenic.
3        You've cited studies in your report that
4    prenatal lead in some studies has been associated
5    with the outcomes of ASD and ADHD. Correct?
6        A. Yeah. I would say that the overall
7    literature is not as strong and compelling in
8    terms of prenatal. There haven't been as many
9    studies relating prenatal exposure to autism and
10    ADHD as compared to postnatal. But I still did
11    take that into consideration.
12        Q. How?
13        A. So it's understood that when you're
14    thinking about postnatal lead and arsenic in
15    relation to autism and ADHD -- I'm sorry; that's
16    so distracting, whatever that voice is -- that
17    that's not their only time period of exposure.
18        The fact that babies and children are
19    exposed during other periods of time doesn't
20    negate the etiological role of postnatal exposure.
21        For example, like in my studies of PFAS,
22    we're measuring PFAS in people in middle age and
23    older age, knowing that they were exposed when
24    they were much younger as well. That doesn't mean
25    that there isn't an etiological role for

Page 224

1    later-life PFAS exposure.
2        So I took this into consideration more
3    because I was interested in how that can inform
4    questions about temporality.
5        Q. But recognizing, as you have, that there
6    can be and is prenatal exposure to lead and
7    arsenic and some studies have related that to the
8    outcome of ASD and ADHD, to what extent did you
9    factor that into your consideration of the
10    postnatal studies you relied on?
11        MR. ESFANDIARY: Asked and answered three
12    times.
13        You can answer it again.
14        A. Like I said, it was relevant to me to
15    inform temporality -- they're not perfectly
16    correlated. So you could -- everyone may be
17    exposed in a study to lead. They may have body
18    burden of lead.
19        But it's still going to be variable.
20    There's variability for prenatal exposures and
21    there's variability for postnatal exposures to
22    both lead and to arsenic.
23        So a finding of an association for
24    prenatal lead and arsenic doesn't mean that there
25    can't be an impact of postnatal lead and arsenic

Page 225

1  on ASD and ADHD, nor does it mean that there
2  definitely is. It's simply important to consider.
3  As an epidemiologist, I considered the entire
4  literature on these metals.
5      Q. I understand you considered the whole
6  literature. I'd like to understand how you
7  factored in the prenatal exposures to lead and
8  arsenic to the postnatal studies you relied on.
9      What methodology did you use to exclude
10  the prenatal effects that you know occur from the
11  postnatal studies you relied on? Did you use any
12  methodology to do that?
13     A. You don't want to exclude that. Like, if
14  we were excluding a role of prenatal exposure,
15  that would be weird. If anything, that would just
16  be weird to exclude it.
17     It's like I feel like you keep asking me
18  about the need to exclude other exposures in my
19  assessment of causality. That is not how it
20  works. It's not required.
21     Just like if you were assessing the role
22  of cigarette smoking in later adulthood, you
23  wouldn't want to exclude -- you don't need to
24  exclude the role of cigarette smoking early on in
25  life.

Page 226

1      Or maybe sun exposure is probably a better
2  example. We know that sun exposure during
3  childhood is the most etiologically relevant in
4  terms of sunburns. That doesn't exclude the role
5  of adulthood sun exposure, and you wouldn't want
6  to exclude that.
7      Q. How methodologically did you exclude from
8  the postnatal heavy metal ASD/ADHD studies you
9  rely on that the effect may have already occurred
10  prenatally? How did you exclude that possibility?
11     A. The exposure did start. So I think what
12  you're saying is these exposures are cumulative.
13  And so I think you are acknowledging what I have
14  talked about here, that these are cumulative
15  exposures.
16     And the fact that children are typically
17  already born exposed to heavy metals only
18  underscores the importance of reducing their
19  presence, you know, and the fact that, you know,
20  the amount of heavy metals in baby food is
21  outrageous.
22     It's getting better. You guys are
23  decreasing it. But it only underscores the need
24  to reduce those exposures because they're not the
25  only exposures. They actually -- they contribute

Page 227

1  to body burden. And like I said, for some kids
2  they can be the primary contributors.
3      For most kids age 1 to 6, food is the
4  primary contributor. For a lot of kids, their
5  exposure to heavy metals from other sources can
6  actually -- can be even bigger.
7      Q. So I'm just simply asking what methodology
8  did you use to exclude the fact that the total
9  effect resulting in the outcome of ASD or ADHD
10  postnatally may have already occurred prenatally?
11     MR. ESFANDIARY: Objection, vague and
12  ambiguous.
13     A. You wouldn't exclude that
14  methodologically. That would not be appropriate.
15  It's so relevant here. I mean --
16     Q. So the effect may have occurred totally
17  prenatally before you ever get to the postnatal
18  point. Correct?
19     A. In a great world where you guys remove the
20  lead and arsenic from your products or your
21  clients' products, then -- and from other sources
22  so that the only exposure is prenatally, then yes,
23  the entire exposure could theoretically in the
24  future all be prenatal. That's not how it is.
25     Children are born exposed, but then they

Page 228

1  continue to be exposed to varying degrees.
2  They're exposed to varying degrees before they're
3  born and then afterwards.
4      Q. How did you evaluate or weigh the relative
5  contributions of prenatal exposure to lead and
6  arsenic in the studies versus postnatal effects?
7      A. You don't need to. That's the point, that
8  it's the body burden. And it actually doesn't
9  matter, you know, what it's coming from.
10     So, for example, it doesn't matter if it's
11  coming from their mothers or from the food that
12  they eat or the dust in their house.
13     What my charge was was to look at their
14  body burden. And some may have been, you know,
15  stored from birth. So that's what the studies
16  really looked at.
17     They didn't look at where -- what the
18  exposure was. Were they born with a certain
19  amount of exposure? Did it come from the dust in
20  their house, the soil in their yard?
21     Q. So the answer to my question is, you
22  applied no specific evaluation or weighting of the
23  source of exposure in the postnatal studies of ASD
24  and ADHD in lead or arsenic that you relied on.
25  Correct?

1     MR. ESFANDIARY: Objection, misstates the
2  testimony.
3     A. That sentence just doesn't make sense.
4  I'm sorry.
5     Q. All right. You've acknowledged there
6  could be exposure to these heavy metals, lead and
7  arsenic, from many different sources. Correct?
8     A. That is correct. Yeah. For not all
9  children. So different children will be exposed
10 from different sources.
11     The majority of young children will be
12 exposed from their food, but not all children.
13 Some children, the amount they're exposed to from
14 their food will pale in comparison to the amount
15 that they were exposed to from other sources. It
16 will vary.
17     And then the amount that they are exposed
18 to. So the amount they're exposed to prenatally,
19 the amount they're exposed to before they start
20 eating baby food, the amount that they're exposed
21 to while they're eating baby food, all those
22 different time periods. You wouldn't want to
23 exclude them.
24     When you say methodologically, that sort
25 of implies that I have conducted original research

1  on this. And as you can see, there was no
2  Gardener, et al., in terms of the study -- this
3  hypothetical study that you're trying to ask about
4  my methodology for doesn't exist.
5     Q. I'm simply asking, did you as part of your
6  methodology in arriving at your conclusions assign
7  any weight to prenatal exposure, postnatal
8  exposure, before consuming baby food, during
9  consumption of baby food, after consumption of
10 baby food? Did you assign any sort of weighting
11 or evaluation of those various sources? And if
12 you didn't do it, that's fine. I'm just curious
13 methodologically whether you did that.
14     A. Absolutely. So this matter relates to
15 postnatal exposure. So coming to my conclusions,
16 I really weighted the data from postnatal
17 exposure.
18     I considered that prenatal exposure too.
19 But in forming my opinions, what's most relevant
20 for this matter is postnatal exposure. So that
21 was --
22     Q. But how did you consider or weigh the
23 prenatal exposure? I don't understand how you did
24 that other than just saying you considered it.
25     MR. ESFANDIARY: Objection.

1     Q. You had to use some methodology or process
2  to factor in the prenatal exposures in relying on
3  the postnatal studies. Right?
4     MR. ESFANDIARY: Objection, vague and
5  ambiguous. The question doesn't make any sense.
6     A. The question doesn't make sense from an
7  epi perspective. I don't know if there are
8  specific methodologies that you're asking.
9     Q. Just whether you had one, that's all I'm
10 asking, to weight the different sources of
11 exposure in different time periods of exposure.
12     A. I'm sorry. The question just doesn't make
13 sense.
14     Q. So you didn't apply any such
15 methodology --
16     MR. ESFANDIARY: No.
17     A. The question doesn't --
18     MR. ESFANDIARY: That misstates the
19 testimony.
20     Q. How did you weight prenatal exposure with
21 respect to the postnatal studies you relied on?
22     A. Yeah. So the way that I weighted this
23 into my opinion is I also read the literature on
24 the prenatal exposure. And I used it to help
25 really allay my concerns about potential --

1  concerns about potential temporality in the
2  literature on the postnatal exposure.
3     Q. The kids in the postnatal exposure studies
4  all would have been exposed prenatally. Correct?
5     MR. ESFANDIARY: Objection, calls for
6  speculation, overbroad.
7     A. So when you say -- it all varies. People
8  are exposed to varying amounts postnatally and
9  prenatally.
10     Q. I understand. And did you do any sort of
11 evaluation or weighting in the studies you
12 considered to apportion a certain amount to
13 prenatal lead and arsenic exposure, a certain
14 amount to postnatal lead or arsenic exposure?
15     A. I'm sorry, but your question just makes no
16 sense from an epi -- it's just not a question any
17 epidemiologist or biostatistician would -- it
18 doesn't make sense to my profession, so I don't
19 know how to answer it and I don't know how to
20 describe to you why or how it makes no sense.
21     Q. Did you consider at all quantitatively the
22 prenatal contribution of exposure to lead and
23 arsenic in the postnatal studies you relied on?
24     A. I feel like you're trying to ask it in
25 different ways. It just doesn't make sense. I

Page 233

1  feel like I have answered this question over and
2  over again.
3        I think what -- you're asking a question
4  that could be a valid question about an individual
5  study that I authored.
6        Q. No. I'm asking your --
7        A. I just don't understand your question.
8        Q. I'm sorry. I talked over you.
9        I'm asking you when you evaluated the
10  postnatal heavy metal exposure studies that you
11  rely on and have described in your report, I'm
12  just wondering how you considered or evaluated,
13  let's say, contribution of genetics to the
14  outcome.
15        How did you evaluate contribution of
16  genetics versus what you believe is contribution
17  of the heavy metals?
18        A. Yeah. So I can talk about that. Do you
19  want me to talk about --
20        Q. I just --
21        A. -- how I thought about genetics?
22        Q. I was just wondering --
23        MR. ESFANDIARY: Whoa, whoa, whoa. She
24  was in the middle of answering your question.
25        You asked about genetics. Do you want to

Page 234

1  withdraw that question and ask a new one?
2        MR. KLATT: I'll withdraw the question.
3        Q. Did you consider the contribution of
4  genetics to the outcome of the postnatal heavy
5  metal studies that you relied on for your opinions
6  in the case?
7        A. Yeah. I talked a lot about genetics here.
8  Genetics are relevant. And I talked about how
9  there is data to suggest that the interaction
10  between the genetics -- genetic factors and lead
11  and arsenic, that there is -- so when we talk
12  about some kids are more vulnerable, there are
13  some kids for whom baby food is going -- heavy
14  metals from baby food is going to be more
15  etiologically relevant than other kids and how I,
16  as an epidemiologist, look at it from a population
17  perspective.
18        But from an individual perspective, you
19  have to think about the circumstances of that
20  child.
21        And part of that is genetics, and there
22  are genetic risk factors for autism. We know that
23  there's a role for lead and arsenic in causing
24  autism and ADHD. And that likely interacts with
25  genes and their control of the metabolism,

Page 235

1  absorption, detoxification of lead and arsenic
2  such that an amount of heavy metals would be more
3  etiologically relevant, more likely to cause ASD
4  and ADHD in those children than in other children.
5        And I talked about that in this report.
6        Q. Did you come to any conclusions on the
7  extent to which in the heavy metal studies you
8  rely on genetics contributes to the outcome of ASD
9  or ADHD compared to the percentage contribution of
10  what you believe is heavy metal exposure?
11        A. So I thought you were going somewhere
12  different.
13        So how much these genes, these autism
14  genes are impacting the causality of lead and
15  arsenic. It's presumed to be substantial. That's
16  beyond the -- I was not charged with identifying
17  that.
18        Q. So you didn't --
19        A. So the amount, that would be irrespective
20  of your genes and the amount that wouldn't -- that
21  probably partly depends on how exposed you are.
22        So there are some genes that make it so
23  that your exposures to certain toxins are more
24  relevant.
25        And this is a good analogy in terms of,

Page 236

1  like, smoking and lung cancer. Part of the reason
2  why some people will smoke all day every day and
3  never get lung cancer is because their genetics
4  are different from the person who just smokes a
5  tiny amount and gets lung cancer.
6        There's a difference in their genes that
7  regulate how the toxins in cigarettes are
8  metabolized and absorbed and how they impact the
9  etiology of that disease.
10        That's the exact same thing that's
11  hypothesized here. We know that lead and arsenic
12  cause autism and ADHD, as I laid this out here.
13        How the specific genes that are involved,
14  how that relates, which ones are -- which ones are
15  controlling those pathways, that has not been
16  worked out. It's been talked about. But we don't
17  have specific answers for that.
18        Q. When evaluating the postnatal heavy metal
19  exposure studies that you rely on in coming to
20  your opinions in the case, how did you consider
21  the extent to which other environmental exposures
22  other than lead and arsenic may have contributed
23  to the outcome of ASD or ADHD?
24        A. That wasn't part of my charge. So that's
25  a specific causation. That is for the other

Page 237

1  experts who need to think about, all right, you
2  have a specific child.  And what are their
3  different exposures?
4       For example, an epidemiologist can say,
5  you know, all right, smoking is a strong risk
6  factor for lung cancer.  Radon is a strong risk
7  factor for lung cancer.  We don't need to know the
8  amount of radon to -- actually in our equations
9  for identifying the etiological fraction of
10  smoking.  We actually don't even take into account
11  radon.
12       That's different from someone who would be
13  charged with specific people and deciding their --
14  the impact of smoking versus radon for those
15  individuals.
16       So when we look at the etiological
17  fraction, the attributable risk in an epi study,
18  we don't necessarily need to -- we don't bring in
19  the other risk factors.  When you add them all up,
20  there can be over 100 percent.  But that's very
21  different from the science of identifying the
22  etiological role for individuals.
23       Q. So it wasn't part of your charge to
24  consider the extent to which other environmental
25  exposures other than lead and arsenic may have

Page 238

1  contributed to the outcome of ASD and ADHD in the
2  studies you rely on.  Correct?
3       MR. ESFANDIARY:  Objection, misstates the
4  testimony.
5       MR. KLATT:  She said that wasn't part of
6  my charge.
7       Q. Is that correct?
8       A. Can you show me where I said -- how about
9  this?  I'll read you my charge.  Anything that's
10  not in what I read is not part of my charge.
11       Q. That's not my question.
12       I said, how did you consider the extent to
13  which other environmental exposures other than
14  lead and arsenic may have contributed to the
15  outcome of ASD and ADHD in the studies you relied
16  on?
17       And your answer was, that wasn't part of
18  my charge, my specific causation.
19       MR. ESFANDIARY:  No, You're misstating the
20  testimony.  You're omitting literally paragraphs
21  of her answer.
22       MR. KLATT:  Nonresponsive paragraphs.
23       MR. ESFANDIARY:  Read her entire response.
24       MR. KLATT:  No, I'm not going to waste
25  time doing that.  You can ask her that.

Page 239

1       MR. ESFANDIARY:  No, I don't need to.
2       Q. Is it part of your charge or not to
3  consider the extent to which other environmental
4  exposures other than lead and arsenic may have
5  contributed to the outcome of ASD and ADHD in the
6  studies that you rely on in this case?
7       A. So that question just doesn't make sense
8  from an epi perspective.  It literally makes no
9  sense.
10       Q. Was it part of your charge?
11       A. My charge made a lot of sense, and I'm
12  happy to read it.  Things that make absolutely no
13  sense scientifically were not part of my charge.
14       If a lawyer gave me a charge that made no
15  sense, I would say, Pedram, that makes no sense.
16  I'm not talking about that under oath because that
17  makes no sense.
18       Q. When evaluating the postnatal heavy metal
19  exposure studies that you rely on in coming to
20  your opinions in this case, how did you consider
21  the extent to which other environmental exposures
22  other than lead and arsenic may have contributed
23  to the outcome of ASD or ADHD?
24       A. The question doesn't make sense.  I don't
25  know how to explain to you the fact that that

Page 240

1  sentence -- that question makes no sense.  So I
2  don't know how to answer it.
3       Q. Did you do it or not?
4       A. I didn't do anything that makes no sense.
5  I would not.  If you called me and tried to --
6       MR. ESFANDIARY:  Wait for a question.
7       Q. Did you consider the extent to which other
8  environmental exposures in the studies you rely on
9  for ASD and ADHD may have contributed to the
10  outcome in the studies?  Did you consider it or
11  not?
12       MR. ESFANDIARY:  Asked and answered.
13       A. The question -- what is the outcome in the
14  study?
15       Q. ASD or ADHD.
16       A. That's not -- like, it just makes no
17  sense.  Like, the question just doesn't make
18  sense.
19       If you came to me and gave me that as a
20  charge, I would say to you that charge doesn't
21  make sense.
22       MR. ESFANDIARY:  Mike, maybe I can help
23  out.  Are you asking about confounding?  Is that
24  what you're trying to get at in the studies?
25       MR. KLATT:  I'm just asking whether she

1    considered --
2        MR. ESFANDIARY: I know, I know. But
3    clearly it's not working. So are you asking
4    whether some of the results were confounded by
5    other exposures? Maybe you should ask it that
6    way.
7        MR. KLATT: All right. Let's ask Pedram's
8    question.
9        Q. Were the results of the postnatal ADHD and
10   ASD studies regarding lead and arsenic confounded
11   by other environmental exposures?
12       A. So I did think about what confounders were
13   controlled for, and I thought about, you know,
14   what are possible confounders.
15           I think sort of this line of questioning
16   came on the heels of thinking about, like, PFAS
17   and brominated flame retardants. Those are not
18   considered major confounders.
19           I haven't seen those controlled for in the
20   study. I haven't seen -- in talking to people, in
21   reviewing other grants on these heavy metals, I've
22   never heard of people saying, "Oh, but they didn't
23   adjust for brominated flame retardants or PFAS."
24       Q. Or phthalates?
25       A. Yes, or phthalates. I've never -- in all

1    the -- I shouldn't say that.
2        In other things that I've been asked to
3    review, that does not come up as an important
4    source of bias.
5        Q. Let me ask you --
6        A. And we have literature on --
7        Q. There's no question pending.
8        MR. ESFANDIARY: She was finishing
9    answering your initial question.
10       A. Am I allowed to take a minute to pause
11   and, like, think about another --
12       MR. ESFANDIARY: Of course you are.
13       A. So when you think about -- right now
14   there's all these exposures to PFAS, to
15   phthalates, to brominated flame retardants.
16       We knew -- we have strong data that lead
17   and arsenic were important neurotoxins during
18   times when those exposures were not nearly as
19   prevalent as they are now.
20       So I am confident that my opinions on --
21   that lead and arsenic cause autism and ADHD are
22   not only in the absence of other environmental
23   toxins.
24       MR. KLATT: Object to the
25   nonresponsiveness of the answer and move to strike

1    everything that begins with "when you think
2    about."
3        Q. Can we go back to I believe it's
4    Exhibit 3, which is the supplemental report.
5        A. Exhibit 3. This rebuttal?
6        Q. I called it supplemental. You're correct,
7    Exhibit 3 is your rebuttal report of July 15th,
8    2025 in this case. Correct? Is that correct?
9        A. That it's Exhibit 3, yes.
10       Q. And in there, you talked about the levels
11   of heavy metals that were calculated by Dr. Jones.
12   And if you need to, take a second to look at that.
13       A. Yes.
14       Q. Do you understand how Dr. Jones calculated
15   her blood lead levels?
16       A. No, I do not have -- I am not well versed
17   in how she did that.
18       Q. What is your understanding of what
19   Dr. Jones was trying to calculate there? What
20   were those blood lead levels representative of?
21       A. Can you show me?
22       Q. Let's look. You said -- in Exhibit 3 you
23   said, "In my report I discuss how the levels
24   calculated by Dr. Jones represented meaningful
25   exposures of lead or arsenic by comparing the

1    levels to various benchmarks and finding those
2    benchmarks were exceeded. I've now been advised
3    that Dr. Jones has revised her estimates of the
4    average daily dose of lead and arsenic in
5    defendants' baby food and the blood levels
6    associated with those doses."
7        Do you see that?
8        A. I sort of lost you, but okay.
9        Q. Go ahead and read if you need to, to catch
10   up. I was just reading from the rebuttal report.
11       A. Okay.
12       Q. So I'm just trying to understand what
13   these daily doses in blood levels represent. Is
14   that what a typical child might consume? What is
15   your understanding of what those values represent?
16       A. They represented hypothetical menus. I'm
17   just thinking. Like -- how to describe this?
18   Like a possible distribution across a day of
19   various baby foods.
20       Q. The menus that Dr. Jones made calculations
21   for, these hypothetical menus, did you do any
22   evaluation to consider whether they were realistic
23   menus that actually might be consumed by a child
24   or not?
25       A. No, I didn't. But I also don't really

Page 245

1  have the expertise. I don't have the expertise to
2  come up with menus for a hypothetical child. I've
3  only fed two children, my own children, in my
4  whole life. I have never created or analyzed
5  other people's hypothetical menus, so I don't have
6  the expertise to say how realistic, how
7  representative they might be.
8      Q. Okay.
9      A. How many kids have eaten, will eat, would
10  eat those precise menus.
11     Q. Are you offering an opinion, Dr. Gardener,
12  on the minimum dose and duration of exposure to
13  lead that's necessary to cause ASD or ADHD from
14  any source?
15     MR. ESFANDIARY: Objection, previously
16  asked and answered.
17     A. So what I've written in my report many
18  times is that there is no safe level of lead. And
19  there are many health organizations that have
20  repeatedly stated that there is no safe level of
21  lead.
22     And in the literature, there is no level
23  of lead exposure below which we can say, you know,
24  autism or ADHD would not be causally related.
25     What we do see in the literature is that

Page 246

1  in populations with really, really low levels of
2  exposure, there's still variability. And within
3  that variability, we're seeing associations with
4  lead and ADHD.
5      And so I -- there was no minimum amount of
6  exposure. There was also a suggestion that within
7  those levels increased exposure was associated
8  with an increased risk.
9      So I am not here with an estimate for an
10  amount of exposure that is safe, nor am I here
11  saying that there's an amount of an exposure that
12  would always cause autism or ADHD.
13     Really on a population-wide level,
14  increased exposure is associated with an increased
15  risk.
16     But on an individual level, it would
17  depend on the circumstances of that child, that
18  child's genetics, that child's -- the amount that
19  they are exposed, and their ability to detoxify
20  and metabolize that lead and their exposure from
21  other sources, their other environmental
22  exposures.
23     Q. So you're not offering an opinion in this
24  case on the minimum amount of lead that's
25  necessary to cause ADHD or ASD. Correct?

Page 247

1      A. Right. I don't have . . .
2      (Interruption)
3      A. There is no amount that is minimally --
4  there is no minimum amount of exposure or -- below
5  which autism -- lead and arsenic don't cause
6  autism and ADHD, nor is there a maximum amount. I
7  mean, there's an amount a child might die, but
8  they might die not autistic, without ADHD.
9      Q. Are you offering any opinion in this case
10  that homemade baby food is safer than commercially
11  bought baby food?
12     A. That was not part of my charge, and that
13  was not -- all of my opinions are laid out.
14     Q. As a scientist in this area who's reviewed
15  literature, you're not intending to offer any
16  opinion that homemade baby food or table food is
17  safer than commercially bought baby food.
18  Correct?
19     A. Safer? Safer is very broad. So I'm not
20  representing anything about anything being safer
21  or less safe. I am not rendering any opinions
22  about the exposure sources.
23     Like I said, what matters is the body
24  burden. And the amount of lead exposure from a
25  jarred, you know -- a jarred Plum apple sauce,

Page 248

1  versus an apple sauce -- shout it out.
2      I don't even know if Plum makes a jarred
3  apple sauce versus a batch of apple sauce that I
4  may have made myself. I'm not saying that either
5  of those sources are better or worse. They both
6  can contribute to the overall body burden.
7      Q. And so you believe that fruits,
8  vegetables, or grains purchased off the shelf, not
9  as part of a commercially prepared product, are
10  sufficient to cause ASD or ADHD if they contain
11  lead or arsenic?
12     MR. ESFANDIARY: Objection, overbroad,
13  calls for speculation, and undisclosed opinion.
14     A. And so many components to that. If I said
15  yes or if I said no, it would be like what part of
16  this could be no.
17     Q. I'm just -- would you like me to rephrase
18  it or can you answer?
19     MR. ESFANDIARY: If she'd like you to
20  rephrase it, she'll tell you. But she was
21  answering the question.
22     Go ahead, Doctor.
23     A. There was so many compounds in there.
24     Q. Let's read it again.
25     Do you believe that fruits, vegetables, or

Page 249

1  grains purchased off the shelf at a grocery store
2  in the U.S. that aren't part of commercially
3  prepared baby food are sufficient to cause ASD or
4  ADHD if they contain lead or arsenic?
5       MR. ESFANDIARY:  That's literally the same
6  question, so I'm going to state the same
7  objections:  overbroad, calls for speculation,
8  undisclosed opinion.
9       A. So the "sufficiency" word -- there really
10 is a specific causation because there's no --
11 there's no amount that, you know, on a
12 population-wide level every single person who gets
13 this grain and this is going to be autistic or
14 have ADHD.
15      What I'm saying is what you named, grains,
16 fruits, and vegetables that are not part of
17 commercial baby food, that you go to Shaw's and
18 you get some food and you mix it up and you give
19 it to your baby, that can and may have both lead
20 and arsenic.
21      And that lead and arsenic will contribute
22 to the body burden of the children, the babies,
23 the adults that consume that product -- those
24 products and can contribute as a result to the
25 neurodevelopmental harm on a population-wide

Page 250

1  level.
2       For a specific individual, whether that
3  specific child will end up with autism or ADHD,
4  that's a totally different factor.
5       But if you're asking are there relevant
6  sources of lead and arsenic on a grocery shelf
7  beyond what's in the baby food aisle, yes.
8       Lead and arsenic are not just problems of
9  the baby food industry.  The baby food industry
10 seems to be making great strides in terms of
11 reducing those exposures.  My hope is that that
12 will -- that will be translated to food more
13 generally.
14      Q. Do you believe that the produce in the
15 produce section that's not in a jar or pouch but
16 just available, the fruits and vegetables on the
17 produce shelf at grocery stores, contain lead or
18 arsenic?
19      MR. ESFANDIARY:  Objection, overbroad,
20 vague and ambiguous, calls for speaks.
21      A. Some will and some won't.  I mean, it
22 depends on the produce, where it's grown, what
23 water, what soil.
24      Lead and arsenic are not specific to baby
25 food.  There's plenty of fruits and vegetables.

Page 251

1  In some circumstances, there can be contamination
2  related to the processing, but a lot of the
3  exposure is understood to be from the soil from
4  which it's grown, the water from which it's grown.
5       So that would relate not just to food in
6  the baby aisle but outside the baby aisle,
7  absolutely, as well.  And when those items have
8  lead and arsenic, they're also etiologically
9  relevant because the source doesn't matter.
10      My charge here related more to the lead
11 and the arsenic exposure in terms of their ability
12 to cause autism and ADHD.  And that's not specific
13 to baby food.  It relates to homemade food, food
14 anywhere in the grocery.
15      And it's not just related to food.  It's
16 related to the home environment in general, the
17 school environment.  So many different exposures.
18 And it's not exclusive of -- it doesn't exclude
19 the role of food as well.
20      Q. You rely on a number of foreign studies in
21 your materials considered list and in your report.
22      Do you have any understanding whether on
23 average on the population level children's
24 exposures to heavy metals in non-Western
25 developing countries are often much higher than

Page 252

1  those in the United States?
2       A. They can be.  It depends on the time
3  period.  It depends on the population.  The levels
4  of heavy metals vary within the United States,
5  over time, by country, by county.
6       Q. For example, in the -- in your materials
7  considered list, Exhibit 3, I think on page 26 you
8  refer to several studies by a lead author of
9  Rahbar or Rahbar, done in Jamaica.
10      A. I'm sorry.  Which exhibit are we looking
11 at?
12      Q. Exhibit 3, your materials considered list.
13      A. Yup.
14      Q. I believe it's at page 26.
15      A. Yup.  There were a few studies.  So what I
16 see here is that in the past -- in the past, my
17 reports have also included mercury.  And so, like,
18 I just noticed this.  Some of these articles in
19 this list may not actually have informed my
20 opinion on the current version of my report.  The
21 version of my report relates to lead and arsenic.
22      For example, I just saw Reference
23 Number 394 says, "Seafood consumption and blood
24 mercury concentrations in Jamaican children."
25 That's an example I just noticed of

1    something that probably doesn't actually --
2        Q. Is that one of the Rahbar or Rahbar
3    studies?
4        A. Yes.
5        Q. And there's a couple of other Rahbar
6    studies you cite there.  Correct?
7        A. Yes.
8        Q. Are any of them relating to lead?
9        A. So if I'm just looking at the titles,
10   there's one that says, "Blood lead concentrations
11   in Jamaican children with and without autism
12   spectrum."
13       Q. Are you aware that the mean lead level of
14   lead in Jamaican soil is two to three times higher
15   than that in the United States?
16       A. I am not prepared to opine on the relative
17   levels of lead in soil in the United States versus
18   Jamaica.
19       Q. What about the studies from Egypt that you
20   cite in your materials considered?  Do you know
21   any comparison between the average blood lead
22   levels of Egyptian children compared to the
23   average blood levels of United States children?
24       A. So blood lead levels will change over time
25   and by location within the United States, within

1    Massachusetts, within whatever state you live in,
2    and by country, by time, and by different
3    populations, by different race and ethnic groups,
4    for example.
5        And what matters is not necessarily where
6    the blood -- where the lead is coming from but the
7    overall contribution.
8        And even when you look at, like -- say you
9    were comparing New York versus Massachusetts and
10   you saw, say, Massachusetts had higher blood lead
11   levels than kids in New York, there would still be
12   many kids in Massachusetts who would have much
13   lower levels of lead and kids in New York who have
14   much higher levels of lead.  It's just that there
15   might be a difference in the overall distribution.
16       But at any location, you're going to have
17   variability.
18       Q. In citing Egyptian studies in your report,
19   are you aware that the average Egyptian child has
20   blood lead levels up to five to ten times higher
21   than the average U.S. child?
22       A. I can't confirm or deny that, off the top
23   of my head.  One of the great things about this
24   literature and one of the strengths is that there
25   was a confluence of data from many different

1    populations of kids.
2        So for example, not all of the data came
3    from the past five years where overall kids had
4    lower lead levels than ten years ago.
5        That doesn't mean that the data from ten
6    years ago isn't relevant or the data from 15 years
7    ago isn't relative.  It just impacts the
8    distribution.
9        And one of -- the beauty of sort of
10   looking at different time periods and kids from
11   different socioeconomic status groups, kids from
12   different parts of the United States and from
13   different countries, is that when you see
14   associations consistent in different study
15   populations and over different time periods, that
16   is actually reassuring even if the average
17   level -- the average blood lead level in a child
18   in 1995 in Egypt might be quite far off from a
19   child in this study.
20       That doesn't mean that that study is not
21   informative at all.
22       MR. KLATT:  Okay.  Object to the
23   responsiveness of the answer after "I can't
24   confirm or deny that, off the top of my head," and
25   move to strike.

1        Q. Are you aware of any studies, whether you
2    cited them in your report or not, that indicate
3    that blood lead levels in developing countries are
4    associated with ASD or ADHD but not blood lead
5    levels in the United States?
6        A. We saw -- in this literature base, there
7    were associations in different countries.  Like
8    what I -- when you look at the ADHD literature, it
9    is more consistent than any other literature that
10   I've actually probably ever reviewed in my career.
11       The amount of consistency in the lead and
12   ADHD literature is probably actually just as
13   consistent if not more than the literature I have
14   seen in terms of smoking and stroke risk.
15   Everyone knows smoking causes stroke.  You ask any
16   stroke neurologist, smoking causes stroke.
17       Still, the literature on that association
18   is less consistent than what we see in lead and
19   ADHD here across so many different study
20   populations.
21       All the studies on lead and ADHD, they
22   were not all conducted on white middle-class
23   children in Chicago in the early aughts.  They
24   were studied in all different populations.  And
25   you see it again and again and again to the point

Page 257

1  where as an epidemiologist the consistency was
2  truly remarkable.
3      Q. Let me ask you the question again.
4      Were you aware of any studies that you
5  reviewed that showed that the blood lead levels in
6  developing countries were associated with ASD and
7  ADHD but not the blood lead levels in the United
8  States?  Were you aware of any such specific
9  studies?  That's all I'm asking.
10     A. That looked at children in some countries
11 and not in other countries --
12     Q. That reviewed studies in developing
13 countries, reviewed studies in the United States,
14 found an association between blood lead levels in
15 developing countries and ASD and ADHD, but didn't
16 find that association in the United States.
17     Are you aware of any specific studies that
18 showed that?
19     A. So what you would be asking about is,
20 like, meta-analyses and review studies.  So I'd
21 have to look back.
22     What we do in meta-analyses --
23     Q. I just need to know whether you recall any
24 such studies.  I don't need to know --
25     MR. ESFANDIARY:  Please.

Page 258

1      MR. KLATT:  Come on, she's way beyond the
2  question.
3      MR. ESFANDIARY:  She's answering the
4  question.  Stop interrupting the witness, please.
5      MR. KLATT:  I want responsive answers.
6      MR. ESFANDIARY:  She --
7      Q. I simply asked you whether you were aware
8  of any studies, whether they want to be
9  meta-analysis or whatever, that show increased
10 risks in developing countries but not in the
11 United States?
12     If you're aware of such studies, great.
13 If you're not, I don't need to know what you do
14 when you review meta-analyses.
15     MR. ESFANDIARY:  Objection.
16     Q. Are you aware of any such studies?
17     A. My answers are what they are no matter
18 what they are.  They are my truth.
19     And I'm doing my best to be as responsive
20 to your -- the way you're asking questions to the
21 best that I can be.  I just want to be clear about
22 that.
23     Whether they're found legally to be
24 unresponsive or not, I don't know.  I'm doing my
25 best to interpret as an epidemiologist your legal

Page 259

1  questions and answer them as an epidemiologist to
2  the best that I can.
3      I can look through the reports so that I
4  don't misrepresent the literature.
5      But sometimes in meta-analyses what we'll
6  do is we'll look at meta-regressions, were the
7  associations stronger in boys than in girls, in
8  older time period versus more recent time period.
9      We often do that to try to get a sense of
10 was the association stronger when the association
11 levels were stronger.
12     Q. Do you recall seeing any studies,
13 meta-analysis, whatever type, that showed
14 increased risk of ASD and ADHD in arsenic or lead
15 exposed children in developing countries but that
16 same study didn't show that increase in U.S.
17 studies?  Are you aware of any such studies or
18 not, as we sit here?
19     A. Are you saying I'm not allowed to look at
20 my report?
21     Q. I'd just like to know, because you can
22 spend hours looking at your report, I'd just like
23 to know, off the top of your head, are you aware
24 of such studies?  Have you seen or reviewed such
25 studies, to your recollection?

Page 260

1      A. I feel like you're asking me to have
2  memorized this and give an answer without looking.
3  And I was told that I would be able to sort of
4  refer to it.
5      So I don't feel comfortable guessing,
6  remembering things off the top of my head without
7  confirming.
8      Q. I'm not asking you to guess.  I'm asking
9  if you remember without having to refer to your
10 report.
11     A. To be responsible as a scientist, I
12 would -- the most responsible thing would be to
13 refer to my report.
14     Can we take a break for five minutes
15 before you put another --
16     Q. Sure.  Let me just ask, no study of that
17 nature comes to mind as you sit here without
18 looking at your report.  Is that correct?
19     A. I would have to look at my report because
20 there have been -- there have been
21 meta-regressions by country.  But in order to
22 accurately as a scientist answer your questions --
23 I don't think you want me to not be doing that.
24     Q. I just want you -- I just want you to
25 respond to the question asked.  That's all I'm

Page 261

1  asking.
2      A. And I want to be responsible here, which
3  would require looking at my report. I'm happy to
4  do that after the break if you still want me to.
5      MR. KLATT: Let's take a break.
6      THE VIDEOGRAPHER: This concludes Media
7  Number 6. Going off the record, 4:13 p.m.
8      (Recess, 4:13 p.m. to 4:30 P.M.)
9      THE VIDEOGRAPHER: This is the beginning
10  of Media Number 7. Going back on the record,
11  4:30 p.m.
12  BY MR. KLATT:
13      Q. We're back on the record, Dr. Gardener.
14  Are you doing okay?
15      A. I am.
16      Q. Can you name for me any medical or
17  scientific organization that has concluded that
18  consumption of baby food causes ASD or ADHD?
19      A. I haven't -- as far as I know, no
20  scientific organization has looked at it.
21      What's relevant here is the lead and the
22  arsenic. I haven't seen any organization -- any
23  scientific organization confirm or deny any risk
24  factor for autism or ADHD or, like, you know,
25  dementia, for example.

Page 262

1      Q. So you can't name any medical or
2  scientific organization, as we sit here today,
3  that has concluded that consumption of baby food
4  causes ASD or ADHD. Correct?
5      A. I haven't seen any medical organization go
6  through the process of determining -- looking at
7  that. So what their conclusion would be, I
8  haven't even seen them, like, investigate that
9  question or other risk factors for autism or ADHD
10  or other -- or other outcomes.
11      I haven't -- they could exist. They could
12  exist for dementia.
13      Q. My question specifically is, can you name
14  one?
15      A. I haven't looked.
16      Q. Okay. Can you name any regulatory
17  authority in any country, anywhere in the world,
18  that's concluded that consumption of baby food
19  causes ASD or ADHD?
20      A. So I wasn't making the distinction between
21  regulatory or medical authority. I haven't seen
22  any that have looked into it, concluded it one way
23  or another, for food or for any other risk factor.
24      Q. Can you name any pediatric society that
25  has concluded that consumption of baby food can

Page 263

1  cause ASD or ADHD?
2      A. I haven't seen any sort of review of baby
3  food or food related to any outcome.
4      Q. Can you name any psychiatric or neurologic
5  organization -- and you're in the department of
6  neurology -- who's concluded that consumption of
7  baby food can cause ASD or ADHD?
8      A. I am an associate professor in the
9  department of neurology, and I've never seen any
10  neurological association sort of write anything
11  like that for food in relation to any neurological
12  condition or any other environmental risk factor
13  in relation to any neurological condition. I
14  haven't seen any sort of similar kinds of reports
15  in any way.
16      Q. Including ASD or ADHD. Correct?
17      A. Yeah. I haven't seen any reports on any,
18  you know, risk factors of any kind in relation to
19  ASD or ADHD, food in relation to any outcome,
20  other environmental risk factors in terms of any
21  outcomes.
22      If you have an example of, like, a -- you
23  know, something totally unrelated that would be
24  similar --
25      Q. My question is specific to ASD and ADHD.

Page 264

1  And you can't name a neurologic or psychiatric
2  society that has concluded that baby food
3  consumption causes ASD or ADHD. Correct?
4      A. I haven't seen anything -- I haven't
5  looked, but I haven't seen any organization make
6  any conclusions about any risk factors for those
7  outcomes or other neurological outcomes.
8      Q. And that would also include any
9  nutritional society or organization. Correct?
10      A. So I haven't seen any nutritional society
11  comment on any sort of specific foods in relation
12  to ASD, ADHD, any other neurological outcome or
13  cardiovascular outcome.
14      Q. Are you aware of any medical textbook that
15  has concluded that consumption of baby food causes
16  ASD or ADHD?
17      A. I haven't read a medical textbook, you
18  know, looking at anything like that.
19      Q. There's no medical, scientific, or
20  regulatory organization that has recommended that
21  parents stop feeding their kids commercial baby
22  food. Correct?
23      A. I have seen organizations -- I'll find it
24  here.
25      So on page 110 of my report I wrote, "The

1    CDC and the FDA have both provided multiple
2    warnings about the potential for lead in baby food
3    to have grave health consequences for babies who
4    consume them.
5        "In 2023, it was recognized that cinnamon
6    applesauce pouches alone were causing high blood
7    lead levels in babies, widespread across the U.S.,
8    prompting recalls of multiple brands of cinnamon
9    applesauce and repeated warnings about lead
10   contamination in these baby food items by the FDA
11   and CDC.
12       "In relation to lead contamination in
13   cinnamon applesauce pouches, the CDC warned
14   consumers to avoid eating any amount of the
15   recalled applesauce pouches, acknowledging that
16   there was no safe amount of these to consume of
17   these due to the lead contamination.
18       "Public health agencies provided no
19   reassurance about how much of these pouches was
20   safe for babies to consume.  Rather, they made it
21   clear that any consumption amount was a cause for
22   concern.
23       "This situation provided clear recognition
24   that lead contamination in food marketed to babies
25   can cause lead toxicity and that there was no safe

1    amount to consume.
2        "In relation to the contamination of
3    applesauce pouches with lead, the FDA wrote:  Lead
4    is toxic to humans and can affect people of any
5    age or health status, protecting children from
6    exposure to lead is particularly important because
7    they are more susceptible to lead toxicity.
8        "Most children have no obvious immediate
9    symptoms.  Parents and caretakers should consult a
10   healthcare provider if you suspect a child may
11   have been exposed to lead.
12       "Short-term exposure to lead could result
13   in the following symptoms:  headache, abdominal
14   pain, colic, vomiting, anemia.
15       "Longer-term exposure could result in the
16   following additional symptoms:  irritability,
17   lethargy, fatigue, muscle aches, or muscle
18   prickly, burning, constipation, difficulty
19   concentrating, muscular weakness, tremor, and
20   weight loss.
21       "In relation to the consumption of
22   lead-contaminated applesauce pouches, the CDC
23   wrote the following:  No safe level of lead in
24   children's blood has been identified.  Lead
25   toxicity primarily targets the central nervous

1    system.  Children are more vulnerable to lead
2    poisoning than adults because their nervous
3    systems are still developing.  Children also tend
4    to absorb a higher fraction of ingested lead than
5    adults.
6        "Although children with lead exposure may
7    have no apparent acute symptoms, even low levels
8    of lead have been associated with learning,
9    behavioral, and cognitive deficits.  A child who
10   is exposed to large amounts of lead may develop
11   acute lead poisoning, presenting with
12   gastrointestinal, hematological, and neurological
13   effects, including one or more of the following
14   signs and symptoms."
15       Q. That's far beyond the question I asked.
16       MR. ESFANDIARY:  Hang on.
17       MR. KLATT:  She's talking about symptoms
18   now and I asked about regulatory recommendations.
19       MR. ESFANDIARY:  She was responding to
20   your question.
21       MR. KLATT:  No.  She's just reading ad
22   nauseam.  We're far beyond the question.
23       Q. So can we go back --
24       A. I thought that was -- do you want to
25   repeat the question again?

1        MR. ESFANDIARY:  I want to be very clear.
2    Dr. Gardener was in the process of answering
3    Counsel's question.  He interrupted her,
4    preventing her from answering the question.
5        But you can go ahead and ask your next
6    question.
7        MR. KLATT:  Thank you.
8        Q. You're aware what you're reading from your
9    report relates to specific recalls of highly
10   contaminated individual products and doesn't apply
11   to baby food as a whole?  Do you understand that?
12       A. So it was in relation to, in 2023,
13   lead-contaminated cinnamon applesauce pouches from
14   certain brands.
15       You asked me -- I thought I was being
16   responsive to your question.  Do you want to
17   repeat your question?
18       Q. Yes.  There's no medical, scientific, or
19   regulatory organization in the world that has
20   recommended that parents stop feeding children
21   commercial baby food.  Correct?
22       A. Yes.  So the CDC and FDA have issued very
23   clear warnings that parents of children stop
24   feeding their children these baby foods.  In fact,
25   they told people to be cautious when cleaning up

Page 269

1  these baby foods.  Not just eating it but eating
2  any amount.  Any amount, they said, can cause harm
3  and even cleaning it should be done with caution.
4      Q. You recognize those CDC and FDA statements
5  in that particular year related to a particular
6  contaminated product -- in fact, not to the food
7  but to the cinnamon spice used in the food that
8  originated in South America and that was in
9  relation to a specific recall.
10     My question isn't about a specific product
11 that's highly contaminated.  I'm talking about
12 commercial baby foods that virtually every child
13 in the United States consumes on a regular basis.
14     There's no medical, regulatory, or
15 scientific organization in the U.S. or anywhere in
16 the world that has told parents to stop eating
17 commercial baby food because of heavy metals.
18 True?
19     A. No, that's not true.  Even more so, first
20 of all, I want to correct something.  You said it
21 wasn't due to the food.  It was due to the
22 cinnamon in the food.
23     Cinnamon is food.  It's not like they were
24 talking about the cap of the food or the lining of
25 the pouch.  They were talking about -- the

Page 270

1  cinnamon is part of the food.  It's an ingredient.
2  It's a listed ingredient.  So I want to make that
3  point clear.
4      Second of all, the FDA starting in January
5  of this year now has new regulatory guidelines
6  about not just the consumption but the sale of
7  specific baby foods.  They have new regulations
8  about the amount of lead that can be sold in
9  different categories.  I think it's 20 parts per
10 billion for, like, cereals and 20 parts per
11 billion for single-ingredient root vegetables and
12 10 parts per billion for everything else.
13     So it should be understood that if those
14 products should not be sold they should also not
15 be consumed, I would say emphatically.
16     Q. Has the FDA said to parents stop feeding
17 your children commercial baby food, period?
18     A. The FDA in that guidance made it very
19 clear that children should not be eating baby
20 foods outside of those guidelines.  And they made
21 it very clear that a pretty high proportion of
22 baby foods on the market in the past actually
23 wouldn't adhere to those guidelines.
24     Q. Has FDA required those products to be
25 recalled?

Page 271

1      MR. ESFANDIARY:  Which products?
2      Q. The products you just referred to that
3  don't meet those guidelines.  Or are they still on
4  the shelves?
5      MR. ESFANDIARY:  Which manufacturer?
6  Which product?
7      MR. KLATT:  Any manufacturer.
8      A. I will find the -- they had made it very
9  clear that those products should be considered
10 adulterated.
11     Q. They have not said stop feeding your
12 children commercial baby foods because of heavy
13 metal consumption.  Correct?
14     A. They have said they should not be sold.
15 So it's very clear if they -- they're only being
16 sold to be eaten.  So if they shouldn't be sold,
17 then they shouldn't be eaten.
18     They are adulterated.  The FDA has made it
19 very clear that not just are they regulating this,
20 but actually this is just their starting point.
21 That their goal of protecting children from lead
22 contamination in baby foods, this is just
23 starting.  And these levels are harmful.  And
24 these levels, products with these levels in the
25 past are widely on the shelves.

Page 272

1      Q. They didn't conclude that those levels
2  caused any level of harm.  That's just levels
3  below which they recommended that people make.
4  Correct?
5      A. I'll read some excerpts of it.
6      Q. That's fine.  I withdraw the question.
7      A. Okay.
8      Q. Has the American Academy of Pediatrics
9  told American parents to stop feeding their
10 children commercial baby foods?
11     A. I don't know.
12     Q. You haven't seen that?
13     A. I haven't seen their guidance about this.
14 No.
15     Q. Do you agree with me, changing the
16 subject, that temporality is a component of
17 determining causality.  Right?
18     A. Temporality is part of the Bradford Hill
19 criteria that I wrote about extensively in my
20 report.
21     Q. And exposure must precede outcome to meet
22 the temporality requirement.  Correct?
23     A. So in order for an exposure to cause an
24 outcome, it has to occur before the outcome.
25     But oftentimes in epi studies the exposure

Page 273

1  is understood to occur before the outcome, but the
2  measurement of it can occur later.  It can occur
3  concurrently.  And we often do this.
4       As you so beautifully emphasized
5  throughout the day, you were talking about how
6  lead and arsenic exposure starts in utero and
7  continues for all of the in utero period and
8  infancy and childhood.  And that is so important
9  here because it speaks to this whole temporality
10  issue.
11       You realize this lead and arsenic exposure
12  is not something that babies and children are only
13  exposed to later on when some of these studies
14  were conducted.
15       These are exposures that they've had their
16  whole life.  If children were never exposed to
17  lead and arsenic until the age of 2, we wouldn't
18  be sitting here.  I hold myself and my scientific
19  standards to a really, really high standard.  And
20  if we were talking about an exposure that nobody
21  was exposed to until later on in life, I would not
22  have the confidence to be reporting this in the
23  way that I am.
24       Temporality is very important.  The fact
25  that lead and arsenic exposure is a lifelong

Page 274

1  exposure from the in utero period and throughout
2  infancy provided a lot of -- I should say it
3  really informed my opinion here.
4       MR. SACHSE:  Motion to strike everything
5  after "So in order for an exposure to cause an
6  outcome, it has to occur before the outcome."
7  Thank you.
8       MR. KLATT:  Can you mark this.
9       (Exhibit 10 marked for identification)
10  Q. I'm going to show you something I
11  prepared.  And it's a question I'm going to ask
12  you.
13       Can you cite for me, Dr. Gardener, any
14  published epidemiologic study on lead or arsenic
15  exposure from any source, an ASD risk that meets
16  the following four criteria:
17       Number 1, exposure in the six months to
18  three-year-old time period.
19       Number 2, sources to doses of lead and
20  arsenic one might reasonably get from baby food.
21       Number 3, an increase in the diagnosed
22  outcome of ASD.
23       And Number 4, in a population of U.S.
24  children?
25       MR. ESFANDIARY:  Do you have an extra copy

Page 275

1  of that?
2       MR. KLATT: Sure.
3       MR. ESFANDIARY:  Thank you.
4  Q. As you sit here today, can you cite a
5  study that you've seen, that you've cited or not
6  cited, that meets those four criteria?  And if so,
7  which one?
8  A. First of all, babies -- children in -- the
9  majority of the children in all of these studies
10  that I have cited were exposed to lead and arsenic
11  within the first three years of life.  You talked
12  about that earlier, that maybe not every single
13  child in every single study, but we're talking
14  about lead and arsenic being ubiquitous.
15       In these studies, kids were all exposed
16  during this time period.  Also, the exposure
17  levels in a lot of these studies were extremely
18  low.  Extremely low.  And similar to or even less
19  than the amount that was estimated in Dr. Jones
20  from the hypothetical menus and from the studies
21  that I conducted in terms of lead exposure in baby
22  food and what sort of understood from food in
23  general including baby food to have lead, not
24  every single study showed an association with
25  autism.

Page 276

1       But as I showed in my report, many did.
2  And some of the studies were conducted in the
3  United States and some were not.
4       I would have to -- I don't think I have
5  time right now to go through and say which ones
6  were in the United States and which ones were not.
7       MS. FOUHEY:  Move to strike as
8  nonresponsive.
9       MR. ESFANDIARY:  She literally just
10  answered the question perfectly, point by point.
11       What are you talking about?  Maybe I'm
12  losing it.
13       Ask your next question.
14  Q. You answered different studies for
15  different criteria.  I'm asking for any published
16  epidemiologic study that met all four of these
17  criteria, exposure in the six month to
18  three-year-old time period --
19  A. All of them.
20  Q. -- exposure to doses of lead and arsenic
21  one might reasonably get from baby food.
22  A. Almost all of them.
23  Q. An increase in the diagnosed outcome of
24  ASD, not just symptoms.
25  A. Not all of them but a good number.

Page 277

1    Q. And I'm asking for a single study in a
2  population in the United States.
3    A. Not all, but a good number. I'd have to
4  look.
5    Q. Can you name one study that meets all four
6  of those criteria?
7    A. I'd have to look. Not off the top of my
8  head, but yeah. I mean, of course. As you talked
9  about earlier, these exposures are ubiquitous.
10    Q. We'll leave a blank in your deposition.
11  When you find that study that meets all four
12  criteria -- I'm not talking about five studies
13  that meet one, six studies that meet another.
14    A. Sure, yeah, tons.
15    Q. I'm talking about one study from the
16  United States that meets all four of those
17  criteria, if you would provide it as part of this
18  transcript.
19    MR. ESFANDIARY: No, she's not going to go
20  back and do additional homework. This is your
21  chance to ask questions. She's literally just
22  responded to your question. I know you don't like
23  it.
24    MR. KLATT: I'm not going to sit here for
25  three hours --

Page 278

1    MR. ESFANDIARY: Calm down, wait for a
2  question.
3    She's not going to do any homework. This
4  is your time to ask questions, so wrap it up.
5    MR. KLATT: I'm not going to sit here and
6  let her go through a hundred-page report for three
7  hours.
8    MR. ESFANDIARY: Then don't ask a
9  ridiculous question.
10    MR. KLATT: No, that's a very simple
11  question. That's a foundational question.
12    MR. ESFANDIARY: It's a simple question?
13  You made an exhibit about it.
14    MR. KLATT: You're interrupting me now.
15  I'm asking if she can name, as she sits
16  here, a single study that meets those four
17  criteria. If she can't without referring to her
18  report, that's fine. I just want to know that.
19    A. I can't refer -- if you had asked me any
20  question -- I'm horrible with names. I don't
21  remember the names and the dates other than if it
22  was me, and like I said earlier, sometimes not
23  even if it was me. If you had asked me a set of
24  criteria and asked me about my own research, I
25  would have to look at those.

Page 279

1    So I don't think it's reasonable for a
2  scientist to be able just to look at all those and
3  be like, you know, Joe Smith, 2018.
4  BY MR. KLATT:
5    Q. When you testify in front of Judge Corley
6  in December, if you do, are you going to sit there
7  and go through hundreds of pages of your report to
8  answer questions she may have?
9    MR. ESFANDIARY: Calls for speculation as
10  to what's going to happen six months from now.
11    A. All I can do in front of Judge Corley is
12  my best. I wouldn't make things up. Like, if
13  Judge Corley asked me this question, I wouldn't
14  just say, you know, Joe Smith, 2018.
15    I'm a human. I will be sworn in that day
16  and I will do everything to the best of my
17  ability, knowing that at the end of the day I need
18  to be professional as a scientist and I need to
19  do . . .
20    I would say to her, you know, if she was
21  asking the question, I need to look at the papers.
22  I need to -- if that isn't allowed, then I don't
23  know how to answer the question.
24    I would simply just have to answer
25  honestly. And that would be me being the most

Page 280

1  responsive. I understand that's not the answer
2  you want.
3    Q. No. I just want an honest answer, what
4  you think you'll do if you're asked that same
5  identical question by Judge Corley.
6    A. So I've never been -- I guess I have been
7  in front of a judge. I had the Sargon hearing.
8  So maybe it's similar. I didn't have any issues.
9  The Sargon hearing for me went great. I haven't
10  run into any sort of problems. But I would be
11  honest with the judge and ask her how I'm supposed
12  to proceed.
13    Q. If you'd look at Exhibit 10. I believe
14  that's what we're looking at. Is that correct?
15    A. Yes.
16    Q. And if I just changed in that question ASD
17  to ADHD so that it read, "Can you cite for me, as
18  you sit here today, any published epidemiologic
19  study on lead or arsenic exposure from any source
20  and ADHD risk that meets all of the following four
21  criteria:
22    Number 1, exposure in the six months to
23  three-year-old time period.
24    Number 2, exposure to doses of lead and
25  arsenic one might reasonably get from baby food.

Page 281

1      Number 3, increase in the diagnosed
2  outcome of ADHD.
3      And Number 4, in a population of U.S.
4  children.
5      Can you name such a study, sitting here
6  today, without referring to your report?
7      A. I would have to refer to my report to be
8  most responsible. I mean, not doing so would just
9  not be -- you know, I had an oath here. I don't
10 want to be incorrect with any of my statements.
11 It's very important to me to be 100 percent
12 correct.
13     Q. I understand. And I would imagine if
14 there was such a study you could cite it off the
15 top of your head. But if you can't --
16     A. Absolutely not. Some people could. Some
17 people could. It would absolutely not be me. I'm
18 horrible with names. And it would just not be
19 responsible.
20     Q. Do you understand almost 100 percent of
21 lead in the bloodstream is contained within red
22 blood cells?
23     A. I am not prepared to opine on that.
24     Q. Okay. Do you know the lifespan of a human
25 red blood cell that contains lead?

Page 282

1      A. I do not know. I'm not prepared to opine
2  on that. It's not part of my charge, not part of
3  what I looked at.
4      Q. Do you know that the lifespan of a red
5  blood cell is approximately 120 days?
6      A. If you want to show me, I'm happy to look,
7  but I can't --
8      Q. Do you know one way or the other?
9      A. I can't confirm or deny that fact. I did
10 not come prepared to talk about the lifespan of a
11 red blood cell.
12     Q. Can you tell us whether measuring blood
13 in -- excuse me -- measuring lead levels in blood
14 and arriving at a level tells you about a lead
15 exposure that precedes 120 days?
16     A. I am not prepared, I guess, to -- I guess
17 you were a little bit broad in just asking me to
18 talk about it.
19     Q. I just want to know whether you know, one
20 way or the other.
21     A. I guess I'm not prepared to talk about the
22 amount that would be there after that period of
23 time.
24     Q. I'm just wondering when you rely on these
25 studies that have blood lead levels in them, how

Page 283

1  far back do you assume that blood level reflects
2  exposure to lead?
3      A. Earlier you brought up the important point
4  that you called it sequestered. I never used that
5  word. It can be -- lead can be stored in bones
6  and be rereleased. So I think that's what you're
7  asking about.
8      And yes, I agree with you that lead in
9  your blood is not just indicative of very recent
10 exposure but it can be -- it can reflect past
11 exposure that is, as you called it, sequestered in
12 the bones and then released.
13     Q. If you --
14     A. If that's what you're asking about.
15     Q. If you have a blood lead level that's
16 measured at the time or after your ASD diagnosis,
17 does that give you any information at all about
18 when that person was exposed to that lead?
19     A. So as you so rightfully pointed out many
20 times, children are exposed to lead every day.
21 Lead is ubiquitous.
22     But what really matters is how much lead,
23 the variability of lead. And that can change over
24 time. So the exposure -- the exposure tends to be
25 higher in children and babies than adults, but not

Page 284

1  necessarily. Some people are more exposed as
2  adults than when they were younger. And there is
3  variability.
4      Q. My question is very simple. If you get a
5  blood lead level measurement, let's say today, can
6  you pinpoint when you were exposed to the lead
7  that resulted in that blood level?
8      A. Like you said, you're exposed all the
9  time. So your blood lead level today represents
10 the burden of lead in your blood right now. The
11 exposure may reflect, you know, exposures from the
12 past, including that day, the past month, farther
13 back, but it will vary day by day.
14     Q. If a child has a blood lead level measured
15 at four years of age, does that tell you what the
16 child's blood level was under one year?
17     A. So it would vary day by day. It would be
18 over time. Typically in these sort of studies we
19 don't measure, you know, blood lead levels every
20 single day. When we go to the doctor, we measure
21 it a couple times in a childhood because that is
22 thought to be relevant.
23     It's not like some exposures where, you
24 know, it's literally eliminated within hours.
25     And if you're talking about a relevant

1   source, there tends to be some variability but
2   also a lot of correlation over time.
3       It might not be perfectly representative
4   of a week before. But on a population-wide level,
5   it's highly correlated.
6       Q. But a blood lead level in a four-year-old
7   or a seven-year-old or an eight-year-old tells you
8   nothing about when the exposure to that lead
9   occurred. Correct?
10      A. So the exposure to lead happens all the
11  time.
12      Q. And a blood lead level taken of a child at
13  four or seven or eight years of age or any age
14  doesn't tell you the source of the lead. Correct?
15      A. Your blood lead level represents the body
16  burden and it doesn't say whether that blood lead
17  level is from water or from the apples you eat or
18  the spinach that you eat or the house paint or
19  reflects how much prenatal exposure.
20      Just like this is true for other
21  environmental exposure. So for example, PFAS,
22  which is what I study. When we look at the serum
23  concentrations of PFAS, we can't tell if the PFAS
24  comes from the person's couch or the food that
25  they're eating or the water that they're drinking

1   or from their car. It doesn't actually matter
2   because what matters is the neurotoxicant, not as
3   much the exposure.
4       The exposure does matter in terms of
5   actions people can take and regulations that can
6   happen on a population-wide level to protect
7   ourselves.
8       Q. My question is simply, and I think you may
9   have just answered it, getting a measurement of a
10  blood lead level or an arsenic level doesn't in
11  and of itself identify where that exposure came
12  from. Correct?
13      A. That is correct. It doesn't show what
14  foods or what sources. It doesn't really need to.
15  What it does is it -- for these studies, it shows
16  the association between the neurotoxin itself and
17  the outcome, which is what's relevant here.
18      And when I talk to, say, clients who
19  they'll have a high blood lead concentration in
20  their children, they want to be thinking about all
21  exposure sources that they can eliminate.
22      And what I tell my clients is even if your
23  blood lead level is nondetect, you still want to
24  be identifying exposure sources and reducing them
25  because there is no safe level of lead.

1       Q. Have you, yourself, published any
2   recommendations or advised any of your colleagues
3   at the University of Miami that parents should
4   avoid feeding their children commercial baby
5   foods?
6       A. I don't think I've ever talked to any of
7   my colleagues, given them advice about what their
8   kids should eat.
9       I'm in the neurology department. None of
10  my colleagues treat children. My colleagues are
11  all older than me. I can't think of anyone who's
12  actually had children after me. I don't like
13  telling people what they should eat themselves or
14  other people other than sort of in a -- like a
15  professional setting.
16      Nobody has ever asked me or I never told
17  them, you know, feed this to your kids, feed that
18  to your kids.
19      First off, I can't think of any colleague
20  who had a baby after me.
21      Q. So you haven't gone to any of your
22  colleagues, young or older, whether they're
23  research assistants or whatever, and said, "I've
24  been doing a lot of reading. I'm very concerned
25  about heavy metals in baby foods, and you should

1   avoid feeding your children those"?
2       A. I can think of one colleague who maybe I
3   have talked to about her grandchildren.
4       Q. Who is that?
5       A. My colleague named Bonnie.
6       Q. In your department?
7       A. Yeah.
8       Q. Bonnie who?
9       A. Bonnie Levin.
10      Q. And what did you tell her?
11      A. We have talked about -- she's very much on
12  the same page as I am about heavy metal toxicity,
13  and we've talked about heavy metals in various
14  food sources.
15      Q. Does Bonnie feed her grandchildren
16  commercial baby food?
17      A. She doesn't really feed her grandchildren.
18      Q. Do you know whether she knows if her
19  grandchildren are even fed commercial baby food?
20      A. I don't know.
21      Q. Do you agree that baby foods are complex
22  mixtures that contain vitamins and nutrients that
23  are known to be beneficial for healthy brain
24  development?
25      MR. ESFANDIARY: Objection, overbroad,

Page 289

1  nonspecific.
2      A. There's a lot of parts to that question.
3      So some baby foods are simple; they'll
4  just be a single ingredient. And other baby foods
5  have multiple ingredients. Some will have
6  cinnamon, like I talked about earlier. A lot of
7  the applesauce pouches have cinnamon. I don't
8  know if you would call that a complex mixture.
9      But there will be -- some baby foods are
10 just one ingredient and some baby foods are
11 multiple ingredients. The amounts of their
12 nutrients will vary.
13     Q. Do you consider yourself to be an expert
14 on baby food nutrient and nonnutrient interactions
15 in the body?
16     A. I talked about this in this report. Like
17 I've said many times, my understanding of what is
18 an expert is someone who knows a lot more than the
19 general public. I would say I know a lot more
20 than the general public about this. I touched on
21 it in my report. There's a whole section about
22 it.
23     Q. Have you ever held yourself out to your
24 colleagues as an expert in the interaction between
25 nutrient and nonnutrient components of food?

Page 290

1      A. I have never held myself out as an expert
2  to my colleagues on nutrition. That just sounds
3  very like an awkward thing to do. My colleagues
4  recognize me as an expert on diet.
5      I can't imagine being like, "Hey, guys,
6  I'm the expert in diet. They have more said to
7  other people, "Hannah, you know, is an expert on
8  diet."
9      Q. Have you published on -- any publications
10 on how nutrients and nonnutrients interact in
11 food?
12     A. How nutrients interact? I can't think of
13 a paper of mine that -- I don't think -- I'm not
14 trying to be nonresponsive, but I can't think of a
15 paper of mine that would probably fit what you're
16 asking.
17     Q. That's very responsive. That's the most
18 responsive answer you've given today.
19     A. Then our definitions of what's responsive
20 are very different.
21     Q. You don't consider yourself a
22 nutritionist. Correct?
23     A. I don't call myself a nutritionist. I do
24 call myself a nutritional epidemiologist.
25     Q. And on your web page, do you say you're a

Page 291

1  nutritional epidemiologist with the University of
2  Miami?
3      A. I have no idea. A friend created my
4  website over a decade ago. I have no idea what it
5  says. It's so dated.
6      Q. Where have you held yourself out in public
7  as a nutritional epidemiologist?
8      A. I guess -- I'm not really allowed to talk
9  about those meetings. I've called myself a
10 nutritional epidemiologist to other scientists
11 when sort of describing my expertise before.
12     Q. That's just verbal descriptions as opposed
13 to something that you've, like I said, put on your
14 website or your resume?
15     A. I have no idea what my website says.
16     My resume speaks for itself. I've
17 published a ton on nutritional epidemiology.
18     Q. I don't think I saw a nutritional
19 epidemiologist on your CV, but you can correct me
20 if I'm wrong.
21     A. What did I put on my CV? I don't see a
22 spot where I would have put that or anything, but
23 maybe I don't understand, like, the section that
24 you'd be looking for.
25     What did I say myself?

Page 292

1      Q. Did you represent in your CV that you're a
2  nutritional epidemiologist?
3      A. I guess like where have I represented
4  myself as something -- I don't recall an area of
5  my CV where I'm like I am an environmental
6  epidemiologist. I am a nutritional
7  epidemiologist. I am an epidemiologist. I just
8  don't -- I did say, you know, I'm a research
9  associate professor. I put in parentheses
10 epidemiology in the department of neurology. I
11 said I'm the director of the biostatistics core.
12 I wrote that I have a doctorate of science in
13 epidemiology.
14     I don't see a place where I have said I am
15 an epidemiologist. I am an epidemiologist, in
16 fact, but I don't see anywhere where I have said a
17 sentence like "I am an epidemiologist" or "I am an
18 environmental epidemiologist, a
19 neuroepidemiologist, a nutritional
20 epidemiologist."
21     One thing we do when we write grants is we
22 don't submit our whole CV. We submit what we call
23 a bio sketch, which is a very, very condensed
24 version of that. We often include a personal
25 statement.

Page 293

1    And that's a spot where I have included,
2  you know, things like I am a nutritional
3  epidemiologist or I am an environmental
4  epidemiologist or a neuroepidemiologist, depending
5  on sort of the topic of --
6    Q. Your testimony is you have represented
7  yourself as a nutritional epidemiologist in such a
8  document?
9    A. I have represented myself definitely as a
10 nutritional epidemiologist online.  I've
11 represented it -- myself informally, formally, in
12 many different places.
13   Q. Have you conducted any analysis comparing
14 the eating behaviors of children with and without
15 autism?
16   A. I have not published a study on eating
17 behaviors comparing children with and without
18 autism.
19   Q. Are restricted eating patterns and
20 essential nutrient deficiencies in children with
21 ASD a plausible biological mechanism by which
22 children with ASD have higher lead and arsenic
23 levels than children without ASD?
24   A. Could you say that again?
25   Q. Sure.  Are restrictive eating patterns and

Page 294

1  essential nutrient deficiencies in children with
2  ASD a plausible biological mechanism by which
3  children with ASD have higher lead or arsenic
4  levels than children without ASD?
5    A. So I did talk about how lead competes
6  with, like -- with iron and calcium receptors and
7  can impact those levels.  I have talked about that
8  a bit in the report.
9    I've also talked about how I considered
10 the possibility of restricted eating patterns and
11 whether those could be associated with increased
12 or decreased lead or arsenic exposures.
13   I have not seen any evidence to confirm or
14 refute that, but I did consider that possibility.
15 I didn't see any evidence, but that was something
16 that was important for me to think about.
17   But I think what you were saying is, is
18 one possibility of the way that lead and arsenic
19 and particularly lead is neurotoxic is the fact
20 that it competes for binding sites with calcium
21 and iron.
22   Q. No, that's not what I'm asking.
23   I'm asking if the feeding patterns and
24 food selectivity that is more common in children
25 with ASD than children without may affect their

Page 295

1  blood lead levels.  Do you know one way or the
2  other?
3    A. Like I said, I haven't seen any evidence
4  to confirm or refute the fact that these selective
5  eating patterns or eating habits are -- tend to be
6  higher in lead or arsenic or lower in lead or
7  arsenic.  Yeah.
8    I mean, you know, what we see is that
9  children with ASD and ADHD, they have higher body
10 burden of lead.
11   And that doesn't necessarily indicate the
12 source nor does it indicate the role of genetics
13 that's impacting how long those toxic heavy metals
14 stay in the body, how they distribute, how they're
15 detoxified.
16   Q. So does that mean -- do you believe that
17 genetic changes that result in autism can also be
18 genetic changes that affect children's metabolism
19 of heavy metals?
20   A. That's definitely something that I've
21 talked about is how that is an important part of
22 this causal mechanism, that even if a child -- say
23 you have two children and they're both exposed to
24 the same amount of lead, that some children, their
25 genetics, which may be related, as suggested by

Page 296

1  some of these studies, to their propensity to be
2  autistic or to have ADHD.
3    Those genetics may impact -- may affect
4  the impact of the lead, the brain toxicity, how
5  long the lead stays in their body.  That's what
6  I'm talking about is the interaction with
7  genetics.
8    It seems very plausible to me.  I talk
9  about that in my report.  That's not confounding.
10 That is part of the causal mechanisms.  That's why
11 baby food needs to be safe for everyone.
12   That's why I was talking about lead paint
13 earlier.
14   Q. I think you may be talking about something
15 a little different.
16   My question is, have you entertained the
17 possibility that the genetic changes that can
18 cause autism or ASD, those genetic changes can
19 also affect the way kids metabolize lead or
20 arsenic so that their levels are higher as a
21 result of the genetic mutations?
22   A. Absolutely.  That's what I talked about in
23 here.  But those are not coincidental.  There's a
24 plausibility that you have these genes that cause
25 autism.

1    Oh, and by chance they also -- because
2    genes affect different things. Oh, look. They
3    happen to also increase the body burden of these
4    neurotoxins but totally just coincidentally. Just
5    by chance. Not in a way such that the neurotoxins
6    are related. That's just not plausible.
7        It's so wildly coincidental and unlikely.
8    It would be like saying, oh, look, there is these
9    genes that increase the risk of lung cancer, and
10   they also affect the metabolism and the toxicity
11   of nicotine but just by chance.
12       Not because nicotine causes -- not because
13   cigarette smoking causes lung cancer but just --
14   they do different things and they happen to both
15   do these same things. That sounds to me wildly
16   implausible.
17       Q. But you just pointed out that the same
18   genes can have a variety of different and
19   unrelated biologic effects. Correct?
20       A. Yes. Absolutely. What is far more likely
21   is that there are these genes that impact the risk
22   of neurodevelopmental outcomes because they impact
23   how neurotoxins, including heavy metals, impact
24   those diseases.
25       Just like we know that the genes -- it's

1    widely assumed that the genes that impact how
2    cigarette smoke is processed in the body, they
3    impact the risk of lung cancer because they do
4    that. Not just coincidentally.
5        MR. KLATT: Object to the
6    nonresponsiveness of the answer.
7        Can we take a quick break for a second?
8        MR. ESFANDIARY: Sure.
9        THE VIDEOGRAPHER: This concludes Media
10   Number 7. Going off the record, 5:19 p.m.
11       (Recess, 5:19 p.m. to 5:35 p.m.)
12       THE VIDEOGRAPHER: This is the beginning
13   of Media Number 8. Going back on the record,
14   5:35 p.m.
15       EXAMINATION BY COUNSEL FOR PLUM, PBC
16   BY MR. SACHSE:
17       A. Good evening, Doctor. We've met before.
18   My name is Will Sachse. I represent Plum. I'm
19   going to ask you a few follow-up questions, if
20   that's okay.
21       A. Sure.
22       Q. I think I'd like to actually start where
23   we ended.
24       A few minutes ago I believe you agreed
25   that the genetic changes that can result in autism

1    can also be genetic changes that cause elemental
2    dysregulation in a child. Is that fair?
3        A. That's been suggested in the literature as
4    a possibility for what's going on. I talk about
5    that in my report.
6        Q. So here's my question: If you've got a
7    study that shows that children with autism have
8    higher levels of lead and lower levels of
9    essential nutrients, how do you go about
10   determining whether that result is due to the
11   genetic changes that lead to autism versus the
12   genetic changes that lead to dysregulation?
13       A. Sorry. I'm lost.
14       Q. Let me try it again.
15       A. Late in the day.
16       Q. You agree -- I think you've said this
17   previously -- that genetics play an important role
18   in autism. Right?
19       A. Yes. Like all neurological diseases.
20       Q. Sure. And I think you'd agree that there
21   are some cases where the autism is due solely to
22   those genetic changes. Correct?
23       MR. ESFANDIARY: Objection, misstates her
24   testimony.
25       A. You'd have to show me where, you know --

1    where you're taking that from.
2        Q. I'm just asking you a question as somebody
3    who has studied in this area.
4        A. So that's a question of more of specific
5    causation, whether there are highly penetrant
6    genes that, you know, would make it so that a
7    child would be autistic no matter how much lead
8    they were exposed to.
9        Q. Sure. And I understand in the specific
10   causation context. I'm asking more in the general
11   causation context because if you -- let me just
12   ask the question.
13       You agree that genetics is a -- plays an
14   important role in causing autism generally.
15   Correct?
16       A. Yeah. There's a genetic role in autism.
17       There's a lot of sort of uncertainty and
18   debate in terms of how -- the percentage of autism
19   that can be attributed to genetics versus heavy
20   metals.
21       There's going to be an overlap. That's
22   what I would say has been more recognized over --
23   probably since I published my dissertation is, you
24   know, at the time when I was publishing my
25   dissertation we were talking about, like, genetics

1  or environmental factors.
2      And over the past, you know, two decades I
3  would say there's a lot more recognition of
4  epigenetic changes and the interplay between genes
5  and environment.
6      And so say, for example, I probably do --
7  as sort of an example, I probably do have genes
8  that would really, really, really increase my risk
9  of lung cancer if I smoked.
10     The fact that I don't smoke makes those
11 genes irrelevant. But that's still a risk factor
12 I have. It's only relevant in that context.
13     The fact that all children are exposed to
14 lead or the vast majority of children are exposed
15 to lead means that there could be genetic
16 mechanisms related to the neurotoxicity of lead
17 related to genetics that they would apply to any
18 children that had those genes.
19     Q. Okay. That's super helpful. So let me
20 see if I can untangle this.
21     When you're evaluating a study, how do you
22 go about deciding whether the result that you see
23 of autism is due directly to the genetic changes
24 that cause autism versus indirectly from genetic
25 changes that lead to -- contribute to autism but

1  also can contribute to elemental dysregulation?
2      A. It would depend on the genes. I mean,
3  like, what are, like, the -- there are advanced
4  statistical methods that would help disentangle
5  mediation, mediation analyses for example, or
6  interaction analyses.
7      At the end of the day, it doesn't always
8  matter, you know. We see that there's this
9  increase in lead burden. And the point is that
10 some children might be just far more -- we know
11 some children are far more susceptible to lead.
12     The reason why we -- why we regulated lead
13 out of house paint is not because house paint was
14 going to cause cognitive impairment in every
15 single person but because on a population-wide
16 level there was going to be detriments that was
17 going to be bigger in some people.
18     We need to make house paint safe for
19 everyone, just like we need to make toys safe for
20 all children, just like we need to make food safe
21 for all children regardless of how well their
22 bodies metabolize, detoxify, excrete that lead.
23     Q. Okay. Thank you for that answer.
24     A. It's involved in the causal mechanisms.
25     Q. Okay. Thank you for that answer.

1      MR. SACHSE: Respectfully, I'm going to
2  move to strike everything after "It would depend
3  on the genes."
4      Q. Let's just move on, and I want to talk now
5  about your specific process.
6      When you were looking at all of the
7  studies that you reviewed before forming your
8  opinions here, what was the methodology that you
9  used to determine the extent to which it was --
10 the results that you were seeing were due to
11 elevated levels of lead or arsenic versus a
12 genetic component, a preexisting genetic component
13 in the children with autism?
14     A. I think what you're asking is what are the
15 mechanisms? What are the mechanisms involved in
16 this lead exposure? Do those mechanisms involve
17 genes?
18     That wasn't part of my charge. It doesn't
19 actually --
20     Q. I'm sorry. I'm asking a different
21 question.
22     A. It's hard for me to finish if you're not
23 interrupting me but you're going, like as I talk.
24 It feels like an interruption.
25     Q. I apologize. Go ahead.

1      A. So what you're asking me about is what are
2  the mechanisms by which increased body burden of
3  lead is associated on a population-wide level with
4  lead and ADHD. To what degree is genetics part of
5  that mechanism.
6      That wasn't really part of my -- part of
7  my charge. For me, I was interested in does an
8  increased body burden of lead and arsenic increase
9  the risk of autism and ADHD. Yes. Yes.
10     The evidence shows that increased exposure
11 to lead and to arsenic increases the risk of
12 autism and ADHD. To what extent do -- does
13 genetics modify that exposure? That wasn't part
14 of my charge. I don't have an answer for you to
15 what extent those mechanisms, those mediation --
16 those mediation components are working.
17     I think for this matter it doesn't matter
18 because what we need is, we need the exposures
19 in -- the lead and arsenic exposures in our world
20 to decrease because people don't know what their
21 genetics are.
22     In an ideal world where there's much more
23 precision medicine -- we've been talking a lot
24 recently in the medical world about precision
25 exposures.

Page 305

1      In the future, when you're born and you
2  know your genetics and you're, like, oh, look, me,
3  I am someone who can tolerate lead very well and
4  I'm not, then we can better understand how diet
5  should be modified.
6      We're not there yet. In the absence of
7  that, exposures need to be reduced to reduce the
8  burden of autism and ADHD on the population.
9      Q. Okay. So I appreciate that lengthy
10  answer. It was not exactly the question I was
11  asking. I know your counsel will object.
12      MR. SACHSE: I'm just going to put on the
13  record you have been giving lengthy, lengthy
14  answers that are not directly responsive to
15  questions this entire afternoon. And so we may
16  very well have to go to the Court and seek more
17  time.
18      I am going to finish today, but I just
19  wanted to let you know if you let me ask my
20  questions and try to answer them precisely,
21  hopefully we will be done with this today. Okay?
22      A. Sure.
23      Q. All right. Good. And really I heard you
24  say this wasn't part of my charge to consider the
25  different mechanisms apart from postnatal lead and

Page 306

1  arsenic exposure. I'm sort of paraphrasing.
2  That's what you were saying. Right?
3      A. I think part of my -- so my charge was
4  to --
5      Q. I'm sorry. Let me withdraw. Let me back
6  up and just ask a better question. Okay?
7      Your charge was not to consider the role
8  that genetics play in causing autism. Is that
9  right?
10      MR. ESFANDIARY: Objection, misstates her
11  testimony.
12      A. My role was to determine if lead and
13  arsenic are causally associated with autism and
14  ADHD. To do that, I have to think about genetics
15  and I have to review the entire literature, many
16  of which talked about this, talked about . . .
17      So part of the Bradford Hill criteria
18  considered plausibility. Do we -- is there a
19  mechanism involved. And sometimes we can
20  determine that an association is causally
21  associated with the outcome even if we don't know
22  the mechanism yet.
23      So there was enough evidence to say that
24  smoking caused lung cancer before we really
25  understood the mechanism. But when we have more

Page 307

1  data and more understanding of mechanisms, it
2  helps our causal inference.
3      So there's been a lot of work sort of
4  thinking about -- and I described it -- what are
5  the potential mechanisms.
6      And for me, knowing that genetics plays a
7  role in autism and ADHD, I paid attention to how
8  genetics could be involved in that mechanism.
9      So it was part of my charge.
10      Q. Okay. Great. What precisely did you do?
11  What method did you use to consider the role of
12  genetics in the results that you were seeing in
13  the studies you rely on?
14      A. Yeah. So I talked about it in my report.
15  Should I read it?
16      Q. You shouldn't read it. You should just
17  tell me what you did.
18      A. At this point in the night it would be a
19  lot easier for me to read it.
20      I read the studies. I read the studies
21  looking at the potential role of genetics in these
22  mechanisms and all sorts of mechanisms.
23      So I talked about different research in
24  terms of mechanisms. Some of them were in
25  animals. I can talk about them much more clearly

Page 308

1  if I refer to my report, but I'm unable to just
2  recite that part right now.
3      Q. That's fine. I'm really just trying to
4  understand kind of in broad strokes, what did you
5  do to consider whether genetics alone explained
6  the results you were seeing in the postnatal lead
7  and arsenic studies?
8      A. Whether all the mechanisms was -- all the
9  causal mechanism related to genetics?
10      Q. Exactly.
11      A. That's not the assumption is that it's all
12  mediated by genetics. In the literature that --
13  there's data on other mechanisms too.
14      My role here was to review the literature
15  and review it in a really rigorous way, the way I
16  would be if I was publishing this, the way that I
17  would be when I do all of my other research.
18      I'm a professor at a medical school, so I
19  do research all the time and I apply the same
20  scientific rigor when creating this report as I do
21  in all -- in any other sort of review that I've
22  worked on or summarizing the literature.
23      I didn't exclude studies or commentary
24  that talked about the interplay between genetics
25  and neurotoxins. And I'm not sitting here and

1  being like, oh, you know, genetics are not
2  involved in this.  Genetics are believed to be
3  involved in this, just like neuroinflammation,
4  just like oxidative stress, just like disruption
5  of neurotransmitters.
6      Q. So I understand -- I mean, what I think
7  you just said is it's all mediated by genetics.
8  My question was a little --
9      A. No, I did not say that.  If I did, let's
10 strike that because I did not mean to say it's all
11 mediated by genetics.
12     Q. Anyway, I'm getting at a different point,
13 which is whether -- how you went about considering
14 whether the results that you're seeing in the
15 postnatal lead studies were due solely to genetic
16 autism factors versus the exposure -- the lead and
17 arsenic exposure?
18     A. I guess if I -- if that's all that I saw
19 in the literature and not all the other, you know,
20 powerful work that I would see in here, then one
21 could assume that.
22     But, I mean, this is not all about
23 genetics.  There's so much more here.  And so that
24 makes it clear that it's not all about genetics.
25     My purpose here -- I didn't conduct any

1  original research.  I reviewed all of the
2  literature.  I reviewed case-controlled studies,
3  cohort studies, cross-sectional prevalence
4  studies.  I looked at animal studies.  Basically
5  every type of scientific literature there was.
6      And that was -- it was like a review.  It
7  wasn't a -- I didn't do any sort of formal
8  calculations or meta-analyses in relation to lead
9  and ADHD.
10     I did create a plot that was sort of
11 similar to a forest plot, but I didn't do any sort
12 of formal interaction analyses between lead and
13 genetics.
14     There's a lot more we need to learn about,
15 you know, all of the genetic variants involved in
16 autism.
17     Q. So I'm actually asking about genetics
18 independent of lead exposure.
19     What did you do to consider whether the
20 results that you were seeing in the postnatal lead
21 and arsenic studies were due to genetics
22 independent of any exposure?
23     A. So I didn't -- my report doesn't focus on
24 genes independent of lead exposure.  The focus of
25 my report is lead and arsenic.  Whether -- you're

1  saying whether there might be genes that are just
2  much more common in children with ADHD and much
3  seen in relation to higher exposures to lead but
4  just by coincidence.
5      As I explained before, that just doesn't
6  sound plausible.  Like, you know, we know there's
7  a genetic component to lung cancer.  And you're
8  suggesting that if I were summarizing or reviewing
9  the literature on smoking and lung cancer, to what
10 extent might I consider genes, explaining that
11 association that had nothing to do with the
12 cigarettes, that there are genes out there that
13 increase the risk of lung cancer and --
14     Q. You're just repeating yourself.
15     A. Yeah.  It's hard to understand this stuff.
16 I'm an epidemiologist.  This stuff might seem
17 obvious to me.  I'm trying to explain it.
18     MR. SACHSE:  I'm going to stop you and
19 strike everything after "my report doesn't focus
20 on genes independent of lead exposure," because
21 that was my question.
22     MR. ESFANDIARY:  So you just interrupted
23 the witness in the middle of responding to your
24 question.
25     That's fine.  It doesn't matter.

1      What time are we on the record?
2      THE VIDEOGRAPHER:  6 hours and 43 minutes.
3      MR. KLATT:  All right.
4      Q. Let me -- and again, I'm really trying to
5  be precise here.
6      A. I'm trying to answer it as best as I can,
7  as responsibly as I can, because I don't want to
8  misrepresent myself.  I know what you want is
9  little, short snippets that answer your questions
10 the way you want them, but I have a responsibility
11 to represent my opinions accurately.  And that
12 might take more explanation.  I'm doing my best.
13     Q. And I appreciate that you're doing your
14 best.  I know it's the end of a long day.  We're
15 all doing our best.
16     So you said that your report doesn't focus
17 on genes independent of lead exposure.
18     As part of your analysis of the evidence
19 in this case, did you consider the role of genes
20 independent of lead exposure?
21     A. Yeah.
22     Q. And how did you do that?  What was the
23 methodology that you used to consider the role of
24 genetics in autism independent of lead exposure?
25     A. I reviewed the literature with that in

Page 313

1  mind, understanding that there are other risk
2  factors for autism and ADHD. I think it's
3  important to have that as a scientist,
4  understanding that in mind.
5      You know, reviewing all of these
6  discussions and thinking about the fact that there
7  are kids who are going to have ADHD regardless of
8  how much lead they are exposed to or how much
9  arsenic they are exposed to. And there's going to
10  be other kids who can be exposed to a real lot of
11  lead and not develop autism or ADHD. That was
12  important for me to understand.
13      I guess what you're asking is how -- what
14  was the process for me in terms of understanding
15  the overall etiology of these outcomes. And that
16  involves reading -- how many papers? 556 papers
17  over the years.
18      Q. 557.
19      A. Oh, right, 557. Yes. 557. And I've been
20  reading about autism since I was a student, since
21  one of my professors, you know, asked me to help
22  him do this really, really important work on
23  autism. It wasn't something that I thought about
24  before then. So I have had decades of sort of
25  learning about this condition. This isn't

Page 314

1  something that I -- that Pedram called me about.
2      Sometimes lawyers will call me and I'll
3  have to learn about a whole new thing I know
4  nothing about. This was not the case.
5      I have been studying autism since I was
6  not a baby but it felt like I was a baby in my
7  20s.
8      Q. And so switching to another area which you
9  touched on earlier, which is prenatal exposure to
10  heavy metals.
11      What was the methodology -- when you were
12  looking at these postnatal lead and arsenic
13  studies, what was the methodology you used to
14  determine the extent to which the results that you
15  were observing were due to prenatal versus
16  postnatal exposure?
17      A. Yeah. So I reviewed the literature on
18  prenatal exposure as well. I'm not here to, like,
19  opine on whether prenatal exposure to lead or
20  arsenic causes ASD. I haven't scrutinized the
21  literature to that extent. But I read a lot of
22  it. I read a lot of studies. And so I thought
23  about, you know, is there an association?
24      The associations are not as consistent.
25  They're not as strong as they are for postnatal

Page 315

1  exposure. But I did read that there is evidence
2  that prenatal exposure also matters. And I
3  thought about the fact that these children are all
4  born already exposed to lead and to arsenic.
5      If it was a hypothetical biospecimen that
6  didn't reflect postnatal exposure, that only
7  reflected prenatal exposure, I would be a little
8  bit more doubtful about, you know, making
9  inferences about the role of postnatal exposure.
10      That's not the case. We know that
11  children are exposed and we know that these --
12  that lead is cumulative. And it is probably true
13  that an increased exposure prenatally might
14  increase, you know, a child's vulnerability to
15  that postnatal exposure, which is all the more
16  reason why we need to decrease postnatal
17  exposures.
18      The fact that there are exposures outside
19  of food just underscores the fact that we need to
20  reduce the exposure in food more. The fact that
21  each individual exposure is not the only exposure
22  highlights the importance of reducing exposure to
23  all of them because they add up.
24      Q. So after reading all of the studies, what
25  further methodology did you apply to assess

Page 316

1  whether the results you're seeing in the postnatal
2  lead and arsenic studies are explained by
3  postnatal exposure versus maybe they're solely
4  explained by prenatal exposure?
5      A. You're saying there is a hypothetical that
6  kids who -- that kids who were exposed
7  postnatally, it's so highly correlated with their
8  prenatal exposure that it's really the prenatal
9  exposure?
10      Q. That's not right.
11      A. I did think about that.
12      Q. But that's not the question I asked,
13  though.
14      What I'm asking is whether you considered
15  after reviewing all the literature, whether you
16  considered that observations you were seeing in
17  the postnatal literature were, in fact, due to --
18  due solely to those children's prenatal exposure
19  to lead and arsenic?
20      A. That's actually the same thing. I just
21  said it in a more sort of scientific -- in a more
22  sciencey way.
23      I think that argument would be -- that
24  would have weighed on me much more if we saw this
25  huge convincing science about -- strong science

1    about the prenatal exposure that was so much
2    stronger than the postnatal exposure, then that
3    might have weighed on me more, that possibility.
4    I don't think that they are perfectly correlated.
5        And in any sort of related science, I
6    haven't seen the argument that, you know, it
7    doesn't really matter what the postnatal exposure
8    is. It's so highly correlated, it's all being
9    driven by the prenatal.
10        If that were true for autism, it would be
11    true for other neurotoxicity too.
12        As a society, we care about postnatal lead
13    exposure neurotoxicity. That's talked about in
14    abundance. It's also -- prenatal exposure is
15    also -- is also relevant.
16        If your hypothetical was true, it's
17    perfectly correlated with prenatal exposure and
18    all being driven by prenatal exposure, that
19    argument would be made across the board for all
20    neurodevelopment, for all neurotoxicity.
21        We see so many medical organizations talk
22    about the fact that postnatal lead exposures are
23    relevant for neurotoxicity and neurodevelopment.
24    It would be so weird if autism was this weird
25    exception to that.

1        Q. I'm going to switch gears because I'm
2    running out of time here.
3        At the beginning of this deposition, you
4    agreed that you previously had given reports in
5    the baby food litigation in the NC case, in the
6    Landon case, and the class action. Is that right?
7        A. There have been two class actions. There
8    was a -- there was a baby food class action and
9    then there was an infant formula class action.
10    And there's also been some other studies that
11    haven't gone to deposition.
12        Q. This is easy. You stand by the opinions
13    you've previously given. Correct?
14        A. I'm not here to correct any opinions I've
15    given in the past.
16        Q. I think you said that earlier.
17        In the Landon case, you also offered the
18    opinion that exposure to mercury postnatally can
19    cause increased -- can cause autism and ADHD. Is
20    that right?
21        A. That's correct.
22        Q. And when you formed that opinion, did you
23    use the same methodology that you used to form the
24    opinions related to lead and arsenic?
25        A. Yes. But I haven't updated my opinion

1    since that was dropped from this case. I don't
2    have any other standing cases that I'm working on
3    right now that have to do with mercury. So my
4    being up to speed on the mercury issue is maybe
5    six months behind lead and arsenic.
6        Q. Okay. You're anticipating what I'm
7    getting at.
8        So you are not offering opinions about
9    whether mercury increases the risk of autism or
10    ADHD. Is that right?
11        A. That was not part of my charge for this
12    case. My understanding is that it might be for
13    other cases, but for this case it wasn't.
14        And so as a result, since I think March is
15    when I had the deposition where mercury was
16    involved, I have not updated. I haven't looked at
17    the literature since then in case something big
18    came out. I haven't seen it.
19        Q. Okay. But when you were given your charge
20    by the plaintiff's lawyers in this case, mercury
21    was not part of that charge. Correct?
22        A. That is correct.
23        Q. I want to talk a little bit more about
24    nutrients. You have not -- you're not offering
25    any expert opinions on absorption, distribution,

1    metabolism, or excretion of metals in this case,
2    are you?
3        MR. ESFANDIARY: Objection, misstates her
4    testimony.
5        A. I'm sorry. It's the end of the day. Can
6    you repeat that?
7        Q. That's okay. I don't need that.
8        You haven't studied how nutrients compete
9    with nonnutrient metals in the body to bind to
10    transporters, are you?
11        A. Are you asking -- I think it depends on
12    sort of how you -- you say have I studied.
13    Obviously I have reviewed the literature. It's a
14    huge part of this report. I have not published
15    anything on that myself as an author.
16        Q. And outside of studying that in connection
17    with this litigation, have you ever previously
18    investigated how nutrients compete with metals in
19    the body to bind to transporters?
20        A. I don't know how what you're asking is
21    different from me saying that I haven't published
22    on it myself.
23        I don't have -- nor do I have any, like,
24    ongoing analyses that I haven't published yet on
25    that. All of my work on that topic has been in

Page 321

1    terms of the literature review for this case and
2    for other -- the class action cases involve that
3    too.
4        I employ the same methodology in creating
5    this report as I would be if I were writing a
6    review article for publication or in any sort of
7    white paper or work as part of my academic work.
8    But I haven't published on that.
9        Q. Okay. You're not offering any expert
10   opinions in this case about which essential
11   nutrients compete with which heavy metals at which
12   sites, which transporter cells within the body,
13   are you?
14       MR. ESFANDIARY: Objection, misstates her
15   testimony.
16       A. I'm not offering any opinions beyond that
17   which I have in here. So I don't want to say --
18   I'm not saying that and then I've actually written
19   something in here.
20       So I guess I have no plans to opine on
21   that beyond what I have in here. If some research
22   comes out between now and this hearing, that would
23   be relevant. I can't say I wouldn't rely on that
24   in terms of forming my opinions.
25       I don't think I'm going to be -- that's

Page 322

1    not a main part of my focus, I guess.
2        Q. You read my mind, Doctor. That is what I
3    was getting at.
4        So -- and you've referred now to the work
5    that you did specific to nutrients in this
6    litigation.
7        And am I correct that the studies that you
8    reviewed that led you to the conclusion that the
9    evidence is inconclusive, those were all studies
10   about supplementation of nutrients in children
11   with high levels of lead exposure or arsenic
12   exposure?
13       MR. ESFANDIARY: Objection, misstates.
14       A. No.
15       MR. ESFANDIARY: Go ahead.
16       A. No. It was a long section. There were so
17   many different kinds of studies. The results were
18   all over. They're largely showing no association,
19   which is why I said it was inconclusive.
20       What you describe really just represents
21   such a small portion of the evidence that informed
22   my opinions on that. There was so much.
23       Q. I'm running out of time, so just a couple
24   more questions.
25       I think you previously testified that you

Page 323

1    reviewed some of the expert reports from the
2    defense experts in this case, in this litigation.
3    Is that right?
4        A. That is correct.
5        Q. Okay. And did you review the expert
6    report of Dr. Fombonne?
7        A. In this one?
8        Q. Yes.
9        A. I have definitely reviewed stuff from
10   Dr. Fombonne in the past. I'm not sure if I did
11   from this round.
12       Q. Did you review -- do you recall any
13   defense epidemiology opinions that you reviewed
14   after submitting your report but before submitting
15   your rebuttal in this litigation?
16       A. After submitting my report. I think what
17   I reviewed was all before the rebuttal. My
18   understanding was that they were -- the charge was
19   only -- the rebuttal was only in relation to
20   commenting on whether Dr. Jones's new estimates
21   changed my opinion. And that was the extent of
22   what I was asked to do.
23       Q. Did you see some criticisms of some of
24   your opinions that the defense experts offered?
25       A. Criticisms? I don't think I saw

Page 324

1    criticisms of my -- I guess you could call it
2    criticisms.
3        I do remember seeing my name in relation
4    to the fact that my name kept coming up in that
5    there were criticisms of Dr. Jones's calculations
6    that then I relied upon. I haven't read -- I've
7    read very small portions of those expert reports.
8        Q. When you reviewed those small portions of
9    the expert reports, did you see anything that you
10   thought was incorrect that you wanted to respond
11   to?
12       A. I wouldn't say I want. Honestly, I never
13   choose to do a rebuttal. I am perfectly happy
14   with their -- with rebutting things at deposition,
15   at hearing. It's just more work for me. It's not
16   that I agreed with everything that was written by
17   any means, but I never said to the lawyers, you
18   know, I must create a new report on this.
19       Q. So I just told your counsel -- you saw
20   some baseball hand signals there. I'm --
21       A. We're a little bit over time. I'm okay.
22       Q. We're at time. I just have literally
23   three or four more questions.
24       A. Okay.
25       Q. The first question, sitting here today,

Page 325

```
 1   there's nothing that you saw in those defense
 2   expert reports that you wanted to include in a
 3   rebuttal?
 4      A. I didn't rebut anything. I didn't agree
 5   with, like, the little things -- all the little
 6   things that I saw. I didn't feel -- I didn't want
 7   to write anything.
 8      Q. That's fair. You're under oath, after
 9   all.
10      Second question: Would you agree or do
11   you agree, Doctor, that there are no studies -- no
12   epidemiology studies specifically examining
13   whether commercial baby food causes autism or
14   ADHD?
15      MR. ESFANDIARY: Objection, asked and
16   answered previously.
17      A. Oh, I've gotten that question before.
18      Q. Today?
19      A. I mean, probably. It's a classic that's
20   fun to recycle.
21      I haven't seen any studies comparing kids
22   who are autistic and kids who are not and the
23   amount of commercial baby food they have consumed.
24   It could be out there. I would be surprised if it
25   was out there and I didn't see it.
```

Page 326

```
 1      My charge related to heavy metal and
 2   irrespective of sources. Just like when I study
 3   PFAS, I study PFAS body burden irrespective of the
 4   sources.
 5      Q. And I shouldn't have said three questions.
 6      A. We can do one more. I'm not going to hold
 7   you to three.
 8      Q. Well, this is my last question, so I want
 9   to make it count.
10      A. Do it.
11      Q. I know. Yes, I am, though, because it's
12   kind of a big one.
13      Previously in response to questioning from
14   my co-counsel you agreed that you considered
15   confounders when evaluating the postnatal lead and
16   arsenic studies.
17      Can you give us the list of the
18   confounders that you considered?
19      A. I would say for most studies or -- not for
20   most studies. For a lot of studies I mentioned,
21   the ones that were considered -- I don't have an
22   exhaustive list.
23      Q. And when you say you mentioned, you're
24   sort of gesturing towards your report.
25      So you mentioned the confounders that you
```

Page 327

```
 1   considered in the text of your report. Is that
 2   fair?
 3      A. I talked about confounders. Yup.
 4      Q. And so we can rely on your report for the
 5   universe of confounders that you considered when
 6   evaluating those studies. Is that fair?
 7      A. I don't know if that's fair.
 8      Q. Sitting here today, are there any
 9   confounders other than what you've put in your
10   report that you considered when evaluating those
11   studies?
12      A. I wouldn't say there aren't any that I
13   didn't consider. I mean, I considered
14   confounding. I considered, you know . . .
15      Q. Now that I think we're fully in Alice in
16   Wonderland, I have no further questions.
17      MR. ESFANDIARY: Cool. Thank you. No
18   questions.
19      THE VIDEOGRAPHER: This concludes the
20   deposition of Hannah Gardener, Sc.D. Going off
21   the record, 6:16 p.m.
22      (Off the record at 6:16 p.m.)
23
24
25
```

Page 328

```
 1   COMMONWEALTH OF MASSACHUSETTS
 2   SUFFOLK, SS.
 3
 4      I, Michelle Keegan, Registered Merit Reporter
 5   and Notary Public in and for the Commonwealth of
 6   Massachusetts, do hereby certify that HANNAH E.
 7   GARDENER, SC.D., the witness whose deposition is
 8   hereinbefore set forth, was duly sworn by me and
 9   that such deposition is a true record, to the best
10   of my ability, of the testimony given by the
11   witness.
12      I further certify that I am neither related to
13   or employed by any of the parties in or counsel to
14   this action, nor am I financially interested in
15   the outcome of this action.
16      In witness whereof, I have hereunto set my hand
17   and seal this 1st day of August, 2025.
18
19
20
21
22         Notary Public
23         My commission expires:
24         May 15, 2026
25
```

```
                            Page 329
 1          E R R A T A  S H E E T
 2     I, HANNAH E. GARDENER, SC.D., do hereby certify
 3  that I have read the foregoing transcript of my
 4  testimony, and further certify that said
 5  transcript is a true and accurate record of my
 6  testimony (with the exception of the following
 7  corrections listed below):
 8  Page      Line          Correction
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  Signed under the pains and penalties of perjury
22  this      day of        , 2025.
23
24
25          HANNAH E. GARDENER, SC.D.
```