1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE: BABY FOOD PRODUCTS                    Case No.  24-md-03101-JSC
    LIABILITY LITIGATION
8   _____            **ORDER RE DEFENDANTS' MOTIONS
                                                TO DISMISS**
9   This document relates to:
                                                Re: Dkt. Nos. 511, 513, 514, 523, 542, 543,
10            ALL ACTIONS
                                                544
11
                                                **PUBLIC REDACTED**
12

13

14          This multidistrict litigation comprises over 200 actions by Plaintiffs who allege the

15  presence of toxic heavy metals in baby food caused children to develop autism spectrum disorder

16  ("ASD") and attention deficit hyperactivity disorder ("ADHD").  Plaintiffs bring their claims

17  against the baby food manufacturers as well as foreign and domestic parent companies of those

18  entities.

19          On March 17, 2025, the Court issued a sealed order resolving seven motions brought by

20  Defendants pursuant to Federal Rule of Civil Procedure 12.  (Dkt. No. 427.[1])  The Court

21  subsequently amended the order to account for confidential information and published the

22  unsealed order on April 2, 2025.  (Dkt. No. 447.)  Thereafter, Plaintiffs amended the Master

23  Complaint and added five new Defendants: Nestlé USA, Inc., Nestlé Enterprises S.A., Société des

24  Produits Nestlé S.A. ("SPN"), Danone North America, PBC, and Danone Nutricia Nederland BV.

25  (Dkt. No. 451.)

26  //

27  _____
    [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
28  ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

United States District Court
Northern District of California

The Amended Master Complaint asserts seven causes of action against all Defendants: 1) failure to warn (strict products liability); 2) manufacturing defect (strict products liability); 3) design defect (strict products liability); 4) failure to warn (negligence); 5) manufacturing defect (negligence); 6) design defect (negligence); and 7) general negligence.  Defendants now move to dismiss the Amended Master Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  That said, on August 20, 2025, Plaintiffs voluntarily dismissed their claims against Defendant Danone Nutricia Nederland BV without prejudice.  (Dkt. No. 577.)  Therefore, Danone Nutricia Nederland BV's motion is **DENIED AS MOOT**.  Six motions remain, brought by domestic companies Nestlé USA, Danone North America, The Campbell's Company ("Campbell"), and Sun-Maid Growers of California ("Sun-Maid"), as well as foreign parent companies Nestlé Enterprises and SPN.

Having considered the parties' submissions, and with the benefit of oral argument heard on September 18, 2025, the Court **GRANTS** in part and **DENIES** in part Defendants' motions to dismiss.

## DISCUSSION

In adjudicating these six motions, the Court "applies the law of [this] circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL."  *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 823 (N.D. Cal. 2023) (citation omitted).  As in the Court's prior order on Defendants' Rule 12 motions, "the Court sets out the relevant standard, and when appropriate, discusses state-law discrepancies."  *In re Baby Food Prods. Liab. Litig.*, No. 24-MD-03101-JSC, 2025 WL 986959, at *1 (N.D. Cal. Apr. 2, 2025).

## I.    DOMESTIC DEFENDANTS' MOTIONS

Defendants Nestlé USA, Danone North America, Campbell, and Sun-Maid each move to dismiss the Amended Master Complaint for failure to state a claim.  In addition, Nestlé USA moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction.  The Court first considers this lone jurisdictional motion before turning to the parties' arguments under Rule 12(b)(6).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.   Nestlé USA's Rule 12(b)(2) Motion

"To exercise personal jurisdiction over a nonresident defendant, the defendant must have had at least 'minimum contacts' with the forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959, at *3 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004)) (internal quotation omitted).  A defendant may be subject to general or specific personal jurisdiction depending on its contacts with the forum.  "Absent a federal statute governing personal jurisdiction, a district court applies the long-arm statute of the forum state to determine the court's reach." *Id.* (citing *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 502 (9th Cir. 2023)).  In the context of an MDL, "the [transferee] court is entitled to exercise personal jurisdiction over each defendant only to the same degree that the original transferor court could have." *Id.* (citing *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 674 (N.D. Cal. 2020)).

Nestlé USA is incorporated in Delaware with its principal place of business in Virginia. (Dkt. No. 451 ¶ 18.)  Plaintiffs from transferor courts in California, Connecticut, Florida, Georgia, Indiana, and Illinois have named Nestlé USA as a defendant.  (Dkt. No. 513 at 12.)  Nestlé USA asserts the long-arm statutes of each state permit personal jurisdiction to the full extent allowed by the United States Constitution, and Plaintiffs do not argue otherwise.  (*Id.*)  Therefore, the Court conducts the jurisdictional analysis under this standard.

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger*, 374 F.3d at 800.  "The court assumes the truth of any uncontested allegations, but a defendant may dispute facts through supporting affidavits or evidence.  Once the defendant has raised a factual dispute as to the complaint's jurisdictional allegations, the burden shifts to the plaintiff to 'make a *prima facie* showing of jurisdictional facts.'" *In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959, at *3 (internal citations omitted).

To establish personal jurisdiction over Nestlé USA, the Amended Master Complaint contains the following jurisdictional allegations:

1

2

3

> Nestlé USA employees were decision makers about the safety of Gerber Baby Foods and ingredients, including the amount of Toxic Heavy Metals in those foods.  Nestlé USA was responsible for testing Gerber's Baby Food products for heavy metals at its Nestlé Quality Assurance Center in Solon, Ohio.

4

(Dkt. No. 450-3 ¶ 19.)  In addition, Plaintiffs allege Nestlé USA was "responsible for procuring

5

the rice for Gerber's Baby Food products" and was "involved in consumer messaging regarding

6

the safety of Gerber's Baby Food."  (*Id*. ¶¶ 19-20.)  Accompanying its motion, Nestlé USA

7

submits the affidavit of Douglas J. Keaton, senior litigation paralegal, to contest Plaintiffs'

8

allegations.  (Dkt. No. 513-1.)  Keaton states Nestlé USA "is neither a parent nor a subsidiary of

9

Gerber" and "has never directed or controlled Gerber's day-to-day activities, including but not

10

limited to Gerber's manufacturing, advertising, distribution, marketing, or sales activities . . . ."

11

(*Id*. ¶ 2.)  Moreover, Keaton asserts Nestlé USA employees "have never been decision makers

12

about the safety of Gerber Baby Foods and ingredients, including the amount of Toxic Heavy

13

Metals in those foods . . . ."  (*Id*. ¶ 3 (internal quotation omitted).)  Finally, Keaton notes Nestlé

14

USA "has never had control over[] consumer messaging regarding the safety of Gerber's Baby

15

Food . . . ."  (*Id*. ¶ 5 (internal quotation omitted).)  Based on this affidavit, the burden shifts to

16

Plaintiffs to make a *prima facie* showing of jurisdictional facts.

17

The Court first considers Plaintiffs' proffered evidence regarding specific personal

18

jurisdiction in California, Connecticut, Florida, Indiana, and Illinois.  Then, the Court turns to the

19

parties' arguments regarding general personal jurisdiction in Georgia.

20

### 1.    Specific Personal Jurisdiction

21

To exercise specific personal jurisdiction over a non-resident defendant, three requirements

22

must be met: "(1) the defendant must either 'purposefully direct his activities' toward the forum or

23

'purposefully avail[ ] himself of the privileges of conducting activities in the forum'; (2) 'the

24

claim must be one which arises out of or relates to the defendant's forum-related activities'; and

25

(3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be

26

reasonable.'"  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017).

27

In tort cases, the Court applies the "purposeful direction" test at the first step of the specific

28

personal jurisdiction analysis.  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,

United States District Court
Northern District of California

United States District Court
Northern District of California

433 F.3d 1199, 1206 (9th Cir. 2006).  So, the Court inquires "whether a defendant 'purposefully direct[ed] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum."  *Id*. (citation omitted).  "[A] defendant purposefully directed his activities at the forum if he: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'"  *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (citation omitted).  Further, a "mere injury to a forum resident is not a sufficient connection to the forum" for purposes of specific personal jurisdiction.  *Id*. (citation omitted).

Plaintiffs base their *prima facie* case on three categories of evidence: 1) documents related to testing Gerber products for heavy metals at the Nestlé Quality Assurance Center ("NQAC"); 2) emails regarding Nestlé USA's involvement in sourcing decisions for ingredients in Gerber baby food; and 3) Nestlé USA's involvement in disseminating health and safety information about Gerber products.  (Dkt. No. 553 at 22-24.)

### a.    Purposeful Direction

First, the Court considers whether the three categories of proffered evidence support a *prima facie* showing of an intentional act, expressly aimed at the forum, causing a harm Nestlé USA should have foreseen.  *See Picot*, 780 F.3d at 1214.  As to the first category, Plaintiffs submit two documents to show the NQAC tested Gerber products for heavy metals.  The first is the NQAC Terms and Conditions.  (Dkt. No. 553-3.)  The second is Gerber's December 19, 2019, letter to Congress, which states in relevant part:

> The majority of our analytical testing is conducted by the Nestle Quality Assurance Center (NQAC) located in Dublin, Ohio. NQAC is an ISO-accredited laboratory, meaning they follow international standards for analytical reliability. They use the latest technologies, validated methods, and provide some of the lowest detection limits relative to other highly respected laboratories in the U.S. While NQAC is a Nestlé facility, they also conduct analytical testing for other companies and institutions.

(Dkt. No. 553-4 at 6.)  These documents support a *prima facie* showing that Nestlé USA acted "with the 'intent to perform an actual, physical act in the real world.'"  *Picot*, 780 F.3d at 1214.

1    Testing Gerber products for heavy metals clearly constitutes an intentional act. However, neither

2    document supports a *prima facie* showing that Nestlé USA "expressly aimed" that conduct at any

3    of the relevant forum states.

4    Under the purposeful direction test, a plaintiff must do more than show an effect of her

5    conduct occurred in the forum—she must plausibly allege the defendant's conduct was "expressly

6    aimed at the forum state." *Picot*, 780 F.3d at 1214. In *Pebble Beach Co. v. Caddy*, 453 F.3d

7    1151, 1156 (9th Cir. 2006), the Ninth Circuit "warned courts not to focus too narrowly on the

8    test's third prong—the effects prong—holding that 'something more' is needed in addition to a

9    mere foreseeable effect." That "something more" is the "expressly aimed" prong of the test and

10   requires some conduct by the defendant targeted specifically at the forum. *Id*. The court further

11   noted that "individualized targeting" of the plaintiffs was a common thread in certain caselaw

12   where the "expressly aimed" prong was satisfied. *Id*. at 1157. As applied here, the NQAC Terms

13   and Conditions say nothing about conduct directed toward California, Connecticut, Florida,

14   Indiana, or Illinois. The facility is located in Ohio, and Plaintiffs make no argument suggesting it

15   directs marketing or its services into any forum state, or to any specific individuals. Nor do

16   Plaintiffs endeavor to explain how a letter sent by the Gerber CEO to Congress, which states the

17   NQAC tests Gerber products in Ohio, establishes conduct expressly aimed at any other state.

18   (Dkt. No. 553-4 at 6.) Consequently, these documents do not help Plaintiffs carry their

19   jurisdictional burden.

20   Regarding the second category of evidence, Plaintiffs proffer four email chains involving

21   Nestlé USA employees discussing sourcing considerations for ingredients in Gerber products.

22   (*See* Dkt. Nos. 552-4 – 552-7.) These emails show Nestlé USA conferring about appropriate

23   levels of arsenic in sourced ingredients in response to certain FDA guidance (Dkt. No. 552-6 at 3-

24   4) as well as discussions between Nestlé USA employees and Gerber employees about heavy

25   metal quantities in sourced ingredients (Dkt. No. 552-5 at 1-2). Though this evidence suggests

26   Nestlé USA's involvement in the alleged tortious conduct, and thus an intentional act, Plaintiffs

27   fail to make a *prima facie* showing that this intentional act was expressly aimed at the forum.

28   Here, Plaintiffs do not allege—nor provide any evidence—that Nestlé USA had contact with

consumers of Gerber baby food, sold any Gerber baby food in the relevant states, marketed or advertised Gerber baby food to consumers, or engaged in any "individualized targeting" of consumers. Plaintiffs' proffered evidence suggests Nestlé USA's participation in ingredient sourcing decisions but does not connect that conduct to any of the forum states.

Plaintiffs' third category of evidence includes a performance review for an individual involved in the marketing of Gerber products (Dkt No. 552-8), an email chain responding to an FDA investigation of a customer complaint (Dkt. No. 552-9), and plans for a presentation at the 2020 Food & Nutrition Conference & Expo., which included Wendy Johnson, Nestlé USA's Vice President of Nutrition, Health, and Wellness (Dkt. No. 552-10). Starting with the performance review, Nestlé USA—through the affidavit of Douglas J. Keaton—asserts the individual mentioned therein was not an employee of Nestlé USA. (Dkt. No. 513-1 ¶ 6.) The document itself provides no indication otherwise, so this evidence does not aid Plaintiffs in making a *prima facie* showing that Nestlé USA expressly aimed any acts toward the forum.

Nor does the email thread indicate Plaintiffs have met their burden to show an intentional act aimed at the forum states. The communications do not show Nestlé USA actively contacting any consumer regarding the FDA's investigation. Though certain emails indicate attempts to call or send a letter to the individual who submitted the complaint to the agency (Dkt. No. 552-9 at 5), those attempts were not made by Wendy Johnson, the only Nestlé USA employee on the email thread. Further, the communications do not indicate where the consumer who issued the complaint was located, so they provide no evidence of an intentional act aimed at a relevant forum state.

Finally, Johnson's participation in a presentation at the 2020 Food & Nutrition Conference & Expo in Indiana also does not support a *prima face* showing of jurisdiction here. (Dkt. No. 552-10 at 2.) True, this evidence suggests Nestlé USA engaged in an intentional act aimed at one of the forum states. But even though the conference took place in a forum state, Plaintiffs do not allege—and have not shown—this intentional act caused a harm they experienced in the forum. Under the third prong of the purposeful direction test, Plaintiffs must make a *prima facie* showing that Nestlé USA's intentional act aimed at Indiana caused harm that it "knows is likely to be

suffered in the forum state." *Picot*, 780 F.3d at 1214.  While "the 'brunt' of the harm need not be suffered in the forum state," a plaintiff must at least show the intentional act caused "a jurisdictionally sufficient amount of harm . . . in the forum state . . . ."  *Yahoo! Inc.*, 433 F.3d at 1207.  Here, Plaintiffs have not alleged a presentation on heavy metals to business professionals has any connection to the specific tortious conduct alleged in the Amended Master Complaint.  Though Johnson's involvement in the presentation establishes a contact with a forum state, it bears no obvious relation to Plaintiffs' injuries.

For these reasons alone, Plaintiffs have not met their burden to make a *prima facie* showing of specific personal jurisdiction over Nestlé USA in California, Connecticut, Florida, Indiana, or Illinois.

> **b.    Whether Plaintiffs' claims "arise out of or relate to" Nestlé USA's contacts with the forum**

The parties also devote a significant share of their arguments to the second step of the specific personal jurisdiction analysis—namely, whether Plaintiffs' claims arise out of, or relate to, Nestlé USA's contacts with the forum states.  While the Court's analysis in Section I.A.1.a., *supra*, concludes Plaintiffs have not met their burden to show purposeful direction, Plaintiffs have also failed to make a *prima facie* showing that their claims arise out of any contacts between Nestlé USA and California, Connecticut, Florida, Indiana, or Illinois.

At paragraphs 84 to 90 of the Amended Master Complaint, Plaintiffs summarize Nestlé USA's culpable conduct.  (Dkt. No. 450-3.)  There, Plaintiffs allege Nestlé USA was negligent in setting unsafe heavy metal limits on Gerber baby food products (*id*. ¶ 84), failing to adhere to their own product specifications for heavy metals (*id*. ¶ 85), and sourcing ingredients with high levels of heavy metals (*id*. ¶¶ 86-87).  Yet, these claims do not arise out of or relate to Nestlé USA's contacts with the forum states.  *See Axiom Foods, Inc*, 874 F.3d at 1068.  Indeed, Plaintiffs do not identify any Nestlé USA contact with the forum states, except for Johnson's role in the 2020 Food & Nutrition Conference & Expo in Indiana.  But as the Court has already explained, *supra*, this act bears no connection to the harm suffered by Plaintiffs, or the specific tortious conduct alleged at paragraphs 84 through 90 of the Amended Master Complaint.  Without establishing contacts with

1    a forum state, Plaintiffs cannot show their claims against Nestlé USA arise out of, or relate to,

2    such contacts.

3          In opposition, Plaintiffs argue the Court has specific personal jurisdiction over Nestlé USA

4    because "the 'effects' of its relevant actions—i.e., determining the heavy metal contents of Gerber

5    products—'were felt' in the forums where Plaintiffs were injured by those products." (Dkt. No.

6    552-3 at 21.)  But Plaintiffs fail to recognize the personal jurisdiction analysis requires "something

7    more," that is, the defendant's actions were expressly aimed at the forum states.  *See Pebble Beach*

8    *Co.*, 453 F.3d at 1156.  The lion's share of Plaintiffs' opposition argues the proffered evidence

9    shows Nestlé USA was involved in the alleged tortious conduct.  Yet that evidence goes to

10   liability, not jurisdiction.  What matters here is whether Nestlé USA's actions were expressly

11   aimed at a forum in which the Plaintiffs' suffered harm.  On this question, Plaintiffs merely

12   conclude: "Nestlé USA reached into the relevant forums by injuring Plaintiffs there." (Dkt. No.

13   552-3 at 24.)  That is not enough.  Injury to a plaintiff alone is not sufficient to confer jurisdiction

14   in the forum of the injury—purposeful direction requires conduct expressly aimed at that forum.

15   *See, e.g., Walden v. Fiore*, 571 U.S. 277, 287 (2014) (noting the *Calder* "effects test" required

16   connection to the forum state, not just to the plaintiff).

17                                * * *

18         Absent a *prima facie* showing of purposeful direction, the Court may not exercise specific

19   personal jurisdiction over Nestlé USA.  So, for the reasons discussed above, the Court **GRANTS**

20   Nestlé USA's motion to dismiss for lack of personal jurisdiction in California, Connecticut,

21   Florida, Indiana, and Illinois.

22              **2.**       **General Personal Jurisdiction**

23         "For a court to exercise general personal jurisdiction over a defendant corporation, the

24   defendant's contacts with the forum state must be 'so continuous and systematic as to render [it]

25   essentially at home in the forum State.'" *Yamashita*, 62 F.4th at 503 (citation omitted).  "A

26   corporation is 'at home' in 'its place of incorporation and principal place of business,' and 'in an

27   exceptional case a corporation might also be "at home" elsewhere.'" *Id*. (citation omitted).

28   Plaintiffs only assert Nestlé USA is subject to general personal jurisdiction in the state of Georgia.

1    Georgia's long-arm statute states:

2        A court of this state may exercise [specific] personal jurisdiction over
     any nonresident ..., as to a cause of action arising from any of the acts,
3        omissions, ownership, use, or possession enumerated in this Code
     section, in the same manner as if he or she were a resident of this state,
4        if in person or through an agent, he or she:

5            (1) Transacts any business within this state;

6            (2) Commits a tortious act or omission within this state, except
         as to a cause of action for defamation of character arising from
7            the act; [or]

8            (3) Commits a tortious injury in this state caused by an act or
         omission outside this state if the tort-feasor regularly does or
9            solicits business, or engages in any other persistent course of
         conduct, or derives substantial revenue from goods used or
10           consumed or services rendered in this state[.]

11   *Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 428-29 (2021) (citing OCGA § 9-10-

12   91) (alterations in original).  Further, the statute defines "nonresident" to include, "a corporation

13   which is not organized or existing under the laws of this state and is not authorized to do or

14   transact business in this state at the time a claim or cause of action under Code Section 9-10-91

15   arises." *Id*. at 429.  To avoid a statutory construction whereby domestic corporations could escape

16   personal jurisdiction entirely, the Georgia Supreme Court has interpreted the long-arm statute to

17   confer general personal jurisdiction over any defendant corporation registered to do business in the

18   state. *See id*. at 431 (citing *Allstate Insurance Co. v. Klein*, 262 Ga. 599 (1992)).  Nestlé USA

19   does not contest it is registered to do business in Georgia.  Rather, it argues Georgia's long-arm

20   statute is unconstitutional despite the Supreme Court's recent decision in *Mallory v. Norfolk S. Ry.*

21   *Co.*, 600 U.S. 122 (2023).  The Court disagrees.

22       In *Mallory*, the Court upheld the constitutionality of Pennsylvania's long-arm statute,

23   which similarly required corporations to consent to general personal jurisdiction in the state as a

24   condition of being licensed to conduct business there. *Id*. at 136.  Justice Alito provided the

25   deciding vote and upheld constitutionality on a more limited ground than the plurality—noting the

26   Court's prior decision in *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining &*

27   *Milling Co.*, 243 U.S. 93 (1917), controlled. *Mallory*, 600 U.S. 122, 151 (2023) (Alito, J.

28   concurring).  Without adopting the plurality's broader holding on the relationship between the

United States District Court
Northern District of California

10

1   long-arm statute and the Due Process Clause, Justice Alito reasoned:

2   > The parallels between *Pennsylvania Fire* and the case before us are
    > undeniable. In both, a large company incorporated in one State was
3   > actively engaged in business in another State. In connection with that
    > business, both companies took steps that, ***under the express terms or***
4   > ***previous authoritative construction of state law*, *were understood as***
    > ***consent to the State's jurisdiction in suits on all claims, no matter***
5   > ***where the events underlying the suit took place*.** In both cases, an
    > out-of-state plaintiff sued the out-of-state company, alleging claims
6   > unrelated to the company's forum-state conduct. And in both, the out-
    > of-state company objected, arguing that holding it to the terms of its
7   > consent would violate the Fourteenth Amendment's Due Process
    > Clause. In *Pennsylvania Fire*, we held that there was no due process
8   > violation in these circumstances. Given the near-complete overlap of
    > material facts, that holding, unless it has been overruled, is binding
9   > here.

10  *Id.* at 152 (emphasis added).  This reasoning applies with equal force to Georgia's long-arm

11  statute.  The Georgia Supreme Court's authoritative construction of state law has applied general

12  personal jurisdiction to corporate entities registered in the state since at least 1992.  *See Klein*, 262

13  Ga. 599.  Indeed, federal district courts in Georgia have unanimously upheld the constitutionality

14  of the statute under *Mallory*.  *See Sloan v. Burist*, No. 2:22-CV-76, 2023 WL 7309476, at *4 (S.D.

15  Ga. Nov. 6, 2023); *Shaver L. Grp. LLC v. Concorde Inv., LLC*, No. 1:25-CV-00006-JPB, 2025

16  WL 2529764, at *3 n.1 (N.D. Ga. Aug. 25, 2025); *Rheem Mfg. Co. v. A.O. Smith Corp.*, No. 1:23-

17  CV-04688-WMR, 2024 WL 5113026, at *3 n.2 (N.D. Ga. Aug. 2, 2024); *Brown v. MUY Pizza-*

18  *Tejas, LLC*, No. 1:23-CV-1816-MLB, 2024 WL 3489201, at *3 n.3 (N.D. Ga. July 18, 2024);

19  *OnAxis Franchising Grp., LLC v. Harod*, No. 1:23-CV-4835-MHC, 2024 WL 4525524, at *9

20  (N.D. Ga. Feb. 9, 2024); *HDDA, LLC v. Sangha Hosp., LLC*, No. 5:22-CV-21 (MTT), 2023 WL

21  6283320, at *3 n.6 (M.D. Ga. Sept. 26, 2023); *HCL Am. Inc. v. Mace*, 686 F. Supp. 3d 1310, 1317

22  (N.D. Ga. 2023).

23        Nestlé USA argues the Georgia long-arm statute differs from the Pennsylvania statute in

24  that it does not expressly state the corporation consents to general personal jurisdiction by

25  registering to do business in the state.  (Dkt. No. 573 at 7 n.3.)  But Justice Alito's concurrence in

26  *Mallory* noted *Pennsylvania Fire* controlled where "the express terms *or previous authoritative*

27  *construction of state law*" made clear that the statute provided for general personal jurisdiction.

28  *Mallory*, 600 U.S. at 152 (emphasis added).  The Georgia Supreme Court interpreted the long-arm

United States District Court
Northern District of California

11

1    statute to permit general personal jurisdiction over 30 years ago.  And so, the Court joins the

2    Georgia district courts in reading *Mallory* to uphold the constitutionality of Georgia's long-arm

3    statute.

4        Therefore, Plaintiffs have satisfied their burden and made a *prima facie* showing of general

5    personal jurisdiction over Nestlé USA for those cases involving Georgia plaintiffs.

6            **3.    Jurisdictional Discovery**

7        "A district court has discretion in permitting a plaintiff to conduct jurisdictional

8    discovery." *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1009 (N.D. Cal. 2020)

9    (citing *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)).  A

10   request for jurisdictional discovery may be granted "where pertinent facts bearing on the question

11   of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is

12   necessary." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986).

13   That said, "where a plaintiff's claim 'of personal jurisdiction appears to be both attenuated and

14   based on bare allegations in the face of specific denials made by defendants, the Court need not

15   permit even limited discovery.'" *Reynolds*, 481 F. Supp. 3d at 1009 (citing *Terracom v. Valley*

16   *Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)).

17       Plaintiffs request jurisdictional discovery on Nestlé USA to establish personal jurisdiction

18   in California, Connecticut, Florida, Indiana, and Illinois.  The basis for their request is that the

19   proffered evidence does not have "the same issues" the Court identified in previously dismissing

20   Plaintiffs' claims against Nestlé S.A.  (Dkt. No. 553 at 24.)  There, the Court determined

21   Plaintiffs' prior arguments supporting jurisdiction over Nestlé S.A. relied upon documents that did

22   not even refer to that entity.  *See generally*, *In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959,

23   at *4 - *6 (N.D. Cal. Apr. 2, 2025).  The evidence presented here does not suffer from that same

24   deficiency.  However, as the Court described in Section I.A.1.a., Plaintiffs have not made a *prima*

25   *facie* showing that any of Nestlé USA's conduct was expressly aimed at any forum state.  Even if

26   the allegations and proffered evidence support an inference of Nestlé USA's involvement in the

27   alleged tortious conduct, that is not the relevant inquiry under a personal jurisdiction analysis.

28   None of the documents supplied by Plaintiffs even come close to showing Nestlé USA's conduct

United States District Court
Northern District of California

was expressly aimed at a forum state.  Further, Plaintiffs have not explained what kind of evidence they expect would establish purposeful direction if limited discovery were permitted.

In the face of the specific denials stated in the declaration of Douglas J. Keaton, the Court determines there is no basis for jurisdictional discovery here.

### B.    Rule 12(b)(6) Motions

Having resolved Nestlé USA's challenge to personal jurisdiction, the Court turns to the remaining Rule 12(b)(6) motions brought by Nestlé USA,[2] Danone North America, Campbell, and Sun-Maid.

"To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up).  The Court must assume the plaintiffs' allegations are true and draw all reasonable inferences in their favor.  *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022).  That said, the Court need not construe conclusory statements or unreasonable inferences as true.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  The Court addresses each defendant's motion in turn.

### 1.    Danone North America

Danone North America asserts Plaintiffs have failed to plausibly allege its involvement in any tortious conduct.  At paragraphs 95 through 99 of the Amended Master Complaint, Plaintiffs set out that conduct as it applies to Danone North America.  In sum, Plaintiffs allege Danone North America: 1) did not begin testing its products early enough (Dkt. No. 450-3 ¶ 95); 2) did not test for heavy metals as a condition of releasing Nurture baby food products (*id.*); 3) did not test batches of baby food frequently enough (*id.* ¶¶ 95, 98); 4) failed to monitor ingredient suppliers and source ingredients with lower levels of heavy metals (*id.* ¶ 96); and 5) knew of the dangers posed by heavy metals in baby food and yet continued to set unreasonably high limits in their

---

[2] At the September 18, 2025 hearing, the Court requested supplemental briefing on Nestlé USA's motion to dismiss claims by Georgia plaintiffs.  The Court does not address that motion here and will issue a separate order once supplemental briefing has been completed.

United States District Court
Northern District of California

1    products (*id*. ¶¶ 97-98).  However, Plaintiffs fail to support these conclusions with factual

2    allegations.

3        Three broad allegations form the basis of Plaintiffs' Complaint against Danone North

4    America, none of which permits a plausible inference of liability.  First, Plaintiffs allege Danone

5    North America's quality and food safety department oversees all brands, including Nurture, and

6    "audits and manages Nurture products produced at contract manufacturers."  (*Id*. ¶ 30.)  But

7    Plaintiffs offer no factual allegations describing how, or to what extent, these audits relate to the

8    allegations of tortious conduct described above.  Merely asserting Danone North America "audits"

9    and "manages" the products lacks the factual specificity required to satisfy Plaintiffs' pleading

10   burden.

11       Second, Plaintiffs allege three employees involved in Nurture's business—Magdelena

12   Bartosik, Rebecca Beaudin, and David Maltese—either work for Danone North America, or report

13   to a Danone North America employee.  (*Id*. ¶ 31.)  However, Plaintiffs do not allege what these

14   employees do and whether they exercise control over the heavy metal limits for Nurture products,

15   source ingredients for those products, or set the policy for frequency of testing.  At most, they

16   allege Maltese "worked directly with vendors" and that "the safety of the food is absolutely [his]

17   department."  (*Id*.)  Even so, the Complaint does not supply any allegations explaining what it

18   means to work with vendors, and whether that involves making decisions on which ingredients to

19   source for the products.  Further, the broad statement that Maltese's department handles food

20   safety does not permit a plausible inference that Danone North America was engaged in the

21   *specific* manufacturing practices at issue in this litigation.  To wit, these allegations lack specificity

22   as to Maltese's role in, or control over, the conduct that forms the basis of Plaintiffs' injury.

23       Third, Plaintiffs allege "Danone North America drafted and submitted Nurture's response

24   to Congress's inquiries as part of a Congressional investigation into the Toxic Heavy Metal

25   content of Nurture's Baby Food products."  (*Id*. ¶ 32.)  Yet Plaintiffs say nothing with respect to

26   how Danone North America's involvement in drafting and submitting that response reflects

27   control over the alleged tortious conduct described at paragraphs 95 to 99.  Danone North

28   America's participation in Nurture's response to Congress, without more, fails to permit a

United States District Court
Northern District of California

1    reasonable inference of Danone's involvement here.

2         In response, Plaintiffs assert it is "certainly plausible to infer that the *head of quality and*

3    *food safety* for the food brand at issue had something to do with the quality and food safety

4    problems" alleged.  (Dkt. No. 552-3 at 17 (emphasis in original).)  But Plaintiffs have alleged

5    *specific* tortious conduct.  If Maltese's role is so clear, then the Amended Master Complaint

6    should provide factual allegations to support his involvement in either setting heavy metal limits,

7    testing frequency or timing, and sourcing protocols.  It does not.  So, Plaintiffs have failed to

8    plausibly allege a basis for their negligence and product liability claims against Danone North

9    America.

10        Accordingly, the Court **GRANTS** Danone North America's motion to dismiss.

11                   **2.        The Campbell's Company**

12        Turning to the Campbell's Company's motion, Campbell moves to dismiss complaints

13   brought by plaintiffs in California, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky,

14   Maryland, Missouri, Pennsylvania, and Washington.  Campbell advances two arguments for

15   dismissal: 1) Under the standard for parent company liability set out in *United States v. Bestfoods*,

16   524 U.S. 51 (1998), the alleged conduct does not permit a plausible inference that Campbell was

17   involved in any tortious conduct; and 2) Plaintiffs have failed to plausibly allege Campbell is

18   subject to state strict products liability law or owed a state-law duty to Plum's customers.  The

19   Court is unpersuaded.

20        In the Court's previous order disposing of Rule 12 motions, it set out the relevant standard

21   under *Bestfoods*, which the parties apply here:

22              To determine when a parent company's actions amount to direct
                involvement in its subsidiary's bad acts, the *Bestfoods* Court provided
23              a touchstone.  There, the Court considered whether the parent's
                actions were "consistent with the parent's investor status, such as
24              monitoring of the subsidiary's performance, supervision of the
                subsidiary's finance and capital budget decisions, and articulation of
25              general policies and procedures ...." Such routine conduct "should not
                give rise to direct liability." Ultimately, "[t]he critical question is
26              whether, in degree and detail, actions ... by an agent of the parent
                alone are eccentric under accepted norms of parental oversight of a
27              [subsidiary]."

28

United States District Court
Northern District of California

*In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959, at *12 (citing *Bestfoods*, 524 U.S. at 72). The Amended Master Complaint adds new allegations of conduct by Campbell's employees that, drawing reasonable inferences in Plaintiffs' favor, exceeds the accepted norms of parental oversight of a subsidiary.  For instance, Plaintiffs allege Campbell's Principal Scientist for Food Safety, Timothy Spitzenberger, "personally was responsible for setting limits on the amount of Toxic Heavy Metals allowed in Plum Baby Foods."  (Dkt. No. 450-3 ¶ 41.)  Moreover, "Spitzenberger also testified that those limits were enforced—to the extent that they actually were enforced—by Campbell through *ad hoc* testing conducted after sale at Campbell's lab in Napoleon, Ohio."  (*Id*.)  Additionally, Plaintiffs highlight another Campbell employee, Steve DeMuri, who was involved in food safety for Plum products.  (*Id*.)  In a specific example of DeMuri's role, Plaintiffs allege he instructed Plum to stop sourcing rice from China because of heavy metal concerns and "personally stopped an effort by Plum's Quality Director to implement a heavy-metal testing program for Plum products in 2016."  (*Id*.)  Subsequently, Plaintiffs allege DeMuri was involved in firing Plum's Quality Director and sent an email to that effect, stating "[t]rying to keep Plum aligned and not doing their own thing is always fun."  (*Id*.)  These factual allegations support a plausible inference that Campbell employees were directly involved in the alleged tortious conduct; namely, they set limits for toxic heavy metals (*id*. ¶ 102), were involved in the decisions of when to test Plum products (*id*. ¶ 106), and dictated ingredient sourcing (*id*. ¶101).  Campbell has not established—as a matter of law—this level of nuanced involvement in the manufacture of Plum baby food falls within the scope of ordinary parent activity articulated in *Bestfoods*.

To counter, Campbell contends the setting of heavy metal levels for Plum products does not depart from ordinary parent activity, since it is merely setting "general policies and procedures."  *Bestfoods*, 524 U.S. at 72.  However, the kind of specific manufacturing limits set for Plum do not fall within such "general" policies as a matter of law.  Indeed, none of the cases relied upon by Campbell involved a policy with such direct connection to the tortious conduct at issue.  For example, in *Linsner v. Exelon Corp.*, No. 1-11-753, 2012 WL 6961999, at *8 (Ill. App. Ct. Mar. 28, 2012), the court determined "[n]o evidence showed that [Defendant] controlled the

16

United States District Court
Northern District of California

workplace or the manner in which the work was done," based on the safety policies it articulated. In fact, the defendant there "did not mandate a decrease in any safety rules or procedures, and it was not responsible for the implementation of the safety rules and procedures already in place." *Id*. The present case is clearly distinguishable as Plaintiffs have alleged Campbell employees were responsible for implementing and enforcing heavy metal limits through testing. (Dkt. No. 450-3 ¶ 41.)

*Joiner v. Ryder Sys. Inc.*, 966 F. Supp. 1478, 1486 (C.D. Ill. 1996), is similarly inapposite because the involvement of the parent company was limited to providing "legal services, printing services, and cash management services," which the subsidiary was not required to use. Here, Campbell allegedly set the heavy metal limits, was involved in sourcing ingredients, and enforced those limits through *ad hoc* testing. (Dkt. No. 450-3 ¶ 41.) Lastly, in *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523 (2000), the court of appeal determined the subsidiary company was not an alter ego of the parent because the parent's activities were limited to "monitoring of [the subsidiary's] performance, supervising [the subsidiary's] budget decisions, and setting general policies and procedures to be followed by [the subsidiary]." *Id*. at 551. The opinion offers little elaboration on what those general policies were, but drawing inferences in Plaintiffs' favor here, Campbell's employees were more involved in key subsidiary activities than the defendant in *Sonora Diamond Corp*.

Moreover, the courts in both *Linsner* and *Joiner* considered motions for summary judgment, where the factual record had been developed to show the scope of the policies at issue. Unlike a motion for summary judgement, on a motion to dismiss, the Court must accept the Amended Master Complaint's well-pleaded allegations as true. *Shields*, 32 F.4th at 1220. Here, the Court cannot say, as a matter of law, that Campbell's involvement in setting heavy metal limits for Plum and enforcing those limits through *ad hoc* testing, constitutes a "general policy" under *Bestfoods*. Indeed, the three cases cited by Campbell indicate the present allegations are a far cry from ordinary parental oversight of a subsidiary.

Next, Campbell argues state law does not permit negligence or products liability claims on these allegations. In support, Campbell provides an appendix of citations from relevant state

17

products liability law.  (*See* Dkt. No. 511-1.)  That said, the citations are mostly to the definition of "manufacturer" under state law without supporting caselaw interpreting how those definitions have been applied.  As the Court noted in its prior order on Rule 12 motions, *Bestfoods* "likely does not control interpretation of the state products liability law at issue here," and "whether a defendant is liable as a manufacturer often requires consideration of state statutory and common law."  *In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959, at *12.  As an example of this nuance, the Washington Products Liability Act imposes liability beyond manufacturers to include "a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." *Cadwell Indus., Inc. v. Chenbro Am., Inc.*, 119 F. Supp. 2d 1110, 1113 (E.D. Wash. 2000) (citation omitted).  In comparison, Georgia products liability law has been construed more narrowly, and may even exclude product safety testing from the ambit of liability.  *See, e.g.*, *Williams v. Pac. Cycle, Inc.*, 661 F. App'x 716, 720 (11th Cir. 2016) ("Georgia courts have held that the presence of a testing program is not sufficient to bring a company within the definition of a manufacturer under Georgia law.").  Campbell cannot wave away these nuances by gesturing to the Restatement (Second) of Torts § 402A, without making specific arguments under the laws of California, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Missouri, Pennsylvania, and Washington.  Indeed, the cited provision from the Restatement does not explain what activity by an entity is sufficient to consider the entity a "seller" or "manufacturer."  *See* Restatement (Second) of Torts § 402A.  Therefore, the Court cannot say, as a matter of law, Plaintiffs' allegations against Campbell would not state a strict products liability or negligence claim.

This reasoning also disposes of Campbell's remaining arguments—specifically, that Plaintiffs have not alleged Campbell owed a duty to consumers of Plum baby food, and that as an "upstream" parent entity, no strict products liability attaches.  (Dkt. No. 511 at 19-23.)  Whether Campbell owes a duty to consumers of Plum baby food is a question of state law.  It is intertwined with each state's definition of "manufacturer" and how state courts have interpreted its contours.  Campbell merely concludes "'ad hoc testing' of finished Plum products and Plum's use, beginning in 2017, of a Campbell subsidiary's Ohio lab for 'scattershot' ingredient testing does not transfer

1  Plum duties to its former parent," but cites no case in support. (*Id*. at 23.) Whether Campbell is

2  correct on this point depends entirely on the applicable state law—a question not briefed in the

3  instant motion. The same goes for Campbell's argument that a parent company is "upstream"

4  from the manufacturer, and strict products liability only applies "downstream." (*Id*. at 20-21.)

5  Even if this proposition of law were true across all the relevant jurisdictions, Campbell has

6  provided no state caselaw to show—on these allegations—it does not fall within any state law

7  definition of "manufacturer."

8      For these reasons, the Court **DENIES** Campbell's motion to dismiss.

9          **3.      Sun-Maid Growers of California**

10     Last, Sun-Maid moves to dismiss the Amended Master Complaint for failing to plausibly

11  allege Sun-Maid was involved in the alleged tortious conduct. Despite amending their allegations,

12  Plaintiffs again fail to plausibly allege Sun-Maid acted with negligence or violated products

13  liability law.

14     In the Court's previous order granting Sun-Maid's motion to dismiss, the Court noted

15  Plaintiffs had relied on their allegations regarding Campbell's conduct to imply Sun-Maid acted in

16  the same manner when it became the new parent company to Plum. *See In re Baby Food Prods.*

17  *Liab. Litig.*, 2025 WL 986959, at *14. Yet Plaintiffs failed to allege "any additional facts by

18  which the Court could infer allegations regarding Campbell's actions apply equally to Sun-Maid."

19  *Id*. As the Court observed, "the transition of operations from one parent company to another does

20  not permit a reasonable inference that the new parent then acted in precisely the same way as the

21  previous parent." *Id*. On amendment, Plaintiffs add the following allegations:

22          On information and belief, Plum did not develop for itself all the
            functions handled by Campbell upon Plum's sale to Sun-Maid.
23

            Campbell and Sun-Maid personnel set up "daily calls to review issues
24          that come with managing the day to day business" of the Plum brand
            in anticipation of Plum's transfer to Sun-Maid.
25

26  (Dkt. No. 450-3 ¶ 44.) Neither allegation helps satisfy Plaintiffs' pleading burden.

27     To begin, Plaintiffs' allegation that Sun-Maid did not develop all the functions previously

28  handled by Campbell is conclusory. Accordingly, the Court does not presume it is true on a Rule

United States District Court
Northern District of California

1    12(b)(6) motion.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.  Without any factual

2    allegations indicating which functions, if any, were carried on by Sun-Maid, Plaintiffs have not

3    plausibly alleged a basis for their claims here.  Further, the existence of "daily calls" between

4    Campbell and Sun-Maid during the transition of ownership says nothing about the specific tortious

5    conduct alleged.  Plaintiffs do not allege those calls involved heavy metal testing limits, sourcing

6    of ingredients for Plum products, or heavy metal testing protocols.  On these allegations, the

7    claims against Sun-Maid cannot advance.

8         Consequently, the Court **GRANTS** Sun-Maid's motion to dismiss.

9    **II.    FOREIGN DEFENDANTS' MOTIONS**

10        Foreign Defendants Nestlé Enterprises and SPN move to dismiss the Amended Master

11   Complaint for lack of personal jurisdiction and failure to state a claim.  As a threshold issue,

12   Foreign Defendants argue the Court cannot exercise personal jurisdiction because they have not

13   been properly served.[3]  To date, both Foreign Defendants have been served with the Amended

14   Master Complaint but have not been served with any short-form complaint by an individual

15   plaintiff.  (Dkt. No. 542 at 16; Dkt. No. 543 at 16.)  The parties dispute whether service of the

16   Amended Master Complaint, alone, is sufficient.  The Court concludes it is not.

17        The dispositive question here is whether a master complaint is a complete pleading that

18   supersedes the underlying complaints for purposes of service.  From the limited case law

19   expounding its function, the master complaint may operate as a superseding pleading or an

20   administrative summary depending on the circumstances of the MDL.  *Compare Gelboim v. Bank*

21   *of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) ("Parties may elect to file a 'master complaint' and a

22   corresponding 'consolidated answer,' which supersede prior individual pleadings. In such a case,

23   the transferee court may treat the master pleadings as merging the discrete actions for the duration

24   of the MDL pretrial proceedings. No merger occurs, however, when 'the master complaint is not

25   meant to be a pleading with legal effect but only an administrative summary of the claims brought

26   by all the plaintiffs.'" (internal citations omitted)) *with In re Guidant Corp. Implantable*

27   _____

28   [3] Foreign Defendants also indicate Rule 12(b)(4), which applies to defects in process, serves as a
     basis for dismissal.  (Dkt. No. 542 at 17 n.4.)

                                           20

1   *Defibrillators Prods. Liab. Litig.*, 489 F. Supp. 2d 932, 936 (D. Minn. 2007) ("Consolidation of a

2   master complaint is merely a procedural device designed to promote judicial economy, and, as

3   such, it does not affect the rights of the parties in separate suits.").  So, the Court looks to the

4   language of the Amended Master Complaint and the Short-Form Complaint to determine the

5   function of these papers in this MDL.

6          The Amended Master Complaint makes clear that it does not supersede individual

7   plaintiffs' complaints.  Prior to stating the Plaintiffs' allegations, the cover page to the Amended

8   Master Complaint explains:

9               This Complaint does not constitute a waiver or dismissal of any
                claims asserted in individual actions, and Plaintiffs reserve the right
10              to amend this Complaint based upon newly discovered facts and/or
                evidence. The purpose of this Complaint is to provide general
11              allegations as they apply to each Defendant, which can then be
                adopted in part or in whole by individual Plaintiffs filing Short-Form
12              Complaints. This Complaint in addition to a filed Short Form
                Complaint, constitute each Plaintiffs' pleading under Fed. R. Civ. P.
13              3.

14  (Dkt. No. 451 at 1.)  This language alone resolves any dispute as to the intended function of the

15  Master Complaint in relation to the Short-Form Complaint—the two filings *together* "constitute

16  each Plaintiffs' pleading."  The Short-Form Complaint lends support to this reading and states:

17              Plaintiff incorporates by reference the allegations contained in the
                First Amended Master Long-Form Complaint, filed in MDL 3101
18              (ECF Docket No. 197), as well as any further amendments made to
                that First Amended Master Long-Form Complaint.
19

20  (Dkt. No. 471.)  Both documents are meant to be read together, in that the Short-Form Complaint

21  incorporates various allegations present only in the Master Complaint.  In this MDL, the Amended

22  Master Complaint does not supersede individual complaints, but instead, serves as a method of

23  efficiently presenting allegations common to the underlying complaints.  Indeed, other district

24  courts have required service of both the master complaint and short-form complaint on newly

25  added defendants in an MDL.  *See, e.g.*, *In re Juul Labs, Inc., Mktg., Sales Pracs., & Prods. Liab.

26  Litig.*, No. 19-MD-02913-WHO, 2020 WL 1487301, at *2 (N.D. Cal. Mar. 27, 2020).  Therefore,

27  service of the full complaint in this MDL requires Foreign Defendants receive both the Amended

28  Master Complaint and a plaintiff's Short-Form Complaint.

United States District Court
Northern District of California

Plaintiffs advance various arguments in response—none is persuasive.  First, Plaintiffs assert Foreign Defendants have been put on notice of this action, and so the purpose of service has already been achieved.  Not so.  As the cases cited by Plaintiffs indicate, service of process is meant to "afford[] the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996).  Foreign Defendants' motions demonstrate why those aims cannot be achieved absent service of an individual plaintiff's short-form complaint.  For instance, a challenge to specific personal jurisdiction requires the Court to rely on the long-arm statute of the transferor court's forum state.  *See In re Baby Food Prods. Liab. Litig.*, 2025 WL 986959, at *3 (citing *Yamashita*, 62 F.4th at 502, and *In re JUUL Labs*, 497 F. Supp. 3d at 674).  The Court cannot determine which statute would apply from the Amended Master Complaint alone, since it does not identify any individual plaintiffs.  Further, without a short-form complaint identifying the relevant state forum, Foreign Defendants cannot raise Rule 12(b)(6) challenges based on interpretation of state law.  Plaintiffs have asserted products liability claims against all Defendants, which rise or fall based on the individual state products liability statutes.  With only the information provided by the Amended Master Complaint, Foreign Defendants have been deprived of the opportunity to present these defenses.

Second, Plaintiffs argue the Short-Form Complaint does not provide any additional relevant notice because "[t]he purpose of the short-form complaint that the Court has approved is primarily to indicate which specific baby food products a particular Plaintiff consumed."  (Dkt. No. 580-3 at 11.)  This argument ignores two other critical functions of the Short-Form Complaint: 1) to identify the parties (Dkt. No. 471-1 at 3), and 2) to establish a basis for jurisdiction and venue (*id*. at 4-5).  The Amended Master Complaint is incomplete without such allegations because it does not identify any plaintiffs.

At the hearing on Foreign Defendants' motions, Plaintiffs relied on *In re Chinese-Manufactured Drywall Prods. Liab. Litig*., No. CV 09-2047, 2018 WL 279629 (E.D. La. Jan. 2, 2018), to further support their position.  There, the court determined the defendants had been properly served despite their arguments that the plaintiffs had failed to serve them at the correct address or properly name the defendants.  *Id*. at *7.  The court rejected these arguments as it was

United States District Court
Northern District of California

clear from plaintiffs' proffered evidence that defendants had actual notice of the suit and had addressed it in public statements.  *Id*.  Ultimately, *In re Chinese-Manufactured Drywall Prods. Liab. Litig*. offers little to aid the Court's analysis in the present scenario.  The case says nothing about service of a master complaint without a short-form complaint and does not contemplate a scenario in which a defendant has been served, but cannot identify a plaintiff from the service papers.  While the district court in *In re Chinese-Manufactured Drywall Prods. Liab. Litig*. excused the plaintiffs' error in naming one of the defendants, that situation differs critically from the instant case.  Here, the Court does not confront an inaccurately named party; rather the issue is Foreign Defendants do not know who is suing them in the first place.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig*. does not address this question and therefore is inapposite.

Finally, Plaintiffs assert that any defect in service does not warrant dismissal because the service on Foreign Defendants was in "substantial compliance" with Federal Rule of Civil Procedure 4.  (Dkt. No. 580-3 at 12.)  The Court disagrees.  "So long as a party receives sufficient notice of the complaint, Rule 4 is to be 'liberally construed' to uphold service.  However, 'neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without substantial compliance with Rule 4.'"  *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009) (internal citations omitted).  As discussed, *supra*, service of the Amended Master Complaint alone is not a complete pleading as required by Rule 4(c)(1).  *See* Fed. R. Civ. P. 4(c)(1) ("A summons must be served with a copy of the complaint.").  Indeed, the Amended Master Complaint fails to identify any plaintiff, which fundamentally impedes Defendants' ability to respond and raise objections.  So, substantial compliance with Rule 4 has not been achieved here.

When a plaintiff has not met his burden to show service of process, the Court retains discretion to either dismiss the action or quash service and permit the plaintiff to re-serve the defendant.  *See Stevens v. Sec. Pac. Nat. Bank*, 538 F.2d 1387, 1389 (9th Cir. 1976) ("The choice between dismissal and quashing service of process is in the district court's discretion."); *see also Manalastas v. Joie de Vivre Kabuki*, LLC, No. 23-CV-03957-HSG, 2024 WL 390042, at *1 (N.D. Cal. Jan. 31, 2024) ("If the plaintiff is unable to satisfy this burden, the Court has the discretion

1    either to dismiss the action or to allow it to remain on file but quash the service of process.").

2        The Court, in its discretion, dismisses the claims against Foreign Defendants.  If Plaintiffs

3    wish to proceed against them, then by October 16, 2025, they shall file a motion for leave to

4    amend that identifies the states in which they must make a *prima facie* showing of personal

5    jurisdiction.  Further, the motion shall set forth Plaintiffs' arguments as to why the Amended

6    Master Complaint establishes personal jurisdiction over the Foreign Defendants.  Foreign

7    Defendants may file a response by October 30, 2025.  The Court will take the matter of leave to

8    amend under submission at that time.

9                                    **CONCLUSION**

10       For the reasons stated above, the Court enters the following rulings:

11   • Nestlé USA's motion to dismiss for lack of personal jurisdiction is **GRANTED.**  This

12      is the second round of personal jurisdiction motions.  Prior to adding the new Nestlé

13      and Danone entities as defendants, Plaintiffs were aware of their burden to show

14      personal jurisdiction and the Court's prior rulings.  Since Plaintiffs' opposition does

15      not suggest jurisdictional discovery or further amendment would be fruitful, the Court

16      **DENIES** the request for jurisdictional discovery, and the grant of the motion to dismiss

17      is without leave to amend.

18   • Nestlé USA's motion to dismiss for failure to state a claim is taken under submission.

19      The Court will issue an order on this motion once the parties complete supplemental

20      briefing, as ordered by the Court during the September 18, 2025 hearing.

21   • Danone North America's motion to dismiss for failure to state a claim is **GRANTED**.

22      As further amendment would be futile, the dismissal is without leave to amend.

23   • The Campbell's Company's motion to dismiss for failure to state a claim is **DENIED**.

24   • Sun-Maid Growers of California's motion to dismiss for failure to state a claim is

25      **GRANTED**.  As further amendment would be futile, the dismissal is without leave to

26      amend.

27   • Defendants Nestlé Enterprises S.A.'s and Société des Produits Nestlé S.A.'s motions to

28      dismiss are **GRANTED**.

United States District Court
Northern District of California

- Danone Nutricia Nederland BV's motion to dismiss is **DENIED AS MOOT**.

No further amendment to the Master Complaint is permitted without leave of court. Should Plaintiffs choose to file a motion for leave to amend the Master Complaint to allege claims against Nestlé Enterprises S.A. and Société des Produits Nestlé S.A., they must do so by October 16, 2025.  Defendants may respond to that motion by October 30, 2025.

This Order disposes of Docket Nos. 511, 513, 514, 523, 542, 543, and 544.

**IT IS SO ORDERED.**

Dated: October 29, 2025

JACQUELINE SCOTT CORLEY
United States District Judge