WHITE & CASE LLP
Bryan A. Merryman (SBN 134357)
bmerryman@whitecase.com
555 S. Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329

WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli (Admitted *Pro Hac Vice*)
jpetrosinelli@wc.com
Neelum J. Wadhwani (SBN 247948)
nwadhwani@wc.com
680 Maine Avenue S.W.
Washington, D.C.  20024
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

Attorneys for Defendant
GERBER PRODUCTS COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 24-md-3101-JSC<br><br>MDL 3101<br><br>Hon. Jacqueline Scott Corley<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF JOINT MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS RACHAEL JONES AND PRISCILLA BARR**<br><br>**Date**: December 8, 2025<br>**Time**: 9:00 a.m. PT<br>**Location**: Courtroom 8<br>                   19th Floor<br>                   450 Golden Gate Ave.<br>                   San Francisco, CA 94102 |

# TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................................... 1

II.     ARGUMENT ................................................................................................................. 2

      A.      Ms. Barr's and Dr. Jones' Opinions Are Inadmissible Because Plaintiffs'
            Counsel's Hypothetical Consumption Patterns Do Not Reflect "Realistic"
            Exposure Levels from Defendants' Products. ....................................................... 2

      B.      Ms. Barr's and Dr. Jones' Blind Reliance on Black-Box Inputs and
            Assumptions Provided By Plaintiffs' Counsel Does Not Reflect the
            Intellectual Rigor of Experts in Their Fields. ...................................................... 5

      C.      Dr. Jones' Unquestioning Reliance on Cherry-Picked Inputs, Assumptions,
            and Data from Plaintiffs' Counsel Renders Her Opinions Unreliable. ............... 11

      D.      Dr. Jones' Unthinking Reliance on Attorney-Dictated Assumptions Led to
            Numerous Errors and Real-World Contradictions that Render Her Opinions
            Unreliable. ........................................................................................................... 13

III.    CONCLUSION ............................................................................................................ 15

1

# TABLE OF AUTHORITIES

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) ......................................................................... 5

*GPNE v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................................ 8

*Hardeman v. Monsanto*,
    997 F.3d 941 (9th Cir. 2021) ............................................................... 2, 12, 15

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................................ 11

*In re Roundup Prod. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............................................................. 4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................... 7, 11

*Miguel v. Salesforce.com. Inc.*,
    2024 WL 1221934 (N.D. Cal. Mar. 20, 2024) ...................................................... 6

*Rearden LLC v. Walt Disney Co.*,
    2021 WL 6882227 (N.D. Cal. July 12, 2021) ...................................................... 11

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
    2003 WL 27366224 (C.D. Cal. Jan. 6, 2003) ...................................................... 6

*United States v. Gomez*,
    725 F.3d 1121 (9th Cir. 2013) ..................................................................... 7

*Waymo LLC v. Uber Technologies, Inc.*,
    2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ...................................................... 11

## I.     INTRODUCTION

Plaintiffs' Opposition puts a spotlight on the many methodological flaws underlying Ms. Barr's and Dr. Jones' proposed opinions and confirms that both experts should be excluded in their entirety under Rule 702.

There is much in Defendants' Motion that Plaintiffs do *not* dispute.  Plaintiffs do not dispute, for example, that unknown attorneys for Plaintiffs were wholly responsible for devising the seven Defendant-specific hypothetical consumption patterns on which Ms. Barr's and Dr. Jones' opinions are based.  They do not dispute that Ms. Barr and Dr. Jones ceded to attorneys all decisions about what products, quantities, durations, and consumption years to include on those hypothetical menus, and that Ms. Barr and Dr. Jones know nothing about how those decisions were made or whether those decisions were based on any scientific data or methodology.  They do not dispute that Ms. Barr and Dr. Jones did not test those assumptions against known science or probe the bases of the decisions reflected in the hypothetical menus.   They do not dispute that the hypothetical consumption patterns reflect cherry-picking by Plaintiffs' counsel—in terms of product selection, quantities, and years of consumption—to try to maximize estimated lead and arsenic levels from consuming Defendants' products.  Indeed, Plaintiffs open their Opposition by citing a single outlier test result for Nurture's Blueberry & Purple Carrot Yogis, which the hypothetical child following Plaintiffs' counsel's Nurture consumption pattern is assumed to eat every single day for *29 months*—confirming their biased selection process. Opp. at 1.  Finally, Plaintiffs do not dispute that the hypothetical menus do not reflect the consumption patterns of any plaintiff in this MDL, or indeed, any child in the United States.  To the contrary, Plaintiffs confirm that the hypothetical menus—and the lead and arsenic exposure estimates flowing therefrom—are intended only to show exposures that are theoretically "possible."  *Id.* at 27.

According to Plaintiffs, none of this matters under Rule 702.  By Plaintiffs' account, there is nothing improper about attorneys providing experts with virtually every substantive input and assumption that goes into their opinions and having those experts rely on those inputs and assumptions without question or independent thought.  Plaintiffs also contend that they were under

1

no obligation to show that any child, anywhere, has ever consumed or will consume Defendants' products in a manner akin to the hypothetical consumption patterns. Instead, Plaintiffs claim that Ninth Circuit law gives them license to model the highest exposures to Defendants' products at issue in the MDL, even if doing so requires outright cherry-picking, so long as the hypothetical consumption patterns are conceivably, physically "possible."

Plaintiffs are wrong at every turn. Rule 702 does not permit experts to abdicate their independent judgment and hand over the reins to non-scientists to make the substantive decisions for them—particularly where, as here, the attorney-dictated assumptions run counter to accepted scientific knowledge, real-world data, and the experts' own experience in their fields. Nor can Plaintiffs establish general causation by relying on an exposure level that is theoretically "possible" based on cherry-picked data, but unsupported by reliable, real-world evidence. Instead, Plaintiffs are required to show that the exposure estimates generated from their hypothetical consumption patterns reflect lead and arsenic levels that children "*realistically* may have experienced" from consuming Defendants' baby foods. *Hardeman v. Monsanto,* 997 F.3d 941, 963 (9th Cir. 2021). Plaintiffs come nowhere close to making that showing. Far from being "realistic," the consumption patterns concocted by Plaintiffs' counsel—which assume, among other things, that a child consumes the exact same foods, in the exact same quantities, with the exact same average or maximum lead and arsenic levels day after day for months or years at a time—are a physical impossibility.

For these reasons and more, Ms. Barr's and Dr. Jones' opinions should be excluded.

## II.    ARGUMENT

### A.    Ms. Barr's and Dr. Jones' Opinions Are Inadmissible Because Plaintiffs' Counsel's Hypothetical Consumption Patterns Do Not Reflect "Realistic" Exposure Levels from Defendants' Products.

Under *Hardeman v. Monsanto Co.*, Plaintiffs can establish general causation only if they provide reliable expert testimony that consumption of Defendants' baby food products "can cause [autism or ADHD] at exposure levels people *realistically* may have experienced." 997 F.3d at 963 (emphasis added). Plaintiffs argue that the hypothetical consumption patterns Plaintiffs' counsel devised and instructed their experts to implement reflect "realistic" exposure levels to arsenic and

lead from consuming Defendants' baby food products.  *See* Opp. at 28.  But what Plaintiffs (and Ms. Barr) mean by "realistic" is that, according to them, it is theoretically ***possible*** for a single child, somewhere, to follow the consumption patterns Plaintiffs' counsel came up with.  *Id.* at 26-27. Plaintiffs expressly concede this: in their words, "these hypothetical menus are not meant to represent a *typical* exposure; they are meant to reflect a *possible* one."  (Pls.' Mot. to Exclude Drs. Scrafford & Gibbons at 13 (Dkt. 616); *see also* Ex. 39, Barr Vol. I Tr. 123:25-124:8 ("[I]t was just about being nutritionally plausible. So that's – *could a child consume this, like any child*." (emphasis added)); *id.* at 145:25-147:3.)[1]  But "possible" is not the standard under Ninth Circuit law; Plaintiffs must present admissible evidence of ***realistic*** human exposures.  They have not done so.

As an initial matter, neither Dr. Jones nor Ms. Barr made any attempt to determine—and therefore cannot say—whether Plaintiffs' counsel's consumption patterns remotely resemble a realistic, real-world exposure scenario.  They have not attempted to model the consumption patterns of any plaintiff in this MDL, or indeed, of any child in the United States.  (Ex. 39, Barr Vol. I Tr. 154:18-155:6, 333:12-19, 334:4-12; Ex. 41, Jones Vol. I Tr. 73:13-23, 74:1-8.)  Plaintiffs brush aside this abdication of expert responsibility and vast analytical gap by accusing Defendants of trying to fast-forward to the type of Plaintiff-specific exposure analysis that would take place at a specific causation stage.  Opp. at 28-29.  That is incorrect.  Defendants are not suggesting that Plaintiffs' experts needed to precisely model any individual plaintiff's consumption.  Rather, the short-form complaints were one potential source of data that could have provided at least *some* real-world (alleged) evidence of what a realistic extended consumption pattern for Defendants' products would be.  Those complaints, along with published government health agency data on dietary patterns and other evidence (such as market share data for Defendants' individual products), would have at least provided some methodology beyond lawyer and expert *ipse dixit*.  Yet Ms. Barr did not review this information, opting instead to blindly rely on consumption patterns selected by lawyers, without any apparent reference to real-world human experience.

Beyond that fundamental Rule 702 problem, the hypothetical consumption patterns

---

[1] Documents cited as "Ex." refer to the exhibits attached to the Declaration of Livia M. Kiser in Support of Defendants' Motion to Exclude Plaintiffs' General Causation Experts (Dkt. 611-1).

1    Plaintiffs' counsel devised are, in fact, not even *possible*, let alone realistic. No child in the real

2    world would or could consume the exact same products, in the exact same quantities, with the exact

3    same average levels of lead and arsenic every single day for months or years at a time. Plaintiffs

4    attempt to sidestep this problem by claiming that the hypothetical menus allow for some

5    "variability" for certain Defendants and certain products, and that Ms. Barr and Dr. Jones did not

6    understand the menus to require identical day-to-day consumption. Opp. at 29. But Plaintiffs ignore

7    the obvious flaw in that lawyer argument: Dr. Jones confirmed that her exposure calculations were

8    based on that exact understanding. (*See, e.g.*, Ex. 41, Jones Vol. I Tr. 391:1-11 [Q. Would you agree

9    that your exposure calculations for Nurture are based on a hypothetical child eating blueberry and

10   purple carrot Yogis every day from age 7 months to 3 years? A. Yes.]; *see also* Defs.' Opp. to Pls.'

11   Mot. to Exclude Drs. Scrafford & Gibbons, at 14-15 (Dkt. 638) (explaining that Dr. Jones' exposure

12   calculations allow for no day-to-day variability in the hypothetical child's dietary intake and

13   resulting lead and arsenic exposure).) The consumption patterns (and accompanying lead and

14   arsenic exposures) dictated to these experts are the opposite of anything realistic—they could not

15   happen. On that basis alone, the experts' opinions based on those patterns are inadmissible.

16         Plaintiffs' repeated invocation of the *Roundup* district court's reference to "the highest dose

17   people might plausibly experience" does not help them. *E.g.*, Opp. at 28 ("[H]ypothetical exposures

18   [*sic*] levels are sufficiently 'realistic' for general causation purposes if they are within 'the highest

19   dose people might plausibly experience.'" (quoting *In re Roundup Prod. Liab. Litig.*, 390 F. Supp.

20   3d 1102, 1113 (N.D. Cal. 2018)). For one, the Ninth Circuit did not adopt the district court's

21   "highest plausible dose" formulation or endorse the example of a plaintiff who "applie[s] Roundup

22   without using protective equipment several times per week, many hours per day, for decades." *Id.*

23   But even if that were the governing standard, Dr. Jones' exposure estimates still fail to reflect levels

24   of lead or arsenic that children could "plausibly" experience from consuming Defendants' baby

25   foods. It is simply not plausible—indeed, it is *impossible*—for a child to consume the same baby

26   food products, containing the same levels of lead or arsenic, in the same amounts, day after day for

27   months or years at a time, starting as early as four to six months old.

28         Nor is it enough for Plaintiffs to say that Ms. Barr considered some sources of real-world

4

consumption data in assessing whether the menus were plausible. Opp. at 30-33. As Ms. Barr conceded, she has seen no real-world evidence of any child consuming baby food in a manner consistent with these hypothetical consumption patterns. (*See, e.g.*, Ex. 40, Barr Tr. Vol II 493:18-495:12.) And the data on which Ms. Barr relied do not support her conclusion that a child plausibly could. To take just one example, Plaintiffs point out—in response to Defendants' argument that Ms. Barr unreliably deemed certain products "age appropriate" (Mot. at 22-23)—that Ms. Barr relied on certain data showing that "some children" eat infant cereal "through age 2." Opp. at 37. But the study on which Ms. Barr relied was based on surveys that involved only two 24-hour dietary recalls over the course of two non-consecutive days. (Ex. 18, Barr Report at 21-22 (citing Duffy, et al. 2019)). That study does not purport to suggest that any child consumes the exact same number of servings of infant rice cereal *every single day* until age two, which is what Plaintiffs' counsel's menus dictated for Beech-Nut. (*See* Ex. 20, Hypothetical Menus at 1-3 [Beech-Nut].)

Moreover, Plaintiffs themselves admit that it is literally impossible for a child to follow the hypothetical consumption patterns because some of the Defendants' products were not even available for sale throughout Plaintiffs' counsel's chosen consumption periods. Mot. at 22. Plaintiffs' only response is that "that limitation was indicated *on the menus themselves*." Opp. at 37. But how does that help them? The fact that Plaintiffs disclosed the impossibility of their consumption patterns to Ms. Barr and Dr. Jones does not magically make them possible. To the contrary, it merely underscores the Rule 702 problems with Ms. Barr's and Dr. Jones' unquestioning reliance on these lawyer-created consumption patterns.

Because Ms. Barr's "plausibility" opinion and Dr. Jones' resulting exposure estimates are founded on mere possibilities about exposure levels, derived from lawyer-generated assumptions, they do not "fit" the general causation question and should be excluded. *See Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025).

### B.   Ms. Barr's and Dr. Jones' Blind Reliance on Black-Box Inputs and Assumptions Provided By Plaintiffs' Counsel Does Not Reflect the Intellectual Rigor of Experts in Their Fields.

Plaintiffs' Opposition attempts to wave away the significant methodological problems with

DEFENDANTS' REPLY ISO MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS
24-MD-3101-JSC

Ms. Barr's and Dr. Jones' unthinking acceptance of attorney-dictated assumptions (*see* Mot. at 13-23) and to play up the minimal independent work these experts actually did. Those arguments cannot save these experts from exclusion under Rule 702.

**First**, Plaintiffs argue that experts may, under certain circumstances, rely on reasonable facts and assumptions provided to them by counsel. Opp. at 34-35. That unremarkable principle does not help Plaintiffs here. Plaintiffs point to cases where courts have held that a damages expert's reliance on attorney-provided facts and assumptions related to, for example, valuation of an asset may not render the expert's opinion inadmissible under Rule 702. *Id.* at 34. But in none of these cases did an expert accept from lawyers, without verification or testing, *every key input and assumption* that went into the expert's analysis without asking any questions about the bases for those inputs and assumptions or comparing them to accepted science, data, or the expert's real-world experience in the relevant field. *See, e.g.*, *Miguel v. Salesforce.com. Inc.*, 2024 WL 1221934, at *3 (N.D. Cal. Mar. 20, 2024) (observing that damages expert had "verified the numbers" from other experts "upon which he relied"); *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2003 WL 27366224, at *5 & n.9 (C.D. Cal. Jan. 6, 2003) (admitting testimony from an "expert on damages as an accountant" based on conclusion that the expert applied "accepted accounting principles"). As Dr. Jones acknowledged, she has never proceeded in this manner in her thirty-year career as an exposure scientist. (Ex. 41, Jones Vol. I Tr. 115:14-116:14.)

Plaintiffs' cases also do not suggest that experts can ignore obvious flaws in the assumptions provided to them, surrender control over every variable in their analyses to non-scientists, and formulate opinions without exercising any scientific judgment about whether those assumptions make sense in light of known data. But that is exactly what Ms. Barr and Dr. Jones did here. As both experts readily and repeatedly admitted, they did not take *any* steps to test the methods or assumptions underlying Plaintiffs' counsel's hypothetical menus—even when those inputs ran contrary to their real-world experience. (*E.g.*, Ex. 41, Jones Vol. I Tr. 85:6-16, 88:1-23, 112:17-25, 244:21-245:3; Ex. 42, Jones Vol. II Tr. 510:2-11, 517:4-519:5; Ex. 39, Barr Vol. I Tr. 150:9-22, 154:18-155:6, 338:7-339:20.) Dr. Jones, for example, admitted that she "do[esn't] know" how it would "even be possible to eat the same baby foods in the exact same servings every single day"

for months or years.  (Ex. 41, Jones Vol. I Tr. 158:24-159:7.)  Ms. Barr likewise admitted that, based on her real-world "experience working with patients, children don't eat the same exact amount of food every day."  (Ex. 40, Barr Vol. II Tr. 436:16-437:4.)  An expert opinion that contradicts the expert's own experience and beliefs outside the courtroom is not reliable, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)—and that is especially so when the opinion is based on assumptions dictated by lawyers.

Neither Dr. Jones nor Ms. Barr knows *anything* about the methods, scientific or otherwise, that went into Plaintiffs' counsel's preparation of the hypothetical consumption patterns *or* of the heavy-metal testing spreadsheets Plaintiffs' counsel created and directed Dr. Jones to use in calculating her exposure estimates—and yet they relied on them without question.  (*E.g.*, Ex. 40, Barr Vol. II Tr. 498:15-21; Ex. 41, Jones Vol. I Tr. 17:11-15, 19:3-8, 70:12-17, 106:16-23.)  Although Federal Rule of Civil Procedure 26 allows experts to receive reasonable assumptions from counsel, Federal Rule of Evidence 702 prohibits expert opinions that are unreliable.  Expert opinions that are based on wholesale adoption of unknown, unrealistic, and untested methods and analysis provided by lawyers are unreliable.[2]

**Second**, Plaintiffs attempt to downplay the bizarre and unscientific nature of this "hypothetical consumption pattern" exercise by analogizing the process to what would happen at the specific causation stage.  *See, e.g.*, Opp. at 43 ("What Dr. Jones did here is not meaningfully different from what Dr. Jones would be asked to do in a specific causation phase."); *id.* at 36 (brushing aside the fact that Ms. Barr had no role in selecting the products or consumption patterns in the hypothetical menus because "that would be the case in any non-bifurcated case, where the products consumed by the child would be dictated by the specific facts of that child's case").  That

---

[2] At other points, Plaintiffs outright mischaracterize the cases on which they rely.  For example, Plaintiffs cite *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013) for the proposition that there is "no [] problem" with an expert's opinion based on "materials provided to them" if the "expert is applying his training and experience to the sources before him and reaching his own judgment."  Opp. at 43.  Incredibly, Plaintiffs omitted the portion of that quote making clear that the court in *Gomez* was considering whether there was a "***Crawford*** problem" when an expert witness in a criminal trial relies on "testimonial hearsay."  *Gomez*, 725 F.3d at 1129.  Rule 702 is not mentioned once in *Gomez*.

1  comparison does not hold water.  Generating exposure estimates based on hypothetical consumption

2  patterns concocted by Plaintiffs' counsel and cherry-picked to maximize heavy-metal levels is in no

3  way analogous to calculating an estimated level of exposure based on allegations about what an

4  individual Plaintiff actually ate.

5      Because the exposure inputs in a specific-causation case will come "directly from the

6  Plaintiff (or their parent)," *id*. at 43, Defendants would have the opportunity to cross-examine the

7  person alleging that consumption pattern, probe the bases of their allegations, and test the credibility

8  of their claims.  That is why cases like *Roundup* and others that Plaintiffs cite allow some room for

9  experts to rely on exposure information furnished by an "interested party," *id*.—when the interested

10  party is a plaintiff or their representative, they cannot hide the facts underlying their alleged

11  exposure.  Here, there is *no one* Defendants can question about the methods that went into creating

12  these hypothetical menus or whether they had any grounding at all in science or real-world

13  exposures.  Plaintiffs' attempt to deflect attention away from this problem by claiming that Dr. Jones

14  described how she ran her calculations, *id.* at 44-45, misses the point.  The problem is not that

15  Defendants do not understand how Dr. Jones' actual math worked; it is that no witness can testify

16  to any factual or scientific basis for the numerous assumptions and inputs that went *into* those

17  calculations.  That is precisely the kind of impenetrable "black box" methodology courts deem

18  unacceptable under Rule 702.  *See, e.g.*, *GPNE v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal.

19  Apr. 16, 2014); Mot. at 16.

20      Moreover, in a specific-causation setting, Dr. Jones would not be able to focus narrowly (and

21  artificially) on potential exposures from Defendants' baby food products while ignoring all other

22  potential sources of lead and arsenic exposure.  *See* Mot. at 11.  Instead, she would have to consider

23  *all* of the possible sources of lead and arsenic to which children are naturally exposed by virtue of

24  living in the world—a task that would necessarily require her to draw on and apply her experience

25  in exposure science.  Here, by contrast, all Dr. Jones did was take the information Plaintiffs' counsel

26  gave her and run basic equations without exercising independent scientific or rational thought.  That

27  is not a scientific methodology.  Plaintiffs' attempt to analogize Dr. Jones' math assignment to

28  specific causation only highlights the many methodological problems with her approach.

***Third***, Plaintiffs cannot transform Dr. Jones' and Ms. Barr's rote efforts into meaningful independent expert work. *See* Opp. at 30-33, 38-42. For Dr. Jones, *all* of the substantive exposure analysis was done for her. Plaintiffs' counsel handed her hypothetical consumption patterns—including specific products, durations and amounts, and consumption years—which she relied on entirely without conducting any independent analysis of a hypothetical child's potential exposures to lead and arsenic through Defendants' baby foods or any other sources. Plaintiffs' counsel also gave her a set of Defendant-specific spreadsheets containing heavy-metal testing data, which provided her with the remaining inputs to use in her calculations. Despite claiming that one step of her methodology was to identify and exclude potential duplicate test results in Defendants' data (Ex. 21, Jones Opening Report at 12), Dr. Jones did not actually do that work when preparing her initial report—instead, she relied on Plaintiffs' counsel to do that for her and did not check their work before running her calculations. As Dr. Jones admitted, she assumed "[t]hat the data provided to [her] had been cleaned and verified for completeness and accuracy" before the spreadsheets were provided to her (Ex. 41, Jones Vol. I Tr. 44:4-45:11), and did not "do anything to check the accuracy of the heavy metal test results that were listed for certain products in the spreadsheets" against the Bates-stamped test results produced by Defendants (*id.* at 19:3-8).

All that was left for Dr. Jones to do was run the numbers using the information Plaintiffs' counsel had given her. Her method for doing so was basic arithmetic: for each product on the hypothetical menus, she simply calculated the average level of lead or arsenic. If Dr. Jones had four lead or arsenic test results for a given product, she added up the four results and divided by four. She did the same with every product on the hypothetical menus, weighted the averages for each product based on how much of the product Plaintiffs' counsel directed would be consumed, and added the numbers up to arrive at an "average daily intake" of lead and arsenic from the menu. (*Id.* at 118:8-119:16, 120:6-121:12.) For lead, she then took those estimates, typed them into the EPA's publicly available IEUBK model, zeroed out all other lead exposure sources built into the model,

1    and hit "enter" to get her estimated blood lead levels for each Defendant and each age range.[3]

2        Ms. Barr's work was similarly limited.  Despite the fact that Ms. Barr is registered dietician,

3    she did not create the hypothetical menus and did not propose specific products, quantities, or

4    consumption time periods to include.  (Ex. 39, Barr Vol. I Tr. 109:21-111:10, 114:2-24, 116:5-

5    117:22.)  Particularly given the nature of Ms. Barr's claimed expertise and the task assigned to her,

6    one would have assumed that Ms. Barr would be the one to create the consumption patterns—not

7    an unidentified attorney with no known education, expertise, or experience with infant nutrition.

8    The fact that Ms. Barr accepted this arrangement (and the many unrealistic assumptions baked into

9    the menus) without asking any questions underscores the Rule 702 problems with her approach.[4]

10        ***Finally,*** Plaintiffs simply ignore Dr. Jones' and Ms. Barr's testimony making clear that the

11    work they conducted for this MDL bears no resemblance to their work outside the courtroom.  *See*

12    Mot. at 15-16.  Although Plaintiffs claim that Dr. Jones' professional work has included conducting

13    exposure assessments "directed at exposures that would occur based on a set of hypothetical

14    conditions" (Opp. at 42-43), they omit the key qualifier in Dr. Jones' testimony: in professional

15    exposure assessments where Dr. Jones has relied on assumptions provided to her by others, those

16    assumptions were provided by *scientists*—not unknown individuals working for law firms (Ex. 41,

17    Jones Vol. I Tr. 115:14-116:14).  Likewise, while Plaintiffs attempt to portray Ms. Barr's assessment

18    of the hypothetical menus as similar to her professional work, they fail to acknowledge Ms. Barr's

---

20    [3] Plaintiffs claim that Defendants "do not attack the reliability of [Dr. Jones'] methods used to
21    calculate exposures."  Opp. at 42.  To be clear, there are significant issues Dr. Jones' methods for
    calculating exposure estimates.  These include, to name just two, (1) Dr. Jones' calculation of a
22    "mean" daily intake level for every product on the hypothetical menus regardless of the dataset she
    had for a particular product and whether that dataset included extreme outliers that skewed the
23    mean dramatically upward (*see* Ex. 41, Jones Vol. I Tr. 144:19-146:11); and (2) her use of the IEUBK
    model to generate BLLs based *only* on hypothetical lead exposure from Defendants' baby food
24    while ignoring all other lead exposure sources built into that model.  As Dr. Jones admitted, the
    IEUBK model is "[m]ost commonly … applied to multiple routes of exposure, not just diet."  (*Id.*
25    at 299:10-300:14.)  Dr. Jones could not recall *ever* reviewing a publication in which the IEUBK
    model was used to "zero[] out" the lead exposures "for everything but the diet component and then
26    trying to estimate the blood lead levels for a narrow set of food products" only.  (*Id.*)
    [4] Plaintiffs similarly assert that "Defendants do not contest the reliability of any of the methodology"
27    they describe for Ms. Barr.  Opp. at 34.  That is incorrect: there are significant issues with the manner
    of Ms. Barr's reliance on NHANES and FITS data and other sources, and with the conclusions she
28    purports to draw from those sources.

DEFENDANTS' REPLY ISO MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS
24-MD-3101-JSC

1  admission that she could not recall ever conducting an exercise where she was asked to bless a

2  wholly hypothetical menu as "plausible."  (Ex. 40, Barr Vol. II Tr. 504:19-508:23.)

3      Because Ms. Barr's and Dr. Jones' unquestioning reliance on attorney-dictated inputs and

4  assumptions does not reflect the "level of intellectual rigor that characterizes the practice" of experts

5  in nutrition or exposure science, their opinions should be excluded.  *Kumho Tire*, 526 U.S. at 152.

### C.   Dr. Jones' Unquestioning Reliance on Cherry-Picked Inputs, Assumptions, and Data from Plaintiffs' Counsel Renders Her Opinions Unreliable.

8      Plaintiffs do not even attempt to dispute that Plaintiffs' counsel cherry-picked particular

9  products and consumption years to include in their hypothetical menus in order to generate the

10 highest possible theoretical exposures to lead and arsenic from Defendants' baby food products.  *See*

11 Mot. at 16-19.[5]  Instead, they appear to assert that the district court's decision in *Roundup* blesses

12 such cherry-picking by permitting Plaintiffs' experts to rely on the "the highest level" "a theoretical

13 plaintiff *might* experience."  Opp. at 24 (emphasis added); *id.* at 43 ("[W]hether the products on the

14 menus are among the most or least contaminated products has absolutely no bearing on the reliability

15 of the opinions offered by Dr. Jones.").  As already explained, however, that decision cannot bear

16 the reading Plaintiffs place on it.  *See supra* at 4.  Even putting that aside, Plaintiffs' Opposition

17 minimizes or completely ignores the ways that Dr. Jones' unquestioning reliance on Plaintiffs'

18 counsel's cherry-picked inputs render her opinions unreliable under Rule 702.

19     It is well-established that an expert's reliance on data and inputs that are cherry-picked to

20 support a particular conclusion merits exclusion under Rule 702.  *See, e.g.*, *In re Bextra & Celebrex*

21 *Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176, 1184 (N.D. Cal. 2007); *Waymo*

22 *LLC v. Uber Technologies, Inc.*, 2017 WL 5148390, at *3-4, *8 (N.D. Cal. Nov. 6, 2017); *Rearden*

23 *LLC v. Walt Disney Co.*, 2021 WL 6882227, at *7 (N.D. Cal. July 12, 2021).  Thus, if either Ms.

24 Barr or Dr. Jones had crafted the hypothetical menus and deliberately selected products and

---

[5] Nor could they, as their Opposition makes clear.  The opening paragraph of Plaintiffs' Opposition highlights a single outlier Nurture test result for Blueberry and Purple Carrot Yogis that tested for 641 ppb of lead.  Opp. at 1.  It is no coincidence that Blueberry & Purple Carrot Yogis are one of the *most consistently consumed foods* on Plaintiffs' counsel's hypothetical menus, with the hypothetical child alleged to have consumed multiple servings of this product every single day between the ages of 7 months and 3 years.  (Ex. 20, Hypothetical Menus at 14 [Nurture].)

consumption years in an artificial manner so as to skew the exposure estimates higher, that would be an unreliable methodology under Rule 702. Plaintiffs appear to contend that because Plaintiffs' counsel did the cherry-picking instead of Dr. Jones, this body of case law does not apply. By Plaintiffs' account, as long as Dr. Jones did not *further* cherry-pick data on top of the already gerrymandered inputs and assumptions Plaintiffs' counsel provided her, there can be no concern about the reliability of her methods under Rule 702. Opp. at 44. Plaintiffs cite no case law for this extraordinary proposition, which would create a gaping loophole for unreliable expert testimony under Rule 702. It cannot be the case that Plaintiffs' counsel can insulate expert opinions based on plainly biased and unreliable methods by applying those flawed methods themselves and then directing their experts to rely on the outputs without question.

Moreover, Dr. Jones' total failure to consider whether the hypothetical consumption patterns reflected cherry-picking by Plaintiffs' counsel further illustrates the unreliability of her methods. Once again, the key "dose" question for general causation is whether exposure to lead and arsenic in Defendants' baby food products at ***realistic***, human-relevant exposure levels is capable of causing autism or ADHD. *Hardeman*, 997 F.3d at 963. Here, there are numerous decisions and assumptions baked into Plaintiffs' counsel's hypothetical menus that affected whether Dr. Jones' estimates based on those menus reflect realistic exposure level. Those include, among others, the small fraction (25%) of Defendants' products Plaintiffs' counsel selected from the 600+ products identified in Appendix A to the Master Complaint, as well as the particular years of heavy-metal testing data Plaintiffs' counsel directed Dr. Jones to use for each Defendant (which were inexplicably different for different Defendants, and presumably designed to capture higher test results and exclude lower ones). Despite having access to all the data she would have needed to assess whether those decisions were scientifically sound or instead suggested unrealistic bias, Dr. Jones did not even attempt to do so. *See* Mot. at 16-19. She did not, for example, review heavy-metal testing data for any of Defendants' products other than those chosen by Plaintiffs' counsel to determine if Plaintiffs' counsel had deliberately picked products with higher heavy-metal test results. (Ex. 41, Jones Vol. I Tr. 77:14-78:4.) And she did not even pause to consider why the hypothetical menus were weighted so heavily towards particular product categories, like infant rice cereal, that contain

12

1    ingredients Dr. Jones knows tend to have higher levels of arsenic—even after defense expert Dr.

2    Scrafford pointed this out.  (*Id.* at 85:6-86:12, 86:21-87:8.)

3        As to the products that Plaintiffs' counsel *did* choose to include on the hypothetical menus,

4    Dr. Jones did not check whether the Defendant-specific consumption years selected by Plaintiffs'

5    counsel reflected bias that would render her estimates unrealistic—even when faced with extreme

6    outlier results for particular products (as for Plum, *see* Mot. at 17-18), or with a dataset that included

7    barely any finished-product testing for the years selected by Plaintiffs' counsel (as for Hain, *see id.*

8    at 17).  Not even the fact that Plaintiffs' counsel deliberately included certain Defendants' products

9    that were not available for sale during Plaintiffs' counsel's chosen consumption periods was enough

10   to make Dr. Jones stop and question the methods underlying the hypothetical menus.   This

11   unquestioning and uncritical reliance on the inputs and assumptions from Plaintiffs' counsel made

12   it impossible for Dr. Jones to know whether her exposure estimates reflect "realistic," real-world

13   levels of exposure to lead and arsenic from Defendants' baby foods or if they are instead the skewed

14   results of a biased sample set.  That is not a reliable methodology under Rule 702.

15
16       **D.    Dr. Jones' Unthinking Reliance on Attorney-Dictated Assumptions Led to
             Numerous Errors and Real-World Contradictions that Render Her Opinions
             Unreliable.**

17       Plaintiffs do not deny that Dr. Jones made numerous errors in her original exposure

18   calculations or that many of her estimated BLLs from baby food *alone* are dramatically higher than

19   the BLLs (reflecting all lead exposure sources) for the 97.5th percentile of U.S. children.  Instead,

20   they claim that these errors and inconsistencies with real-world data do not matter under Rule 702.

21   Opp. at 45-49.  Plaintiffs' arguments rest on a dramatic mischaracterization of the nature of Dr.

22   Jones' errors and the underlying methodological flaws those errors reveal.

23       Plaintiffs claim that Defendants' Rule 702 challenge regarding the many errors in Dr. Jones'

24   opening report are based on mere "data input errors" and the fact that "[s]ome of the calculations in

25   Dr. Jones' original report were incorrect."  *Id*. at 47.  That is an extreme understatement.  "Some"

26   of Dr. Jones' original estimates were not incorrect—***94%*** of her estimates were wrong.  Mot. at 12.

27   A massive error rate like this one is an important indicator of an unreliable methodology under

28

DEFENDANTS' REPLY ISO MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS
24-MD-3101-JSC

1    *Daubert*.  *See* 509 U.S. 579, 594 (1993).

2           Moreover, Defendants' core methodological challenge is not over the *number* of mistakes

3    Dr. Jones made—it is based on the underlying reasons for those mistakes.  Dr. Jones' calculations

4    were riddled with a huge number of errors because she did not do her own work.  By her own

5    admission, Dr. Jones relied on the spreadsheets Plaintiffs' counsel gave her without "do[ing]

6    anything to check the accuracy of the heavy metal test results that were listed for certain products

7    in the spreadsheets" (Ex. 41, Jones Vol. I Tr. 19:3-8), or confirming that the data in those

8    spreadsheets had been sufficiently "cleaned and verified for completeness and accuracy" before the

9    spreadsheets were provided to her (*id.* at 44:4-45:11).  Because of that blind reliance, Dr. Jones did

10   not know (until Dr. Scrafford pointed it out) that those spreadsheets contained numerous errors that

11   affected her calculations.  Indeed, when Dr. Jones went back to revise her estimates after reviewing

12   Dr. Scrafford's report and checked the spreadsheets for the first time, she identified ***thousands*** of

13   erroneously included test results.  Mot. at 12; *see also* Ex. 42, Jones Vol. II Tr. at 645:9-647:7.

14   These are not ordinary, occasional errors from working with a large dataset—they are the product

15   of an unscientific approach where the purported expert blindly defers to Plaintiffs' counsel.

16          Plaintiffs also claim—somewhat incredibly—that Dr. Jones' attempts to correct these data-

17   entry errors "did not meaningfully impact the results" of her calculations.  Opp. at 48.  In fact, many

18   of Dr. Jones' estimates changed by a dramatic degree.  For Hain alone, Dr. Jones' original estimated

19   mean BLL from Hain menu products for ages 6 months to < 1 year dropped by nearly *half*, from her

20   original estimate of 6.1 micrograms per deciliter (ug/dL) to her modified estimate of 3.2 ug/dL. (Ex.

21   23, Jones Rebuttal Report at 29.)  And her maximum daily arsenic intake level from the Hain menu

22   for ages 1 year to < 2 years plummeted by nearly 90%, from 415 ug/day to 52.2 ug/day.  (*Id.*)  It

23   strains credulity to argue that changes of this magnitude are not "meaningful."

24          The fact that Dr. Jones did not identify any of these glaring errors until Dr. Scrafford pointed

25   them out underscores yet another methodological problem: she did not test her results against known

26   scientific data.  For example, despite the fact that Dr. Jones knows that 97.5% of U.S. children have

27   BLLs below 3.2 ug/day, and despite recognizing that her estimated BLLs for Hain were noticeably

28   "higher than other defendants," she did not think to question the accuracy of her estimated 6.1 ug/day

14

1    BLL for Hain—she simply assumed it was correct because "of the data that had been provided to

2    [her] by Plaintiffs and because of [her] methodology." (Ex. 42, Jones Vol. II Tr. 615:13-616:7.)

3    Similarly, Dr. Jones' original calculations included a maximum daily arsenic intake level of *1,345*

4    *ppb* for Hain's Banana Blueberry Baby Food Puree. In her revised estimates, that dropped nearly

5    *ten times* to 145 ppb. Even seeing this massively high result did not cause Dr. Jones to pause. As

6    she explained, even though "[t]his [result] was unexpectedly high, … I understood that the data

7    [from Plaintiffs' counsel] was complete and accurate, and so I used – reported those results." (*Id.*

8    at 611:5-612:23.) But that is exactly the problem. Defendants are not claiming that Dr. Jones'

9    opinions should be excluded because she made "some" mistakes. It is Dr. Jones' blind reliance on

10   Plaintiffs' counsel to do her work for her—and her total failure to ask any questions even when

11   those inputs led to obviously unrealistic results—that renders her opinions inadmissible.

12        Plaintiffs respond by claiming that there was no reason for Dr. Jones to "second guess" her

13   extremely high estimates for some Defendants or to give any thought as to how those estimates

14   compared to real-world data on BLLs because "[t]he fact that Defendants' baby foods lead to very

15   high BLLs is the entire point of the lawsuit." Opp. at 45. The obvious flaw with that argument is

16   that many of Dr. Jones' original estimated BLLs were *wrong*, and by a large degree. In any event,

17   it is no answer to say that Dr. Jones was permitted to ignore real-world scientific data in deference

18   to unproven allegations made by Plaintiffs in this litigation.

19        As Plaintiffs point out, Ninth Circuit law requires courts to differentiate between "faulty

20   methodology or theory as opposed to imperfect execution of laboratory techniques." Opp. at 47

21   (quoting *Hardeman*, 997 F.3d at 962). Dr. Jones' error-riddled original estimates—and each round

22   of revised calculations she has issued since—are the product of a fundamentally "faulty

23   methodology." *Id.* That methodology involved blindly accepting inputs and assumptions from

24   Plaintiffs' counsel without exercising independent judgment about whether those inputs (and her

25   resulting calculations) were consistent with scientific knowledge—a method Dr. Jones had never

26   before employed in conducting an exposure assessment. That approach does not satisfy Rule 702.

27   **III.    CONCLUSION**

28        The Court should exclude Ms. Barr's and Dr. Jones' opinions in their entirety.

Dated: November 7, 2025

WILLIAMS & CONNOLLY LLP

By: /s/ *Neelum J. Wadhwani*
Joseph G. Petrosinelli (*pro hac vice*)
Neelum J. Wadhwani

WHITE & CASE LLP

By: /s/ *Bryan Merryman*
Bryan A. Merryman

*Attorneys for Defendant Gerber Products Company*

Dated: November 7, 2025

KING & SPALDING LLP

By: /s/ *Livia M. Kiser*
Livia M. Kiser
Michael Anthony Lombardo
Todd P. Davis (*pro hac vice*)

*Attorneys for Defendants Beech-Nut Nutrition Company and Walmart Inc.*

Dated: November 7, 2025

DLA PIPER LLP (US)

By: /s/ *Brooke Killian Kim*
Brooke Killian Kim
Mary Gately (*pro hac vice*)
Loren H. Brown (*pro hac vice*)

*Attorneys for Defendant Nurture, LLC*

Dated: November 7, 2025

COVINGTON & BURLING LLP

By: /s/ *Michael X. Imbroscio*
Michael X. Imbroscio (*pro hac vice*)
Phyllis A. Jones (*pro hac vice*)
David N. Sneed (*pro hac vice*)
Elizabeth T. Fouhey (*pro hac vice*)

*Attorneys for Defendant The Hain Celestial Group, Inc.*

1   Dated: November 7, 2025              GORDON REES SCULLY MANSUKHANI, LLP

2                                        By: /s/ Michael R. Klatt
3                                        Michael R. Klatt (pro hac vice)
                                         Nancy Mae Erfle (pro hac vice)
4
                                         Attorneys for Defendant Sprout Foods, Inc.
5
6   Dated: November 7, 2025              DECHERT LLP

7                                        By: /s/ Hope S. Freiwald
                                         Hope S. Freiwald (pro hac vice)
8                                        Michelle H. Yeary (pro hac vice)

9                                        Attorneys for Defendant Plum, PBC

10  Dated: November 7, 2025              COZEN O'CONNOR

11                                       By: /s/ Peter Michael Ryan
12                                       Peter Michael Ryan (pro hac vice)
                                         Joan M. Taylor (pro hac vice)
13                                       Brett Nicole Taylor

14                                       Attorneys for Defendant The Campbell's Company

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' REPLY ISO MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS
24-MD-3101-JSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I certify that on November 7, 2025, I electronically filed the foregoing DEFENDANTS' REPLY BRIEF IN SUPPORT OF JOINT MOTION TO EXCLUDE PLAINTIFFS' EXPOSURE EXPERTS RACHAEL JONES AND PRISCILLA BARR using the ECF system, which sent notification of such filing to all counsel of record.

*/s/ Neelum J. Wadhwani*
Neelum J. Wadhwani